UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CENTRAL RAILROAD, INC.,
Plaintiff,

v.

SPRINGFIELD TERMINAL RAILWAY
COMPANY and BOSTON AND MAINE
CORPORATION,
Defendants

Civil Action No.: 04-30235-MAP

FILING FEE PAID:
RECEIPT # 305790
AMOUNT $ 150.00
BY DPTY CLK ___
DATE 12/3/04

## COMPLAINT AND JURY DEMAND

1.   Plaintiff New England Central Railroad, Inc. ("NECR") is a Delaware corporation with a principal place of business located at 2 Federal Street, Suite 201, St. Albans, VT.

2.   Defendant Springfield Terminal Railway Company ("STRC") is a Vermont corporation with a usual place of business located at Iron Horse Park, Billerica, MA.

3.   Defendant Boston and Maine Corporation ("B&M") is a Massachusetts corporation with a usual place of business located at Iron Horse Park, Billerica, MA.

### JURISDICTION AND VENUE

4.   The plaintiff hereby repeats and realleges its allegations set forth in ¶ 1 through 3 above as if expressly set forth herein.

5.   This Court has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a), in that:

   (a)   the plaintiff and all of the defendants reside in different states; and

(b) the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

6. Venue for this action is predicated upon 28 U.S.C. §1391(a) and (c), and Local Rule 40.1.

## FACTUAL BACKGROUND

7. The NECR repeats and realleges its allegations set forth in ¶ 1 through 6 above as if expressly set forth herein.

8. In 1988, the National Railroad Passenger Corporation ("AMTRAK") purchased from the B&M a section of railroad track located between about Brattleboro, VT and Windsor, VT known as the "Connecticut River Line."

9. AMTRAK immediately thereafter conveyed the Connecticut River Line to the Central Vermont Railway, Inc. ("CV").

10. The CV was the NECR's predecessor. In 1994, the NECR purchased the CV's assets, including the tracks which are the subject of this Complaint.

11. As part of the conveyance of the Connecticut River Line from the B&M to AMTRAK and then to the CV, the CV was required by the Interstate Commerce Commission ("ICC") to grant back to the B&M certain rights (known as "trackage rights") to operate its freight trains over the CV's tracks between East Northfield, MA and White River Junction, VT.

12. Initially, the parties operated under a temporary "Interim Agreement" regarding the B&M's trackage rights.

13. On May 18, 1989, the CV petitioned the ICC to impose permanent terms and conditions for the B&M's trackage rights over a 48.8-mile segment of the Connecticut River Line as well as certain CV track segments at both ends of the Connecticut River Line.

14. On February 6, 1990, the ICC imposed a modified *Trackage Rights Agreement* (the "*Agreement*") governing the terms and conditions of the B&M's use of the CV's (now NECR's) main-line track between East Northfield, MA and White River Junction, VT. A copy of the *Agreement* imposed by the ICC is attached hereto as Exhibit "A" and is made a part hereof and specifically incorporated herein by this reference.

15. The *Agreement* is still in effect and currently governs the rights, responsibilities and obligations of the NECR, the B&M and/or STRC with respect to the operation of trains over the NECR's main-line track between East Northfield, MA and White River Junction, VT.

16. The B&M and/or STRC have been operating trains over the tracks subject to the *Agreement* since 1990.

17. The *Agreement*, at § 7.1 provides as follows:

> "[E]ach party hereto shall be responsible for and shall assume <u>all loss, damage or injury…to persons or property</u>, including the cost of removing any trackage, repairing trackage and correcting environmental damage, which may be caused by its engines, cars, trains or other on-track equipment (including damage by fire originating therefrom) <u>whether or not the condition or arrangement of the trackage contributes in any manner or to any extent to such loss, damage or injury</u>, and whether or not a third party may have caused or contributed to such loss, damage or injury, and for all loss or damage to its engines, cars, trains or other on-track equipment while on said trackage from any cause whatsoever, except in the case of collision, in which event the provisions of Section 7.2 shall apply."

Exh. A (emphasis supplied).

18. According to § 9.7 of the *Agreement*, any reference to "the trains, locomotives, cars or equipment of, or in the account of, one of the parties hereto" means "the trains, locomotives, cars and equipment <u>in the possession of or operated by one of the parties</u> and

includes such trains, locomotives, cars and equipment which are owned by, leased to, or in the account of such party." Exh. A (emphasis supplied).

19. On July 3, 2004, employees of the B&M and/or STRC were operating a B&M and/or STRC freight train southbound on a section of the NECR's main line which is subject to the *Agreement*. The train consisted of two (2) locomotives pulling nineteen (19) freight cars behind them, all of which were either owned by, or in the account, of the B&M and/or STRC.

20. At approximately 6:40 AM, at approximately milepost 10.18, the trailing wheels of the train's sixth freight car came off the tracks, but the car remained upright.

21. The train's crew failed to observe the freight car's derailed wheels and continued to operate the train, dragging the derailed freight car along behind the locomotives.

22. The derailed car's wheels were dragged along the NECR's tracks for approximately five (5) miles, traversing over an open deck bridge and three separate grade crossings, all the while causing extensive damage to the NECR's tracks and related property.

23. The derailed wheels finally struck a piece of railroad known as a "frog" which was located approximately at mile post 5.58 (the north switch of the Hartland, VT siding track). The car's hitting the frog caused it to become completely derailed and flipped it onto its side.

24. As the freight car flipped, it caused the following six (6) freight cars to also derail.

25. The derailment of these cars cased extensive damage to the NECR's trackage and related property in the area of the derailment.

26. Due to the damage caused by the derailed wheels of the car and subsequent derailment, the NECR's main line track was shut down for several days clean up procedures and repairs from mile post 10.18 to mile post 5.58.

27. The NECR's track was thereafter reopened for service under a speed restriction for approximately thirty (30) days while the NECR worked to repair and restore the damaged trackage and related property.

28. The NECR has a separate agreement with AMTRAK which permits AMTRAK, *inter alia*, to operate passenger service over the Connecticut River Line.

29. The agreement between the NECR and AMTRAK also contains financial incentives to NECR relating to AMTRAK's run-time performance over the Connecticut River Line.

30. AMTRAK was forced to bus its passengers around the damaged track for the period of time that the Connecticut River Line was completely shut down.

31. The NECR lost revenue that it otherwise would have received from AMTRAK while its track was completely shut down.

32. While the speed restriction was in place, AMTRAK's "run time" over the CRL was increased by about thirty (30) minutes which negatively impacted AMTRAK's run-time performance. As a result, the NECR was unable to meet its run-time incentives and suffered the loss of additional revenue it otherwise would have received.

33. The NECR also incurred additional costs, expenses and damages as a result of its track being shut down.

34. The B&M and/or STRC is responsible for all of the NECR's losses, damages and injuries incurred and/or suffered as a result of the derailment

35. The NECR has demanded that the B&M and/or STRC pay the losses and damages which resulted from the derailment.

36. Despite the NECR's demands for payment, both the B&M and the STRC have failed, neglected and/or otherwise refused to pay the NECR's losses and damages.

37. Instead, both the B&M and the STRC filed a *Formal Complaint and Petition for Declaratory Order* with the Surface Transportation Board alleging that the NECR failed to maintain and repair the Connecticut River Line in a Class II condition.

## COUNT I
## BREACH OF CONTRACT v. B&M

38. The NECR repeats and re-alleges the allegations contained in paragraphs 1 through 37 above as if specifically set forth herein.

39. The train which was involved in the derailment on July 3, 2004 as described herein was being operated by, owned by and/or in the account of the B&M and/or STRC at the time of the derailment.

40. Pursuant to § 7.1 of the *Agreement*, the B&M and/or STRC is required and obligated to assume and pay for any and all loss, damage or injury incurred by the NECR as the result of the derailment.

41. Despite the NECR's demanding that the B&M and/or STRC pay for the losses, injuries and damages which resulted from the derailment, the B&M and/or STRC has failed, neglected and/or otherwise refused to pay for these losses, injuries and damages or to otherwise honor its obligations under the *Agreement*.

WHEREFORE, the NECR demands judgment against the B&M and/or STRC in a monetary amount to be proven at trial together with interest, costs, attorney's fees and such other relief as this Court deems just and proper under the circumstances.

## COUNT II
## NEGLIGENCE v. B&M

42. The NECR repeats and re-alleges the allegations contained in paragraphs 1 through 41 above as if specifically set forth herein.

43. On July 3, 2004, the train's crew had sole control and responsibility for the operation of the train and had a duty to operate the train reasonably and safely.

44. The train's crew breached this duty by operating the train in an unreasonable and unsafe manner.

45. As a result of the crew's negligence, the train was caused to derail and thereby caused damage to the NECR's property and related trackage and also caused the NECR to suffer additional losses, damages and/or injuries.

WHEREFORE, the NECR demands judgment against the B&M and/or STRC in a monetary amount to be proven at trial together with interest, costs, attorney's fees and such other relief as this Court deems just and proper under the circumstances.

## COUNT III
## GROSS NEGLIGENCE, WILFUL, WANTON AND RECKLESS CONDUCT v. B&M

46. The NECR repeats and re-alleges the allegations contained in paragraphs 1 through 45 above as if specifically set forth herein.

47. On July 3, 2004, the train's crew had sole control and responsibility for the operation of the train and had a duty to operate the train reasonably and safely.

48. The train's crew breached this duty by operating the train in a grossly unreasonable, willful, wanton, reckless and unsafe manner.

49. As a result of the crew's gross negligence, willful, wanton, reckless and unsafe operation negligence, the train was caused to derail and thereby caused damage to the NECR's

property and related trackage and also caused the NECR to suffer additional losses, damages and/or injuries.

WHEREFORE, the NECR demands judgment against the B&M and/or STRC in a monetary amount to be proven at trial together with interest, costs, attorney's fees and such other relief as this Court deems just and proper under the circumstances.

## COUNT IV
## BREACH OF CONTRACT v. STRC

50. The NECR repeats and re-alleges the allegations contained in paragraphs 1 through 49 above as if specifically set forth herein.

51. The train which was involved in the derailment on July 3, 2004 as described herein was being operated by, owned by and/or in the account of the B&M and/or STRC at the time of the derailment.

52. Pursuant to § 7.1 of the *Agreement*, the B&M and/or STRC is required and obligated to assume and pay for any and all loss, damage or injury incurred by the NECR as the result of the derailment.

53. Despite the NECR's demanding that the B&M and/or STRC pay for the losses, injuries and damages which resulted from the derailment, the B&M and/or STRC has failed, neglected and/or otherwise refused to pay for these losses, injuries and damages or to otherwise honor its obligations under the *Agreement*.

WHEREFORE, the NECR demands judgment against the B&M and/or STRC in a monetary amount to be proven at trial together with interest, costs, attorney's fees and such other relief as this Court deems just and proper under the circumstances.

## COUNT V
## NEGLIGENCE v. STRC

54. The NECR repeats and re-alleges the allegations contained in paragraphs 1 through 53 above as if specifically set forth herein.

55. On July 3, 2004, the train's crew had sole control and responsibility for the operation of the train and had a duty to operate the train reasonably and safely.

56. The train's crew breached this duty by operating the train in an unreasonable and unsafe manner.

57. As a result of the crew's negligence, the train was caused to derail and thereby caused damage to the NECR's property and related trackage and also caused the NECR to suffer additional losses, damages and/or injuries.

WHEREFORE, the NECR demands judgment against the B&M and/or STRC in a monetary amount to be proven at trial together with interest, costs, attorney's fees and such other relief as this Court deems just and proper under the circumstances.

## COUNT VI
## GROSS NEGLIGENCE, WILFUL, WANTON AND RECKLESS CONDUCT v. STRC

58. The NECR repeats and re-alleges the allegations contained in paragraphs 1 through 57 above as if specifically set forth herein.

59. On July 3, 2004, the train's crew had sole control and responsibility for the operation of the train and had a duty to operate the train reasonably and safely.

60. The train's crew breached this duty by operating the train in a grossly unreasonable, willful, wanton, reckless and unsafe manner.

61. As a result of the crew's gross negligence, willful, wanton, reckless and unsafe operation negligence, the train was caused to derail and thereby caused damage to the NECR's

9

property and related trackage and also caused the NECR to suffer additional losses, damages and/or injuries.

WHEREFORE, the NECR demands judgment against the B&M and/or STRC in a monetary amount to be proven at trial together with interest, costs, attorney's fees and such other relief as this Court deems just and proper under the circumstances.

### JURY DEMAND

The NECR demands a trial by jury as to all issues.

Respectfully submitted,
NEW ENGLAND CENTRAL RAILROAD, INC.,
by its attorneys,

*/s/ Michael G. Flynn, J./*

| Michael B. Flynn | BBO# 559023 |
| Richard A. Davidson, Jr. | BBO# 552988 |

FLYNN & ASSOCIATES, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169
(617) 773-5500

DATED: December 2, 2004

G:\F & A\CASE FILES\RAILAMERICA\BM - STRC\pleadings\Complaint and Jury Demand.doc

# Exhibit "A"

## APPENDIX

### TERMS AND CONDITIONS OF TRACKAGE RIGHTS IMPOSED BY THE INTERSTATE COMMERCE COMMISSION GOVERNING THE USE BY BOSTON AND MAINE CORPORATION OF CERTAIN LINES OF CENTRAL VERMONT RAILWAY, INC.

0. *DEFINITIONS*

As used herein, the following capitalized terms have the following meanings (any other capitalized terms being defined in context hereafter):

0.1 "Agreement" means the terms and conditions of trackage rights as a whole set forth herein, as though the instant terms and conditions had been agreed to contractually by B&M and CV.

0.2 "Amtrak" means the National Railroad Passenger Corporation.

0.3 "B&M" means Boston and Maine Corporation, a corporation with its principal office at Iron Horse Park, North Billerica, Massachusetts 01862.

0.4 "CCR" means Claremont and Concord Railway (including its successors and assigns).

0.5 "Conveyance Date" means September 9, 1988, the date on which B&M conveyed the Former B&M Line to Amtrak, and on which Amtrak conveyed the same to CV, pursuant to the Order.

0.6 "CV" means Central Vermont Railway, Inc., a corporation with its principal office at 2 Federal Street, St. Albans, Vermont 05478.

0.7 "CV Lines" means the approximately 13.4-mile rail line between White River Junction, Vermont, and Windsor, Vermont, and the approximately 10.6-mile rail line between Brattleboro, Vermont, and East Northfield, Massachusetts, both of which have belonged to CV since before the Conveyance Date.

0.8 "Former B&M Line" means the approximately 48.8-mile rail line between Windsor, Vermont, and Brattleboro, Vermont, conveyed by B&M to Amtrak, and by Amtrak to CV, on the Conveyance Date pursuant to the Order.

0.9 "GMRC" means the Green Mountain Railroad Corporation (including its successors and assigns).

0.10 "ICC" means the U.S. Interstate Commerce Commission.

0.11 "Line" means the CV Lines and the Former B&M Line together.

0.12 "Order" means the decision of the ICC in *National Railroad Passenger Corporation—Conveyance of Boston and Maine Corporation Interests in Connecticut River Line in Vermont and New Hampshire*, dated August 4, 1988, served August 9, 1988, and published at pages 761 through 817 of volume 4 of the ICC Reports, Second Series.

0.13 "ST" means the Springfield Terminal Railway Company (including its successors and assigns).

AMTRACK—CONVEYANCE OF B&M IN CONN RIVER LINE IN VT & NH    561

**1. GRANT OF TRACKAGE RIGHTS**

1.1  Subject to the terms and conditions of this Agreement, B&M shall have the non-exclusive right to operate B&M's trains, locomotives, cars and equipment with B&M's own crews over the Line, as more particularly defined as follows:

All main line track and passing sidings between a point at the interlocking at East Northfield, Massachusetts (approximately B&M MP 49.67 and CV MP 110.51) to the Bank switch at the termination of B&M ownership at White River Junction, Vermont (approximately CV MP 13.40).

1.2  B&M shall have only overhead running rights over the CV Lines.

1.3  B&M shall have the exclusive right to serve all existing shippers and shippers' facilities that were located on the Former B&M Line as of the Conveyance Date, including any and all new shippers that locate at such existing facilities after the Conveyance Date, provided that B&M makes available a minimum three day per week service along the Line. B&M must consult with the shippers and ensure their needs are met up to three day per week service.

1.3.1  For purposes of this Section 1.3, "existing shippers and shippers' facilities" shall mean industries and facilities at rail sidings which received or tendered rail shipments during the twelve months immediately prior to the Conveyance Date.

1.3.2  For purposes of this Section 1.3, "three day per week service" shall mean the provision of local set-off and pick-up service to shippers on the Former B&M Line at least three times per week (Monday through the following Sunday) in each direction.

1.3.3  CV shall be permitted to commence service to existing shippers and shippers' facilities upon B&M's failure to make available three day per week service during two weeks out of any four week period, unless such failure is excused by Section 9.6.

1.4  Except as provided in Section 1.3, CV and B&M shall each have the right to compete for and serve the following shippers and shippers' facilities on the Former B&M Line:

(a)  shippers and shippers' facilities located on the Former B&M Line which have not received or tendered rail shipments during the twelve months immediately prior to the Conveyance Date;

(b)  any other new shippers;

(c)  any existing shippers and shippers' facilities to which B&M does not provide a minimum three day per week service, as specified in Section 1.3.

1.4.1  CV shall, upon request by B&M, provide reciprocal switching to permit B&M to serve such shippers and shippers' facilities as B&M may serve hereunder. CV shall not be required to switch cars on B&M's behalf at shippers' facilities which CV serves by virtue of B&M's failure to make available a minimum three day per week service along the Line as specified by Section 1.3, but B&M shall retain the right to provide service directly to such shippers and shippers' facilities. B&M shall pay to CV a per switch charge not greater than 180% of the CV variable cost of providing such switching service computed using CV's costs computed in accordance with formulas generally used or accepted in ICC proceedings.

1.5  CV and B&M shall each have the right to compete for and to interchange traffic at Bellows Falls, Vermont, with GMRC and at Claremont Junction, New Hampshire, with the CCR. B&M shall have the exclusive right to interchange traffic at Charlestown, New Hampshire, with the ST.

1.6  B&M shall have the right of entry over the Line for any and all B&M employees, agents or representatives, machinery, vehicles or equipment which B&M may

562    INTERSTATE COMMERCE COMMISSION REPORTS

deem necessary or convenient for the purposes of inspecting the Line, clearing any derailments or wrecks of B&M trains on the Line or otherwise conducting its operations over the Line.

1.7 B&M shall without charge to CV dispatch the interlocking CPR 50 located at East Northfield, Massachusetts, until seven (7) days after CV notifies B&M that CV is prepared to assume such responsibility and all applicable regulatory requirements have been satisfied.

1.8 Except as provided herein, this Agreement does not diminish in any way CV's right to use the Line, or CV's right to lease or otherwise allow another carrier to use the Line.

*[handwritten margin note: N/A CV has Control]*

## 2. TERM AND TERMINATION

2.1 The term of this Agreement shall commence as of 7:00 a.m. Eastern Time, on the Conveyance Date.

2.2 Except as provided in Section 2.3, and subject to the provisions of this section, the term of this Agreement shall be perpetual. After 20 years from the Conveyance Date, either party to this Agreement may seek modifications from the other and, if satisfactory modifications are not agreed to after a reasonable period for negotiation, may apply to the ICC for modifications. Nothing in this section shall authorize the ICC to impose arbitration requirements upon either party to this Agreement.

2.3 B&M may terminate this Agreement immediately upon notice to CV.

2.4 Notwithstanding the foregoing, the parties hereby acknowledge and agree that B&M has appealed the Order, and that in the event the Former B&M Line is reconveyed to B&M in connection with or resulting from such appeal, this Agreement shall terminate upon such reconveyance, and that thereafter the terms and conditions of the April 1, 1985 and January 1, 1980 Trackage Rights Agreements shall govern their operations over and use of the Line, and such agreements shall be deemed re-executed in their current forms.

## 3. COMPENSATION

3.1 B&M shall have no obligation to pay for or contribute in any way towards the cost of upgrading of the Former B&M Line, except as provided in Section 3.7.

3.2 Except as provided in Section 1.7, CV shall be solely responsible for dispatching all operations over the Line and for the maintenance and repair of the Line, including the signals and the signal and dispatching system which controls operations on it. CV shall keep the Line, at all times throughout the term of this Agreement or any extensions thereof, in not less than FRA Class II condition.

3.3 In full satisfaction of any and all obligations of B&M to pay for the trackage rights provided herein or contribute towards the costs of dispatching, maintenance and repair of the Line (including the maintenance, repair and operation of the signals and the signal and dispatching system which controls operations on it), B&M shall pay to CV 20.1¢ per car mile (whether loaded or empty including locomotives, cabooses and work equipment) of traffic actually operated by B&M (or its assignee) over the Line. Notwithstanding the foregoing, the sum of such payments in respect of the Former B&M Line shall not exceed one hundred forty-two thousand dollars ($142,000) per year during the first three years this Agreement is in force and shall not exceed seventy-five thousand dollars ($75,000) in any year thereafter; provided, however, that the foregoing limitation shall not apply if the annual gross traffic volume on the Former B&M Line attributable to B&M's overhead or local service, including traffic for interchange to GMRC, CCR, or ST, exceeds 32,500 carloads. Locomotives, cabooses and work equipment shall not be included in determining whether traffic attributable to B&M has exceeded 32,500 carloads in a given year. In any year that the amount of traffic attributable to B&M on the Former B&M Line exceeds 32,500

6 I.C.C.2d

AMTRACK—CONVEYANCE OF B&M IN CONN RIVER LINE IN VT & NH   563

carloads, B&M shall pay CV as additional compensation 20.1¢ per car mile for all the cars in excess of 32,500 cars, whether loaded or empty, including locomotives, cabooses and work equipment.

3.4 All payments to be made by B&M and CV under this Agreement (including the caps set forth in Section 3.3) shall be adjusted effective March 31, 1989, and semi-annually thereafter, for price level changes from July 1, 1988, (using September 1988) based on the relationship of the most recent quarter's Association of American Railroads (AAR) Eastern District, Quarterly Indices of Chargeout Prices and Wage Rates (Table C) - "Material prices, wage rates and supplements combined (excluding fuel)" to comparable indices of the quarter six months previous. The first adjustment to be made shall be based on the comparison of the Fourth Quarter 1988 index value to the Second Quarter 1988.  *["(using Second Quarter 1988"]*

3.5 B&M shall have responsibility for and shall report and pay directly to the owner of the cars, all mileage, car hire and other charges accruing on cars in B&M's trains on the Line.

3.6 CV shall issue its bill to B&M for the payments specified by Sections 1.4 and 3.3 by the fifteenth (15) day of each month for the traffic transported during the preceding calendar month. B&M shall pay to CV the amount shown on such bill by the last day of the month in which such bill is issued: B&M shall not be required to pay mileage charges attributable to its operations over the Former B&M Line once payments made in the preceding months of that year with respect to those operations equal the payment cap as adjusted in accordance with Section 3.4 for that year, until traffic attributable to B&M's operations over the Former B&M Line exceeds 32,500 carloads for that year. Payments not received by CV by such last day of the month in which the bill is issued will accrue interest at the rate of one and one-half (1.5%) percent per month for each month or portion of a month by which the payment is late.

3.7 In the event that CV is required to undertake any major capital projects which may become necessary due to changes in applicable local, state or federal statutes, ordinances or regulations, or by catastrophic occurrences on the Line, including but not limited to floods or destruction of bridges, B&M or its assignee shall pay its proportionate share of the expenditures actually made by CV for such capital projects based upon the percentage of total car miles on the Line attributable to B&M's (or its assignee's) average traffic volume during the preceding five (5) year period.

4. *ADDITIONS AND ALTERATIONS*

4.1 CV shall pay for and be responsible for the construction, maintenance, repair and renewal of any additional connections to the Line which it may require.

4.2 If B&M determines that changes in or additions and betterments to the Line, including changes in communication, dispatching or signal facilities as they existed immediately prior to the Conveyance Date, are required to accommodate B&M's operations beyond that required by CV to accommodate CV's and Amtrak's operations over the Line, B&M shall pay for the construction of such additional or altered facilities, including the annual expense of maintaining, repairing, and renewing such additional or altered facilities. Notwithstanding the foregoing, CV shall have the right to approve of any such addition or alteration prior to its construction, which approval shall not be unreasonably withheld, and such addition or alteration shall be constructed in such a manner as to minimize interference with CV's or Amtrak's operations over the Line.

5. *SCHEDULING OF TRAINS AND MAINTENANCE; OPERATING RULES*

5.1 The trains, locomotives, cars and equipment of B&M, CV, Amtrak, and any other present or future user of the Line or any portion thereof, shall be operated without prejudice or partiality to any party to this Agreement or any such other user and in such a

6 I.C.C.2d

564   INTERSTATE COMMERCE COMMISSION REPORTS

manner as will result in the most economical and efficient manner of movement of all traffic; provided, however, that CV shall give priority to intercity rail passenger trains of Amtrak to the extent required by Section 402 of the Rail Passenger Service Act. Notwithstanding the foregoing, B&M shall have the right, in consultation with CV, to establish the schedules of B&M's trains over the Line. Trains performing local work, whether B&M, CV or otherwise, are not entitled to priority over trains that are not performing such work. CV shall establish CV's train schedules with due regard to the trains to be operated by B&M. Each party shall use reasonable efforts to provide five (5) days' notice of changes in its traffic and operating patterns and procedures which may affect the Line.  B&M acknowledges that the upgrading work will require a twelve (12) hour work block scheduled for between 7:00 a.m. and 7:00 p.m. CV shall coordinate with B&M and use its best efforts in scheduling the work required for the upgrading of the Former B&M Line and any future maintenance or repair of the Line to minimize any interference with or disruption of B&M's operations over the Line.

5.2  Any and all training that may be required to qualify B&M operating personnel as to CV's operating rules (after the initial training of such personnel, which will be provided by CV) shall be performed by B&M, and the determination as to whether such operating personnel are qualified under CV's operating rules shall be made in the discretion of B&M (giving consideration to any comments or recommendations of CV). CV shall train, and periodically recertify in accordance with CV's operating rules, B&M operating personnel who act as instructors for B&M personnel regarding CV's operating rules.

5.3  CV operating rules shall govern all operations over the Line, and CV shall report to B&M any incidents of violation of such rules by a B&M employee. CV may at its option, for good cause shown, exclude such employee from the Line.

5.4  In the event that any dispute arises as to the interpretation of any operating rules, the interpretations of the Uniform Code of Operating Rules, as amended, shall govern.

## 6. CLEARING OF DERAILMENTS AND WRECKS

6.1  In the event of any derailment or wreck of a B&M train, B&M shall clear the Line to allow for the passage of other trains within a reasonable time. B&M shall perform any rerailing wrecking or wrecking train service as may be required in connection with such derailment or wreck, in accordance with its customary practices.  Except as provided in Section 7, the cost liability, and expense of the foregoing, including, without limitation, loss of, damage to, or destruction of any property whatsoever and injury to or death of any person or persons whomsoever resulting therefrom, shall be the responsibility of B&M. In the event that B&M does not begin rerailing operations for passage of trains over the Line within twelve (12) hours of an occurrence or does not complete the process of clearing the Line within a reasonable time, CV may clear the Line for passage of trains, and B&M shall reimburse CV for all reasonable costs CV incurs in performing such service.

## 7. RELEASE AND INDEMNIFICATION

7.1  Save as herein otherwise provided, each party hereto shall be responsible for and shall assume all loss, damage or injury (including injury resulting in death) to persons or property, including the cost of removing any trackage, repairing trackage and correcting environmental damage, which may be caused by its engines, cars, trains or other on-track equipment (including damage by fire originating therefrom) whether or not the condition or arrangement of the trackage contributed in any manner or to any extent to such loss, damage or injury, and whether or not a third party may have caused or contributed to such loss, damage or injury, and for all loss or damage to its engines, cars, trains or other ca-

AMTRACK—CONVEYANCE OF B&M IN CONN RIVER LINE IN VT & NH   565

track equipment while on said trackage from any cause whatsoever, except in the case of collision, in which event the provisions of Section 7.2 shall apply.

7.2 In the event of a collision between CV's and B&M's engines, cars, trains or other on-track equipment while on the Line, the apportionment of liability between the parties hereto for all loss, damage or injury (including injury resulting in death) to any person (including CV's or B&M's employees, agents or representatives) or property shall be governed by the following provisions:

7.2.1 If the employees of one party are solely at fault, that party shall be responsible for all such loss, damage or injury including the cost of removing wreckage, repairing trackage, and correcting environmental damage.

7.2.2 If the employees of both parties hereto are at fault, or if the causes of the accident is so connected that it cannot be determined whose employees are at fault, each party shall bear and pay for all such loss, damage or injury which its own engines, cars, trains or other on-track equipment and their contents or property in its custody, or its employees or others claiming for them, may have suffered by reason or in consequence of the accident. Responsibility for all other such loss, damage or injury shall be apportioned equally between the parties hereto.

7.2.3 The words "all other such loss, damage or injury" referred to in this Section 7.2 shall be deemed to include but not be limited to the cost of removing wreckage, repairing trackage, correcting environmental damage, and third party claims.

7.2.4 As between the parties hereto, the foregoing provisions of this Section 7.2 shall be applicable whether or not a third party may have caused or contributed to the accident.

7.2.5 The words "trackage" referred to in this Section 7 shall be deemed to include but not be limited to the tracks, structures or facilities pertaining to operation of the Line.

7.3 Without in any way restricting the terms of this Section 7, in the case of a collision or accident between the train of either party to this Agreement and the property of a third person or other entity, including any action done in the process of trying to avoid an accident or a collision, such party shall save harmless and indemnify the other party forthwith for all damages suffered by the other party including damages to equipment and structures or injuries (including death) to the employees or agents of the other party including also the results of those actions done in the process of avoiding a collision or accident, and irrespective of negligence of either party or such third person or other entity, and with a right of subrogation in favor of such party against any such third person or other entity.

7.4 Each party hereto shall forever indemnify and save harmless the other party, from and against all claims, liability or judgments by reason or on account of any injury to or death of any person or of any loss or damage to property, the liability for which is herein assumed by such first mentioned party, and such first mentioned party shall pay and discharge any judgment that may be obtained by reason thereof, and all costs, charges and expenses payable thereunder, including legal counsel fees.

7.5 The parties shall settle, as between themselves, any claim for loss or damage according to the terms of this Agreement, notwithstanding any judgment or decree of any court or other tribunal in a proceeding brought by other parties. In case a suit or proceeding shall be commenced by any person or corporation against either party hereto for or on account of any loss, damage or injury for which the other party hereto is liable under the provisions of this Agreement, the party so sued or proceeded against shall give to the other party reasonable notice, in writing, of the pendency of such suit or proceeding and thereupon the other party shall assume the defense of such suit or proceeding or shall save and hold the party so sued harmless from all loss and costs by reason thereof. Neither party hereto shall be bound by any judgment against the other party unless it shall have reasonable notice that it is so required to defend and has reasonable opportunity to make such defense. When such notice and opportunity has been given, the party notified shall be

566                 INTERSTATE COMMERCE COMMISSION REPORTS

bound by the judgment as to all matters that could have been litigated in such suit or proceeding.

7.6 In every case of death or injury suffered by an employee of either B&M or CV, when compensation to such employee or employee's dependents is required to be paid under any workmen's compensation, occupational disease, employer's liability or other law, and either of said parties, under the provisions of this Agreement, is required to pay such compensation, if such compensation is required to be paid in installments over a period of time, such party shall not be released from paying such future installments by reason of the expiration or other termination of this Agreement prior to any of the respective dates upon which any such future installments are to be paid.

## 8. DEFAULT; PAYMENT DELINQUENCY

8.1 In the event of a material breach by B&M of the terms and conditions of this Agreement which continues for a period of forty-five (45) days after notice thereof from CV, CV shall have the right to terminate this Agreement upon ninety (90) days' notice.

8.2 If B&M becomes delinquent in payment of any amount by more than fourteen (14) days under the terms of Section 3.6, CV shall be entitled to receive advance payment from B&M for each B&M train seeking access to the Line until B&M satisfies the delinquency in full. If B&M fails to tender the advance payment, CV shall be further entitled to exclude and eject B&M from the Line until B&M tenders the advance payment. CV shall be entitled to these remedies for delinquencies even if B&M has disputed the billed amount by invoking arbitration or otherwise. During the pendency of any such exclusion or ejectment, CV shall nevertheless accept B&M cars for interchange at any point on the Line.

## 9. GENERAL PROVISIONS

9.1 *No Waiver.* Waiver of any provision of this Agreement, in whole or in part, in any one instance shall not constitute a waiver of any other provision in the same instance, nor any waiver of the same provision in another instance, but each provision shall continue in full force and effect with respect to any other then existing or subsequent breach.

9.2 *Notice.* Any notice required or permitted under this Agreement shall be given in writing to the parties at their respective addresses specified above, or at such other address for a party as that party may specify by notice as provided herein, by (i)(A) delivery in hand or by postage prepaid, United States first class mail and (B) registered or certified mail, return receipt requested, or (ii)(A) telefax and (B) registered or certified mail, return receipt requested, or (iii)(A) Federal Express or other form of expedited mail that provides for delivery to the sender of a signed receipt, or (iv) telegram. Notice so sent shall be effective upon receipt.

9.3 *Integration.* Except for the Order and the documents executed in pursuance thereof, this Agreement constitutes the entire agreement of the parties with respect to its subject matter, superseding all prior oral and written communications, proposals, negotiations, representations, understandings, courses of dealing, agreements, contracts and the like between the parties in each respect. Except for any and all obligations incurred or causes of action accrued thereunder prior to or as of the Conveyance Date, and except as provided in Section 2.4 and 9.3.1 hereof, the Trackage Rights Agreements by and between B&M and CV dated as of April 1, 1925, and January 1, 1930, are hereby terminated. Any provisions of any other agreement(s) between CV and B&M which are not inconsistent with the provisions of this Agreement shall remain in effect until cancelled according to the terms of such other agreement(s).

AMTRACK—CONVEYANCE OF B&M IN CONN RIVER LINE IN VT & NH   567

9.3.1 The provisions of Section 8, Freight Haulage, of the January 1, 1930 Trackage Rights Agreement between CV and B&M, as amended from time to time, shall remain in effect until cancelled by either party upon ninety (90) days' prior written notice to the other.

9.4 *Miscellaneous.* This Agreement: (i) may be amended, modified, or terminated, and any right under this Agreement may be waived in whole or in part, only by a writing signed by both parties; (ii) contains headings only for convenience, which headings do not form part of and shall not be used in construction of this Agreement; and (iii) is not intended to inure to the benefit of any party not a party to this Agreement.

9.5 *Availability of Equitable Relief.* The obligations imposed by this Agreement are unique. Breach of any of such obligations would injure the parties to this Agreement; such injury is likely to be difficult to measure; and monetary damages, even if ascertainable, are likely to be inadequate compensation for such injury. Protection of the respective interests provided herein would require equitable relief, including specific performance and injunctive relief, in addition to any other remedy or remedies that the parties may have at law or under this Agreement.

9.6 *Force Majeure.* No party to this Agreement shall be responsible for delays or errors in its performance or other breach under this Agreement occurring by reason of circumstances beyond its control, including acts of civil or military authority, national emergencies, fire, major mechanical breakdown, labor disputes, flood or catastrophe, acts of God, insurrection, war, riots, delays in suppliers, derailments or failure of transportation, communication or power supply.

9.7 *Trains, Locomotives, Cars or Equipment.* As used in this Agreement, whenever reference is made to the trains, locomotives, cars or equipment of, or in the account of, one of the parties hereto, such expression means the trains, locomotives, cars and equipment in the possession of or operated by one of the parties and includes such trains, locomotives, cars and equipment which are owned by, leased to, or in the account of such party. Whenever such trains, locomotives, cars or equipment are owned or leased by one party to this Agreement and are in the possession or account of, or under the control of the other party to this Agreement, such trains, locomotives, cars and equipment shall be considered those of the other party, except where the cars or equipment are being transported under the Haulage Agreement referred to in Section 9.3.1 of this Agreement.

9.8 *Assignment.* This Agreement shall bind and inure to the benefit of the parties and their respective legal representatives, successors and assigns. B&M shall have the right to assign any or all of B&M's rights and obligations under this Agreement to any affiliate of B&M, following consultation with CV. B&M shall have the right to assign any or all of B&M's rights and obligations under this Agreement to any other person with CV's prior consent, which shall not be withheld unreasonably. In the event of an Agreement, the number of carloads attributable to the assignee's operations over the Former B&M Line shall be included in the number of cars attributable to B&M's operations for the purposes of Section 3.3 of this Agreement.

9.9 *Governing Law.* This Agreement is imposed and entered into in, and shall be governed by the laws of, the District of Columbia.