UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CENTRAL RAILROAD, INC.,
Plaintiff,

v.

SPRINGFIELD TERMINAL RAILWAY
COMPANY and BOSTON AND MAINE
CORPORATION,
Defendants

Civil Action No.: 04-30235-MAP

## PLAINTIFF'S OPPOSITION TO THE DEFENDANTS' MOTION TO DISMISS

The Plaintiff, New England Central Railroad, Inc. ("NECR") hereby opposes the *Motion to Dismiss* which has been filed by the defendants, Springfield Terminal Railway Company and Boston and Maine Corporation ("STRC/B&M") on the grounds that the federal district court has subject matter jurisdiction over the NECR's claims. As further grounds therefore, the NECR states as follows:

## I.      FACTUAL BACKGROUND:

In 1988, the National Railroad Passenger Corporation ("AMTRAK") purchased from the B&M a section of railroad track located between Brattleboro, VT and Windsor, VT. This section of track is known as the "Connecticut River Line." See *Complaint* at ¶ 8. AMTRAK immediately thereafter conveyed the Connecticut River Line to the Central Vermont Railway, Inc. ("CV"). Id. at ¶ 9. CV was the NECR's predecessor. In 1994, the NECR purchased the CV's assets including the tracks which are the subject of the NECR's *Complaint*. Id. at ¶ 10.

As part of the conveyance of the Connecticut River Line from the B&M to AMTRAK, and then to the CV, the CV was required by the Interstate Commerce Commission ("ICC") to grant back to the B&M certain rights (known as "Trackage Rights") to operate its freight trains over the CV's tracks between East Northfield, MA and White River Junction, VT. Id. at ¶ 11. Initially, the parties operated under a temporary "*Interim Agreement*" regarding the B&M's Trackage Rights. Id. at ¶ 12.

On May 18, 1989, the CV petitioned the ICC to impose permanent terms and conditions for the B&M's Trackage Rights over a 48.8-mile segment of the Connecticut River Line as well as certain CV track segments at both ends of the Connecticut River Line. Id. at ¶ 13. On February 6, 1990, the ICC imposed a *Modified Trackage Rights Agreement* (the "Agreement") governing the terms and conditions of the B&M's use of the CV's (now NECR's) main-line track between East Northfield, MA and White River Junction, VT. Id. at ¶ 14. A copy of the *Agreement* imposed by the ICC is attached as Exhibit "A." Thus, although the Agreement is simply a contract between the parties, it has been imposed by the ICC and is therefore considered to be an ICC order.[1]

The *Agreement* is still in effect and currently governs the rights, responsibilities and obligations of the NECR, the B&M and/or STRC with respect to the operation of trains over the NECR's mainline track between East Northfield, MA and White River Junction, VT. The STRC/B&M has been operating trains over the tracks subject to the *Agreement* since 1990.

It is clear that the *Trackage Rights Agreement* is simply a private agreement between two parties (the NECR and STRC/B&M), and that it imposes a number of typical obligations on both railroads. For instance, at issue in this case is a provision which allocates responsibility for certain losses:

---

[1] In fact, the STRC/B&M consistently refer to the Agreement as a *Trackage Rights Order* ("TRO").

> [E]ach party hereto shall be responsible for and shall assume <u>all loss, damage or injury…to persons or property</u>, including the cost of removing any trackage, repairing trackage and correcting environmental damage, which may be caused by its engines, cars, trains or other on-track equipment (including damage by fire originating therefrom) <u>whether or not the condition or arrangement of the trackage contributes in any manner or to any extent to such loss, damage or injury</u>, and whether or not a third party may have caused or contributed to such loss, damage or injury, and for all loss or damage to its engines, cars, trains or other on-track equipment while on said trackage from any cause whatsoever, except in the case of collision, in which event the provisions of Section 7.2 shall apply.

See Exh. A at §7.1 (emphasis supplied).[2]

On July 3, 2004, employees of the STRC/B&M were operating a STRC/B&M freight train over a section of the NECR's mainline which is subject to the *Agreement*. See *Complaint* at ¶ 19. The train derailed and caused extensive damage to the NECR's trackage and related property in the area of the derailment. See <u>Id</u>. at ¶ 20-25. As a result of the damage caused by the derailment, the NECR has suffered extensive damages. <u>Id</u>. at ¶ 26-33. Shortly thereafter, on or about December 2, 2004, the NECR filed its *Complaint* in this case seeking, pursuant to §7.1, recovery of the damages it incurred as a result of the derailment. See *Complaint*.[3]

## II.    DISCUSSION OF LAW:

### A.    The Interstate Commerce Commission Termination Act:

In 1887, Congress passed the Interstate Commerce Act ("ICA"), which established a statutory scheme for regulating the nation's railroads. The ICA was originally codified at 49

---

[2] Any reference to the "trains, locomotives, cars or equipment of, or on the account of, one of the parties hereto" means "the trains, locomotives, cars and equipment <u>in the possession of or operated by one of the parties</u> and includes such trains, locomotives, cars and equipment which are owned by, leased to, or in the account of such party." Exh. A at § 9.7 (emphasis supplied).

[3] On or about November 1, 2004, the STRC/B&M filed, with the Surface Transportation Board ("STB"), the ICC's successor agency, a *Formal Complaint and Petition for Declaratory Order*, a copy of which is attached as Exhibit "B."

U.S.C. §1, *et seq.* The ICA established the Interstate Commerce Commission ("ICC") as the federal regulatory agency responsible for overseeing railroad transportation. Although the ICA has been changed and amended numerous times since its inception, it continues (in its present form) to govern interstate commerce. In 1995, Congress abolished the ICC by enacting the ICCTA. Pub. L. No. 104-88, Dec. 29, 1995, 109 Stat. 803. The ICCTA established the Surface Transportation Board ("STB") to take the place of the ICC and granted the STB exclusive jurisdiction over rail functions and proceedings. *See* 49 U.S.C. §701(a). Congress' purpose in passing the ICCTA was to substantially reduce the regulation of railroads and other modes of surface transportation. *See* 49 U.S.C. §10101; *see also* H.R. Rep. No. 104-311, at 82 (1995); Sen. Rep. No. 104-176, at 2 (1995).

**B.    The Federal District Court Has Independent Subject Matter Jurisdiction of the NECR's Complaint Since It Arises Under An Act Of Congress Regulating Commerce:**

**1.    49 U.S.C. § 10501(b) Does Not Give to the STB Exclusive Jurisdiction Over the NECR's Claims:**

Although, pursuant to 49 U.S.C. § 10501(b), the STB has jurisdiction over many aspects of the regulation of railroad transportation, federal courts have concurrent jurisdiction with the STB over claims for damages arising under the ICCTA. This issue is governed by a recent First Circuit decision, Pejepscot Industrial Park, Inc. d/b/a Grimmel Industries v. Maine Central Railroad Co., et al., 215 F. 3d 195 (1st Cir. 2000). In Pejepscot, the First Circuit ruled that § 10501(b) does not grant the STB exclusive jurisdiction over claims against rail carriers alleging violations of the ICCTA or STB orders and that the federal district court has subject matter jurisdiction over such claims. Id. at 197.[4]

---

[4] The First Circuit's holding in Pejepscot is completely adverse to the preemption argument made by the defendants' in the *Memorandum of Reasons in Support of the Defendants' Motion to Dismiss.* However, the defendants have failed to bring this countervailing authority to this Honorable Court's attention, even though they have cited the case

The First Circuit and the STB agree that the STB does not have exclusive jurisdiction over rail carriers.  Although when "[r]ead in isolation [§ 10501(b)]…appears to grant the STB exclusive jurisdiction over any claim involving 'transportation by rail carriers'…," "other sections of the ICCTA permit the filing of certain types of suits in federal district court." Pejepscot, 215 F.3d at 199; see, e.g. 49 U.S.C. § 11705(a) (establishing a three-year statute of limitations on civil actions to recover payment of services provided by rail carriers); 49 U.S.C. § 11705(b) (establishing a three-year statute of limitations on civil actions for the recovery of overcharges); and 49 U.S.C. § 11706(d) (authorizing shippers to file civil actions for recovery under bills of lading).  As the First Circuit noted, "[i]t is difficult to reconcile these provisions with the notion that the STB has exclusive jurisdiction over all matters under the ICCTA."[5] Pejepscot, 215 F. 3d at 199.

The ICCTA also specifically authorizes the filing of civil actions to recover damages from a rail carrier in certain situations, and has conferred upon the federal district court subject matter jurisdiction over these actions.  Thus, "[a] person[6] injured because a rail carrier…does not obey an order of the Board" has the right to "bring a civil action in a United States District Court to enforce that order under this subsection."  49 U.S.C. § 11704(a) (emphasis supplied). Similarly, "[a] person may file a complaint with the Board…or bring a civil action under

---

for other reasons.  This oversight is particularly egregious given that one of the defendants here (STRC) was also a defendant in the Pejepscot case and Robert B. Culliford, counsel of record here, is (and was at the time of the Pejepscot decision) STRC's in-house counsel.

[5] The First Circuit noted that in interpreting the preemptive effect of § 10501(b) "we 'will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute…and the objects and policy of the law.'"  Pejepscot, 215 F. 3d at 201, quoting Puerto Rico Tel. Co. v. Telecommunications Reg. Bd., 189 F. 3d 1, 9 (1st Cir. 1999).

[6] By definition, a "rail carrier" is considered to be a "person" for purposes of the ICCTA.  See 49 U.S.C. § 10102(5) ("rail carrier" means a person providing common carrier railroad transportation for compensation,…"); Chicago R.I. & P.R. Co. v. Chicago, B. & Q.R. Co., 301 F. Supp. 72 (N.D. Ill. 1969), affirmed 437 F.2d 6, cert. denied 402 U.S. 996 (A railroad corporation is a "person" for purposes of federal court jurisdiction over a civil action between two railroads).

subsection (b) of this section <u>to enforce liability against a rail carrier</u> providing transportation subject to the jurisdiction of the Board under this part." 49 U.S.C. § 11704(c)(1) (emphasis supplied).[7] These sections clearly suggest that certain actions (including the action filed by the NECR here) may be filed in federal district court and that the STB's jurisdiction may in some instances be concurrent, but is certainly not exclusive.[8]

The STB has also consistently held, in its own decisions, that it does not have jurisdiction to interpret or construe private contracts between rail carriers, including trackage rights agreements. See, e.g. *Lackawanna County Railroad Authority–Acquisition Exemption–F&L Realty, Inc.*, STB Finance Docket No. 33905 (STB served October 22, 2001), at 6 ("The parties want us to interpret the various agreement that have been entered into the record and to clarify their respective rights to operate the track. The interpretation of these agreements, however, lies within the purview of the courts, not us."); *The Town of Woodbridge, NJ, et al.* v. *Consolidated Rail Corporation, Inc.*, STB Docket No. 42053 (STB served March 23, 2001) at 3, ("the courts are well suited to address matters of contract interpretation, and if necessary, fashion appropriate remedies."); *The Town of Woodbridge, NJ, et al.* v. *Consolidated Rail Corporation, Inc.*, STB Docket No. 42053 (STB served December 1, 2000) at 5, ("It would be inappropriate for us to rule on the merits of the contract dispute in this case. Such matters are best addressed by the courts."): *Kansas City Southern Railway Company – Adverse Discontinuance Application – A Line of Arkansas and Missouri Railroad Company*, 1999 STB LEXIS 179 (Docket No. AB-

---

[7] The "subsection (b)" referred to states that "[a] rail carrier providing transportation subject to the jurisdiction of the Board under this part is liable for damages sustained by a person as a result of an act or omission of that carrier in violation of this part." 49 U.S.C. § 11704(b).

[8] The First Circuit in <u>Pejepscot</u> arrived at this conclusion only after reviewing the legislative history of both § 10501(b) and § 11704. See <u>Pejepscot</u>, 215 F. 3d at 203-205. Of particular importance, the court noted that § 11704 of the ICCTA "'reenacts the applicable rail portions of former section 11705. These include authority for injured persons to seek judicial enforcement of agency orders and to seek damages from a violation of the statute.'" <u>Id</u>. at 203 *quoting* H.R. Conf. Rep. No. 104-422, at 195 (1995), reprinted in 1995 U.S.C.C.A.N. 850, 880.

103[Sub-No. 14], decided March 23, 1999) at *16 ("We reiterate here, as we have in stated in the past, that the Board will not undertake to interpret or enforce operating agreements or contracts."); *Arbitration of Disputes Subject to Stat. Juris. of the STB*, 2 S.T.B. 564, 568-569 and 583 (1997) (STB recognized limits to its jurisdiction when developing arbitration rules to expedite proceedings); *Brotherhood of Locomotive Engineers v. C&NW Transp. Co.*, 366 I.C.C. 857, 858 (1983) ("contractual disputes between the parties to trackage rights agreements are matters for the courts to resolve.").

Both 49 U.S.C. §§11704(b) and (c)(1) apply to the NECR's claims here because the STRC/B&M's failure to indemnify as required under the *Agreement* is a violation of an STB order (the *Trackage Rights Order*) and the NECR's *Complaint* is clearly an attempt to "enforce liability against a rail carrier." The defendants have also conceded that although the NECR's *Complaint* alleges breach of contract, negligence and wanton, reckless and willful conduct, these claims are "made actionable by 49 U.S.C. § 11704(b)." See *Memorandum of Reasons in Support of the Defendants' Motion to Dismiss* at 5.

## 2. The Federal District Court Has Jurisdiction Over the NECR's Claims Pursuant to 28 U.S.C. § 1337(a):

Regardless of whether or not this court has diversity jurisdiction, the federal district court has independent subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1337(a):

> The District Court shall have original jurisdiction of any civil action or proceeding arising under any act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.

28 U.S.C. § 1337(a). The NECR's claims here clearly arise under an act of Congress regulating commerce, that being the ICCTA (specifically, 49 U.S.C. § 11704). The defendants have admitted this in their pleadings. The federal district court has subject matter jurisdiction over a

claim arising under § 11704, pursuant to the jurisdictional authority conferred by 28 U.S.C. §1337(a).  See e.g. Pejepscot, 215 F. 3d at 205-206.

A federal court can exercise its discretion to refuse to dismiss a case for lack of subject matter jurisdiction, even if the initial complaint fails to make the proper jurisdictional allegation, provided the federal district court nevertheless has jurisdiction over the matter.  See Odishelidze v. Aetna Life & Casualty Co., et al., 853 F. 2d  21, 24 (1st Cir. 1988); Eisler v. Stritzler, 535 F. 2d 148, 152 (1st Cir. 1976).  At least one First Circuit decision has ruled that in a situation such as is presented here, amendment of the complaint to allege proper jurisdictional grounds is not necessary:  "[s]ince we conclude that the District Court had federal question jurisdiction over at least portions of this lawsuit, it would be a baseless formality to require plaintiffs to amend their complaint, and we consider plaintiffs' complaint to be amended as alleging jurisdiction under (certain federal statutes)."  Eisler, 535 F. 2d at 152, n.3 citing to Norton v. Larney, 266 U.S. 511 (1925).  In any event, at the very least NECR should be allowed to amend its Complaint to allege jurisdiction under 28 U.S.C. § 1337(a): "amendment should be permitted, rather than dismissal, whenever it appears that a basis for federal jurisdiction can be stated by plaintiff."  Odishelidze, 853 F 2d, 24.  The NECR has this day filed a Motion for Leave to File an Amended Complaint to: allege jurisdiction under 28 U.S.C. § 1337(a); add claims for relief under §§ 11704(a), (b) and (c); and also to allege supplemental jurisdiction over its breach of contract, negligence and wanton/willful counts pursuant to 28 U.S.C. § 1367.[9]

Although federal district courts may decline to exercise supplemental jurisdiction if the

---

[9] 28 U.S.C. §1367 provides as follows:

> In any civil action of which the District Courts have original jurisdiction, the District Courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article 3 of the United States Constitution.

28 U.S.C. § 1367(a).

state claim "substantially predominates over the claim or claims over which the District Court has original jurisdiction" or "the claim raises a novel or complex issue of state law" [see 28 U.S.C. § 1367(c)(1) and (c)(2)], neither of these exceptions apply to the case at hand.  As stated by the First Circuit in Pejepscot:

> The decision whether to exercise supplemental jurisdiction is left to the sound discretion of the district court.  See Vera-Lozano v. International Broad., 50 F. 3d. 67, 70 (1ˢᵗ Cir. 1995).  A federal court may exercise supplemental jurisdiction over a state claim whenever it is joined with a federal claim and the two claims "derive from a common nucleus of operative fact" and the plaintiff "would ordinarily be expected to try them both in one judicial proceeding." Id.; United Mine Workers v. Gibbs, U.S. 715, 725, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966).

Pejepscot, 215 F. 3d at 206.  Thus, once the NECR's *Complaint* has been amended, the court will have jurisdiction over all of the claims in this case.

## C.   THE DEFENDANTS' MOTION TO DISMISS WAS NOT FILED IN A TIMELY FASHION:

On December 6, 2004, the NECR served on the defendants the process in this action. The defendants were required to answer the *Complaint* on or before December 27, 2004.  On December 20, 2004, Attorney Robert B. Culliford, counsel for the defendants, called Attorney Richard A. Davidson, Jr., counsel for the NECR, and requested thirty days additional time to answer the complaint.  See *Affidavit of Richard A. Davidson, Jr.* ("Affidavit"), at ¶ 5, attached as Exhibit "C."  The request for an additional thirty (30) days to answer the *Complaint* was granted by Attorney Davidson.  Id. at ¶ 6.  At no time during the telephone conversation did Attorney Culliford request additional time to file a motion to dismiss, nor did he even raise this issue.  Id. at ¶ 7.  Had Attorney Culliford made such a request then Attorney Davidson would not have granted such an extension without first seeking the approval of the NECR.  Id. at ¶ 8.

Also, during the telephone conversation, Attorney Culliford asked Attorney Davidson

why the case was filed in Springfield versus Boston in that all counsel were located within the Boston area.  Id. at ¶ 9.  Attorney Davidson informed Attorney Culliford that the Western Division of the District of Massachusetts was the most appropriate division within the district for the action to be brought due to the fact that the NECR runs through that division and the division is the closest to the region in Vermont wherein the dispute took place.  Id. at ¶ 10.  There was no discussion between counsel as to any issue involving diversity of citizenship or whether the court had jurisdiction to hear the dispute.  Id. at ¶ 11.  It was only upon a review of the defendants' *Motion to Dismiss* that the NECR's counsel became aware of the defendants' dispute concerning diversity jurisdiction and whether the ICCTA preempted the NECR's claims.  Id. at ¶ 12.

On December 23, 2004, Attorney Davidson received from Attorney Culliford a letter in which Attorney Culliford "confirms" the granting of the additional time to respond.  See letter dated December 20, 2004, attached hereto as Exhibit "D."  In the letter Attorney Culliford also sets forth that the extension granted is to answer or otherwise respond.  Id.  When Attorney Davidson received the letter he failed to notice this additional language of "or otherwise respond," but nevertheless this was never granted.  Exh. A, ¶ 15-18.

The defendants were never granted an extension by plaintiff to file any responsive pleading other than an answer in this matter and, therefore, the filing of their *Motion to Dismiss* is untimely.  The defendants were required by Fed. R. Civ. P. 12(a)(1)(A) to file their *Motion* on or before December 27, 2004,[10] having each been served with a summons and a copy of the complaint on December 6, 2004.  The defendants have failed to meet that filing deadline by more than twenty-five (25) days, having served their *Motion* on the NECR on January 21, 2005.

The defendants have failed to seek leave of the Court to file their *Motion* late and,

---

[10] On December 10, 2004, the Court entered a notice, within docket entries Nos. 2 and 3, that the defendants' answers were due on or before December 27, 2004.  The defendants had twenty (20) days to answer the complaint which is the same amount of time allowed by Rule 12 to file the subject motion.

therefore, it must be stricken as untimely. The defendants had twenty (20) days from the service of the process by which to file their *Motion*. Fed. R. Civ. P. 12(a)(1)(A). The defendants have not sought leave of this Honorable Court to file their *Motion* late beyond that time which is allowed for by Rule 12.

The defendants' counsel has certified that he complied with the requirements set forth in Local Rule 7.1(A)(2). The defendants, in their *Motion*, have alleged that there is no diversity jurisdiction and that the ICCTA preempts the plaintiff's state based claims. The parties never, before the defendants field their *Motion*, conferred as to the subject matter of these issues. The certification contained in the defendants' *Motion* is simply false. The defendants made no attempt, let alone a "good faith" attempt, to resolve or narrow the issues presented in the *Motion*.

The defendants' *Motion* should be stricken because: (1) it was not timely filed; (2) the defendants' have failed to seek leave of Court to file the *Motion* late; and (3) the defendants' counsel has failed to meet the requirements of Local Rule 7.1(A)(2).

## III.    <u>CONCLUSION</u>:

WHEREFORE, for all the above-stated reasons, the NECR respectfully requests that the *Defendants' Motion to Dismiss* be <u>DENIED</u>.

Respectfully submitted,
NEW ENGLAND CENTRAL RAILROAD, INC.,
by its attorneys,

 /s/  Richard A. Davidson, Jr
Michael B. Flynn              BBO# 559023
*mbflynn@flynnassoc.com*
Richard A. Davidson, Jr.      BBO# 552988
*radavidsonjr@flynnassoc.com*
FLYNN & ASSOCIATES, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169
(617) 773-5500

Dated:  February 17, 2005

11

## **REQUEST FOR HEARING**

In accordance with Local Rule 7.1(D), the NECR believes that oral argument may assist the Court and wishes to be heard, and, therefore requests that the Court schedule a hearing on the within motion.

<div style="margin-left:40%">

Respectfully submitted,
NEW ENGLAND CENTRAL RAILROAD, INC.,
by its attorneys,

 /s/  Richard A. Davidson, Jr.
Michael B. Flynn          BBO# 559023
*mbflynn@flynnassoc.com*
Richard A. Davidson, Jr.    BBO# 552988
*radavidsonjr@flynnassoc.com*
FLYNN & ASSOCIATES, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169
(617) 773-5500

</div>

Dated:  February 17, 2005

# Exhibit "A"

560                    INTERSTATE COMMERCE COMMISSION REPORTS

## APPENDIX

### TERMS AND CONDITIONS OF TRACKAGE RIGHTS
IMPOSED BY THE INTERSTATE COMMERCE COMMISSION
GOVERNING THE USE BY BOSTON AND MAINE CORPORATION
OF CERTAIN LINES OF CENTRAL VERMONT RAILWAY, INC.

0.    *DEFINITIONS*

As used herein, the following capitalized terms have the following meanings (any other capitalized terms being defined in context hereafter):

0.1 "Agreement" means the terms and conditions of trackage rights as a whole set forth herein, as though the instant terms and conditions had been agreed to contractually by B&M and CV.

0.2 "Amtrak" means the National Railroad Passenger Corporation.

0.3 "B&M" means Boston and Maine Corporation, a corporation with its principal office at Iron Horse Park, North Billerica, Massachusetts 01862.

0.4 "CCR" means Claremont and Concord Railway (including its successors and assigns).

0.5 "Conveyance Date" means September 9, 1988, the date on which B&M conveyed the Former B&M Line to Amtrak, and on which Amtrak conveyed the same to CV, pursuant to the Order.

0.6 "CV" means Central Vermont Railway, Inc., a corporation with its principal office at 2 Federal Street, St. Albans, Vermont 05478.

0.7 "CV Lines" means the approximately 13.4-mile rail line between White River Junction, Vermont, and Windsor, Vermont, and the approximately 10.6-mile rail line between Brattleboro, Vermont, and East Northfield, Massachusetts, both of which have belonged to CV since before the Conveyance Date.

0.8 "Former B&M Line" means the approximately 48.8-mile rail line between Windsor, Vermont, and Brattleboro, Vermont, conveyed by B&M to Amtrak, and by Amtrak to CV, on the Conveyance Date pursuant to the Order.

0.9 "GMRC" means the Green Mountain Railroad Corporation (including its successors and assigns).

0.10 "ICC" means the U.S. Interstate Commerce Commission.

0.11 "Line" means the CV Lines and the Former B&M Line together.

0.12 "Order" means the decision of the ICC in *National Railroad Passenger Corporation—Conveyance of Boston and Maine Corporation Interest in Connecticut River Line in Vermont and New Hampshire*, dated August 4, 1988, served August 9, 1988, and published at pages 761 through 817 of volume 4 of the ICC Reports, Second Series.

0.13 "ST" means the Springfield Terminal Railway Company (including its successors and assigns).

AMTRACK—CONVEYANCE OF B&M IN CONN RIVER LINE IN VT & NH   561

## 1. GRANT OF TRACKAGE RIGHTS

1.1  Subject to the terms and conditions of this Agreement, B&M shall have the non-exclusive right to operate B&M's trains, locomotives, cars and equipment with B&M's own crews over the Line, as more particularly defined as follows:

All main line track and passing sidings between a point at the interlocking at East Northfield, Massachusetts (approximately B&M MP 49.67 and CV MP 110.51) to the Bank switch at the termination of B&M ownership at White River Junction, Vermont (approximately CV MP 13.40).

1.2  B&M shall have only overhead running rights over the CV Lines.

1.3  B&M shall have the exclusive right to serve all existing shippers and shippers' facilities that were located on the Former B&M Line as of the Conveyance Date, including any and all new shippers that locate at such existing facilities after the Conveyance Date, provided that B&M makes available a minimum three day per week service along the Line. B&M must consult with the shippers and ensure their needs are met up to three day per week service.

1.3.1  For purposes of this Section 1.3, "existing shippers and shippers' facilities" shall mean industries and facilities at rail sidings which received or tendered rail shipments during the twelve months immediately prior to the Conveyance Date.

1.3.2  For purposes of this Section 1.3, "three day per week service" shall mean the provision of local set-off and pick-up service to shippers on the Former B&M Line at least three times per week (Monday through the following Sunday) in each direction.

1.3.3  CV shall be permitted to commence service to existing shippers and shippers' facilities upon B&M's failure to make available three day per week service during two weeks out of any four week period, unless such failure is excused by Section 9.6.

1.4  Except as provided in Section 1.3, CV and B&M shall each have the right to compete for and serve the following shippers and shippers' facilities on the Former B&M Line:

(a)  shippers and shippers' facilities located on the Former B&M Line which have not received or tendered rail shipments during the twelve months immediately prior to the Conveyance Date;

(b)  any other new shippers;

(c)  any existing shippers and shippers' facilities to which B&M does not provide a minimum three day per week service, as specified in Section 1.3.

1.4.1  CV shall, upon request by B&M, provide reciprocal switching to permit B&M to serve such shippers and shippers' facilities as B&M may serve hereunder. CV shall not be required to switch cars on B&M's behalf at shippers' facilities which CV serves by virtue of B&M's failure to make available a minimum three day per week service along the Line as specified by Section 1.3, but B&M shall retain the right to provide service directly to such shippers and shippers' facilities. B&M shall pay to CV a per switch charge not greater than 180% of the CV variable cost of providing such switching service computed using CV's costs computed in accordance with formulas generally used or accepted in ICC proceedings.

1.5  CV and B&M shall each have the right to compete for and to interchange traffic at Bellows Falls, Vermont, with GMRC and at Claremont Junction, New Hampshire, with the CCR. B&M shall have the exclusive right to interchange traffic at Charlestown, New Hampshire, with the ST.

1.6  B&M shall have the right of entry over the Line for any and all B&M employees, agents or representatives, machinery, vehicles or equipment which B&M may

6 I.C.C.2d

AMTRACK—CONVEYANCE OF B&M IN CONN RIVER LINE IN VT & NH    563

carloads, B&M shall pay CV as additional compensation 20.1¢ per car mile for all the cars in excess of 32,500 cars, whether loaded or empty, including locomotives, cabooses and work equipment.

3.4  All payments to be made by B&M and CV under this Agreement (including the caps set forth in Section 3.3) shall be adjusted effective March 31, 1989, and semi-annually thereafter, for price level changes from July 1, 1988, (using September 1988) based on the relationship of the most recent quarter's Association of American Railroads (AAR) Eastern District, Quarterly Indices of Chargeout Prices and Wage Rates (Table C) - "Material prices, wage rates and supplements combined (excluding fuel)" to comparable indices of the quarter six months previous. The first adjustment to be made shall be based on the comparison of the Fourth Quarter 1988 index value to the Second Quarter 1988.  *"(using Second Quarter 198*

3.5  B&M shall have responsibility for and shall report and pay directly to the owner of the cars, all mileage, car hire and other charges accruing on cars in B&M's trains on the Line.

3.6  CV shall issue its bill to B&M for the payments specified by Sections 1.4 and 3.3 by the fifteenth (15) day of each month for the traffic transported during the preceding calendar month. B&M shall pay to CV the amount shown on such bill by the last day of the month in which such bill is issued; B&M shall not be required to pay mileage charges attributable to its operations over the Former B&M Line once payments made in the preceding months of that year with respect to those operations equal the payment cap as adjusted in accordance with Section 3.4 for that year, until traffic attributable to B&M's operations over the Former B&M Line exceeds 32,500 carloads for that year. Payments not received by CV by such last day of the month in which the bill is issued will accrue interest at the rate of one and one-half (1.5%) percent per month for each month or portion of a month by which the payment is late.

3.7  In the event that CV is required to undertake any major capital projects which may become necessary due to changes in applicable local, state or federal statutes, ordinances or regulations, or by catastrophic occurrences on the Line, including but not limited to floods or destruction of bridges, B&M or its assignee shall pay its proportionate share of the expenditures actually made by CV for such capital projects based upon the percentage of total car miles on the Line attributable to B&M's (or its assignee's) average traffic volume during the preceding five (5) year period.

## 4.  ADDITIONS AND ALTERATIONS

4.1  CV shall pay for and be responsible for the construction, maintenance, repair and renewal of any additional connections to the Line which it may require.

4.2  If B&M determines that changes in or additions and betterments to the Line, including changes in communication, dispatching or signal facilities as they existed immediately prior to the Conveyance Date, are required to accommodate CV's and Amtrak's operations beyond that required by CV to accommodate CV's and Amtrak's operations over the Line, B&M shall pay for the construction of such additional or altered facilities, including the annual expense of maintaining, repairing, and renewing such additional or altered facilities. Notwithstanding the foregoing, CV shall have the right to approve of any such addition or alteration prior to its construction, which approval shall not be unreasonably withheld, and such addition or alteration shall be constructed in such a manner as to minimize interference with CV's or Amtrak's operations over the Line.

## 5.  SCHEDULING OF TRAINS AND MAINTENANCE; OPERATING RULES

5.1  The trains, locomotives, cars and equipment of B&M, CV, Amtrak, and any other present or future user of the Line or any portion thereof, shall be operated without prejudice or partiality to any party to this Agreement or any such other user and in such a

564            INTERSTATE COMMERCE COMMISSION REPORTS

manner as will result in the most economical and efficient manner of movement of all traffic; provided, however, that CV shall give priority to intercity rail passenger trains of Amtrak to the extent required by Section 402 of the Rail Passenger Service Act. Notwithstanding the foregoing, B&M shall have the right, in consultation with CV, to establish the schedules of B&M's trains over the Line. Trains performing local work, whether B&M, CV or otherwise, are not entitled to priority over trains that are not performing such work. CV shall establish CV's train schedules with due regard to the trains to be operated by B&M. Each party shall use reasonable efforts to provide five (5) days' notice of changes in its traffic and operating patterns and procedures which may affect the Line. B&M acknowledges that the upgrading work will require a twelve (12) hour work block scheduled for between 7:00 a.m. and 7:00 p.m. CV shall coordinate with B&M and use its best efforts in scheduling the work required for the upgrading of the Former B&M Line and any future maintenance or repair of the Line to minimize any interference with or disruption of B&M's operations over the Line.

5.2  Any and all training that may be required to qualify B&M operating personnel as to CV's operating rules (after the initial training of such personnel, which will be provided by CV) shall be performed by B&M, and the determination as to whether such operating personnel are qualified under CV's operating rules shall be made in the discretion of B&M (giving consideration to any comments or recommendations of CV). CV shall train, and periodically recertify in accordance with CV's operating rules, B&M operating personnel who act as instructors for B&M personnel regarding CV's operating rules.

5.3  CV operating rules shall govern all operations over the Line, and CV shall report to B&M any incidents of violation of such rules by a B&M employee. CV may at its option, for good cause shown, exclude such employee from the Line.

5.4  In the event that any dispute arises as to the interpretation of any operating rules, the interpretations of the Uniform Code of Operating Rules, as amended, shall govern.

## 6.  CLEARING OF DERAILMENTS AND WRECKS

6.1  In the event of any derailment or wreck of a B&M train, B&M shall clear the Line to allow for the passage of other trains within a reasonable time. B&M shall perform any rerailing wrecking or wrecking train service as may be required in connection with such derailment or wreck, in accordance with its customary practices. Except as provided in Section 7, the cost liability, and expense of the foregoing, including, without limitation, loss of, damage to, or destruction of any property whatsoever and injury to or death of any person or persons whomsoever resulting therefrom, shall be the responsibility of B&M. In the event that B&M does not begin rerailing operations for passage of trains over the Line within twelve (12) hours of its occurrence or does not complete the process of clearing the Line within a reasonable time, CV may clear the Line for passage of trains, and B&M shall reimburse CV for all reasonable costs CV incurs in performing such service.

## 7.  RELEASE AND INDEMNIFICATION

7.1  Save as herein otherwise provided, each party hereto shall be responsible for and shall assume all loss, damage or injury (including injury resulting in death) to persons or property, including the cost of removing any trackage, repairing trackage and correcting environmental damage, which may be caused by its engines, cars, trains or other on-track equipment (including damage by fire originating therefrom) whether or not the condition or arrangement of the trackage contributes in any manner or to any extent to such loss, damage or injury, and whether or not a third party may have caused or contributed to such loss, damage or injury, and for all loss or damage to its engines, cars, trains or other car-

6 I.C.C.2d

AMTRACK—CONVEYANCE OF B&M IN CONN RIVER LINE IN VT & NH   565

track equipment while on said trackage from any cause whatsoever, except in the case of collision, in which event the provisions of Section 7.2 shall apply.

7.2  In the event of a collision between CV's and B&M's engines, cars, trains or other on-track equipment while on this Line, the apportionment of liability between the parties hereto for all loss, damage or injury (including injury resulting in death) to any person (including CV's or B&M's employees, agents or representatives) or property shall be governed by the following provisions:

7.2.1  If the employees of one party are solely at fault, that party shall be responsible for all such loss, damage or injury including the cost of removing wreckage, repairing trackage, and correcting environmental damage.

7.2.2  If the employees of both parties hereto are at fault, or if the cause of the accident is so concealed that it cannot be determined whose employees are at fault, each party shall bear and pay for all such loss, damage or injury which its own engines, cars, trains or other on-track equipment and their contents or property in its custody, or its employees or others claiming for them, may have suffered by reason or in consequence of the accident. Responsibility for all other such loss, damage or injury shall be apportioned equally between the parties hereto.

7.2.3  The words "all other such loss, damage or injury" referred to in this Section 7.2 shall be deemed to include but not be limited to the cost of removing wreckage, repairing trackage, correcting environmental damage, and third party claims.

7.2.4  As between the parties hereto, the foregoing provisions of this Section 7.2 shall be applicable whether or not a third party may have caused or contributed to the accident.

7.2.5  The words "trackage" referred to in this Section 7 shall be deemed to include but not be limited to the tracks, structures or facilities pertaining to operation of the Line.

7.3  Without in any way restricting the terms of this Section 7, in the case of a collision or accident between the train of either party to this Agreement and the property of a third person or other entity, including any action done in the process of trying to avoid an accident or a collision, each party shall save harmless and indemnify the other party forthwith for all damages suffered by the other party including damages to equipment and structures or injuries (including death) to the employees or agents of this other party including also the results of those actions done in the process of avoiding a collision or accident, and irrespective of negligence of either party or such third person or other entity, and with a right of subrogation in favor of such party against any such third person or other entity.

7.4  Each party hereto shall forever indemnify and save harmless the other party, from and against all claims, liability or judgments by reason or on account of any injury to or death of any person or of any loss or damage to property, the liability for which is herein assumed by such first mentioned party, and such first mentioned party shall pay and discharge any judgment that may be obtained by reason thereof, and all costs, charges and expenses payable thereunder, including legal counsel fees.

7.5  The parties shall settle, as between themselves, any claim for loss or damage according to the terms of this Agreement, notwithstanding any judgment or decree of any court or other tribunal in a proceeding brought by other parties.  In case a suit or proceeding shall be commenced by any person or corporation against either party hereto for or on account of any loss, damage or injury for which the other party hereto is liable under the provisions of this Agreement, the party so sued or proceeded against shall give to the other party reasonable notice, in writing, of the pendency of such suit or proceeding and thereupon the other party shall assume the defense of such suit or proceeding or shall save and hold the party so sued harmless from all loss and costs by reason thereof. Neither party hereto shall be bound by any judgment against the other party unless it shall have reasonable notice that it is so required to defend and has reasonable opportunity to make such defense. When such notice and opportunity has been given, the party notified shall be

566        INTERSTATE COMMERCE COMMISSION REPORTS

bound by the judgment as to all matters that could have been litigated in such suit or proceeding.

7.6  In every case of death or injury suffered by an employee of either B&M or CV, when compensation to such employee or employee's dependents is required to be paid under any workmen's compensation, occupational disease, employer's liability or other law, and either of said parties, under the provisions of this Agreement, is required to pay such compensation, if such compensation is required to be paid in installments over a period of time, such party shall not be released from paying such future installments by reason of the expiration or other termination of this Agreement prior to any of the respective dates upon which any such future installments are to be paid.

## 8. DEFAULT; PAYMENT DELINQUENCY

8.1  In the event of a material breach by B&M of the terms and conditions of this Agreement which continues for a period of forty-five (45) days after notice thereof from CV, CV shall have the right to terminate this Agreement upon ninety (90) days' notice.

8.2  If B&M becomes delinquent in payment of any amount by more than fourteen (14) days under the terms of Section 3.6, CV shall be entitled to receive advance payment from B&M for each B&M train seeking access to the Line until B&M satisfies the delinquency in full. If B&M fails to tender the advance payment, CV shall be further entitled to exclude and eject B&M from the Line until B&M tenders the advance payment. CV shall be entitled to these remedies for delinquencies even if B&M has disputed the billed amount by invoking arbitration or otherwise. During the pendency of any such exclusion or ejectment, CV shall nevertheless accept B&M cars for interchange at any point on the Line.

## 9. GENERAL PROVISIONS

9.1  *No Waiver.* Waiver of any provision of this Agreement, in whole or in part, in any one instance shall not constitute a waiver of any other provision in the same instance, nor any waiver of the same provision in another instance, but each provision shall continue in full force and effect with respect to any other than existing or subsequent breach.

9.2  *Notice.* Any notice required or permitted under this Agreement shall be given in writing to the parties at their respective addresses specified above, or at such other address for a party as that party may specify by notice as provided herein, by (i)(A) delivery in hand or by postage prepaid, United States first class mail and (B) registered or certified mail, return receipt requested, or (ii)(A) telefax and (B) registered or certified mail, return receipt requested, or (iii)(A) Federal Express or other form of expedited mail that provides for delivery to the sender of a signed receipt, or (iv) telegram. Notices so sent shall be effective upon receipt.

9.3  *Integration.* Except for the Order and the documents executed in pursuance thereof, this Agreement constitutes the entire agreement of the parties with respect to its subject matter, superseding all prior oral and written communications, proposals, negotiations, representations, understandings, courses of dealing, agreements, contracts and the like between the parties in such respect. Except for any and all obligations incurred or causes of action accrued thereunder prior to or as of the Conveyance Date, and except as provided in Section 2.4 and 9.3.1 hereof, the Trackage Rights Agreements by and between B&M and CV dated as of April 1, 1985, and January 1, 1990, are hereby terminated. Any provisions of any other agreement(s) between CV and B&M which are not inconsistent with the provisions of this Agreement shall remain in effect until cancelled according to the terms of such other agreement(s).

9.3.1 The provisions of Section 8, Freight Haulage, of the January 1, 1930 Trackage Rights Agreement between CV and B&M, as amended from time to time, shall remain in effect until cancelled by either party upon ninety (90) days' prior written notice to the other.

9.4 *Miscellaneous.* This Agreement (i) may be amended, modified, or terminated, and any right under this Agreement may be waived in whole or in part, only by a writing signed by both parties; (ii) contains headings only for convenience, which headings do not form part of and shall not be used in construction of this Agreement; and (iii) is not intended to inure to the benefit of any party not a party to this Agreement.

9.5 *Availability of Equitable Relief.* The obligations imposed by this Agreement are unique. Breach of any of such obligations would injure the parties to this Agreement; such injury is likely to be difficult to measure; and monetary damages, even if ascertainable, are likely to be inadequate compensation for such injury. Protection of the respective interests provided herein would require equitable relief, including specific performance and injunctive relief, in addition to any other remedy or remedies that the parties may have at law or under this Agreement.

9.6 *Force Majeure.* No party to this Agreement shall be responsible for delays or errors in its performance or other breach under this Agreement occurring by reason of circumstances beyond its control, including acts of civil or military authority, national emergencies, fire, major mechanical breakdown, labor disputes, flood or catastrophe, acts of God, insurrection, war, riots, delays in suppliers, derailments or failure of transportation, communication or power supply.

9.7 *Trains, Locomotives, Cars or Equipment.* As used in this Agreement, whenever reference is made to the trains, locomotives, cars or equipment of, or in the account of, one of the parties hereto, such expression means the trains, locomotives, cars and equipment in the possession of or operated by one of the parties and includes such trains, locomotives, cars and equipment which are owned by, leased to, or in the account of such party. Whenever such trains, locomotives, cars or equipment are owned or leased by one party to this Agreement and are in the possession or account of, or under the control of the other party to this Agreement, such trains, locomotives, cars and equipment shall be considered those of the other party, except where the cars or equipment are being transported under the Haulage Agreement referred to in Section 9.3.1 of this Agreement.

9.8 *Assignment.* This Agreement shall bind and inure to the benefit of the parties and their respective legal representatives, successors and assigns. B&M shall have the right to assign any or all of B&M's rights and obligations under this Agreement to any affiliate of B&M, following consultation with CV. B&M shall have the right to assign any or all of B&M's rights and obligations under this Agreement to any other person with CV's prior consent, which shall not be withheld unreasonably. In the event of an Agreement, the number of carloads attributable to the assignee's operations over the Former B&M Line shall be included in the number of cars attributable to B&M's operations for the purposes of Section 3.3 of this Agreement.

9.9 *Governing Law.* This Agreement is imposed and entered into in, and shall be governed by the laws of, the District of Columbia.

# Exhibit "B"

BEFORE THE
SURFACE TRANSPORTATION BOARD

---

BOSTON AND MAINE CORPORATION
and
SPRINGFIELD TERMINAL RAILWAY COMPANY

v.

NEW ENGLAND CENTRAL RAILROAD, INC.

---

Docket No. _____

---

FORMAL COMPLAINT AND PETITION FOR DECLARATORY ORDER

---

## JURISDICTION

1.     The Board has jurisdiction to adjudicate this formal complaint pursuant to 49 U.S.C. §§ 11701 and 11704(b). The Board has jurisdiction to issue a declaratory order pursuant to 49 U.S.C. § 721 and 5 U.S.C. § 554(e) to terminate a controversy or remove uncertainty.

## PARTIES

2.     The Boston and Maine Corporation ("B&M") is a common carrier by rail subject to the jurisdiction of the Board pursuant to 49 U.S.C. § 10501(a). B&M maintains its principal place of business at Iron Horse Park, North Billerica, Massachusetts 01862.

3.    The Springfield Terminal Railway Company ("ST") is a common carrier by rail subject to the jurisdiction of the Board pursuant to 49 U.S.C. § 10501(a). ST maintains its principal place of business at Iron Horse Park, North Billerica, Massachusetts 01862.

4.    New England Central Railroad, Inc. ("NECR") is a common carrier by rail subject to the jurisdiction of the Board pursuant to 49 U.S.C. § 10501(a). NECR maintains its principal place of business at 2 Federal Street, Suite 201, St. Albans, Vermont 05478.

### FACTS COMMON TO ALL CLAIMS

5.    In a decision served February 6, 1990, the Board's predecessor in interest, the Interstate Commerce Commission ("ICC"), imposed the terms and conditions of a trackage rights order ("TRO") upon the B&M and NECR's predecessor in interest, Central Vermont Railway, Inc. ("CV").

6.    The TRO was imposed by the ICC as part of the compensation to be paid to B&M in an eminent domain proceeding brought by the National Railroad Passenger Corporation ("Amtrak") to acquire a line of railroad located between White River Junction, Vermont and East Northfield, Massachusetts (the "Line").

7.    CV acquired its interest in the Line from Amtrak subsequent to the eminent domain proceeding and subject to the requirement that CV grant trackage rights to B&M.

8.    ST subsequently succeeded to the rights of B&M under the trackage rights agreement and currently operates trains on the Line.

9.    NECR acquired the assets of CV, including the Line and CV's rights and responsibilities under the TRO, in 1995. NECR continues to own and operate the Line.

2

10.     As the owner of the Line, NECR is required to inspect and maintain the line to a standard that is in compliance with the TRO and the Track Safety Standards promulgated by the Federal Railroad Administration ("FRA").

11.     NECR also is required to maintain the Line in a safe condition for its intended uses.

12.     NECR failed to inspect or maintain the Line to such standards in multiple locations along the Line, including the location where the derailment described below began.

13.     Moreover, specialized testing performed on or about June 8, 2004 by FRA on the Line had disclosed that there were multiple locations along the line that were unsafe, did not meet FRA Class II standards, and were otherwise in violation of the FRA Track Safety Standards.

14.     The results of this testing were provided to NECR before the Derailment, yet NECR failed to correct these dangerous conditions on the Line.

15.     On or about July 3, 2004, an ST train was operating southbound on the Line when a car partially derailed near Hartland, Vermont.

16.     Upon reaching a switch on the Line, the partially derailed car fully derailed, along with six additional cars.

17.     The cause of this derailment (the "Derailment") was a defective, unsafe track condition.

## FORMAL COMPLAINT FOR DAMAGES

### First Cause of Action—Breach of the Interstate Commerce Act and an Order Issued Thereunder

18.     B&M and ST repeat and reallege the allegations of Paragraphs 1 through 17 as if fully set forth here.

3

19.    Part A of Subtitle IV of Title 49 of the United States Code (the "Interstate Commerce Act" or "ICA") and the TRO ordered by the ICC require NECR to maintain the Line at not less than FRA Class II condition.

20.    The Line and, in particular, the portion of the Line where the Derailment began, was not being maintained by NECR at the time of the Derailment in a safe condition, nor was it being maintained in accordance with the TRO or the FRA Track Safety Standards.

21.    NECR knew or should have known that the Line was not in Class II condition and not safe at the time of the Derailment.

22.    NECR's failure to maintain the Line safely and in Class II condition was the cause of the Derailment.

23.    NECR's failure to maintain the Line safely and in Class II condition violated the ICA and the TRO.

24.    NECR's failure to maintain the Line safely and in Class II condition damaged B&M and ST in excess of $100,000, including damaged or destroyed railroad cars, excess per diem costs, wrecking and rerailing costs and excess crew costs.

<div align="center"><strong><u>Second Cause of Action—Breach of Contract</u></strong></div>

25.    B&M and ST repeat and reallege the allegations contained in Paragraphs 1 through 24 as if fully set forth here.

26.    Pursuant to Sections 3.2 and 3.3 of the TRO, NECR is solely responsible for the maintenance and repair of the Line at all times to not less than FRA Class II condition in exchange for the payment of a trackage rights fee by ST.

27.    The Derailment was caused by the failure of NECR to maintain the Line in accordance with its obligations under the TRO and the Track Safety Standards established by the FRA.

28.    This failure of NECR to perform its obligations constituted a breach of the TRO, which is a contract between NECR, on the one hand, and B&M and ST, on the other.

29.    As a result of NECR's breach of contract, B&M and ST suffered damages in excess of $100,000, including damaged or destroyed railroad cars, excess per diem costs, wrecking and rerailing costs and excess crew costs.

### Third Cause of Action—Tortious Injury to B&M and ST Due to Gross Negligence, Recklessness, and Willful Misconduct of NECR

30.    B&M and ST repeat and reallege the allegations contained in Paragraphs 1 through 29 as if fully set forth here.

31.    NECR had a duty to maintain the Line in safe condition for B&M, ST and all other users thereof.

32.    Portions of the Line—including the section where the Derailment began—were in substandard condition, in breach of applicable federal regulations, unsafe for users such as B&M and ST, and hence presented a substantial risk of derailment of B&M and ST's trains.

33.    NECR knew of these adverse conditions.

34.    NECR nevertheless failed to maintain the Line in an appropriate, safe, and legally sufficient condition.

35.    NECR therefore breached its duty to B&M and ST in a grossly negligent, reckless, and willful manner.

36.    B&M and ST were injured in excess of $100,000, including damaged or destroyed railroad cars, excess per diem costs, wrecking and rerailing costs and excess crew costs, as the result of NECR's misconduct.

## REQUEST FOR DECLARATORY ORDER

37.    B&M and ST repeat and reallege the allegations contained in Paragraphs 1 through 36 as if fully set forth here.

38.    NECR's breach of its duties under the ICA, the TRO, and at common law was grossly negligent, reckless, or willful.

39.    NECR's breach of such duties was the proximate cause of the Derailment.

40.    NECR has taken the position that under the terms of the TRO, ST is solely responsible for all expenses arising out of the Derailment, including expenses relating to the repair of the track and other expenses incurred by NECR, even if the sole cause of the Derailment was NECR's breach of its duties under the ICA, the TRO, and at common law.

41.    In furtherance of this position, NECR has demanded payment by B&M and ST of approximately $750,000, allegedly constituting NECR's expenses in respect of the Derailment.

42.    In support of this position, NECR apparently relies upon Section 7.1 of the TRO, which NECR interprets as apportioning to B&M and ST all responsibility for the Derailment even if the Derailment was caused solely by NECR's grossly negligent, reckless, or willful misconduct.

43.    Such an interpretation does not reflect the intent of the parties, or of the ICC, at the time the terms and conditions of the TRO were imposed.

44.    Such an interpretation also would be contrary to public policy and the intent of the ICA, the Federal Rail Safety Act, and other applicable statutes, regulations, and orders.

6

WHEREFORE, B&M and ST respectfully request that the Board enter an order—

(1)    declaring that the TRO does not apportion any liability to B&M or ST for damages caused by NECR's gross negligence, recklessness, and willful misconduct;

(2)    awarding B&M and ST compensatory, incidental, and punitive damages due to NECR's violation of the ICA, the TRO (as order and as contract), and NECR's common law duties;

(3)    awarding B&M and ST their costs in connection with this proceeding, including a reasonable attorneys' fee; and

(4)    awarding B&M and ST such other and further relief as may be just.

B&M and ST suggest that this proceeding be handled under the Board's Modified Procedures.

Respectfully submitted,

Eric L. Hirschhorn
Winston & Strawn LLP
1400 L Street, NW
Washington DC 20005
Tel. 202-371-5706

Robert B. Culliford
Guilford Rail System
Iron Horse Park
North Billerica MA 01862
Tel. 978-663-1029

Dated:    October 29, 2004

7

## CERTIFICATE OF SERVICE

I certify that on this _____ 1st _____ day of November 2004, I served a copy of the foregoing document upon the respondent, New England Central Railroad, Inc., by facsimile and overnight courier, at the following address and facsimile number:

Chief Legal Officer
New England Central Railroad, Inc.
2 Federal Street, Suite 201
St. Albans, Vermont 05478

Fax no. 802-527-3455.

The cover page of the facsimile transmitting and the cover of the envelope containing such copy bear the legend, "Service of STB Complaint."

_Bonnie J. Boling_
Bonnie J. Boling

# Exhibit "C"

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CENTRAL RAILROAD, INC.,<br>Plaintiff,<br><br>v.<br><br>SPRINGFIELD TERMINAL RAILWAY<br>COMPANY and BOSTON AND MAINE<br>CORPORATION,<br>Defendants | Civil Action No.:   04-30235-MAP |

## AFFIDAVIT OF RICHARD A. DAVIDSON, JR.

Now comes Attorney Richard A. Davidson, Jr., to set forth the following:

1.      I am Richard A. Davidson, Jr., an attorney licensed to practice law in the Commonwealth of Massachusetts, the United States District Court for the District of Massachusetts, and before the United States Court of Appeals for the First Circuit.

2.      I am co-counsel to the plaintiff, New England Central Railroad, Inc., in the above-captioned matter.

3.      On December 6, 2004, service of process was effectuated upon the defendants.

4.      On December 10, 2004, the court issued an electronic order acknowledging the receipt of each summons served on each defendant and noted that each answer was due to be filed on December 27, 2004.

5.      On December 20, 2004, defendants' counsel, Robert B. Culliford, called me and requested that his clients be granted an extension to answer the complaint.

6.      I then granted, pursuant to Attorney Culliford's request, the defendants an

additional thirty (30) days to answer the complaint.

      7.      At no time did Attorney Culliford request or indicate to me that he desired to file any other pleading other than an answer within thirty (30) days.

      8.      Had Attorney Culliford requested additional time to file a motion to dismiss or otherwise plead, other than answer, then I would have not granted his request without first consulting with and obtaining authorization from my client.

      9.      During that same telephone conversation, Attorney Culliford inquired as to why the action was filed in Springfield and not in Boston as all counsel were located more conveniently near Boston.

      10.      In response to his question, I informed Attorney Culliford that the Western Division of the District of Massachusetts was the most appropriate division within the district for the action to be brought due to the fact that the NECR runs through that division and the division is the closest to the region in Vermont wherein the dispute took place.

      11.      There was no discussion in that telephone conversation between us concerning diversity jurisdiction.

      12.      It was only upon a review of the defendants' *motion* this date that I became aware of the defendants' issues set forth in their *motion,* i.e. the lack of diversity jurisdiction and whether the Interstate Commerce Act ("ICA") preempted my client's claims.

      13.      Today, was the first time that the parties discussed the issue of diversity jurisdiction.

      14.      There never have been any discussions between the parties as to whether or not the ICA preempts my client's claims.

      15.      On December 23, 2004, I received from Attorney Culliford a letter in which

Attorney Culliford "confirms" the granting of the additional time to respond.

16.    In the letter Attorney Culliford also sets forth that the extension granted is to answer or otherwise respond.

17.    I failed to pick up on the additional language of "or otherwise respond" at the time of the receipt of his letter.

18.    It was only after I checked the letter this date that I first noticed the additional language which was not part of our initial agreement.

Signed under the pains and penalties of perjury this 25th day of January, 2005.


                                            /s/  Richard A. Davidson, Jr.
                                            Richard A. Davidson, Jr.          BBO# 552988

G:\F & A\CASE FILES\RAILAMERICA\BM - STRC-Hartland\pleadings\NECR Motion to Strike Motion to Dismiss - Affidavit in Support.doc

3

# Exhibit "D"



**BOSTON & MAINE CORPORATION**
**MAINE CENTRAL RAILROAD COMPANY**
**SPRINGFIELD TERMINAL RAILWAY COMPANY**

**IRON HORSE PARK**
**NO. BILLERICA, MASS. 01862**



RECEIVED
DEC 2 3 2004
By

**LAW DEPARTMENT**
**(978) 663-1029**

December 20, 2004

Richard A. Davidson, Jr., Esquire
Flynn & Associates, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169

Re:    **New England Central Railroad, Inc. v. Boston and Maine Corp. and**
       **Springfield Terminal Railway Co.**
       **C.A. No. 04-30235 MAP**

Dear Mr. Davidson:

Please accept this letter as confirmation of our earlier discussion in which we agreed to a 30 day extension of time in which to answer or otherwise respond to the complaint in the above-referenced action. By my estimation, the defendants' answer or other response will now be due on January 25, 2004.

Thank you again for your courtesies. Please feel free to contact me if you should have any questions or comments.

Sincerely,

Robert B. Culliford
Corporate Counsel

cc:    Eric L. Hirschhorn, Esq.