UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CENTRAL RAILROAD, INC.,
Plaintiff,

v.

Civil Action No.:  04-30235-MAP

SPRINGFIELD TERMINAL RAILWAY
COMPANY and BOSTON AND MAINE
CORPORATION,
Defendants

## PLAINTIFF'S OPPOSITION TO THE DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT AND REQUEST FOR ORAL ARGUMENT

The Plaintiff, New England Central Railroad, Inc. ("NECR") hereby opposes the *Motion to Dismiss* plaintiff's *Amended Complaint* which has been filed by the defendants, Springfield Terminal Railway Company and Boston and Main Corporation ("STRC/B&M") on the grounds that the Plaintiff's *Amended Complaint* states claims upon which relief can be granted, the federal court has jurisdiction over the NECR's claims, and it would inappropriate to refer this case to the Surface Transportation Board.  As further grounds therefore, the NECR states as follows:

## I.        FACTUAL BACKGROUND:

In 1988, the National Railroad Passenger Corporation ("AMTRAK") purchased from the B&M a section of railroad track located between Brattleboro, VT and Windsor, VT. This section of track is commonly known as the "Connecticut River Line."  See *Amended Complaint* at ¶ 9. AMTRAK immediately thereafter conveyed the Connecticut River Line to the Central Vermont

Railway, Inc. ("CV"). Id. at ¶ 10. CV was the NECR's predecessor. In 1994, the NECR purchased the CV's assets which included the tracks and rights which are the subject of the NECR's *Amended Complaint.* Id. at ¶ 11.

As part of the conveyance of the Connecticut River Line from the B&M to AMTRAK, and then to the CV, the CV was required by the Interstate Commerce Commission ("ICC") to grant back to the B&M certain rights (known as "Trackage Rights") to operate its freight trains over the CV's tracks between East Northfield, MA and White River Junction, VT. Id. at ¶ 12. Initially, the parties operated under a temporary "*Interim Agreement*" regarding the B&M's Trackage Rights. Id. at ¶ 13.

On May 18, 1989, the CV petitioned the ICC to impose permanent terms and conditions for the B&M's Trackage Rights over a 48.8 mile segment of the Connecticut River Line as well as certain CV track segments at both ends of the Connecticut River Line. Id. at ¶ 14. On February 6, 1990, the ICC imposed a *Modified Trackage Rights Agreement* (the "Agreement") governing the terms and conditions of the B&M's use of the CV's (now NECR's) main-line track between East Northfield, MA and White River Junction, VT. Id. at ¶ 15. A copy of the *Agreement* imposed by the ICC is attached as Exhibit "A." Thus, although the *Agreement* is simply a contract between the parties, it has been imposed by the ICC and is therefore considered to be an ICC order.[1]

The *Agreement* is still in effect and currently governs the rights, responsibilities and obligations of the NECR, the B&M and/or STRC with respect to the operation of trains over the NECR's mainline track between East Northfield, MA and White River Junction, VT. The STRC/B&M has been operating trains over the tracks subject to the *Agreement* since 1990.

---

[1] In fact, the STRC/B&M consistently refer to the Agreement as a *Trackage Rights Order* ("TRO").

It is clear that the *Agreement* is simply a private agreement between two parties (the

NECR and STRC/B&M), and that it imposes a number of typical obligations on both railroads.

For instance, at issue in this case is a provision which allocates responsibility for certain losses:

> [E]ach party hereto shall be responsible for and shall assume <u>all loss, damage or injury...to persons or property,</u> including the cost of removing any trackage, repairing trackage and correcting environmental damage, which may be caused by its engines, cars, trains or other on-track equipment (including damage by fire originating therefrom) <u>whether or not the condition or arrangement of the trackage contributes in any manner or to any extent to such loss, damage or injury,</u> and whether or not a third party may have caused or contributed to such loss, damage or injury, and for all loss or damage to its engines, cars, trains or other on-track equipment while on said trackage from any cause whatsoever, except in the case of collision, in which event the provisions of Section 7.2 shall apply.

See Exh. A at § 7.1 (emphasis supplied.).[2]

On July 3, 2004, employees of the STRC/B&M were operating a STRC/B&M freight

train over a section of the NECR's mainline which is subject to the *Agreement.* See *Amended*

*Complaint* at ¶ 20. The train derailed and caused extensive damage to the NECR's trackage and

related property in the area of the derailment. <u>Id</u>. at ¶ 21-26. As a result of the damage caused

by the derailment, the NECR has suffered extensive damages. <u>Id</u>. at ¶ 27-34.

On or about November 1, 2004, the STRC/B&M filed, with the Surface Transportation

Board ("STB"), the ICC's successor agency, a *Formal Complaint and Petition for Declaratory*

*Order* (the "*Petition*"), a copy of which is attached as Exhibit "B." In its *Petition*, the

STRC/B&M sought, *inter alia*, monetary compensation for damages the B&M/STRC allegedly

incurred as a result of the derailment. <u>Id</u>. The B&M/STRC alleged, in its *Petition*, that the

---

[2] Any reference to the "trains, locomotives, cars or equipment of, or on the account of, one of the parties hereto" means "the trains, locomotives, cars and equipment <u>in the possession of or operated by one of the parties</u> and includes such trains, locomotives, cars and equipment which are owned by, leased to, or in the account of such party." Exh. A at § 9.7 (emphasis supplied).

NECR violated the *Agreement*.  Id.  On February 23, 2005, the STB dismissed the B&M/STRC's

*Petition*.  A copy of the STB decision is attached as Exhibit "C," the B&M/STRC appealed the

dismissal of their appeal and the appeal is presently pending.  In sum, the STB found that:

> [G]iven that this dispute is founded primarily on claims of breach
> of contract and tortious actions, we find that the courts are the
> appropriate forum to resolve the dispute.  This agency has
> recognized that resolution of contract disputes should typically be
> pursued before the courts or through arbitration, and we believe
> that deference to the court should apply here.  The dispute does not
> involve the interpretation of a core operational provision of the
> TRO and does not involve service questions, over which we have
> primary jurisdiction, but is, rather, a dispute of liability for a
> derailment, an area as to which we have very little expertise and
> limited authority.

Id. at 3.

On or about December 2, 2004, the NECR filed its original *Complaint* in this case

seeking, pursuant to § 7.1, recovery of the damages it incurred as a result of the derailment.  On

or about January 21, 2005, the defendants filed a *Motion to Dismiss* the *Complaint*.  The plaintiff

thereafter filed an *Opposition* to the *Motion to Dismiss* and, at the same time, filed a *Motion for

Leave to Amend Complaint.*  Plaintiff then withdrew its *Motion for Leave to Amend Complaint*

and filed its *Amended Complaint* causing the defendants to withdraw their *Motion to Dismiss* and

then they filed their present pending motion.

Jurisdiction over the subject of the matter which forms the basis of the claims set forth in

Counts I - IV of the *Amended Complaint* is based on the jurisdictional provisions of the federal

*Interstate Commerce Commission Termination Act* (the "ICCTA"), 49 U.S.C. § 11704.  See

*Amended Complaint* at ¶ 5.  The *Amended Complaint* also alleges that this Court has

supplemental jurisdiction over the plaintiff's common law breach of contract, negligence and

wanton/willful allegations (Counts V - X) on the grounds that they are sufficiently related to the

claims made under 49 U.S.C. § 11704.  Id. at ¶ 6.

The defendants' present *Motion* seeks to dismiss Counts I - IV of the *Amended Complaint* (the 49 U.S.C. § 11704 claims).[3]  These Counts allege that the plaintiff has been injured by the defendants' failure to obey an order of the STB, by failing to comply with the provisions of the *Agreement* and also by failing to pay the damages as required by § 7.1 of the *Agreement*, which, as noted herein, is an *Order* of the STB.  The *Motion* also seeks to dismiss the plaintiff's common law claims in their entirety.

## II.    DISCUSSION OF LAW:

### A.    The Interstate Commerce Commission Termination Act:

In 1887, Congress passed the Interstate Commerce Act ("ICA"), which established a statutory scheme for regulating the nation's railroads.  The ICA was originally codified at 49 U.S.C. § 1, *et. seq.*  The ICA established the ICC as the federal regulatory agency responsible for overseeing railroad transportation.  Although the ICA has been changed and amended numerous times since its inception, it continues (in its present form) to govern interstate commerce.  In 1995, Congress abolished the ICC by enacting the ICCTA.  Pub. L. No. 104-88, Dec. 29, 1995, 109 Stat. 803.  The ICCTA established the STB to take the place of the ICC and granted the STB exclusive jurisdiction over rail functions and proceedings.  See 49 U.S.C. § 701(a).  Congress' purpose in passing the ICCTA was to substantially reduce the regulation of railroads and other modes of surface transportation.  See 49 U.S.C. § 10101; see also H.R. Rep. No. 104-311, at 82 (1995); Sen. Rep. No. 104-176, at 2 (1995).

---

[3] The defendants' motion seeks to have Counts I-IV referred to the STB under the primary jurisdiction doctrine. Although the motion requests a referral, the effect the motion seeks is dismissal of these Counts.

**B.**    **The Federal court Has Independent Subject Matter Jurisdiction of the**
**NECR's Complaint Since it Arises Under An Act of Congress Regulating**
**Commerce:**

    **1.**    **49 U.S.C. § 10501(b) Does Not Give to the STB Exclusive Jurisdiction Over**
    **the NECR's Claims:**

Although pursuant to 49 U.S.C. § 10501(b), the STB has jurisdiction over many aspects

of the regulation of railroad transportation, federal courts have concurrent jurisdiction with the

STB over claims for damages arising under the ICCTA.  The ICCTA specifically authorizes the

filing of civil actions to recover damages from a rail carrier in certain situations, and has

conferred upon the federal court subject matter jurisdiction over these actions.  See 49 U.S.C. §

11704.  Thus, "[a] person[4] injured because a rail carrier…<u>does not obey an order of the Board</u>"

has the right to "bring a civil action <u>in a United States District Court</u> to enforce that order under

this subsection."  49 U.S.C. § 11704(a) (emphasis supplied).  Similarly, "[a] person may file a

complaint with the Board…or bring a civil action under subsection (b) of this section <u>to enforce</u>

<u>liability against a rail carrier</u> providing transportation subject to the jurisdiction of the Board

under this part."  49 U.S.C. § 11704(c)(1) (emphasis supplied).[5]  These sections clearly authorize

the filing of certain actions (including the action filed by the NECR here) in federal court.  These

sections also clearly suggest that the STB's jurisdiction may in some instances be concurrent, but

is certainly not exclusive.[6]  The *Amended Complaint* has specifically invoked the jurisdictional

---

[4] By definition, a "rail carrier" is considered to be a "person" for purposes of the ICCTA.  See 49 U.S.C. § 10102(5) ("rail carrier" means <u>a person</u> providing common carrier railroad transportation for compensation,…"); <u>Chicago R.I. & P.R. Co. v. Chicago, B. & Q.R. Co.</u>, 301 F. Supp. 72 (N.D. Ill. 1969), *affirmed* 437 F.2d 6, *cert. denied* 401 U.S. 996 (A railroad corporation is a "person" for purposes of federal court jurisdiction over a civil action between two railroads).

[5] The "subsection (b)" referred to states that "[a] rail carrier providing transportation subject to the jurisdiction of the Board under this part is liable for damages sustained by a person as a result of an act or omission of that carrier in violation of this part."  49 U.S.C. § 11704(b).

[6] The First Circuit in <u>Pejepscot</u> arrived at this conclusion only after reviewing the legislative history of both §

provisions of 49 U.S.C. § 11704.  See *Amended Complaint* at ¶ 5.

Jurisdiction over ICCTA claims is also the subject of a recent First Circuit decision, <u>Pejepscot Industrial Park, Inc. d/b/a Grimmel Industries v. Maine Central Railroad Co., et al.,</u> 215 F.3d 195 (1st Cir. 2000).  In <u>Pejepscot</u>, the First Circuit ruled that § 10501(b) does not grant the STB exclusive jurisdiction over claims against rail carriers alleging violations of either the ICCTA or an STB order, and also that the federal court has subject matter jurisdiction over such claims.  <u>Id</u>. at 197.  The First Circuit's holding in <u>Pejepscot</u> is completely adverse to the preemption argument made by the defendants' in the *Memorandum of Reasons in Support of the Defendants' Motion to Dismiss*.  However, the defendants have failed to bring this countervailing authority to this Honorable Court's attention, even though they have cited the case for other reasons.  This oversight is particularly egregious given that one of the defendants here (STRC) was also a defendant in the <u>Pejepscot</u> case and both of the STRC's counsel in this case were also STRC's counsel in the <u>Pejepscot</u> case.

Further, what makes this oversight even more egregious is that the plaintiff brought this oversight to the defendants' attention in its *Opposition* to their original *Motion to Dismiss,* which was filed on February 17, 2005; yet, despite the fact that the oversight was raised to the defendants in the previous *Opposition*, the defendants failed to correct the oversight and have filed herewith essentially the same legal argument.

The First Circuit and the STB agree that the STB does not have exclusive jurisdiction over rail carriers.  Although when "read in isolation [§ 10501(b)]…appears to grant the STB exclusive jurisdiction over any claim involving 'transportation by rail carriers…other sections of

---

10501(b) and § 11704.  See <u>Pejepscot</u>, 215 F.3d at 203-205.  Of particular importance, the court noted that § 11704 of the ICCTA "'reenacts the applicable rail portions of former § 11705.  These include authority for injured persons to seek judicial enforcement of agency orders and to seek damages from a violation of the statute.'"  <u>Id</u>. at 203 *quoting* H.R. Conf. Rep. No. 104-422, at 195 (1995), reprinted in 1995 U.S.C.C.A.N. 850, 880.

the ICCTA permit the filing of certain types of suits in federal court." Pejepscot, 215 F.3d at 199; see, e.g. 49 U.S.C. § 11705(a) (establishing a three-year statute of limitations on civil actions to recover payment of services provided by rail carriers); 49 U.S.C. § 11705(b) (establishing a three year statute of limitations in civil actions for the recovery of overcharges); and 49 U.S.C. § 11706(d) (authorizing shippers to file civil actions for recovery under bills of lading). As the First Circuit noted, "[I]t is difficult to reconcile these provisions with the notion that the STB has exclusive jurisdiction over all matters under the ICCTA."[7] Pejepscot, 215 F.3d at 199.

The STB has consistently held, in its own decisions, that it does not have jurisdiction to interpret or construe private contracts between rail carriers, including trackage rights agreements. See, e.g. *Lackawanna County Railroad Authority – Acquisition Exemption-F&L Realty, Inc.,* STB Finance Docket No. 33905 (STB served October 22, 2001), at 6 ("The parties want us to interpret the various agreements that have been entered into the record and to clarify their respective rights to operate the track. The interpretation of these agreements, however, lies within the purview of the courts, not us."); *The Town of Woodbridge, NJ, et al v. Consolidated Rail Corporation, Inc.,* STB Docket No. 42053 (STB served March 23, 2001) at 3, ("the courts are well suited to address matters of contract interpretation, and if necessary, fashion appropriate remedies."); *The Town of Woodbridge, NJ, et. al. v. Consolidated Rail Corporation, Inc.*, STB Docket No. 42053 (STB served December 1, 2000) at 5, ("It would be inappropriate for us to rule on the merits of the contract dispute in this case. Such matters are best addressed by the courts."); *Kansas City Southern Railway Company – Adverse Discontinuance Application – A*

---

[7] The First Circuit noted that in interpreting the preemptive effect of § 10501(b) "we 'will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute…and the objects and policy of the law.'" Pejepscot, 215 F.3d at 201, *quoting* Puerto Rico Tel. Co., v. Telecommunications Reg. Bd., 189 F.3d 1, 9 (1st Cir. 1999).

*Line of Arkansas and Missouri Railroad Company,* 1999 STB LEXIS 179 (Docket No. AB-103[Sub-No. 14], decided March 23, 1999) at *16 ("We reiterate here, as we have stated in the past, that the Board will not undertake to interpret or enforce operating agreements or contracts."); *Arbitration of Disputes Subject to Stat. Juris. of the STB.* 2 S.T.B. 564, 568-569 and 583 (1997) (STB recognized limits to its jurisdiction when developing arbitration rules to expedite proceedings); *Brotherhood of Locomotive Engineers v. C&NW Transp. Co.,* 366 I.C.C. 857, 858 (1983) ("contractual disputes between the parties to trackage rights agreements are matters for the courts to resolve.").  Moreover, the STB has <u>in this case</u> ruled that it does not have jurisdiction over the NECR's claims and that these claims should be adjudicated in federal court.  See Exh. C.

Both 49 U.S.C. §§ 11704(b) and (c)(1) apply to the NECR's claims here because the STRC/B&M's failure to indemnify as required under the *Agreement* is a violation of an STB order (the *Trackage Rights Order*) and the *Amended Complaint* is clearly the NECR's attempt to "enforce liability against a rail carrier."  The defendants have also conceded that although the *Amended Complaint* alleges breach of contract, negligence and wanton, reckless and willful conduct, these claims are "made actionable by 49 U.S.C. § 11704(b)."  See *Memorandum of Reasons in Support of the Defendants'* (original) *Motion to Dismiss*, a copy of which is attached as Exhibit "D,"

**2.    The Federal court has Jurisdiction over the NECR's Claims
        Pursuant to 28 U.S.C.  § 1337(a):**

The federal court also has independent subject matter jurisdiction over the case pursuant to 28 U.S.C.  § 1337(a):

> The District Court shall have original jurisdiction of any civil
> action or proceeding arising under any act of Congress regulating

commerce or protecting trade and commerce against restraints and
monopolies.

28 U.S.C. § 1337(a). The NECR's claims here clearly arise under an act of Congress regulating

commerce, that being the ICCTA (specifically, 49 U.S.C. § 11704). The defendants have

admitted this in their pleadings. The federal court has subject matter jurisdiction over a claim

arising under § 11704, pursuant to the jurisdictional authority conferred by 28 U.S.C. § 1337(a).

See e.g. Pejepscot, 215 F.3d at 205-206.

A federal court can exercise its discretion to refuse to dismiss a case for lack of subject

matter jurisdiction, even if the initial complaint fails to make the proper jurisdictional allegation,

provided the federal court nevertheless has jurisdiction over the matter. See Odishelidze v.

Aetna Life & Casualty Co., et al, 853 F.2d 21, 24 (1st Cir. 1988); Eisler v. Stritzler, 535 F.2d,

148, 152 (1st Cir. 1976). At least one First Circuit decision has ruled that in a situation such as is

presented here, amendment of the complaint to allege proper jurisdictional grounds is not

necessary: "[s]ince we conclude that the District Court had federal question jurisdiction over at

least portions of this lawsuit, it would be a baseless formality to require plaintiffs to amend their

complaint, and we consider plaintiffs' complaint to be amended as alleging jurisdiction under

(certain federal statutes)." Eisler, 535 F.2d at 152, n.3 *citing to* Norton v. Larney, 266 U.S. 511

(1925).

**3.    Supplemental Jurisdiction Pursuant to 28 U.S.C. § 1367:**

The federal court also has supplemental jurisdiction over the NECR's common-law

claims. 28 U.S.C. § 1367 provides as follows:

> In any civil action of which the District Courts have original
> jurisdiction, the District Courts shall have supplemental
> jurisdiction over all other claims that are so related to claims in the
> action within such original jurisdiction that they form part of the

10

> same case or controversy under Article 3 of the United States
> Constitution.

28 U.S.C. § 1367(a).  Although federal courts may decline to exercise supplemental jurisdiction

if the state claim "substantially predominates over the claim or claims over which the District

Court has original jurisdiction" or "the claim raises a novel or complex issue of state law" [see

28 U.S.C. § 1367(c)(2)], neither of these exceptions apply to the case at hand.   As stated by the

First Circuit in Pejepscot:

> [t]he decision to exercise supplemental jurisdiction
> is left to the sound discretion of the district court.  See Vera-Lozano v.
> International Broad., 50 F. 3d 67, 70 (1st Cir. 1995).  A federal
> court may exercise supplemental jurisdiction over a state claim
> whenever it is joined with a federal claim and the two claims
> "derive from a common nucleus of operative fact" and the plaintiff
> "would ordinarily be expected to try them both in one judicial
> proceeding."  Id.; United Mine Workers v. Gibbs, 383 U.S. 715,
> 725, 16 L.Ed. 2d 218, 86 S. Ct. 1130 (1966).

215 F.3d at 206.  Thus, this Honorable Court has jurisdiction over all of the claims in this case.

C.    **The NECR's 49 U.S.C. § 11704 Claims Are Not Referable to the STB Under the "Primary Jurisdiction" Doctrine:**

The defendants have also argued that the STB retains primary jurisdiction over the

NECR's claims for violations of 49 U.S.C. §11704 (Counts I - IV).  The defendants' argument is

that the STB is "uniquely suited" to determine the meaning of the *Agreement*, and also make

decisions about national rail transportation policy, relying primarily on the case of Rymes

Heating Oils, Inc. v. Springfield Terminal Ry. Co., 358 F.3d 82, 91 (1st Cir. 2004).  However, the

STB has already, in this case, specifically rejected this argument and specifically ruled that the

primary jurisdiction doctrine does not apply here.

More specifically, in the decision dismissing the defendants' STB petition, the STB ruled

that the provisions of the *Agreement* which are at issue here are not the type of issues which

11

would be subject to the STB's primary jurisdiction and also do not amount to issues of "national rail transportation policy":

> The dispute does not involve the interpretation of a core operational provision of the TO and does not involve service questions, over which we have primary jurisdiction, but is, rather, a dispute over liability for a derailment, an area as to which we have very little expertise and limited authority…The intent of this language (in the *Agreement)* was not to require the agency to get involved in issues such as liability over derailment.  Indeed, this agency does not have special expertise regarding the adjudication and award of damages concerning the claims presented in this proceeding.

Exh. C at 3.  The STB also substantively discussed the First Circuit's decision in <u>Rymes</u> and specifically expressed why <u>Rymes</u> actually supports the rejection of the primary jurisdiction doctrine, and the adjudication of this case in the federal court.  The STB first noted that <u>Rymes</u> involved regulatory matters which are more appropriate subjects for the STB's jurisdiction:

> unlike the current proceeding, the dispute in <u>Rymes</u> involved the interests of shippers protected under our governing statute, and did not concern non-regulatory issues such as responsibility for an accident.  Thus, while the Board was the appropriate forum to adjudicate the dispute in <u>Rymes</u>, it is not here.

<u>Id</u>. at 4.  The STB then went on to discuss the three factors that the First Circuit, in <u>Rymes</u>, decided must be considered to determine if the STB's primary jurisdiction applies.  These factors are as follows:

> (1)  whether the agency determination lies at the heart of the task assigned by the agency;  (2)  whether the agency expertise is required to unravel intricate technical facts; and (3)  whether, though perhaps not determinative, the agency determination would materially aid the court.

<u>Rymes</u>, 358 F.3d at 91, *citing*  <u>Pejepscot</u>, 215 F.3d at 205; see also Exh. C at 4.  Applying these factors to the facts of the case at hand, the STB determined that it does not have primary

jurisdiction because:

> [T]he agency determinations in the TRO are not central to the
> dispute here.  The dispute centers around fact-bound issues that
> can most expeditiously and properly be resolved by the courts.
> Nor is agency expertise required to unravel intricate technical
> facts.  This agency is not charged with the investigation of the
> cause of train accidents and has little expertise in determining
> gross negligence, recklessness and willful misconduct, or in
> determining damages on the basis of such conduct.  Similarly, the
> expertise of the Board is not needed to resolve other major fact-
> bound issues that could be dispositive of the matter, such as the
> condition of the track when the accident occurred, the extent, if
> any, to which the accident had any connection with track
> maintenance, and the intent of the landlord and tenant carriers
> when the terms of § 7.1 were being worked out.  Thus, we do not
> believe that the determination by the Board here would materially
> aide a court should the parties choose to pursue this matter there.
> For the foregoing reasons, we conclude the primary issues
> presented here are more properly the subject of adjudication before
> the courts, and we will, therefore dismiss the *Complaint*...

Exh. C at § 4. There is simply no need to further elaborate on this issue, as the STB has already

eloquently and affirmatively described precisely why the primary jurisdiction doctrine does not

apply.

### III.    CONCLUSION:

WHEREFORE, for all the above-stated reasons, the plaintiff NECR respectfully requests

that the defendants' *Motion to Dismiss* be <u>DENIED</u>.

<div style="margin-left: 40%;">

Respectfully submitted,
NEW ENGLAND CENTRAL RAILROAD, INC.
by its attorneys,


 /s/ Richard A. Davidson, Jr.
Michael B. Flynn            BBO#559203
Richard A. Davidson, Jr.,    BBO#552988
FLYNN & ASSOCIATES, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA  02169
(617) 773-5500

</div>

13

## <u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to Local Rule 7.1(D), the plaintiff respectfully states that oral argument may

assist the Court and requests a hearing on the defendants' *Motion To Dismiss*.

Respectfully submitted,

Respectfully submitted,
NEW ENGLAND CENTRAL RAILROAD, INC.
by its attorneys,

 /s/ Richard A, Davidson, Jr.
Michael B. Flynn            BBO#559203
Richard A. Davidson, Jr.,      BBO#552988
FLYNN & ASSOCIATES, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA  02169
(617) 773-5500

Dated:  April 6, 2005

G:\F & A\CASE FILES\RAILAMERICA\BM - STRC-Hartland\pleadings\NECR Opposition to deft. Motion to Dismiss-1.doc

# Exhibit "A"

560          INTERSTATE COMMERCE COMMISSION REPORTS

### APPENDIX

TERMS AND CONDITIONS OF TRACKAGE RIGHTS
IMPOSED BY THE INTERSTATE COMMERCE COMMISSION
GOVERNING THE USE BY BOSTON AND MAINE CORPORATION
OF CERTAIN LINES OF CENTRAL VERMONT RAILWAY, INC.

0.   *DEFINITIONS*

As used herein, the following capitalized terms have the following meanings (any other capitalized terms being defined in context hereafter):—

0.1  "Agreement" means the terms and conditions of trackage rights as a whole set forth herein, as though the instant terms and conditions had been agreed to contractually by B&M and CV.

0.2  "Amtrak" means the National Railroad Passenger Corporation.

0.3  "B&M" means Boston and Maine Corporation, a corporation with its principal office at Iron Horse Park, North Billerica, Massachusetts 01862.

0.4  "CCR" means Claremont and Concord Railway (including its successors and assigns).

0.5  "Conveyance Date" means September 9, 1988, the date on which B&M conveyed the Former B&M Line to Amtrak, and on which Amtrak conveyed the same to CV, pursuant to the Order.

0.6  "CV" means Central Vermont Railway, Inc., a corporation with its principal office at 2 Federal Street, St. Albans, Vermont 05478.

0.7  "CV Lines" means the approximately 13.4-mile rail line between White River Junction, Vermont, and Windsor, Vermont, and the approximately 10.6-mile rail line between Brattleboro, Vermont, and East Northfield, Massachusetts, both of which have belonged to CV since before the Conveyance Date.

0.8  "Former B&M Line" means the approximately 48.8-mile rail line between Windsor, Vermont, and Brattleboro, Vermont, conveyed by B&M to Amtrak, and by Amtrak to CV, on the Conveyance Date pursuant to the Order.

0.9  "GMRC" means the Green Mountain Railroad Corporation (including its successors and assigns).

0.10  "ICC" means the U.S. Interstate Commerce Commission.

0.11  "Line" means the CV Lines and the Former B&M Line together.

0.12  "Order" means the decision of the ICC in *National Railroad Passenger Corporation—Conveyance of Boston and Maine Corporation Interests in Connecticut River Line in Vermont and New Hampshire*, dated August 4, 1988, served August 9, 1988, and published at pages 761 through 817 of volume 4 of the ICC Reports, Second Series.

0.13  "ST" means the Springfield Terminal Railway Company (including its successors and assigns).

1. *GRANT OF TRACKAGE RIGHTS*

1.1 Subject to the terms and conditions of this Agreement, B&M shall have the non-exclusive right to operate B&M's trains, locomotives, cars and equipment with B&M's own crews over the Line, as more particularly defined as follows:

All main line track and passing sidings between a point at the interlocking at East Northfield, Massachusetts (approximately B&M MP 49.67 and CV MP 110.51) to the Bank switch at the termination of B&M ownership at White River Junction, Vermont (approximately CV MP 13.40).

1.2 B&M shall have only overhead running rights over the CV Lines.

1.3 B&M shall have the exclusive right to serve all existing shippers and shippers' facilities that were located on the Former B&M Line as of the Conveyance Date, including any and all new shippers that locate at such existing facilities after the Conveyance Date, provided that B&M makes available a minimum three day per week service along the Line. B&M must consult with the shippers and ensure their needs are met up to three day per week service.

1.3.1 For purposes of this Section 1.3, "existing shippers and shippers' facilities" shall mean industries and facilities at rail sidings which received or tendered rail shipments during the twelve months immediately prior to the Conveyance Date.

1.3.2 For purposes of this Section 1.3, "three day per week service" shall mean the provision of local set-off and pick-up service to shippers on the Former B&M Line at least three times per week (Monday through the following Sunday) in each direction.

1.3.3 CV shall be permitted to commence service to existing shippers and shippers' facilities upon B&M's failure to make available three day per week service during two weeks out of any four week period, unless such failure is excused by Section 9.6.

1.4 Except as provided in Section 1.3, CV and B&M shall each have the right to compete for and serve the following shippers and shippers' facilities on the Former B&M Line:

(a) shippers and shippers' facilities located on the Former B&M Line which have not received or tendered rail shipments during the twelve months immediately prior to the Conveyance Date;

(b) any other new shippers;

(c) any existing shippers and shippers' facilities to which B&M does not provide a minimum three day per week service, as specified in Section 1.3.

1.4.1 CV shall, upon request by B&M, provide reciprocal switching to permit B&M to serve such shippers and shippers' facilities as B&M may serve hereunder. CV shall not be required to switch cars on B&M's behalf at shippers' facilities which CV serves by virtue of B&M's failure to make available a minimum three day per week service along the Line as specified by Section 1.3, but B&M shall retain the right to provide service directly to such shippers and shippers' facilities. B&M shall pay to CV a per switch charge not greater than 180% of the CV variable cost of providing such switching service computed using CV's costs computed in accordance with formulas generally used or accepted in ICC proceedings.

1.5 CV and B&M shall each have the right to compete for and to interchange traffic at Bellows Falls, Vermont, with GMRC and at Claremont Junction, New Hampshire, with the CCR. B&M shall have the exclusive right to interchange traffic at Charlestown, New Hampshire, with the ST.

1.6 B&M shall have the right of entry over the Line for any and all B&M employees, agents or representatives, machinery, vehicles or equipment which B&M may

AMTRACK—CONVEYANCE OF B&M IN CONN RIVER LINE IN VT & NH  563

carloads, B&M shall pay CV as additional compensation 20.1¢ per car mile for all the cars in excess of 32,500 cars, whether loaded or empty, including locomotives, cabooses and work equipment.

3.4  All payments to be made by B&M and CV under this Agreement (including the caps set forth in Section 3.3) shall be adjusted effective March 31, 1989, and semi-annually thereafter, for price level changes from July 1, 1988, (using September 1988) based on the relationship of the most recent quarter's Association of American Railroads (AAR) Eastern District, Quarterly Indices of Chargeout Prices and Wage Rates (Table C) - "Material prices, wage rates and supplements combined (excluding fuel)" to comparable indices of the quarter six months previous. The first adjustment to be made shall be based on the comparison of the Fourth Quarter 1988 index value to the Second Quarter 1988.

3.5  B&M shall have responsibility for and shall report and pay directly to the owner of the cars, all mileage, car hire and other charges accruing on cars in B&M's trains on the Line.

3.6  CV shall issue its bill to B&M for the payments specified by Sections 1.4 and 3.3 by the fifteenth (15) day of each month for the traffic transported during the preceding calendar month. B&M shall pay to CV the amount shown on such bill by the last day of the month in which such bill is issued. B&M shall not be required to pay mileage charges attributable to its operations over the Former B&M Line once payments made in the preceding months of that year with respect to those operations equal the payment cap as adjusted in accordance with Section 3.4 for that year, until traffic attributable to B&M's operations over the Former B&M Line exceeds 32,500 carloads for that year. Payments not received by CV by such last day of the month in which the bill is issued will accrue interest at the rate of one and one-half (1.5%) percent per month for each month or portion of a month by which the payment is late.

3.7  In the event that CV is required to undertake any major capital projects which may become necessary due to changes in applicable local, state or federal statutes, ordinances or regulations, or by catastrophic occurrences on the Line, including but not limited to floods or destruction of bridges, B&M or its assignee shall pay its proportionate share of the expenditures actually made by CV for such capital projects based upon the percentage of total car miles on the Line attributable to B&M's (or its assignee's) average traffic volume during the preceding five (5) year period.

## 4.  ADDITIONS AND ALTERATIONS

4.1  CV shall pay for and be responsible for the construction, maintenance, repair and renewal of any additional connections to the Line which it may require.

4.2  If B&M determines that changes in or additions and betterments to the Line, including changes in communication, dispatching or signal facilities as they existed immediately prior to the Conveyance Date, are required to accommodate B&M's operations beyond that required by CV to accommodate CV's and Amtrak's operations over the Line, B&M shall pay for the construction of such additional or altered facilities, including the annual expense of maintaining, repairing, and renewing such additional or altered facilities. Notwithstanding the foregoing, CV shall have the right to approve of any such addition or alteration prior to its construction, which approval shall not be unreasonably withheld, and such addition or alteration shall be constructed in such a manner as to minimize interference with CV's or Amtrak's operations over the Line.

## 5.  SCHEDULING OF TRAINS AND MAINTENANCE; OPERATING RULES

5.1  The trains, locomotives, cars and equipment of B&M, CV, Amtrak, and any other present or future user of the Line or any portion thereof, shall be operated without prejudice or partiality to any party to this Agreement or any such other user and in such a

6 I.C.C.2d

564                    INTERSTATE COMMERCE COMMISSION REPORTS

manner as will result in the most economical and efficient manner of movement of all traffic; provided, however, that CV shall give priority to intercity rail passenger trains of Amtrak to the extent required by Section 402 of the Rail Passenger Service Act. Notwithstanding the foregoing, B&M shall have the right, in consultation with CV, to establish the schedules of B&M's trains over the Line. Trains performing local work, whether B&M, CV or otherwise, are not entitled to priority over trains that are not performing such work. CV shall establish CV's train schedules with due regard to the trains to be operated by B&M. Each party shall use reasonable efforts to provide five (5) days' notice of changes in its traffic and operating patterns and procedures which may affect the Line. B&M acknowledges that the upgrading work will require a twelve (12) hour work block scheduled for between 7:00 a.m. and 7:00 p.m. CV shall coordinate with B&M and use its best efforts in scheduling the work required for the upgrading of the Former B&M Line and any future maintenance or repair of the Line to minimize any interference with or disruption of B&M's operations over the Line.

5.2 Any and all training that may be required to qualify B&M operating personnel as to CV's operating rules (after the initial training of such personnel, which will be provided by CV) shall be performed by B&M, and the determination as to whether such operating personnel are qualified under CV's operating rules shall be made in the discretion of B&M (giving consideration to any comments or recommendations of CV). CV shall train, and periodically recertify in accordance with CV's operating rules, B&M operating personnel who act as instructors for B&M personnel regarding CV's operating rules.

5.3 CV operating rules shall govern all operations over the Line, and CV shall report to B&M any incidents of violation of such rules by a B&M employee. CV may at its option, for good cause shown, exclude such employee from the Line.

5.4 In the event that any dispute arises as to the interpretation of any operating rules, the interpretations of the Uniform Code of Operating Rules, as amended, shall govern.

## 6. CLEARING OF DERAILMENTS AND WRECKS

6.1 In the event of any derailment or wreck of a B&M train, B&M shall clear the Line to allow for the passage of other trains within a reasonable time. B&M shall perform any rerailing wrecking or wrecking train service as may be required in connection with such derailment or wreck, in accordance with its customary practices. Except as provided in Section 7, the cost liability, and expense of the foregoing, including, without limitation, loss of, damage to, or destruction of any property whatsoever and injury to or death of any person or persons whomsoever resulting therefrom, shall be the responsibility of B&M. In the event that B&M does not begin rerailing operations for passage of trains over the Line within twelve (12) hours of an occurrence or does not complete the process of clearing the Line within a reasonable time, CV may clear the Line for passage of trains, and B&M shall reimburse CV for all reasonable costs CV incurs in performing such service.

## 7. RELEASE AND INDEMNIFICATION

7.1 Save as herein otherwise provided, each party hereto shall be responsible for and shall assume all loss, damage or injury (including injury resulting in death) to persons or property, including the cost of removing any trackage, repairing trackage and correcting environmental damage, which may be caused by its engines, cars, trains or other on-track equipment (including damage by fire originating therefrom) whether or not the condition or arrangement of the trackage contributes in any manner or to any extent to such loss, damage or injury, and whether or not a third party may have caused or contributed to such loss, damage or injury, and for all loss or damage to its engines, cars, trains or other co-

AMTRACK–CONVEYANCE OF B&M IN CONN RIVER LINE IN VT & NH  565

track equipment while on said trackage from any cause whatsoever, except in the case of collision, in which event the provisions of Section 7.2 shall apply.

7.2  In the event of a collision between CV's and B&M's engines, cars, trains or other on-track equipment while on the Line, the apportionment of liability between the parties hereto for all loss, damage or injury (including injury resulting in death) to any person (including CV's or B&M's employees, agents or representatives) or property shall be governed by the following provisions:

7.2.1  If the employees of one party are solely at fault, that party shall be responsible for all such loss, damage or injury including the cost of removing wreckage, repairing trackage, and correcting environmental damage.

7.2.2  If the employees of both parties hereto are at fault, or if the causes of the accident is so concealed that it cannot be determined whose employees are at fault, each party shall bear and pay for all such loss, damage or injury which its own engines, cars, trains or other on-track equipment and their contents or property in its custody, or its employees or others claiming for them, may have suffered by reason or in consequence of the accident. Responsibility for all other such loss, damage or injury shall be apportioned equally between the parties hereto.

7.2.3  The words "all other such loss, damage or injury" referred to in this Section 7.2 shall be deemed to include but not be limited to the cost of removing wreckage, repairing trackage, correcting environmental damage, and third party claims.

7.2.4  As between the parties hereto, the foregoing provisions of this Section 7.2 shall be applicable whether or not a third party may have caused or contributed to the accident.

7.2.5  The words "trackage" referred to in this Section 7 shall be deemed to include but not be limited to the tracks, structures or facilities pertaining to operation of the Line.

7.3  Without in any way restricting the terms of this Section 7, in the case of a collision or accident between the train of either party to this Agreement and the property of a third person or other entity, including any action done in the process of trying to avoid an accident or a collision, such party shall save harmless and indemnify the other party forthwith for all damages suffered by the other party including damages to equipment and structures or injuries (including death) to the employees or agents of the other party including also the results of those actions done in the process of avoiding a collision or accident, and irrespective of negligence of either party or such third person or other entity, and with a right of subrogation in favor of such party against any such third person or other entity.

7.4  Each party hereto shall forever indemnify and save harmless the other party, from and against all claims, liability or judgments by reason or on account of any injury to or death of any person or of any loss or damage to property, the liability for which is herein assumed by such first mentioned party, and such first mentioned party shall pay and discharge any judgment that may be obtained by reason thereof, and all costs, charges and expenses payable thereunder, including legal counsel fees.

7.5  The parties shall settle, as between themselves, any claim for loss or damage according to the terms of this Agreement, notwithstanding any judgment or decree of any court or other tribunal in a proceeding brought by other parties.  In case a suit or proceeding shall be commenced by any person or corporation against either party hereto for or on account of any loss, damage or injury for which the other party hereto is liable under the provisions of this Agreement, the party so sued or proceeded against shall give to the other party reasonable notice, in writing, of the pendency of such suit or proceeding and thereupon the other party shall assume the defense of such suit or proceeding or shall save and hold the party so sued harmless from all loss and costs by reason thereof. Neither party hereto shall be bound by any judgment against the other party unless it shall have reasonable notice that it is so required to defend and has reasonable opportunity to make such defense.  When such notice and opportunity has been given, the party notified shall be

6 I.C.C.2d

566          INTERSTATE COMMERCE COMMISSION REPORTS

bound by the judgment as to all matters that could have been litigated in such suit or proceeding.

7.6  In every case of death or injury suffered by an employee of either B&M or CV, when compensation to such employee or employee's dependents is required to be paid under any workmen's compensation, occupational disease, employer's liability or other law, and either of said parties, under the provisions of this Agreement, is required to pay such compensation, if such compensation is required to be paid in installments over a period of time, such party shall not be released from paying such future installments by reason of the expiration or other termination of this Agreement prior to any of the respective dates upon which any such future installments are to be paid.

## 8.  DEFAULT; PAYMENT DELINQUENCY

8.1  In the event of a material breach by B&M of the terms and conditions of this Agreement which continues for a period of forty-five (45) days after notice thereof from CV, CV shall have the right to terminate this Agreement upon ninety (90) days' notice.

8.2  If B&M becomes delinquent in payment of any amount by more than fourteen (14) days under the terms of Section 3.6, CV shall be entitled to receive advance payment from B&M for each B&M train seeking access to the Line until B&M satisfies the delinquency in full.  If B&M fails to tender the advance payment, CV shall be further entitled to exclude and eject B&M from the Line until B&M tenders the advance payment. CV shall be entitled to these remedies for delinquencies even if B&M has disputed the billed amount by invoking arbitration or otherwise.  During the pendency of any such exclusion or ejectment, CV shall nevertheless accept B&M cars for interchange at any point on the Line.

## 9.  GENERAL PROVISIONS

9.1  No Waiver.  Waiver of any provision of this Agreement, in whole or in part, in any one instance shall not constitute a waiver of any other provision in the same instance, nor any waiver of the same provision in another instance, but each provision shall continue in full force and effect with respect to any other then existing or subsequent breach.

9.2  Notice.  Any notice required or permitted under this Agreement shall be given in writing to the parties at their respective addresses specified above, or at such other address for a party as that party may specify by notice as provided herein, by (I)(A) delivery in hand or by postage prepaid, United States first class mail and (B) registered or certified mail, return receipt requested, or (ii)(A) telefax and (B) registered or certified mail, return receipt requested, or (iii)(A) Federal Express or other form of expedited mail that provides for delivery to the sender of a signed receipt, or (iv) telegram.  Notice so sent shall be effective upon receipt.

9.3  Integration.  Except for the Order and the documents executed in pursuance thereof, this Agreement constitutes the entire agreement of the parties with respect to its subject matter, superseding all prior oral and written communications, proposals, negotiations, representations, understandings, courses of dealing, agreements, contracts and the like between the parties in such respect.  Except for any and all obligations incurred or causes of action accrued thereunder prior to or as of the Conveyance Date, and except as provided in Section 2.4 and 9.3.1 hereof, the Trackage Rights Agreements by and between B&M and CV dated as of April 1, 1988, and January 1, 1990, are hereby terminated.  Any provisions of any other agreement(s) between CV and B&M which are not inconsistent with the provisions of this Agreement shall remain in effect until cancelled according to the terms of such other agreement(s).

6 I.C.C.2d

AMTRACK--CONVEYANCE OF B&M IN CONN RIVER LINE IN VT & NH    567

9.3.1 The provisions of Section 8, Freight Haulage, of the January 1, 1950 Trackage Rights Agreement between CV and B&M, as amended from time to time, shall remain in effect until cancelled by either party upon ninety (90) days' prior written notice to the other.

9.4 *Miscellaneous.* This Agreement (i) may be amended, modified, or terminated, and any right under this Agreement may be waived in whole or in part, only by a writing signed by both parties; (ii) contains headings only for convenience, which headings do not form part of and shall not be used in construction of this Agreement; and (iii) is not intended to inure to the benefit of any party not a party to this Agreement.

9.5 *Availability of Equitable Relief.* The obligations imposed by this Agreement are unique. Breach of any of such obligations would injure the parties to this Agreement; such injury is likely to be difficult to measure; and monetary damages, even if ascertainable, are likely to be inadequate compensation for such injury. Protection of the respective interests provided herein would require equitable relief, including specific performance and injunctive relief, in addition to any other remedy or remedies that the parties may have at law or under this Agreement.

9.6 *Force Majeure.* No party to this Agreement shall be responsible for delays or errors in its performance or other breach under this Agreement occurring by reason of circumstances beyond its control, including acts of civil or military authority, national emergencies, fire, major mechanical breakdown, labor disputes, flood or catastrophe, acts of God, insurrection, war, riots, delays in suppliers, derailments or failure of transportation, communication or power supply.

9.7 *Trains, Locomotives, Cars or Equipment.* As used in this Agreement, whenever reference is made to the trains, locomotives, cars or equipment of, or in the account of, one of the parties hereto, such expression means the trains, locomotives, cars and equipment in the possession of or operated by one of the parties and includes such trains, locomotives, cars and equipment which are owned by, leased to, or in the account of such party. Whenever such trains, locomotives, cars or equipment are owned or leased by one party to this Agreement and are in the possession or account of, or under the control of the other party to this Agreement, such trains, locomotives, cars and equipment shall be considered those of the other party, except where the cars or equipment are being transported under the Haulage Agreement referred to in Section 9.3.1 of this Agreement.

9.8 *Assignment.* This Agreement shall bind and inure to the benefit of the parties and their respective legal representatives, successors and assigns. B&M shall have the right to assign any or all of B&M's rights and obligations under this Agreement to any affiliate of B&M, following consultation with CV. B&M shall have the right to assign any or all of B&M's rights and obligations under this Agreement to any other person with CV's prior consent, which shall not be withheld unreasonably. In the event of an Agreement, the number of carloads attributable to the assignee's operations over the Former B&M Line shall be included in the number of cars attributable to B&M's operations for the purposes of Section 3.3 of this Agreement.

9.9 *Governing Law.* This Agreement is imposed and entered into in, and shall be governed by the laws of, the District of Columbia.

6 I.C.C.2d

# Exhibit "B"

**BEFORE THE**
**SURFACE TRANSPORTATION BOARD**

---

**BOSTON AND MAINE CORPORATION**
**and**
**SPRINGFIELD TERMINAL RAILWAY COMPANY**

**v.**

**NEW ENGLAND CENTRAL RAILROAD, INC.**

---

Docket No. _____

---

**FORMAL COMPLAINT AND PETITION FOR DECLARATORY ORDER**

---

**JURISDICTION**

1.     The Board has jurisdiction to adjudicate this formal complaint pursuant to 49

U.S.C. §§ 11701 and 11704(b).  The Board has jurisdiction to issue a declaratory order pursuant

to 49 U.S.C. § 721 and 5 U.S.C. § 554(e) to terminate a controversy or remove uncertainty.

**PARTIES**

2.     The Boston and Maine Corporation ("B&M") is a common carrier by rail subject

to the jurisdiction of the Board pursuant to 49 U.S.C. § 10501(a).  B&M maintains its principal

place of business  at Iron Horse Park, North Billerica, Massachusetts 01862.

3.    The Springfield Terminal Railway Company ("ST") is a common carrier by rail subject to the jurisdiction of the Board pursuant to 49 U.S.C. § 10501(a).  ST maintains its principal place of business at Iron Horse Park, North Billerica, Massachusetts 01862.

4.    New England Central Railroad, Inc. ("NECR") is a common carrier by rail subject to the jurisdiction of the Board pursuant to 49 U.S.C. § 10501(a).  NECR maintains its principal place of business at 2 Federal Street, Suite 201, St. Albans, Vermont 05478.

### FACTS COMMON TO ALL CLAIMS

5.    In a decision served February 6, 1990, the Board's predecessor in interest, the Interstate Commerce Commission ("ICC"), imposed the terms and conditions of a trackage rights order ("TRO") upon the B&M and NECR's predecessor in interest, Central Vermont Railway, Inc. ("CV").

6.    The TRO was imposed by the ICC as part of the compensation to be paid to B&M in an eminent domain proceeding brought by the National Railroad Passenger Corporation ("Amtrak") to acquire a line of railroad located between White River Junction, Vermont and East Northfield, Massachusetts (the "Line").

7..    CV acquired its interest in the Line from Amtrak subsequent to the eminent domain proceeding and subject to the requirement that CV grant trackage rights to B&M.

8.    ST subsequently succeeded to the rights of B&M under the trackage rights agreement and currently operates trains on the Line.

9.    NECR acquired the assets of CV, including the Line and CV's rights and responsibilities under the TRO, in 1995.  NECR continues to own and operate the Line.

2

10.    As the owner of the Line, NECR is required to inspect and maintain the line to a standard that is in compliance with the TRO and the Track Safety Standards promulgated by the Federal Railroad Administration ("FRA").

11.    NECR also is required to maintain the Line in a safe condition for its intended uses.

12.    NECR failed to inspect or maintain the Line to such standards in multiple locations along the Line, including the location where the derailment described below began.

13.    Moreover, specialized testing performed on or about June 8, 2004 by FRA on the Line had disclosed that there were multiple locations along the line that were unsafe, did not meet FRA Class II standards, and were otherwise in violation of the FRA Track Safety Standards.

14.    The results of this testing were provided to NECR before the Derailment, yet NECR failed to correct these dangerous conditions on the Line.

15.    On or about July 3, 2004, an ST train was operating southbound on the Line when a car partially derailed near Hartland, Vermont.

16.    Upon reaching a switch on the Line, the partially derailed car fully derailed, along with six additional cars.

17.    The cause of this derailment (the "Derailment") was a defective, unsafe track condition.

## FORMAL COMPLAINT FOR DAMAGES

### First Cause of Action—Breach of the Interstate Commerce Act and an Order Issued Thereunder

18.    B&M and ST repeat and reallege the allegations of Paragraphs 1 through 17 as if fully set forth here.

3

19.    Part A of Subtitle IV of Title 49 of the United States Code (the "Interstate Commerce Act" or "ICA") and the TRO ordered by the ICC require NECR to maintain the Line at not less than FRA Class II condition.

20.    The Line and, in particular, the portion of the Line where the Derailment began, was not being maintained by NECR at the time of the Derailment in a safe condition, nor was it being maintained in accordance with the TRO or the FRA Track Safety Standards.

21.    NECR knew or should have known that the Line was not in Class II condition and not safe at the time of the Derailment.

22.    NECR's failure to maintain the Line safely and in Class II condition was the cause of the Derailment.

23.    NECR's failure to maintain the Line safely and in Class II condition violated the ICA and the TRO.

24.    NECR's failure to maintain the Line safely and in Class II condition damaged B&M and ST in excess of $100,000, including damaged or destroyed railroad cars, excess per diem costs, wrecking and rerailing costs and excess crew costs.

### Second Cause of Action—Breach of Contract

25.    B&M and ST repeat and reallege the allegations contained in Paragraphs 1 through 24 as if fully set forth here.

26.    Pursuant to Sections 3.2 and 3.3 of the TRO, NECR is solely responsible for the maintenance and repair of the Line at all times to not less than FRA Class II condition in exchange for the payment of a trackage rights fee by ST.

4

27.    The Derailment was caused by the failure of NECR to maintain the Line in accordance with its obligations under the TRO and the Track Safety Standards established by the FRA.

28.    This failure of NECR to perform its obligations constituted a breach of the TRO, which is a contract between NECR, on the one hand, and B&M and ST, on the other.

29.    As a result of NECR's breach of contract, B&M and ST suffered damages in excess of $100,000, including damaged or destroyed railroad cars, excess per diem costs, wrecking and rerailing costs and excess crew costs.

### Third Cause of Action—Tortious Injury to B&M and ST Due to Gross Negligence, Recklessness, and Willful Misconduct of NECR

30.    B&M and ST repeat and reallege the allegations contained in Paragraphs 1 through 29 as if fully set forth here.

31.    NECR had a duty to maintain the Line in safe condition for B&M, ST and all other users thereof.

32.    Portions of the Line—including the section where the Derailment began—were in substandard condition, in breach of applicable federal regulations, unsafe for users such as B&M and ST, and hence presented a substantial risk of derailment of B&M and ST's trains.

33.    NECR knew of these adverse conditions.

34.    NECR nevertheless failed to maintain the Line in an appropriate, safe, and legally sufficient condition.

35.    NECR therefore breached its duty to B&M and ST in a grossly negligent, reckless, and willful manner.

36.    B&M and ST were injured in excess of $100,000, including damaged or destroyed railroad cars, excess per diem costs, wrecking and rerailing costs and excess crew costs, as the result of NECR's misconduct.

## REQUEST FOR DECLARATORY ORDER

37.    B&M and ST repeat and reallege the allegations contained in Paragraphs 1 through 36 as if fully set forth here.

38.    NECR's breach of its duties under the ICA, the TRO, and at common law was grossly negligent, reckless, or willful.

39.    NECR's breach of such duties was the proximate cause of the Derailment.

40.    NECR has taken the position that under the terms of the TRO, ST is solely responsible for all expenses arising out of the Derailment, including expenses relating to the repair of the track and other expenses incurred by NECR, even if the sole cause of the Derailment was NECR's breach of its duties under the ICA, the TRO, and at common law.

41.    In furtherance of this position, NECR has demanded payment by B&M and ST of approximately $750,000, allegedly constituting NECR's expenses in respect of the Derailment.

42.    In support of this position, NECR apparently relies upon Section 7.1 of the TRO, which NECR interprets as apportioning to B&M and ST all responsibility for the Derailment even if the Derailment was caused solely by NECR's grossly negligent, reckless, or willful misconduct.

43.    Such an interpretation does not reflect the intent of the parties, or of the ICC, at the time the terms and conditions of the TRO were imposed.

44.    Such an interpretation also would be contrary to public policy and the intent of the ICA, the Federal Rail Safety Act, and other applicable statutes, regulations, and orders.

6

WHEREFORE, B&M and ST respectfully request that the Board enter an order—

(1)    declaring that the TRO does not apportion any liability to B&M or ST for damages caused by NECR's gross negligence, recklessness, and willful misconduct;

(2)    awarding B&M and ST compensatory, incidental, and punitive damages due to NECR's violation of the ICA, the TRO (as order and as contract), and NECR's common law duties;

(3)    awarding B&M and ST their costs in connection with this proceeding, including a reasonable attorneys' fee; and

(4)    awarding B&M and ST such other and further relief as may be just.

B&M and ST suggest that this proceeding be handled under the Board's Modified Procedures.

Respectfully submitted,

Eric L. Hirschhorn
Winston & Strawn LLP
1400 L Street, NW
Washington DC 20005
Tel. 202-371-5706

Robert B. Culliford
Guilford Rail System
Iron Horse Park
North Billerica MA 01862
Tel. 978-663-1029

Dated:    October 29, 2004

7

## CERTIFICATE OF SERVICE

I certify that on this _____ l s t _____ day of November 2004, I served a copy of the foregoing document upon the respondent, New England Central Railroad, Inc., by facsimile and overnight courier, at the following address and facsimile number:

    Chief Legal Officer
    New England Central Railroad, Inc.
    2 Federal Street, Suite 201
    St. Albans, Vermont 05478

    Fax no. 802-527-3455.

The cover page of the facsimile transmitting and the cover of the envelope containing such copy bear the legend, "Service of STB Complaint."

*Bonnie J. Boling*
Bonnie J. Boling

8

# Exhibit "C"

35267
EB

SERVICE DATE - FEBRUARY 24, 2005

SURFACE TRANSPORTATION BOARD

DECISION

STB Finance Docket No. 34612

BOSTON AND MAINE CORPORATION
and
SPRINGFIELD TERMINAL RAILWAY COMPANY
v.
NEW ENGLAND CENTRAL RAILROAD, INC.

Decided: February 23, 2005

Boston and Maine Corporation (B&M) and Springfield Terminal Railway Company (ST) (jointly, "BM/ST" or "complainants") request damages and a declaratory order in a complaint arising out of the derailment of a BM/ST train on track owned by the New England Central Railroad, Inc. (NEC). We find that the primary issues presented here, which involve claims of tortious acts and breach of contract, are better suited for adjudication before the courts. Thus, we are dismissing the complaint and the declaratory order request.

BACKGROUND

In Amtrak – Conveyance of B&M in Conn River Line in VT & NH, 4 I.C.C.2d 761 (1988) (Amtrak I), the Board's predecessor agency, the Interstate Commerce Commission (ICC), required B&M to convey its 48.8-mile "Connecticut River Line" to the National Railroad Passenger Corporation (Amtrak), subject to the requirement that Amtrak grant specified trackage rights back to B&M. The ICC also authorized Central Vermont Railway, Inc. (CV) to acquire the conveyed line from Amtrak and to operate it, subject to B&M's trackage rights. The carriers were directed to negotiate a trackage rights arrangement containing certain core requirements designed to ensure that the tenant carrier would be able to continue to conduct operations over the line.

During their negotiations, the carriers operated under a temporary trackage rights agreement. When the parties were unable to agree on certain terms for a permanent agreement, the ICC issued a decision in Amtrak – Conveyance of B&M in Conn River Line in VT & NH, 6 I.C.C.2d 539 (1990) (Amtrak II), clarifying its core requirements, resolving the disagreements, and adopting the detailed trackage rights terms and conditions attached as an appendix to that decision, herein called "the trackage rights order" (TO). Many provisions of the temporary agreement, including the provisions concerning responsibility for accidents (Section 7), were not in dispute and were carried over into the TO without further discussion.

STB Finance Docket No. 34612

## DISCUSSION AND CONCLUSION

Given that this dispute is founded primarily on claims of breach of contract and tortious actions, we find that the courts are the appropriate forum to resolve the dispute. This agency has recognized that resolution of contract disputes should typically be pursued before the courts or through arbitration,[2] and we believe that deference to the courts should apply here. The dispute does not involve the interpretation of a core operational provision of the TO and does not involve service questions, over which we have primary jurisdiction, but is, rather, a dispute over liability for a derailment, an area as to which we have very little expertise and limited authority.

We recognize that, when the ICC issued the TO in Amtrak II, it declined to adopt an arbitration clause proposed by CV, stating instead that (6 I.C.C.2d at 556-57):

> Disputes may be referred to us for resolution. This is appropriate, as the operations will be conducted pursuant to our decision in Amtrak [I], supra, and this follow-up decision.

This language, however, does not mean that the Board must resolve all disputes arising under the TO. Rather, this language allows the agency to interpret the provisions in the agreement to ensure that the trackage rights as valued in the takings portion of Amtrak I are not undermined and that the operations conducted thereunder do not neglect the essential interests of the shippers and passengers who were intended to benefit from the transactions approved in Amtrak I. The intent of this language was not to require the agency to get involved in issues such as liability over a derailment. Indeed, this agency does not have special expertise regarding the adjudication and award of damages concerning the claims presented in this proceeding.

This interpretation of Amtrak I and Amtrak II is consistent with our decision in Rymes Heating Oils, Inc. – Petition for Declaratory Order, STB Finance Docket No. 34098 (STB served July 19, 2002) (Rymes). In Rymes, a shipper sought and obtained a declaration that it was entitled to receive service from NEC as an alternative to service from B&M, notwithstanding Section 1.3 of the TO, which reserves to B&M service to "existing shippers and facilities." Unlike the provisions of Section 7.1, the ICC, in helping to develop the provisions of Section 1 governing service, intended to assure that the value of the property rights ordered conveyed in Amtrak I was preserved. See 6 I.C.C.2d 542-43. The Board's interpretation of the provisions of Section 1 in Rymes was necessary to resolve a dispute over a fundamental issue involving the scope of the trackage rights – who is entitled to be served under the TO – and involved provisions key to valuing the trackage rights granted to B&M as part of determining the

---

[2] See, e.g., MVC Transp., LLC – Acquisition Exemption – P&LE Properties, Inc., STB Finance Docket No. 34462 et al. (STB served Oct. 20, 2004); Burlington Northern, Inc. – Trackage Rights, 347 I.C.C. 210, 213 (1974).

-3-

STB Finance Docket No. 34612

compensation due to B&M for ordering the transfer of the Connecticut River Line. And, unlike the current proceeding, the dispute in Rymes involved the interests of shippers protected under our governing statute, and did not concern non-regulatory issues such as responsibility for an accident. Thus, while the Board was the appropriate forum to adjudicate the dispute in Rymes, it is not here.

In its ruling on subsequent litigation in the Rymes matter, the United States Court of Appeals for the First Circuit discussed the three factors to determine if the primary jurisdiction of the Board applies: "(1) whether the agency determination lies at the heart of the task assigned by the agency; (2) whether the agency expertise is required to unravel intricate technical facts; and (3) whether, though perhaps not determinative, the agency determination would materially aid the court." Rymes Heating Oils. v. Springfield Terminal Ry., 358 F.3d 82, 91 (1st Cir. 2004), citing Pejepscot Indus. Park. Inc. v. Maine Cent. R.R., 215 F.3d 195, 205 (1st Cir. 2000).

In the present case, an examination of these factors demonstrates that the Board does not have primary jurisdiction. The agency determinations in the TO are not central to the dispute here. The dispute centers around fact-bound issues that can most expeditiously and properly be resolved by the courts. Nor is agency expertise required to unravel intricate technical facts. This agency is not charged with the investigation of the cause of train accidents and has little expertise in determining gross negligence, recklessness, and willful misconduct, or in determining damages on the basis of such conduct. Similarly, the expertise of the Board is not needed to resolve other major fact-bound issues that could be dispositive of the matter, such as the condition of the track when the accident occurred, the extent, if any, to which the accident had any connection with track maintenance, and the intent of the landlord and tenant carriers when the terms of Section 7.1 were being worked out. Thus, we do not believe a determination by the Board here would materially aid a court should the parties choose to pursue this matter there.

For the foregoing reasons, we conclude that the primary issues presented here are more properly the subject of adjudication before the courts, and we will, therefore, dismiss the complaint and request for a declaratory order without further addressing the merits of the dispute.

This action will not significantly affect either the quality of the human environment or the conservation of energy resources.

It is ordered:

1. The complaint and request for a declaratory order are dismissed.

-4-

STB Finance Docket No. 34612

2. This decision is effective on its date of service.

By the Board, Chairman Nober, Vice Chairman Buttrey, and Commission Mulvey.

Vernon A. Williams
Secretary

-5-

# Exhibit "D"

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

FILED

U.S. DISTRICT COURT
DISTRICT OF MASS

NEW ENGLAND CENTRAL
RAILROAD, INC.,

    Plaintiff,

    -v.-                                   Civil Action No. 04-30235-MAP

SPRINGFIELD TERMINAL
RAILWAY COMPANY, et al.,

    Defendants.

---

## MEMORANDUM OF REASONS
## IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, and Rule

7.1 of the Rules of this Court, the defendants have moved to dismiss this action because this

Court lacks jurisdiction over the subject matter and because the complaint fails to state a claim

on which relief can be granted.[1]  The applicable jurisdictional statute, 28 U.S.C. § 1332, requires

diversity of citizenship between all plaintiffs and all defendants.  The complaint reflects that such

diversity is not present and accordingly the action must be dismissed.  Moreover, even were

subject matter jurisdiction present, the state law claims that constitute the entirety of the

complaint are preempted by the Interstate Commerce Act ("ICA"),[2] whose remedies are

exclusive of all other federal and state law remedies.

---

[1] The defendants' time to move or answer originally expired December 27, 2004 but the parties agreed to extend this deadline to and including January 25, 2005.

[2] The ICA is Subtitle IV of Title 49 of the U.S. Code.  The rail provisions of the ICA—Part A of Subtitle IV—are codified at 49 U.S.C. §§ 10101-11908.

1



## Facts[3]

This is a dispute between two railroads about liability for damages occurring when a train operated by the defendant Springfield Terminal Railway Company ("STRC") and/or the defendant Boston and Maine Corporation ("B&M") derailed while traveling over track owned by the plaintiff, New England Central Railroad, Inc. ("NECR"). Complaint [Docket #1] ¶ 19. The defendants' right to operate on NECR's track is governed by a trackage rights order (the "TRO") that was imposed upon the parties' predecessors in interest by a 1990 order of the Interstate Commerce Commission ("ICC"). *Id.* ¶¶ 14-16. As is apparent from the complaint, *see id.* ¶¶ 14-18, 41, 52, the meaning of the TRO is central to the determination of which railroad is liable for what damages. In particular, NECR believes that Section 7.1 of the TRO makes the defendants liable for all the damages caused by the derailment even if the cause of the derailment was the poor condition of NECR's track. *See id.* ¶¶ 17-18, 40, 52; *id.* Exh. A, § 7.1.

The defendants, on the other hand, believe that Section 7.1 was not intended to—and as a matter of public policy under the ICA, could not—insulate NECR from its own misconduct in failing to keep the track in adequate repair despite having knowledge of the line's substandard condition. For this reason, the defendants filed a formal complaint and request for declaratory order with the Surface Transportation Board ("STB"), the successor to the ICC, on November 1, 2004. *See id.* ¶ 37.[4] The defendants' petition was filed pursuant to the STB's jurisdiction under the ICA, specifically 49 U.S.C. § 11704(b), which gives the STB jurisdiction over specified damage claims against railroads.

---

[3] For purposes of a "facial attack" on subject matter jurisdiction, the well-pleaded allegations of the complaint must be taken as true. 2 Moore's Federal Practice § 12.30[4], at p. 12-39 (3rd ed. 2004); *see Pejepscot Indus. Park, Inc. v. Maine Central R. Co.*, 215 F.3d 195, 197 (1st Cir. 2000). The defendants' recitation of "facts" accordingly does not constitute an admission of their accuracy.

[4] The STB proceeding is *Boston and Maine Corp. and Springfield Terminal Railway Company v. New England Central Railroad, Inc.*, STB Finance Docket No. 34612 (complaint filed Nov. 1, 2004).

A little more than a month later, NECR, desiring for some reason to avoid the STB forum, filed in this Court what in effect is a counterclaim seeking damages arising out of the same derailment. The complaint here alleges that the plaintiff, NECR, is a Delaware corporation whose principal place of business is in Vermont. Complaint ¶ 1. The complaint further alleges that one defendant, STRC, is a Vermont corporation "with a usual place of business located" in Massachusetts, and that the other defendant, B&M, is a Massachusetts corporation "with a usual place of business located" in Massachusetts. *Id.* ¶¶ 2-3.

The complaint alleges only state law claims—specifically, breach of contract, negligence, and gross negligence—against STRC and B&M. *Id.* ¶¶ 38-61. Jurisdiction, according to NECR, is based solely upon diversity of citizenship because "the plaintiff and all of the defendants reside in different states" and more than $75,000 (exclusive of interest and costs) is in controversy. *Id.* ¶ 5 (citing 28 U.S.C. § 1332). NECR's claims, however, amount to nothing more than a claim that the TRO—an order of the ICC—requires the defendants to pay for NECR's damages resulting from the derailment and that the defendants are violating the TRO by refusing to do so.

### Argument

I.    **Because complete diversity of citizenship is absent, this Court lacks jurisdiction over the subject matter of the action.**

The diversity statute confers jurisdiction only over actions that are "between . . . citizens of different States." 28 U.S.C. § 1332(a) (2000).[5] This requires "complete" diversity, which means that *all* the plaintiffs must be citizens of different states than *all* defendants. *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806); *Gabriel v. Preble*, No. 04-1744, slip op. at 6 (1st Cir.

---

[5] NECR's reference to residence, *see* Complaint § 5(a), is thus inapposite.

Jan. 19, 2005) (noting that "[d]iversity jurisdiction exists only when . . . no plaintiff is a citizen of the same state as any defendant").

The statute further provides that "a corporation shall be deemed to be a citizen of any State by which it has been incorporated *and* of the State where it has its principal place of business." 28 U.S.C. § 1332(c)(1) (2000) (emphasis added).[6] That is, "Section 1332(c) does not give a plaintiff the option of treating a corporation as a citizen of *either* the state of incorporation or the state where its principal place of business is located. Rather, the statute treats a corporation as a citizen of *both* states." 15 Moore's Federal Practice § 102.50, at 102-106.1 (3rd ed. 2004) (emphasis in original) (citing *Bender v. Hilton Riviera Corp.*, 367 F. Supp. 380, 382 (D.P.R. 1973)); *accord Gabriel v. Preble*, No. 04-1744, slip op. at 7 & n. 2 (1st Cir. Jan. 19, 2005).

Section 1332 must be strictly construed, *City of Indianapolis v. Chase Nat'l Bank*, 314 U.S. 63, 76 (1941); *Gabriel v. Preble*, No. 04-1744, slip op. at 13 (1st Cir. Jan. 19, 2005); *Hawes v. Club Ecuestre El Comandante*, 598 F.2d 698, 702 (1st Cir. 1979), with any doubts being resolved against a finding of federal jurisdiction, *China Basin Properties, Ltd. v. Allendale Mut. Ins. Co.*, 818 F. Supp. 1301, 1303 (N.D. Cal. 1992); 15 Moore's Federal Practice § 102.14, at p. 102-24 (3rd ed. 2004). Moreover, the burden of establishing diversity jurisdiction is on the party—here, NECR—asserting it. *Bull HN Information Sys., Inc. v. Hutson*, 229 F.3d 321, 328 (1st Cir. 2000).

In this instance, of course, burden is not an issue because NECR's complaint effectively concedes that diversity is absent. For purposes of Section 1332, NECR, the plaintiff, is a citizen of Delaware (where it is incorporated) and of *Vermont* (the location of its principal place of

---

[6] The second prong of this provision was added nearly a half century ago. Act of July 25, 1958, Pub. L. No. 85-554, § 2, 72 Stat. 415.

4

business). *See* Complaint ¶ 1. STRC, a defendant, also is a citizen of *Vermont* (where it is incorporated), as well as being a citizen of Massachusetts (where, according to NECR, it has a "usual place of business"). *See id.* ¶ 2. Diversity of citizenship is absent because both the plaintiff and a defendant are citizens of Vermont. This ends the inquiry, for "[w]henever it appears . . . that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed. R. Civ. P. 12(h)(3).[7]

## II.    NECR's state law claims are preempted by 49 U.S.C. § 10501(b).

If subject matter jurisdiction is lacking, this case is at an end and the issue raised by this point need not be addressed by the Court. Even if subject matter jurisdiction exists, however, NECR's state law claims are preempted by the ICA and hence must be dismissed for failure to state a claim on which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).

Although NECR attempts to characterize its claim as arising under various state law causes of action (breach of contract, negligence, gross negligence, etc.), NECR's claim in fact is one for damages caused by a rail carrier in violation of the TRO—an order of the ICC. That is, NECR contends that a defendant's train derailed on NECR's track and that under Section 7.1 of the TRO, that defendant is liable for all damages arising from that event. As such NECR's claim is made actionable by 49 U.S.C. § 11704(b).

The ICA gives the STB exclusive jurisdiction over all aspects of rail transportation, including "rates, classifications, *rules* (including car service, interchange, and other operating rules), *practices*, routes, services, and *facilities* of [rail] carriers." 49 U.S.C. § 10501(b) (2000) (emphasis added). Section 10501(b) also decrees that "[e]xcept as otherwise provided in this

---

[7] Even if this Court had jurisdiction, the meaning of an order of the ICC is central to the adjudication of this dispute. That means that the matter almost certainly would have to be referred to the STB under the primary jurisdiction doctrine. *See Pejepscot Indus. Park, Inc. v. Maine Central Railroad Co.*, 215 F.3d 195, 205-06 (1st Cir. 2000). The

part,[8] the *remedies provided under this part* with respect to the regulation of rail transportation
are *exclusive* and *preempt* the *remedies* provided under Federal or *State law.*" *Id.* (emphasis
added).[9]  State common law remedies such as those sought by the complaint are preempted by
Section 10501(b).[10]  *Alliance Shippers, Inc. v. Southern Pac. Transp. Co.*, 858 F.2d 567, 568-69
(9th Cir. 1988) (interpreting predecessor provision); *Engelhard Corp. v. Springfield Terminal Ry.
Co.*, 193 F. Supp. 2d 385 (D. Mass. 2002).

As demonstrated below, the ICA provides remedies with respect to the claims at issue
here.  Hence the state-law claims—which constitute all the claims in the complaint—are
preempted by Section 10501(b).  NECR is limited to the remedy prescribed by the federal
statute, 49 U.S.C. § 11704(b).[11]

Federal law "shall be the supreme Law of the Land; . . . any Thing in the Constitution or
the Laws of any state to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2.  There are
three types of preemption pursuant to the Supremacy Clause—(1) express preemption, where the

---

controversy already had been pending before that agency, by virtue of the STRC/B&M petition against NECR, for
more than a month when this action was commenced. *See* Complaint ¶ 37.

[8] "[T]his part" is Part A (Rail) of Subtitle IV (Interstate Transportation) of Title 49 of the U.S. Code. *See* 109 Stat.
804-05.  Part A comprises Sections 10101 through 11908 of title 49.

[9] The full text of Section 10501(b) reads:

"(b)    The jurisdiction of the Board over—

"(1)    transportation by rail carriers, and the remedies provided in this part with respect to rates,
classifications, rules (including car service, interchange, and other operating rules), practices, routes,
services, and facilities of such carriers; and

"(2)    the construction, acquisition, operation, abandonment, or discontinuance of spur,
industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be
located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to
regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law."

[10] Between 1980 and 1995, a similar provision was codified as 49 U.S.C. § 10501(d).  Similar provisions have been
contained in the ICA since 1920. *See Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 329 n.
16 (1981).

[11] Preemption is appropriately raised by motion to dismiss. *Sturm, Ruger Co., Inc. v. Connecticut Gen. Life Ins. Co.*,
1994 WL 258313 (D.N.H. 1994); *Lawal v. British Airways, PLC*, 812 F. Supp. 713, 721 (S.D. Tex. 1992).

6

intent of Congress is explicitly stated in the language of a statute or implicitly contained in its structure and purpose; (2) conflict preemption, where the state law in question conflicts with the federal law; and (3) field preemption, where federal law so thoroughly occupies the field as to leave no room for the states to supplement it. *Cippollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992). Any given situation may involve more than one type of preemption, *see Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n. 6 (2000), and the case at bar involves both express and field preemption. And where, as here, the express preemptive language of the federal statute is broad and makes no distinction between positive state enactments and common law, state common law remedies also are preempted. *Levesque v. Miles, Inc.*, 816 F. Supp. 61, 67 (D.N.H. 1993) (citing *Cippollone*).

In Section 10501(b), Congress has "explicitly stated" its intent to preempt state law remedies that touch upon or concern "transportation by rail carriers." *Pejepscot Indus. Park, Inc. v. Maine Central R. Co.*, 215 F.3d 195, 202 (1st Cir. 2000). "The last sentence of § 10501(b) plainly preempts state law." *Id.*; *accord City of Auburn v. United States*, 154 F.3d 1025, 1028-30 (9th Cir. 1998); *Burlington N. Santa Fe Corp. v. Anderson*, 959 F. Supp. 1288, 1295 (D. Mont. 1997); *CSX Transp., Inc. v. Georgia Public Service Comm'n*, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996) (noting extraordinary breadth of § 10501(b)); *Burlington N. R. Co. v. Page Grain Co.*, 545 N.W.2d 749 (Neb. 1996). This is consistent with longstanding federal preemption of the field of rail transportation, leaving no room for state causes of action. *See Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981); *Modin v. New York Central Co.*, 650 F.2d 829, 834-35 (6th Cir. 1981) (finding ICA preemption of damage claim under state insurance law).

Congressional intent to preempt state-law remedies is further evidenced by the inclusion in the ICA of a specific remedy for violations of the sort claimed by NECR: "A rail carrier

7

providing transportation subject to the jurisdiction of the Board under this part is liable for damages sustained by a person as a result of an act or omission of that carrier in violation of this part." 49 U.S.C. § 11704(b) (2000). Section 11704 also prescribes in detail the procedure to be followed by a party seeking to impose liability on a rail carrier. 49 U.S.C. § 11704(c) (2000).

NECR alleges that ST and Conrail are rail carriers. Complaint ¶ 16. Nothing in the complaint avoids—or can avoid—the preemptive effects of Section 10501(b). The essence of NECR's complaint is that the TRO makes STRC and B&M liable for any damage resulting from a derailment of STRC or B&M rolling stock. The state law claims lodged by NECR fall comfortably within the ambit of the responsibilities that NECR alleges are imposed upon STRC and B&M by the TRO.

"[I]n deciding whether any conflict is present, a court's concern is necessarily with 'the nature of the activities which the States have sought to regulate, rather than on the method of regulation adopted.'" *Kalo Brick & Tile*, 450 U.S. at 317-18 (quoting *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 243 (1959)) (striking down state common law damages actions relating to railroad abandonments). Indeed, the state law causes of action found preempted in *Kalo Brick & Tile* included one for common law negligence based on the carrier's alleged failure to maintain its roadbed. *Id.* at 323-25.[12] Moreover, just as in *Kalo Brick & Tile*, *see id.* at 322, the ICA "spells out with considerable precision the remedies available to" a party injured by a carrier's violation of the relevant provisions of the Act. *See* 49 U.S.C. § 11704 (2000) (prescribing damage remedies).

---

[12] The other state law causes of action found preempted in *Kalo Brick & Tile* were for violation of a statute requiring railroads to furnish cars, breach of the common law duty of a common carrier, and the common law tort of interference with contractual relations between the shipper and its customers. *Kalo Brick & Tile*, 450 U.S. at 323-25.

8

Thus in addition to the ICA's giving the STB exclusive jurisdiction over rail transportation, *see* 49 U.S.C. § 10501(b) (2000), preempting all state law remedies, *id.*, and providing a federal damage remedy for conduct like that alleged by NECR, *see* 49 U.S.C. § 11704(b) (2000), the ICC in the TRO covered the precise circumstances alleged by NECR.

Thus NECR's state causes of action are preempted by the ICA and the TRO, and the complaint must be dismissed for failure to state a claim on which relief can be granted. Fed. R. Civ. P. 12(b)(6).

### Conclusion

For the reasons set out above, the complaint should be dismissed because this Court lacks jurisdiction over the subject matter of the action and fails to state a claim on which relief can be granted.

Respectfully submitted,

Robert B. Culliford
BBO #638468
Iron Horse Park
North Billerica MA 01862
978-663-1029

*Attorney for Defendants Springfield Terminal Railway Company and Boston and Maine Corporation*

January 21, 2005.

9

## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

NEW ENGLAND CENTRAL
RAILROAD, INC.,

        Plaintiff,

    -v.-                          Civil Action No. 04-30235-MAP

SPRINGFIELD TERMINAL
RAILWAY COMPANY, et al.,

        Defendants.

### DEFENDANTS' CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure and Rule 7.3(a) of the Local Rules of this Court, the defendants—Springfield Terminal Railway Company ("ST") and Boston and Maine Corporation ("B&M")—hereby state that each is wholly owned by Guilford Transportation Industries, Inc. ("GTI"), that GTI is not a public company, and that no public company owns ten percent or more of the stock of ST or B&M.

Respectfully submitted,

Robert B. Culliford
BBO #638468
Iron Horse Park
North Billerica MA 01862
978-663-1029

*Attorney    for    Defendants    Springfield
    Terminal Railway Company and Boston
    and Maine Corporation*

January 21, 2005.

DC:397129.1