# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

NEW ENGLAND CENTRAL
RAILROAD, INC.,

           Plaintiff,

      -v.-                     Civil Action No. 04-30235-MAP

SPRINGFIELD TERMINAL
RAILWAY COMPANY, et al.,

           Defendants.

---

## SUPPLEMENTAL MEMORANDUM OF REASONS
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
## COUNTS V THROUGH X OF AMENDED COMPLAINT
## AND TO REFER AMENDED COMPLAINT
## TO THE SURFACE TRANSPORTATION BOARD

Eric L. Hirschhorn
Winston & Strawn LLP
1700 K Street, NW
Washington DC 20006
202-282-5706

Robert B. Culliford
BBO #638468
Iron Horse Park
North Billerica MA 01862
978-663-1029

*Attorneys for Defendants Springfield Terminal Railway Company and Boston and Maine Corporation*

August 30, 2005.

## TABLE OF CONTENTS

Page

Additional Facts ........................................................................................................................2

Argument .................................................................................................................................5

I.      The ICA preempts NECR's state claims. ..........................................................................5

II.     Preemption could be avoided only if NECR did not state a claim under the ICA, but were
        that the case, this Court would lack subject matter jurisdiction because complete diversity
        of citizenship would be absent. .....................................................................................11

III.    The STB's policy is to accept and act upon referrals from U.S. District Courts, and the
        STB's previous declination of this case should not deter this Court from ordering a
        referral. .......................................................................................................................13

Conclusion ..............................................................................................................................14

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

NEW ENGLAND CENTRAL
RAILROAD, INC.,

        Plaintiff,

    -v.-                         Civil Action No. 04-30235-MAP

SPRINGFIELD TERMINAL
RAILWAY COMPANY, et al.,

        Defendants.

## SUPPLEMENTAL MEMORANDUM OF REASONS
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
## COUNTS V THROUGH X OF AMENDED COMPLAINT
## AND TO REFER AMENDED COMPLAINT
## TO THE SURFACE TRANSPORTATION BOARD

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Rule 7.1 of the

Rules of this Court, the defendants—Springfield Terminal Railway Company ("ST") and Boston

and Maine Corporation ("B&M") (collectively, "Guilford")[1]—have moved to dismiss Counts V

through X of the amended complaint [Docket No. 16] for failure to state a claim on which relief

can be granted.  Guilford's motion also seeks referral of this matter to the Surface Transportation

Board ("STB") for an interpretation of a provision of a trackage rights order imposed in 1990 by

the STB's predecessor.

A hearing on Guilford's motion was held July 19, 2005.  At that time, the Court asked the

parties to file supplemental briefs on the issues addressed during the hearing.

---

[1] ST and B&M are wholly owned by Guilford Transportation Industries, Inc., which is not a party to this action.

This supplemental brief for Guilford makes three points:

- Counts I through IV of the amended complaint appear to state claims under the Interstate Commerce Act ("ICA").[2]  Accordingly, the state law claims in Counts V through X are preempted, even though they are grounded in common law contract and tort, because the remedies provided under the ICA for actions alleged to violate the ICA are exclusive.

- The state law claims in Counts V through X could avoid preemption by the ICA only if Counts I through IV failed to state claims under the ICA.  In that case, however, this Court would lack subject matter jurisdiction because complete diversity of citizenship would be absent.

- This matter should be referred to the STB because the meaning of Section 7.1 of the 1990 Trackage Rights Order ("TRO"), which was imposed by the STB's predecessor agency, the Interstate Commerce Commission ("ICC"), is of central importance to this action.

**Additional Facts**

Guilford outlined the relevant facts in its initial memo on this motion [Docket No. 21].  Several additional facts, relating to the origin of Section 7.1 of the TRO and to the citizenship of the parties, have become relevant in light of the July 19 hearing.

*Origin of Section 7.1 of the TRO.*  As is apparent from the amended complaint, *see* Amended Complaint ¶¶ 14-19, 40-41, 43-44, 46, 48, 51-52, 63-64 [Docket No. 16], the meaning of a TRO provision is central to the determination of which party is liable for what damages.  Section 7.1 of the TRO provides in pertinent part that—

---

[2] The rail portions of the ICA were restated and reenacted by the ICC Termination Act of 1995, Pub. L. 104-88, § 102, 109 Stat. 804 ("ICCTA").

each party hereto shall be responsible for and shall assume all loss, damage or injury . . . to persons or property, including the cost of removing any trackage, repairing trackage and correcting environmental damage, which may be caused by its engines, cars. trains or other on-track equipment (including damage by fire originating therefrom) *whether or not the condition or arrangement of the trackage contributes in any manner or to any extent to such loss, damage or injury*, and whether or not a third party may have caused or contributed to such loss, damage or injury, and for all loss or damage to its engines, cars, trains or other on-track equipment while on said trackage from any cause whatsoever . . . .

*Amtrak—Conveyance of B&M in Conn River Line in VT & NH*, 6 I.C.C.2d 539, 564 (1990)

(emphasis added) ("*Amtrak II*").

The plaintiff, New England Central Railroad, Inc. ("NECR"), contends that Section 7.1

of the TRO makes Guilford liable for all the damages caused by the derailment even if the cause

of the derailment was the poor condition of NECR's track. *See* Amended Complaint ¶¶ 18-19,

51-52, 63-64 [Docket No. 16]. Guilford, on the other hand, believes that Section 7.1 was not

intended to—and as a matter of public policy, could not, *see Nat'l R. Passenger Corp.—*

*Applic.—49 U.S.C. 24308(a)*, 3 S.T.B. 157, 162 (1998) ("public policy generally disfavors

requiring one party to be responsible for another's gross negligence or willful and wanton

misconduct")—insulate NECR from its own failure to keep the track in adequate repair despite

having knowledge of its substandard condition.

Part of Guilford's reasoning in respect of Section 7.1 is that the provision was not agreed

to by the parties in a private contract setting but was imposed—over the objection of Guilford—

by an order of the ICC. The STB decision served February 24, 2005 [Docket No. 14]

characterized Section 7.1 as "not in dispute and carried over [from the temporary trackage rights

agreement of 1988] into the [TRO] without further discussion," but that statement by the STB

was inaccurate.[3] The temporary trackage rights agreement that preceded the TRO, *see* Decision

---

[3] Guilford has pointed out this error in its petition for reconsideration by the STB of the February 24 decision.

at 1 [Docket No. 14], provided for shared liability "in proportion to the respective relative fault

of each [railroad] for the occurrence which gave rise to the liability." Interim Trackage Rights

Agreement Between Central Vermont Railway, Inc.[4] and Boston and Maine Corp. §§ 7.1-7.2

(Sept. 9, 1988) ("Temporary Agreement"). (A copy of the Temporary Agreement is annexed as

Exhibit 1.) Thus the Temporary Agreement—a contract as to which the predecessors of Guilford

and NECR agreed—provided for apportionment of responsibility based upon negligence.

In the *Amtrak II* proceeding, NECR's predecessor, Central Vermont Railway ("CV"),

submitted the version of Section 7.1 that the ICC ultimately adopted and that is at issue here. (A

copy of the CV proposal is annexed as Exhibit 2.) CV's twenty-two page brief in support of its

proposed version made no mention of liability beyond the passing remark that "liability

indemnification is spelled out" in the proposal. Verified Pet. of Central Vermont Railway, Inc.

for Imposition of Terms and Conditions of Trackage Rights on Connecticut River Line, and for

Other Relief, STB Finance Docket No. 31259, at 6 (May 18, 1989).

Guilford, by contrast, proposed a version of Sections 7.1 and 7.2 identical to that in the

Temporary Agreement—i.e., providing for shared liability "in proportion to the respective

relative fault of each [railroad] for the occurrence which gave rise to the liability." (A copy of

the Guilford (Boston and Maine) proposal is annexed as Exhibit 3.) Guilford's brief also made

no mention of liability issues. The parties' subsequent responses to one another did not address

liability, either.

The ICC decision addressed the issue only briefly:

> CV proposes a revised section 7 to address release and indemnification in greater
> detail than the Interim Agreement. [Guilford] states no objection. Because we
> find the revisions *will not change the essence of section 7*, we will impose as
> terms sections 7.1 through 7.6 as proposed by CV.

---

[4] Central Vermont was the predecessor in interest of NECR.

*Amtrak II*, 6 I.C.C.2d at 554 (emphasis added).

That Guilford did not seek judicial review of the decision imposing the TRO thus is understandable and is no bar here, for no reasonable person could interpret Section 7.1 as having the limitless scope that NECR now seeks to assign to it. The silence of the parties' four *Amtrak II* filings on the point underscores this conclusion, as does the ICC's statement that the CV version "will not change the essence of section 7" of the Temporary Agreement—a provision that apportioned liability based upon relative fault.

*Citizenship of the parties.* The amended complaint alleges that NECR is a Delaware corporation with its principal place of business in Vermont. Amended Complaint ¶ 1 [Docket No. 16]. It also alleges that defendant ST is a Vermont corporation with its usual place of business in Massachusetts, *id.* ¶ 2, and that defendant B&M is incorporated and has its usual place of business in Massachusetts, *id.* ¶ 3.

### Argument

### I.    The ICA preempts NECR's state claims.

Six of NECR's claims (Counts V through X) are said to arise under various state law causes of action (breach of contract, negligence, gross negligence, etc.). The ICA provides, however, that "the *remedies provided under this part*[5] with respect to the regulation of rail transportation are *exclusive* and *preempt* the remedies provided under Federal or *State law*." 49 U.S.C. § 10501(b) (2000) (emphasis added).[6] The preemptive effect extends not only to state

---

[5] "[T]his part" is part A (Rail) of subtitle IV (Interstate Transportation) of title 49 of the U.S. Code. *See* ICC Termination Act of 1995, Pub. L. No. 104-88, § 102(a), 109 Stat. 804-05. Part A comprises sections 10101 through 11908 of title 49.

[6] The full text of section 10501(b) reads:

"(b)    The jurisdiction of the [Surface Transportation] Board over—

regulation but also to state law-based claims for monetary or equitable relief. *Suchon v. Wisconsin Central Ltd.*, No. 04-C-0379-C, 2005 U.S. Dist. LEXIS 4343, at *9-*10 (W.D. Wisc. Feb. 23, 2005).

The ICA is "among the most pervasive and comprehensive of federal regulatory schemes," *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981), and "[i]t is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations" than that found in Section 10501(b), *CSX Transp., Inc. v. Georgia Public Service Comm'n*, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996). NECR seeks to avoid this high hurdle by relying upon the considerably narrower preemption provision of a separate statute, the Federal Railroad Safety Act ("FRSA"). New England Central Railroad's Supplemental Brief in Support of Its Opposition to the Defendant's Motion to Dismiss ("NECR Supplemental Brief") [Docket No. 27], at 2. The FRSA, however, is a different statute than the ICA and the FRSA preemption clause is not to be confused with Section 10501(b). *Maynard v. CSX Transp., Inc.*, 360 F. Supp. 2d 836, 838 n. 2, 843 (E.D. Ky. 2004).

NECR also contends that the preemptive effect of Section 10501(b) is limited to situations involving *economic* regulation of railroads. NECR Supplemental Brief at 6. But "there is nothing in the case law that supports [NECR's] argument that, through the ICCTA, Congress only intended preemption of economic regulation of the railroads." *City of Auburn v.*

---

"(1)    transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

"(2)    the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law."

*United States*, 154 F.3d 1025, 1030 (9th Cir. 1998) (finding ICA preemption of state and local environmental regulations).

NECR further argues that only matters listed in Section 10501(b) as being within the STB's jurisdiction can serve as a basis for preemption of state law claims. NECR Supplemental Brief at 7. But Section 10501(b) includes rules, practices, and facilities in the list of matters over which the STB has exclusive jurisdiction. Moreover, the final sentence of Section 10501(b)—"Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law"—is considerably broader than the list of activities appearing elsewhere in the section. Section 10501(b) does not say that controversies over listed matters preempt state law but that the *remedies* provided in the ICA preempt the *remedies* provided under state law.

Finally, NECR claims that "preemption only applies when the 'challenge[d] state statute stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" NECR Supplemental Brief at 9 (quoting *Perez v. Campbell*, 402 U.S. 637, 649 (1971) (internal quotation marks and citation omitted)). For one thing, that criterion is satisfied here. Perhaps more important, the quoted passage covers only one type of preemption, namely "conflict" preemption. The other two types—"express" preemption and "field" preemption—are more clearly applicable in this instance. *See Cippollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (outlining the different types of preemption); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n. 6 (2000) (noting that more than one type of preemption may be present in a given situation). Express preemption arises from the presence of Section 10501(b). Field preemption arises from the "pervasive and comprehensive" nature of the ICA's regulation of railroads. *City of Auburn*, 154 F.3d at 1029 (internal quotation marks omitted); *see Modin v.*

7

*New York Central Co.*, 650 F. 2d 829, 835 (6th Cir. 1981) (noting federal superintendence of the field); *Guckenberg v. Wisconsin Central Ltd.*, 178 F. Supp. 2d 954, 960 n. 1 (E.D. Wisc. 2001) (noting congressional intent to occupy the field of rail transportation regulation); *Suchon*, 2005 U.S. Dist. LEXIS 4343, at *9-*10 (holding that § 10501(b) effects field preemption, "which is applicable when either Congress's regulation of a field or the federal interest in a matter is so pervasive that the court can infer an intent to occupy the entire field," as well as express and conflict preemption).

At the July 19 hearing, the Court asked that Guilford identify some reported decisions under Section 10501(b) that did not focus on rate and service disputes. Here are some examples:

- In *Engelhard Corp. v. Springfield Terminal Railway Co.*, 193 F. Supp. 2d 385 (D. Mass. 2002), the plaintiffs alleged that two railroads had failed to pay for leased tank cars. The state law claims—for unjust enrichment and three types of breach of implied contract (course of dealing, promissory estoppel, and third-party beneficiary)—were dismissed on preemption grounds. *Id.* at 388-90 & n. 6. Judge Stearns observed that "[t]he concluding sentence of section 10501(b) is an unmistakable statement of Congress's intent to preempt state laws touching on the substantive aspects of rail transportation." *Id.* at 392.[7]

- *San Luis Central R. Co. v. Springfield Terminal Railway Co.*, 369 F. Supp. 2d 172 (D. Mass. 2005), also involved a railroad's alleged failure to make lease payments. Judge Saris dismissed, on ICA preemption grounds, state law claims for breach of contract, "breach of covenant of good faith and fair dealing," unjust enrichment, and conversion. *Id.* at 175-77.

---

[7] Somewhat surprisingly, NECR relies upon this decision for the proposition that preemption is not favored. *See* NECR Supplemental Brief at 3.

- In *Maynard*, 360 F. Supp. 2d 836, the plaintiffs brought common law nuisance claims against a railroad whose activity blocked access to their land. The court found that the ICA preempted these claims. *Id.* at 843-44.

- *Friberg v. Kansas City So. R. Co.*, 267 F.3d 439 (5th Cir. 2001), was another case in which the plaintiffs sued a railroad for blocking access to their property. The court found that state law claims for negligence and negligence per se were preempted by the ICA. *Id.* at 444.

- *Guckenberg* was a suit charging that a railroad's yard noise constituted a common law nuisance and unreasonably interfered with the plaintiffs' enjoyment of their property. The state law claims were dismissed on preemption grounds. 178 F. Supp. 2d at 958-60.

- The plaintiff in *Suchon* claimed that railroad activity in the vicinity of his auto body shop subjected him to trespass, vibrations, diesel fumes, and other health hazards. His common law nuisance claim was dismissed on preemption grounds. 2005 U.S. Dist. LEXIS 4343, at *9-*10.

- The plaintiff in *Modin* alleged that the defendant railroad's cancellation of her husband's life insurance policy without notice violated the ICA and applicable state insurance law. The court of appeals, noting the ICA's comprehensive regulation of railroad employees, found the state law claim preempted. 650 F. 2d 829 at 834-35.

- In *Pejepscot Industrial Park, Inc. v. Maine Central R. Co.*, 297 F. Supp. 2d 326 (D. Me. 2003), the plaintiff alleged that the railroad's refusal to provide service constituted tortious interference. Judge Carter ruled that the ICA preempted the

9

tort claim, noting that "courts have regularly found that the ICCTA preempts state common law claims with respect to railroad operations." *Id.* at 332-34.[8]

The ICA contains—and NECR seeks to avail itself of—express remedies for violations of the sort claimed by NECR: First, "[a] person injured because a rail carrier . . . does not obey an order of the Board . . . may bring a civil action in a United States District Court to enforce that order under this subsection." 49 U.S.C. § 11704(a) (2000). Second, "[a] rail carrier . . . is liable for damages sustained by a person as a result of an act or omission of that carrier in violation of this part." 49 U.S.C. § 11704(b) (2000). Section 11704 sets out in detail the procedure to be followed by a party seeking to impose liability on a rail carrier under subsection (b). 49 U.S.C. § 11704(c) (2000). These are precisely the types of remedies that trigger preemption by Section 10501(b), and NECR has recognized in Counts I through IV that the ICA accords NECR a remedy in the event Guilford is found liable.

Here, as was the case in *Kalo Brick & Tile*, the ICA "spells out with considerable precision the remedies available to" a party injured by a carrier's violation of the relevant provisions of the Act. *See Kalo Brick & Tile*, 450 U.S. at 322; 49 U.S.C. § 11704 (2000). Further, the ICA expressly addresses trackage rights as an action requiring STB approval. 49 U.S.C. § 11323(a)(6) (2000); *see* 49 C.F.R. pt. 1180 (2004) (implementing regulations). Indeed, in the instant case the ICC's involvement went beyond simply approving a trackage rights agreement previously reached between two railroads. The ICC *imposed* a trackage rights *order* to whose Section 7.1 Guilford did not agree.

Thus Congress in the ICA gave the STB exclusive jurisdiction over rail transportation generally and trackage rights in particular, provided a federal remedy for rail carrier violations of

---

[8] A breach of contract claim was left standing because the fact that the railroad had agreed to the contract—a situation that does not apply here—took it out of the ambit of § 10501(b). *Pejepscot*, 297 F. Supp. 2d at 332-33.

the ICA, and preempted all state law remedies. Section 10501(b) preempts NECR's state law claims and Counts V through X accordingly should be dismissed.

**II.    Preemption could be avoided only if NECR did not state a claim under the ICA, but were that the case, this Court would lack subject matter jurisdiction because complete diversity of citizenship would be absent.**

NECR's initial complaint [Docket No. 1] contained only state law claims. When Guilford pointed out that diversity of citizenship was lacking and hence that this Court lacked subject matter jurisdiction [Docket No. 7], NECR filed an amended complaint that included four claims under the ICA—specifically, under 49 U.S.C. § 11704. Amended Complaint ¶¶ 5, 39-48 [Docket No. 16]. The amended complaint thus appears to invoke a remedy under the ICA. As demonstrated in Point I above and as stated expressly in the statute—the remedies provided under the ICA "are *exclusive* and *preempt* the remedies provided under Federal or *State* law." 49 U.S.C. § 10501(b) (2000) (emphasis added). That is, if NECR is asserting a claim under the ICA, state law claims are preempted.

If, on the other hand, NECR were *not* stating an ICA claim, the only possible basis for jurisdiction would be diversity of citizenship.[9] *See* 28 U.S.C. § 1332 (2000). The amended complaint alleges that NECR's principal place of business is in Vermont and that ST is incorporated in Vermont. Amended Complaint ¶¶ 1-2 [Docket No. 16]. The diversity statute confers jurisdiction over actions "between . . . citizens of different States." 28 U.S.C. § 1332(a) (2000). This requires "complete" diversity, which means that *all* the plaintiffs must be citizens of different states than *all* the defendants. *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806); *Gabriel v. Preble*, 396 F.3d 10, 13 (1st Cir. 2005) (noting that "[d]iversity jurisdiction exists only when . . . no plaintiff is a citizen of the same state as any defendant").

---

[9] Somewhat confusingly, the amended complaint alleges "diversity jurisdiction . . . as per 49 U.S.C. § 11704," Amended Complaint ¶ 4 [Docket No. 16], but § 11704 is not a diversity-based statute.

For diversity purposes, "a corporation shall be deemed to be a citizen of any State by which it has been incorporated *and* of the state where it has its principal place of business." 28 U.S.C. § 1332(c)(1) (2000) (emphasis added).[10]  That is, "Section 1332(c) does not give a plaintiff the option of treating a corporation as a citizen of *either* the state of incorporation or the state where its principal place of business is located.  Rather, the statute treats a corporation as a citizen of *both* states." 15 Moore's Federal Practice § 102.50, at 102-106.1 (3rd ed. 2004) (emphasis in original) (citing *Bender v. Hilton Riviera Corp.*, 367 F. Supp. 380, 382 (D.P.R. 1973)); *accord Gabriel*, 396 F.3d at 14 & n. 2.

Section 1332 is construed strictly, *City of Indianapolis v. Chase Nat'l Bank*, 314 U.S. 63, 76 (1941); *Gabriel*, 396 F.3d at 16; *Hawes v. Club Ecuestre El Comandante*, 598 F.2d 698, 702 (1st Cir. 1979), with any doubts being resolved against a finding of federal jurisdiction, *China Basin Properties, Ltd. v. Allendale Mut. Ins. Co.*, 818 F. Supp. 1301, 1303 (N.D. Cal. 1992); 15 Moore's Federal Practice § 102.14, at p. 102-24 (3rd ed. 2004).  Moreover, the burden of establishing diversity jurisdiction is on the party—here, NECR—asserting it.  *Bull HN Information Sys., Inc. v. Hutson*, 229 F.3d 321, 328 (1st Cir. 2000).

The amended complaint effectively concedes that diversity is absent.  For purposes of Section 1332, NECR, the plaintiff, is a citizen of Delaware (where it is incorporated) and of *Vermont* (the location of its principal place of business).  *See* Amended Complaint ¶ 1 [Docket No. 16].  ST, a defendant, also is a citizen of *Vermont* (where it is incorporated) as well as being a citizen of Massachusetts (where, according to NECR, it has a "usual place of business").  *See id.* ¶ 2.  Diversity of citizenship is absent because both the plaintiff and a defendant are citizens of Vermont.

---

[10] The second prong of this provision is not new, having been added nearly a half century ago.  Act of July 25, 1958, Pub. L. No. 85-554, § 2, 72 Stat. 415.

NECR cannot have it both ways. If it is alleging an ICA claim, which it appears to be, *see* Amended Complaint ¶¶ 5, 39-48, then Section 10501(b) preempts the state law claims in Counts V through X. If no ICA claim were being asserted, then NECR would be making only state law claims and, because diversity is absent, this Court would lack jurisdiction over the subject matter. "Whenever it appears . . . that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed. R. Civ. P. 12(h)(3).

**III.    The STB's policy is to accept and act upon referrals from U.S. District Courts, and the STB's previous declination of this case should not deter this Court from ordering a referral.**

Guilford seeks a referral to the STB for the limited purpose of obtaining an interpretation of Section 7.1 of the TRO—a provision imposed by the ICC. This is an issue that the STB, as successor to the ICC, is uniquely qualified to decide: Did the ICC intend Section 7.1 to absolve a track owner whose track is in substandard condition due to its own gross negligence or willful misconduct from liability for a derailment resulting from the condition of that track? In addition to being about the meaning of the ICC-imposed TRO, this presents an important question of national transportation policy—namely, whether a track owner should be permitted to avoid liability for gross negligence or willful misconduct in the discharge of its track safety responsibilities.

At the July 19 hearing, the Court noted that the Occupational Health and Safety Administration had rejected a recent referral on the ground that it had neither the means nor the desire to hear the matter. The STB should be a different story, though, because "[p]etitions for issuance of a declaratory order premised on referral from a federal court are routinely accepted" by that body. *Engelhard Corp.—Petition for Declaratory Order—Springfield Terminal Railway Corp. and Consolidated Rail Corp.*, 2003 STB LEXIS 157, at *4 (STB Docket No. 42075,

13

served Apr. 1, 2003) (citing *Delegation of Authority—Declaratory Order Proceedings*, 5 I.C.C.2d 675, 676 (1989)). It is true that the STB dismissed Guilford's complaint against NECR, but that reflected principally a reluctance to engage in fact finding as to which carrier was at fault in respect of the derailment. *See Boston and Maine Corp. v. New England Central R., Inc.*, 2005 STB LEXIS 116, at *1, *4, *7-*8 (STB Fin. Docket No. 34612, served Feb. 24, 2005) [Docket No. 14].[11]

Finally, in addition to the fact that the STB is well qualified to interpret Section 7.1, there should be a uniform national standard for all STB-imposed trackage rights. The promotion of nationwide regulatory uniformity is, of course, a classic basis for application of the primary jurisdiction doctrine. *See, e.g., Pejepscot Indus. Park, Inc. v. Maine Central R. Co.*, 215 F.3d 195, 205-06 (1st Cir. 2000) ("promote uniformity"); *Hansen v. Norfolk & W. Ry. Co.*, 689 F.2d 707, 710-11 (7th Cir. 1982) (same). The Court accordingly should refer this case to the STB for consideration of whether Section 7.1 absolves NECR of liability for damages caused by NECR's negligence or willful misconduct.

## Conclusion

For the reasons set out above and in Guilford's previous submissions, Counts V through X of the amended complaint [Docket No. 16] should be dismissed for failure to state a claim on which relief can be granted. In any event, the matter should be referred to the STB, under the primary jurisdiction doctrine, for that agency's interpretation of Section 7.1 of the TRO.

---

[11] On March 10, 2005 Guilford filed a petition asking that the STB reconsider so much of its February 24 ruling as declined to interpret § 7.1. The STB has not yet acted on that request.

Respectfully submitted,

Eric L. Hirschhorn
Winston & Strawn LLP
1700 K Street, NW
Washington DC 20006
202-282-5706

Robert B. Culliford
BBO #638468
Iron Horse Park
North Billerica MA 01862
978-663-1029

*Attorneys for Defendants Springfield Terminal Railway Company and Boston and Maine Corporation*

August 30, 2005.

EXHIBIT 1

INTERIM
TRACKAGE RIGHTS AGREEMENT
BETWEEN CENTRAL VERMONT RAILWAY, INC.
AND
BOSTON AND MAINE CORPORATION

INTERIM AGREEMENT ("Agreement") made as of this Ninth day of September, 1988 by and between the CENTRAL VERMONT RAILWAY, INC., a corporation with its principal office at 2 Federal Street, St. Albans, Vermont  05478 (hereinafter referred to as "CV"), and the BOSTON AND MAINE CORPORATION, a corporation with its principal office at Iron Horse Park, North Billerica, Massachusetts  01862 (hereinafter referred to as "B&M").

WHEREAS, pursuant to Trackage Rights Agreements dated as of April 1, 1985 and January 1, 1930, the B&M has the right to operate over the approximately 13.4 mile segment of railroad between Windsor, Vermont and White River Junction, Vermont and the approximately 10.6 mile segment of railroad between East Northfield, Massachusetts and Brattleboro, Vermont (the "CV Lines"); and

WHEREAS, pursuant to an Order of the Interstate Commerce Commission ("ICC"), service date August 9, 1988, in Finance Docket No. 31250 (the "Order"), the B&M was required to convey to the National Railroad Passenger Corporation ("Amtrak") certain rights and interests in the 48.8 mile segment of railroad between Brattleboro, Vermont and Windsor, Vermont ("the Former B&M Line"); and

WHEREAS, CV and B&M seek to reach, but have not reached, agreement over the terms of a final arrangement to permit B&M

to operate over the Former B&M Line and over the CV Line, but desire to create an interim arrangement to permit the conveyance and upgrading of the Former B&M Line to proceed immediately, without prejudice to seeking imposition of a final arrangement by the ICC in the event further negotiations fail and without prejudice to the parties' position regarding their rights under the Order; and

WHEREAS, Amtrak is conveying the Former B&M Line to CV pursuant to an Agreement Governing Acquisition of Certain Interests in the Connecticut River Line, dated March 18, 1988; and

WHEREAS, as provided in the Order and in consideration of the sale of the Former B&M Line to Amtrak, B&M retained the right to operate over the Former B&M Line; and

WHEREAS, the parties desire to clarify and reestablish their respective rights and obligations with respect to their interim operations over the CV Lines and the Former B&M Line (for the purposes of this Agreement, the CV Lines and the Former B&M Line shall be collectively referred to as the "Line");

NOW, THEREFORE, in consideration of the promises, covenants and undertakings contained herein, the parties agree as follows:

1.    GRANT OF TRACKAGE RIGHTS

1.1  Subject to the terms and conditions of this Agreement, CV hereby grants to B&M the non-exclusive right to operate B&M's trains, locomotives, cars and equipment with

2.

B&M's own crews over the Line, as more particularly defined as follows:

> All main line track and passing sidings between a point at the interlocking at East Northfield, Massachusetts (approximately B&M MP 49.67 and CV MP 110.51) to the Bank switch at the termination of B&M ownership at White River Junction, Vermont (approximately CV MP 13.40).

1.2  B&M shall have overhead running rights over the CV Lines.

1.3  B&M shall have the exclusive right to serve all existing shippers and shippers' facilities that were located on the Former B&M Line as of September 10, 1988 (the "Conveyance Date"), including any and all new shippers that locate at such existing facilities after the Conveyance Date, provided the B&M maintains a minimum three day per week service along the Line.

1.4  Except as provided in Section 1.3, CV and B&M shall each have the right to compete for and serve shippers and shippers' facilities on the Former B&M Line, and CV shall, upon request by B&M, provide reciprocal switching to permit B&M to serve such shippers and shippers' facilities.  B&M shall pay to CV a per switch charge equal to the actual cost of providing such switching service, not to exceed 180% of the CV variable cost of providing such switching service.

1.5  CV and B&M shall each have the right to compete for and to interchange traffic at Bellows Falls, Vermont with the Green Mountain Railroad Corporation (or its successors and

assigns) ("GMRC"). B&M shall have the exclusive right to interchange traffic at Claremont Junction, New Hampshire with the Claremont and Concord Railway (or its successors and assigns) ("CCR") and to interchange traffic at Charlestown, New Hampshire with the Springfield Terminal Railway Company (or its successors and assigns) ("ST").

1.6   B&M shall have the right of entry over the Line for any and all B&M employees, agents or representatives, machinery, vehicles or equipment which B&M may deem necessary or convenient for the purposes of inspecting the Line, clearing any derailments or wrecks of B&M trains on the Line or otherwise conducting its operations over the Line.

1.7   B&M shall without charge to CV dispatch the interlocking CPR 50 located at East Northfield, Massachusetts until seven (7) days after CV notifies B&M that CV is prepared to assume such responsibility and all applicable regulatory requirements have been satisfied.

1.8   Except as provided herein, this Agreement does not diminish in any way CV's right to use the Line, or CV's right to lease or otherwise allow another carrier to use the Line.

2.   **TERM AND TERMINATION**

2.1   The term of this Agreement shall commence as of 7:00 a.m. Eastern Time, on the Conveyance Date.

2.2   The initial terms of this Agreement shall run for a period of thirty (30) days. Upon expiration of such initial thirty (30) day term, this Agreement shall automatically and without requirement of any notice from one party to the other

4.

continue in effect for successive terms of thirty (30) days each, pending agreement between CV and B&M on the terms of a final arrangement for B&M's operation over the Line or pending final imposition by the ICC of the terms of such an arrangement. It is hereby agreed by CV and B&M that the term of the final trackage rights agreement agreed to or imposed by the ICC shall be retroactive to the commencement date of the Agreement. It is further agreed that in the event the final trackage rights agreement is limited in scope to the Former B&M Line, the April 1, 1985 and January 1, 1930 Trackage Rights Agreements shall govern the operations of the parties over the CV Lines and such agreements shall be deemed re-executed in their current forms with respect to the CV Lines.

2.3  B&M may terminate this Agreement immediately upon notice to CV.

2.4  Notwithstanding the foregoing, the parties hereby acknowledge and agree that B&M has appealed the Order, and that in the event the Former B&M Line is reconveyed to B&M in connection with or resulting from such appeal, this Agreement shall terminate upon such reconveyance, and that thereafter the terms and conditions of the April 1, 1985 and January 1, 1930 Trackage Rights Agreements shall govern their operations over and use of the Line, and such agreements shall be deemed re-executed in their current forms.

3.   COMPENSATION

3.1   CV hereby acknowledges and agrees that B&M shall have no obligation to pay for or contribute in any way towards the cost of such upgrading of the Former B&M Line.

3.2   Except as provided in Section 1.7, CV hereby acknowledges and agrees that CV shall be solely responsible for dispatching all operations over the Line and for the maintenance and repair of the Line, including the signals and the signal and dispatching system which controls operations on it.   CV hereby further acknowledges and agrees that CV shall keep the Line, at all times throughout the term of this Agreement or any extensions thereof, in a state of reasonable repair and condition corresponding to the FRA Track Standard for the applicable authorized speeds, provided that CV may, but shall not be required to maintain the Line to a higher level than FRA Class III.

3.3   In full satisfaction of any and all obligations of B&M to pay for the trackage rights provided herein or contribute towards the costs of dispatching, maintenance and repair of the Line (including the maintenance, repair and operation of the signals and the signal and dispatching system which controls operations on it), B&M shall pay to CV $.19 per car mile (whether loaded or empty) of traffic actually operated by B&M over the Line.   Notwithstanding the foregoing, the sum of such payments in respect of the Former B&M Line shall not exceed one hundred thousand dollars ($100,000) during the first three years this Agreement is in

6.

force and shall not exceed seventy-five thousand dollars ($75,000) in any year thereafter; provided, however, that the foregoing limitation shall not apply if the annual gross traffic volume on the Former B&M Line attributable to B&M's overhead or local service, including traffic for interchange to GMRC, CCR or ST, exceeds 32,500 carloads.  In any year that the amount of traffic attributable to B&M on the Former B&M Line exceeds 32,500 carloads, B&M shall pay CV as additional compensation $.19 per car mile for all cars in excess of 32,500 cars, whether loaded or empty.

3.4  All payments to be made by B&M and CV under this Agreement (other than the caps set forth in Section 3.3) shall be adjusted March 31, 1989, and semi-annually thereafter, for price level changes beginning July 1, 1988, (using Second Quarter 1988) based on the relationship of the most recent quarter's Association of American Railroads (AAR) Eastern District, Quarterly Indices of Chargeout Prices and Wage Rates (Table C) - "Material prices, wage rates and supplements combined (excluding fuel)" to comparable indices of the quarter six months previous.  The first adjustment to be made shall be based on the comparison of the Fourth Quarter 1988 index value to the Second Quarter 1988.

3.5  B&M shall have responsibility for and shall report and pay directly to the owner of the cars, all mileage, car hire and other charges accuring on cars in B&M's trains on the Line.

7.

4.    ADDITIONS AND ALTERATIONS

4.1  CV shall pay for and be responsible for the construction, maintenance, repair and renewal of any additional connections to the Line which it may require.

4.2  If B&M determines that changes in or additions and betterments to the Line, including changes in communication, dispatching or signal facilities as they existed immediately prior to the Conveyance Date, are required to accommodate B&M's operations beyond that required by CV to accommodate CV's and Amtrak's operations over the Line, B&M shall pay for the construction of such additional or altered facilities, including the annual expense of maintaining, repairing, and renewing such additional or altered facilities. Notwithstanding the foregoing, CV shall have the right to approve of any such addition or alteration prior to its construction, which approval shall not be unreasonably withheld, and such addition or alteration shall be constructed in such a manner as to minimize interference with CV's or Amtrak's operations over the Line.

5.    SCHEDULING OF TRAINS AND MAINTENANCE; OPERATING RULES

5.1  The trains, locomotives, cars and equipment of B&M, CV, Amtrak and any other present or future user of the Line or any portion thereof, shall be operated without prejudice or partiality to any party to this Agreement or any such other user and in such a manner as will result in the most economical and efficient manner of movement of all traffic; provided, however, that CV shall give priority to intercity

9.

rail passenger trains of Amtrak to the extent required by
Section 402 of the Rail Passenger Service Act.
Notwithstanding the foregoing, B&M shall have the right, in
consultation with CV, to establish the schedules of B&M's
trains over the Line.  It is understood that trains
performing local work, whether B&M, CV or otherwise, are not
entitled to priority over trains that are not performing such
work.  CV shall establish CV's train schedules with due
regard to the trains to be operated by B&M.  Each party shall
use reasonable efforts to provide thirty (30) days notice of
changes in its traffic and operating patterns and procedures
which may affect the Line.  B&M acknowledges that the
upgrading work will require a twelve (12) hour work block
scheduled for between 7:00 AM and 7:00 PM.  CV hereby agrees
to coordinate with B&M and to use its best efforts in
scheduling the work required for the upgrading of the Former
B&M Line and any future maintenance or repair of the Line to
minimize any interference with or disruption of B&M's
operations over the Line.

   5.2  CV hereby acknowledges and agrees that any and all
training that may be required to qualify B&M operating
personnel as to CV's operating rules (after the initial
training of such personnel, which will be provided by CV)
shall be performed by B&M, and that the determination as to
whether such operating personnel are qualified under CV's
operating rules shall be made in the discretion of B&M
(giving consideration to any comments or recommendations of

CV). CV shall train, and periodically recertify in accordance with CV's operating rules, B&M operating personnel who act as instructors for B&M personnel regarding CV's operating rules. CV hereby further agrees to provide, for a period not to exceed 14 days at CV's sole cost and expense, pilot crews as may be necessary, during the initial training of B&M operating personnel as to CV's operating rules to accommodate any and all B&M trains operating over the Line.

5.3  CV operating rules shall govern all operations over the Line, and CV shall report to B&M any incidents of violation of such rules by a B&M employee.  B&M thereupon shall investigate the matter promptly pursuant to B&M's normal procedures.  If CV does not accept B&M's decision as to penalty or sanction (if any) against such B&M employee, CV may exclude such employee from the Line, in which event CV will be liable for any compensation lost or denied to such employee if CV's action ultimately is not sustained by applicable labor board.

5.4  In the event that any dispute arises as to the interpretation of any operating rules, the interpretations of the Standard Code, as amended, adopted by the Association of American Railroads shall govern.

6.  **CLEARING OF DERAILMENTS AND WRECKS**

6.1  In the event of any derailment or wreck of a B&M train, B&M hereby agrees to clear the Line to allow for the passage of other trains within a reasonable time.  B&M hereby further agrees to perform any rerailing, wrecking or wrecking

train service as may be required in connection with such
derailment or wreck, in accordance with its customary
practices. Except as provided in Sections 7.1 and 7.2, the
cost, liability, and expense of the foregoing, including,
without limitation, loss of, damage to, or destruction of any
property whatsoever and injury to or death of any person or
persons whomsoever resulting therefrom, shall be the
responsibility of B&M.  In the event that B&M does not clear
the Line for passage of trains within a reasonable time, CV
may clear the Line for passage of trains, and B&M shall
reimburse CV for all reasonable costs CV incurs in performing
such service.

7.   RELEASE AND INDEMNIFICATION

7.1  B&M hereby agrees to indemnify, defend, protect and
hold CV and its officers, agents, representatives and
employees harmless from and against any and all liability,
cost or expense (including expenses described in Section 6.1,
above) which relate to or arise out of any loss of, damage
to, or destruction of any property whatsoever, or any injury
to or death of any person or persons whomsoever, when such
liability, cost or expense arises out of the operation of B&M
trains on the Line, including local freight or any overhead
service (including movement of traffic for interchange to
GMRC, CCR or ST).  Notwithstanding the foregoing, CV and B&M
shall each share in the responsibility for any liability,
cost or expense described in the preceding sentence which is
caused in part by the fault, failure, negligence, misconduct,

11.

nonfeasance, or misfeasance of CV or its officers, agents, representatives or employees, in proportion to the respective relative fault of each for the occurrence which gave rise to the liability, cost or expense.

7.2  CV hereby agrees to indemnify, defend, protect and hold B&M and their officers, agents, representatives and employees harmless from and against any and all liability, cost or expense (including expenses described in Section 6.1, above) which relate to or arise out of any loss of, damage to, or destruction of any property whatsoever, or any injury to or death of any person or persons whomsoever, when such liability, cost or expenses arises out of the operation of CV or Amtrak trains on the Line, including local freight service (including movement of traffic for interchange to GMRC), or any maintenance or repair of the Line.  Notwithstanding the foregoing, B&M and CV shall each share in the responsibility for any liability, cost or expense described in the preceding sentence which is caused in part by the fault, failure, negligence, misconduct, nonfeasance or misfeasance of B&M or its officers, agents, representatives or employees, in proportion to the respective relative fault of each for the occurrence which gave rise to the liability, cost or expense.

7.3  In every case of death or injury suffered by an employee of either B&M or CV, when compensation to such employee or employee's dependents is required to be paid under any workmen's compensation, occupational disease, employer's liability or other law, and either of said

parties, under the provisions of this Agreement, is required to pay such compensation, if such compensation is required to be paid in installments over a period of time, such party shall not be released from paying such future installments by reason of the expiration or other termination of this Agreement prior to any of the respective dates upon which any such future installments are to be paid.

8.   DEFAULT

   8.1  In the event of a material breach by B&M of the terms and conditions of this Agreement which continues for a period of forty-five (45) days after notice thereof from CV, CV shall have the right to terminate this Agreement upon ninety (90) days notice.

9.   GENERAL PROVISIONS

   9.1  No Waiver.  Waiver of any provision of this Agreement, in whole or in part, in any one instance shall not constitute a waiver of any other provision in the same instance, nor any waiver of the same provision in another instance, but each provision shall continue in full force and effect with respect to any other then existing or subsequent breach.

   9.2  Notice.  Any notice required or permitted under this Agreement shall be given in writing to the parties at their respective addresses specified above, or at such other address for a party as that party may specify by notice as provided herein, by (i)(A) delivery in hand or by postage prepaid, United Stated first class mail and (B) registered or

13.

certified mail, return receipt requested, or (ii) Federal
Express or other form of expedited mail that provides for
delivery to the sender of a signed receipt, or (iii)
telegram.  Notice so sent shall be effective upon receipt.

9.3  Integration.  Except for the Order and the
documents executed in pursuance thereof, this Agreement
constitutes the entire agreement of the parties with respect
to its subject matter, superseding all prior oral and written
communications, proposals, negotiations, representations,
understandings, courses of dealing, agreements, contracts and
the like between the parties in such respect.  Except for any
and all obligations incurred or causes of action accrued
thereunder prior to or as of the Conveyance Date, and except
as provided in Sections 2.2 and 2.4 hereof, the Trackage
Rights Agreements by and between B&M and CV dated as of April
1, 1985 and January 1, 1930 are hereby terminated.  Any
provisions of any other agreement(s) between CV and B&M which
are not inconsistent with the provisions of this Agreement
shall remain in effect until cancelled according to the terms
of such other agreement(s).

9.4  Miscellaneous.  This Agreement: (i) may be executed
in any number of counterparts, each of which when executed by
both parties to this Agreement shall be deemed to be an
original, and all of which counterparts together shall
constitute one and the same instrument; (ii) may be amended,
modified, or terminated, and any right under this Agreement
may be waived in whole or in part, only by a writing signed

14.

by both parties; (iii) contains headings only for
convenience, which headings do not form part of and shall not
be used in construction of this Agreement; and (iv) is not
intended to inure to the benefit of any party not a party to
this Agreement.

9.5    Availability of Equitable Relief.  The obligations
imposed by this Agreement are unique.  Breach of any of such
obligations would injure the parties to this Agreement; such
injury is likely to be difficult to measure; and monetary
damages, even if ascertainable, are likely to be inadequate
compensation for such injury.  The parties to this Agreement,
therefore, acknowledge and agree that protection of the
respective interests provided herein would require equitable
relief, including specific performance and injunctive relief,
in addition to any other remedy or remedies that the parties
may have at law or under this Agreement.

9.6    Force Majeure.   No party to this Agreement shall
be responsible to the other for delays or errors in its
performance or other breach under this Agreement occurring by
reason of circumstances beyond its control, including acts of
civil or military authority, national emergencies, fire,
major mechanical breakdown, labor disputes, flood or
catastrophe, acts of God, insurrection, war, riots, delays of
suppliers, or failure of transportation, communication or
power supply.

9.7    Trains, Locomotives, Cars or Equipment.   As used in
this Agreement, whenever reference is made to the trains,

15.

locomotives, cars or equipment of, or in the account of, one of the parties hereto, such expression means the trains, locomotives, cars and equipment in the possession of or operated by one of the parties and includes such trains, locomotives, cars and equipment which are owned by, leased to, or in the account of such party. Whenever such trains, locomotives, cars or equipment are owned or leased by one party to this Agreement and are in the possession or account of, or under the control of the other party to this Agreement, such trains, locomotives, cars and equipment shall be considered those of the other party.

9.8  **Assignment.**    This Agreement shall bind and inure to the benefit of the parties and their respective legal representatives, successors and assigns. CV hereby acknowledges and agrees that B&M shall have the right to assign any or all of B&M's rights and obligations under this Agreement to any affiliate of B&M, following consultation with CV. CV further acknowledges and agrees that B&M shall have the right to assign any or all of B&M's rights and obligations under this Agreement to any other person with CV's prior consent, which shall not be withheld unreasonably.

16.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as a sealed instrument as of the date first set forth above by their duly authorized representatives.

BOSTON AND MAINE CORPORATION

By: _Sydney B Culliford_
    Sydney B. Culliford
    Vice President - Transportation

CENTRAL VERMONT RAILWAY, INC.

By: _R. A. Walker_
Name: _Robert A. Walker_
Title: _Vice President_

EXHIBIT 2

TERMS AND CONDITIONS OF TRACKAGE RIGHTS
IMPOSED BY THE INTERSTATE COMMERCE COMMISSION
GOVERNING USE BY BOSTON AND MAINE CORPORATION
OF CERTAIN LINES OF CENTRAL VERMONT RAILWAY, INC.

IT IS ORDERED:

0.  DEFINITIONS

As used herein, the following capitalized terms have
the following meanings (other capitalized terms being
defined in context hereafter):

0.1  "Agreement" means the terms and conditions of
trackage rights as a whole set forth herein, as though the
instant terms and conditions had been contractually agreed
to by B&M and CV.

0.2  "Amtrak" means the National Railroad Passenger
Corporation.

0.3  "B&M" means Boston and Maine Corporation, a
corporation with its principal office at Iron Horse Park,
North Billerica, Massachusetts  01862.

0.4  "CV" means Central Vermont Railway, Inc., a
corporation with its principal office at 2 Federal Street,
St. Albans, Vermont  05478.

0.5  "Conveyance Date" means September 9, 1988, the
date on which B&M conveyed the Former B&M Line to Amtrak,
and on which Amtrak conveyed the same to CV, pursuant to the
Order.

0.6.  "CV Lines" means the approximately 13.4-mile
rail line between White River Junction, Vermont and Windsor,
Vermont, and the approximately 10.6-mile rail line between

Brattleboro, Vermont and East Northfield, Massachusetts, both of which have belonged to CV since before the Conveyance Date.

0.7  "Former B&M Line" means the approximately 48.8-mile rail line between Windsor, Vermont and Brattleboro, Vermont, conveyed by B&M to Amtrak, and by Amtrak to CV, on the Conveyance Date pursuant to the Order.

0.8  "Interim Agreement" means the interim trackage rights agreement temporarily governing B&M's use of the Line, executed by B&M and CV on the Conveyance Date.

0.9  "Line" means the CV Lines and the Former B&M Line together.

0.10  "Order" means the decision of the Commission dated August 4, 1988, and served August 9, 1988, ordering, inter alia, the conveyance of the Former B&M Line from B&M to Amtrak pursuant to 45 U.S.C. § 562(d), and permitting its conveyance from Amtrak to CV.

1.  GRANT OF TRACKAGE RIGHTS

1.1  Subject to the terms and conditions of this Agreement, B&M is hereby granted the non-exclusive right to operate B&M's trains, locomotives, cars and equipment with B&M's crews over the Line, as more particularly defined as follows:

All main line track and passing sidings between a point at the interlocking at East Northfield, Massachusetts (approximately B&M MP 49.67 and CV MP 110.51) to the Bank switch at the termination of B&M

-2-

ownership at White River Junction, Vermont

(approximately CV MP 13.40).

1.2  B&M shall have only overhead running rights over the CV Lines.

1.3  B&M shall have the exclusive right to serve all existing shippers and shippers' facilities that were located on the Former B&M Line as of the Conveyance Date, including any and all new shippers that locate at such existing facilities after the Conveyance Date, provided that B&M maintains a minimum three day per week service along the Line.  CV shall have the exclusive right to serve all other shippers located on or which locate on the Former B&M Line.

1.3.1  For purposes of this Section 1.3, "existing shippers and shippers' facilities" shall mean industries and facilities at rail sidings which received or tendered rail shipments during the twelve months immediately prior to the Conveyance Date.

1.3.2  For purposes of this Section 1.3, "three day per week service" shall mean the provision of local set-off and pick-up service to shippers on the Former B&M Line at least three times per week (Monday through the following Sunday) in each direction.

1.3.3  CV shall be permitted to commence service to existing shippers and shippers' facilities upon B&M's failure to provide three day per week service during two weeks out of any four week period, unless such failure is excused by Section 9.6.

1.4   Except as provided in Section 1.3, CV and B&M shall each have the right to compete for and serve the following shippers and shippers' facilities on the Former B&M Line:

(a)   shippers and shippers' facilities located on the Former B&M Line which have not received or tendered rail shipments during the twelve months immediately prior to the Conveyance Date;

(b)   any other new shippers;

(c)   any existing shippers and shippers' facilities to which B&M does not provide a minimum three day per week service, as specified in Section 1.3.

1.4.1   CV shall, upon request by B&M, provide reciprocal switching to permit B&M to serve such shippers and shippers' facilities as B&M may serve hereunder.   CV shall not be required to switch cars on B&M's behalf at shippers' facilities which CV serves by virtue of B&M's failure to maintain a minimum three day per week service along the Line as specified by Section 1.3, but B&M shall retain the right to provide service directly to such shippers and shippers' facilities.   B&M shall pay to CV a per switch charge not greater than 180% of the CV variable cost of providing such switching service computed using CV's costs computed in accordance with formulas generally used or accepted in ICC proceedings.

1.5   CV and B&M shall each have the right to compete for and to interchange traffic at Bellows Falls, Vermont

-4-

with the Green Mountain Railroad Corporation (or its successors and assigns) ("GMRC"), and at Claremont Junction, New Hampshire with the Claremont and Concord Railway (or its successors and assigns) ("CCR"). B&M shall have the exclusive right to interchange traffic at Charlestown, New Hampshire with the Springfield Terminal Railway Company (or its successors and assigns) ("ST").

1.6   B&M shall have the right of entry over the Line for any and all B&M employees, agents or representatives, machinery, vehicles or equipment which B&M may deem necessary or convenient for the purposes of inspecting the Line, clearing any derailments or wrecks of B&M trains on the Line or otherwise conducting its operations over the Line.

1.7   B&M shall without charge to CV dispatch the interlocking CPR 50 located at East Northfield, Massachusetts until seven (7) days after CV notifies B&M that CV is prepared to assume such responsibility and all applicable regulatory requirements have been satisfied.

1.8.  Except as provided herein, this Agreement does not diminish in any way CV's right to use the Line, or CV's right to lease or otherwise allow another carrier to use the Line.

2.    **TERM AND TERMINATION**

2.1   The term of this Agreement shall commence as of 7:00 a.m. Eastern Time, on September 10, 1988.

-5-

2.2   The initial term of this Agreement shall run for a period of twenty (20) years.   Upon expiration of such initial twenty (20) year term, this Agreement shall automatically and without requirement of any notice from one party to the other continue in effect for successive terms of one (1) year each, unless terminated by either party upon ninety (90) days' notice prior to the end of that term or in accordance with Section 8 of this Agreement.

2.3   If B&M ceases rail operations over the Line, it may terminate this Agreement immediately upon notice to CV.

2.4   Notwithstanding the foregoing, it is acknowledged that B&M has appealed the Order, and in the event the Former B&M Line is reconveyed to B&M in connection with or resulting from such appeal, this Agreement shall terminate upon such reconveyance, and it is agreed that thereafter the terms and conditions of the April 1, 1985 and January 1, 1930 Trackage Rights Agreements shall govern their operations over and use of the Line, and such agreements shall be deemed re-executed in their current forms, except that each shall be deemed to be amended to include a covenant that the owner shall maintain its line at not less than FRA Class II condition.

3.   <u>COMPENSATION</u>

3.1   B&M shall have no obligation to pay for or contribute in any way towards the cost of the initial upgrading work on the Former B&M Line to FRA Class III

standards as specified by the Rehabilitation Agreement between CV and Amtrak dated March 18, 1988.

3.2  Except as provided in Section 1.7, CV shall be solely responsible for dispatching all operations over the Line and for the maintenance and repair of the Line, including the signals and the signal and dispatching system which controls operations on it.  CV shall keep the Line, at all times throughout the term of this Agreement or any extensions thereof, in not less than FRA Class II condition.

3.3  In full satisfaction of any and all obligations of B&M to pay for the trackage rights provided herein or contribute towards the costs of dispatching, maintenance and repair of the Line (including the maintenance, repair and operation of the signals and the signal and dispatching system which controls operations on it), B&M shall pay to CV $.21 per car mile (whether loaded or empty including locomotives, cabooses and work equipment) of traffic actually operated by B&M or its assignee over the Line. Notwithstanding the foregoing, after the expiration of three Years of Operations under this Agreement the payments made by B&M or its assignee, with respect to traffic on the Former B&M Line and not with respect to traffic on the CV Lines, shall not exceed seventy-five thousand dollars ($75,000) per year (the "Cap"); provided, however, that the foregoing Cap shall not apply in a Year of Operations in which the annual gross traffic volume on the Former B&M Line attributable to B&M's overhead or local service, including

-7-

traffic for interchange to GMRC, CCR or ST, exceeds 125 percent of the 1985 annual traffic volume on the Former B&M Line ("Traffic Ceiling"). In any year that the amount of traffic attributable to B&M or its assignee on the Former B&M Line exceeds 125 percent of the 1985 annual traffic volume, B&M shall pay CV $.21 per car mile for all cars transported over the Former B&M Line, whether loaded or empty, including locomotives, cabooses and work equipment. There shall be no cap at all for payments by B&M for traffic on the CV Lines. For the purposes of this Agreement a "Year of Operations" runs from October 1 through September 30 of the following calendar year.

3.4  All payments to be made by B&M and CV under this Agreement (including the Cap set forth in Section 3.3) shall be adjusted effective March 31, 1989, and semi-annually thereafter, for price level changes from July 1, 1988, (using Second Quarter 1988) based on the relationship of the most recent quarter's Association of American Railroads (AAR) Eastern District, Quarterly Indices of Chargeout Prices and Wage Rates (Table C) - "Material prices, wage rates and supplements combined (excluding fuel)" to comparable indices of the quarter six months previous. The first adjustment to be made shall be based on the comparison of the Fourth Quarter 1988 index value to the Second Quarter 1988.

3.5  B&M shall have responsibility for and shall report and pay directly to the owner of the cars, all

mileage, car hire and other charges accruing on the cars in B&M's trains on the Line.

3.6  CV shall issue its bill to B&M for the payments specified by Sections 1.4 and 3.3 by the fifteenth (15) day of each month for the traffic transported during the preceding calendar month, based on B&M's actual mileage for such preceding calendar month.  B&M shall pay to CV the amount shown on such bill by the last day of the month in which such bill is issued.  Payments not received by CV by such last day of the month in which the bill is issued will accrue interest at the rate of one and one-half (1.5%) percent per month for each month or portion of a month by which the payment is late.

3.7  Commencing with the fourth (4) Year of Operations under the Agreement, and during each succeeding Year of Operations, B&M shall not be required to pay mileage charges attributable to its operations over the Former B&M Line once payments made in the preceding months of that year in respect of those operations equal the Cap as adjusted in accordance with Section 3.4.  Unless the Traffic Ceiling has been exceeded, the same procedure will be followed during each Year of Operations thereafter.  If during any Year of Operations commencing on or after October 1, 1991, the traffic volume exceeds the Traffic Ceiling, B&M or its assignee shall pay the difference between the charges which would have been paid without the Cap and the charges actually paid, in three equal installments with the regular

monthly payments for November, December and January of the next Year of Operations . If this Agreement is terminated during or at the end of any Year of Operations in which the Traffic Ceiling is exceeded, B&M or its assignee shall pay any such charges on the effective date of termination of the Agreement.

3.8  CV estimates that the capital programs required to preserve the Line to the agreed standards (i.e., FRA Class II) will cost an average of $4,343 per mile for rail, ties and surfacing beginning in the sixth Year of Operations under this Agreement.  During any Year of Operations in which CV actually conducts such capital projects, B&M or its assignee shall pay a proportionate share of the expenditures actually made by CV for these capital projects based upon the percentage of the total car miles on the Line attributable to B&M's (or its assignee's) traffic during the preceding twelve (12) month period.  CV shall provide B&M with the capital budget for work to be performed during the following work season on the Line by March 1 of the year in which the work will be performed.

3.9  In the event that CV is required to undertake any major capital projects which may become necessary due to changes in applicable local, state or federal statutes, ordinances or regulations, or by catastrophic occurrences on the Line, including but not limited to floods or destruction of bridges, B&M or its assignee shall pay its proportionate share of the expenditures actually made by CV for such

capital projects based upon the percentage of total car miles on the Line attributable to B&M's (or its assignee's) average traffic volume during the preceding five (5) year period.  If CV proposes any such projects, and if B&M does not agree that the project is required to preserve the Line to FRA Class II standards, B&M must seek the determination to that effect from an arbitrator in accordance with Section 9.9 of this Agreement.  Pending the ruling of the arbitrator, B&M shall pay to CV B&M's share of the amount expended by CV on the project.  In the event the arbitrator determines that CV is not entitled to receive the amount paid by B&M, the amount owed to B&M shall be paid within thirty (30) days of the arbitrator's ruling with interest from the date of payment by B&M at a rate of one and one-half percent per month compounded monthly.

4.    <u>ADDITIONS AND ALTERATIONS</u>

4.1  CV shall pay for and be responsible for the construction, maintenance, repair and renewal of any additional connections to the Line which it may require.

4.2  If B&M determines that changes in or additions and betterments to the Line, including changes in communication, dispatching or signal facilities as they existed immediately prior to the Conveyance Date, are required to accommodate B&M's operations beyond that required by CV to accommodate CV's and Amtrak's operations over the Line, then CV alone shall construct, and B&M shall pay CV for the construction of, such additional or altered

-11-

facilities.  B&M shall also reimburse CV for the annual
expense of maintaining, repairing, and renewing such
additional or altered facilities.  Notwithstanding the
foregoing, CV shall have the right to approve of any such
addition or alteration prior to its construction, which
approval shall not be unreasonably withheld, and such
addition or alteration shall be constructed in such a manner
as to minimize interference with CV's or Amtrak's operations
over the Line.

5.    SCHEDULING OF TRAINS AND MAINTENANCE; OPERATING RULES

5.1  The trains, locomotives, cars and equipment of
B&M, CV, Amtrak and any other present or future user of the
Line or any portion thereof, shall be operated without
prejudice or partiality to any party to this Agreement or
any such other user and in such manner as will result in the
most economical and efficient manner of movement of all
traffic; provided, however, that CV shall give priority to
intercity rail passenger trains of Amtrak to the extent
required by Section 402 of the Rail Passenger Service Act.
Notwithstanding the foregoing, B&M shall have the right, in
consultation with CV, to establish the schedules of B&M's
trains over the Line.  Trains performing local work, whether
B&M, CV or otherwise, are not entitled to priority over
trains that are not performing such work.  CV shall
establish CV's train schedules with due regard to the trains
to be operated by B&M.  Each party shall use reasonable
efforts to provide five (5) days' notice of changes in its

-12-

traffic and operating patterns and procedures which may affect the Line.

5.2. Any and all training that may be required to qualify B&M operating personnel as to CV's operating rules (after the initial training of such personnel, which will be provided by CV) shall be performed by B&M, and the determination as to whether such operating personnel are qualified under CV's operating rules shall be made in the discretion of B&M (giving consideration to any comments or recommendations of CV). CV shall train, and periodically recertify in accordance with CV's operating rules, B&M operating personnel who act as instructors for B&M personnel regarding CV's operating rules.

5.3 CV operating rules shall govern all operations over the Line, and CV shall report to B&M any incidents of violation of such rules by a B&M employee. CV may at its option exclude such employee from the Line.

5.4 In the event that any dispute arises as to the interpretation of any operating rules, the interpretations of the Uniform Code of Operating Rules, as amended, shall govern.

6.    <u>CLEARING OF DERAILMENTS AND WRECKS</u>

6.1 In the event of any derailment or wreck of a B&M train, B&M shall clear the Line to allow for the passage of other trains within a reasonable time. B&M shall perform any rerailing, wrecking or wrecking train service as may be required in connection with such derailment or wreck, in

accordance with its customary practices. Except as provided in Section 7 of this Agreement, the cost, liability, and expense of the foregoing, including, without limitation, loss of, or damage to, or destruction of any property whatsoever and injury to or death of any person or persons whomsoever resulting therefrom, shall be the responsibility of B&M. In the event that B&M does not begin rerailing operations for passage of trains over the Line within twelve (12) hours of an occurrence or does not complete the process of clearing the Line within a reasonable time, CV may clear the Line for passage of trains, and B&M shall reimburse CV for all reasonable costs CV incurs in performing such service.

7.    RELEASE AND INDEMNIFICATION

7.1  Save as herein otherwise provided, each party hereto shall be responsible for and shall assume all loss, damage or injury (including injury resulting in death) to persons or property, including the cost of removing any wreckage, repairing trackage and correcting environmental damage, which may be caused by its engines, cars, trains or other on-track equipment (including damage by fire originating therefrom) whether or not the condition or arrangement of the trackage contributes in any manner or to any extent to such loss, damage or injury, and whether or not a third party may have caused or contributed to such loss, damage or injury, and for all loss or damage to its engines, cars, trains or other on-track equipment while on

-14-

said trackage from any cause whatsoever, except in the case of collision, in which event the provisions of the following Paragraph 7.2 shall apply.

7.2  In the event of a collision between CV's and B&M's engines, cars, trains or other on-track equipment while on the Line, the apportionment of liability between the parties hereto for all loss, damage or injury (including injury resulting in death) to any person (including CV's or B&M's employees, agents or representatives) or property shall be governed by the following provisions:

7.2.1  If the employees of one party are solely at fault, that party shall be responsible for all such loss, damage or injury including the cost of removing wreckage, repairing trackage, and correcting environmental damage.

7.2.2  If the employees of both parties hereto are at fault, or if the cause of the accident is so concealed that it cannot be determined whose employees are at fault, each party shall bear and pay all such loss, damage or injury which its own engines, cars, trains or other on-track equipment and their contents or property in its custody, or its employees or others claiming for them may have suffered by reason or in consequence of the accident.  Responsibility for all other such loss, damage or injury shall be apportioned equally between the parties hereto.

7.2.3  The words "all other such loss, damage or injury" referred to in this Section 7.2 shall be deemed to include but not be limited to the cost of removing wreckage,

repairing trackage, correcting environmental damage, and third party claims.

7.2.4  As between the parties hereto, the foregoing provisions of this Section 7.2 shall be applicable whether or not a third party may have caused or contributed to the accident.

7.2.5  The words "trackage" referred to in this Section 7 shall be deemed to include but not be limited to all tracks, structures or facilities pertaining to operation of the Line.

7.3  Without in any way restricting the terms of this Section 7, in the case of a collision or accident between the train of either party to this Agreement and the property of a third person or other entity, including any action done in the process of trying to avoid an accident or a collision, such party shall save harmless and indemnify the other party forthwith for all damages suffered by the other party including damages to equipment and structures or injuries (including death) to the employees or agents of the other party and including also the results of those actions done in the process of avoiding a collision or accident, and in any way resulting from such collision or accident, irrespective of negligence of either party or such third person or other entity, and with a right of subrogation in favor of such party against any such third person or other entity.

-16-

7.4   Each party hereto shall forever indemnify and save harmless the other party, from and against all claims, liability or judgments by reason or on account of any injury to or death of any person or of any loss or damage to property, the liability for which is herein assumed by such first mentioned party, and such first mentioned party agrees to pay and discharge any judgment that may be obtained by reason thereof, and all costs, charges, and expenses payable thereunder, including legal counsel fees.

7.5   The parties shall settle, as between themselves, any claim for loss or damage according to the terms of this Agreement, notwithstanding any judgment or decree of any court or other tribunal in a proceeding brought by other parties.  In case a suit or proceeding shall be commenced by any person or corporation against either party hereto for or on account of any loss, damage or injury for which the other party hereto is liable under the provisions of this Agreement, the party so sued or proceeded against shall give to the other party reasonable notice, in writing, of the pendency of such suit or proceeding and thereupon the other party shall assume the defense of such suit or proceeding or shall save and hold the party so sued harmless from all loss and costs by reason thereof.  Neither party hereto shall be bound by any judgment against the other party unless it shall have reasonable notice that it is so required to defend and has reasonable opportunity to make such defense. When such notice and opportunity has been given, the party

notified shall be bound by the judgment as to all matters that could have been litigated in such suit or proceeding.

7.6  In every case of death or injury suffered by an employee of either B&M or CV, when compensation to such employee or employee's dependents is required to be paid under any workmen's compensation, occupational disease, employer's liability or other law, and either of said parties, under the provisions of this Agreement, is required to pay such compensation, if such compensation is required to be paid in installments over a period of time, such party shall not be released from paying such future installments by reason of the expiration or other termination of this Agreement prior to any of the respective dates upon which any such future installments are to be paid.

8.    DEFAULT; PAYMENT DELINQUENCY

8.1  In the event of a material breach by B&M of the terms and conditions of this Agreement which continues for a period of forty-five (45) days after notice thereof from CV, CV shall have the right to terminate this Agreement upon ninety (90) days notice.

8.2  In the event B&M becomes delinquent in payment of any amount by more than fourteen (14) days under the terms of Section 3.6, CV shall be entitled to receive advance payment from B&M for each B&M train seeking access to the Line until B&M satisfies such delinquency in full.  In the event B&M fails to tender such advance payment, CV shall be further entitled to exclude and eject B&M from the Line

-18-

until B&M satisfies such delinquency in full. CV shall be
entitled to such remedies for delinquencies in any amount
billed to B&M, notwithstanding that B&M may have disputed
such billed amount by invoking arbitration or otherwise.
During the pendency of any such exclusion or ejectment, CV
shall nevertheless accept B&M cars for interchange at any
point on the Line.

9.    GENERAL PROVISIONS

9.1    No Waiver.  Waiver of any provision of this
Agreement, in whole or in part, in any one instance shall
not constitute a waiver of any other provision in the same
instance, nor any waiver of the same provision in another
instance, but each provision shall continue in full force
and effect with respect to any other then existing or
subsequent breach.

9.2    Notice.  Any notice required or permitted under
this Agreement shall be given in writing to the parties at
their respective addresses specified above, or at such other
address for a party as that party may specify by notice as
provided herein, by (i)(A) delivery in hand or by postage
prepaid, United States first class mail and (B) registered
or certified mail, return receipt requested, or (ii)(A)
telefax and (B) registered or certified mail, return receipt
requested, or (iii) Federal Express or other form of
expedited mail that provides for delivery to the sender of a
signed receipt, or (iv) telegram.  Notice so sent shall be
effective upon receipt.

-19-

9.3   <u>Integration</u>.  Except for the Order and the documents executed in pursuance thereof, this Agreement constitutes the entire agreement of the parties with respect to its subject matter, superseding all prior oral and written communications, proposals, negotiations, represen- tations, understandings, courses of dealing, agreements, contracts and the like between the parties in such respect. Except for any and all obligations incurred or causes of action accrued thereunder prior to or as of the Conveyance Date, and except as provided in Sections 2.4 and 9.3.1 hereof, the Trackage Rights Agreements by and between B&M and CV dated as of April 1, 1985 and January 1, 1930 are hereby terminated.  Any provisions of any other agree- ments(s) between CV and B&M which are not inconsistent with the provisions of this Agreement shall remain in effect until cancelled according to the terms of such other agreement(s).

9.3.1  The provisions of Section 8, Freight Haulage, of the January 1, 1930 Trackage Rights Agreement between CV and B&M, as amended from time to time, shall remain in effect until cancelled by either party upon ninety (90) days prior written notice to the other.

9.4   <u>Miscellaneous</u>.  This Agreement:  (i) may be amended, modified, or terminated, and any right under this Agreement may be waived in whole or in part, only by a writing signed by both parties; (ii) contains headings only for convenience, which headings do not form part of and

shall not be used in construction of this Agreement; and
(iii) is not intended to inure to the benefit of any party
not a party to this Agreement.

9.5  Availability of Equitable Relief.  The
obligations imposed by this Agreement are unique.  Breach of
any of such obligations would injure the parties to this
Agreement; such injury is likely to be difficult to measure;
and monetary damages, even if ascertainable, are likely to
be inadequate compensation for such injury.  Therefore,
subject to the mandatory arbitration provisions of
section 9.9, protection of the respective interests provided
herein shall include equitable relief, including specific
performance and injunctive relief, in addition to any other
remedy or remedies that the parties may have at law or under
this Agreement.

9.6  Force Majeure.  No party to this Agreement shall
be responsible for delays or errors in its performance or
other breach under this Agreement occurring by reason of
circumstances beyond its control, including acts of civil or
military authority, national emergencies, fire, major
mechanical breakdown, labor disputes, flood or catastrophe,
acts of God, insurrection, war, riots, delays in suppliers,
derailments or failure of transportation, communication or
power supply.

9.7  Trains, Locomotives, Cars or Equipment.  As used
in this Agreement, whenever reference is made to the trains,
locomotives, cars or equipment of, or in the account of, one

of the parties hereto, such expression means the trains,
locomotives, cars and equipment in the possession of  or
operated by one of the parties and includes such trains,
locomotives, cars and equipment which are owned by, leased
to, or in the account of such party.  Whenever such trains,
locomotives, cars or equipment are owned or leased by one
party to this Agreement and are in the possession or account
of, or under the control of the other party to this
Agreement, such trains, locomotives, cars and equipment
shall be considered those of the other party, except where
the cars or equipment are being transported under the
Haulage Agreement referred to in Section 9.3.1 of this
Agreement.

9.8  Assignment.  This Agreement shall bind and inure
to the benefit of the parties and their respective legal
representatives, successors and assigns.  B&M shall have the
right to assign any or all of B&M's rights and obligations
under this Agreement to any affiliate of B&M, following
consultation with CV.  B&M shall have the right to assign
any or all of B&M's rights and obligations under this
Agreement to any other person with CV's prior consent, which
shall not be withheld unreasonably.  In the event of an
assignment of all or a part of B&M's interests in this
Agreement, the number of carloads attributable to the
assignee's operations over the Line shall be included in the
number of cars attributable to B&M's operations for the
purposes of Section 3.3 of this Agreement.

9.9  <u>Arbitration</u>.  Any difference whatsoever which may arise between the parties hereto under this Agreement, either as to its construction or as to its carrying out, according to the true intent and meaning hereof, shall, if it cannot be amicably adjusted by the parties hereto, be submitted to arbitration.  As a consequence, once the dispute contemplated has arisen, the party desiring arbitration shall give notice thereof to the other party of its intention to refer to arbitration; such other party shall, within thirty (30) days from receipt of such notice, appoint an arbitrator on its behalf, and the party desiring arbitration shall appoint an arbitrator on its own behalf; the two arbitrators so appointed or selected shall select a third one within ten (10) days from the date of the appointment of the second arbitrator.  Should the party notified to appoint an arbitrator fail to do so within thirty (30) days, or should the two arbitrators appointed fail to appoint a third one within ten (10) days from the date of the appointment of the second one, or should the parties fail to agree as to what the objects of the dispute are, the party desiring the arbitration will apply to a Judge of the United States District Court for the District of Columbia for the appointment of the arbitrator or arbitrators, as the case may be, and to state the object in dispute, if necessary.  The award of the said three arbitrators, or a majority of them made after due notice to both parties of the time and place of hearing the party or

-23-

parties which may attend, shall be final and binding on both parties hereto, which hereby expressly agree to abide thereby.

9.9.1  In the case of death or refusal or inability to act as an arbitrator, or if for any cause the office of any arbitrator becomes vacant, his successor shall be appointed in the same manner as is provided for his appointment in the first instance, unless the parties otherwise agree.  Each party shall pay half the costs of and incidental to any such arbitration.

9.9.2  CV and B&M hereby acknowledge and agree that this mandatory arbitration provision entails waiver by the parties of their right to appeal or challenge the substance of any decision or award of the arbitrator, any challenges being limited to those matters relating to arbitrator qualifications and partiality which are specifically allowed to be challenged under the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq.

9.10  _Governing Law_.  This Agreement is imposed and entered into in, and shall be governed by the laws of, the District of Columbia.

BY THE COMMISSION:


Noreta R. McGee
Secretary


1807G

EXHIBIT 3

**TERMS AND CONDITIONS OF TRACKAGE RIGHTS
IMPOSED BY THE INTERSTATE COMMERCE COMMISSION
GOVERNING THE USE BY BOSTON AND MAIN CORPORATION
OF CERTAIN LINES OF CENTRAL VERMONT RAILWAY, INC.**

IT IS ORDERED:

0.  <u>DEFINITIONS</u>

As used herein, the following capitalized terms have the following meanings (any other capitalized terms being defined in context hereafter):

0.1  "Agreement" means the terms and conditions of trackage rights as a whole set forth herein, as though the instant terms and conditions had been agreed to contractually by B&M and CV.

0.2  "Amtrak" means the National Railroad Passenger Corporation.

0.3  "B&M" means Boston and Maine Corporation, a corporation with its principal office at Iron Horse Park, North Billerica, Massachusetts 01862.

0.4  "CCR" means Claremont and Concord Railway (including its successors and assigns).

0.5  "Conveyance Date" means September 9, 1988, the date on which B&M conveyed the Former B&M Line to Amtrak, and on which Amtrak conveyed the same to CV, pursuant to the Order.

0.6    "CV" means Central Vermont Railway, Inc., a corpora-
tion with its principal office at 2 Federal Street, St. Al-
bans, Vermont 05478.

0.7    "CV Lines" means the approximately 13.4-mile rail
line between White River Junction, Vermont and Windsor, Ver-
mont, and the approximately 10.6-mile rail line between Brat-
tleboro, Vermont and East Northfield, Massachusetts, both of
which have belonged to CV since before the Conveyance Date.

0.8    "Former B&M Line" means the approximately 48.8-mile
rail line between Windsor, Vermont and Brattleboro, Vermont,
conveyed by B&M to Amtrak, and by Amtrak to CV, on the Convey-
ance Date pursuant to the Order.

0.9    "GMRC" means the Green Mountain Railroad Corporation
(including its successors and assigns).

0.10    "ICC" means the U.S. Interstate Commerce Commission.

0.11    "Line" means the CV Lines and the Former B&M Line
together.                                              o

0.12    "Order" means the decision of the ICC in National
Railroad Passenger Corporation--Conveyance of Boston and Maine
Corporation Interests in Connecticut River Line in Vermont and
New Hampshire, dated August 4, 1988, served August 9, 1988 and
published at pages 761 through 817 of volume 4 of the ICC
Reports, Second Series.

0.13    "ST" means the Springfield Terminal Railway Company
(including its successors and assigns).

1. **GRANT OF TRACKAGE RIGHTS**

1.1  Subject to the terms and conditions of this Agreement, B&M shall have the non-exclusive right to operate B&M's trains, locomotives, cars and equipment with B&M's own crews over the Line, as more particularly defined as follows:

All main line track and passing sidings between a point at the interlocking at East Northfield, Massachusetts (approximately B&M MP 49.67 and CV MP 110.51) to the Bank switch at the termination of B&M ownership at White River Junction, Vermont (approximately CV MP 13.40).

1.2  B&M shall have overhead running rights over the CV Lines.

1.3  B&M shall have the exclusive right to serve all existing shippers and shippers' facilities that were located on the Former B&M Line as of the Conveyance Date, including any and all new shippers that locate at such existing facilities after the Conveyance Date, provided the B&M makes available a minimum three day per week service along the Line.

1.4  Except as provided in Section 1.3, CV and B&M shall each have the right to compete for and serve shippers and shippers' facilities on the Former B&M Line, and CV shall, upon request by B&M, provide reciprocal switching to permit B&M to serve such shippers and shippers' facilities.  B&M shall pay to CV a per switch charge equal to the actual cost

of providing such switching service, not to exceed 180% of the CV variable cost of providing such switching service.

1.5  CV and B&M shall each have the right to compete for and to interchange traffic at Bellows Falls, Vermont with GMRC.  B&M shall have the exclusive right to interchange traffic at Claremont Junction, New Hampshire with the CCR and to interchange traffic at Charlestown, New Hampshire with the ST.

1.6  B&M shall have the right of entry over the Line for any and all B&M employees, agents or representatives, machinery, vehicles or equipment which B&M may deem necessary or convenient for the purposes of inspecting the Line, clearing any derailments or wrecks of B&M trains on the Line or otherwise conducting its operations over the Line.

1.7  B&M shall without charge to CV dispatch the interlocking CPR 50 located at East Northfield, Massachusetts until seven (7) days after CV notifies B&M that CV is prepared to assume such responsibility and all applicable regulatory requirements have been satisfied.

1.8  Except as provided herein, this Agreement does not diminish in any way CV's right to use the Line, or CV's right to lease or otherwise allow another carrier to use the Line.

2.  TERM AND TERMINATION

2.1  The term of this Agreement shall commence as of 7:00 a.m. Eastern Time, on the Conveyance Date.

-4-

2.2  Except as provided in Section 2.3, and subject to the provisions of this section, the term of this Agreement shall be perpetual.  After 20 years from the Conveyance Date, either party to this Agreement may seek modifications from the other and, if satisfactory modifications are not agreed to after a reasonable period for negotiation, may apply to the ICC for modifications.  Nothing in this section shall authorize the ICC to impose arbitration requirements upon either party to this Agreement.

2.3  B&M may terminate this Agreement immediately upon notice to CV.

2.4  Notwithstanding the foregoing, the parties hereby acknowledge and agree that B&M has appealed the Order, and that in the event the Former B&M Line is reconveyed to B&M in connection with or resulting from such appeal, this Agreement shall terminate upon such reconveyance, and that thereafter the terms and conditions of the April 1, 1985 and January 1, 1930 Trackage rights Agreements shall govern their operations over and use of the line, and such agreements shall be deemed re-executed in their current forms.

3.  COMPENSATION

3.1  CV hereby acknowledges and agrees that B&M shall have no obligation to pay for or contribute in any way towards the cost of such upgrading of the Former B&M Line.

3.2  Except as provided in Section 1.7, CV hereby acknow-
ledges and agrees that CV shall be solely responsible for
dispatching all operations over the Line and for the mainten-
ance and repair of the Line, including the signals and the
signal and dispatching system which controls operations on it.
CV hereby further acknowledges and agrees that CV shall keep
the Line, at all times throughout the term of this Agreement
or any extensions thereof, in a state of reasonable repair and
condition corresponding to the FRA Track Standard for the
applicable authorized speeds, provided that CV may, but shall
not be required to maintain the Line to a higher level than
FRA Class III.

3.3  In full satisfaction of any and all obligations of
B&M to pay for the trackage rights provided herein or contrib-
ute towards the costs of dispatching, maintenance and repair
of the Line (including the maintenance, repair and operation
of the signals and the signal and dispatching system which
controls operations on it), B&M shall pay to CV $.19 per car
mile (whether loaded or empty) of traffic actually operated by
B&M over the Line.  Notwithstanding the foregoing, the sum of
such payments in respect of the Former B&M Line shall not
exceed one hundred forty-two thousand dollars ($142,000) dur-
ing the first three years this Agreement is in force and shall
not exceed seventy-five thousand dollars ($75,000) in any year
thereafter; provided, however, that the foregoing limitation

-6-

shall not apply if the annual gross traffic volume on the Former B&M Line attributable to B&M's overhead or local service, including traffic for interchange to GMRC, CCR or ST, exceeds 32,500 carloads.  In any year that the amount of traffic attributable to B&M on the Former B&M Line exceeds 32,500 carloads, B&M shall pay CV as additional compensation $.19 per car mile for all cars in excess of 32,500 cars, whether loaded or empty.

3.4  All payments to be made by B&M and CV under this Agreement (other than the caps set forth in Section 3.3) shall be adjusted March 31, 1989, and semi-annually thereafter, for price level changes beginning July 1, 1988, (using Second Quarter 1988) based on the relationship of the most recent quarter's Association of American Railroads (AAR) Eastern District, Quarterly Indices of Chargeout Prices and Wage Rates (Table C) - "Material prices, wage rates and supplements combined (excluding fuel)" to comparable indices of the quarter six months previous.  The first adjustment to be made shall be based on the comparison of the Fourth Quarter 1988 index value to the Second Quarter 1988.

3.5  B&M shall have responsibility for and shall report and pay directly to the owner of the cars, all mileage, car hire and other charges accruing on cars in B&M's trains on the line.

4. __ADDITIONS AND ALTERATIONS__

4.1   CV shall pay for and be responsible for the construc-
tion, maintenance, repair and renewal of any additional con-
nections to the Line which it may require.

4.2   If B&M determines that changes in or additions and
betterments to the Line, including changes in communication,
dispatching or signal facilities as they existed immediately
prior to the Conveyance Date, are required to accommodate
B&M's operations beyond that required by CV to accommodate
CV's and Amtrak's operations over the Line, B&M shall pay for
the construction of such additional or altered facilities,
including the annual expense of maintaining, repairing, and
renewing such additional or altered facilities.   Notwithstand-
ing the foregoing, CV shall have the right to approve of any
such addition or alteration prior to its construction, which
approval shall not be unreasonably withheld, and such addition
or alteration shall be constructed in such a manner as to
minimize interference with CV's or Amtrak's operations over
the Line.

5. __SCHEDULING OF TRAINS AND MAINTENANCE; OPERATING RULES__

5.1   The trains, locomotives, cars and equipment of B&M,
CV, Amtrak and any other present or future user of the line or
any portion thereof, shall be operated without prejudice or
partiality to any party to this Agreement or any such other
user and in such a manner as will result in the most economi-

cal and efficient manner and movement of all traffic; provi-
ded, however, that CV shall give priority to intercity rail
passenger trains of Amtrak to the extent required by Section
402 of the Rail Passenger Service Act.  Notwithstanding the
foregoing, B&M shall have the right, in consultation with CV,
to establish the schedules of B&M's trains over the Line.  It
is understood that trains performing local work, whether B&M,
CV or otherwise, are not entitled to priority over trains that
are not performing such work.  CV shall establish CV's train
schedules with due regard to the trains to be operated by B&M.
Each party shall use reasonable efforts to provide thirty (30)
days notice of changes in its traffic and operating patterns
and procedures which may affect the Line.  B&M acknowledges
that the upgrading work will require a twelve (12) hour work
block scheduled for between 7:00 AM and 7:00 PM.  CV hereby
agrees to coordinate with B&M and to use its best efforts in
scheduling the work required for the upgrading of the Former
B&M Line and any future maintenance or repair of the line to
minimize any interference with or disruption of B&M's opera-
tions over the Line.

5.2  CV hereby acknowledges and agrees that any and all
training that may be required to qualify B&M operating person-
nel as to CV's operating rules (after the initial training of
such personnel, which will be provided by CV) shall be per-
formed by B&M, and that the determination as to whether such

-9-

operating personnel are qualified under CV's operating rules
shall be made in the discretion of B&M (giving consideration
to any comments or recommendations of CV).  CV shall train,
and periodically recertify in accordance with CV's operating
rules, B&M operating personnel who act as instructors for B&M
personnel regarding CV's operating rules.  CV hereby further
agrees to provide, for a period not to exceed 14 days at CV's
sole cost and expense, pilot crews as may be necessary, during
the initial training of B&M operating personnel as to CV's
operating rules to accommodate any and all B&M trains opera-
ting over the Line.

5.3  CV operating rules shall govern all operations over
the Line, and CV shall report to B&M any incidents of viola-
tion of such rules by a B&M employee.  CV may at its option,
for good cause shown, exclude such employee from the Line.

5.4  In the event that any dispute arises as to the inter-
pretation of any operating rules, the interpretations of the
Standard Code, as amended, adopted by the Association of Amer-
ican Railroads shall govern.

6.  CLEARING OF DERAILMENTS AND WRECKS

6.1  In the event of any derailment or wreck of a B&M
train, B&M hereby agrees to clear the Line to allow for the
passage of other trains within a reasonable time.  B&M hereby
further agrees to perform any rerailing, wrecking or wrecking
train service as may be required in connection with such de-

-10-

railment or wreck, in accordance with its customary practices. Except as provided in Sections 7.1 and 7.2, the cost, liability, and expense of the foregoing, including, without limitation, loss of, damage to, or destruction of any property whatsoever and injury to or death of any person or persons whomsoever resulting therefrom, shall be the responsibility of B&M. In the event that B&M does not clear the Line for passage of trains within a reasonable time, CV may clear the Line for passage of trains, and B&M shall reimburse CV for all reasonable costs CV incurs in performing such service.

7.  RELEASE AND INDEMNIFICATION

7.1  B&M hereby agrees to indemnify, defend, protect and hold CV and its officers, agents, representatives and employees harmless from and against any and all liability, cost or expense (including expenses described in Section 6.1, above) which relate to or arise out of any loss of, damage to, or destruction of any property whatsoever, or any injury to or death of any person or persons whomsoever, when such liability, cost or expense arises out of the operation of B&M trains on the Line, including local freight or any overhead service (including movement of traffic for interchange to GMRC, CCR or ST). Notwithstanding the foregoing, CV and B&M shall each share in the responsibility for any liability, cost or expense described in the preceding sentence which is caused in part by the fault, failure, negligence, misconduct, nonfeasance, or

-11-

misfeasance of CV or its officers, agents, representatives or employees, in proportion to the respective relative fault of each for the occurrence which gave rise to the liability, cost or expense.

7.2 CV hereby agrees to indemnify, defend, protect and hold B&M and their officers, agents, representatives and employees harmless from and against any and all liability, cost or expense (including expenses described in Section 6.1, above) which relate to or arise out of any loss of, damage to, or destruction of any property whatsoever, or any injury to or death of any person or persons whomsoever, when such liability, cost or expenses arises out of the operation of CV or Amtrak trains on the Line, including local freight service (including movement of traffic for interchange to GMRC), or any maintenance or repair of the Line. Notwithstanding the foregoing, B&M and CV shall each share in the responsibility for any liability, cost or expense described in the preceding sentence which is caused in part by the fault, failure, negligence, misconduct, nonfeasance or misfeasance of B&M or its officers, agents, representatives or employees, in proportion to the respective relative fault of each for the occurrence which gave rise to the liability, cost or expense.

7.3 In every case of death or injury suffered by an employee of either B&M or CV, when compensation to such employee or employee's dependents is required to be paid under any

workmen's compensation, occupational disease, employer's lia-
bility or other law, and either of said parties, under the
provisions of this Agreement, is required to pay such compen-
sation, if such compensation is required to be paid in in-
stallments over a period of time, such party shall not be
released from paying such future installments by reason of the
expiration or other termination of this Agreement prior to any
of the respective dates upon which any such future install-
ments are to be paid.

8. **DEFAULT**

    8.1  In the event of a material breach by B&M of the terms
and conditions of this Agreement which continues for a period
of forty-five (45) days after notice thereof from CV, CV shall
have the right to terminate this Agreement upon ninety (90)
days notice.

9. **GENERAL PROVISIONS**

    9.1  **No Waiver**.  Waiver of any provision of this Agree-
ment, in whole or in part, in any one instance shall not con-
stitute a waiver of any other provision in the same instance,
nor any waiver of the same provision in another instance, but
each provision shall continue in full force and effect with
respect to any other then existing or subsequent breach.

    9.2  **Notice**.  Any notice required or permitted under this
Agreement shall be given in writing to the parties at their
respective addresses specified above, or at such other address

-13-

for a party as that party may specify by notice as provided
herein, by (i)(A) delivery in hand or by postage prepaid,
United States first class mail __and__ (B) registered or certified
mail, return receipt requested, __or__ (ii) Federal Express or
other form of expedited mail that provides for delivery to the
sender of a signed receipt, __or__ (iii) telegram. Notice so sent
shall be effective upon receipt.

9.3  __Integration.__  Except for the Order and the documents
executed in pursuance thereof, this Agreement constitutes the
entire agreement of the parties with respect to its subject
matter, superseding all prior oral and written communications,
proposals, negotiations, representations, understandings,
courses of dealing, agreements, contracts and the like between
the parties in such respect.  Except for any and all obliga-
tions incurred or cause of action accrued thereunder prior to
or as of the Conveyance Date, and except as provided in Sec-
tions 2.2 and 2.4 hereof, the Trackage Rights Agreements by
and between B&M and CV dated as of April 1, 1985 and January
1, 1930 are hereby terminated.  Any provisions of any other
agreement(s) between CV and B&M which are not inconsistent
with the provisions of this Agreement shall remain in effect
until cancelled according to the terms of such other agree-
ment(s).

9.4  __Miscellaneous.__  This Agreement: (i) may be executed
in any number of counterparts, each of which when executed by

both parties to this Agreement shall be deemed to be an original, and all of which counterparts together shall constitute one and the same instrument; (ii) may be amended, modified, or terminated, and any right under this Agreement may be waived in whole or in part, only by a writing signed by both parties; (iii) contains headings only for convenience, which headings do not form part of and shall not be used in construction of this Agreement; and (iv) is not intended to inure to the benefit of any party not a party to this Agreement.

9.5  <u>Availability of Equitable Relief.</u>  The obligations imposed by this Agreement are unique.  Breach of any of such obligations would injure the parties to this Agreement; such injury is likely to be difficult to measure; and monetary damages, even if ascertainable, are likely to be inadequate compensation for such injury.  The parties to this Agreement, therefore, acknowledge and agree that protection of the respective interests provided herein would require equitable relief, including specific performance and injunctive relief, in addition to any other remedy or remedies that the parties may have at law or under this Agreement.

9.6  <u>Force Majeure.</u>  No party to this Agreement shall be responsible for delays or errors in its performance or other breach under this Agreement occurring by reason of circumstances beyond its control, including acts of civil or military authority, national emergencies, fire, major mechanical break-

down, labor disputes, flood or catastrophe, acts of God, in-
surrection, war, riots, delays of suppliers, or failure of
transportation, communication or power supply.

9.7 <u>Trains, Locomotives, Cars or Equipment.</u> As used in
this Agreement, whenever reference is made to the trains,
locomotives, cars or equipment of, or in the account of, one
of the parties hereto, such expression means the trains, loco-
motives, cars and equipment in the possession of or operated
by one of the parties and includes such trains, locomotives,
cars and equipment which are owned by, leased to, or in the
account of such party. Whenever such trains, locomotives,
cars or equipment are owned or leased by one party to this
Agreement and are in the possession or account of, or under
the control of the other party to this Agreement, such trains,
locomotives, cares and equipment shall be considered those of
the other party.

9.8 <u>Assignment.</u> This Agreement shall bind and inure to
the benefit of the parties and their respective legal repre-
sentatives, successors and assigns. CV hereby acknowledges
and agrees that B&M shall have the right to assign any or all
of B&M's rights and obligations under this Agreement to any
affiliate of B&M, following consultation with CV. CV further
acknowledges and agrees that B&M shall have the right to as-
sign any or all of B&M's rights and obligations under this

Agreement to any other person with CV's prior consent, which shall not be withheld unreasonably.

                                    BY THE COMMISSION:


                                    Noreta R. McGee
                                    Secretary

# WINSTON & STRAWN LLP

35 WEST WACKER DRIVE
CHICAGO, ILLINOIS 60601-9703

43 RUE DU RHONE
1204 GENEVA, SWITZERLAND

CITY POINT
1 ROPEMAKER STREET
LONDON, EC2Y 9HT

ERIC L. HIRSCHHORN
(202) 371-5706
ehirschhorn@winston.com

1400 L STREET, N.W.
WASHINGTON, D.C. 20005-3502

(202) 371-5700

FACSIMILE (202) 371-5950

www.winston.com

333 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-1543

200 PARK AVENUE
NEW YORK, NEW YORK 10166-4193

21 AVENUE VICTOR HUGO
75116 PARIS, FRANCE

101 CALIFORNIA STREET
SAN FRANCISCO, CALIFORNIA 94111-5894

March 10, 2005



**VIA HAND DELIVERY**

Mr. Vernon A. Williams, Secretary
Surface Transportation Board
1925 K Street, N.W., Room 700
Washington DC 20423

ATTENTION:  Mr. Tim Cambridge

Re:     **Boston and Maine Corporation and Springfield Terminal Railway
Company v. New England Central Railroad, Inc.—Formal
Complaint and Petition for Declaratory Order—Finance Docket No.
34612**

Dear Mr. Williams:

Please find enclosed a check for $200, payable to the Surface Transportation
Board, representing the filing fee for the petition for reconsideration submitted earlier today in
the above captioned proceeding.

I apologize for the omission and any resulting inconvenience.

Sincerely,

Eric L. Hirschhorn

Enclosure