UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

NEW ENGLAND CENTRAL          )
RAILROAD, INC.,              )
         Plaintiff           )
                             )
         v.                  ) CIVIL ACTION NO. 04-30235-MAP
                             )
SPRINGFIELD TERMINAL         )
RAILWAY COMPANY and          )
BOSTON AND MAINE CORPORATION,)
         Defendants          )


MEMORANDUM AND ORDER REGARDING DEFENDANTS'
PARTIAL MOTION TO DISMISS
(Docket No. 20)


February 3, 2006

PONSOR, D.J.


I. INTRODUCTION

    This case concerns a dispute over liability for damages

resulting from a train derailment.  Plaintiff, New England

Central Railroad, Inc., is seeking compensation under

federal and state law for damage to its track and property,

and for related economic losses, caused by Defendants,

Springfield Terminal Railway Company and Boston and Maine

Corporation

    Defendants have moved to dismiss Plaintiff's state law

claims on the ground that they are preempted by federal law.

For the reasons set forth below, Defendants' Partial Motion
to Dismiss will be denied.

II. <u>FACTS AND PROCEDURAL HISTORY</u>

A. <u>The Derailment</u>.

On July 3, 2004, at approximately 6:40 a.m., Defendants'
nineteen-car freight train was en route on Plaintiff's
Connecticut River Line, when the trailing wheels of the
sixth freight car came off the tracks.  Unaware that the
wheels had derailed, the Defendants' train crew continued to
operate the train, dragging the derailed car for
approximately five miles, across a bridge and three graded
crossings.  Eventually, when its wheels hit a piece of track
known as a "frog," the sixth car overturned, derailing the
following six cars.

The incident caused extensive damage to Plaintiff's
trackage and related property in the area of the derailment.
About five miles of Plaintiff's track were shut down for
several days.  When the line subsequently reopened, it
remained under a speed restriction for thirty days while
repair work continued.

Plaintiff claims that damages from this incident include
clean-up and repairs to the track, economic losses stemming

-2-

from the period during which the National Railroad Passenger Corporation ("Amtrak") was not able to use the tracks and had to bus its passengers around the damaged track, lost Amtrak "run-time" financial incentives for the duration of the speed restrictions, and other costs incurred as a result of the track closure.

Defendants have been operating trains over Plaintiff's track since 1990 pursuant to a trackage rights agreement (the "Agreement") imposed by the Interstate Commerce Commission (ICC). See Amtrak – Conveyance of B&M in Conn River Line in VT & NH, 6 I.C.C. 2d 539 (1990).[1]

B. Surface Transportation Board Decisions.

On November 1, 2004, Defendants filed a formal complaint and petition for a declaratory order with the ICC's successor, the Surface Transportation Board (STB). In their complaint, Defendants alleged that the derailment was caused by Plaintiff's failure to adequately maintain the track, and that Defendants were therefore entitled to damages. In a

_____

[1] Although the Agreement is a contract between Plaintiff and Defendants, because it was adopted as part of an ICC decision, the agency also refers to the document as an "order." See Boston & Me. Corp. v. New England Cent. R.R., STB Fin. Dkt. No. 34612 (served Feb. 24, 2005); see also Amtrak, 6 I.C.C. 2d at 559.

decision served February 24, 2005, the STB dismissed
Defendants' complaint and request for a declaratory order.
The Board found that because the issues presented in the
case were fact-bound and predominantly involved contract and
tort claims, they were better suited for court adjudication.
See Boston & Me. Corp. v. New England Cent. R.R., STB Fin.
Dkt. No. 34612, 2005 WL 429631, slip op. at 3 (served Feb.
24, 2005).  Defendants promptly filed a request for
reconsideration.

        In a decision served January 10, 2006, the Board
partially granted Defendants' request for reconsideration of
the February 2005 opinion.  See Boston & Me. Corp. v. New
England Cent. R.R., STB Fin. Dkt. No. 34612, 2006 WL 47366
(served Jan. 10, 2006).  The Board "provide[d] guidance on
the proper interpretation" of the Agreement's liability
provision, but "continue[d] to defer to the courts the
resolution of the remaining issues," which "predominantly
involve claims of breach of contract and tort."  Id., slip
op. at 3.

        Two days later, in response to the Board's decision,
Defendants withdrew the portion of the motion now before
this court that sought to refer Plaintiff's federal claims

-4-

to the STB under the primary jurisdiction doctrine.

    C. <u>Complaint and Partial Motion to Dismiss</u>.

    On December 2, 2004, one month after Defendants' first STB filing, Plaintiff filed its complaint with this court. Plaintiff's amended complaint alleges ten federal and state counts against Defendants.  Counts I through IV are federal claims: failure to obey an order of the STB (the Agreement) in violation of 49 U.S.C. § 11704(a) (Counts I and II); and failure to obey an order of the STB to pay damages specified under the Agreement in violation of 49 U.S.C. § 11704(b), (c) (Counts III and IV).  The remaining counts assert state common law claims: breach of contract (Counts V and VIII); negligence (Counts VI and IX); and gross negligence and reckless conduct (Counts VII and X).

    Defendants now move to dismiss Plaintiff's state law claims on the ground that they are preempted by federal law.

### III. <u>DISCUSSION</u>

    A. <u>The Preemption Provision: 49 U.S.C. § 10501(b)</u>.

    Defendants argue that Plaintiff's common law tort claims, Counts V - X, must be dismissed because they are

preempted by 49 U.S.C. § 10501(b).  State law is preempted

by federal law when: Congress' intent is "explicitly stated

in the statute's language or implicitly contained in its

structure and purpose;" it "actually conflicts with federal

law;" or "federal law so thoroughly occupies a legislative

field as to make reasonable the inference that Congress left

no room for the States to supplement it."  <u>Cipollone v.</u>

<u>Liggett Group, Inc.</u>, 505 U.S. 504, 516 (1992) (internal

citations and quotations omitted).

> The ICCTA's preemption provision states:
>
> The jurisdiction of the Board over –
>    (1) transportation by rail carriers, and the
> remedies provided in this part with respect to
> rates, classifications, rules (including car
> service, interchange, and other operating rules),
> practices, routes, services, and facilities of such
> carriers; and
>    (2) the construction, acquisition, operation,
> abandonment, or discontinuance of spur, industrial,
> team, switching, or side tracks, or facilities,
> even if the tracks are located, or intended to be
> located, entirely in one State, is exclusive.
> Except as otherwise provided in this part, <u>the
> remedies provided under this part with respect to
> regulation of rail transportation are exclusive and
> preempt the remedies provided under Federal or
> State law</u>.

49 U.S.C. § 10501(b) (2005) (emphasis added).  While the

language of the Act is broad, the narrow question at issue

in this case is whether § 10501(b) preempts common law

claims arising from a dispute between two railroads over liability for a derailment.

Where, as here, a statute includes language that expressly preempts state law, a court must still define the scope of the preemption by "identify[ing] the domain expressly preempted by that language." <u>Medtronic, Inc. v. Lohr</u>, 518 U.S. 470, 484 (internal quotation omitted) (1996). "Congress' intent primarily is discerned from the language of the preemption statute and the 'statutory framework' surrounding it." <u>Id.</u> at 486.

The strong language of § 10501(b) demonstrates that the preemption provision has a broad scope. <u>Cf.</u> <u>Sprietsma v. Mercury Marine</u>, 537 U.S. 51, 63 (2002) (parsing the language of a narrower preemption provision). The only potential limitation on the face of the statute is the clause "with respect to <u>regulation of rail transportation</u>." 49 U.S.C. § 10501(b) (emphasis added). Thus, some courts have argued that § 10501(b) does not apply to all "rail transportation," but only to regulation of such transportation. <u>See, e.g.</u>, <u>Fl. E. Coast Ry. Co. v. City of West Palm Beach</u>, 266 F.3d 1324, 1331 (11th Cir. 2001); <u>but see</u> <u>City of Auburn v. United States</u>, 154 F.3d 1025, 1030 (9th Cir. 1998)("[T]here

-7-

is nothing in the case law that supports Auburn's argument
that, through the ICCTA, Congress only intended preemption
of economic regulation of the railroads."); <u>Wisconsin Cent.
Ltd. v. City of Marshfield</u>, 160 F. Supp. 2d 1009, 1014 (W.D.
Wis. 2000) ("The ICCTA expressly preempts more than just
state laws specifically designed to regulate rail
transportation.").

The "statutory framework" surrounding § 10501(b) also
guides an analysis of the scope of the preemption.  The
ICCTA is informed by a broad policy of railroad
deregulation, and was enacted specifically to abolish the
ICC and "substantially deregulate[]" the railroad industry.
<u>See</u> <u>Pejepscot Indus. Park, Inc. v. Maine Cent. R.R. Co.</u>, 215
F.3d 195, 197 (1st Cir. 2000) (quoting H.R. Rep. No.
104-311, at 82 (1995)); <u>see also</u> <u>Friberg v. Kan. City S. Ry.
Co.</u>, 267 F.3d 439, 443 (5th Cir. 2001) ("The regulation of
railroad operations has long been a traditionally federal
endeavor, to better establish uniformity in such operations
and expediency in commerce, and it appears manifest that
Congress intended the ICCTA to further that exclusively
federal effort, at least in the economic realm." (footnote
omitted)).  Section 10501(b) is a broader preemption than

-8-

the provisions in earlier railroad statutes, such that "[i]t is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations." <u>CSX Transp., Inc. v. Ga. Pub. Serv. Comm'n</u>, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996); <u>cf.</u> <u>Ill. Commerce Comm'n v. ICC</u>, 879 F.2d 917 (D.C. Cir. 1989) (discussing the previous statutory scheme).

The ICCTA also includes federal remedies for certain harms, one of which Plaintiff specifically invokes, bringing Counts I - IV under 49 U.S.C. § 11704, "rights and remedies of persons injured by rail carriers."  Under subsection § 11704(a),

> A person injured because a rail carrier providing transportation or service subject to the jurisdiction of the Board under this part <u>does not obey an order of the Board</u> . . . may bring a civil action in a United States District Court to enforce that order under this subsection.

49 U.S.C. § 11704(a) (2005) (emphasis added).  A damaged "person" may also "bring a civil action" for "damages sustained . . . <u>as a result of an act or omission</u>" against "a rail carrier providing transportation subject to the jurisdiction of the Board." § 11704(b), (c) (emphasis added).  A "person" includes a corporation, such as a

-9-

railroad.  See 49 U.S.C. § 10102(4); 1 U.S.C. § 1.[2]

    B. Section 10501(b) Caselaw.

    The First Circuit has not yet analyzed the scope of §
10501(b) preemption.  The Court of Appeals discussed the
provision briefly in Pejepscot, where the question before
the court concerned federal court jurisdiction over certain
ICCTA claims.  The Court of Appeals contrasted the
jurisdictional language in the first part of § 10501(b) with
the preemption provision, noting that "[t]he last sentence
of § 10501(b) plainly preempts state law."  See 215 F.3d at
202 (citing both the statute and Burlington Northern Santa
Fe Corp. v. Anderson, 959 F. Supp. 1288 (D. Mont. 1997));
see also Burlington N. Santa Fe Corp. v. Anderson, 959 F.
Supp. 1288 (holding that the ICCTA preempts a Montana law
authorizing a state agency to exercise regulatory authority
over railroad agencies).  Although the Pejepscot defendants
raised a preemption challenge to the plaintiff's state law

---

    [2] At least one other section of the Act is indirectly
implicated in this case.  Section 11323(a)(6) requires that
trackage rights agreements receive approval from the STB.  See
49 U.S.C. § 11323(a)(6) (2005).  In this case, the ICC actually
imposed the trackage rights agreement after the parties failed
to reach agreement on trackage rights independently.  See
Amtrak - Conveyance of B&M in Conn River Line in VT & NH, 6
I.C.C. 2d 539 (1990).

claims, the Court of Appeals did not reach this issue.  <u>See</u>
215 F.3d at 206.

On remand, the district court found that the breach of
contract claim in <u>Pejepscot</u> was not preempted, because
defendants had entered into a voluntary contract and
therefore could not use § 10501(b) to shield themselves from
its implications.  <u>See</u> <u>Pejepscot Indus. Park, Inc. v. Maine</u>
<u>Cent. R.R. Co.</u>, 297 F. Supp. 2d 326, 333 (D. Me. 2003).
Focusing on the issue of exemplary damages, however, the
court noted that because such damages could amount to
regulation of railroad transportation, to the extent that
the contract claim sought exemplary damages, the claim was
preempted.  <u>Id.</u>  In the same vein, the court also held that
the tortious interference claim was preempted because
"awards of damages pursuant to state tort claims may qualify
as state 'regulation' when applied to restrict or burden a
rail carrier's operations" and the alleged interference in
the case "centers around rail transportation itself, [so]
awards of damages in these circumstances may serve to
impermissibly regulate rail transportation."  <u>Id.</u>

The First Circuit also alluded to § 10501(b) preemption
in <u>Boston & Me. Corp. v. Town of Ayer</u>, 330 F.3d 12 (1st Cir.

2003).  Because the case partially settled after oral
argument, the court again did not reach merits of the
preemption question.  The Court of Appeals did note,
however, that the Board's "finely crafted" preemption
analysis "found state and local regulation to be permissible
'where it does not interfere with interstate rail
operations, and localities retain certain police powers to
protect public health and safety.'"  Id. at 16.

Many other courts have wrestled with the scope of the
§ 10501(b) preemption provision.  Courts have held in
numerous cases that state statutes or regulations are
preempted.  These include, inter alia: state regulatory
authority over intrastate railroad tracks and agencies, see
CSX Transp., Inc. v. Ga. Pub. Serv. Comm'n, 944 F. Supp.
1573 (N.D. Ga. 1996); state environmental land use statutes,
see Green Mountain R.R. Corp. v. Vermont, 404 F.3d 638 (2d
Cir. 2005); state eminent domain statutes, see Dakota, Minn.
& E.R.R. Corp. v. South Dakota, 236 F. Supp. 2d 989 (D.S.D.
2002); Wis. Cent. Ltd. v. City of Marshfield, 160 F. Supp.
2d 1009 (W.D. Wis. 2000); state law providing for reversion
of a railroad right-of-way to adjacent landowners after
abandonment, see Cedarapids, Inc. v. Chi., Cent. & Pac. R.R.

-12-

<u>Co.</u>, 265 F. Supp. 2d 1005 (N.D. Iowa 2003).  A court has also found that where a state law "is viewed as having the effect of requiring [a] railroad to undergo substantial capital improvements," it is preempted.  <u>CSX Transp., Inc. v. City of Plymouth</u>, 92 F. Supp. 2d 643, 658 (E.D. Mich. 2000); <u>see also</u> <u>CSX Transp., Inc. v. City of Plymouth</u>, 283 F.3d 812 (6th Cir. 2002) (affirming the decision below regarding preemption under the Federal Railroad Safety Act, but declining to reach the question of ICCTA preemption).

On the other hand, courts declined to find preemption in other circumstances, including: a city's application of zoning and other ordinances to a lessee of railway property, <u>see</u> <u>Fl. E. Coast Ry. Co.</u>, 266 F.3d 1324; state administrative proceedings regarding whether a railroad should be ordered to replace four bridges at its own expense, <u>see</u> <u>Ia, Chi. & E. R.R. Corp. v. Washington County</u>, 384 F.3d 557 (8th Cir. 2004); a requirement under the Coal Act that a railroad pay annual premiums to a union health benefit plan, <u>see</u> <u>Holland v. Delray Connecting R.R. Co.</u>, 311 F. Supp. 2d 744 (N.D. Ind. 2004); zoning regulations that "do not interfere with railway operations," <u>see</u> <u>In re Appeal of Vt. Ry.</u>, 769 A.2d 648, 655 (Vt. 2000); "states'

-13-

traditional police power regarding grade crossings," <u>Home of Econ. v. Burlington N. Santa Fe R.R.</u>, 694 N.W.2d 840, 846 (N.D. 2005).

Courts have also applied § 10501(b) preemption analysis to common law claims concerning railroads.  In the District of Massachusetts, courts have found that contract claims that concern areas regulated by the STB are preempted.  In <u>San Luis Central Railroad Co. v. Springfield Terminal Railway Co.</u>, 369 F. Supp. 2d 172 (D. Mass. 2005), a plaintiff rail carrier sued two terminal companies and two railroad companies alleging that the defendants owed the plaintiff "car hire" payments in accordance with an agreement governing use of plaintiff's cars on defendants' railroad lines.  The court found that the state law claims were preempted because the use of railroad cars and payment rates, and therefore even a voluntary agreement governing such issues, is subject to regulatory oversight by the STB under various provisions of the ICCTA.[3]  <u>See</u> <u>id.</u> at 176-77.

---

[3] <u>San Luis</u> is in many ways the inverse of the current case. In <u>San Luis</u>, the court dismissed common law claims despite the fact that the issues at the heart of the case were governed by a voluntary agreement, on the ground that these areas were subject to extensive STB control.  By contrast, in this case the Agreement takes the form of an STB order, but the STB has twice dismissed Defendant's attempts to invoke the Board's

Similarly, in <u>Engelhard Corp. v. Springfield Terminal Railway Co.</u>, 193 F. Supp. 2d 385 (D. Mass. 2002), the court dismissed state common law contract claims regarding alleged non-payment of car mileage allowances after analyzing the relationship between § 10501(b), and other sections of the ICCTA concerning both remedies and rates of compensation. The court concluded that Congress had so occupied the field of car mileage allowances as to preempt any potentially parallel state-law remedies. <u>See id.</u> at 389-90. <u>Cf. Pejepscot</u>, 297 F. Supp. 2d at 333 (holding that breach of contract claim based on voluntary contract between shipper and carrier was not preempted, but exemplary damages were).

Courts have also found property owners' claims against railroads for nuisance and negligence are largely preempted. <u>See Friberg v. Kan. City S. Ry. Co.</u>, 267 F.3d 439 (5th Cir. 2001) (state law claims preempted because suit regarding railroad's alleged obstruction of plaintiffs' property through use of sidetracks would affect railroad operations); <u>Suchon v. Wis. Cent. Ltd.</u>, No. 04-C-0379-C, 2005 U.S. Dist.

-------

exclusive authority, finding instead that the contract and tort questions in this case are better suited for court adjudication.

LEXIS 4343 (W.D. Wis. Feb. 23, 2005) (nuisance suit preempted because plaintiff was attempting to use state law to change the conduct of the railroad); Maynard v. CSX Transp., Inc., 360 F. Supp. 2d 836, 842 (E.D. Ky. 2004) (preempting state law claims against railroad whose use of sidetrack blocked access to plaintiffs' property and permitted drainage onto the property from adjoining properties because "ICCTA preempts state common law claims with respect to railroad operations"); Guckenberg v. Wis. Cent. Ltd., 178 F. Supp. 2d 954 (E.D. Wisc. 2001) (preempting state law claim regarding noise from activity on railroad sidetracks, because operation of a sidetrack intended to be located entirely in one state is an area under exclusive STB jurisdiction); Rushing v. Kan. City S. Ry. Co., 194 F. Supp. 2d 493, 500-01 (S.D. Miss. 2001) (preempting nuisance and negligence claims that would interfere with railroad's operation of switchyard).

Although courts have repeatedly found that common law claims are preempted where they seek to affect railroad conduct, courts have upheld common law claims against railroads that do not relate directly to railroad operations.  In Rushing, for example, a court allowed

-16-

homeowners' claims for damage to property from pooling of
rainwater caused by the railroad's construction of an
earthen berm.  See 194 F. Supp. 2d at 501 (allowing nuisance
and negligence claims related to the earthen berm).

Contract claims have also been allowed to proceed.  As
noted above, in Pejepscot, the district court found that
breach of contract claims based on a voluntary agreement
were not preempted, provided that the agreement did not
unreasonably interfere with interstate commerce.  See 297 F.
Supp. 2d at 333.  In Cedarapids, after dismissing claims
that would have forced the railroad to abandon its tracks,
the district court found that the plaintiff's request for
rescission of a lease and restitution of amounts paid
thereunder was not preempted, because it concerned only the
lease and the parties' rights thereunder.  265 F. Supp. 2d
at 1015.

C. Analysis.

The question of whether preemption applies to the facts
before the court is complicated.  Many courts have struggled
to define the scope of this preemption provision, and as
this decisional authority emerges, a general line comes into
focus, distinguishing purely regulatory activity, which is

-17-

clearly preempted, from traditional torts.  Courts have
consistently found that state law that directly or
indirectly regulates railroads is preempted by § 10501(b).
In other words, preemption clearly applies where a claim
will directly affect railroad transportation.  On the other
hand, where adjudication of a claim will address garden
variety issues of negligence, without significant
"regulation" of the railroad, then preemption generally will
not be appropriate.  It is significant that the STB itself
has expressed a preference for traditional adjudication on
the facts of this case.  Indeed, it is hard to see, at least
from the current vantage point, how disposition of the
issues before the court will effect any "regulation" of the
parties.  While some courts have concluded that damages
themselves may have a regulatory effect, see, e.g.,
Pejepscot, 297 F. Supp. 2d at 333, here it would be
illogical to conclude that the mere fact that financial
liability must be allocated between two railroads is
tantamount to regulating the railroads.[4]

_____

    [4] At this stage in the case, the court need not reach the
question of whether exemplary damages would be preempted by §
10501(b).  See, e.g., San Luis, 369 F. Supp. 2d at 177.

Defendants' strongest argument for preemption is that § 11704 provides a remedy under the federal Act that thereby preempts any state common law claim. Plaintiff's response, that § 10501(b) preemption applies only to those areas of railroad transportation specifically enumerated in that subsection, is unpersuasive. The plain language of the preemption provision invokes the entire ICCTA, referring to remedies found in "this part," and courts have consistently read the preemption provision in the context of the Act as a whole. See, e.g., San Luis, 369 F. Supp. 2d at 176-77; Engelhard, 193 F. Supp. 2d at 389-90.

At this time, however, a finding that Plaintiff's state law claims are preempted is premature.[5] Without a full record, this court cannot evaluate the nature of Plaintiff's claim and say with certainty that § 11704 provides a remedy that preempts the common law claims. See Ayer, 330 F.3d at 17 (noting that the determination of whether a state law unduly restricts a railroad or interferes with interstate commerce is a "fact-bound question"). The large majority of

---

[5] It is significant that denial of this partial motion to dismiss Plaintiff's state law claims will not increase the discovery burden because Plaintiff's federal claims rely on the same set of underlying facts.

-19-

the cases cited above in which courts found that a claim was preempted by § 10501(b) were not decided on a motion to dismiss, but rather at some later stage, when the record before the court was more fully developed.

## IV. <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Partial Motion to Dismiss (Docket No. 20) is hereby DENIED.  The court will carefully reconsider the question of preemption on a fully-developed factual record if the parties file motions at that point under Fed. R. Civ. P. 56.  The clerk will set this case for a status conference to set a schedule for further proceedings.

It is So Ordered.


<u>/s/ Michael A. Ponsor</u>
MICHAEL A. PONSOR
U. S. District Judge