UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

NEW ENGLAND CENTRAL
RAILROAD, INC.,

        Plaintiff,

-v.-                                      Civil Action No. 04-30235-MAP

SPRINGFIELD TERMINAL
RAILWAY COMPANY, et al.,

        Defendants-
        Counterclaimants.

---

**DEFENDANTS' ANSWER TO AMENDED COMPLAINT**
**AND**
**DEFENDANTS' COUNTERCLAIMS**

## ANSWER

The defendants—Springfield Terminal Railway Co. ("STRC") and Boston and Maine Corp. ("B&M")—hereby answer the amended complaint in this action [Docket No. 16] as follows:

1.    Defendants lack information sufficient to form a belief as to the truth of the allegations in paragraph 1.

2.    Defendants admit the allegations of paragraph 2.

3.    Defendants admit the allegations of paragraph 3, except deny that B&M is a Massachusetts corporation.

4.    Defendants repeat and reallege their responses to paragraphs 1 through 3.

5. Defendants deny the allegations of paragraph 5, except admit that claims under 49 U.S.C. § 11704 are within the jurisdiction of this Court under 28 U.S.C. §§ 1331 and 1337(a).

6. Defendants deny the allegations of paragraph 6.

7. Defendants admit the allegations of paragraph 7.

8. Defendants repeat and reallege their responses to paragraphs 1 through 7.

9. Defendants deny the allegations of paragraph 9, except admit that in 1988 B&M transferred to the National Railroad Passenger Corporation ("Amtrak"), for consideration, a section of railroad track located between Brattleboro, Vermont and Windsor, Vermont.

10. Defendants admit the allegations of paragraph 10.

11. Defendants lack information sufficient to form a belief as to the truth of the allegations in paragraph 11.

12. Defendants deny the allegations of paragraph 12, except admit that the Interstate Commerce Commission ("ICC") required Amtrak and Central Vermont Railway, Inc. to grant certain trackage rights to B&M.

13. Defendants deny the allegations of paragraph 13, except admit that between September 1988 and February 1990 the parties operated under an interim trackage rights agreement.

14. Defendants admit the allegations of paragraph 14.

15. Defendants deny the allegations of paragraph 15, except admit that by decision served February 6, 1990, the ICC imposed a trackage rights order ("TRO") governing the terms and conditions of B&M's use of the main line between East Northfield, Massachusetts and White River Junction, Vermont.

16. Defendants deny the allegations of paragraph 16.

17. Defendants admit the allegations of paragraph 17.

18. Defendants deny the allegations of paragraph 18, and note the January 10, 2006 decision of the United States Surface Transportation Board interpreting Section 7.1 of the TRO [Docket No. 29, Exh. 1].

19. Defendants deny the allegations of paragraph 19.

20. Defendants admit the allegations of paragraph 20.

21. Defendants lack knowledge sufficient to form an opinion as to the truth of the allegations of paragraph 21.

22. Defendants deny the allegations of paragraph 22.

23. Defendants deny the allegations of paragraph 23, except admit that a derailed car's wheels were dragged along NECR's tracks for approximately five miles.

24. Defendants deny the allegations of paragraph 24.

25. Defendants deny the allegations of paragraph 25.

26. Defendants deny the allegations of paragraph 26.

27. Defendants deny the allegations of paragraph 27.

28. Defendants lack knowledge sufficient to form an opinion as to the truth of the allegations of paragraph 28.

29. Defendants lack knowledge sufficient to form an opinion as to the truth of the allegations of paragraph 29.

30. Defendants lack knowledge sufficient to form an opinion as to the truth of the allegations of paragraph 30.

31. Defendants deny the allegations of paragraph 31.

32. Defendants lack knowledge sufficient to form an opinion as to the truth of the allegations of paragraph 32.

33. Defendants deny the allegations of paragraph 33.

34. Defendants lack knowledge sufficient to form an opinion as to the truth of the allegations of paragraph 34.

35. Defendants deny the allegations of paragraph 35.

36. Defendants admit the allegations of paragraph 36.

37. Defendants admit the allegations of paragraph 37.

38. Defendants admit the allegations of paragraph 38.

39. Defendants repeat and reallege their responses to paragraphs 1 through 38.

40. Defendants deny the allegations of paragraph 40.

41. Defendants deny the allegations of paragraph 41.

42. Defendants repeat and reallege their responses to paragraphs 1 through 41.

43. Defendants deny the allegations of paragraph 43.

44. Defendants deny the allegations of paragraph 44.

45. Defendants repeat and reallege their responses to paragraphs 1 through 44.

46. Defendants deny the allegations of paragraph 46.

47. Defendants repeat and reallege their responses to paragraphs 1 through 46.

48. Defendants deny the allegations of paragraph 48.

49. Defendants repeat and reallege their responses to paragraphs 1 through 48.

50. Defendants admit the allegations of paragraph 50.

51. Defendants deny the allegations of paragraph 51.

52. Defendants deny the allegations of paragraph 52.

53. Defendants repeal and reallege their responses to paragraphs 1 through 52.

54. Defendants deny the allegations of paragraph 54, except admit that the train's crew had a duty to operate the train reasonably and safely.

55. Defendants deny the allegations of paragraph 55.

56. Defendants deny the allegations of paragraph 56.

57. Defendants repeat and reallege their responses to paragraphs 1 through 56.

58. Defendants deny the allegations of paragraph 58, except admit that the train's crew had a duty to operate the train reasonably and safely.

59. Defendants deny the allegations of paragraph 59.

60. Defendants deny the allegations of paragraph 60.

61. Defendants repeat and reallege their responses to paragraphs 1 through 60.

62. Defendants admit the allegations of paragraph 62.

63. Defendants deny the allegations of paragraph 63.

64. Defendants deny the allegations of paragraph 64.

65. Defendants repeat and reallege their responses to paragraphs 1 through 64.

66. Defendants deny the allegations of paragraph 66, except admit that the train's crew had a duty to operate the train reasonably and safely.

67. Defendants deny the allegations of paragraph 67.

68. Defendants deny the allegations of paragraph 68.

69. Defendants repeat and reallege their responses to paragraphs 1 through 68.

70. Defendants deny the allegations of paragraph 70, except admit that the train's crew had a duty to operate the train reasonably and safely.

71. Defendants deny the allegations of paragraph 71.

72.   Defendants deny the allegations of paragraph 72.

## DEFENSES

As and for their defenses, defendants allege:

1.   Any injury to plaintiff was caused by plaintiff's own negligence.

2.   Any injury to plaintiff was caused by plaintiff's own gross negligence.

3.   Any injury to plaintiff was caused by plaintiff's own willful and wanton misconduct.

4.   Any injury to plaintiff was caused by plaintiff's own breach of contract in failing to maintain the track in question to the standard required by the TRO.

5.   Any injury to plaintiff was caused by plaintiff's own violation of Federal Railroad Administration ("FRA") rules and regulations.

6.   Counts V through X of the amended complaint fail to state claims on which relief can be granted.

## COUNTERCLAIMS

For their counterclaims against plaintiff, defendants allege:

1.   This Court has jurisdiction over defendants' counterclaims pursuant to 49 U.S.C. § 11704(b) and 28 U.S.C. §§ 1332, 1337 and 1367.

2.   Plaintiff New England Central Railroad, Inc. ("NECR") is a common carrier by rail subject to the jurisdiction of the United States Surface Transportation Board ("Board") pursuant to 49 U.S.C. § 10501(a). NECR maintains its principal place of business at 2 Federal Street, Suite 201, St. Albans, Vermont 05478.

3. Defendant B&M is a common carrier by rail subject to the jurisdiction of the Board pursuant to 49 U.S.C. § 10501(a). B&M maintains its principal place of business at Iron Horse Park, North Billerica, Massachusetts 01862.

4. Defendant STRC is a common carrier by rail subject to the jurisdiction of the Board pursuant to 49 U.S.C. § 10501(a). STRC maintains its principal place of business at Iron Horse Park, North Billerica, Massachusetts 01862.

5. In a decision rendered February 6, 1990, the Board's predecessor, the ICC, imposed the terms and conditions of a trackage rights order ("TRO") upon the B&M and NECR's predecessor in interest, Central Vermont Railway, Inc. ("CV").

6. The TRO was imposed by the ICC as part of the compensation to be paid to B&M in an eminent domain proceeding brought by the National Railroad Passenger Corporation ("Amtrak") to acquire a 48.8 mile long line of railroad located between the vicinity of Brattleboro, Vermont and the vicinity of Windsor, Vermont (the "Line").

7. CV acquired its interest in the Line from Amtrak subsequent to the eminent domain proceeding and subject to the requirement that CV grant trackage rights to B&M.

8. STRC subsequently succeeded to the rights of B&M under the trackage rights agreement and currently operates trains on the Line.

9. NECR acquired the assets of CV, including the Line and CV's rights and responsibilities under the TRO, in 1995. NECR continues to own and operate the Line.

10. As the owner of the Line, NECR is required to inspect and maintain the line to a standard that is in compliance with the TRO and the Track Safety Standards promulgated by the Federal Railroad Administration ("FRA").

11. NECR also is required to maintain the Line in a safe condition for its intended uses.

12. NECR failed to inspect the Line properly.

13. NECR failed to maintain the Line safely in multiple locations along the Line, including the location where the derailment described below began.

14. NECR failed to maintain the Line to FRA standards in multiple locations along the Line, including the location where the derailment described below began.

15. Moreover, specialized testing performed on or about June 8, 2004 by FRA on the Line had disclosed that there were multiple locations along the Line that were unsafe.

16. Such testing also disclosed that there were multiple locations along the Line that did not meet FRA's Class 2 standards and violated FRA Track Safety Standards.

17. The results of this testing were provided to NECR on or about June 8, 2004 and prior to the derailment described below.

18. After receiving such test results, NECR failed to correct these dangerous conditions on the Line prior to the derailment described below.

19. On or about July 3, 2004, an STRC train was operating southbound on the Line when a car partially derailed near Hartland, Vermont.

20. Upon reaching a switch on the Line, the partially derailed car fully derailed, along with six additional cars.

21. The cause of the derailment described in paragraphs 19 and 20 (the "Derailment") was a defective, unsafe track condition.

22. Subsequent to the Derailment, on July 8, 2004 NECR alleged that the two STRC employees operating the STRC train at the time of the Derailment, J.C. Scappace, Jr. and A. Peter Kari, had violated applicable operating rules.

23. NECR further alleged that these violations of the applicable operating rules were the cause of the Derailment and barred Mr. Scappace and Mr. Kari from operating on the Line for more than nine months, allegedly pursuant to Section 5.3 of the TRO.

24. This debarment was without good cause.

25. Section 5.3 of the TRO provides that an employee may only be barred from operating on the Line for good cause.

26. STRC disputed this action by NECR, and also initiated its own investigation into the conduct of Mr. Scappace and Mr. Kari.

27. The STRC investigation culminated in an evidentiary hearing on August 9, 2004 pursuant to the collective bargaining agreements between STRC and its employees.

28. At this evidentiary hearing, NECR was given the opportunity to present evidence to support its allegations of operating rules violations by Mr. Scappace and Mr. Kari.

29. NECR produced no such evidence, nor did NECR demonstrate that good cause existed to bar Mr. Scappace or Mr. Kari from operating on the Line.

30. As a result of NECR's arbitrary decision to bar these two STRC employees from operating on the Line, each has filed a claim, pursuant to his union's collective bargaining agreement with STRC, seeking compensation from STRC for lost work opportunities.

31. STRC may be required to compensate these employees due to NECR's improper and unjustified actions.

32. Any such liability on the part of STRC is due solely to NECR's improper and unjustified debarment of Mr. Scappace and Mr. Kari from working on the Line.

### First Counterclaim—Breach of the Interstate Commerce Act and an Order Issued Thereunder

33. B&M and STRC repeat and reallege the allegations of Paragraphs 1 through 32 as if fully set forth here.

34. Part A of Subtitle IV of Title 49 of the United States Code (the "Interstate Commerce Act" or "ICA") and the TRO ordered by the ICC require NECR to maintain the Line at not less than FRA Class 2 condition.

35. At the time of the Derailment, the Line—and in particular, the portion of the Line where the Derailment began—was not being maintained by NECR in a safe condition.

36. At the time of the Derailment, the Line—and in particular, the portion of the Line where the Derailment began—was not being maintained by NECR in accordance with the TRO or the FRA Track Safety Standards.

37. NECR knew or should have known that the Line was not in Class 2 condition.

38. NECR knew or should have known that the Line was not safe at the time of the Derailment.

39. NECR's failure to maintain the Line safely caused the Derailment.

40. NECR's failure to maintain the Line in Class 2 condition caused the Derailment.

41. NECR's failure to maintain the Line safely violated the ICA and the TRO.

42. NECR's failure to maintain the Line in Class 2 condition violated the ICA and the TRO.

43. NECR's failure to maintain the Line safely damaged B&M and STRC in excess of $100,000, including damaged or destroyed railroad cars, excess per diem costs, wrecking and rerailing costs, and excess crew costs.

44. NECR's failure to maintain the Line in Class 2 condition damaged B&M and STRC in excess of $100,000, including damaged or destroyed railroad cars, excess per diem costs, wrecking and rerailing costs, and excess crew costs.

45. NECR's improper and unjustified debarment of Mr. Scappace and Mr. Kari from working on the Line violated the TRO and the ICA, and damaged B&M and STRC.

## Second Counterclaim—Breach of Contract

46. B&M and STRC repeat and reallege the allegations contained in Paragraphs 1 through 45 as if fully set forth here.

47. Pursuant to Sections 3.2 and 3.3 of the TRO, NECR is solely responsible for the maintenance and repair of the Line at all times to not less than FRA Class 2 condition in exchange for the payment of a trackage rights fee by STRC.

48. The Derailment was caused by the failure of NECR to maintain the Line in accordance with its obligations under the TRO and the Track Safety Standards established by the FRA.

49. This failure of NECR to perform its obligations constituted a breach of the TRO, which is a contract between NECR, on the one hand, and B&M and STRC, on the other.

50. As a result of NECR's breach of contract, B&M and STRC suffered damages in excess of $100,000, including damaged or destroyed railroad cars, excess per diem costs, wrecking and rerailing costs, and excess crew costs.

51.     NECR's improper and unjustified debarment of Mr. Scappace and Mr. Kari from working on the Line violated the TRO and damaged B&M and STRC.

### Third Counterclaim—Negligence

52.     B&M and STRC repeat and reallege the allegations contained in Paragraphs 1 through 51 as if fully set forth here.

53.     NECR had a duty to maintain the Line in safe condition for B&M, STRC, and all other authorized users thereof.

54.     Portions of the Line—including the section where the Derailment began—were in substandard condition, in breach of applicable federal regulations, unsafe for users such as B&M and STRC, and hence presented a substantial risk of derailment of B&M and STRC's trains.

55.     NECR knew or should have known of these adverse conditions.

56.     NECR nevertheless failed to maintain the Line in an appropriate, safe, and legally sufficient condition.

57.     NECR therefore negligently breached its duty to B&M and STRC.

58.     B&M and STRC were injured in excess of $100,000, including damaged or destroyed railroad cars, excess per diem costs, wrecking and rerailing costs, and excess crew costs, as the result of NECR's misconduct.

### Fourth Counterclaim—Gross Negligence

59.     B&M and STRC repeat and reallege the allegations contained in Paragraphs 1 through 58 as if fully set forth here.

60.     NECR had a duty to maintain the Line in safe condition for B&M, STRC, and all other authorized users thereof.

61.   Portions of the Line—including the section where the Derailment began—were in substandard condition, in breach of applicable federal regulations, unsafe for users such as B&M and STRC, and hence presented a substantial risk of derailment of B&M and STRC's trains.

62.   NECR knew or should have known of these adverse conditions.

63.   NECR nevertheless failed to maintain the Line in an appropriate, safe, and legally sufficient condition.

64.   NECR therefore breached its duty to B&M and STRC in a grossly negligent, reckless, and willful manner.

65.   B&M and STRC were injured in excess of $100,000, including damaged or destroyed railroad cars, excess per diem costs, wrecking and rerailing costs, and excess crew costs, as the result of NECR's misconduct.

### Fifth Counterclaim—Willful Misconduct

66.   B&M and STRC repeat and reallege the allegations contained in Paragraphs 1 through 65 as if fully set forth here.

67.   NECR had a duty to maintain the Line in safe condition for B&M, STRC, and all other authorized users thereof.

68.   Portions of the Line—including the section where the Derailment began—were in substandard condition, in breach of applicable federal regulations, unsafe for users such as B&M and STRC, and hence presented a substantial risk of derailment of B&M and STRC's trains.

69.   NECR knew or should have known of these adverse conditions.

70.   NECR nevertheless failed to maintain the Line in an appropriate, safe, and legally sufficient condition.

71.    NECR therefore breached its duty to B&M and STRC in a grossly negligent, reckless, and willful manner.

72.    B&M and STRC were injured in excess of $100,000, including damaged or destroyed railroad cars, excess per diem costs, wrecking and rerailing costs, and excess crew costs, as the result of NECR's misconduct.

WHEREFORE, B&M and STRC respectfully request that this Court—

(1)    award B&M and STRC compensatory, incidental, and punitive damages due to NECR's violation of the ICA and the TRO (as order and as contract), as well as due to NECR's negligence, gross negligence, and willful misconduct;

(2)    dismiss the amended complaint;

(3)    award B&M and STRC their costs in connection with this action, including a reasonable attorneys' fee; and

(4)    award B&M and STRC such other and further relief as may be just.

## JURY DEMAND

B&M and STRC demand a trial by jury of all issues so triable.

Respectfully submitted,

*[signature]*

Eric L. Hirschhorn
Winston & Strawn LLP
1700 K Street, NW
Washington DC 20006
202-282-5706

Robert B. Culliford
BBO #638468
Pan Am Systems, Inc.

14 Aviation Drive
Pease International Tradeport
Portsmouth NH 03801

*Attorneys for Defendants-Counterclaimants
Springfield Terminal Railway Company
and Boston and Maine Corporation*

March 7, 2006.