UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CENTRAL RAILROAD, INC.,
Plaintiff,

v.

SPRINGFIELD TERMINAL RAILWAY
COMPANY and BOSTON AND MAINE
CORPORATION,
Defendants

Civil Action No.:   04-30235-MAP

## JOINT PRE-TRIAL CONFERENCE MEMORANDUM

The parties hereby submit, pursuant to the *Procedural Order Re: Final Pre-Trial Conference/Trial*, dated March 17, 2006, their *Joint Pre-Trial Conference Memorandum*, as follows:

## I.   CONCISE STATEMENT OF THE EVIDENCE:

### A.   Plaintiff's Statement of the Evidence:

#### 1.   Liability:

This is a clear cut case where the defendants' are liable, pursuant to a clear and unambiguous contractual obligation, for damages its train crew caused to the plaintiff's trackage and operating profits by causing a substantial freight train derailment.

On July 3, 2004, employees of the defendant Springfield Terminal Railway Company ("STRC") were operating a STRC freight train over the plaintiff New England Central Railroad, Inc.'s ("NECR") mainline railroad tracks in Vermont, commonly known as the *Connecticut River Line* (the "Line").  At some point the STRC freight train derailed causing extensive

damage to NECR's trackage, related property, and other financial losses. One of the cars in the train first derailed at approximately Mile Post 10.18. The defendants' crew then failed to recognize that the freight car had derailed and continued to operate the train as if there was nothing wrong, dragging the derailed car for approximately 5 miles, causing damage to the plaintiff's trackage along the way. Ultimately, at approximately Mile Post 5.7, several other railcars also derailed resulting in a pile-up of railcars and substantial damage to the track structure. The plaintiff incurred substantial costs to repair and restore its trackage. In addition, the plaintiff also suffered significant lost profits due to its having to close the track to traffic and, thereafter, to restrict the track speed while repair and restoration efforts were ongoing.

### a. The STRC is Responsible to the NECR for the Damages that the NECR Incurred as a Result of the Derailment:

The Interstate Commerce Commission's imposed *Modified Trackage Rights Agreement* ("Agreement"), dated February 6, 1990, governs the terms, conditions, rights, responsibilities and obligations of the NECR and the B&M and/or STRC with respect to the operation of the B&M and/or the STRC's trains over the *Line*. The *Agreement* imposes a number of typical obligations on both railroads. The provision of the *Agreement* which is applicable to the facts of this particular case is § 7.1 which allocates between the parties the responsibility for certain losses, as follows:

> [E]ach party hereto shall be responsible for and shall assume all loss, damage or injury...to persons or property, including the cost of removing any trackage, repairing trackage and correcting environmental damage, which may be caused by its engines, cars, trains or other on-track equipment (including damage by fire originating therefrom) whether or not the condition or arrangement of the trackage contributes in any manner or to any extent to such loss, damage or injury, and whether or not a third party may have caused or contributed to such loss, damage or injury, and for all loss or damage to its engines, cars, trains or other on-track

2

equipment while on said trackage <u>from any cause whatsoever</u>....

Pursuant to the clear and unambiguous language of this provision, the defendants are responsible for the losses and damages which were caused by the derailment <u>regardless of any other cause including the condition of the track</u>.

Roger Bergeron, the defendants' current Vice-President for Special Projects and former Assistant Vice-President of Engineering, inspected the scene of the derailment and conducted on behalf of the defendants an investigation as to the cause of the derailment shortly after it occurred and worked with the plaintiff on clean up and remediation efforts. He has also given sworn testimony in this case as the defendants' Rule 30(b)(6) deponent, thus his testimony binds the defendants, that the defendants are responsible for the derailment damages pursuant to § 7.1 of the *Agreement*.

It is the plaintiff's position that this case is extremely simple, in that, there is no dispute that the derailment damage was caused by the defendants' "engines, cars (and/or) trains," the defendants are solely responsible for all of the resulting loss. All that is required under the *Agreement* to establish liability in this case is that the derailment damage was caused by the defendants' equipment.

The liability issue, in this case, should be resolved by summary judgment, and that the only matter that need be tried is the issue of damages. It is therefore the plaintiff's position that the other liability issues discussed herein are irrelevant; however, these issues are dealt with hereafter in order to communicate the plaintiff's position in the event that judgment is not entered in its favor on the contractual liability issue.

3

**b.      The STRC Crew Negligently Failed to Notice the Derailed Car:**

Even if there were a dispute on the defendants' clear contractual obligations, it is the

plaintiff's position that the defendants were negligent in their operation of the train. While the

train was moving on the *Line*, the STRC's conductor and the were required to operate the train in

accordance with the *General Code of Operating Rules* (the "GCOR"), a uniform set of rules

which are followed by several railroads. The GCOR, at § 6.29.2 (entitled *Train Inspections by*

*Crew Members*), required both the engineer and conductor to inspect the train frequently and

look for a number of defective conditions including railcar wheels not properly positioned on the

rail and dragging equipment. The crew was also required to stop the train if they discovered any

of the listed defects, promptly correct them or take other evasive action.

The STRC crew failed to properly take notice of the initial derailment and thereafter

failed to properly inspect the train as the derailed car was being dragged for approximately five

miles, all the while damaging the plaintiff's trackage and track structure including tie plates,

track ballast, three grade crossings, and a bridge deck. The crew should have either directly

observed the derailed car as it was being pulled with its wheels off the tracks, should have

noticed or felt the railcar dragging, or they should have observed from several gauges of the

functioning levels of the train engine's operational systems that something was wrong. Due to

their negligence and complete lack of attention to the most basic aspect of their job duties, they

failed to recognize the condition of their train.

**i.      The Crew's Foggy Condition Claim:**

The STRC's crew later claimed that there were "foggy" conditions in the area from the

initial point of derailment to the location of the pile-up. These conditions allegedly restricted the

crew's visibility such that they were unable to see the railcar that derailed. However, this is

4

directly contradicted by weather reports. The plaintiff's Dispatcher's Office had obtained, just

prior to the derailment, weather data and noted that there was fair weather throughout the *Line*.

The NECR crew did not report to the NECR's dispatcher that they were in fog conditions or that

their visibility was somewhat impaired which was required by § 6.21 of the GCOR. In addition,

NECR employees who arrived at the scene shortly after the derailment did not note the existence

of foggy conditions.

After the derailment, the STRC crew was required to report to the NECR dispatcher

information which was relevant to the derailment which included the weather conditions, the

speed of the train, the AMPS, throttle position, the breaking employed at the time, etc. The

NECR dispatcher noted that the crew reported to him that the weather was clear at the time of the

derailment.

> c. **The STRC Crew Failed to take Precautions against "the Fog:"**

Even if the fog conditions did exist as the STRC train passed over the *Line* after the

initial derailment and before the pile-up, the STRC crew was required by § 6.21 of the GCOR to

protect the train against any known condition, such as fog, that might have interfered with the

safe operation of the train. The STRC crew failed to protect their train from the alleged fog

conditions by slowing the speed of the train. This might have prevented the initial derailment,

would have lessened the damage to the tracks, might also have prevented the pile up, and/or the

reduced train speed could have caused the STRC crew to feel or notice the derailed railcar.

> d. **The NECR's Track at the Point of Derailment was in Better Condition than the *Agreement* Required:**

The condition of the track is simply not relevant because § 7.1 of the *Agreement* states

that the defendants are responsible for the derailment damages regardless of the condition of the

5

track. Nevertheless, even if the condition of the track should become an issue at trial, the plaintiff expects to show that its track was in even better condition than required under the *Agreement*. The plaintiff was required, pursuant to § 3.2 of the *Agreement,* to keep the *Line* in not less than Federal Railroad Administration ("FRA") Class II condition. An FRA Class II rating restricts the speed of freight trains to not more than 25 mph. For the most part, the *Line* is generally maintained at FRA Class III level, which restricts the speed of freight trains to not more than 40 mph; therefore the *Line* is generally maintained to a greater standard than that which is required under the *Agreement*. On July 3, 2004, the NECR's track at the initial point of derailment was in Class III condition.

The plaintiff expects, if necessary, to present evidence which will demonstrate that FRA track compliance testing was completed approximately three weeks before the derailment and FRA-mandated twice weekly inspections were performed by the NECR between June 8th and July 1st. The most recent track inspection was completed on July 1st which was just two days before the derailment.

On June 8, 2004, less than one month before the derailment, the FRA conducted a "Geometry Test" on the *Line*.[1] According to the June 8, 2004 Geometry Car report, there were areas on the *Line* where the classification of the track was reduced due to defects that were determined by the geometry test. The NECR immediately imposed the reduced classifications at those areas and set about rectifying the most serious of the defects.

The initial point of derailment was Mile Post 10.18. There were no defects found at this point by the June 8, 2004, Geometry Test. The closest defect noted to the point of derailment was located at Mile Post 10.16. The railcar had already derailed and was on the ground before it

---

[1] A "Geometry Test" is performed by a specially equipped weighted railcar that travels over the tracks and records various measurement of track conditions.

6

came to the Mile Post 10.16 having derailed 105.6 feet back up the *Line*. The condition of the track at Mile Post 10.18 played no part in causing the derailment. Moreover, even though the FRA's testing found a defect at Mile Post 10.16, this defect reduced the classification of this section of the track down from Class III to Class II, which was still within compliance with the requirements of the *Agreement*.

### 2. **Damages:**

As a result of the derailment, the NECR was required to rebuild a substantial amount of its *Line* approximately between Mile Post 10.18 and 5.7. This included the replacement of over 7,000 ties, 15,000 tie plates, a bridge deck, several segments of rail, tons of ballast, and the rebuilding of three grade crossings. In addition, the NECR suffered lost time incentive revenue from an agreement that it had with the National Railroad Passenger Corporation ("AMTRAK"), losses incurred from care hire and delays, as well as moneys paid to its employees and materials required in order to restore the track back to its previous FRA Class III condition. The NECR is seeking damages for its Maintenance of Way labor, equipment and miscellaneous costs; outside contracting costs; increased care hire expenses; and lost on-time performance revenue from AMTRAK.

### B. **Defendants' Statement of the Evidence:**

The defendants-counterclaimants' ("Guilford") evidence will include proof of its counterclaim and its defense against the claims of plaintiff New England Central Railroad's ("NECR"). Guilford expects the evidence to show that—

- the derailment was caused by excessive superelevation due to the substandard condition of NECR's track and roadbed at or near milepost ("MP") 10.18 and a "slow order" set at an unsuitable speed by NECR, contrary to the express

7

requirements of the Track Safety Standards ("TSS") and regulations of the Federal Railroad Administration ("FRA");

- NECR was aware of the problem at and around MP 10.18 approximately four weeks before the derailment due to an FRA automated track geometry inspection, which employs measured and recorded values that accurately represent track condition, and which is distributed to railroad officials to enable them to reduce the risk of accident, derailment, or other incidents;

- between that time and the time of the derailment, NECR failed to inspect the condition regularly to ascertain whether it was worsening and whether additional corrective action was necessary;

- under FRA rules and regulations, NECR as owner of the track is responsible for compliance;

- NECR should have repaired its substandard track condition and, if necessary in the interim, imposed a *safe* speed limit by means of a proper "slow order";

- despite NECR's knowledge of the unsafe condition at and around the eventual point of derailment, NECR failed to take such corrective action prior to the derailment;

- as a result of this track defect and a condition known as "harmonic rock," which was exacerbated by the track defect and the improper slow order imposed by NECR, the wheels of one car in the Guilford train lifted off the rails at or near MP 10.18 and continued to travel in the train consist for approximately five miles;

- NECR's failure was the proximate cause of the derailment and the resulting damage to property of Guilford and NECR;

8

- NECR accordingly was guilty of gross negligence or willful misconduct;

- because the derailed car's alignment was in close proximity to the rails and in line with the track, only a single truck of a single car had derailed, the train was accelerating following the end of the speed-restricted area (which accounted for the absence of an elevated amperage reading on the train's instruments), and the foggy weather in the area, Guilford's train crew was not negligent in failing to realize that a set of wheels in the seventh freight car of their train had derailed before the derailed set of wheels hit a switch around MP 5 and several of the train's cars overturned;

- following the derailment, NECR did not merely restore the track to its condition immediately prior to the derailment but seized upon the opportunity to improve the track considerably;

- NECR spent far more than was justified, and in excess of the industry standard, even for the work that actually was required to be done;

- NECR was grossly negligent and Guilford was not negligent; and

- even if Guilford were liable, NECR's actual damages as a result of the derailment are substantially less than NECR has claimed.

## II.   **STATEMENT OF THE FACTS ESTABLISHED BY PLEADING, ADMISSIONS, OR BY STIPULATION:**

A.   On July 3, 2004, employees of the STRC were operating an STRC freight train over the *Connecticut River Line* in Vermont.

B.   The *Connecticut River Line*, including the railroad track and track structures, was owned by the plaintiff.

9

C.   On July 3, 2004, at about 6:41 a.m., one or both sets of wheels of a railcar in the defendant's freight train derailed at about Mile Post 10.18.

D.   The locomotives and freight cars involved in the derailment were either owned by and/or in the possession, custody and/or control of and being operated by the defendants.

E.   The duties and obligations of the parties with respect to operation of trains over the *Line* was governed by the ICC-imposed *Modified Trackage Rights Agreement*.

F.   The derailed railcar, which remained upright, was dragged for approximately five miles after the initial point of derailment.

G.   The dragging of the derailed car caused damage to the plaintiff's trackage, related property, and the railcars in train.

H.   The derailed railcar ultimately, at or about Mile Post 5.7, turned over, along with several other railcars, resulting in a pile up of railcars.

I.   The pile up caused damage to the track and track structure.

J.   The derailment shut down the rail traffic over the *Connecticut River Line* for a period of time after the derailment.

K.   The defendants and NECR are rail carriers subject to the Interstate Commerce Act and the jurisdiction of the United States Surface Transportation Board ("STB").

L.   The ICC-imposed *Modified Trackage Rights Agreement* requires that the defendants have trackage rights over the NECR's *Connecticut River Line* in the vicinity of the derailment.

M.      On June 8, 2004, the NECR personnel were present at, and received a report of,

an automated track geometry inspection conducted by the Federal Railroad

Administration.

N.      Certain AMTRAK passenger trains travel regularly over the *Connecticut River

Line.*

## III.    CONTESTED ISSUES OF FACT:

### A.    Issues of Fact Contested by the Plaintiff[2]:

1.  Whether it was foggy on the morning of July 3, 2004, on the *Line*;

2.  Whether the crew of the STRC train were conducting their visual
    inspections of their train as required by the GCOR;

3.  Whether the STRC's crew's visibility was restricted;

4.  Whether the STRC's crew violated the applicable operating rules and
    requirements;

5.  Whether the condition of the track played any role in causing the
    derailment;

6.  The existence, nature, amount and cause of the defendants' damages, if
    any;

7.  Whether the NECR was negligent, grossly negligent, and/or responsible

    for willful misconduct;

8.  Whether the defendants were guilty of contributory negligent and was that

    contributory negligence greater that that of the plaintiff; and

9.  Whether the defendants investigated the derailment in accordance with

    their applicable policies and procedures.

---

[2] The NECR re-states that it is its position that § 7.1 of the *Agreement* controls the issue of liability and only sets forth these issues of fact to communicate its position should judgment not enter in its favor on its contract claims.

**B.**    **Issues of Fact Contested by the Defendants:**

1.    The ICC-imposed Trackage Rights Order ("TRO")[3] required NECR to maintain the relevant rail line in Class 2 condition.

2.    The TRO, along with the fact of NECR's ownership of the rail line, makes NECR responsible for the dispatching of the line, as well as its maintenance in compliance with the TRO and with FRA track safety standards.

3.    NECR's tracks at and around the point of the derailment (Milepost 10.18) were not in condition for Class 2 speed (up to 25 mph).

4.    NECR had been aware that there was a defective condition at and around MP 10.18 for approximately four weeks prior to the derailment because NECR had received a FRA track geometry report pointing out this shortcoming.

5.    NECR failed to make follow-up physical inspections to ascertain whether the defect was worsening or, if such inspections were made, failed to act on the findings of such inspections.

6.    The FRA's track safety regulations and standards required NECR to correct this shortcoming.  NECR was aware of this requirement but had failed to make the correction.

7.    Pending correction of the track, FRA rules permitted NECR to impose a temporary "slow order" to a speed that was safe in light of the condition of the track, but such rules do not permit a track owner to ignore a defect.

---

[3] NECR refers to the TRO as the "Modified Trackage Rights Agreement."

12

8.      The FRA rules provide that in the case of an excessively superelevated curve such as that at MP 10.18, a slow order establishing a maximum speed of twenty-five miles per hour is *not* safe due to the potential that such superelevation presents for exacerbating harmonic rock and increasing the risk of derailment. The relevant FRA regulation provides expressly that for jointed track with staggered joints in Class 2 through Class 5, such a curve may not have a crosslevel difference exceeding one and one-quarter inches in *any* of six consecutive pairs of joints. 49 C.F.R. § 213.63, table n. 2.

9.      The line at and around the point of derailment consisted of jointed track with staggered joints.

10.     At the time of the derailment, the curve at the point of derailment had a crosslevel difference exceeding one and one-quarter inches in some or all of six consecutive pairs of joints.

11.     At the time of the derailment a "slow order" limiting train speed to twenty-five miles per hour had been imposed by NECR and was in effect at the point of derailment.

12.     NECR's establishment of a 25 mile per hour speed limit was improper and unsafe.

13.     Because the rule of 49 C.F.R. § 213.63, note 2, does not apply to Class 1 track, the proper speed under the NECR slow order should not have exceeded the Class 1 limit, namely ten miles per hour. *See* 49 C.F.R. § 213.9.

14.  The condition of NECR's track and the impropriety of the NECR slow order were the proximate cause of the derailment.

15.  At the time of the derailment, the Defendant's train whose car derailed was traveling in compliance with NECR's timetable and general instructions, and was operating at or below the speed limit set by the NECR slow order but faster than the ten miles per hour prescribed in the FRA regulations to prevent dangerous harmonics in areas of excess superelevation.

16.  Until it left the track near MP 5, the derailed car had only a single set of wheels off the track and was traveling aligned with the track and the remainder of the train. Moreover, because the train was accelerating following the end of the speed-restricted area, the derailed car did not produce an elevated amperage reading on the train's instruments.

17.  Guilford's train crew was unaware, and had no reason to be aware, of the improper anomaly in NECR's track, of its propensity to increase the possibility of a derailment, or of the impropriety of the NECR 25 mph slow order.

18.  At the time in question, the weather between the point of derailment (MP 10.18) and the point where the derailed car and six of its fellows fell from the track (near MP 5) was foggy, and visibility accordingly was limited.

19.  The Guilford train crew, which was in the train's locomotive, was not readily able to see the derailed set of car wheels from that vantage point.

14

20.    Instrument observations were made by Guilford's train crew between the point of derailment and the point where the cars fell from the track. No increase in amperage—a common indication of a derailed car—was observed beyond that normal for an accelerating train.

21.    The Guilford crew did not have, and could not reasonably have been expected to have, knowledge of the derailment until the cars left the track near MP 5.

22.    The damage to Guilford due to the derailment exceeded $100,000, including damaged or destroyed railroad cars, excess per diem costs, wrecking and rerailing costs, and excess crew costs.

23.    Even if Guilford were determined to be liable for the damage to NECR's track due to the derailment, such damage was substantially less than the sum claimed by NECR.

24.    Even if Guilford were determined to have some liability to NECR, any reduction in on-time payments from Amtrak to NECR was due to conditions other than the derailment.

## IV.    JURISDICTIONAL ISSUES:

### A.    Plaintiff's Jurisdictional Issues:

The Court has jurisdiction over the subject of the matter of this litigation on the basis of the claims set forth in *Counts I - IV* of the *Amended Complaint* which are rooted in the *Interstate Commerce Commission Termination Act* (the "ICCTA"), 49 U.S.C. § 11704, and it has supplemental jurisdiction over the plaintiff's common law breach of contract, negligence and wanton/willful allegations in that they are sufficiently related to the ICCTA based claims.

15

**B.    Defendants' Jurisdictional Issues:**

By motion to dismiss, Guilford sought a ruling that NECR's state law claims are

preempted by the Interstate Commerce Act.  The Court denied that motion on the ground that a

finding of preemption would be "premature" but stated that it would "carefully reconsider the

question of preemption on a fully-developed factual record if the parties file motions at that point

under Fed. R. Civ. P. 56."  Dkt. #30.  Guilford expects to file such a motion or to include such a

claim in a broader motion for summary judgment (see Item 8 below).

**V.    ISSUES RAISED BY PENDING MOTIONS:**

There are presently no pending motions before the Court.  *See § VIII* regarding the

possible future motions.

**VI.   ISSUES OF LAW, EVIDENTIARY QUESTIONS:**

**A.    Issues Raised by the Plaintiff:**

The *Agreement* is, pursuant to § 9.9, governed by the laws of the District of Columbia.

The parties' common law claims, which are not contract based, are governed by the laws of the

State of Vermont.

**1.    The *Agreement* is not Ambiguous or Subject to Different
Interpretation and must be Enforced According to the Plain Meaning
of its Terms:**

The *Agreement*, at § 7.1, allocates between the parties the responsibility for the losses

which were incurred as a result of this derailment.  The defendants are responsible for and must

assume all loss, damage or injury to the NECR's property, including the cost of removing any

trackage, repairing trackage which was caused by the defendants' engines, cars, trains or other

on-track equipment whether or not the condition or arrangement of the trackage contributes in

any manner or to any extent to such loss, or damage.  This contract provision is not ambiguous

16

and this Court can determine its meaning without any other guide than the knowledge of the simple facts on which, from the nature of language in general, its meaning depends. Burbridge v. Howard Univ., 305 A.2d 245, 247 (D.C. 1973); Tillery v. D.C. Contract App. Board, 04-AA-1363 (D.C. 12-21-2006). The District of Columbia adheres to an "objective" law of contracts, meaning the written language embodying the terms of an agreement will govern the rights and liabilities of the parties regardless of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress, or mutual mistake. DSP Venture Group, Inc. v. Allen, 830 A.2d 850, 852 (D.C. 2003).

>      **2.      § 7.1 of the *Agreement is* Enforceable, thereby Requiring the
>              Defendants to Pay the NECR's Damages:**

§ 7.1 is essentially an indemnity provision. In a written agreement, parties may provide that one party indemnify another party against its own negligence. District of Columbia v. Murtaugh, 728 A.2d 1237, 1245 (D.C. 1999); W.M. Schlosser Co. v. Maryland Drywall Co., 673 A.2d 647, 653 (D.C. 1996); District of Columbia v. Royal, 465 A.2d 367, 368-69 (D.C. 1983). An indemnity provision, however, should not be construed to permit an indemnitee to recover for his own negligence unless the court is firmly convinced that such an interpretation reflects the intention of the parties. Schlosser, 673 A.2d at 653; United States v. Seckinger, 397 U.S. 203, 211 (1970). The *Agreement* is very specific and sufficiently broad so as to require the defendants to indemnify the NECR against liability for its own damages and/or negligence. Royal, 465 A.2d at 369.

17

### 3.     The STRC's Spoliation of Evidence:

The defendants have lost or failed to preserve relevant factual evidence concerning the happening of this derailment, as well as their subsequent investigation of the derailment. The defendants rest their claims solely on this evidence in their claims as to how the derailment occurred and to support their counter-claims. Specifically, the defendants faiiled to preserve and, in fact, has destroyed: (1) Mr. Bergeron's handwritten notes and calculations taken at the derailment scene; and (2) the initial report concerning the derailment authored by the train's conductor. Further, the defendants failed to preserve, by means of photographic evidence, the condition of the curve in the *Line* measured by Mr. Bergeron where he claims existed an obvious visual defect that caused the derailment.

The Bergeron notes are significant due to the fact that the defendants will apparently at trial be relying on the data from those notes to advance its explanation for how derailment occurred. The notes contained a number of calculations, measurement, readings, and drawings concerning the track layout and structure at Mile Post 10.18. This original information was thrown away by Mr. Bergeron after he made another drawing from this information.

The defendants' conductor was required to complete a full report as to the happening of the derailment. He has testified that he completed the required report and then affixed a copy to his superior's door in East Deerfield, MA and then facsimiled a copy to the defendants' dispatching center in Billerica, MA. Neither of the copies that were made available to the defendants have been produced in discovery. The conductor does not know what happened to the original report or where it is located now. The conductor drafted a "replacement" report about twenty days after he drafted the initial report and based his "replacement" report upon his

18

notes, records, and memory at that time. None of his notes or records, upon which he relied upon to draft the "replacement" report, have been produced in discovery.

Last, Mr. Bergeron, while at the scene, had an assistant with him who was an employee of the defendants, to whom he gave instructions concerning a number of issues. One instruction of particular note was to photograph the area of the track where Mr. Bergeron took his measurements and where he determined that the derailment occurred due to an obvious visual condition of the "defective" track. None of these photographs have been produced. The defendants had a duty to preserve this evidence knowing full well that they did not disclose their determinations and observations as to the cause of the derailment to the NECR and that the NECR would, as part of the restoration of the *Line*, re-surface that section of track thereby forever losing an opportunity to photograph and/or measure the trackage to challenge or verify the defendants' determination, observations, calculations, measurement, readings, and drawings.

In a diversity action brought in federal court, the court is to apply state substantive law and federal procedural law. Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1983). Rules of evidence are generally considered procedural, which means that, even in diversity actions, the court should apply federal law with respect to evidentiary issues. Headley v. Chrysler Motor Corp., 141 F.R.D. 362, 364-65 (D.Mass. 1991); *see also* Carota v. Johns Manville Corp., 893 F.2d 448 (1st Cir. 1990). With respect to spoliation of evidence issues in diversity suits, federal law controls. Chapman v. Bernard's, Inc., 167 F. Supp. 2d 406, 413 (D.Mass. 2001). *But see* Fedder v. McClennen, 1994 U.S. Dist. LEXIS 14680, *5 (D.Mass. Sept. 28, 1994) (applying the procedural laws of the forum state in a diversity action with respect to the appropriate statute of limitations).

Spoliation of evidence is defined as "the intentional, negligent, or malicious destruction of relevant evidence." Townsend v. American Insulated Panel Co., Inc., 174 F.R.D. 1, 4 (D.Mass. 1997). A party has a duty to preserve material evidence both during litigation and during prelitigation stages when the party knows or reasonably should know that the evidence may be relevant. Blinzler v. Marriott Int'l Inc., 81 F.3d 1148, 1158-59 (1st Cir. 1996). A party's bad faith destruction of a document relevant to proof of an issue at trial gives rise to a strong inference that production of the document would have been unfavorable to the party responsible for its destruction. Townsend, 174 FRD at 4. Nation-wide Check Corp. v. Forest Hills Distributors, 692 F.2d 214, 218 (1st Cir. 1982). "District courts have inherent power to exclude evidence that has been improperly altered or damaged by a party where necessary to protect the non-offending party from undue prejudice." Chapman, 167 F. Supp. 2d at 413 (citing Sacramona v. Bridgestone/Firestone, Inc., 106 F.3d 444, 446 (1st Cir. 1997)).

Upon determining that evidence has been destroyed, the court may then impose appropriate sanctions on the party who destroyed the evidence. Townsend, 174 F.R.D. at 4 (citing Corales v. Sea-Land Service, Inc., 172 F.R.D. 10 (D.P.R. 1997)). When sanctioning a party for spoliating evidence, the court may impose sanctions, including "dismissal of the case, the exclusion of evidence, or a jury instruction on the 'spoliation inference.'" Corales, 172 F.R.D. at 13 (quoting Howell v. Maytag, 168 F.R.D 502, 505 (M.D. Pa. 1996)). In determining what sanctions to impose, the court weighs the following factors:

> (1) [W]hether the adverse party was prejudiced by the destruction of evidence; (2) whether the prejudice can be cured; (3) the practical importance of the evidence; (4) whether the destruction was in good faith or bad faith; and (5) the potential for abuse if the evidence is not excluded or the party is not otherwise sanctioned.

20

Corales, 172 F.R.D. at 13 (*citing* Mayes v. Black & Decker, Inc., 931 F.Supp. 80, 83 (D.N.H.

1996)); Headley v. Chrysler Motor Corp., 141 F.R.D. 362, 365 (D.Mass. 1991) (*quoting* Lewis v.

Darce Towing Co., Inc., 94 F.R.D. 262, 266-67 (W.D. La. 1982)); Northern Assurance Co. v.

Ware, 145 F.R.D. 281 at 283 (D.Me. 1993); *see also* McGuire v. Acufex Microsurgical, Inc., 175

F.R.D. 149, 156 (D.Mass. 1997).

While bad faith is a consideration in issuing sanctions for spoliation of evidence, it is not

required for sanctions to be imposed. Rather, where a party is prejudiced as a result of the

destruction of evidence, even where the destruction is the result of carelessness, sanctions may

be imposed. Sacramona, 106 F.3d at 444. (upholding sanctions excluding evidence where the

defendants were unable to examine the evidence, specifically a wheel, where the plaintiff's

expert inspected and cleaned the wheel, thereby making it impossible to discern any markings

that were on the wheel at the time of the incident). Rather, bad faith "is not essential. If such

evidence is mishandled through carelessness, and the other side is prejudiced...the district court

is entitled to consider imposing sanctions, including exclusion of evidence." Kelley v. United

Airlines, Inc, 176 F.R.D. 422, 427 (D.Mass. 1997) (*quoting* Sacramona 106 F.3d at 447

(citations omitted)). Accordingly, an inference that evidence was destroyed because its contents

were unfavorable to a party *may* be drawn upon a showing that the destroyer had notice "of the

potential claim and of the document's potential relevance." Kelley., 176 F.R.D. at 427 (*quoting*

Blinzler, 81 F.3d at 1158-59; *see also* Nation-Wide Check Corp. v. Forest Hills Distributors,

Inc., 692 F.2d 214, 218 (1st Cir. 1982).

4.      **The Defendants' Common Law Claims are Preempted
        Pursuant to 49 C.F.R. § 213.2:**

Railroad operations and facilities, including track structures and bridges, are governed by

a comprehensive scheme of federal statutes and their implementing regulations, including the

*Federal Railroad Safety Act* ("FRSA"). In 1966, Congress transferred the responsibility for rail

safety to the Secretary of Transportation, *see* section 6(e) of the *Department of Transportation*

*Act*, Pub.L.Co. 89-670, 80 Stat. 93 (1966), which in turn delegated those responsibilities to the

Federal Railroad Administration ("FRA"), a unit of the Department of Transportation ("DOT").

*See* 49 C.F.R. § 1.49(m); *Act of October 15, 1966*, Pub. L. 89-670 § 6(e)(1), 80 Stat. 939,

formerly codified at 49 U.S.C. §1655(e)(1). The FRA has promulgated specific and detailed

specifications and safety standards for all types of railroad equipment, activities and operations,

including *Track Safety Standards* (49 C.F.R. Part 213). The FRSA's stated purpose is "to

promote safety in every area of railroad operations and reduce railroad-related accidents and

incidents." 49 U.S.C. § 20101. Under the FRSA, the Secretary is given broad power to

"prescribe regulations and issue orders for every area of railroad safety ..." Id. The FRSA

contains an express preemption provision, which states:

> Laws, regulations, and orders related to railroad safety shall be
> nationally uniform to the extent practicable. A State may adopt or
> continue to enforce a law, regulation, or order related to railroad
> safety until the Secretary of Transportation prescribes a regulation
> or issues an order covering the subject matter of the State
> requirement.

49 U.S.C. § 20106. Where the statute being construed contains an express preemption clause,

such as § 20106, "the task of statutory construction must in the first instance focus on the plain

wording of the clause...." CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993). The

provisions of the FRSA's preemption clause mandate that "applicable federal regulations may

preempt any state 'law, rule, regulation, order, or standard relating to railroad safety.' Legal duties imposed on railroads by the common law fall within the scope of these broad phrases." Id.; Ouellette v. Union Tank Car Co., 902 F. Supp. 5, 9 (D. Mass. 1995). FRSA preemption applies to any and all regulations pertaining to railroad operations and railroad safety, whether enacted before or after the FRSA. *See, e.g.,* CSX Transp., Inc. v. Public Utilities Comm'n of Ohio, 901 F.2d 497, 501 (6th Cir. 1990); Consol. Rail Corp. v. City of Bayonne, 724 F.Supp. 320 (D.N.J.1989); Tolentino v. United Parcel Service, et al., 2001 U.S. Dist. LEXIS 1395 (D. Mass. 2001).

All that is required to trigger the FRSA's preemption provision is that the subject of the defendants' claim be "covered" by any of the FRA's regulations. The focus of the inquiry must be on whether the FRA has adopted regulations which "substantially subsume" the subject at issue. Here, the subject is the inspection and maintenance of the track structure. The FRA has promulgated detailed and specific regulations on this subject at 49 C.F.R. Parts 213, which is entitled *Track Safety Standards*, and it contains detailed and specific regulations for minimum inspection and maintenance requirements for all components of the track structure, including the roadbed and the area immediately adjacent to it and various appurtenances to railroad tracks and railroad rights of way. *See e.g.* 49 C.F.R. §213.7 and subpart F – *Inspection*, 49 C.F.R. §§ 213.231 to 213.241. Part 213 also contains a number of provisions which impose upon railroads specific requirements for the inspection and maintenance of these areas and structures. Part 213 also has its own express preemption provision which states as follows:

> Under 49 U.S.C. 20106, issuance of these regulations preempts
> any state law, regulation, or order covering the same subject matter
> except an additional or more stringent law, regulation, or order that
> is necessary to eliminate or reduce an essentially local safety
> hazard; is not compatible with a law, regulation, or order of the

23

> United States Government; and that does not impose an
> unreasonable burden on interstate commerce.

49 C.F.R. §213.2. Part 213 also has specific provisions setting forth penalties for violations of

any requirements of the regulations set forth therein, including a schedule of fines. 49 C.F.R.

§213.15, and App. B. Subpart F sets forth specific "requirements for the frequency and manner

of inspecting track to detect deviations from the standards prescribed in this part." 49 C.F.R.

§213.231. Part 213 also contains specific sub-parts pertaining to the "roadbed"[4] and "track

appliances and track-related devices." 49 C.F.R. subparts B and E.

It is clear from the plain language of 49 C.F.R. Parts 213 that the FRA has issued

regulations which cover the trackage. Thus, the expressed preemption provisions of 49 U.S.C.

§ 20106 and 49 C.F.R. § 213.2 have been triggered. Given these facts, the regulations

substantially subsume the subject of the design, condition, maintenance, inspection and repair of

all components of the trackage. Therefore, the defendants' common law negligence claims in

this regard are preempted and must be dismissed.

### B. Issues Raised by the Defendants-Counterclaimants:

1.    Section 9.9 of the 1990 trackage rights order ("TRO") of the Interstate Commerce

Commission, which is the basis for NECR's damage claim under the Interstate Commerce Act,

provides that the TRO shall be interpreted under District of Columbia law. *Amtrak—*

*Conveyance of B&M in Conn River Line in VT & NH*, 6 I.C.C.2d 539, 567 (1990) (§ 9.9 of

TRO).

2.    The District of Columbia is a contributory negligence jurisdiction, which means

that "there is a complete bar to recovery [by NECR] if [Guilford] prevails on the question of

---

[4] As stated in §213.31, "this sub-part prescribes minimum requirements for roadbed and areas immediately adjacent to roadbed."

24

contributory negligence." *Krombein v. Gali Service Indus., Inc.*, 317 F. Supp. 2d 14, 17 (D.D.C. 2004) (citing *Andrews v. Wilkins*, 934 F.2d 1267, 1272 (D.C. Cir. 1991)); *see Hall v. Carter*, 825 A.2d 954, 956 (D.C. 2003); *id.* at 964 (separate statement of two judges explaining workings of D.C. rule). Thus, NECR cannot recover on its claims if NECR's negligence was any part of the cause of the derailment and resulting damage.

3.    Moreover, because NECR violated track safety regulations and standards of the Federal Railroad Administration, Guilford can recover on its counterclaims against NECR even if Guilford was contributorily negligent. *See Jarrett v. Woodward Bros., Inc.*, 751 A.2d 972, 985 (D.C. 2000).

4.    The STB has ruled, in a proceeding in which Guilford and NECR were parties, that notwithstanding the literal text of § 7.1 of the TRO, NECR is liable for its acts or omissions relating to the derailment if such acts or omissions constitute gross negligence or willful misconduct. *Boston and Maine Corp. v. New England Central R. Inc.*, STB Finance Dkt. No. 34612 (STB served Jan. 10, 2006) [Dkt. #29, Att. 1]. Because NECR did not seek review of the STB decision within sixty days, the decision is binding upon NECR. *See* 28 U.S.C. § 2344.

## VII.    **REQUESTED AMENDMENTS TO THE PLEADINGS:**

None at this time.

## VIII.    **ADDITIONAL MATTERS TO AID IN THE DISPOSITION OF THE CASE:**

Both parties desire to file *Motions for Summary Judgment*, as well as *Motions in Limine* concerning certain evidentiary issues to be resolved before trial. The parties can file their *Motions for Summary Judgment* within the next forty-five (45) days. They desire to file their *Motions in Limine* in accordance with the present order, which is one week before trial, but are willing to filing same with their *Motions for Summary Judgment*, should the Court so require.

## IX.   PROBABLE LENGTH OF TRIAL:

The length of this trial will depend on what issues are to be tried.  The parties believe that

trial could take from 5 to 10 days of testimony.  Both sides have requested a jury trial

## X.   LIST OF WITNESSES:

### A.   Plaintiff's Witness List:

1.   Michael Lawyer, NECR, 2 Federal Street, St. Albans, VT.
The investigation into the derailment, the work completed to restore the
*Line* back to FRA Class III condition, involvement by Engineers
Construction, Inc. in the derailment and NECR's business generally, the
NECR's response to the derailment; and the damages suffered by the
NECR as a result of the derailment.

2.   Charles Moore, NECR, 2 Federal Street, St. Albans, VT.
The investigation into the derailment, the work completed to restore the
*Line* back to FRA Class III condition, involvement by Engineers
Construction, Inc. in the derailment and NECR's business generally, the
NECR's response to the derailment; the damages suffered by the NECR as
a result of the derailment; the NECR's efforts to collect the monies due
from the defendants on account of the derailment; and discipline of the
STRC crew after the derailment.

3.   Thomas Murphy, American Rail Dispatch Center.
The policies and procedures applicable to the NECR's dispatching center
and foreign railroads.

4.   Richard T. Boucher, NECR, 2 Federal Street, St. Albans, VT.
The inspection of the *Line*, the investigation and confirmation of the defect
at Mile Post 10.6 after the FRA Geometry test on June 8, 2004, and the
condition of the line immediately before, at the time of, and after the
derailment.

5.   Richard R. Boucher, NECR, 2 Federal Street, St. Albans, VT.
The inspection of the *Line*, the investigation and confirmation of the defect
at Mile Post 10.6 after the FRA Geometry test on June 8, 2004, and the
condition of the line immediately before, at the time of, and after the
derailment.

6.   Ronald W. Boucher, NECR, 2 Federal Street, St. Albans, VT.
The condition of the line immediately before, at the time of, and after the
derailment.

26

7.  Tami Campbell, NECR, 2 Federal Street, St. Albans, VT.
    The NECR's AMTRAK lost time incentive damages.

8.  Gilbert St. Amand, NECR, 2 Federal Street, St. Albans, VT.
    Dispatching of the STRC's train on July 3, 2004, his communications with
    the STRC crew immediately after the derailment, and the policies and
    procedures applicable to the foreign train crews while on the NECR's
    *Line.*

9.  Steven Larro, NECR, 2 Federal Street, St. Albans, VT.
    The applicable operating rules and requirements applicable to the foreign
    crew on the *Line* on July 3, 2004.

10. Peter Kari, Springfield Terminal Railway Company, Iron Horse Park,
    North Billerica, MA.
    His operation of the STRC's train and activities thereon on July 3, 2004,
    as the engineer of the derailed train, as well as the applicable operating
    rule and procedures that his crew was required to comply with on that
    date.

11  Joseph Scappaci, Springfield Terminal Railway Company, Iron Horse
    Park, North Billerica, MA.
    His control of the STRC's train and activities thereon on July 3, 2004, as
    the engineer of the derailed train, as well as the applicable operating rule
    and procedures that his crew was required to comply with on that date.

12. Roger D. Bergeron, Springfield Terminal Railway Company, Iron Horse
    Park, North Billerica, MA.
    His investigation into and cause determination concerning the derailment,
    his communications internally and externally with NECR, B&M, and
    STRC employees concerning the derailment, the applicability of the
    provisions of the *Agreement.*

13. Lawrence Ferguson, Springfield Terminal Railway Company, Iron Horse
    Park, North Billerica, MA.
    Communications internally and externally with NECR, B&M, and STRC
    employees concerning the derailment.

14. Sydney Culliford, Springfield Terminal Railway Company, Iron Horse
    Park, North Billerica, MA.
    His investigation into and cause determination concerning the derailment,
    his communications internally and externally with NECR, B&M, and
    STRC employees concerning the derailment, the applicability of the
    provisions of the *Agreement.*

27

15.   Michael C. Bump, Springfield Terminal Railway Company, Iron Horse
      Park, North Billerica, MA.
      His investigation into and cause determination concerning the derailment,
      his communications internally and externally with NECR, B&M, and
      STRC employees concerning the derailment, his observations at the
      derailment site, and the STRC's activities at the derailment site in clean-up
      efforts.

16.   Steven Mumbly, 481 Meridan Road, Lebanon, NH.
      The work authorized and completed on the derailment as contracted with
      Engineers Construction, Inc.

17.   Eugene J. Trombly, 2446 Carter Hill Road, Swanton, VT.
      The work authorized and completed on the derailment as contracted with
      the NECR.

18.   The NECR's expert witnesses will testify regarding train handling,
      operations and track safety issues, the cause of the derailment, and the
      costs incurred by as the result of the derailment.

The NECR reserves the right to call all witnesses identified by the defendants, to call

rebuttal and/or impeachment witnesses, and to supplement its witness list prior to trial.

**B.    Defendants-Counterclaimants' Witness List:**

Some of Guilford's proposed witnesses may be beyond the reach of trial subpoenas. *See*

Fed. R. Civ. P. 45(b)(2), (c)(3)(A)(ii). Should any such individuals not be available for trial,

Guilford intends to offer appropriate portions of their deposition testimony into evidence. *See*

Fed. R. Civ. P. 32(a)(3).

Roger Bergeron (Guilford employee) will testify regarding track safety issues, the result
of his investigation into the derailment, the costs incurred by Guilford as a result of
the derailment, and the costs allegedly incurred by NECR as a result of the
derailment.

Guilford's expert witness will testify regarding track safety issues, his opinion regarding
the cause of the derailment, and his opinion regarding the costs incurred by the
parties as the result of the derailment.

28

Charles Moore (former NECR employee) will testify regarding his knowledge of the causes of the derailment and the subsequent repairs to the rail line.

A. Peter Kari (Guilford employee—member of train crew) will testify regarding the derailment, the circumstances surrounding same, and the slow orders that were in place for the line before and after the derailment.

J.C. Scappace, Jr. (Guilford employee—member of train crew) will testify regarding the derailment, the circumstances surrounding same, and the slow orders that were in place for the line before and after the derailment.

Steve Mumley (nonparty witness—employee of Vermont Rail) will testify regarding the extent and cost of post-derailment repairs.

Rick Boucher (NECR track inspector) will testify regarding track conditions before and after the derailment, as well as regarding track safety issues and possibly regarding the cost and extent of post-derailment repairs.

Richard Boucher (NECR track supervisor) will testify regarding track conditions before and after the derailment, as well as regarding track safety issues and possibly regarding the cost and extent of post-derailment repairs.

Michael Lawyer (NECR employee) will testify regarding track conditions before and after the derailment, as well as regarding track safety issues and the extent and cost of the response to the derailment.

Eugene J. Trombly (nonparty witness—employee of ECI Rail Constructors, Inc., f/k/a Engineers Construction, Inc.) will testify regarding the extent and cost of post-derailment repairs.

Tami Campbell (NECR employee) will testify regarding NECR's allegedly reduced Amtrak payments because of the derailment.

Defendants reserve the right to call any witness identified by NECR, to call rebuttal and impeachment witnesses, and to supplement this witness list.

## XI.   LIST OF TRIAL EXHIBITS:

### A.   Plaintiff's Exhibit List:

1.   *Modified Trackage Rights Agreement*, dated February 6, 1990, Finance

Docket No.: 31250, I.C.C.;

29

2.    *Rail America Engineering Standards*;

3.    *General Code of Operating Rules*;

4.    Timetable;

5.    Dispatcher's Train Sheet – Roxbury Subdivision;

6.    F.R.A. Geometry Car Inspection Report (applicable to the section of track involved in this incident);

7.    Car Hire Print-outs;

8.    Maintenance of Way labor documents and print-outs;

9.    Equipment and miscellaneous costs documents and print-outs;

10.   Outside contracting costs documents and print-outs;

11.   Increased care hire expenses documents and print-outs;

12.   Lost on-time performance revenue from AMTRAK documents and print-outs.

13.   Invoices from contractors concerning repairs to the track and structures;

14.   Damages Summary Sheet;

15.   Time sheet print-out;

16.   Dailey Operational Bulletin;

17.   F.R.A. reports filed by the defendants;

18.   *Initial Rail Equipment Accident/Incident Record*;

19.   Track Warrant;

20.   Transcript of the Disciplinary Hearing conducted by the defendants;

21.   All notices and correspondence between the parties concerning the defendants' disciplinary hearing/procedure against its crew;

22.     System map;

23.     Track chart;

24.     Train cancellation print-out;

25.     Correspondence between the parties concerning the derailment;

26.     Event recorder print-out;

27.     Hand written notes and computer generated graphics showing measurements of the derailment;

28.     Weather reports;

29.     Training sign-in sheet for Operating Rules class, April 26, 2004;

30.     Handwritten diagram of the derailment;

31.     *Rail America Atlantic Region Dispatch Center Incident Documentation* form;

32.     Applicable Code of Federal Regulations;

33.     Track Inspection reports;

34.     Official Railway Equipment Register;

35.     NECR Invoice to the Boston and Maine Corporation and the Springfield Terminal Railway Company, dated September 7, 2004;

36.     AAR Train Derailment Cause Finding;

37.     Photographs of the point of derailment;

38.     Photographs of the damage to the Connecticut River Line as a result of the derailment;

39.     Photographs of the pile-up scene of the railcars;

40.     Letter from Larry Ferguson to Charles Moore, dated July 9, 2004;

41.     STRC's *Conductor's Wheel Report*; and

42.     Agreement for Construction Services between the NECR and Engineers
        Construction, Inc., dated January 5, 2004.

The NECR reserves the right to use any of the documents, data compilations and tangible things identified and/or produced by the defendants, and incorporates herein by this reference the documents, data compilations and tangible things set forth in the its and the defendants' disclosures. The NECR reserves the right to supplement this exhibit list prior to trial.

**B.     Defendants-Counterclaimants' Exhibit List:**

1.      1990 Trackage Rights Order.

2.      Diagrams of derailment site.

3.      Excerpts from the Blue Book, which establishes standard rail industry
        rates for track work.

4.      Standing agreement between NECR and ECI regarding track work,
        including attachment setting forth rates.

5.      List of equipment rental rates charged by Klutt.

6.      Invoices and summaries of invoices from ECI, Vermont Rail, Laboready,
        and other entities with which NECR allegedly contracted for post-
        derailment track work.

7.      Invoices and summaries of invoices rendered to Guilford by NECR.

8.      Printouts from FRA track geometry inspection occurring in or about early
        June 2004.

9. NECR train sheets for the segment of the line on which the derailment occurred.

10. NECR slow orders on the line before, on, and after July 3, 2004.

11. NECR (RailAmerica) track maintenance manual.

12. Relevant FRA Track Safety standards.

13. Relevant FRA regulations.

14. NECR track chart for the relevant line segment.

15. Memorandum from Charles Moore (NECR) to Scott Linn (NECR or RailAmerica), dated July 3, 2004.

16. Vermont Railway direct labor distribution sheets.

17. Photographs of the derailment location and the location where the cars left the tracks.

18. AAR Train Derailment Cause Finding (Apr. 1982; rev. Apr. 1983).

19. Accident/incident reports re derailment.

20. Transcript of disciplinary hearing (Aug. 9, 2004).

In addition, the Defendants reserve the right to use any exhibits listed by, or other items produced by, the Plaintiff. The Defendants also reserve the right to supplement this list of exhibits.

### C. The parties' objections to the exhibits:

The plaintiff objects to Defendants' Exhibits 2, 3, 5, and 19.

The defendants object to Plaintiff's Exhibit 17.

Respectfully submitted,
by their attorneys:

NEW ENGLAND CENTRAL R.R., INC.,

/s/ Richard A. Davidson, Jr.
Michael B. Flynn              BBO# 559023
Richard A. Davidson, Jr.      BBO# 552988
FLYNN & ASSOCIATES, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169
(617) 773-5500

SPRINGFIELD TERMINAL RY. CO.
and the BOSTON AND MAINE CORP.,

/s/ Eric L. Hirschhorn
Winston & Strawn LLP
1700 K Street, NW
Washington, D.C. 20006
(202) 282-5706

/s/ Robert B. Culliford
Pan Am Systems, Inc. BBO# 638468
14 Aviation Avenue
Portsmouth, NH 03801
(978) 663-1024

Dated: January 29, 2007