# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NEW ENGLAND CENTRAL RAILROAD<br><br>Plaintiff/Counterdefendant,<br><br>-v.-<br><br>SPRINGFIELD TERMINAL RAILWAY COMPANY, et al.,<br><br>Defendant/Counterclaimants. | : : : : : : : : : : : : : : : : | Civil Action No. 04-30235-MAP |

---

## MEMORANDUM
### OF REASONS IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Robert B. Culliford
Pan Am Systems, Inc.
14 Aviation Avenue
Portsmouth, NH 03801
(603) 766-2002

Eric L. Hirschhorn
Debra R. Coletti
Winston & Strawn
1700 K Street, NW
Washington, DC 20007
(202) 282-5000

Attorneys for Defendants,
Springfield Terminal
Railway Company, et al.

Dated:  March 23, 2007

# Table of Contents

                                                                                        **Page**

Statement of the Case ......................................................................................................2

Facts ..................................................................................................................................3

    The Trackage Rights Order ...............................................................................3

    The FRA inspection of the Line.........................................................................6

    The Derailment....................................................................................................10

    The investigative hearing ..................................................................................12

    Investigation of the Derailment .......................................................................15

Argument .......................................................................................................................19

    I.     NECR is liable for ST/BM's damages and ST/BM is not liable
           for NECR's damages ...........................................................................19

          A.    No reasonable jury could conclude other than that
               NECR was guilty of gross negligence as a matter of law........................19

          B.    No reasonable jury could conclude other than that
               NECR was guilty of negligence, at the very least, as a
               matter of law....................................................................................22

          C.    No reasonable jury could conclude that ST/BM was
               guilty of negligence.........................................................................23

          D.    ST/BM is entitled to summary judgment on liability
               regardless of whether a contributory or comparative
               negligence standard applies. .........................................................24

               1.    The TRO—contributory negligence standard ...............................24

               2.    The common-law negligence claims—comparative
                      negligence standard .........................................................25

Case 3:04-cv-00255-MARP    Document 662    Filed 08/23/2007    Page 3 of 34
Table of Contents – continued
Page 2

Page

II.    Counts VII and X of the Amended Complaint must be
       dismissed because NECR has adduced no evidence that would
       support a finding that ST/BM was guilty of gross negligence or
       willful misconduct .................................................................................26

III.   Counts I and II of the Amended Complaint fail to state claims
       on which relief can be granted because the TRO does not order
       ST/BM to do anything in respect of the Derailment ............................26

IV.    Counts V and VIII of the Amended Complaint fail to state
       claims on which relief can be granted because there is no
       contract between ST/BM and NECR .................................................27

Conclusion ........................................................................................................28

# TABLE OF AUTHORITIES

## Federal Cases and Administrative Decisions

*Amtrak—Conveyance of B & M in Conn River Line in VT & NH*,
  4 I.C.C.2d 761 (1988) ................................................................. 3, 4, 27

*Amtrak—Conveyance of B&M in Conn River Line in VT & NH*,
  6 I.C.C.2d 539 (1990) ........................................................................ 4

*Andrews v. Wilkins*, 934 F.2d 1267 (D.C. Cir. 1991) ................................ 24

*Boston and Maine Corp. v. New England Central Ry. Co.*, 2006 STB
  LEXIS 17, STB Finance Docket No. 343612 (served Jan. 10, 2006) .............. 3, 5

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................... 26

*Flanders & Medeiros, Inc. v. Bogosian*, 65 F.3d 198 (1st Cir. 1995) ............ 26

*Krombein v. Gali Service Industrial, Inc.*, 317 F. Supp. 2d 14 (D.D.C. 2004) ............ 24

*Railroad Supply Co. v. Elyria Iron & Steel Co.*, 244 U.S. 285 (1917) ............ 11

## State Cases

*Denis Bail Bonds, Inc. v. State of Vermont*, 622 A.2d 495 (Vt. 1993) ............ 22

*District of Columbia v. Walker*, 689 A.2d 40 (D.C. 1997) ........................ 19

*Favreau v. Miller*, 591 A.2d 68 (Vt. 1991) ........................................ 25

*Gilman v. Towmotor Corp.*, 621 A.2d 1260 (Vt. 1992) .............................. 25

*Hall v. Carter*, 825 A.2d 954 (D.C. 2003) ........................................ 24

*Jarrett v. Woodward Brothers, Inc.*, 751 A.2d 972 (D.C. 2000) ................ 19, 24

*Mellin v. Flood Brook Union School District*, 790 A.2d 408 (Vt. 2001) ............ 26

*Powers v. Office of Child Support*, 795 A.2d 1259 (Vt. 2002) .................... 26

*Shaw v. Moore*, 162 A. 373 (Vt. 1932) ............................................ 26

*Watson v. Dimke*, 872 A.2d 337 (Vt. 2005) ........................................ 22

## Federal Statutes

28 U.S.C. § 2342(5) (2000) ................................................................ 3, 6

28 U.S.C. § 2344 (2000) ..................................................................... 3, 6

49 U.S.C. § 103 (2000) .......................................................................... 6

49 U.S.C. § 11704(a) (2000) ................................................................ 27

49 U.S.C. § 702 (2000) ........................................................................... 5

49 U.S.C. § 722(b) (2000) .................................................................. 3, 6

## Federal Rules and Regulations

49 C.F.R. pt. 213 (2005) ....................................................................... 22

49 C.F.R. § 1.49 (2006) ........................................................................... 6

49 C.F.R. § 213.241(b) (2005) .............................................................. 18

49 C.F.R. § 213.5 (2005) ............................................................ 4, 8, 20

49 C.F.R. § 213.63 (2006) ..................................................... 7, 9, 16, 21

49 C.F.R. § 213.9 (2006) ................................................................. 8, 21

Fed. R. Evid. 802(6) .............................................................................. 13

Fed. R. Evid. 807 .................................................................................. 13

## State Statute

12 V.S.A. § 1036 ................................................................................... 25

## Other Authorities

17A Am. Jur. 2d, Contracts § 1 ............................................................ 27

American Heritage Dictionary of the English Language (1971) ........... 10, 12

Restatement (Second) of Contracts § 1 ................................................ 27

1 Williston on Contracts § 1.1 (4th ed. 2006) ...................................... 27

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

NEW ENGLAND CENTRAL
RAILROAD, INC.,

   Plaintiff/Counterdefendant,

  -v.-           Civil Action No. 04-30235-MAP

SPRINGFIELD TERMINAL
RAILWAY COMPANY, et al.,

   Defendants/Counterclaimants.

## MEMORANDUM OF REASONS IN SUPPORT OF
## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Springfield Terminal Railway Company and Boston and Maine Corporation ("ST/BM"),

which are the defendants/counterclaimants herein, have moved, pursuant to Fed. R. Civ. P. 56,

Loc. R. 56.1, ¶ 3 of this Court's pretrial scheduling order of February 6, 2007 [Dkt. #54], and the

Court's endorsed order of March 20, 2007, for partial summary judgment. Specifically, the

motion seeks summary judgment on the following issues:

  1.  ST/BM is not liable to the plaintiff, New England Central Railroad, Inc.

("NECR"), for any damages or injuries suffered by NECR in connection with the derailment of

an ST/BM train on NECR's Connecticut River Line near Hartland, Vermont, on July 3, 2004

(the "Derailment"). The Derailment was caused by NECR's gross negligence, and no negligence

on the part of ST/BM contributed to the Derailment or to NECR's injuries.

2.     NECR is liable to ST/BM for the damages and injuries suffered by ST/BM in connection with the Derailment because the Derailment was caused by NECR's gross negligence and no negligence on the part of ST/BM contributed to the Derailment or to ST/BM's injuries.

3.     ST/BM also is entitled to summary judgment on Counts VII and X of the Amended Complaint [Dkt. #16] because NECR has offered no evidence of gross negligence or willful misconduct on the part of ST/BM.

4.     Counts I and II of the Amended Complaint [Dkt. #16] fail to state claims on which relief can be granted under 49 U.S.C. § 11704(a) because the Interstate Commission's 1990 Trackage Rights Order ("TRO") does not require ST/BM to take, or to refrain from taking, any action in respect of the Derailment.

5.     Counts V and VIII of the Amended Complaint fail to state claims on which relief can be granted because the TRO is not a contract between ST/BM and NECR.

### Statement of the Case

NECR filed this action December 3, 2004.  The amended complaint [Dkt. #16] seeks damages for the Derailment on theories of breach of the TRO (Counts I through IV), common law breach of contract (Counts V and VIII), common law negligence (Counts VI and IX), and gross negligence (Counts VII and X).

ST/BM has denied liability and has counterclaimed, seeking damages from NECR for the Derailment on theories of breach of the TRO and Interstate Commerce Act requirements that the Line be maintained safely and in Class 2 condition (First Counterclaim), that this misconduct on the part of NECR constituted a breach of contract (Second Counterclaim), that the Derailment was due to NECR's negligence (Third Counterclaim), gross negligence (Fourth Counterclaim), and willful misconduct (Fifth Counterclaim) [Dkt. #33].

In January 2006, in a related proceeding between ST/BM and NECR, the Surface

Transportation Board ("STB") ruled that Section 7.1 of the TRO does not absolve NECR of

gross negligence or willful misconduct relating to a derailment.  *Boston and Maine Corp. v. New*

*England Central Ry. Co.*, 2006 STB LEXIS 17, STB Finance Dkt. No. 34612 (served Jan. 10,

2006) ("January 2006 Decision"), at 3 (Exh. 2 to Bergeron Declaration).  The January 2006

Decision also noted that the TRO had been imposed by the Interstate Commerce Commission

("ICC") and that certain provisions—including § 7.1—were not agreed upon by Central Vermont

and Boston and Maine.  *Id.* at 1, 3.  NECR did not seek judicial review of the January 2006

Decision, *see* 28 U.S.C. §§ 2342(5), 2344 (2000) (petition for review must be filed within 60

days), and hence is bound thereby, *see* 49 U.S.C. § 722(b) (2000) (STB orders binding until and

unless altered by STB or a court).

ST/BM's motion to dismiss the state-law claims as preempted by the Interstate

Commerce Act was denied on February 3, 2006 [Dkt. #30].

This Court's Pretrial Scheduling Order [Dkt. #54], issued February 6, 2007, authorized

the filing of motions for summary judgment on or before March 23, 2007.  By endorsed order

dated March 20, 2007, the Court permitted briefs on this summary judgment motion to be up to

forty pages long.

## Facts

### *The Trackage Rights Order*

In 1988, the ICC compelled the Boston and Maine Corporation to sell approximately

forty-eight miles of the Connecticut River Line to the National Railroad Passenger Corporation

("Amtrak"), which immediately resold the property to the Central Vermont Railway.  *See*

*Amtrak—Conveyance of B & M in Conn River Line in VT & NH*, 4 I.C.C.2d 761 (1988)

3

("*Amtrak I*"). The ICC order, which ultimately was upheld by the courts, required that the new owner grant trackage rights to Boston and Maine. *Id.* Trackage rights are similar to the rights of a lessee of ordinary real property, giving the tenant railroad certain rights to operate trains over, and otherwise use, the tracks of the landlord railroad. Declaration of Roger D. Bergeron in Support of Defendants' Motion for Partial Summary Judgment ("Bergeron Declaration"), ¶ 6.

In February 1990, after Central Vermont and Boston and Maine were unable to agree upon the provisions of a trackage rights agreement, the ICC imposed a trackage rights order governing Boston and Maine's use of the Line (the "TRO"). *Amtrak—Conveyance of B&M in Conn River Line in VT & NH*, 6 I.C.C.2d 539 (1990) ("*Amtrak II*"). The TRO also covered several segments connecting to the transferred portion that already were owned by Central Vermont and over which Boston and Maine already had trackage rights.

The derailment that is the subject of this action occurred on a segment that already was owned by Central Vermont but that is subject to the TRO. The tracks subject to the TRO are referred to herein as "the Line." The full text of the TRO is Exhibit 1 to the Bergeron Declaration.

The TRO makes CV "*solely responsible* for dispatching all operations over the Line and for the maintenance and repair of the Line, including the signals and the signal and dispatching system which controls operations on it," as well as for "keep[ing] the Line, *at all times* throughout the term of this Agreement or any extensions thereof, in not less than FRA Class II condition." Bergeron Declaration ¶ 9 & Exh. 1 (TRO § 3.2) (emphasis added); *see* 49 C.F.R. § 213.5 (2005) (track owner responsible for keeping track in compliance).

Section 7.1 of the TRO provides, in pertinent part:

[E]ach party hereto shall be responsible for and shall assume all loss, damage or injury . . . to persons or property, including the cost of removing any trackage,

repairing trackage and correcting environmental damage, which may be caused by its engines, cars, trains or other on-track equipment (including damage by fire originating therefrom) *whether or not the condition or arrangement of the trackage contributes in any manner or to any extent to such loss, damage or injury*, and whether or not a third party may have caused or contributed to such loss, damage or injury, and for all loss or damage to its engines, cars, trains or other on-track equipment while on said trackage from any cause whatsoever.

Bergeron Declaration Exh. 1 (emphasis added). Neither § 7.1 nor any other provision of the TRO requires ST/BM to take, or refrain from taking, any action in respect of the Derailment. *Id.*

The TRO remains in force. Bergeron Declaration ¶ 11. ST/BM is the successor in interest to Boston and Maine. *Id.* The New England Central Railroad, Inc. ("NECR"), which is the plaintiff/counterdefendant in this action, is the successor in interest to Central Vermont. *Id.*

In January 2006, in a proceeding between ST/BM and NECR, the Surface Transportation Board ("STB"), which is the successor to the ICC, *see* 49 U.S.C. § 702 (2000), ruled that Section 7.1 of the TRO does not absolve NECR of gross negligence or willful misconduct relating to a derailment:

> To construe [TRO] Section 7.1 as excusing gross negligence and willful misconduct would not encourage safe operations, and it would contravene well-established precedent that disfavors such indemnification provisions. Thus, we do not believe that it was the intent of the [ICC] in imposing [TRO] Section 7.1 to allow the landlord carrier to escape liability for maintenance failures that are the result of its own gross negligence or willful misconduct, and we do not construe [TRO] Section 7.1 in that manner.

*Boston and Maine Corp. v. New England Central Ry. Co.*, 2006 STB LEXIS 17, STB Finance Dkt. No. 34612 (served Jan. 10, 2006) ("January 2006 Decision"), at 3 (Exh. 2 to Bergeron Declaration).

The January 2006 Decision also noted that the TRO had been imposed by the ICC and that certain provisions—including § 7.1—were not agreed upon by Central Vermont and Boston

and Maine.  *Id.* at 1, 3.  NECR did not seek judicial review of the January 2006 Decision, *see* 28

U.S.C. §§ 2342(5), 2344 (2000) (petition for review must be filed within 60 days), and hence is

bound thereby, 49 U.S.C. § 722(b) (2000) (STB orders binding until and unless altered by STB

or a court).

### *The FRA inspection of the Line*

The Federal Railroad Administration ("FRA") has plenary responsibility for rail safety in

the United States.  Bergeron Declaration ¶ 13; 49 U.S.C. § 103 (2000); 49 C.F.R. § 1.49 (2006).

On June 8 and 9, 2004, the Line was inspected, under FRA's Automated Track Inspection

Program, by a T-2000 track geometry car (the "Inspection").  Bergeron Declaration ¶ 14.  NECR

personnel rode on the inspection car and relayed information about defects and remedial actions

from there to NECR's dispatchers.  *Id.* ¶ 14 & Exhs. 3 (Richard Boucher[1] dep. at 6:6-10) and 4

(at p. 7—Bates #803).

During such an inspection, instruments on the inspection car automatically record

defects, locating each defect using the Global Positioning System ("GPS").  *Id.* ¶ 15.  The system

for relating defects identified by the inspection car to physical landmarks such as mile posts and

bridges is not automated; instead, the railroad's track inspector calls out landmarks as they are

passed and an inspector or operator punches a button to mark each such location.  *Id.*  The

imprecision of the "call-out," as well as the reaction time for the individual who pushes the

marker button, means that that results of such an inspection typically are not precise as to related

landmarks such as mile  posts (though they are relatively precise as to GPS readings).  *Id.*

Indeed, it is normal practice, when the track owner's inspection personnel revisit each

defect site, to begin by examining the track for several hundred feet on either side of the marked

point.  *Id.* ¶ 16.  In the case of a post-derailment inspection involving a possible crosslevel

defect, standard industry practice is to consider the track segment from 300 feet before the derailment to 100 feet after the derailment. *Id.* ¶ 16 & Exh. 5 (Train Derailment Cause Finding, at V-9). Moreover, a crosslevel defect of the sort involved in the Derailment is by definition at least sixty-two feet long; thus even were the inspection car reading precise, the defect could extend for sixty-two feet in either direction from the noted spot. *Id.* ¶ 16; *see* 49 C.F.R. § 213.63 & n. 1 (2006).

The Inspection revealed 251 defects in a 230-mile stretch of track. *Id.* ¶ 17 & Exhs. 4 and 6. Particularly troubling was the fact that 189 of the defects were such that the related track was in *less* than FRA Class 2 condition and that seventy-four defects were such that the related track was in *no* recognized FRA class (i.e., they were not in condition to have trains running over them). *Id.* ¶ 17 & Exhs. 4 and 6.

The identified defects included a crosslevel defect, also known as a warp, in the vicinity of Milepost ("MP") 10.16. *Id.* ¶ 18 & Exh. 3 (Richard Boucher dep. at 7:2-3). The warp near MP 10.18 exceeded the limit established by the FRA's track safety standards. *Id.* ¶ 18; *see* 49 C.F.R. § 213.63 & n. 2 (2006). Thus, NECR was aware of this defect at least twenty-five days before the Derailment on July 3, 2004. Bergeron Declaration ¶ 18. Moreover, the FRA inspection report included the text of § 213.63 and its note 2. *Id.* ¶ 18 & Exh. 9 at Bates #809. NECR's track inspector agreed with the test car's determination of a warp defect in the vicinity of MP 10.18. *Id.* ¶ 18 & Exh. 7 (Rick Boucher dep. at 10:5-13).

A recognized authority on the subject of derailment, Train Derailment Cause Finding, states that crosslevel (warp) defects are among the more common types that "cause or contribute to a derailment." Bergeron Declaration ¶ 19 & Exh. 5 (at V-8).

---

[1] *Richard* Boucher is an NECR track supervisor. *Rick* Boucher, who is Richard's son, is an NECR track inspector.

>If a car with a high center of gravity is traveling at a speed such that its trucks are directly over successively low joints at the same time as the car rocks to the side of the low joints, the rocking will become more and more severe until the wheels on the opposite side of the low joints lift off the rail. *The speed at which wheel lift occurs is between 10 and 25 miles per hour.*"

*Id.* ¶ 19 & Exh. 5 (at V-9) (emphasis added).

According to NECR's roadmaster, Mike Lawyer, "[a] warp would be that [the height difference between the two rails] changes too drastically in a 62-foot segment," and "[t]he rail car could rock if there is too much of a change in a certain distance at a certain speed." *Id.* ¶ 20 & Exh. 8 (Lawyer dep. at 19:9-20:7). NECR's track supervisor, Richard Boucher, conceded that a warp can cause harmonic rock and that under certain conditions, that in turn can cause wheel lift. *Id.* ¶ 20 & Exh. 3 (Richard Boucher dep. at 9:20-11:16).

As a result of the Inspection, NECR placed slow orders at numerous locations on the Line, including the vicinity of MP 10.16. Normal industry practice, including that of the Federal Railroad Administration and ST/BM, is not to impose slow orders on fixed points but on *segments* of track, having varying length depending upon the defect in question. *Id.* ¶ 21. This NECR did not do. *Id.*

A comparison of NECR's Daily Operating Bulletins for June 10 and 11, 2004, reveals that the slow order for the MP 10.16 vicinity, which set a "Class 2" speed limit of twenty-five miles per hour, *see* 49 C.F.R. § 213.9(a) (2006), was not established until two days after the Inspection. Bergeron Declaration ¶ 22 & Exhs. 9 (at p. 3 of 5—Bates #1397) and 10 (at p. 4 of 7—Bates #1403). This delay is highly improper and dangerous, as the ironclad industry practice is to address any defect, at least on a permitted temporary basis, before the next train uses the defective track segment. *Id.* ¶ 22; 49 C.F.R. § 213.5(a) (2005).

8

The slow order remained in effect on July 3, 2004, the day of the Derailment. Bergeron Declaration ¶ 23 & Exh. 11 (at p. 4 of 6—Bates #000018). The warp had not been repaired when the Derailment occurred. *Id.* ¶ 23 & Exh. 8 (Lawyer dep. at 23:11-24:4). The proper remedial action would have been tamping up the ballast under the low (inside) end of the ties. *Id.* ¶ 24. This could have been accomplished using a self-lining, self-leveling tamper or, at least temporarily, manually by several workers using basic track tools. *Id.* ¶ 24 & Exh. 8 (Lawyer dep. at 28:2-29:8). Neither action was taken; the excuse offered by NECR's Richard Boucher was that the operator of NECR's tamping machine went on vacation before NECR got around to correcting this defect. *Id.* ¶ 24 & Exh. 3 (Richard Boucher dep. at 9:3-11).

Instead, NECR took the easy—and improper—way out, dropping the segment to Class 2 status, which meant a maximum freight-train speed of twenty-five miles per hour. *Id.* ¶ 25; *see* 49 C.F.R. § 213.63 n. 2 (2005) (harmonic-rock exception from Class 2 in cases of warp defects). Ironically, the improper slow order issued by NECR probably created a *greater* derailment risk than would have existed had the segment remained at Class 3—a class whose maximum speed for freight trains of forty miles per hour is well above the harmonic-risk range of 10-25 mph addressed by note 2 to § 213.63. Bergeron Declaration ¶ 25.

NECR's track supervisor, Richard Boucher, measured the defect at MP 10.16 on June 8, 2004, but did not measure it again between then and the occurrence of the Derailment more than three weeks later. *Id.* ¶ 26 & Exh. 3 (Richard Boucher dep. at 11:3-11). Moreover, Mr. Boucher admitted that it would not have been the practice of NECR's track inspection department to do so. *Id.* ¶ 26 & Exh. 3 (Richard Boucher dep. at 11:12-16). Indeed, NECR track inspector Rick Boucher didn't even record the defect on his subsequent inspection reports, *id.* ¶ 26 & Exh. 7 (Rick Boucher dep. at 8:18-9:1; 21:21-25:19), though the FRA's track safety rules require such

recording on *each* track inspection report until the defect has been corrected, *id.* ¶ 26 & Exh. 12 (at 5.140, 2nd full ¶). Thus NECR had no way of knowing whether the condition had worsened, though the FRA recognizes that such an occurrence is a distinct possibility and therefore expects remeasurement *regularly* until the defect has been corrected. *Id.* ¶ 27. NECR's Richard Boucher conceded that this defect could have caused wheel lift of the type that led to the Derailment. *Id.* ¶ 27 & Exh. 3 (Richard Boucher dep. at 11:21-12:6).

### *The Derailment*

In the early hours of July 3, 2004, a nineteen-car ST/BM freight train set out in a southerly direction on the Line from White River Junction, Vermont. *Id.* ¶ 28. As the train rounded a curve—the curve with the warp defect—near MP 10.18, the wheels of one truck[2] of a boxcar on the train lifted off the rails. *Id.* This "wheel lift"[3] occurred due to the combination of the speed of the train (approximately twenty-three miles per hour), excessive superelevation (more than six inches), the warp (or "crosslevel") defect, and harmonic rocking occurring in that speed range, the relative lack of centrifugal force occasioned by that speed range, in the presence of that type of defect. *Id.* ¶ 29. Had NECR made the FRA-required followup inspections and measurements, NECR would have been aware of all these factors. *Id.*

Approximately twenty-two feet after lifting, the wheels settled back down. *Id.* ¶ 30. Instead of returning to being flush against the rail heads of their respective rails, however, one set of the wheels came down on the ties and tie plates[4] outside its rail and the other set came down

---

[2] A railroad truck is a "swiveling frame[] of wheels under each end of a railroad car, trolley car, or the like." American Heritage Dictionary of the English Language 1376 (1971).

[3] Wheel lift is when "the flange of the wheel is allowed to come up onto the rail, or partially onto the rail head, as opposed to riding on the gauged side of the rail." Bergeron Declaration ¶ 29 & Exh. 8 (Lawyer dep. at 22:2-6).

[4] "A railroad tie plate, sometimes called a 'wear plate,' is a rectangular piece of metal, originally with both surfaces flat, designed to be placed upon the tie immediately under the rail, for the purpose of protecting the tie from the wear, which, in soft wood, is very great, incident to the vibration of the rail caused by passing engines and trains, and for the purpose of holding the rail more firmly in place than it could otherwise be held by the spikes without the

on the ties and tie plates inside the opposite rail. *Id.* ¶ 30 & Exh. 13 (Trombly dep. at 53:3-20). Mr. Bergeron's investigation of the marks in and around the track structure showed that the boxcar in question remained upright and, to any observer of the moving train, aligned with the other cars as the train continued southward. *Id.* ¶ 31. Specifically, Mr. Bergeron's investigation revealed that the wheels remained tight against their respective rails, but on the wrong side of the rail—a distance of only a few inches from where they were supposed to be. *Id.* The now-misaligned wheels of the truck caused damage to the ties and tie plates over which they traveled. *Id.*

The ST/BM crew did not learn immediately that the truck had come off the rails. *Id.* ¶ 32. The weather was foggy, *id.* ¶ 32 & Exhs. 14 (Kari dep. at 17:2-21; 39:7-16), 15 (Scappace dep. at 20:5-21) ("ground fog, river fog"), and the computerized records show that the lead locomotive's ammeter did not reflect unusually high amperage for a train that was accelerating up a 0.50 percent grade after passing a slow-ordered section of track, *id.* ¶ 32 & Exh. 16. Moreover, the train crew did not feel any unusual jostling, *id.* ¶ 33 & Exh. 14 (Kari dep. at 17:22-18:2), or anything else out of the ordinary, *id.* ¶ 33 & Exhs. 14 (Kari dep. at 20:14-17), 15 (Scappace dep. at 97:17-98:3).

Visibility was between 240 and 300 feet. *Id.* ¶ 34 & Exhs. 14 (Kari dep. at 18:13-18; 39:10-17), 15 (Scappace dep. at 85:5-86:3). Freight cars are approximately sixty feet long. *Id.* ¶ 34. The boxcar in question was the sixth car of the train (the eighth car, if one counts the two locomotives at the front), and hence was more than 400 feet behind the locomotive where the operator and conductor were located. *Id.* This meant that the crew could not consistently see the sixth car. *Id.* ¶ 34 & Exh. 14 (Kari dep. at 57:9-11). At any rate, the boxcar remained upright

---

plate, thereby preserving the gauge of the track." *Railroad Supply Co. v. Elyria Iron & Steel Co.*, 244 U.S. 285, 287 (1917).

and was not noticeably out of alignment with the rest of the train. *Id.* ¶ 34 & Exh. 15 (Scappace dep. at 86:23-87:14). The engineer testified that he last looked back to check the train consist shortly before the cars went onto the ground at MP 5.7. *Id.* ¶ 34 & Exh. 14 (Kari dep. at 38:15-39:6).

At approximately MP 5.7, however, the derailed wheels reached the "frog" portion of a switch[5] near Hartland, Vermont, at which time the truck turned sideways and the boxcar in question went onto the ground, taking with it the six cars behind it in the train. *Id.* ¶ 35 & Exh. 14 (Kari dep. at 25:22-27:2). Prior to this point there was no warning to the crew that a set of wheels had derailed. *Id.* ¶ 36 & Exhs. 14 (Kari dep. at 33:9-11; 58:3-13), 15 (Scappace dep. at 34:16-20; 62:23-63:17; 97:17-98:3).

### *The investigative hearing*

After the Derailment, NECR charged that the ST/BM crew had been negligent or otherwise acted improperly. Declaration of David A. Nagy in Support of Defendants/Counterclaimants' Motion for Partial Summary Judgment ("Nagy Declaration") ¶ 4 & Exh. B. On August 9, 2004, ST/BM accordingly convened an investigative hearing, under the applicable labor-management agreement, for the crew members, J.C. Scappace, Jr. and A. Peter Kari. David Nagy, who now is ST/BM's Executive Director of Safety Training and was at that time Director of Manpower, was appointed as hearing officer. *Id.* ¶ 5. (NECR never convened or sought to convene any hearing into the conduct of the train crew, but simply banned them from NECR's line effective July 9, 2004. *Id.* ¶ 15 & Exh. B.)

The charge against each crew member was "[f]ailure to properly perform [his] duties" in that the individual "allegedly failed to comply with the provisions of General Code of Rules

---

[5] A frog is "[a] device on intersecting railroad tracks that permits wheels to cross the junction." American Heritage Dictionary of the English Language 529 (1971).

6.29.2 and Rule 6.21 (in effect on New England Central Railway) resulting in derailment of seven (7) railcars." *Id.* ¶ 5 & Exh. A (at 1-2). The transcript of the hearing is Exhibit A to the Nagy Declaration; the transcript is within the business records exception to the hearsay rule. *See id.* ¶ 3; Fed. R. Evid. 802(6). Given that NECR had alleged misconduct on the part of the ST/BM train crew, and that the Derailment had occurred on NECR's track, Charles D. Hunter, Assistant General Manager of RailAmerica for NECR, attended the hearing and testified on behalf of NECR. *Id.* ¶ 6 & Exh. A at 1, 18-20.[6]

The hearing demonstrated that the train's recorder, which tracks such elements as speed, throttle position, brake applications, and air pressure in the train's brake lines, reflected that the train was traveling within the slow-ordered speed limit. *Id.* ¶ 7 & Exh. A at 10-11.

GCOR 6.29.2 provides in pertinent part that "[w]hile their train is moving, crew members must inspect it frequently and look for indications of defects in the train, especially when rounding curves." *Id.* ¶ 8 & Exh. A (at 6). Mr. Scappace testified that GCOR 6.29.2 requires train crew members to inspect the train whenever possible, and that he looked back to check the train at North Hartland (i.e., near where the cars went onto the ground). *Id.* ¶ 9 & Exh. A (at 30-31). He testified that derailed cars typically exhibit sparks, dust, and erratic movement, but that when he checked the train, he did not see any such conditions. *Id.* ¶ 9 & Exh. A (at 31-32). Mr. Kari testified that he did not feel anything unusual until the cars went onto the ground. *Id.* ¶ 9 & Exh. A (at 38).

Mr. Scappace also testified that taking the two engines into account, the boxcar whose wheels initially derailed at MP 10.18 was the ninth car of the train and hence was not visible

---

[6] Given the relatively formal nature of the hearing, the testimony adduced there should be considered by the Court under the residual hearsay exception, *see* Fed. R. Evid. 807 (residual exception for hearsay if it bears indicia of reliability), to the extent it is not admitted under the business records exception, *see* Fed. R. Evid. 802(6).

from the locomotive. *Id.* ¶ 10 & Exh. A (at 34). He noted that slowing the train would not have improved visibility because the distance between the crew and that boxcar would not have been changed. *Id.* ¶ 10 & Exh. A (at 36).

GCOR 6.21 provides in pertinent part that "[w]hen conditions restrict visibility, regulate speed to ensure that crew members can observe and comply with signal indication." *Id.* ¶ 11 & Exh. A (at 6-7). ST/BM foreman Michael Bump, who is an experienced engineer and was ST/BM's representative at the hearing, testified that 6.21 relates to signal visibility and not to general weather conditions such as fog or snow. *Id.* ¶ 11 & Exh. A (at 15).

Mr. Bump also testified that patchy fog is common on the track segment where the Derailment occurred. *Id.* ¶ 12 & Exh. A (at 17). NECR's witness, Mr. Hunter, testified to the same effect. *Id.* ¶ 12 & Exh. A (at 20). Mr. Hunter conceded that GCOR 6.21 does not restrict speeds at night but contended that it does restrict speeds in the presence of fog, at least where conditions limit visibility of signals. *Id.* ¶ 12 & Exh. A (at 27-28). Mr. Scappace testified that there was patchy ground fog in the area at the time of the Derailment, *id.* ¶ 12 & Exh. A (at 30, 34), and Mr. Kari agreed, *id.* ¶ 12 & Exh. A (at 37).

Mr. Bump testified that he believed neither crew member had violated GCOR 6.21 or 6.29.2. *Id.* ¶ 13 & Exh. A (at 40). Ultimately, there was no evidence adduced at the hearing to indicate that either crew member had violated GCOR 6.21 or 6.29.2. *Id.* Exh. A, *passim*. The decision-making officer for ST/BM, Warren J. Bostwick, found no violations of the GCOR provisions cited by NECR—Sections 6.21 and 6.29.2—and no discipline was imposed on either crew member. *Id.* ¶ 14 & Exh. C.

---

Moreover, NECR took the depositions of Messrs. Kari and Scappace during discovery in this action and questioned them about the derailment and the investigative hearing.

### *Investigation of the Derailment*

Roger D. Bergeron investigated the Derailment on behalf of ST/BM. Bergeron Declaration ¶ 37. He has led or otherwise been involved in investigations of more than three thousand derailments, including several hundred that occurred on main lines. *Id.* ¶ 4.

Mr. Bergeron has been employed by ST/BM and their predecessors for 36 years. *Id.* ¶ 2. His positions during that period have included trackman in the late 1960s, engineering surveyor and a construction inspector in the early 1970s, resident engineer in the mid-1970s, a track supervisor from the late 1970s to early 1980s, a roadmaster and engineer of track in the mid-1980s, an engineer of production and construction until 1996, then assistant vice-president of engineering until 2006. *Id.*

Mr. Bergeron's current position includes responsibility for industrial development of railroad properties, track construction and design projects, preparing estimates for permitting commuter rail service on certain portions of ST/BM's track, continuing my responsibilities for overseeing track maintenance and construction. *Id.* ¶ 3. In that capacity he is qualified under Section 213.7 of the Federal Railroad Administration regulations regarding track safety generally and regarding track inspection, renewal, and replacement in particular. *Id.*

Mr. Bergeron determined that because of the relatively slow train speed (not in excess of twenty-five miles per hour) and the excessive superelevation of the outside rail on the curve at MP 10.18, most of the weight of the boxcar in question was over the inside rail of the curve. *Id.* ¶ 37. This meant, of course, that the opposite wheels—those on the outside rail of the curve— were bearing an unusually light load; that fact, plus the previously noted deviation in track alignment, plus the harmonic motion that the FRA track safety regulations warn against at Class

2 speeds, caused those wheels to lift off the outside (high) rail of the curve at approximately MP

10.18. *Id.*

An additional factor was that the track where the wheels initially came off (around MP

10.18) was misaligned by approximately one and one-quarter inches. *Id.* ¶ 38. Although Mr.

Bergeron's inspection occurred after the Derailment, the physical evidence demonstrated that the

misalignment was not of recent vintage, but had antedated the Derailment. *Id.*

Thus, the area around MP 10.18 had both an alignment defect and a crosslevel defect.

Each type of defect can aggravate the other type, such that "[t]he combination of forces from

alignment and surface defects in the same location . . . has a cumulative effect much greater than

either defect alone. *Id.* ¶ 39 & Exh. 17 (at 6-6).

All these factors were within the control of NECR, which had known at least since the

Inspection approximately four weeks earlier that a dangerous condition existed at MP 10.18.

Specifically, NECR knew that the elevation of the outside rail at MP 10.18 was higher than

permitted by the FRA track safety regulations. *Id.* ¶ 40; *see* 49 C.F.R. § 213.63 (2006). Those

regulations also provide that because of the danger of harmonic rocking, the presence of such

superelevation requires that the speed limit *not* be that for Class 2 track—namely, twenty-five

miles per hour—but that for Class *1* track, which is ten miles per hour. Bergeron Declaration ¶

40; 49 C.F.R. § 213.63 n. 2 (2006).

NECR knew that this defect required correction but had failed to correct it. Bergeron

Declaration ¶ 41 & Exh. 3 (Richard Boucher dep. at 6:14-9:11). The defect could have been

corrected by "tamping up" the ballast under the inside (lower) rail of the curve so that the

crosslevel difference in elevation was within the limit established by the track safety regulations.

*Id.* ¶ 41 & Exh. 3 (Richard Boucher dep. at 8:15-22). The excuse offered by NECR for not doing

this is that the operator of their tamping machine had gone on vacation. *Id.* ¶ 41 & Exh. 3 (Richard Boucher dep. at 9:3-11). NECR has offered no excuse for not using the temporary expedient of having workers with basic track tools add ballast (rock) beneath the lower ends of the relevant ties. *Id.* ¶ 41.

In conducting his investigation, Mr. Bergeron noticed that at least one joint of the lower rail at the MP 10.18 location was sinking into the mud. *Id.* ¶ 42. Moreover, the ballast at that point contained mud and contaminants and therefore did not properly transmit load to the subgrade. *Id.* This is an improper condition because it limits the ability of the track structure safely to handle the load. *Id.* Amazingly, NECR's track inspector admitted that he had not noticed these conditions at the location in question. *Id.* ¶ 42 & Exh. 7 (Rick Boucher dep. at 13:4-7).

NECR potentially had available to it a second temporary option—namely, to slow-order that section of the Line to a *safe* speed, as permitted by the track safety regulations. *Id.* ¶ 43; *see* 49 C.F.R. § 213.9 (2005) (allowing safe-speed slow order for up to 30 days). NECR issued a slow order but did so without taking into account the disastrous potential combination of the crosslevel and alignment defects around MP 10.18 with a Class 2 speed limit of twenty-five miles per hour. Bergeron Declaration ¶ 44. NECR's failure to do so violates a basic element of track safety. *Id.* That is, NECR knew, or was indifferent to, the fact that the combined effect of the crosslevel defect, the alignment defect, and the Class 2 speed limit created a high likelihood of a derailment. *Id.* The question was not *whether* a derailment would occur under those conditions, but *when* it would occur. *Id.* ¶ 45.

Of particular interest is the fact that NECR has not suggested that Mr. Bergeron's analysis of the cause is incorrect. When deposed, for example, NECR's track inspector and

roadmaster—surprisingly—testified that they did not know the cause of the Derailment. *Id.* ¶ 46 & Exhs. 7 (Rick Boucher dep. at 18:1-20), 8 (Lawyer dep. at 32:15-33:8). Richard Boucher, NECR's track supervisor, testified that he didn't investigate the cause of the Derailment and that NECR's Rick Boucher and Michael Lawyer did that. *Id.* ¶ 47 & Exh. 3 (Richard Boucher dep. at 13:6-17). Rick Boucher testified that although he participated in the NECR's investigation, he did not know the cause. *Id.* ¶ 48 & Exh. 7 (Rick Boucher dep. at 17:22-18:20). Finally, Michael Lawyer, who was offered by NECR as its corporate witness on track conditions before and after the Derailment, testified he didn't know whether NECR had determined a cause of the Derailment. *Id.* ¶ 49 & Exh. 8 (Lawyer dep. at 32:15-33:8). Assuming that this testimony was truthful and not an effort to obscure the cause, it bespeaks either a concession that Mr. Bergeron is correct or a shocking lack of attention to track safety by NECR. *Id.* ¶ 50.

Moreover, NECR's track inspector admitted that although he was aware of the defect at MP 10.16, he didn't note it (or, presumably, measure it) in any of his supposedly semiweekly inspection reports because he hadn't been the individual who *found* the defect. *Id.* ¶ 51 & Exh. 7 (Rick Boucher dep. at 8:18-9:1; 21:5-25:19). This is grossly improper, as the FRA's track safety regulations require that *each* inspection report note a defect from the time it's initially discovered until the time it has been corrected. *Id.* ¶ 51 & Exh. 12 (at 5.140, 2nd full ¶); 49 C.F.R. § 213.241(b) (2005). The reason, of course, is that track defects don't correct themselves; indeed, they typically worsen if not attended to. Bergeron Declaration ¶ 51. Only by rechecking a known defect at each semiweekly inspection can the track owner be certain that matters are not deteriorating further. *Id.*

18

### Argument

**I.      NECR is liable for ST/BM's damages and ST/BM is not liable for NECR's damages.**

      **A.      No reasonable jury could conclude other than that NECR was guilty of gross negligence as a matter of law.**

The TRO, including § 7.1, is to be interpreted under District of Columbia law.  TRO § 9.9 (Exh. 1 to Bergeron Declaration).  Under that body of law, the basic elements of a negligence claim are the existence of a duty, violation of a standard of care, and injury resulting as a proximate cause of the violation.  *Jarrett v. Woodward Bros., Inc.,* 751 A.2d 972, 977 (D.C. 2000).  Further, *gross* negligence is "the failure to exercise even slight care" and "negligence as would shock fair-minded men." *District of Columbia v. Walker,* 689 A.2d 40, 44 (D.C. 1997) (internal quotations omitted).

NECR's repeated failures with regard to basic elements of track safety were so deficient as to constitute gross negligence as a matter of law:

- NECR knew for approximately a month that the crosslevel defect existed around MP 10.18, yet didn't correct it using the tamping machine because the machine operator went on vacation and offered no explanation for not correcting it using manual labor and a track jack.

- When Mr. Bergeron examined the site of the defect following the Derailment, he found that at least one joint of the lower rail was sinking into the mud and that the ballast was contaminated and hence unsafe.  The NECR track inspector claimed not to have noticed these conditions, though he supposedly was inspecting the track—including in particular all existing defects—twice weekly.

- Instead, NECR imposed a slow order that was manifestly improper under the federal track safety regulations because it failed to take account of the risk of

harmonic rock addressed in note 2 to § 213.63 of the federal track safety regulations.

- The slow order, which is supposed to be imposed before any more trains traverse the track segment in question, was not imposed until two or three days after the Inspection, though NECR personnel were on the track geometry car and hence were immediately aware of the defects. This violated standard practice in the railroad industry.

- The slow order also violated industry standards because it was imposed on a single point rather than a segment of track.

- NECR's track inspector violated federal track safety regulations by failing to record the crosslevel defect on *any* of his supposedly semiweekly inspections. He offered the somewhat lame excuse that because the defect already had been noted in the Inspection report, there was no need for him to note it on his own inspection writeups.

- NECR's track supervisor measured the crosslevel defect shortly after the Inspection but failed to re-measure it thereafter despite the distinct possibility that the defect could worsen.

- There was an alignment defect at the same location that NECR failed to notice before the Derailment.

NECR owed ST/BM a duty to maintain the Line in a safe working condition at all times pursuant to the TRO and federal law. *See* TRO § 3.2 (Exh. 1 to Bergeron Declaration); 49 C.F.R. § 213.5 (2005) (track owner responsible for keeping track in compliance). Despite this

duty, NECR neglected to do anything ameliorative about the crosslevel defect and failed to set a *proper* slower speed limit (i.e. Class 1—10 mph).

The applicable rule is straightforward: "If a segment of track does not meet all of the requirements for its intended class, it is reclassified to the next lowest class of track for which it does meet *all the requirements* of [the FRA's track safety standards]." 49 C.F.R. § 213.9(b) (2005) (emphasis added). A segment of track does not qualify for Class 2 if its crosslevel difference exceeds the parameters of note 2 of § 213.62 of the track safety regulations. 49 C.F.R. § 213.63 n. 2 (2005). As NECR would have known had it taken the trouble to compare the track geometry report resulting from the Inspection with the track safety regulations, the curve around MP 10.18 where the Derailment began did not meet "all the requirements" for Class 2 and hence should have been placed in Class 1—a class for which the freight speed limit is ten miles per hour, 49 C.F.R. § 213.9(a) (2005), a speed that is below the harmonic danger addressed by note 2 to § 213.63. This is more than mere negligence, for it is a failure to exercise even slight care insofar as the segment around MP 10.18 was concerned. Indeed, as previously has been noted, the Class 2 slow order, with its harmonic-rock risk, likely created a greater derailment risk than if the speed had been left at Class 3 (though a slow order to Class 1, with its ten mph speed limit, would have been proper). Bergeron Declaration ¶ 25.

Moreover, NECR failed even to recognize the misaligned track at MP 10.18 and neglected to record the defects from the track geometry report on each subsequent inspection report. It was these flagrant omissions by NECR, coupled with NECR's failure to properly correct the crosslevel defect or impose an appropriate slow order, that proximately caused the Derailment and the resulting injuries to ST/BM and NECR.

21

The foregoing conduct by NECR constitutes gross negligence as a matter of law.  In turn, this means that ST/BM is not liable for NECR's damages and that NECR is liable for ST/BM's damages under § 7.1 of the TRO (First Counterclaim), and that NECR is liable under ST/BM's common law claim for gross negligence (Fourth Counterclaim).

**B.    No reasonable jury could conclude other than that NECR was guilty of negligence, at the very least, as a matter of law.**

ST/BM is entitled to summary judgment on liability as to ST/BM's negligence claim against NECR (Third Counterclaim).  To establish liability for negligence, ST/BM must show that: (1) NECR owed ST/BM a duty of care; (2) NECR breached that duty; (3) the breach was the proximate cause of ST/BM's injuries; and (4) STBM suffered actual harm.  *Watson v. Dimke,* 872 A.2d 337 (Vt. 2005); *Denis Bail Bonds, Inc. v. State of Vermont*, 622 A.2d 495 (Vt. 1993).

As discussed above, NECR owed ST/BM a duty to maintain the Line in a safe operational condition, and in Class 2 condition, at all times pursuant to the TRO and federal law.  See TRO § 3.2 (Bergeron Declaration Exh. 1); 49 C.F.R. pt. 213 (2005).  Portions of the Line, however—including the segment where the Derailment began—were noncompliant with the requirements of the TRO, in breach of applicable federal regulations, and unsafe for users such as ST/BM.  As such, they presented a substantial risk of derailment.  NECR knew or should have known of these adverse conditions, which were within NECR's control to correct, but nevertheless failed to maintain the Line in a safe and legally sufficient condition.

NECR breached its duty to ST/BM through its multiple failures and violations.  NECR failed to correct the crosslevel defect around MP 10.18 with either a tamping machine or a manual procedure, despite knowing of the defect for nearly a month before the Derailment.  Bergeron Declaration ¶¶ 23-24, 41-42.  NECR failed to set a proper slower speed limit that would take account of the risk of harmonic rock as addressed in the federal track safety

22

regulations. *Id.* ¶¶ 25, 43-45. NECR violated standard industry practice by failing to impose a slow order following the Inspection before any more trains negotiated the dangerous track segment in question. *Id.* ¶ 22. NECR failed to even identify the misaligned track at MP 10.18. *Id.* ¶ 38. NECR violated federal track safety regulations by neglecting to note and remeasure the crosslevel defect on each subsequent inspection report, so as to ensure that the defect was not worsening. *Id.* ¶ 51.

These failures and violations by NECR proximately caused the Derailment and the resulting harm to ST/BM. Accordingly, NECR was, at the very least, guilty of negligence as a matter of law, and ST/BM thus is entitled to summary judgment as to NECR's liability on the Third Counterclaim.

### C. No reasonable jury could conclude that ST/BM was guilty of negligence.

ST/BM is not liable for negligence as a matter of law. Indeed, NECR has adduced no evidence that would support a finding that ST/BM breached any duty to NECR. The derailed wheels of the sixth car of the train moved only a few inches between their proper location on the rail heads to locations just beside each rail. *Id.* ¶ 31. The ammeter readings, which can be an indicator of a derailed car, were normal for a train negotiating a 0.50 percent grade and accelerating from a slow-ordered track segment. *Id.* ¶ 32. From their position in the locomotive, the crew could not consistently see the sixth car of the train consist. At any rate, the boxcar remained upright and was not noticeably out of alignment with the rest of the train. *Id.* ¶ 31. The train crew felt nothing unusual between MP 10.18, where the wheels of the sixth car left the track, and MP 5.7, where that car and six of its fellows went onto the ground. *Id.* ¶ 33. The patchy fog in the area between MP 10.18 and MP 5.7 was an additional factor demonstrating that the crew did nothing improper.

Accordingly, no reasonable jury could conclude that any negligence on the part of ST/BM caused the Derailment or NECR's injuries. Thus, ST/BM is entitled to summary judgment against NECR on NECR's Counts VI, VII, IX, and X.

**D.     ST/BM is entitled to summary judgment on liability regardless of whether a contributory or comparative negligence standard applies.**

**1.     The TRO—contributory negligence standard.**

Section 9.9 of the TRO provides that the TRO shall be interpreted under District of Columbia law. TRO § 9.9 (Bergeron Declaration Exh. 1). In the January 2006 Decision, the STB ruled that § 7.1 of the TRO does not absolve NECR of gross negligence or willful misconduct relating to a derailment. Because the District of Columbia is a contributory negligence jurisdiction, "there is a complete bar to recovery [by NECR] if [ST/BM] prevails on the question of contributory negligence." *Krombein v. Gali Service Indus., Inc.*, 317 F. Supp. 2d 14, 17 (D.D.C. 2004) (citing *Andrews v. Wilkins*, 934 F.2d 1267, 1272 (D.C. Cir. 1991)); *see Hall v. Carter*, 825 A.2d 954, 956 (D.C. 2003); *id.* at 964 (separate statement of two judges explaining workings of D.C. rule). Thus, NECR cannot recover on Counts I through IV of the Amended Complaint if NECR's gross negligence was any part of the cause of the Derailment and resulting damage. Moreover, because NECR violated FRA's track safety regulations and standards, ST/BM can recover on its negligence-based counterclaims even if ST/BM was contributorily negligent. *See Jarrett*, 751 A.2d at 985.

### 2. The common-law negligence claims—comparative negligence standard.

As for NECR's common-law negligence claims (Counts VI, VII, IX, and X of the Amended Complaint), if NECR was grossly negligent, it follows that NECR was guilty of negligence as well. Vermont's comparative negligence statute provides in pertinent part:

> Contributory negligence shall not bar recovery in an action by any plaintiff, or his legal representative, to recover damages for negligence resulting in death, personal injury or property damage, if the negligence was not greater than the causal total negligence of the defendant or defendants, but the damage shall be diminished by general verdict in proportion to the amount of negligence attributed to the plaintiff.

12 V.S.A. § 1036 (2007); *see also Favreau v. Miller*, 591 A.2d 68, 73 (Vt. 1991) ("[U]nder Vermont's comparative negligence statute, a plaintiff can recover only if her own negligence contributed to no more than half the cause of the accident, and even then only in proportion to the amount of negligence attributed to defendant"); *Gilman v. Towmotor Corp.*, 621 A.2d 1260, 1262-63 (Vt. 1992) ("Comparative negligence requires the negligence of the plaintiff to be compared to the negligence of the defendant, and recovery is reduced according to the proportional amount of plaintiff's negligence"). Accordingly, if Vermont's comparative negligence standard applies, NECR cannot recover on its claims if its negligence was greater than that of ST/BM's. ST/BM, however, can recover because no reasonable jury could find that negligence on the part of ST/BM was more than half the cause of the Derailment.

Therefore, ST/BM is entitled to summary judgment on liability regardless of whether a contributory or comparative negligence standard applies. Counts I through IV, VI, VII, IX, and X of the Amended Complaint should be dismissed for that reason, and a liability finding in favor of ST/BM should be entered on ST/BM's First, Third, and Fourth Counterclaims.

**II.    Counts VII and X of the Amended Complaint must be dismissed because NECR has adduced no evidence that would support a finding that ST/BM was guilty of gross negligence or willful misconduct.**

Under the common law, "gross negligence is equivalent to the failure to exercise even a slight degree of care…It is a heedless and palpable violation of legal duty respecting the rights of others." *Shaw v. Moore,* 162 A. 373 (Vt. 1932*); accord Mellin v. Flood Brook Union School District,* 790 A.2d 408, 423 (Vt. 2001); *Powers v. Office of Child Support,* 795 A.2d 1259, 1266 (Vt. 2002).

Through the course of discovery, NECR has adduced no evidence to support a finding that ST/BM was guilty of gross negligence or willful misconduct.  Likewise, ST/BM does not anticipate any information will be provided in NECR's response to this motion that would support such a finding.

Summary judgment is "mandate[d] ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Flanders & Medeiros, Inc. v. Bogosian,* 65 F.3d 198, 206 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)).  Thus, Counts VII and X of the Amended Complaint must be dismissed as a matter of law.

**III.    Counts I and II of the Amended Complaint fail to state claims on which relief can be granted because the TRO does not order ST/BM to do anything in respect of the Derailment.**

Counts I and II of the Amended Complaint allege that ST/BM has violated an order of the STB[7] and hence is liable under 49 U.S.C. § 11704(a).  The only relevant provision on which NECR relies for this allegation, though, is § 7.1 of the TRO, which NECR contends makes ST/BM absolutely liable for the damage resulting from the Derailment.  Amended Complaint ¶¶ 18, 35-37 [Dkt. #16].

26

For one thing, the STB has ruled that ST/BM is not liable under § 7.1 if NECR has committed gross negligence or willful misconduct.  January 2006 Decision, at 3 (Bergeron Declaration Exh. 2).  More importantly, even if ST/BM were to be adjudged liable for NECR's damages, it is the *court's judgment*, not the TRO, that would require ST/BM to pay NECR therefore.  Indeed, neither § 7.1 nor any other provision of the TRO requires ST/BM to take, or refrain from taking, any action in respect of the Derailment.  *See* TRO (Bergeron Declaration Exh. 1); 49 U.S.C. § 11704(a) (2000).  Therefore, Counts I and II of the Amended Complaint should be dismissed.

**IV.    Counts V and VIII of the Amended Complaint fail to state claims on which relief can be granted because there is no contract between ST/BM and NECR.**

As the STB has pointed out, § 7.1 of the TRO was not agreed upon between Central Vermont and Boston and Maine (the predecessors, respectively, of NECR and ST/BM), but was imposed—over the objections of ST/BM's predecessor—by the ICC.  January 2006 Decision, at 1, 3 (Bergeron Declaration Exh. 2).  In addition, the whole concept of having Central Vermont grant trackage rights was not agreed upon between the two railroads but was imposed by the ICC.  *See Amtrak I*, 4 I.C.C.2d 761.

A "contract" is "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty."  Restatement (Second) of Contracts § 1 (2007); 1 Williston on Contracts § 1:1 (4th ed. 2006).  Moreover, a "contract" has been defined as "a private, *voluntary* allocation by which two or more parties distribute specific entitlements and obligations."  17A Am. Jur. 2d Contracts § 1 (2007) (emphasis added).  The TRO is not a contract, any more than a court order that requires one party to take or refrain from taking a specified action.  The party subject to such a direction may be

---

[7] Technically, the TRO is an order of the STB's predecessor, the ICC.

subject to a contempt proceeding if it violates the terms of the court order but it does not commit a breach of contract in so doing.

Because the TRO was not agreed upon by Central Vermont and Boston and Maine, it was not a contract and hence NECR can have no action for "breach of contract." For this reason, Counts V and VIII of the amended complaint are insufficient as a matter of law and should be dismissed.

**Conclusion**

Accordingly, this Court should grant summary judgment in favor of ST/BM on the issue of liability due to NECR's gross negligence (ST/BM's First, Third, and Fourth Counterclaims), and should dismiss Counts III, IV, VI, VII, IX, and X of the Amended Complaint. At a minimum, NECR has offered no evidence of gross negligence or willful misconduct on the part of ST/BM, and Counts VII and X of the Amended Complaint therefore must be dismissed.

Even if ST/BM is not granted summary judgment on liability, the Court should dismiss Counts I, II, V, and VIII of the Amended Complaint [Dkt #16] for failure to state a claim on which relief can be granted.

Respectfully submitted,

Eric L. Hirschhorn
Debra R. Coletti
Winston & Strawn LLP
1700 K Street, NW
Washington DC 20006
202-282-5700

Robert B. Culliford (BBO #638468)
Pan Am Systems, Inc.
Pease International Tradeport
14 Aviation Drive
Portsmouth NH 03801
603-766-2002

*Attorneys for Defendants/Counterclaimants*
*Springfield Terminal Railway Company*
*and Boston and Maine Corporation*

March 23, 2007