UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CENTRAL
RAILROAD, INC.,

    Plaintiff/Counterdefendant,

    -v.-                                                  Civil Action No. 04-30235-MAP

SPRINGFIELD TERMINAL
RAILWAY COMPANY, et al.,

    Defendants/Counterclaimants.

## STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Pursuant to Local Rule 56.1, Springfield Terminal Railway Company and Boston and Maine Corporation (collectively, "ST/BM"), who are the defendants/counterclaimants herein, state that there is no genuine issue to be tried as to the following material facts of record:

1.    In 1988, the ICC compelled the Boston and Maine Corporation to sell approximately forty-eight miles of the Connecticut River Line to the National Railroad Passenger Corporation ("Amtrak"), which immediately resold the property to the Central Vermont Railway. *See Amtrak—Conveyance of B & M in Conn River Line in VT & NH*, 4 I.C.C.2d 761 (1988) ("*Amtrak I*").

2.    The ICC order, which ultimately was upheld by the courts, required that the new owner grant trackage rights to Boston and Maine. *Id.*

3.    Trackage rights are similar to the rights of a lessee of ordinary real property, giving the tenant railroad certain rights to operate trains over, and otherwise use, the tracks of the

landlord railroad. Declaration of Roger D. Bergeron in Support of Defendants' Motion for Partial Summary Judgment ("Bergeron Declaration"), ¶ 6.

4. In February 1990, after Central Vermont and Boston and Maine were unable to agree upon the provisions of a trackage rights agreement, the ICC imposed a trackage rights order governing Boston and Maine's use of the Line (the "TRO"). *Amtrak—Conveyance of B&M in Conn River Line in VT & NH*, 6 I.C.C.2d 539 (1990) ("*Amtrak II*").

5. The TRO also covered several segments connecting to the transferred portion that already were owned by Central Vermont and over which Boston and Maine already had trackage rights. The derailment that is the subject of this action occurred on a segment that already was owned by Central Vermont but that is subject to the TRO. *Id.* (The tracks subject to the TRO are referred to herein as "the Line," and the full text of the TRO is Exhibit 1 to the Bergeron Declaration.)

6. The TRO makes CV "*solely responsible* for dispatching all operations over the Line and for the maintenance and repair of the Line, including the signals and the signal and dispatching system which controls operations on it," as well as for "keep[ing] the Line, *at all times* throughout the term of this Agreement or any extensions thereof, in not less than FRA Class II condition." Bergeron Declaration ¶ 9 & Exh. 1 (TRO § 3.2) (emphasis added).

7. Section 7.1 of the TRO provides, in pertinent part:

[E]ach party hereto shall be responsible for and shall assume all loss, damage or injury . . . to persons or property, including the cost of removing any trackage, repairing trackage and correcting environmental damage, which may be caused by its engines, cars, trains or other on-track equipment (including damage by fire originating therefrom) *whether or not the condition or arrangement of the trackage contributes in any manner or to any extent to such loss, damage or injury*, and whether or not a third party may have caused or contributed to such loss, damage or injury, and for all loss or damage to its engines, cars, trains or other on-track equipment while on said trackage from any cause whatsoever.

2

Bergeron Declaration Exh. 1 (emphasis added).

8. Neither § 7.1 nor any other provision of the TRO requires ST/BM to take, or refrain from taking, any action in respect of the Derailment. *Id.*

9. The TRO remains in force. Bergeron Declaration ¶ 11.

10. ST/BM is the successor in interest to Boston and Maine. *Id.*

11. The New England Central Railroad, Inc. ("NECR"), which is the plaintiff/counterdefendant in this action, is the successor in interest to Central Vermont. *Id.*

12. In January 2006, in a proceeding between ST/BM and NECR, the Surface Transportation Board ("STB"), which is the successor to the ICC, *see* 49 U.S.C. § 702 (2000), ruled that Section 7.1 of the TRO does not absolve NECR of gross negligence or willful misconduct relating to a derailment:

> To construe [TRO] Section 7.1 as excusing gross negligence and willful misconduct would not encourage safe operations, and it would contravene well-established precedent that disfavors such indemnification provisions. Thus, we do not believe that it was the intent of the [ICC] in imposing [TRO] Section 7.1 to allow the landlord carrier to escape liability for maintenance failures that are the result of its own gross negligence or willful misconduct, and we do not construe [TRO] Section 7.1 in that manner.

*Boston and Maine Corp. v. New England Central Ry. Co.*, 2006 STB LEXIS 17, STB Finance Dkt. No. 34612 (served Jan. 10, 2006) ("January 2006 Decision"), at 3 (Exh. 2 to Bergeron Declaration).

13. The January 2006 Decision also noted that the TRO had been imposed by the ICC and that certain provisions—including § 7.1—were not agreed upon by Central Vermont and Boston and Maine. *Id.* at 1, 3.

14. NECR did not seek judicial review of the January 2006 Decision.

15. The Federal Railroad Administration ("FRA") has plenary responsibility for rail safety in the United States. Bergeron Declaration ¶ 13; 49 U.S.C. § 103 (2000); 49 C.F.R. § 1.49 (2006).

16. On June 8 and 9, 2004, the Line was inspected, under FRA's Automated Track Inspection Program, by a T-2000 track geometry car (the "Inspection"). Bergeron Declaration ¶ 14.

17. NECR personnel rode on the inspection car and relayed information about defects and remedial actions from there to NECR's dispatchers. *Id.* ¶ 14 & Exhs. 3 (Richard Boucher dep. at 6:6-10) and 4 (at p. 7—Bates #803).

18. During such an inspection, instruments on the inspection car automatically record defects, locating each defect using the Global Positioning System ("GPS"). *Id.* ¶ 15.

19. The system for relating defects identified by the inspection car to physical landmarks such as mile posts and bridges is not automated; instead, the railroad's track inspector calls out landmarks as they are passed and an inspector or operator punches a button to mark each such location. *Id.*

20. The imprecision of the "call-out," as well as the reaction time for the individual who pushes the marker button, means that that results of such an inspection typically are not precise as to related landmarks such as mile posts (though they are relatively precise as to GPS readings). *Id.*

21. It is normal practice, when the track owner's inspection personnel revisit each defect site, to begin by examining the track for several hundred feet on either side of the marked point. *Id.* ¶ 16.

22. In the case of a post-derailment inspection involving a possible crosslevel defect, standard industry practice is to consider the track segment from 300 feet before the derailment to 100 feet after the derailment. *Id.* ¶ 16 & Exh. 5 (Train Derailment Cause Finding, at V-9).

23. Moreover, a crosslevel defect of the sort involved in the Derailment is by definition at least sixty-two feet long; thus even were the inspection car reading precise, the defect could extend for sixty-two feet in either direction from the noted spot. *Id.* ¶ 16; *see* 49 C.F.R. § 213.63 & n. 1 (2006).

24. The Inspection revealed 251 defects in a 230-mile stretch of track. *Id.* ¶ 17 & Exhs. 4 and 6.

25. One hundred eighty-nine of the defects were such that the related track was in *less* than FRA Class 2 condition and that seventy-four defects were such that the related track was in *no* recognized FRA class (i.e., they were not in condition to have trains running over them). *Id.* ¶ 17 & Exhs. 4 and 6.

26. The identified defects included a crosslevel defect, also known as a warp, in the vicinity of Milepost ("MP") 10.16. *Id.* ¶ 18 & Exh. 3 (Richard Boucher dep. at 7:2-3).

27. The warp near MP 10.18 exceeded the limit established by the FRA's track safety standards. *Id.* ¶ 18; *see* 49 C.F.R. § 213.63 & n. 2 (2006). NECR thus was aware of this defect at least twenty-five days before the Derailment on July 3, 2004. Bergeron Declaration ¶ 18.

28. The FRA inspection report included the text of § 213.63 and its note 2. *Id.* ¶ 18 & Exh. 9 at Bates #809.

29. NECR's track inspector agreed with the test car's determination of a warp defect in the vicinity of MP 10.18. *Id.* ¶ 18 & Exh. 7 (Rick Boucher dep. at 10:5-13).

30. A recognized authority on the subject of derailment, Train Derailment Cause Finding, states that crosslevel (warp) defects are among the more common types that "cause or contribute to a derailment." Bergeron Declaration ¶ 19 & Exh. 5 (at V-8).

> If a car with a high center of gravity is traveling at a speed such that its trucks are directly over successively low joints at the same time as the car rocks to the side of the low joints, the rocking will become more and more severe until the wheels on the opposite side of the low joints lift off the rail. *The speed at which wheel lift occurs is between 10 and 25 miles per hour.*"

*Id.* ¶ 19 & Exh. 5 (at V-9) (emphasis added).

31. According to NECR's roadmaster, "[a] warp would be that [the height difference between the two rails] changes too drastically in a 62-foot segment," and "[t]he rail car could rock if there is too much of a change in a certain distance at a certain speed." *Id.* ¶ 20 & Exh. 8 (Lawyer dep. at 19:9-20:7).

32. NECR's track supervisor, Richard Boucher, conceded that a warp can cause harmonic rock and that under certain conditions, that in turn can cause wheel lift. *Id.* ¶ 20 & Exh. 3 (Richard Boucher dep. at 9:20-11:16).

33. As a result of the Inspection, NECR placed slow orders at numerous locations on the Line, including the vicinity of MP 10.16. Normal industry practice, including that of the Federal Railroad Administration and ST/BM, is not to impose slow orders on fixed points but on *segments* of track, having varying length depending upon the defect in question. *Id.* ¶ 21. This NECR did not do. *Id.*

34. A comparison of NECR's Daily Operating Bulletins for June 10 and 11, 2004, demonstrates that the slow order for the MP 10.16 vicinity, which set a "Class 2" speed limit of twenty-five miles per hour, was not established until two days after the Inspection. *Id.* ¶ 22 & Exhs. 9 (at p. 3 of 5—Bates #1397) and 10 (at p. 4 of 7—Bates #1403).

6

35. This delay is highly improper and dangerous, and the ironclad industry practice is to address any defect, at least on a permitted temporary basis, before the next train uses the defective track segment. Bergeron Declaration ¶ 22; *see* 49 C.F.R. § 213.5(a) (2005).

36. The slow order remained in effect on July 3, 2004, the day of the Derailment. Bergeron Declaration ¶ 23 & Exh. 11 (at p. 4 of 6—Bates #000018).

37. The warp had not been repaired when the Derailment occurred. *Id.* ¶ 23 & Exh. 8 (Lawyer dep. at 23:11-24:4).

38. The proper remedial action would have been tamping up the ballast under the low (inside) end of the ties. *Id.* ¶ 24. This could have been accomplished using a self-lining, self-leveling tamper or, at least temporarily, manually by several workers using basic track tools. *Id.* ¶ 24 & Exh. 8 (Lawyer dep. at 28:2-29:8).

39. Neither action was taken; the excuse offered by NECR's Richard Boucher was that the operator of NECR's tamping machine went on vacation before NECR got around to correcting this defect. *Id.* ¶ 24 & Exh. 3 (Richard Boucher at 9:3-11).

40. Instead, NECR dropped the segment to Class 2 status, which meant a maximum freight-train speed of twenty-five miles per hour. *Id.*; *see* 49 C.F.R. § 213.63 n. 2 (2005) (harmonic-rock exception from Class 2 in cases of warp defects). This was improper. Bergeron Declaration ¶ 25.

41. Ironically, the improper slow order issued by NECR probably created a *greater* derailment risk than would have existed had the segment remained at Class 3—a class whose maximum speed for freight trains of forty miles per hour is well above the harmonic-risk range of 10-25 mph addressed by note 2 to § 213.63. *Id.*

7

42.     NECR's track supervisor, Richard Boucher, measured the defect at MP 10.16 on June 8, 2004, but did not measure it again between then and the occurrence of the Derailment more than three weeks later. *Id.* ¶ 26 & Exh. 3 (Richard Boucher dep. at 11:3-11). Mr. Boucher admitted that it would not have been the practice of NECR's track inspection department to do so. *Id.* ¶ 26 & Exh. 3 (Richard Boucher at 11:12-16).

43.     Indeed, NECR track inspector Rick Boucher didn't even record the defect on his subsequent inspection reports, *id.* ¶ 26 & Exh. 7 (Rick Boucher dep. at 8:18-9:1; 21:21-25:19), though the FRA's track safety rules require such recording on *each* track inspection report until the defect has been corrected, *id.* ¶ 26 & Exh. 12 (at 5.140, 2nd full ¶). Thus NECR had no way of knowing whether the condition had worsened, though FRA recognizes that such an occurrence is a distinct possibility and therefore expects remeasurement *regularly* until the defect has been corrected. *Id.* ¶ 27.

44.     NECR's Richard Boucher conceded that this defect could have caused wheel lift of the type that led to the Derailment. *Id.* ¶ 27 & Exh. 3 (Richard Boucher at 11:21-12:6).

45.     In the early hours of July 3, 2004, a nineteen-car ST/BM freight train set out in a southerly direction on the Line from White River Junction, Vermont. *Id.* ¶ 28.

46.     As the train rounded a curve—the curve with the warp defect—near MP 10.18, the wheels of one truck of a boxcar on the train lifted off the rails. *Id.* ¶ 28.

47.     A railroad truck is a "swiveling frame[] of wheels under each end of a railroad car, trolley car, or the like." American Heritage Dictionary of the English Language 1376 (1971).

48.     This "wheel lift" occurred due to the combination of the speed of the train (approximately twenty-three miles per hour), excessive superelevation (more than six inches),

the warp (or "crosslevel") defect, and harmonic rocking occurring in that speed range, the relative lack of centrifugal force occasioned by that speed range, in the presence of that type of defect. Bergeron Declaration ¶ 29.

49. Wheel lift is when "the flange of the wheel is allowed to come up onto the rail, or partially onto the rail head, as opposed to riding on the gauged side of the rail." *Id.* ¶ 29 & Exh. 8 (Lawyer dep. at 22:2-6).

50. Had NECR made the FRA-required followup inspections and measurements, NECR would have been aware of all these factors. *Id.* ¶ 29.

51. Approximately twenty-two feet after lifting, the wheels settled back down. *Id.* ¶ 30.

52. Instead of returning to being flush against the rail heads of their respective rails, however, one set of the wheels came down on the ties and tie plates outside its rail and the other set came down on the ties and tie plates inside the opposite rail. *Id.* ¶ 30 & Exh. 13 (Trombly dep. at 53:3-20).

53. "A railroad tie plate, sometimes called a 'wear plate,' is a rectangular piece of metal, originally with both surfaces flat, designed to be placed upon the tie immediately under the rail, for the purpose of protecting the tie from the wear, which, in soft wood, is very great, incident to the vibration of the rail caused by passing engines and trains, and for the purpose of holding the rail more firmly in place than it could otherwise be held by the spikes without the plate, thereby preserving the gauge of the track." *Railroad Supply Co. v. Elyria Iron & Steel Co.*, 244 U.S. 285, 287 (1917).

54. Mr. Bergeron's investigation of the marks in and around the track structure showed that the boxcar in question remained upright and, to any observer of the moving train, aligned with the other cars as the train continued southward. Bergeron Declaration ¶ 31.

55. Specifically, Mr. Bergeron's investigation revealed that the wheels remained tight against their respective rails, but on the wrong side of the rail—a distance of only a few inches from where they were supposed to be. *Id.*

56. The now-misaligned wheels of the truck caused damage to the ties and tie plates over which they traveled. *Id.*

57. The ST/BM crew did not learn immediately that the truck had come off the rails. *Id.* ¶ 32.

58. The weather was foggy, *id.* ¶ 32 & Exhs. 14 (Kari dep. at 17:2-21; 39:7-16), 15 (Scappace dep. at 20:5-21) ("ground fog, river fog").

59. The computerized record shows that the lead locomotive's ammeter did not reflect unusually high amperage for a train that was accelerating up a 0.50 percent grade after passing a slow-ordered section of track. *Id.* ¶ 32 & Exh. 16.

60. The train crew did not feel any unusual jostling or anything else out of the ordinary. *Id.* ¶ 33 & Exhs. 14 (Kari dep. at 17:22-18:2; 20:14-17), 15 (Scappace dep. at 97:17-98:3).

61. Visibility was between 240 and 300 feet. *Id.* ¶ 34 & Exhs. 14 (Kari dep. at 18:13-18; 39:10-17), 15 (Scappace dep. at 85:5-86:3).

62. Freight cars are approximately sixty feet long. *Id.* ¶ 34.

63. The boxcar in question was the sixth car of the train (the eighth car, if one counts the two locomotives at the front), and hence was more than 400 feet behind the locomotive

where the operator and conductor were located. *Id.* This meant that the crew could not consistently see the sixth car. *Id.* ¶ 34 & Exh. 14 (Kari dep. at 57:9-11).

64.     The boxcar remained upright and was not noticeably out of alignment with the rest of the train. *Id.* ¶ 34 & Exh. 15 (Scappace dep. at 86:23-87:14).

65.     The engineer testified that he last looked back to check the train consist shortly before the cars went onto the ground at MP 5.7. *Id.* ¶ 34 & Exh. 14 (Kari dep. at 38:15-39:6).

66.     At approximately MP 5.7, the derailed wheels reached the "frog" portion of a switch near Hartland, Vermont, at which time the truck turned sideways and the boxcar in question went onto the ground, taking with it the six cars behind it in the train. *Id.* ¶ 35 & Exh. 14 (Kari dep. at 25:22-27:2).

67.     A frog is "[a] device on intersecting railroad tracks that permits wheels to cross the junction." American Heritage Dictionary of the English Language 529 (1971).

68.     Prior to this point there was no warning to the crew that a set of wheels had derailed. *Id.* ¶ 36 & Exhs. 14 (Kari dep. at 33:9-11; 58:3-13), 15 (Scappace dep. at 34:16-20; 62:23-63:17; 97:17-98:3).

69.     After the Derailment, NECR alleged that the ST/BM crew had been negligent or otherwise acted improperly. Declaration of David A. Nagy ("Nagy Declaration") ¶ 4 & Exh. B.

70.     On August 9, 2004, ST/BM accordingly convened an investigative hearing, under the applicable labor-management agreement, for the crew members, J.C. Scappace, Jr. and A. Peter Kari. *Id.* ¶ 5 & Exh. A (p. 1).

71.     David Nagy, who now is ST/BM's Executive Director of Safety Training and was at that time Director of Manpower, was appointed as hearing officer. *Id.* ¶ 5.

72. NECR never convened or sought to convene any hearing into the conduct of the train crew, but simply banned them from NECR's line effective July 9, 2004. *Id.* ¶ 15 & Exh. B.

73. The charge against each crew member was "[f]ailure to properly perform [his] duties" in that the individual "allegedly failed to comply with the provisions of General Code of Rules ("GCOR") 6.29.2 and Rule 6.21 (in effect on New England Central Railway) resulting in derailment of seven (7) railcars." *Id.* ¶ A & Exh. A (pp. 1-2).

74. Given that NECR had alleged misconduct on the part of the ST/BM train crew, and that the Derailment had occurred on NECR's track, Charles D. Hunter, Assistant General Manager of RailAmerica for NECR, attended the hearing and testified on behalf of NECR. *Id.* ¶ 6 & Exh. A (at 1, 18-29).

75. The hearing demonstrated that the train's recorder, which tracks such elements as speed, throttle position, brake applications, and air pressure in the train's brake lines, reflected that the train was traveling within the slow-ordered speed limit. *Id.* ¶ 7 & Exh. A (at 10-11).

76. GCOR 6.29.2 provides in pertinent part that "[w]hile their train is moving, crew members must inspect it frequently and look for indications of defects in the train, especially when rounding curves." *Id.* ¶ 8 & Exh. A (at 6).

77. Mr. Scappace testified that GCOR 6.29.2 requires train crew members to inspect the train whenever possible, and that he looked back to check the train at North Hartland (i.e., near where the cars went onto the ground). *Id.* ¶ 9 & Exh. A (at 30-31).

78. Mr. Scappace testified that derailed cars typically exhibit sparks, dust, and erratic movement, but that when he checked the train, he did not see any such conditions. *Id.* ¶ 9 & Exh. A (at 31-32).

79. Mr. Kari testified that he did not feel anything unusual until the cars went onto the ground. *Id.* ¶ 9 & Exh. A (at 38).

80. Mr. Scappace also testified that taking the two engines into account, the boxcar that initially derailed at MP 10.18 was the ninth car of the train and hence was not visible from the locomotive. *Id.* ¶ 10 & Exh. A (at 34).

81. Mr. Scappace noted that slowing the train would not have improved visibility because the distance between the crew and that boxcar would not have been changed. *Id.* ¶ 10 & Exh. A (at 36).

82. GCOR 6.21 provides in pertinent part that "[w]hen conditions restrict visibility, regulate speed to ensure that crew members can observe and comply with signal indication." *Id.* ¶ 11 & Exh. A (at 6-7).

83. ST/BM foreman Michael Bump, who is an experienced engineer and was ST/BM's representative at the hearing, testified that GCOR 6.21 relates to signal visibility and not to general weather conditions such as fog or snow. *Id.* ¶ 11 & Exh. A (at 15).

84. Mr. Bump also testified that patchy fog is common on the track segment where the Derailment occurred. *Id.* ¶ 12 & Exh. A (at 17).

85. NECR's witness, Mr. Hunter, testified to the same effect. *Id.* ¶ 12 & Exh. A (at 20).

86. Mr. Hunter conceded that GCOR 6.21 does not restrict speeds at night but contended that it does restrict speeds in the presence of fog, at least where conditions limit visibility of signals. *Id.* ¶ 12 & Exh. A (at 27-28).

87. Mr. Scappace and Mr. Kari testified that there was patchy ground fog in the area at the time of the Derailment. *Id.* ¶ 12 & Exh. A (at 30, 34, 37).

88.  Mr. Bump testified that he believed neither crew member had violated GCOR 6.21 or 6.29.2. *Id.* ¶ 13 & Exh. A (at 40).

89.  Ultimately, there was no evidence adduced at the hearing to indicate that either crew member had violated GCOR 6.21 or 6.29.2. *Id.* Exh. A, *passim.*

90.  The decision making officer for ST/BM, Warren J. Bostwick, found no violations of the GCOR provisions cited by NECR—Sections 6.21 and 6.29.2—and no discipline was imposed on either crew member as a result of the hearing. *Id.* ¶ 14 & Exh. C.

91.  Roger D. Bergeron investigated the Derailment on behalf of ST/BM. Bergeron Declaration ¶ 37.

92.  Mr. Bergeron has been employed by ST/BM and their predecessors for 36 years. *Id.* ¶ 2.

93.  Mr. Bergeron is qualified under Section 213.7 of the Federal Railroad Administration regulations regarding track safety generally and regarding track inspection, renewal, and replacement in particular. *Id.* ¶ 3.

94.  Mr. Bergeron has led or otherwise been involved in investigations of more than three thousand derailments, including several hundred that occurred on main lines. *Id.* ¶ 4.

95.  Mr. Bergeron's positions during that period have included trackman in the late 1960s, engineering surveyor and a construction inspector in the early 1970s, resident engineer in the mid-1970s, a track supervisor from the late 1970s to early 1980s, a roadmaster and engineer of track in the mid-1980s, an engineer of production and construction until 1996, then assistant vice-president of engineering until 2006. *Id.* ¶ 2.

96.  Mr. Bergeron's current position includes responsibility for industrial development of railroad properties, track construction and design projects, preparing estimates for permitting

commuter rail service on certain portions of ST/BM's track, continuing my responsibilities for overseeing track maintenance and construction. *Id.* ¶ 3.

97.  Mr. Bergeron determined that because of the relatively slow train speed (not in excess of twenty-five miles per hour) and the excessive superelevation of the outside rail on the curve at MP 10.18, most of the weight of the boxcar in question was over the inside rail of the curve. *Id.* ¶ 37.

98.  This meant that the opposite wheels—those on the outside rail of the curve—were bearing an unusually light load; that fact, plus the previously noted deviation in track alignment, plus the harmonic motion that the FRA track safety regulations warn against at Class 2 speeds, caused those wheels to lift off the outside (high) rail of the curve at approximately MP 10.18. *Id.*

99.  An additional factor was that the track where the wheels initially came off (around MP 10.18) was misaligned by approximately one and one-quarter inches. *Id.* ¶ 38.

100.  Although Mr. Bergeron's inspection occurred after the Derailment, the physical evidence demonstrated that the misalignment was not of recent vintage, but had antedated the Derailment. *Id.*

101.  Thus, the area around MP 10.18 had both an alignment defect and a crosslevel defect. Each type of defect can aggravate the other type, such that "[t]he combination of forces from alignment and surface defects in the same location . . . has a cumulative effect much greater than either defect alone. *Id.* ¶ 39 & Exh. 17 (Canadian Pacific Railroad derailment manual, at 6-6).

102.  All these factors were within the control of NECR, which had known at least since the Inspection approximately four weeks earlier that a dangerous condition existed at MP

15

10.18. Specifically, NECR knew that the elevation of the outside rail at MP 10.18 was higher than permitted by the FRA track safety regulations. *Id.* ¶ 40; *see* 49 C.F.R. § 213.63 (2006).

103. Those regulations also provide that because of the danger of harmonic rocking, the presence of such superelevation requires that the speed limit *not* be that for Class 2 track—namely, twenty-five miles per hour—but that for Class *1* track, which is ten miles per hour. Bergeron Declaration ¶ 40; 49 C.F.R. § 213.63 n. 2 (2006).

104. NECR concededly knew that this defect required correction but had failed to correct it. Bergeron Declaration ¶ 41 & Exh. 3 (Richard Boucher dep. at 6:14-9:11).

105. The defect could have been corrected by "tamping up" the ballast under the inside (lower) rail of the curve so that the crosslevel difference in elevation was within the limit established by the track safety regulations. *Id.* ¶ 41 & Exh. 3 (Richard Boucher dep. at 8:15-22).

106. NECR's track supervisor, Richard Boucher, testified that the reason for not doing this was that the operator of their tamping machine had gone on vacation. *Id.* ¶ 41 & Exh. 3 (Richard Boucher dep. at 9:3-11).

107. NECR has offered no excuse for not using the temporary expedient of having workers with basic track tools add ballast (rock) beneath the lower ends of the relevant ties. *Id.* ¶ 41.

108. In conducting his investigation, Mr. Bergeron noticed that at least one joint of the lower rail at the MP 10.18 location was sinking into the mud. *Id.* ¶ 42.

109. Moreover, the ballast at that point contained mud and contaminants and therefore did not properly transmit load to the subgrade. *Id.*

110. This is an improper condition because it limits the ability of the track structure safely to handle the load. *Id.*

111. NECR's track inspector admitted that he had not noticed these conditions at the location in question. *Id.* ¶ 42 & Exh. 7 (Rick Boucher dep. at 13:4-7).

112. NECR potentially had available to it a second temporary option—namely, to slow-order that section of the Line to a *safe* speed, as permitted by the track safety regulations. *Id.* ¶ 43; *see* 49 C.F.R. § 213.9 (2005) (allowing safe-speed slow order for up to 30 days).

113. NECR issued a slow order but did so without taking into account the disastrous potential combination of the crosslevel and alignment defects around MP 10.18 with a Class 2 speed limit of twenty-five miles per hour. Bergeron Declaration ¶ 44.

114. NECR's failure to do so violates a basic element of track safety. *Id.*

115. That is, NECR knew, or was indifferent to, the fact that the combined effect of the crosslevel defect, the alignment defect, and the Class 2 speed limit created a high likelihood of a derailment. *Id.*

116. In Mr. Bergeron's mind, the question was not *whether* a derailment would occur under those conditions, but *when* it would occur. *Id.* ¶ 45.

117. NECR has not suggested that Mr. Bergeron's analysis of the cause is incorrect. When deposed, for example, NECR's track inspector and roadmaster—surprisingly—testified that they did not know the cause of the Derailment. *Id.* ¶ 46 & Exhs. 7 (Rick Boucher dep. at 18:1-20), 8 (Lawyer dep. at 32:15-33:8).

118. Richard Boucher, NECR's track supervisor, testified that he didn't investigate the cause of the Derailment and that NECR's Rick Boucher and Michael Lawyer had handled that. *Id.* ¶ 47 & Exh. 3 (Richard Boucher dep. at 13:6-17).

119. Track inspector Rick Boucher testified that although he participated in the NECR's investigation, he did not know the cause of the Derailment. *Id.* ¶ 48 & Exh. 7 (Rick Boucher dep. at 17:22-18:20).

120. Michael Lawyer, who was offered by NECR as its corporate witness on track conditions before and after the Derailment, testified he didn't know whether NECR had determined a cause of the Derailment. *Id.* ¶ 49 & Exh. 8 (Lawyer dep. at 32:15-33:8).

121. Assuming that the testimony of Messrs. Richard Boucher, Rick Boucher, and Lawyer was truthful and not an effort to obscure the cause, it bespeaks either a concession that Mr. Bergeron is correct or a shocking lack of attention to track safety by NECR. *Id.* ¶ 50.

122. NECR's track inspector, Rick Boucher, admitted that although he was aware of the defect at MP 10.16, he didn't note it (or, presumably, measure it) in any of his supposedly semiweekly inspection reports because he hadn't been the individual who *found* the defect. *Id.* ¶ 51 & Exh. 7 (Rick Boucher dep. at 8:18-9:1; 21:5-25:19).

123. This is grossly improper, as the FRA's track safety regulations require that *each* inspection report note a defect from the time it's initially discovered until the time it has been corrected. *Id.* ¶ 51 & Exh. 12 (at 5.140, 2nd full ¶); 49 C.F.R. § 213.241(b) (2005).

124. Track defects don't correct themselves; indeed, they typically worsen if not attended to. Bergeron Declaration ¶ 51.

125. Only by rechecking a known defect at each semiweekly inspection can the track owner be certain that matters are deteriorating further. *Id.*

Respectfully submitted,

*[signature]*

Eric L. Hirschhorn
Debra R. Coletti
Winston & Strawn LLP
1700 K Street, NW
Washington DC 20006
202-282-5700

Robert B. Culliford (BBO #638468)
Pan Am Systems, Inc.
Pease International Tradeport
14 Aviation Drive
Portsmouth NH 03801
603-766-2002

*Attorneys for Defendants/Counterclaimants Springfield Terminal Railway Company and Boston and Maine Corporation*

March 23, 2007