UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CENTRAL RAILROAD, INC., <br> Plaintiff, <br><br> v. <br><br> SPRINGFIELD TERMINAL RAILWAY <br> COMPANY and BOSTON AND MAINE <br> CORPORATION, <br> Defendants | Civil Action No.:   04-30235-MAP |

## THE PLAINTIFF NEW ENGLAND CENTRAL RAILROAD, INC.'S MOTION FOR SUMMARY JUDGMENT

The plaintiff New England Central Railroad, Inc. ("NECR") hereby submits its *Motion for Summary Judgment.* As grounds therefore, the NECR states that, as a matter of law, it is entitled to judgment on its statutory and common law breach of contract claims because the defendants are obligated by the clear and unambiguous terms of a contractual provision to pay the NECR for the damages caused by a derailment which occurred on July 3, 2004.  The NECR also states that, as a matter of law, it is entitled to judgment on the defendants' *Counterclaims* because:  (1) the grounds for recovery raised by the defendants (the allegedly defective condition of the NECR's track) is not relevant to a determination of responsibility under the contract and does not relieve the defendants from responsibility pursuant to the terms thereof; (2) the condition of the track was neither in violation of the contractual provision nor did it cause the derailment; (3) the *Counterclaims* are preempted by federal law; and (4)  there is no question of material fact in dispute concerning the defendants' gross negligence claim.

In support of its *Motion*, the NECR expressly incorporates herein by this reference the

following:

1.  *Memorandum of Law in Support of the Plaintiff's Motion for Summary Judgment*;

2.  *The Plaintiff's Concise Statement of Facts Pursuant to Local Rule 56.1*;

3.  the *Trackage Rights Agreement* between the parties and Interstate Commerce Commission decision Finance Docket No. 31250, a copy of which is attached as Exhibit "A;"

4.  the parties *Joint Pre-Trial Conference Memorandum*, a copy of which is attached as Exhibit "B;"

5.  the transcript of the deposition of Michael Lawyer, a copy of the relevant portions of which is attached as Exhibit "C," at p. 6-7, 12-13, 23-29, 46-47;

6.  the transcript of the deposition of Roger Bergeron, a copy of the relevant portions of which is attached as Exhibit "D," at p. 16-17,  p. 82-84, 142-145, 158-160;

7.  *Track Geometry Inspection Report*, a copy of the relevant portions of which is attached as Exhibit "E;"

8.  *Notice of Deposition*, a copy of which is attached as Exhibit "F;"

9.  *Daily Operating Bulletin* dated July 3, 2004, a copy of the relevant portions of which is attached as Exhibit "G;"

10.  transcript of the deposition of Rick T. Boucher, a copy of the relevant portions of which is attached as Exhibit "H," at p. 4, 8, 10-12; and

11.  *Daily Track Inspection Reports* for the months of June and July 2004, copies of which are attached as Exhibit "I".

WHEREFORE, for the foregoing reasons in addition to the reasons stated in the

*Memorandum of Law* in support of this *Motion*, the NECR respectfully requests that its

*Motion for Summary Judgment* be <u>ALLOWED</u>.

## <u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to Local Rule 7.1(D), the plaintiff NECR, respectfully states that oral argument

may assist the Court and requests a hearing on its *Motion for Summary Judgment*.

Respectfully submitted,
NEW ENGLAND CENTRAL RAILROAD, INC.
by its attorneys,

/s/ Michael B. Flynn
Michael B. Flynn            BBO#559203
Richard A. Davidson, Jr.,    BBO#552988
FLYNN & ASSOCIATES, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA  02169
(617) 773-5500

DATED: March 23, 2007

G:\F & A\CASE FILES\RAILAMERICA\New England Central\BM - STRC-Hartland\pleadings\mosuj.doc

3

# EXHIBIT "A"

SERVICE DATE

IFEB 1 2 1990

000035

The attached decision is subject to a formal correction before publication in the ICC 2d Series of Printed Reports. Please notify the Office of the Secretary, Commission Service Section, Room 2203, Washington, D.C. 20423, (202) 275-7764 of any formal errors in order that corrections may be made.

*RR copy*

ICC 304

## INTERSTATE COMMERCE COMMISSION

### FINANCE DOCKET NO. 31250

THE NATIONAL RAILROAD PASSENGER CORPORATION--
CONVEYANCE OF BOSTON AND MAINE CORPORATION
INTERESTS IN CONNECTICUT RIVER LINE
IN VERMONT AND NEW HAMPSHIRE

### FINANCE DOCKET NO. 31259

CENTRAL VERMONT RAILWAY, INC.--PETITION FOR
EXEMPTION--ACQUISITION AND OPERATION OF CERTAIN
INTERESTS IN RAIL LINES FROM THE NATIONAL
RAILROAD PASSENGER CORPORATION

000036

AMTRACK—CONVEYANCE OF B&M IN CONN RIVER LINE IN VT & NH   539

## FINANCE DOCKET NO. 31250[1]

## THE NATIONAL RAILROAD PASSENGER CORPORATION— CONVEYANCE OF BOSTON AND MAINE CORPORATION INTERESTS IN CONNECTICUT RIVER LINE IN VERMONT AND NEW HAMPSHIRE

Decided February 6, 1990

Final terms and conditions imposed for the trackage rights granted to the Boston and Maine Corporation for the Connecticut River Line.

### BY THE COMMISSION:

On May 18, 1989, Central Vermont Railway, Inc. (CV) filed a petition asking us to impose terms and conditions for trackage rights we granted to the Boston and Maine Corporation (B&M) over a 48.8-mile segment of the Connecticut (or Conn) River Line (or former B&M line). CV also seeks our establishment of the same conditions to govern prior trackage rights granted to B&M to operate over CV line segments that connect to either end of the Conn River line, and seeks other relief. We will impose terms and conditions for all the trackage rights and grant other relief as discussed below.

### BACKGROUND

In a decision in these consolidated proceedings, *Amtrak—Conveyance of B&M in Conn River Line in VT & NH*, 4 I.C.C.2d 761 (1988) (*Amtrak*), the Commission granted an application filed by the National Railroad Passenger Corporation (Amtrak) under section 402(d) of the Rail Passenger Service Act (RPSA), 45 U.S.C. § 562(d), seeking conveyance to Amtrak of the 48.8-mile Conn River Line and certain other property

---

[1] This decision also embraces Finance Docket No. 31259, *Central Vermont Railway, Inc. —Petition for Exemption—Acquisition and Operation of Certain Interests in Rail Lines From The National Railroad Passenger Corporation.*

interests belonging to B&M. We also granted CV's related petition for exemption under 49 U.S.C. § 10505 from the requirements of 49 U.S.C. §§ 11343-5 to acquire from Amtrak and operate the Conn River Line subject to the requirement, among others, that Amtrak grant specified trackage rights back to B&M. We set the payment cap for these trackage rights at $75,000 per year.

While Amtrak had submitted a proposed trackage rights agreement, we declined to impose it.[2] Instead, we gave the parties 20 days to negotiate, with recourse to us if private settlement efforts failed, and we established certain principles derived from Amtrak's proposal to govern CV's ownership. We held that B&M must be permitted exclusively to serve existing shippers and new shippers at existing facilities, but that this right was dependent on B&M's providing three day per week service. We also provided that the $75,000 payment cap for the trackage rights would not apply to B&M's traffic exceeding 125% of its 1985 traffic—a total of approximately 32,500 cars.

On September 9, 1988, the parties consummated the transactions. Amtrak paid $2,373,286 to B&M by certified check for the property interests in the Conn River Line ordered conveyed. B&M executed deeds and other instruments conveying the property to Amtrak, and Amtrak immediately conveyed these interests in the Conn River Line to CV. At the same time, B&M and CV entered into a temporary trackage rights agreement (Interim Agreement). CV claims that due to the press of time

---

[2] Under Amtrak's proposed agreement, B&M would have had the right to continue to serve exclusively all existing shippers on the Conn River Line at the time of the transaction and any new shippers that located at existing facilities along the line (provided B&M maintained a minimum three day per week service along the line), and the exclusive right to interchange traffic at Claremont Junction, NH, with the Claremont and Concord Railway (CCR). B&M could serve new shippers that located elsewhere on the line via reciprocal switching to be performed by CV at a rate of not more than 180% of the variable cost of providing such switching services. CV would have had the right to serve new shippers locating at other than existing facilities now served by B&M and would have had the right, along with B&M, to interchange traffic at Bellows Falls, VT, with the Green Mountain Railroad Corporation (GMRC).

The trackage rights agreement would have been for 20 years. However, if B&M defaulted on the agreement, CV would have had the right to terminate B&M's use of the line. Also, under the agreement, CV would have had the right to abandon its operations over the Conn River Line by giving B&M 90 days' notice. Finally, the agreement provided that B&M would pay compensation for these rights in the form of an annual maintenance fee capped at $75,000 unless B&M's annual gross tonnage on the line exceeded 125% of B&M's 1985 traffic (i.e., 26,072 carloads in 1985 according to B&M). This year was chosen as representative of B&M's future traffic levels, since traffic levels during 1986 and 1987 were depressed due to strikes and diversion of Canadian Pacific, Ltd. overhead traffic to its affiliate, the Delaware and Hudson Railway Company.

000038

AMTRACK—CONVEYANCE OF B&M IN CONN RIVER LINE IN VT & NH   541

to take possession and begin rehabilitation work on the line before the fall frost, it was forced to accept temporarily the trackage rights conditions suggested by B&M. CV's current petition is prompted by the parties' failure to reach a final trackage rights agreement satisfactory to it and by what it perceives as ambiguities in the principles we adopted.

In particular, CV requests that we: define with greater specificity the "shippers" and "facilities" B&M may serve exclusively; spell out the parties' rights to compete for all other business, including interchanges with connecting short lines; amend and specify more precisely B&M's per-car payments, as well as switching and interchange charges; amend and clarify the employee-discipline provisions; and add an arbitration provision.

B&M argues that certain terms proposed by CV are inconsistent with the stated assumptions underlying the Commission's valuation method adopted in *Amtrak, supra*. According to B&M, CV's proposed terms would require B&M to pay additional charges not contemplated by the Commission in *Amtrak, supra*. These additional charges allegedly have a present value exceeding $2 million and directly violate the $75,000 cap on B&M's annual payments. Nevertheless, B&M does not object to all of CV's proposed changes and also proposes two substantive changes to the Interim Agreement. First, B&M proposes to increase the payment cap in the first three years from $100,000 to $142,000, consistent with the figures the Commission used in Table II in *Amtrak, supra* at 793, 805 n. 20, in computing the going concern value (GCV) of the line. Second, while consenting to CV's approach to employee discipline, B&M proposes an added requirement that any exclusion of a B&M employee from the CV line be "for cause."

In addition to submissions from CV and B&M, we have received comments from the Claremont and Concord Railway (CCR)[3] supporting CV's proposal that we prescribe an interchange agreement at Claremont Junction (where CCR interchanges with B&M and CV). The Railway Labor Executives' Association (RLEA) and the United Transportation Union (UTU) filed comments on labor concerns.

## DISCUSSION AND CONCLUSIONS

Although both B&M and CV propose a number of changes to the Interim Agreement, they agree on many elements of it. We therefore will

---

[3] Its petition to intervene is granted.

use the Interim Agreement, as do the parties themselves,[4] as the starting point for establishing the final terms and conditions for these trackage rights. We discuss below the issues in the context of the related sections of the Interim Agreement and will impose the terms and conditions of the Interim Agreement as the final trackage rights agreement here, subject to the modifications and clarifications discussed.

1. *Lines Affected.* B&M and CV agree that the final trackage rights agreement should govern the entire line (*i.e.,* the former B&M line and the two adjoining CV lines) between East Northfield, MA, and White River Junction, VT. This is already set forth in section 1.1 of the Interim Agreement. In addition, CV proposes to clarify section 1.2 by specifying that B&M shall have "only" overhead running rights over the CV lines. As these terms are not in dispute, and section 1.2 does not disturb our prior findings, we will adopt them.

2. *Service to Shippers.* Consistent with *Amtrak, supra,* section 1.3 of the Interim Agreement sets forth B&M's exclusive right to serve all existing shippers and shippers' facilities located on the former B&M line as of the "conveyance date."[5] That right includes any and all new shippers that locate at existing facilities after the conveyance date, provided that B&M maintains a minimum three-day per week service. CV submits that the three-day per week standard is objective and workable. B&M does not object, but requests that, in lieu of the requirement that it "maintain" such service, we clarify that it must only "make available" three-day per week service along the line. Shippers may choose (or require) less than that level of service and B&M cannot control shippers' actual use of the line. B&M's requested revision is eminently reasonable as requiring B&M to run unused trains is inappropriate. We therefore will clarify that B&M is required only to "make available" the minimum service, but B&M must consult with the shippers and ensure their needs are met up to three-day per week service.

CV further requests that we clarify this section by defining with greater specificity that: (1) "existing shippers and shippers' facilities" shall

---

[4] Although CV has submitted a "proposed " agreement, that agreement consists essentially of the Interim Agreement with CV's proposed changes incorporated. Similarly, B&M has included with its filing a "proposed" agreement consisting of the Interim Agreement as amended to reflect its proposed changes.

[5] The conveyance date is defined in the Interim Agreement at section 1.3 as being September 10, 1988. However, without explanation, both B&M and CV define the conveyance date as September 9, 1988, in section 0.5 of their proposed final agreements. Since the conveyances all appear to have occurred on September 9, 1988, we will use that date in the final terms and conditions we are imposing here.

000040

AMTRACK—CONVEYANCE OF B&M IN CONN RIVER LINE IN VT & NH    543

mean industries and facilities at rail sidings which received or tendered rail
shipments during the 12 months immediately prior to the conveyance; (2)
"three-day per week service" shall mean the provision of local set-off and
pick-up service to shippers on the former B&M line at least three times per
week (Monday through the following Sunday) in each direction; and (3) CV
shall be permitted to commence service to existing shippers and shippers'
facilities upon B&M's failure to provide three-day per week service during
two weeks out of any four-week period, unless such failure is excused by
section 9.6 (force majeure).  Since B&M states no objection to these
specifications and they reasonably implement our prior decision, we will
impose the terms and conditions of section 1.3 as requested by CV, but
modified to reflect that B&M is required only to "make available" three-
day per week service.

CV also requests that section 1.4 set forth that CV and B&M each
have the right to compete for and serve: (1) shippers and shippers' facilities
located on the former B&M line which have not received or tendered rail
shipments during the 12 months immediately prior to the conveyance date;
(2) any other new shippers; and (3) any existing shippers and shippers'
facilities to which B&M does not provide a minimum three-day per week
service as specified in section 1.3.[6]  B&M states no objection.  We recognize
CV's right to offer service to new, or previously moribund, industries as
well as those existing industries not receiving the minimum service from
B&M, as minimum service is clarified in our discussion of section 1.3
above.  Therefore, we will impose these terms in section 1.4 as requested
by CV, subject to our clarification of minimum service requirements.

3.  *Switching and Interchanges.*  Section 1.4 of the Interim Agreement
also stipulates that CV shall, upon request by B&M, provide reciprocal
switching to permit B&M to serve those shippers and shippers' facilities
defined in that section.  CV requests that the section be amended to specify
that CV will not be required to switch cars for B&M at those shippers'
facilities CV serves because of B&M's failure to provide minimum service.
If B&M does not make available three-day per week service, then B&M
loses the right to provide exclusive service and will then be subjected to
competition from CV.  Of course, B&M retains the right to provide service
to those shippers directly.  Because, under these circumstances, both

---

[6]  CV also notes that its Memorandum of Understanding with the State of Vermont,
paragraph 3(g), filed May 16, 1988, in *Amtrak, supra,* requires that CV accept all traffic on
the line if B&M's service falls below such level.  In light of our clarification that B&M need
not provide three-day per week service if shippers have not so requested, proof of
compliance or noncompliance with this condition will depend on shipper evidence.

000041

544          INTERSTATE COMMERCE COMMISSION REPORTS

carriers will be able to serve the shippers directly, there would be no point in imposing reciprocal switching. Thus, we consider this amendment appropriate.

This section also provides that B&M shall pay to CV a per switch charge equal to the actual cost of providing that service, not to exceed 180% of CV's variable cost. As part of its proposed clarifications, CV further proposes that the variable cost shall be computed using formulas generally used or accepted in ICC proceedings. B&M did not comment on this issue. We consider this clarification reasonable and will incorporate CV's clarification of the per switch charge agreed to by these parties as part of section 1.4.

Section 1.5 of the Interim Agreement stipulates that CV and B&M shall each have the right to compete for and to interchange traffic at Bellows Falls, VT, with the Green Mountain Railroad Corporation (GMRC) (or its successors and assigns). But the Interim Agreement gives B&M the exclusive right to interchange traffic at Claremont Junction, NH, with the CCR (or its successors and assigns) and at Charlestown, NH, with the Springfield Terminal Railway Company (ST) (or its successors and assigns).

CV states that interchange with CCR was not sought during the *Amtrak* proceeding because CCR's former owner had ceased operations due to B&M-related problems. According to CV, neither it nor Amtrak deemed it appropriate to compensate B&M for possible future CCR traffic theoretically available to CV when that traffic had disappeared due to B&M's own actions. CV now requests the right to compete for and to interchange traffic at Claremont Junction with the CCR. It contends that such joint interchange would be fair because CCR's resumed operation is directly attributable to CV's post-conveyance investment in upgrading the line. CCR supports CV's proposal and submits that interchange with both B&M and CV is essential for it to maintain its present level of freight traffic and to have an opportunity to develop business.

B&M states that, although the transaction required by the Commission did not include a joint interchange with the CCR, it is willing to accept a joint interchange with the CCR through reciprocal switching. In reply, CCR observes that CV's tracks directly connect with CCR's tracks at Claremont Junction thereby eliminating any physical need for B&M to provide reciprocal switching in order for CV to participate in this service. CV observes that CCR's cars are equally accessible to CV and B&M and that there are no industries on the CCR that B&M serves exclusively so as to require reciprocal switching.

000042

AMTRACK—CONVEYANCE OF B&M IN CONN RIVER LINE IN VT & NH   545

We will impose the undisputed terms of section 1.5[7] that give CV and B&M each the right to compete for and to interchange traffic at Bellows Falls, VT, with the GMRC (or its successors and assigns) and give B&M the exclusive right to interchange traffic at Charlestown, NH, with the ST (or its successors and assigns). These terms are undisputed. Also in view of B&M's lack of opposition, we will impose the modified terms proposed by CV for section 1.5 to give CV and B&M each the right to compete for and to interchange traffic at Claremont Junction with the CCR (or its successors and assigns). Because CCR and CV have shown that reciprocal switching is neither necessary nor would even make sense here, we will not require it. Allowing CV to participate in this traffic will not place B&M in a worse position than it was in before the transaction when the CCR was moribund. Rather, B&M will benefit through this new traffic.

*ST interchange w/ CCR — no recip. switch*

4.  *Term and Termination.* Section 2.1 of the Interim Agreement states that the agreement shall commence retroactively as of 7 a.m. Eastern Time, on the conveyance date. As the parties do not dispute this term, we will incorporate it.

Both parties seek to revise section 2.2 of the Interim Agreement. B&M proposes that, except as provided in section 2.3, the term will be perpetual, but that after 20 years either party may seek modifications from the other. If satisfactory modifications are not agreed to after a reasonable period for negotiation, either may apply to the Commission for modifications. B&M would also add that nothing in this section authorizes the Commission to impose arbitration requirements. CV first proposed an initial 20-year term with automatic renewal thereafter from year to year, unless terminated by either party on 90-days' notice. On reply, however, CV accepts B&M's proposal for a perpetual agreement with the right to renegotiate or seek imposition of a new agreement by the Commission, after 20 years. We will therefore impose the terms of B&M's proposed section 2.2 as agreed to by CV. Furthermore, in view of our finding not to impose involuntary arbitration, discussed *infra*, we will include B&M's arbitration restriction.

*term*

Section 2.3 of the Interim Agreement provides, in effect, that, notwithstanding section 2.2, B&M may terminate the agreement immediately upon notice to CV. CV does not object, but adds the following preface: "If B&M ceases rail operations over the line * * *." This change is unnecessary because if B&M does not wish to continue its

---

[7] Also, because no party disputes sections 1.6, 1.7, and 1.8 of the Interim Agreement, we will adopt those provisions.

prior service it may terminate the agreement subject, of course, to Commission approval.

Consistent with section 2.4 of the Interim Agreement, the parties agree that, if B&M wins its appeal of the August 9th decision in *Amtrak, supra*, and the former B&M line is reconveyed to B&M as a result of the appeal, this agreement shall terminate upon the reconveyance. The parties further agree that afterwards the terms and conditions of the April 1, 1985 and January 1, 1930 Trackage Rights Agreement will govern their operations over and use of the line, and those agreements will be deemed re-executed in their current form.

CV requests that we add to section 2.4 the proviso that the prior agreements be deemed amended to include a covenant that the owner shall maintain its line at not less than FRA Class II condition. CV cites no authority for us to impose such a maintenance requirement or to amend those agreements. We do not think it would be appropriate to do so on this record.

5. *Maintenance and Compensation.* Section 3.1 of the Interim Agreement provides that "B&M shall have no obligation to pay for or contribute in any way towards the cost of such upgrading of the Former B&M Line." CV requests that section 3.1 be clarified to specify that "such upgrading" refers to the initial upgrading work on the former B&M line to FRA Class III standards as specified by the Rehabilitation Agreement between CV and Amtrak dated March 18, 1989. Essentially, CV is requesting this clarification to make section 3.1 consistent with the additional responsibilities for future capital projects it is proposing for B&M under new sections 3.8 and 3.9 of its proposed final agreement. But as discussed *infra*, we are not imposing on B&M any future responsibilities and costs not provided by the Interim Agreement other than to require B&M to share in the cost of capital improvements that may become necessary due to unusual unforeseen circumstances such as changes in regulations or natural disasters. Thus, we will impose the terms of section 3.1 of the Interim Agreement, subject to this caveat.

Section 3.2 of the Interim Agreement stipulates that, except as provided in section 1.7, CV shall be solely responsible for dispatching all operations over the line and for the maintenance and repair of the line, including the signals and the signal and dispatching system. This section also stipulates that CV shall keep the line in a state of reasonable repair corresponding to the FRA Track Standard for the applicable authorized speeds. (CV may maintain the line at a higher level than FRA Class III.) CV proposes to specify here that it shall keep the line in not less than FRA Class II condition. Since we based our calculations in *Amtrak* on the cost

000044

of upgrading and maintaining the line at FRA Class II standards, and since CV has proposed this standard for itself, we find it appropriate to include.

Section 3.3 of the Interim Agreement establishes trackage rights payment caps for B&M of $100,000 for each of the first three years of operation and $75,000 for each year thereafter. B&M proposes a cap of $142,000 for each of the first three years. CV argues that there is no basis in *Amtrak, supra,* for any payment cap before year 4 and that no cap should be imposed. B&M has based its proposed cap for years 1-3 on approximately the same dollar amounts that we used in *Amtrak, supra,* for those years in calculating compensation for Amtrak's taking of the line. *Amtrak, supra,* at 793 (Table II) and 805, n.20.

We disagree with CV. Payment caps are appropriate for years 1-3 of operation for the same reason we imposed a payment cap following the third year. We used Amtrak's projections for years 1-3, as well as its figure of $75,000 per year for subsequent years, as part of our determining just compensation for the line.[8] Thus, we will impose a cap of $142,000 for each of the first 3 years of operation.

   a.   *Car-mile payments.*  Section 3.3 also sets forth the car-mile trackage rights payments. Under the Interim Agreement, B&M is obliged to pay CV 19¢ per car mile (whether loaded or empty), subject to certain conditions, payment caps, and semi-annual adjustments (section 3.4).

CV contends that rate should not be adopted. According to CV, the terms of the Interim Agreement do not reflect arms-length bargaining, but rather only its attempt to avoid dispute and delay in taking possession and beginning rehabilitation of the line. CV contends that its 1985 agreement with B&M reflects the most recent comparable arms-length bargaining between the parties. It proposes that B&M pay it a basic rate of 21¢ per car mile to reflect both their 1985 agreement and the passage of time. B&M favors the Interim Agreement rate and inflation adjustment system. It notes that the current rate under the 1985 agreement is 20.1¢ and argues that CV presents no justification to round the figure up to 21¢.

We will impose, as a starting rate, 20.1¢ per car mile subject to price level adjustments, discussed *infra,* under section 3.4. Both CV and B&M freely agreed to a rate of 20.1¢ per car mile in their 1985 trackage rights

_____

[8]  In *Amtrak,* as discussed *supra,* we imposed a $75,000 cap beginning in year 4 to restrict Amtrak to certain terms and conditions that it originally proposed. Because Amtrak's proposal did not set terms for a cap in years 1-3, we made no restriction at that time and allowed parties to negotiate those terms. However, since parties are unable to negotiate their own terms, we will establish here the appropriate cap for years 1-3.

cap of 14¢
in years 1-

mileage
payment
20.1¢/mi

000045

agreement. Thus, it better represents comparable, arms-length rates between the parties.

Section 3.5 of the Interim Agreement stipulates that B&M will pay directly to the owner of the cars all mileage, car hire and other charges accruing on cars in B&M's trains on the line. As these terms are not disputed and are reasonable, we will incorporate them.

b. *Excess traffic.* Section 3.3 of the Interim Agreement contains a limit to the applicability of the payment caps. If the annual gross traffic volume on the former B&M line attributable to B&M's overhead or local service, including traffic for interchange to GMRC, CCR, or ST, exceeds 32,500 carloads (125% of B&M's 1985 traffic level), the caps do not apply to those cars in excess of the 32,500 ceiling. For cars exceeding that number, B&M must pay the full per car mile rate.

CV interprets the Commission's decision in *Amtrak, supra,* as holding that the $75,000 cap[9] on annual payments does *not* apply to *any* of B&M's traffic on the line once its traffic exceeds the threshold of 32,500 carloads for that year. CV argues that, once the ceiling is exceeded, the assumptions justifying a payment cap will have disappeared and B&M will have benefitted from CV's ownership and upgrading of the line in ways not anticipated in the Commission's valuation. According to CV, this provision will ensure that B&M pays CV in full for its increased use of the line and that CV will not be forced to subsidize B&M traffic.

B&M disagrees. It argues that the Commission based its compensation calculation in *Amtrak, supra,* on the payment caps and therefore should not permit the complete removal of the cap in any given year in which its traffic exceeded the 32,500 car ceiling.

We agree with B&M that CV's proposal is contrary to our intent in developing the GCV and could result in charges significantly higher than the caps contained in our prior decision. As part of the quid pro quo in the forced divestiture ordered in *Amtrak, supra,* the Commission granted B&M continued access over this line along with a payment cap. Applying the per car-mile charge across-the-board to all B&M traffic once its traffic exceeds the 32,500 carload level in a given year would deprive B&M of part of the value it received in the forced sale and render our GCV analysis invalid. We therefore reject these terms in CV's proposed section 3.3 and clarify instead that the payment cap applies to the first 32,500 carloads of traffic per year regardless of whether B&M moves a greater or lesser amount of

---

[9] As previously discussed, the cap is $142,000 for years 1-3.

AMTRACK—CONVEYANCE OF B&M IN CONN RIVER LINE IN VT & NH   549

traffic in that year. When the traffic threshold is exceeded in a given year, the charge per car mile may be applied to traffic exceeding 32,500 carloads.

CV also proposes amending section 3.3 to specify that B&M shall pay to CV per car mile charges not just for loaded and empty freight cars, but also for locomotives, cabooses and work equipment operated by B&M (or its assignee). B&M states no objection to CV's proposed inclusion of locomotives, cabooses and work equipment in this section nor to CV's inclusion of B&M's assignees. We agree it is appropriate to apply the car mile charge to the types of equipment proposed by CV if they are operated by B&M over the line. We are also imposing CV's proposed section 9.8 which includes B&M's assignee traffic in determining whether the number of carloads attributable to B&M's operations exceeds the carload ceiling in section 3.3, as discussed *infra*. We therefore find it appropriate to amend section 3.3 with these terms. However, the traffic ceiling is tied to carload traffic. Thus, we will add the caveat that locomotives, cabooses and work equipment may not be included in determining whether the 32,500 carload ceiling has been exceeded in a given year.

CV proposes to add a new section 3.6 setting forth procedures for billing and payment of the amounts due under the agreement. In support, CV cites past examples of its difficulties in obtaining money allegedly owed it by B&M. In response, B&M disputes CV's examples and states that the proposed payment provisions are unwarranted. We find CV's proposed procedures, based on its current billing procedures, to be reasonable, and we will impose them.

CV also proposes to add a new section 3.7 to set forth billing and payment procedures both before and after B&M's traffic exceeds the ceiling. As we already have rejected CV's proposed removal of the cap for prior traffic once the ceiling has been exceeded, we reject CV's proposed new section 3.7 reflecting that methodology. However, we will include as part of section 3.6 the language proposed by CV that B&M not be required to pay mileage charges attributable to its operations over the former B&M line once payments made in the preceding months of that year with respect to those operations equal the payment cap as adjusted in accordance with section 3.4 for that year, since that language is consistent with our decision in *Amtrak*. Additionally, we will include language that this limitation exists until traffic attributable to B&M's operations over the former B&M line exceed 32,500 carloads for that year. In this fashion, the payment procedures will properly take into account the payment caps and traffic ceiling.

c.   *Inflation.*   Under section 3.4 of the Interim Agreement, all payments (other than the caps set forth in section 3.3) are adjusted semi-

550       INTERSTATE COMMERCE COMMISSION REPORTS

annually for price level changes. The adjustments are based on the relationship of the most recent quarter's Association of American Railroads (AAR) Eastern District, Quarterly Indices of Chargeout Prices and Wage Rates (Table C) to the comparable indices of the quarter 6 months previous.

CV proposes that all of B&M's payments, including switching charges, car-mile payments, *and any payment caps*, be adjusted semi-annually to reflect changes in the AAR indices. CV observes that the $75,000 figure for the cap ordered in *Amtrak, supra,* is derived from Table II in that decision, which notes that the "[f]igures are from Amtrak." *Id.* at 793. According to CV, the trackage rights proposed for B&M by Amtrak always included an inflation adjustment for the payments *and* the payment cap virtually identical to that now proposed by CV. Submitting that Amtrak's evidence originally explained that the $75,000 figure was "expressed in real 1988 dollars, that is, in dollars of the same purchasing power as the dollar had in 1988,"[10] CV argues that maintenance of the "same purchasing power" for the cap requires an inflation adjustment.

B&M opposes making the annual caps subject to any inflation adjustment. B&M contends that any increase beyond the applicable cap would render inadequate the level of GCV approved by the Commission.

We disagree with B&M's assertion that any change to the $75,000 cap would be inconsistent with *Amtrak, supra.* Rather, we find that inflation adjustments are reasonable and fully consistent with the compensation calculated in *Amtrak, supra.* We developed the compensation in *Amtrak, supra,* based on static revenues and expenses. Therefore, our calculation contained no provision in the net present value of either revenues or expenses to account for any price level changes, despite the obvious merit in doing so. We therefore agree with CV that B&M's per car-mile fees (including the annual payment caps) should be adjusted, and doing so semi-annually is reasonable. Both expenses *and* revenues will change over time as a result of inflation for expenses and the Rail Cost Adjustment Factor (RCAF)—specifically the RCAF-Adjusted index—for revenues. Moreover, B&M will have the opportunity to increase its rates to shippers as its costs rise. Thus, it may not be adversely affected by paying higher per-mile charges. We therefore will impose terms providing for inflationary increases on all payments as CV proposes in its new section 3.4.

d.   *Future capital payments.*   CV proposes to add a section 3.8 requiring that beginning in year 6 B&M must pay to CV a proportionate

---

[10]   *See* Joint Verified Statement of Robert L. Banks and Charles H. Banks, April 1, 1988, at 47.

6 I.C.C.2d

000048

share, based on B&M's percentage of total traffic on the line, of the costs of capital projects required to preserve the line at FRA Class II condition. CV also proposes to add a section 3.9 requiring B&M to contribute to the cost of capital improvements that may be required by law, regulation, or catastrophe. CV asserts that the deferral of the general capital contribution requirement for the first five years assures that B&M will pay for none of the initial upgrading (which CV recognizes to be its own responsibility), while mandating a reasonable sharing of costs for shared facilities.

CV argues that its proposal is not a disguised maintenance charge outside the applicable payment cap. Rather, it constitutes an interest-rental charge for B&M's long-term use of CV's depreciating capital assets. Although CV admits that Amtrak did not include this charge in its original trackage rights proposal, it argues that, because the Commission ultimately set just compensation far in excess of Amtrak's calculations, CV is not now bound by the restrictive trackage rights terms Amtrak originally proposed. Submitting that Amtrak never sought *permanently* to preclude an interest-rental charge and the Commission *has* included an interest-rental charge in other imposed trackage rights agreements, CV argues that such a charge should be included here. CV concludes that CV must be able to earn a long-term return on its capital investment, and an interest-rental component on capital is the most reasonable solution.

B&M responds that not only was such a charge not reflected in the original trackage rights proposal, but CV cannot reconcile its position with its prior representations to the Commission that no interest-rental charges would be sought or assessed.[11] Because the Commission accepted and relied upon these representations in *Amtrak, supra,* B&M argues that CV cannot now claim that the $75,000 cap is merely a starting point and impose additional charges for trackage rights on the theory that, from an accounting standpoint, certain maintenance-related costs are arguably "capital projects" rather than "maintenance expenses." Moreover, B&M calculates that this departure from the $75,000 cap would produce added

---

[11] B&M observes that the Amtrak/CV trackage rights proposal of April 4, 1988, expressly provided that "B&M shall not be required to pay any rental or interest payments to CV for [B&M's] use of and operation over the Line * * *." Verified Statement of James L. Larson.

Also, it notes that the rebuttal documentation of Amtrak/CV stated that "as a result of this proceeding, Amtrak (or its successor) will incur costs for which it will receive either partial compensation or none at all * * *. Amtrak (or its successor) will not be compensated *to any extent in any year* for interest rental * * *. Stated differently, there are ownership costs currently incurred by B&M which, in the future, will be incurred by Amtrak (or its successor)." Rebuttal Joint Verified Statement of Robert L. Banks and Charles H. Banks, at 4 (July 13, 1988) (emphasis in original).

000049

552          INTERSTATE COMMERCE COMMISSION REPORTS

payments by B&M with a present value exceeding $485,000.[12] It argues that, if Amtrak/CV had intended to recover maintenance-related capital costs as a separate item, their proposed compensation for B&M should have been increased by more than $485,000. Finally, B&M rejects CV's attempt to justify its proposed departure from the $75,000 figure by arguing that the Commission's award of just compensation was excessive and that Amtrak would not have offered a $75,000 cap had it known what the Commission ultimately would award as compensation. B&M contends that CV's argument fails for two reasons: (1) the appropriate place for CV to challenge the Commission's award in *Amtrak, supra,* is in CV's pending appeal of that decision; and (2) if CV thought the award excessive, CV could have exercised its option not to take the former B&M line.

CV may not allocate additional costs of routine maintenance to B&M. The annual caps that we established in *Amtrak* include the cost of upgrading and maintaining this line at FRA Class II standards. Not only did we use Amtrak's figures for upgrading the line to FRA Class II standards as the basis for developing the higher $142,000 caps for years 1 through 3, we also used Amtrak's normalized maintenance costs for maintaining the line at FRA Class II standards as the basis for developing the $75,000 annual cap for years 4 through 20.[13] Furthermore, the GCV that we developed precluded any additional interest-rental payment. Our determination that the line was worth more than Amtrak's original estimate is no rationale for imposing CV's proposed interest-rental charges. We therefore will reject CV's proposed section 3.8.

We agree with CV, however, that B&M should share in those costs associated with unforeseen circumstances such as changes in regulation or natural disasters. These costs cannot be predetermined and were not included in our development of the GCV of the line. B&M would have had to incur these costs even if it had not sold the line. We therefore will

---

[12] B&M used the Commission's projected 46%/54% allocation of traffic between B&M and CV, respectively, *Amtrak, supra,* at 793, Table II, n.1, to calculate its share of the proposed capital costs in any given year to be ($211,935 X .46) = $97,491. The present value of $97,491 in year 6 is ($97,491)/(1.116)⁶ = $50,513. The present value of a perpetual stream of $97,491 in years 7 and beyond is ($50,513/.116) = $435,456. $50,513 + $435,456 = $485,969.

[13] Amtrak estimated that B&M would incur maintenance expenses of $536,000 per year. CV argues that the Commission adopted instead a $400,000 per year cost savings figure that represented the lower annual cost Amtrak predicted to maintain the line after the major capital infusion of over $3 million. We note that the $136,000 difference would affect the GCV, not the $75,000 payment cap set for the trackage rights.

AMTRACK—CONVEYANCE OF B&M IN CONN RIVER LINE IN VT & NH    553

impose the terms set forth in CV's proposed section 3.9 to the extent described above.[14]

Sections 4.1 and 4.2 of the Interim Agreement provide for full payment by a party if it desires any new connections or capital improvements on the line. As these terms are not disputed, we will impose them.

6. *Employee discipline.* Section 5.3 stipulates that CV operating rules will govern all operations over the line, and CV will report to B&M any incidents of violations of those rules by B&M employees. In lieu of the interim procedures set forth in section 5.3, both parties agree that CV may, at its option, and for good cause shown, exclude such employees from the line. CV interprets revised section 5.3 as requiring that it must state good, safety-related reasons for excluding an employee and that B&M has no authority to delay any such exclusion. B&M submits that it should have the right to question CV's determination. It advocates that whether it can delay an employee's exclusion should depend upon the individual case and the decision of a neutral decision-maker. B&M further states that it intends to abide by the provisions of labor agreements to which it is a party.

Although both B&M and CV approve of the revised section 5.3 regarding employee discipline, as understood by both of them, RLEA and UTU object to the provision. The unions assert that the Commission may not allow CV to intrude into the contractual relationship between B&M and B&M's employees without complying with the notice and negotiation processes of the Rail Labor Act. RLEA and UTU argue that B&M has not obtained agreement from its employees that permits a delegation of disciplinary power. They further argue that CV, using B&M as its agent for administering the exclusion order, will be able to deprive any B&M employee of a work opportunity otherwise provided for under that employee's contract with B&M because B&M has no option but to obey the order and remove the designated employee from service. Thus, they argue CV will be involved in the *de facto* discipline of B&M employees regardless of whether CV directly excludes the employee or CV orders B&M to deny the employee the opportunity to work on the line pursuant to the terms of the trackage rights agreement.

CV argues that revised section 5.3 only gives it the right to tell B&M which of its employees may not work on CV's property because they have violated safety rules. It further argues that the trackage rights agreement

_____

[14] In addition, we note that CV also refers in that section to the mandatory arbitration provision it proposes to add as section 9.9. Since we reject involuntary arbitration and decline to adopt section 9.9, as discussed *supra*, we will delete CV's proposed reference.

*[handwritten margin note: each party pays for its own improvements]*

000051

554          INTERSTATE COMMERCE COMMISSION REPORTS

would be only between CV and B&M, and CV would not be a party to the employer/employee relationship between B&M and its workers.

As CV observes, new section 5.3 would have no effect on an employee's right to grievance procedures under the collective bargaining agreement between B&M and the employee's union.[15] Contrary to the RLEA and UTU argument, the section would not grant CV unilateral power to discipline B&M employees. B&M has taken a strong interest in protecting the rights of its employees, and we conclude that B&M will not act passively as CV's agent. We therefore find that the employees' collective bargaining agreements and their contractual relationships with B&M will remain intact under new section 5.3. We will therefore impose the terms of new section 5.3 as proposed by both parties.

7. *Operation of the line.* Generally, sections 5.1 through 7.9 of the Interim Agreement set forth procedures concerning dispatching, rule applicability, clearing of wrecks, liability indemnification, and other matters pertaining to the operation of the line. According to CV, most of the provisions in its proposal covering sections 5.1 through 7.9 have been taken directly from the Interim Agreement to which B&M has already agreed. CV notes that prior negotiations have indicated that the main disputed provision is section 5.3, discussed above. B&M has not raised specific objections to any other revision proposed in these sections. With the exception noted below, we will impose the terms of sections 5.1 through 7.9 as CV proposes.

In section 5.1, CV proposes that instead of 30-days' notice each party shall use reasonable efforts to provide five-days' notice of changes in its traffic and operating patterns and procedures that may affect the line. B&M states no objection to this change. We find that five-days' notice is sufficient and will facilitate changes deemed necessary by either party. We therefore will impose CV's proposed revision.

Also in this section, contrary to B&M's proposal, CV proposes to remove the provision that "CV agrees to coordinate with B&M and to use its best efforts in scheduling the work required for the upgrading of the former B&M line and any future maintenance or repair of the line to minimize any interference with or disruption of B&M's operations over the Line." Although this provision relates to the initial upgrading work that has now been completed, it also relates to future maintenance or repair. We therefore will retain this provision as proposed by B&M.

---

[15] CV also asserts its willingness to indemnify B&M for any costs of wrongful exclusion imposed on B&M in a grievance proceeding in which CV has had the opportunity to explain the basis for its action to exclude that employee.

6 I.C.C.2d

000052

AMTRACK–CONVEYANCE OF B&M IN CONN RIVER LINE IN VT & NH   555

In section 5.2, CV proposes to remove the obsolete reference that "CV agrees to provide, for a period not to exceed 14 days at CV's sole cost and expense, pilot crews as may be necessary, during the initial training of B&M operating personnel as to CV's operating rules to accommodate any and all B&M trains operating over the Line." Since this provision is no longer in effect, we will revise the terms of section 5.2 as CV proposes.

In section 5.4, CV proposes to replace the reference to the "Standard Code, as amended, adopted by the AAR" and instead specify that the Uniform Code of Operating Rules, as amended, shall govern disputes arising as to the interpretation of any operating rules. B&M states no objection. This change merely specifies the governing rules with more accuracy. We will revise the terms of section 5.4 accordingly.

In section 6.1, CV proposes to replace the specific reference to sections 7.1 and 7.2 with a broad reference to its proposed revised section 7. B&M states no objection. Since we are imposing CV's proposed revised section 7, *infra*, the specific reference here to sections 7.1 and 7.2 is moot. We therefore will revise section 6.1 as CV proposes.

Section 6 sets forth provisions for clearing derailments and wrecks. It provides that, if B&M does not clear the line for the passage of trains within a reasonable time, CV may do so, and B&M shall reimburse CV for all reasonable costs CV incurs. Here, CV proposes also to apply this provision when B&M does not begin rerailing operations for passage of trains over the line within 12 hours of an occurrence. B&M states no objection, and we find that CV's proposal will provide reasonable time to begin rerailing operations, if not by B&M, then by CV. We will revise section 6.1 as CV proposes.

CV proposes a revised section 7 to address release and indemnification in greater detail than the Interim Agreement. B&M states no objection. Because we find the revisions will not change the essence of section 7, we will impose as terms sections 7.1 through 7.6 as proposed by CV.

8. *Default and sanctions for delinquent payments.* Section 8.1 of the Interim Agreement provides that, if a material breach by B&M of the agreement continues for a period of 45 days after notice from CV, CV shall have the right to terminate the agreement upon 90-days' notice.[16] As these terms are not disputed and are reasonable, we will impose them.

---

[16] Of course, the Commission reserves the right to impose a new agreement for the trackage rights if it finds it is in the public interest to do so. *See Thompson v. Texas-Mexican Railway Co.*, 328 U.S. 134 (1946).

000053

CV proposes to add section 8.2 to encourage prompt payment by B&M. CV requests specifically that: (1) if B&M becomes delinquent in payment of any amount by more than 14 days under the terms of section 3.6, CV shall be entitled to receive advance payment from B&M for each B&M train seeking access to the line until B&M satisfies the delinquency in full; (2) if B&M fails to tender the advance payment, CV shall be further entitled to eject B&M from the line until B&M satisfies such delinquency in full; (3) CV shall be entitled to remedies for delinquencies in any amount billed to B&M, even if B&M has disputed the billed amount by invoking arbitration or otherwise; and (4) during the pendency of any such exclusion or ejectment, CV shall nevertheless accept B&M cars for interchange at any point on the line. CV claims that it has experienced difficulties collecting a number of payments owed by B&M. In reply, B&M denies that it is in arrears.

Here, we find it irrelevant whether B&M is or has been in arrears. CV is entitled to receive payments due to it and therefore is entitled to protection against delinquent payments. If the parties dispute a billed amount, however, we emphasize that CV should not have a license to stop interchanging B&M traffic. CV may require advance payment only. Accordingly, we will impose the terms of the proposed section 8.2 only to the extent described here.

*CV can require advance pmnt (but not eject B&M interchng traffic).*

9. *General Provisions.* Both parties have added a section of definitions (section 0) to the Interim Agreement for the proposed final agreements. As these terms are not in dispute, are reasonable, and are essentially the same, we will impose the definitions as proposed by B&M. Sections 9.1 through 9.8 of the Interim Agreement set forth general provisions agreed to by the parties. With the revisions indicated below, we will impose as terms of the final trackage rights agreement these sections of the Interim Agreement.

In section 9.2, CV proposes to add that, in addition to hand delivery, first class mail, Federal Express, or telegram, written notices also may be sent by telefax/registered or certified mail, return receipt requested. In light of the wide-spread availability of the telefax process, we will impose section 9.2 as CV proposes.

*fax notice*

CV proposes to add section 9.3.1 to the exceptions in section 9.3 which terminate the 1930 and 1965 trackage rights agreements between B&M and CV. Section 9.3.1 provides that Section 8, Freight Haulage, of the January 1, 1930 Trackage Rights Agreement between CV and B&M, as amended from time to time, shall remain in effect until cancelled by either party upon 90-days' prior written notice to the other. Since CV's proposed section 9.3.1 will not otherwise affect the terms of this trackage rights

agreement and B&M does not identify any specific objection to it, we will impose the revisions as CV requests.

In section 9.4, CV proposes to remove the first provision that this agreement "may be executed in any number of counterparts, each of which when executed by both parties to this agreement shall be deemed to be an original, and all of which counterparts together shall constitute one and the same instrument." Again, B&M has not objected to this revision. We will impose the revised section 9.4 as CV proposes.

In section 9.5, CV proposes to add a reference to the mandatory arbitration provision it proposes to add as section 9.9. Since we decline to adopt section 9.9, as discussed *infra*, we reject CV's proposed reference here.

In section 9.6, CV proposes to add "derailments" to the list under force majeure. Absent objection from B&M, we will impose CV's addition to section 9.6 as requested.

In section 9.7, CV proposes to add a reference to section 9.3.1 that those trains, locomotives, cars and equipment owned or leased by one party and in the possession or account of, or under the control of the other party, shall be considered those of the other party, except where the cars or equipment are being transported under the Haulage Agreement referred to in section 9.3.1 of this agreement. Since we are imposing section 9.3.1 as a term of this agreement, we will impose CV's proposed reference here.

In section 9.8, CV proposes to clarify that, if B&M assigns all or part of its interests in this agreement, the number of carloads attributable to the assignee's operations over the line shall be included in the number of cars attributable to B&M's operations for the purposes of section 3.3 of this agreement. B&M has a right to transport a given amount of traffic over its former line under the payment cap, and it may not increase this traffic ceiling by selling part of its system or otherwise through any form of assignment. B&M states no objection to CV's proposed section 9.8. We find it reasonable, and we will impose it.

10. *Arbitration.*   CV proposes to add section 9.9 setting forth procedures for appointment of an arbitrator and requiring all disputes under the trackage rights agreement to be submitted to binding arbitration. CV argues that policy favors arbitration and requiring the parties to arbitrate trackage rights disputes is a reasonable condition.

B&M argues that the Commission should not—and may not—impose non-labor arbitration requirements over B&M's objection. B&M states that it does not wish to refer disputes under this trackage rights agreement to arbitration. B&M asserts that a prerequisite of arbitration in any federal context is voluntariness; the right and duty to arbitrate disputes is a matter

558          INTERSTATE COMMERCE COMMISSION REPORTS

of purely contractual agreement among the parties. B&M emphasizes that, indeed, it is not even a voluntary party to this proceeding. It further asserts that CV offers no authority nor is there any such authority allowing the Commission to impose arbitration provisions outside the limited sphere of employee protection. Because the parties themselves are not in agreement as to the desirability of referring disputes arising under the trackage rights agreement to arbitration, we decline to impose such a requirement. We disagree with B&M, however, that our authority to impose arbitration as a condition upon agreements imposed by us because of the inability of the parties to agree is limited to labor conditions. We will reject CV's proposed section 9.9. Disputes may be referred to us for resolution. This is appropriate, as the operations will be conducted pursuant to our decision in *Amtrak, supra*, and this follow-up decision.

11. *Governing Law*. CV proposes to add a new section 9.10 setting forth that this Agreement shall be governed by the laws of the District of Columbia. It is appropriate for an agreement to set forth the governing law. As B&M states no objection to CV's proposal, we will impose it.

12. *Other issues*. CV requests that we order B&M to turn over all Conn River Line bridge plans and signal circuitry diagrams in B&M's possession to CV immediately. CV argues that it owns all diagrams and plans relating to the line and should not have to pay reproduction costs. We will grant CV's request. CV owns the line and it should have these plans and diagrams so that it can exercise its ownership rights responsibly. B&M may keep copies at it own expense, but must tender all bridge plans and signal circuitry diagrams to CV immediately.[17]

CV also argues that B&M should compensate CV for the labor and replacement expenses it incurred last winter due to B&M's failure to convey the original switch heaters to CV. B&M argues that its evidence (Verified Statement of Mr. Cary) shows that a message regarding the delivery of the heaters to Brattleboro was left at the office of CV's Mr. Bagby in October 1988. However, CV argues that B&M did not tell any responsible employee at CV the location of the switch heaters until the Spring of 1989. We find that B&M satisfied its duty. The record shows that B&M gave adequate notification of the whereabouts of these heaters. B&M is not responsible for the failure of communication among CV's employees. We therefore deny CV's request.

---

[17] We note that B&M initially argued that it should be indemnified by CV with regard to any claims involving these plans. CV has indicated that it remains open to settlement discussions on this point and may have already initiated discussions on that topic.

000050

AMTRACK—CONVEYANCE OF B&M IN CONN RIVER LINE IN VT & NH    559

This action will not significantly affect either the quality of the human environment or the conservation of energy resources.

*It is ordered*:

1. CV's petition for the imposition of terms and conditions for trackage rights to B&M and for other relief is granted to the extent discussed above.

2. CCR's petition to intervene is granted.

3. The trackage rights agreement is imposed as described in this decision and set forth in the attached Appendix and will be effective as provided in this decision when this decision becomes effective.

4. This decision is effective March 14, 1990.

By the Commission, Chairman Gradison, Vice Chairman Phillips, Commissioners Simmons, Lamboley, and Emmett. Vice Chairman Phillips did not participate in the disposition of these consolidated proceedings.

Noreta R. McGee
Secretary

(SEAL)

6 I.C.C.2d

000057

560          INTERSTATE COMMERCE COMMISSION REPORTS

### APPENDIX

### TERMS AND CONDITIONS OF TRACKAGE RIGHTS
IMPOSED BY THE INTERSTATE COMMERCE COMMISSION
GOVERNING THE USE BY BOSTON AND MAINE CORPORATION
OF CERTAIN LINES OF CENTRAL VERMONT RAILWAY, INC.

0.    *DEFINITIONS*

As used herein, the following capitalized terms have the following meanings (any other capitalized terms being defined in context hereafter):

0.1 "Agreement" means the terms and conditions of trackage rights as a whole set forth herein, as though the instant terms and conditions had been agreed to contractually by B&M and CV.

0.2 "Amtrak" means the National Railroad Passenger Corporation.

0.3 "B&M" means Boston and Maine Corporation, a corporation with its principal office at Iron Horse Park, North Billerica, Massachusetts 01862.

0.4 "CCR" means Claremont and Concord Railway (including its successors and assigns).

0.5 "Conveyance Date" means September 9, 1988, the date on which B&M conveyed the Former B&M Line to Amtrak, and on which Amtrak conveyed the same to CV, pursuant to the Order.

0.6 "CV" means Central Vermont Railway, Inc., a corporation with its principal office at 2 Federal Street, St. Albans, Vermont 05478.

0.7 "CV Lines" means the approximately 13.4-mile rail line between White River Junction, Vermont, and Windsor, Vermont, and the approximately 10.6-mile rail line between Brattleboro, Vermont, and East Northfield, Massachusetts, both of which have belonged to CV since before the Conveyance Date.

0.8 "Former B&M Line" means the approximately 48.3-mile rail line between Windsor, Vermont, and Brattleboro, Vermont, conveyed by B&M to Amtrak, and by Amtrak to CV, on the Conveyance Date pursuant to the Order.

0.9 "GMRC" means the Green Mountain Railroad Corporation (including its successors and assigns).

0.10 "ICC" means the U.S. Interstate Commerce Commission.

0.11 "Line" means the CV Lines and the Former B&M Line together.

0.12 "Order" means the decision of the ICC in *National Railroad Passenger Corporation—Conveyance of Boston and Maine Corporation Interest in Connecticut River Line in Vermont and New Hampshire*, dated August 4, 1988, served August 9, 1988, and published at pages 761 through 817 of volume 4 of the ICC Reports, Second Series.

0.13 "ST" means the Springfield Terminal Railway Company (including its successors and assigns).

000058

AMTRACK—CONVEYANCE OF B&M IN CONN RIVER LINE IN VT & NH   561

## 1. GRANT OF TRACKAGE RIGHTS

1.1 Subject to the terms and conditions of this Agreement, B&M shall have the non-exclusive right to operate B&M's trains, locomotives, cars and equipment with B&M's own crews over the Line, as more particularly defined as follows:

All main line track and passing sidings between a point at the interlocking at East Northfield, Massachusetts (approximately B&M MP 49.67 and CV MP 110.51) to the Bank switch at the termination of B&M ownership at White River Junction, Vermont (approximately CV MP 13.40).

1.2 B&M shall have only overhead running rights over the CV Lines.

1.3 B&M shall have the exclusive right to serve all existing shippers and shippers' facilities that were located on the Former B&M Line as of the Conveyance Date, including any and all new shippers that locate at such existing facilities after the Conveyance Date, provided that B&M makes available a minimum three day per week service along the Line. B&M must consult with the shippers and ensure their needs are met up to three day per week service.

1.3.1 For purposes of this Section 1.3, "existing shippers and shippers' facilities" shall mean industries and facilities at rail sidings which received or tendered rail shipments during the twelve months immediately prior to the Conveyance Date.

1.3.2 For purposes of this Section 1.3, "three day per week service" shall mean the provision of local set-off and pick-up service to shippers on the Former B&M Line at least three times per week (Monday through the following Sunday) in each direction.

1.3.3 CV shall be permitted to commence service to existing shippers and shippers' facilities upon B&M's failure to make available three day per week service during two weeks out of any four week period, unless such failure is excused by Section 9.6.

1.4 Except as provided in Section 1.3, CV and B&M shall each have the right to compete for and serve the following shippers and shippers' facilities on the Former B&M Line:

(a) shippers and shippers' facilities located on the Former B&M Line which have not received or tendered rail shipments during the twelve months immediately prior to the Conveyance Date;

(b) any other new shippers;

(c) any existing shippers and shippers' facilities to which B&M does not provide a minimum three day per week service, as specified in Section 1.3.

1.4.1 CV shall, upon request by B&M, provide reciprocal switching to permit B&M to serve such shippers and shippers' facilities as B&M may serve hereunder. CV shall not be required to switch cars on B&M's behalf at shippers' facilities which CV serves by virtue of B&M's failure to make available a minimum three day per week service along the Line as specified by Section 1.3, but B&M shall retain the right to provide service directly to such shippers and shippers' facilities. B&M shall pay to CV a per switch charge not greater than 130% of the CV variable cost of providing such switching service computed using CV's costs computed in accordance with formulas generally used or accepted in ICC proceedings.

1.5 CV and B&M shall each have the right to compete for and to interchange traffic at Bellows Falls, Vermont, with GMRC and at Claremont Junction, New Hampshire, with the CCR. B&M shall have the exclusive right to interchange traffic at Charlestown, New Hampshire, with the ST.

1.6 B&M shall have the right of entry over the Line for any and all B&M employees, agents or representatives, machinery, vehicles or equipment which B&M may

6 I.C.C.2d

562          INTERSTATE COMMERCE COMMISSION REPORTS

deem necessary or convenient for the purposes of inspecting the Line, clearing any derailments or wrecks of B&M trains on the Line or otherwise conducting its operations over the Line.

1.7 B&M shall without charge to CV dispatch the interlocking CPR 50 located at East Northfield, Massachusetts, until seven (7) days after CV notifies B&M that CV is prepared to assume such responsibility and all applicable regulatory requirements have been satisfied.

1.8 Except as provided herein, this Agreement does not diminish in any way CV's right to use the Line, or CV's right to lease or otherwise allow another carrier to use the Line.

## 2. TERM AND TERMINATION

2.1 The term of this Agreement shall commence as of 7:00 a.m. Eastern Time, on the Conveyance Date.

2.2 Except as provided in Section 2.3, and subject to the provisions of this section, the term of this Agreement shall be perpetual. After 20 years from the Conveyance Date, either party to this Agreement may seek modifications from the other and, if satisfactory modifications are not agreed to after a reasonable period for negotiation, may apply to the ICC for modifications. Nothing in this section shall authorize the ICC to impose arbitration requirements upon either party to this Agreement.

2.3 B&M may terminate this Agreement immediately upon notice to CV.

2.4 Notwithstanding the foregoing, the parties hereby acknowledge and agree that B&M has appealed the Order, and that in the event the Former B&M Line is reconveyed to B&M in connection with or resulting from such appeal, this Agreement shall terminate upon such reconveyance, and that thereafter the terms and conditions of the April 1/ 1985 and January 1, 1930 Trackage Rights Agreements shall govern their operations over and use of the Line, and such agreements shall be deemed re-executed in their current forms.

## 3. COMPENSATION

3.1 B&M shall have no obligation to pay for or contribute in any way towards the cost of upgrading of the Former B&M Line, except as provided in Section 3.7.

3.2 Except as provided in Section 1.7, CV shall be solely responsible for dispatching all operations over the Line and for the maintenance and repair of the Line, including the signals and the signal and dispatching system which controls operations on it. CV shall keep the Line, at all times throughout the term of this Agreement or any extensions thereof, in not less than FRA Class II condition.

3.3 In full satisfaction of any and all obligations of B&M to pay for the trackage rights provided herein or contribute towards the costs of dispatching, maintenance and repair of the Line (including the maintenance, repair and operation of the signals and the signal and dispatching system which controls operations on it), B&M shall pay to CV 20.1¢ per car mile (whether loaded or empty including locomotives, cabooses and work equipment) of traffic actually operated by B&M (or its assignee) over the Line. Notwithstanding the foregoing, the sum of such payments in respect of the Former B&M Line shall not exceed one hundred forty-two thousand dollars ($142,000) per year during the first three years this Agreement is in force and shall not exceed seventy-five thousand dollars ($75,000) in any year thereafter; provided, however, that the foregoing limitation shall not apply if the annual gross traffic volume on the Former B&M Line attributable to B&M's overhead or local service, including traffic for interchange to GMRC, CCR, or ST, exceeds 32,500 carloads. Locomotives, cabooses and work equipment shall not be included in determining whether traffic attributable to B&M has exceeded 32,500 carloads in a given year. In any year that the amount of traffic attributable to B&M on the Former B&M Line exceeds 32,500



bound by the judgment as to all matters that could have been litigated in such suit or proceeding.

7.6 In every case of death or injury suffered by an employee of either B&M or CV, when compensation to such employee or employee's dependents is required to be paid under any workmen's compensation, occupational disease, employer's liability or other law, and either of said parties, under the provisions of this Agreement, is required to pay such compensation, if such compensation is required to be paid in installments over a period of time, such party shall not be released from paying such future installments by reason of the expiration or other termination of this Agreement prior to any of the respective dates upon which any such future installments are to be paid.

8. *DEFAULT; PAYMENT DELINQUENCY*

8.1 In the event of a material breach by B&M of the terms and conditions of this Agreement which continues for a period of forty-five (45) days after notice thereof from CV, CV shall have the right to terminate this Agreement upon ninety (90) days' notice.

8.2 If B&M becomes delinquent in payment of any amount by more than fourteen (14) days under the terms of Section 3.6, CV shall be entitled to receive advance payment from B&M for each B&M train seeking access to the Line until B&M satisfies the delinquency in full. If B&M fails to tender the advance payment, CV shall be further entitled to exclude and eject B&M from the Line until B&M tenders the advance payment. CV shall be entitled to these remedies for delinquencies even if B&M has disputed the billed amount by invoking arbitration or otherwise. During the pendency of any such exclusion or ejectment, CV shall nevertheless accept B&M cars for interchange at any point on the Line.

9. *GENERAL PROVISIONS*

9.1 *No Waiver.* Waiver of any provision of this Agreement, in whole or in part, in any one instance shall not constitute a waiver of any other provision in the same instance, nor any waiver of the same provision in another instance, but each provision shall continue in full force and effect with respect to any other than existing or subsequent breach.

9.2 *Notice.* Any notice required or permitted under this Agreement shall be given in writing to the parties at their respective addresses specified above, or at such other address for a party as that party may specify by notice as provided herein, by (i)(A) delivery in hand or by postage prepaid, United States first class mail *and* (B) registered or certified mail, return receipt requested, *or* (ii)(A) [illegible] *and* (B) registered or certified mail, return receipt requested, *or* (iii)(A) Federal Express or other form of expedited mail that provides for delivery to the sender of a signed receipt, *or* (iv) telegram. Notice so sent shall be effective upon receipt.

9.3 *Integration.* Except for the Order and the documents executed in pursuance thereof, this Agreement constitutes the entire agreement of the parties with respect to its subject matter, superseding all prior oral and written communications, proposals, negotiations, representations, understandings, courses of dealing, agreements, contracts and the like between the parties in such respect. Except for any and all obligations incurred or causes of action accrued thereunder prior to or as of the Conveyance Date, and except as provided in Section 2.4 and 9.3.1 hereof, the Trackage Rights Agreements by and between B&M and CV dated as of April 1, 1925, and January 1, 1930, are hereby terminated. Any provisions of any other agreement(s) between CV and B&M which are not inconsistent with the provisions of this Agreement shall remain in effect until cancelled according to the terms of such other agreement(s).

000061

AMTRACK–CONVEYANCE OF B&M IN CONN RIVER LINE IN VT & NH    563

carloads, B&M shall pay CV as additional compensation 20.1¢ per car mile for all the cars in excess of 32,500 cars, whether loaded or empty, including locomotives, cabooses and work equipment.

3.4  All payments to be made by B&M and CV under this Agreement (including the caps set forth in Section 3.3) shall be adjusted effective March 31, 1989, and semi-annually thereafter, for price level changes from July 1, 1988, (using Second Quarter 1988) based on the relationship of the most recent quarter's Association of American Railroads (AAR) Eastern District, Quarterly Indices of Chargeout Prices and Wage Rates (Table C) - "Material prices, wage rates and supplements combined (excluding fuel)" to comparable indices of the quarter six months previous. The first adjustment to be made shall be based on the comparison of the Fourth Quarter 1988 index value to the Second Quarter 1988.

*"(using Second Quarter 198*

3.5  B&M shall have responsibility for and shall report and pay directly to the owner of the cars, all mileage, car hire and other charges accruing on cars in B&M's trains on the Line.

3.6  CV shall issue its bill to B&M for the payments specified by Sections 1.4 and 3.3 by the fifteenth (15) day of each month for the traffic transported during the preceding calendar month. B&M shall pay to CV the amount shown on such bill by the last day of the month in which such bill is issued: B&M shall not be required to pay mileage charges attributable to its operations over the Former B&M Line once payments made in the preceding months of that year with respect to those operations equal the payment cap as adjusted in accordance with Section 3.4 for that year, until traffic attributable to B&M's operations over the Former B&M Line exceeds 32,500 carloads for that year. Payments not received by CV by such last day of the month in which the bill is issued will accrue interest at the rate of one and one-half (1.5%) percent per month for each month or portion of a month by which the payment is late.

3.7  In the event that CV is required to undertake any major capital projects which may become necessary due to changes in applicable local, state or federal statutes, ordinances or regulations, or by catastrophic occurrences on the Line, including but not limited to floods or destruction of bridges, B&M or its assignee shall pay its proportionate share of the expenditures actually made by CV for such capital projects based upon the percentage of total car miles on the Line attributable to B&M's (or its assignee's) average traffic volume during the preceding five (5) year period.

## 4. ADDITIONS AND ALTERATIONS

4.1  CV shall pay for and be responsible for the construction, maintenance, repair and renewal of any additional connections to the Line which it may require.

4.2  If B&M determines that changes in or additions and betterments to the Line, including changes in communication, dispatching or signal facilities as they existed immediately prior to the Conveyance Date, are required to accommodate B&M's operations beyond that required by CV to accommodate CV's and Amtrak's operations over the Line, B&M shall pay for the construction of such additional or altered facilities, including the annual expense of maintaining, repairing, and renewing such additional or altered facilities. Notwithstanding the foregoing, CV shall have the right to approve of any such addition or alteration prior to its construction, which approval shall not be unreasonably withheld, and such addition or alteration shall be constructed in such a manner as to minimize interference with CV's or Amtrak's operations over the Line.

## 5. SCHEDULING OF TRAINS AND MAINTENANCE; OPERATING RULES

5.1  The trains, locomotives, cars and equipment of B&M, CV, Amtrak, and any other present or future user of the Line or any portion thereof, shall be operated without prejudice or partiality to any party to this Agreement or any such other user and in such a

6 I.C.C.2d

000062

564                    INTERSTATE COMMERCE COMMISSION REPORTS

manner as will result in the most economical and efficient manner of movement of all traffic;
provided, however, that CV shall give priority to intercity rail passenger trains of Amtrak
to the extent required by Section 402 of the Rail Passenger Service Act. Notwithstanding
the foregoing, B&M shall have the right, in consultation with CV, to establish the schedules
of B&M's trains over the Line. Trains performing local work, whether B&M, CV or
otherwise, are not entitled to priority over trains that are not performing such work. CV
shall establish CV's train schedules with due regard to the trains to be operated by B&M.
Each party shall use reasonable efforts to provide five (5) days' notice of changes in its
traffic and operating patterns and procedures which may affect the Line. B&M
acknowledges that the upgrading work will require a twelve (12) hour work block scheduled
for between 7:00 a.m. and 7:00 p.m. CV shall coordinate with B&M and use its best efforts
in scheduling the work required for the upgrading of the Former B&M Line and any future
maintenance or repair of the Line to minimize any interference with or disruption of B&M's
operations over the Line.

    5.2  Any and all training that may be required to qualify B&M operating personnel
as to CV's operating rules (after the initial training of such personnel, which will be provided
by CV) shall be performed by B&M, and the determination as to whether such operating
personnel are qualified under CV's operating rules shall be made in the discretion of B&M
(giving consideration to any comments or recommendations of CV). CV shall train, and
periodically recertify in accordance with CV's operating rules, B&M operating personnel who
act as instructors for B&M personnel regarding CV's operating rules.

    5.3  CV operating rules shall govern all operations over the Line, and CV shall report
to B&M any incidents of violation of such rules by a B&M employee. CV may at its option,
for good cause shown, exclude such employee from the Line.

    5.4  In the event that any dispute arises as to the interpretation of any operating
rules, the interpretations of the Uniform Code of Operating Rules, as amended, shall
govern.

## 6. CLEARING OF DERAILMENTS AND WRECKS

    6.1  In the event of any derailment or wreck of a B&M train, B&M shall clear the
Line to allow for the passage of other trains within a reasonable time. B&M shall perform
any rerailing wrecking or wrecking train service as may be required in connection with such
derailment or wreck, in accordance with its customary practices. Except as provided in
Section 7, the cost liability, and expense of the foregoing, including, without limitation, loss
of, damage to, or destruction of any property whatsoever and injury to or death of any
person or persons whomsoever resulting therefrom, shall be the responsibility of B&M.
In the event that B&M does not begin rerailing operations for passage of trains over the
Line within twelve (12) hours of an occurrence or does not complete the process of clearing
the Line within a reasonable time, CV may clear the Line for passage of trains, and B&M
shall reimburse CV for all reasonable costs CV incurs in performing such service.

## 7. RELEASE AND INDEMNIFICATION

    7.1  Save as herein otherwise provided, each party hereto shall be responsible for and
shall assume all loss, damage or injury (including injury resulting in death) to persons or
property, including the cost of removing any trackage, repairing trackage and correcting
environmental damage, which may be caused by its engines, cars, trains or other on-track
equipment (including damage by fire originating therefrom) whether or not the condition
or arrangement of the trackage contributes in any manner or to any extent to such loss,
damage or injury, and whether or not a third party may have caused or contributed to such
loss, damage or injury, and for all loss or damage to its engines, cars, trains or other on-

6 I.C.C.2d

000063

AMTRACK—CONVEYANCE OF B&M IN CONN RIVER LINE IN VT & NH    565

track equipment while on said trackage from any cause whatsoever, except in the case of collision, in which event the provisions of Section 7.2 shall apply.

7.2 In the event of a collision between CV's and B&M's engines, cars, trains or other on-track equipment while on the Line, the apportionment of liability between the parties hereto for all loss, damage or injury (including injury resulting in death) to any person (including CV's or B&M's employees, agents or representatives) or property shall be governed by the following provision:

7.2.1 If the employees of one party are solely at fault, that party shall be responsible for all such loss, damage or injury including the cost of removing wreckage, repairing trackage, and correcting environmental damage.

7.2.2 If the employees of both parties hereto are at fault, or if the cause of the accident is so concealed that it cannot be determined whose employees are at fault, each party shall bear and pay for all such loss, damage or injury which its own engines, cars, trains or other on-track equipment and their contents or property in its custody, or its employees or others claiming for them, may have suffered by reason or in consequence of the accident. Responsibility for all other such loss, damage or injury shall be apportioned equally between the parties hereto.

7.2.3 The words "all other such loss, damage or injury" referred to in this Section 7.2 shall be deemed to include but not be limited to the cost of removing wreckage, repairing trackage, correcting environmental damage, and third party claims.

7.2.4 As between the parties hereto, the foregoing provisions of this Section 7.2 shall be applicable whether or not a third party may have caused or contributed to the accident.

7.2.5 The words "trackage" referred to in this Section 7 shall be deemed to include but not be limited to the tracks, structures or facilities pertaining to operation of the Line.

7.3 Without in any way restricting the terms of this Section 7, in the case of a collision or accident between the train of either party to this Agreement and the property of a third person or other entity, including any action done in the process of trying to avoid an accident or a collision, such party shall save harmless and indemnify the other party forthwith for all damages suffered by the other party including damages to equipment and structures or injuries (including death) to the employees or agents of the other party including also the results of those actions done in the process of avoiding a collision or accident, and irrespective of negligence of either party or such third person or other entity, and with a right of subrogation in favor of such party against any such third person or other entity.

7.4 Each party hereto shall forever indemnify and save harmless the other party, from and against all claims, liability or judgments by reason or on account of any injury to or death of any person or of any loss or damage to property, the liability for which is herein assumed by such first mentioned party, and such first mentioned party shall pay and discharge any judgment that may be obtained by reason thereof, and all costs, charges and expenses payable thereunder, including legal counsel fees.

7.5 The parties shall settle, as between themselves, any claim for loss or damage according to the terms of this Agreement, notwithstanding any judgment or decree of any court or other tribunal in a proceeding brought by other parties. In case a suit or proceeding shall be commenced by any person or corporation against either party hereto for or on account of any loss, damage or injury for which the other party hereto is liable under the provisions of this Agreement, the party so sued or proceeded against shall give to the other party reasonable notice, in writing, of the pendency of such suit or proceeding and thereupon the other party shall assume the defense of such suit or proceeding or shall save and hold the party so sued harmless from all loss and costs by reason thereof. Neither party hereto shall be bound by any judgment against the other party unless it shall have reasonable notice that it is so required to defend and has reasonable opportunity to make such defense. When such notice and opportunity has been given, the party notified shall be

6 I.C.C.2d

000064

AMTRACK—CONVEYANCE OF B&M IN CONN RIVER LINE IN VT & NH   567

9.3.1 The provisions of Section 8, Freight Haulage, of the January 1, 1930 Trackage Rights Agreement between CV and B&M, as amended from time to time, shall remain in effect until cancelled by either party upon ninety (90) days' prior written notice to the other.

9.4 *Miscellaneous.* This Agreement: (i) may be amended, modified, or terminated, and any right under this Agreement may be waived in whole or in part, only by a writing signed by both parties; (ii) contains headings only for convenience, which headings do not form part of and shall not be used in construction of this Agreement; and (iii) is not intended to inure to the benefit of any party not a party to this Agreement.

9.5 *Availability of Equitable Relief.* The obligations imposed by this Agreement are unique. Breach of any of such obligations would injure the parties to this Agreement; such injury is likely to be difficult to measure; and monetary damages, even if ascertainable, are likely to be inadequate compensation for such injury. Protection of the respective interests provided herein would require equitable relief, including specific performance and injunctive relief, in addition to any other remedy or remedies that the parties may have at law or under this Agreement.

9.6 *Force Majeure.* No party to this Agreement shall be responsible for delays or errors in its performance or other breach under this Agreement occurring by reason of circumstances beyond its control, including acts of civil or military authority, national emergencies, fire, major mechanical breakdown, labor disputes, flood or catastrophe, acts of God, insurrection, war, riots, delays in suppliers, derailments or failure of transportation, communication or power supply.

9.7 *Trains, Locomotives, Cars or Equipment.* As used in this Agreement, whenever reference is made to the trains, locomotives, cars or equipment of, or in the account of, one of the parties hereto, such expression means the trains, locomotives, cars and equipment in the possession of or operated by one of the parties and includes such trains, locomotives, cars and equipment which are owned by, leased to, or in the account of such party. Whenever such trains, locomotives, cars or equipment are owned or leased by one party to this Agreement and are in the possession or account of, or under the control of the other party to this Agreement, such trains, locomotives, cars and equipment shall be considered those of the other party, except where the cars or equipment are being transported under the Haulage Agreement referred to in Section 9.3.1 of this Agreement.

9.8 *Assignment.* This Agreement shall bind and inure to the benefit of the parties and their respective legal representatives, successors and assigns. B&M shall have the right to assign any or all of B&M's rights and obligations under this Agreement to any affiliate of B&M, following consultation with CV. B&M shall have the right to assign any or all of B&M's rights and obligations under this Agreement to any other person with CV's prior consent, which shall not be withheld unreasonably. In the event of an Agreement, the number of carloads attributable to the assignee's operations over the Former B&M Line shall be included in the number of cars attributable to B&M's operations for the purposes of Section 3.3 of this Agreement.

9.9 *Governing Law.* This Agreement is imposed and entered into in, and shall be governed by the laws of, the District of Columbia.

# EXHIBIT "B"

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

---

NEW ENGLAND CENTRAL RAILROAD, INC.,
Plaintiff,

v.

SPRINGFIELD TERMINAL RAILWAY
COMPANY and BOSTON AND MAINE
CORPORATION,
Defendants

Civil Action No.:  04-30235-MAP

---

### JOINT PRE-TRIAL CONFERENCE MEMORANDUM

The parties hereby submit, pursuant to the *Procedural Order Re: Final Pre-Trial Conference/Trial*, dated March 17, 2006, their *Joint Pre-Trial Conference Memorandum*, as follows:

### I.    CONCISE STATEMENT OF THE EVIDENCE:

#### A.    Plaintiff's Statement of the Evidence:

##### 1.    Liability:

This is a clear cut case where the defendants' are liable, pursuant to a clear and unambiguous contractual obligation, for damages its train crew caused to the plaintiff's trackage and operating profits by causing a substantial freight train derailment.

On July 3, 2004, employees of the defendant Springfield Terminal Railway Company ("STRC") were operating a STRC freight train over the plaintiff New England Central Railroad, Inc.'s ("NECR") mainline railroad tracks in Vermont, commonly known as the *Connecticut River Line* (the "Line"). At some point the STRC freight train derailed causing extensive

damage to NECR's trackage, related property, and other financial losses. One of the cars in the train first derailed at approximately Mile Post 10.18. The defendants' crew then failed to recognize that the freight car had derailed and continued to operate the train as if there was nothing wrong, dragging the derailed car for approximately 5 miles, causing damage to the plaintiff's trackage along the way. Ultimately, at approximately Mile Post 5.7, several other railcars also derailed resulting in a pile-up of railcars and substantial damage to the track structure. The plaintiff incurred substantial costs to repair and restore its trackage. In addition, the plaintiff also suffered significant lost profits due to its having to close the track to traffic and, thereafter, to restrict the track speed while repair and restoration efforts were ongoing.

### a. The STRC is Responsible to the NECR for the Damages that the NECR Incurred as a Result of the Derailment:

The Interstate Commerce Commission's imposed *Modified Trackage Rights Agreement* ("Agreement"), dated February 6, 1990, governs the terms, conditions, rights, responsibilities and obligations of the NECR and the B&M and/or STRC with respect to the operation of the B&M and/or the STRC's trains over the *Line*. The *Agreement* imposes a number of typical obligations on both railroads. The provision of the *Agreement* which is applicable to the facts of this particular case is § 7.1 which allocates between the parties the responsibility for certain losses, as follows:

> [E]ach party hereto shall be responsible for and shall assume all loss, damage or injury...to persons or property, including the cost of removing any trackage, repairing trackage and correcting environmental damage, which may be caused by its engines, cars, trains or other on-track equipment (including damage by fire originating therefrom) <u>whether or not the condition or arrangement of the trackage contributes in any manner or to any extent to such loss, damage or injury</u>, and whether or not a third party may have caused or contributed to such loss, damage or injury, and for all loss or damage to its engines, cars, trains or other on-track

2

equipment while on said trackage <u>from any cause whatsoever</u>....

Pursuant to the clear and unambiguous language of this provision, the defendants are responsible

for the losses and damages which were caused by the derailment <u>regardless of any other cause</u>

<u>including the condition of the track</u>.

Roger Bergeron, the defendants' current Vice-President for Special Projects and former

Assistant Vice-President of Engineering, inspected the scene of the derailment and conducted on

behalf of the defendants an investigation as to the cause of the derailment shortly after it

occurred and worked with the plaintiff on clean up and remediation efforts. He has also given

sworn testimony in this case as the defendants' Rule 30(b)(6) deponent, thus his testimony binds

the defendants, that the defendants are responsible for the derailment damages pursuant to § 7.1

of the *Agreement*.

It is the plaintiff's position that this case is extremely simple, in that, there is no dispute

that the derailment damage was caused by the defendants' "engines, cars (and/or) trains," the

defendants are solely responsible for all of the resulting loss. All that is required under the

*Agreement* to establish liability in this case is that the derailment damage was caused by the

defendants' equipment.

The liability issue, in this case, should be resolved by summary judgment, and that the

only matter that need be tried is the issue of damages. It is therefore the plaintiff's position that

the other liability issues discussed herein are irrelevant; however, these issues are dealt with

hereafter in order to communicate the plaintiff's position in the event that judgment is not

entered in its favor on the contractual liability issue.

3

### b.    The STRC Crew Negligently Failed to Notice the Derailed Car:

Even if there were a dispute on the defendants' clear contractual obligations, it is the plaintiff's position that the defendants were negligent in their operation of the train. While the train was moving on the *Line*, the STRC's conductor and the were required to operate the train in accordance with the *General Code of Operating Rules* (the "GCOR"), a uniform set of rules which are followed by several railroads. The GCOR, at § 6.29.2 (entitled *Train Inspections by Crew Members*), required both the engineer and conductor to inspect the train frequently and look for a number of defective conditions including railcar wheels not properly positioned on the rail and dragging equipment. The crew was also required to stop the train if they discovered any of the listed defects, promptly correct them or take other evasive action.

The STRC crew failed to properly take notice of the initial derailment and thereafter failed to properly inspect the train as the derailed car was being dragged for approximately five miles, all the while damaging the plaintiff's trackage and track structure including tie plates, track ballast, three grade crossings, and a bridge deck. The crew should have either directly observed the derailed car as it was being pulled with its wheels off the tracks, should have noticed or felt the railcar dragging, or they should have observed from several gauges of the functioning levels of the train engine's operational systems that something was wrong. Due to their negligence and complete lack of attention to the most basic aspect of their job duties, they failed to recognize the condition of their train.

### i.    The Crew's Foggy Condition Claim:

The STRC's crew later claimed that there were "foggy" conditions in the area from the initial point of derailment to the location of the pile-up. These conditions allegedly restricted the crew's visibility such that they were unable to see the railcar that derailed. However, this is

4

directly contradicted by weather reports. The plaintiff's Dispatcher's Office had obtained, just

prior to the derailment, weather data and noted that there was fair weather throughout the *Line*.

The NECR crew did not report to the NECR's dispatcher that they were in fog conditions or that

their visibility was somewhat impaired which was required by § 6.21 of the GCOR. In addition,

NECR employees who arrived at the scene shortly after the derailment did not note the existence

of foggy conditions.

After the derailment, the STRC crew was required to report to the NECR dispatcher

information which was relevant to the derailment which included the weather conditions, the

speed of the train, the AMPS, throttle position, the breaking employed at the time, etc. The

NECR dispatcher noted that the crew reported to him that the weather was clear at the time of the

derailment.

c.    **The STRC Crew Failed to take Precautions against "the Fog:"**

Even if the fog conditions did exist as the STRC train passed over the *Line* after the

initial derailment and before the pile-up, the STRC crew was required by § 6.21 of the GCOR to

protect the train against any known condition, such as fog, that might have interfered with the

safe operation of the train. The STRC crew failed to protect their train from the alleged fog

conditions by slowing the speed of the train. This might have prevented the initial derailment,

would have lessened the damage to the tracks, might also have prevented the pile up, and/or the

reduced train speed could have caused the STRC crew to feel or notice the derailed railcar.

d.    **The NECR's Track at the Point of Derailment was in Better
Condition than the *Agreement* Required:**

The condition of the track is simply not relevant because § 7.1 of the *Agreement* states

that the defendants are responsible for the derailment damages regardless of the condition of the

track. Nevertheless, even if the condition of the track should become an issue at trial, the plaintiff expects to show that its track was in even better condition than required under the *Agreement*. The plaintiff was required, pursuant to § 3.2 of the *Agreement,* to keep the *Line* in not less than Federal Railroad Administration ("FRA") Class II condition. An FRA Class II rating restricts the speed of freight trains to not more than 25 mph. For the most part, the *Line* is generally maintained at FRA Class III level, which restricts the speed of freight trains to not more than 40 mph; therefore the *Line* is generally maintained to a greater standard than that which is required under the *Agreement*. On July 3, 2004, the NECR's track at the initial point of derailment was in Class III condition.

The plaintiff expects, if necessary, to present evidence which will demonstrate that FRA track compliance testing was completed approximately three weeks before the derailment and FRA-mandated twice weekly inspections were performed by the NECR between June 8th and July 1st. The most recent track inspection was completed on July 1st which was just two days before the derailment.

On June 8, 2004, less than one month before the derailment, the FRA conducted a "Geometry Test" on the *Line*.[1] According to the June 8, 2004 Geometry Car report, there were areas on the *Line* where the classification of the track was reduced due to defects that were determined by the geometry test. The NECR immediately imposed the reduced classifications at those areas and set about rectifying the most serious of the defects.

The initial point of derailment was Mile Post 10.18. There were no defects found at this point by the June 8, 2004, Geometry Test. The closest defect noted to the point of derailment was located at Mile Post 10.16. The railcar had already derailed and was on the ground before it

---

[1] A "Geometry Test" is performed by a specially equipped weighted railcar that travels over the tracks and records various measurement of track conditions.

6

came to the Mile Post 10.16 having derailed 105.6 feet back up the *Line*. The condition of the track at Mile Post 10.18 played no part in causing the derailment. Moreover, even though the FRA's testing found a defect at Mile Post 10.16, this defect reduced the classification of this section of the track down from Class III to Class II, which was still within compliance with the requirements of the *Agreement*.

### 2.   Damages:

As a result of the derailment, the NECR was required to rebuild a substantial amount of its *Line* approximately between Mile Post 10.18 and 5.7. This included the replacement of over 7,000 ties, 15,000 tie plates, a bridge deck, several segments of rail, tons of ballast, and the rebuilding of three grade crossings. In addition, the NECR suffered lost time incentive revenue from an agreement that it had with the National Railroad Passenger Corporation ("AMTRAK"), losses incurred from care hire and delays, as well as moneys paid to its employees and materials required in order to restore the track back to its previous FRA Class III condition. The NECR is seeking damages for its Maintenance of Way labor, equipment and miscellaneous costs; outside contracting costs; increased care hire expenses; and lost on-time performance revenue from AMTRAK.

### B.   Defendants' Statement of the Evidence:

The defendants-counterclaimants' ("Guilford") evidence will include proof of its counterclaim and its defense against the claims of plaintiff New England Central Railroad's ("NECR"). Guilford expects the evidence to show that—

- the derailment was caused by excessive superelevation due to the substandard condition of NECR's track and roadbed at or near milepost ("MP") 10.18 and a "slow order" set at an unsuitable speed by NECR, contrary to the express

7

requirements of the Track Safety Standards ("TSS") and regulations of the

Federal Railroad Administration ("FRA");

- NECR was aware of the problem at and around MP 10.18 approximately four

    weeks before the derailment due to an FRA automated track geometry inspection,

    which employs measured and recorded values that accurately represent track

    condition, and which is distributed to railroad officials to enable them to reduce

    the risk of accident, derailment, or other incidents;

- between that time and the time of the derailment, NECR failed to inspect the

    condition regularly to ascertain whether it was worsening and whether additional

    corrective action was necessary;

- under FRA rules and regulations, NECR as owner of the track is responsible for

    compliance;

- NECR should have repaired its substandard track condition and, if necessary in

    the interim, imposed a *safe* speed limit by means of a proper "slow order";

- despite NECR's knowledge of the unsafe condition at and around the eventual

    point of derailment, NECR failed to take such corrective action prior to the

    derailment;

- as a result of this track defect and a condition known as "harmonic rock," which

    was exacerbated by the track defect and the improper slow order imposed by

    NECR, the wheels of one car in the Guilford train lifted off the rails at or near MP

    10.18 and continued to travel in the train consist for approximately five miles;

- NECR's failure was the proximate cause of the derailment and the resulting

    damage to property of Guilford and NECR;

8

- NECR accordingly was guilty of gross negligence or willful misconduct;

- because the derailed car's alignment was in close proximity to the rails and in line with the track, only a single truck of a single car had derailed, the train was accelerating following the end of the speed-restricted area (which accounted for the absence of an elevated amperage reading on the train's instruments), and the foggy weather in the area, Guilford's train crew was not negligent in failing to realize that a set of wheels in the seventh freight car of their train had derailed before the derailed set of wheels hit a switch around MP 5 and several of the train's cars overturned;

- following the derailment, NECR did not merely restore the track to its condition immediately prior to the derailment but seized upon the opportunity to improve the track considerably;

- NECR spent far more than was justified, and in excess of the industry standard, even for the work that actually was required to be done;

- NECR was grossly negligent and Guilford was not negligent; and

- even if Guilford were liable, NECR's actual damages as a result of the derailment are substantially less than NECR has claimed.

II.    **STATEMENT OF THE FACTS ESTABLISHED BY PLEADING, ADMISSIONS, OR BY STIPULATION:**

A.    On July 3, 2004, employees of the STRC were operating an STRC freight train over the *Connecticut River Line* in Vermont.

B.    The *Connecticut River Line*, including the railroad track and track structures, was owned by the plaintiff.

9

C.   On July 3, 2004, at about 6:41 a.m., one or both sets of wheels of a railcar in the defendant's freight train derailed at about Mile Post 10.18.

D.   The locomotives and freight cars involved in the derailment were either owned by and/or in the possession, custody and/or control of and being operated by the defendants.

E.   The duties and obligations of the parties with respect to operation of trains over the *Line* was governed by the ICC-imposed *Modified Trackage Rights Agreement*.

F.   The derailed railcar, which remained upright, was dragged for approximately five miles after the initial point of derailment.

G.   The dragging of the derailed car caused damage to the plaintiff's trackage, related property, and the railcars in train.

H.   The derailed railcar ultimately, at or about Mile Post 5.7, turned over, along with several other railcars, resulting in a pile up of railcars.

I.   The pile up caused damage to the track and track structure.

J.   The derailment shut down the rail traffic over the *Connecticut River Line* for a period of time after the derailment.

K.   The defendants and NECR are rail carriers subject to the Interstate Commerce Act and the jurisdiction of the United States Surface Transportation Board ("STB").

L.   The ICC-imposed *Modified Trackage Rights Agreement* requires that the defendants have trackage rights over the NECR's *Connecticut River Line* in the vicinity of the derailment.

10

M.   On June 8, 2004, the NECR personnel were present at, and received a report of, an automated track geometry inspection conducted by the Federal Railroad Administration.

N.   Certain AMTRAK passenger trains travel regularly over the *Connecticut River Line.*

## III.   CONTESTED ISSUES OF FACT:

### A.   Issues of Fact Contested by the Plaintiff[2]:

1.   Whether it was foggy on the morning of July 3, 2004, on the *Line*;

2.   Whether the crew of the STRC train were conducting their visual inspections of their train as required by the GCOR;

3.   Whether the STRC's crew's visibility was restricted;

4.   Whether the STRC's crew violated the applicable operating rules and requirements;

5.   Whether the condition of the track played any role in causing the derailment;

6.   The existence, nature, amount and cause of the defendants' damages, if any;

7.   Whether the NECR was negligent, grossly negligent, and/or responsible for willful misconduct;

8.   Whether the defendants were guilty of contributory negligent and was that contributory negligence greater that that of the plaintiff; and

9.   Whether the defendants investigated the derailment in accordance with their applicable policies and procedures.

---

[2] The NECR re-states that it is its position that § 7.1 of the *Agreement* controls the issue of liability and only sets forth these issues of fact to communicate its position should judgment not enter in its favor on its contract claims.

**B.**     **Issues of Fact Contested by the Defendants:**

1.     The ICC-imposed Trackage Rights Order ("TRO")[3] required NECR to maintain the relevant rail line in Class 2 condition.

2.     The TRO, along with the fact of NECR's ownership of the rail line, makes NECR responsible for the dispatching of the line, as well as its maintenance in compliance with the TRO and with FRA track safety standards.

3.     NECR's tracks at and around the point of the derailment (Milepost 10.18) were not in condition for Class 2 speed (up to 25 mph).

4.     NECR had been aware that there was a defective condition at and around MP 10.18 for approximately four weeks prior to the derailment because NECR had received a FRA track geometry report pointing out this shortcoming.

5.     NECR failed to make follow-up physical inspections to ascertain whether the defect was worsening or, if such inspections were made, failed to act on the findings of such inspections.

6.     The FRA's track safety regulations and standards required NECR to correct this shortcoming.  NECR was aware of this requirement but had failed to make the correction.

7.     Pending correction of the track, FRA rules permitted NECR to impose a temporary "slow order" to a speed that was safe in light of the condition of the track, but such rules do not permit a track owner to ignore a defect.

---

[3] NECR refers to the TRO as the "Modified Trackage Rights Agreement."

8. The FRA rules provide that in the case of an excessively superelevated curve such as that at MP 10.18, a slow order establishing a maximum speed of twenty-five miles per hour is *not* safe due to the potential that such superelevation presents for exacerbating harmonic rock and increasing the risk of derailment. The relevant FRA regulation provides expressly that for jointed track with staggered joints in Class 2 through Class 5, such a curve may not have a crosslevel difference exceeding one and one-quarter inches in *any* of six consecutive pairs of joints. 49 C.F.R. § 213.63, table n. 2.

9. The line at and around the point of derailment consisted of jointed track with staggered joints.

10. At the time of the derailment, the curve at the point of derailment had a crosslevel difference exceeding one and one-quarter inches in some or all of six consecutive pairs of joints.

11. At the time of the derailment a "slow order" limiting train speed to twenty-five miles per hour had been imposed by NECR and was in effect at the point of derailment.

12. NECR's establishment of a 25 mile per hour speed limit was improper and unsafe.

13. Because the rule of 49 C.F.R. § 213.63, note 2, does not apply to Class 1 track, the proper speed under the NECR slow order should not have exceeded the Class 1 limit, namely ten miles per hour. *See* 49 C.F.R. § 213.9.

13

14.    The condition of NECR's track and the impropriety of the NECR slow
order were the proximate cause of the derailment.

15.    At the time of the derailment, the Defendant's train whose car derailed
was traveling in compliance with NECR's timetable and general
instructions, and was operating at or below the speed limit set by the
NECR slow order but faster than the ten miles per hour prescribed in the
FRA regulations to prevent dangerous harmonics in areas of excess
superelevation.

16.    Until it left the track near MP 5, the derailed car had only a single set of
wheels off the track and was traveling aligned with the track and the
remainder of the train.  Moreover, because the train was accelerating
following the end of the speed-restricted area, the derailed car did not
produce an elevated amperage reading on the train's instruments.

17.    Guilford's train crew was unaware, and had no reason to be aware, of the
improper anomaly in NECR's track, of its propensity to increase the
possibility of a derailment, or of the impropriety of the NECR 25 mph
slow order.

18.    At the time in question, the weather between the point of derailment (MP
10.18) and the point where the derailed car and six of its fellows fell from
the track (near MP 5) was foggy, and visibility accordingly was limited.

19.    The Guilford train crew, which was in the train's locomotive, was not
readily able to see the derailed set of car wheels from that vantage point.

14

20.    Instrument observations were made by Guilford's train crew between the point of derailment and the point where the cars fell from the track. No increase in amperage—a common indication of a derailed car—was observed beyond that normal for an accelerating train.

21.    The Guilford crew did not have, and could not reasonably have been expected to have, knowledge of the derailment until the cars left the track near MP 5.

22.    The damage to Guilford due to the derailment exceeded $100,000, including damaged or destroyed railroad cars, excess per diem costs, wrecking and rerailing costs, and excess crew costs.

23.    Even if Guilford were determined to be liable for the damage to NECR's track due to the derailment, such damage was substantially less than the sum claimed by NECR.

24.    Even if Guilford were determined to have some liability to NECR, any reduction in on-time payments from Amtrak to NECR was due to conditions other than the derailment.

## IV.    JURISDICTIONAL ISSUES:

### A.    Plaintiff's Jurisdictional Issues:

The Court has jurisdiction over the subject of the matter of this litigation on the basis of the claims set forth in *Counts I - IV* of the *Amended Complaint* which are rooted in the *Interstate Commerce Commission Termination Act* (the "ICCTA"), 49 U.S.C. § 11704, and it has supplemental jurisdiction over the plaintiff's common law breach of contract, negligence and wanton/willful allegations in that they are sufficiently related to the ICCTA based claims.

15

**B.    Defendants' Jurisdictional Issues:**

By motion to dismiss, Guilford sought a ruling that NECR's state law claims are preempted by the Interstate Commerce Act. The Court denied that motion on the ground that a finding of preemption would be "premature" but stated that it would "carefully reconsider the question of preemption on a fully-developed factual record if the parties file motions at that point under Fed. R. Civ. P. 56." Dkt. #30. Guilford expects to file such a motion or to include such a claim in a broader motion for summary judgment (see Item 8 below).

**V.    ISSUES RAISED BY PENDING MOTIONS:**

There are presently no pending motions before the Court. *See § VIII* regarding the possible future motions.

**VI.    ISSUES OF LAW, EVIDENTIARY QUESTIONS:**

**A.    Issues Raised by the Plaintiff:**

The *Agreement* is, pursuant to § 9.9, governed by the laws of the District of Columbia. The parties' common law claims, which are not contract based, are governed by the laws of the State of Vermont.

**1.    The *Agreement* is not Ambiguous or Subject to Different Interpretation and must be Enforced According to the Plain Meaning of its Terms:**

The *Agreement*, at § 7.1, allocates between the parties the responsibility for the losses which were incurred as a result of this derailment. The defendants are responsible for and must assume all loss, damage or injury to the NECR's property, including the cost of removing any trackage, repairing trackage which was caused by the defendants' engines, cars, trains or other on-track equipment whether or not the condition or arrangement of the trackage contributes in any manner or to any extent to such loss, or damage. This contract provision is not ambiguous

16

and this Court can determine its meaning without any other guide than the knowledge of the simple facts on which, from the nature of language in general, its meaning depends. Burbridge v. Howard Univ., 305 A.2d 245, 247 (D.C. 1973); Tillery v. D.C. Contract App. Board, 04-AA-1363 (D.C. 12-21-2006). The District of Columbia adheres to an "objective" law of contracts, meaning the written language embodying the terms of an agreement will govern the rights and liabilities of the parties regardless of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress, or mutual mistake. DSP Venture Group, Inc. v. Allen, 830 A.2d 850, 852 (D.C. 2003).

## 2.    § 7.1 of the *Agreement* is Enforceable, thereby Requiring the Defendants to Pay the NECR's Damages:

§ 7.1 is essentially an indemnity provision. In a written agreement, parties may provide that one party indemnify another party against its own negligence. District of Columbia v. Murtaugh, 728 A.2d 1237, 1245 (D.C. 1999); W.M. Schlosser Co. v. Maryland Drywall Co., 673 A.2d 647, 653 (D.C. 1996); District of Columbia v. Royal, 465 A.2d 367, 368-69 (D.C. 1983). An indemnity provision, however, should not be construed to permit an indemnitee to recover for his own negligence unless the court is firmly convinced that such an interpretation reflects the intention of the parties. Schlosser, 673 A.2d at 653; United States v. Seckinger, 397 U.S. 203, 211 (1970). The *Agreement* is very specific and sufficiently broad so as to require the defendants to indemnify the NECR against liability for its own damages and/or negligence. Royal, 465 A.2d at 369.

17

### 3.    The STRC's Spoliation of Evidence:

The defendants have lost or failed to preserve relevant factual evidence concerning the happening of this derailment, as well as their subsequent investigation of the derailment. The defendants rest their claims solely on this evidence in their claims as to how the derailment occurred and to support their counter-claims. Specifically, the defendants faiiled to preserve and, in fact, has destroyed: (1) Mr. Bergeron's handwritten notes and calculations taken at the derailment scene; and (2) the initial report concerning the derailment authored by the train's conductor. Further, the defendants failed to preserve, by means of photographic evidence, the condition of the curve in the *Line* measured by Mr. Bergeron where he claims existed an obvious visual defect that caused the derailment.

The Bergeron notes are significant due to the fact that the defendants will apparently at trial be relying on the data from those notes to advance its explanation for how derailment occurred. The notes contained a number of calculations, measurement, readings, and drawings concerning the track layout and structure at Mile Post 10.18. This original information was thrown away by Mr. Bergeron after he made another drawing from this information.

The defendants' conductor was required to complete a full report as to the happening of the derailment. He has testified that he completed the required report and then affixed a copy to his superior's door in East Deerfield, MA and then facsimiled a copy to the defendants' dispatching center in Billerica, MA. Neither of the copies that were made available to the defendants have been produced in discovery. The conductor does not know what happened to the original report or where it is located now. The conductor drafted a "replacement" report about twenty days after he drafted the initial report and based his "replacement" report upon his

18

notes, records, and memory at that time. None of his notes or records, upon which he relied

upon to draft the "replacement" report, have been produced in discovery.

Last, Mr. Bergeron, while at the scene, had an assistant with him who was an employee

of the defendants, to whom he gave instructions concerning a number of issues. One instruction

of particular note was to photograph the area of the track where Mr. Bergeron took his

measurements and where he determined that the derailment occurred due to an obvious visual

condition of the "defective" track. None of these photographs have been produced. The

defendants had a duty to preserve this evidence knowing full well that they did not disclose their

determinations and observations as to the cause of the derailment to the NECR and that the

NECR would, as part of the restoration of the *Line*, re-surface that section of track thereby

forever losing an opportunity to photograph and/or measure the trackage to challenge or verify

the defendants' determination, observations, calculations, measurement, readings, and drawings.

In a diversity action brought in federal court, the court is to apply state substantive law

and federal procedural law. Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1983). Rules of evidence

are generally considered procedural, which means that, even in diversity actions, the court should

apply federal law with respect to evidentiary issues. Headley v. Chrysler Motor Corp., 141

F.R.D. 362, 364-65 (D.Mass. 1991); *see also* Carota v. Johns Manville Corp., 893 F.2d 448 (1st

Cir. 1990). With respect to spoliation of evidence issues in diversity suits, federal law controls.

Chapman v. Bernard's, Inc., 167 F. Supp. 2d 406, 413 (D.Mass. 2001). *But see* Fedder v.

McClennen, 1994 U.S. Dist. LEXIS 14680, *5 (D.Mass. Sept. 28, 1994) (applying the

procedural laws of the forum state in a diversity action with respect to the appropriate statute of

limitations).

Spoliation of evidence is defined as "the intentional, negligent, or malicious destruction of relevant evidence." Townsend v. American Insulated Panel Co., Inc., 174 F.R.D. 1, 4 (D.Mass. 1997). A party has a duty to preserve material evidence both during litigation and during prelitigation stages when the party knows or reasonably should know that the evidence may be relevant. Blinzler v. Marriott Int'l Inc., 81 F.3d 1148, 1158-59 (1st Cir. 1996). A party's bad faith destruction of a document relevant to proof of an issue at trial gives rise to a strong inference that production of the document would have been unfavorable to the party responsible for its destruction. Townsend, 174 FRD at 4. Nation-wide Check Corp. v. Forest Hills Distributors, 692 F.2d 214, 218 (1st Cir. 1982). "District courts have inherent power to exclude evidence that has been improperly altered or damaged by a party where necessary to protect the non-offending party from undue prejudice." Chapman, 167 F. Supp. 2d at 413 (citing Sacramona v. Bridgestone/Firestone, Inc., 106 F.3d 444, 446 (1st Cir. 1997)).

Upon determining that evidence has been destroyed, the court may then impose appropriate sanctions on the party who destroyed the evidence. Townsend, 174 F.R.D. at 4 (citing Corales v. Sea-Land Service, Inc., 172 F.R.D. 10 (D.P.R. 1997)). When sanctioning a party for spoliating evidence, the court may impose sanctions, including "dismissal of the case, the exclusion of evidence, or a jury instruction on the 'spoliation inference.'" Corales, 172 F.R.D. at 13 (quoting Howell v. Maytag, 168 F.R.D 502, 505 (M.D. Pa. 1996)). In determining what sanctions to impose, the court weighs the following factors:

> (1) [W]hether the adverse party was prejudiced by the destruction of evidence; (2) whether the prejudice can be cured; (3) the practical importance of the evidence; (4) whether the destruction was in good faith or bad faith; and (5) the potential for abuse if the evidence is not excluded or the party is not otherwise sanctioned.

20

Corales, 172 F.R.D. at 13 (*citing* Mayes v. Black & Decker, Inc., 931 F.Supp. 80, 83 (D.N.H. 1996)); Headley v. Chrysler Motor Corp., 141 F.R.D. 362, 365 (D.Mass. 1991) (*quoting* Lewis v. Darce Towing Co., Inc., 94 F.R.D. 262, 266-67 (W.D. La. 1982)); Northern Assurance Co. v. Ware, 145 F.R.D. 281 at 283 (D.Me. 1993); *see also* McGuire v. Acufex Microsurgical, Inc., 175 F.R.D. 149, 156 (D.Mass. 1997).

While bad faith is a consideration in issuing sanctions for spoliation of evidence, it is not required for sanctions to be imposed. Rather, where a party is prejudiced as a result of the destruction of evidence, even where the destruction is the result of carelessness, sanctions may be imposed. Sacramona, 106 F.3d at 444. (upholding sanctions excluding evidence where the defendants were unable to examine the evidence, specifically a wheel, where the plaintiff's expert inspected and cleaned the wheel, thereby making it impossible to discern any markings that were on the wheel at the time of the incident). Rather, bad faith "is not essential. If such evidence is mishandled through carelessness, and the other side is prejudiced...the district court is entitled to consider imposing sanctions, including exclusion of evidence." Kelley v. United Airlines, Inc, 176 F.R.D. 422, 427 (D.Mass. 1997) (*quoting* Sacramona 106 F.3d at 447 (citations omitted)). Accordingly, an inference that evidence was destroyed because its contents were unfavorable to a party *may* be drawn upon a showing that the destroyer had notice "of the potential claim and of the document's potential relevance." Kelley., 176 F.R.D. at 427 (*quoting* Blinzler, 81 F.3d at 1158-59; *see also* Nation-Wide Check Corp. v. Forest Hills Distributors, Inc., 692 F.2d 214, 218 (1st Cir. 1982).

21

### 4.  The Defendants' Common Law Claims are Preempted Pursuant to 49 C.F.R. § 213.2:

Railroad operations and facilities, including track structures and bridges, are governed by a comprehensive scheme of federal statutes and their implementing regulations, including the *Federal Railroad Safety Act* ("FRSA"). In 1966, Congress transferred the responsibility for rail safety to the Secretary of Transportation, *see* section 6(e) of the *Department of Transportation Act*, Pub.L.Co. 89-670, 80 Stat. 93 (1966), which in turn delegated those responsibilities to the Federal Railroad Administration ("FRA"), a unit of the Department of Transportation ("DOT"). *See* 49 C.F.R. § 1.49(m); *Act of October 15, 1966*, Pub. L. 89-670 § 6(e)(1), 80 Stat. 939, formerly codified at 49 U.S.C. §1655(e)(1). The FRA has promulgated specific and detailed specifications and safety standards for all types of railroad equipment, activities and operations, including *Track Safety Standards* (49 C.F.R. Part 213). The FRSA's stated purpose is "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. Under the FRSA, the Secretary is given broad power to "prescribe regulations and issue orders for every area of railroad safety ..." Id. The FRSA contains an express preemption provision, which states:

> Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue to enforce a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement.

49 U.S.C. § 20106. Where the statute being construed contains an express preemption clause, such as § 20106, "the task of statutory construction must in the first instance focus on the plain wording of the clause...." CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993). The provisions of the FRSA's preemption clause mandate that "applicable federal regulations may

<center>22</center>

preempt any state 'law, rule, regulation, order, or standard relating to railroad safety.' Legal

duties imposed on railroads by the common law fall within the scope of these broad phrases."

Id.; Ouellette v. Union Tank Car Co., 902 F. Supp. 5, 9 (D. Mass. 1995). FRSA preemption

applies to any and all regulations pertaining to railroad operations and railroad safety, whether

enacted before or after the FRSA. See, e.g., CSX Transp., Inc. v. Public Utilities Comm'n of

Ohio, 901 F.2d 497, 501 (6th Cir. 1990); Consol. Rail Corp. v. City of Bayonne, 724 F.Supp.

320 (D.N.J.1989); Tolentino v. United Parcel Service, et al., 2001 U.S. Dist. LEXIS 1395 (D.

Mass. 2001).

    All that is required to trigger the FRSA's preemption provision is that the subject of the

defendants' claim be "covered" by any of the FRA's regulations. The focus of the inquiry must

be on whether the FRA has adopted regulations which "substantially subsume" the subject at

issue. Here, the subject is the inspection and maintenance of the track structure. The FRA has

promulgated detailed and specific regulations on this subject at 49 C.F.R. Parts 213, which is

entitled Track Safety Standards, and it contains detailed and specific regulations for minimum

inspection and maintenance requirements for all components of the track structure, including the

roadbed and the area immediately adjacent to it and various appurtenances to railroad tracks and

railroad rights of way. See e.g. 49 C.F.R. §213.7 and subpart F – Inspection, 49 C.F.R.

§§ 213.231 to 213.241. Part 213 also contains a number of provisions which impose upon

railroads specific requirements for the inspection and maintenance of these areas and structures.

Part 213 also has its own express preemption provision which states as follows:

> Under 49 U.S.C. 20106, issuance of these regulations preempts
> any state law, regulation, or order covering the same subject matter
> except an additional or more stringent law, regulation, or order that
> is necessary to eliminate or reduce an essentially local safety
> hazard; is not compatible with a law, regulation, or order of the

23

> United States Government; and that does not impose an
> unreasonable burden on interstate commerce.

49 C.F.R. §213.2. Part 213 also has specific provisions setting forth penalties for violations of

any requirements of the regulations set forth therein, including a schedule of fines. 49 C.F.R.

§213.15, and App. B. Subpart F sets forth specific "requirements for the frequency and manner

of inspecting track to detect deviations from the standards prescribed in this part." 49 C.F.R.

§213.231. Part 213 also contains specific sub-parts pertaining to the "roadbed"[4] and "track

appliances and track-related devices." 49 C.F.R. subparts B and E.

It is clear from the plain language of 49 C.F.R. Parts 213 that the FRA has issued

regulations which cover the trackage. Thus, the expressed preemption provisions of 49 U.S.C.

§ 20106 and 49 C.F.R. § 213.2 have been triggered. Given these facts, the regulations

substantially subsume the subject of the design, condition, maintenance, inspection and repair of

all components of the trackage. Therefore, the defendants' common law negligence claims in

this regard are preempted and must be dismissed.

**B.    Issues Raised by the Defendants-Counterclaimants:**

1.    Section 9.9 of the 1990 trackage rights order ("TRO") of the Interstate Commerce

Commission, which is the basis for NECR's damage claim under the Interstate Commerce Act,

provides that the TRO shall be interpreted under District of Columbia law. *Amtrak—*

*Conveyance of B&M in Conn River Line in VT & NH*, 6 I.C.C.2d 539, 567 (1990) (§ 9.9 of

TRO).

2.    The District of Columbia is a contributory negligence jurisdiction, which means

that "there is a complete bar to recovery [by NECR] if [Guilford] prevails on the question of

---

[4] As stated in §213.31, "this sub-part prescribes minimum requirements for roadbed and areas immediately adjacent to roadbed."

24

contributory negligence." *Krombein v. Gali Service Indus., Inc.*, 317 F. Supp. 2d 14, 17 (D.D.C. 2004) (citing *Andrews v. Wilkins*, 934 F.2d 1267, 1272 (D.C. Cir. 1991)); *see Hall v. Carter*, 825 A.2d 954, 956 (D.C. 2003); *id.* at 964 (separate statement of two judges explaining workings of D.C. rule). Thus, NECR cannot recover on its claims if NECR's negligence was any part of the cause of the derailment and resulting damage.

3.      Moreover, because NECR violated track safety regulations and standards of the Federal Railroad Administration, Guilford can recover on its counterclaims against NECR even if Guilford was contributorily negligent. *See Jarrett v. Woodward Bros., Inc.*, 751 A.2d 972, 985 (D.C. 2000).

4.      The STB has ruled, in a proceeding in which Guilford and NECR were parties, that notwithstanding the literal text of § 7.1 of the TRO, NECR is liable for its acts or omissions relating to the derailment if such acts or omissions constitute gross negligence or willful misconduct. *Boston and Maine Corp. v. New England Central R. Inc.*, STB Finance Dkt. No. 34612 (STB served Jan. 10, 2006) [Dkt. #29, Att. 1]. Because NECR did not seek review of the STB decision within sixty days, the decision is binding upon NECR. *See* 28 U.S.C. § 2344.

**VII.    REQUESTED AMENDMENTS TO THE PLEADINGS:**

None at this time.

**VIII.    ADDITIONAL MATTERS TO AID IN THE DISPOSITION OF THE CASE:**

Both parties desire to file *Motions for Summary Judgment*, as well as *Motions in Limine* concerning certain evidentiary issues to be resolved before trial. The parties can file their *Motions for Summary Judgment* within the next forty-five (45) days. They desire to file their *Motions in Limine* in accordance with the present order, which is one week before trial, but are willing to filing same with their *Motions for Summary Judgment*, should the Court so require.

25

## IX.     PROBABLE LENGTH OF TRIAL:

The length of this trial will depend on what issues are to be tried. The parties believe that

trial could take from 5 to 10 days of testimony. Both sides have requested a jury trial

## X.     LIST OF WITNESSES:

### A.     Plaintiff's Witness List:

1.     Michael Lawyer, NECR, 2 Federal Street, St. Albans, VT.
The investigation into the derailment, the work completed to restore the
*Line* back to FRA Class III condition, involvement by Engineers
Construction, Inc. in the derailment and NECR's business generally, the
NECR's response to the derailment; and the damages suffered by the
NECR as a result of the derailment.

2.     Charles Moore, NECR, 2 Federal Street, St. Albans, VT.
The investigation into the derailment, the work completed to restore the
*Line* back to FRA Class III condition, involvement by Engineers
Construction, Inc. in the derailment and NECR's business generally, the
NECR's response to the derailment; the damages suffered by the NECR as
a result of the derailment; the NECR's efforts to collect the monies due
from the defendants on account of the derailment; and discipline of the
STRC crew after the derailment.

3.     Thomas Murphy, American Rail Dispatch Center.
The policies and procedures applicable to the NECR's dispatching center
and foreign railroads.

4.     Richard T. Boucher, NECR, 2 Federal Street, St. Albans, VT.
The inspection of the *Line*, the investigation and confirmation of the defect
at Mile Post 10.6 after the FRA Geometry test on June 8, 2004, and the
condition of the line immediately before, at the time of, and after the
derailment.

5.     Richard R. Boucher, NECR, 2 Federal Street, St. Albans, VT.
The inspection of the *Line*, the investigation and confirmation of the defect
at Mile Post 10.6 after the FRA Geometry test on June 8, 2004, and the
condition of the line immediately before, at the time of, and after the
derailment.

6.     Ronald W. Boucher, NECR, 2 Federal Street, St. Albans, VT.
The condition of the line immediately before, at the time of, and after the
derailment.

26

7.   Tami Campbell, NECR, 2 Federal Street, St. Albans, VT.
     The NECR's AMTRAK lost time incentive damages.

8.   Gilbert St. Amand, NECR, 2 Federal Street, St. Albans, VT.
     Dispatching of the STRC's train on July 3, 2004, his communications with
     the STRC crew immediately after the derailment, and the policies and
     procedures applicable to the foreign train crews while on the NECR's
     *Line*.

9.   Steven Larro, NECR, 2 Federal Street, St. Albans, VT.
     The applicable operating rules and requirements applicable to the foreign
     crew on the *Line* on July 3, 2004.

10.  Peter Kari, Springfield Terminal Railway Company, Iron Horse Park,
     North Billerica, MA.
     His operation of the STRC's train and activities thereon on July 3, 2004,
     as the engineer of the derailed train, as well as the applicable operating
     rule and procedures that his crew was required to comply with on that
     date.

11   Joseph Scappaci, Springfield Terminal Railway Company, Iron Horse
     Park, North Billerica, MA.
     His control of the STRC's train and activities thereon on July 3, 2004, as
     the engineer of the derailed train, as well as the applicable operating rule
     and procedures that his crew was required to comply with on that date.

12.  Roger D. Bergeron, Springfield Terminal Railway Company, Iron Horse
     Park, North Billerica, MA.
     His investigation into and cause determination concerning the derailment,
     his communications internally and externally with NECR, B&M, and
     STRC employees concerning the derailment, the applicability of the
     provisions of the *Agreement*.

13.  Lawrence Ferguson, Springfield Terminal Railway Company, Iron Horse
     Park, North Billerica, MA.
     Communications internally and externally with NECR, B&M, and STRC
     employees concerning the derailment.

14.  Sydney Culliford, Springfield Terminal Railway Company, Iron Horse
     Park, North Billerica, MA.
     His investigation into and cause determination concerning the derailment,
     his communications internally and externally with NECR, B&M, and
     STRC employees concerning the derailment, the applicability of the
     provisions of the *Agreement*.

27

15. Michael C. Bump, Springfield Terminal Railway Company, Iron Horse Park, North Billerica, MA.
    His investigation into and cause determination concerning the derailment, his communications internally and externally with NECR, B&M, and STRC employees concerning the derailment, his observations at the derailment site, and the STRC's activities at the derailment site in clean-up efforts.

16. Steven Mumbly, 481 Meridan Road, Lebanon, NH.
    The work authorized and completed on the derailment as contracted with Engineers Construction, Inc.

17. Eugene J. Trombly, 2446 Carter Hill Road, Swanton, VT.
    The work authorized and completed on the derailment as contracted with the NECR.

18. The NECR's expert witnesses will testify regarding train handling, operations and track safety issues, the cause of the derailment, and the costs incurred by as the result of the derailment.

The NECR reserves the right to call all witnesses identified by the defendants, to call rebuttal and/or impeachment witnesses, and to supplement its witness list prior to trial.

**B.    Defendants-Counterclaimants' Witness List:**

Some of Guilford's proposed witnesses may be beyond the reach of trial subpoenas. *See* Fed. R. Civ. P. 45(b)(2), (c)(3)(A)(ii). Should any such individuals not be available for trial, Guilford intends to offer appropriate portions of their deposition testimony into evidence. *See* Fed. R. Civ. P. 32(a)(3).

Roger Bergeron (Guilford employee) will testify regarding track safety issues, the result of his investigation into the derailment, the costs incurred by Guilford as a result of the derailment, and the costs allegedly incurred by NECR as a result of the derailment.

Guilford's expert witness will testify regarding track safety issues, his opinion regarding the cause of the derailment, and his opinion regarding the costs incurred by the parties as the result of the derailment.

28

Charles Moore (former NECR employee) will testify regarding his knowledge of the causes of the derailment and the subsequent repairs to the rail line.

A. Peter Kari (Guilford employee—member of train crew) will testify regarding the derailment, the circumstances surrounding same, and the slow orders that were in place for the line before and after the derailment.

J.C. Scappace, Jr. (Guilford employee—member of train crew) will testify regarding the derailment, the circumstances surrounding same, and the slow orders that were in place for the line before and after the derailment.

Steve Mumley (nonparty witness—employee of Vermont Rail) will testify regarding the extent and cost of post-derailment repairs.

Rick Boucher (NECR track inspector) will testify regarding track conditions before and after the derailment, as well as regarding track safety issues and possibly regarding the cost and extent of post-derailment repairs.

Richard Boucher (NECR track supervisor) will testify regarding track conditions before and after the derailment, as well as regarding track safety issues and possibly regarding the cost and extent of post-derailment repairs.

Michael Lawyer (NECR employee) will testify regarding track conditions before and after the derailment, as well as regarding track safety issues and the extent and cost of the response to the derailment.

Eugene J. Trombly (nonparty witness—employee of ECI Rail Constructors, Inc., f/k/a Engineers Construction, Inc.) will testify regarding the extent and cost of post-derailment repairs.

Tami Campbell (NECR employee) will testify regarding NECR's allegedly reduced Amtrak payments because of the derailment.

Defendants reserve the right to call any witness identified by NECR, to call rebuttal and impeachment witnesses, and to supplement this witness list.

## XI.  LIST OF TRIAL EXHIBITS:

### A.  Plaintiff's Exhibit List:

1. *Modified Trackage Rights Agreement*, dated February 6, 1990, Finance Docket No.: 31250, I.C.C.;

29

2. *Rail America Engineering Standards*;

3. *General Code of Operating Rules*;

4. Timetable;

5. Dispatcher's Train Sheet – Roxbury Subdivision;

6. F.R.A. Geometry Car Inspection Report (applicable to the section of track involved in this incident);

7. Car Hire Print-outs;

8. Maintenance of Way labor documents and print-outs;

9. Equipment and miscellaneous costs documents and print-outs;

10. Outside contracting costs documents and print-outs;

11. Increased care hire expenses documents and print-outs;

12. Lost on-time performance revenue from AMTRAK documents and print-outs.

13. Invoices from contractors concerning repairs to the track and structures;

14. Damages Summary Sheet;

15. Time sheet print-out;

16. Dailey Operational Bulletin;

17. F.R.A. reports filed by the defendants;

18. *Initial Rail Equipment Accident/Incident Record*;

19. Track Warrant;

20. Transcript of the Disciplinary Hearing conducted by the defendants;

21. All notices and correspondence between the parties concerning the defendants' disciplinary hearing/procedure against its crew;

22.  System map;

23.  Track chart;

24.  Train cancellation print-out;

25.  Correspondence between the parties concerning the derailment;

26.  Event recorder print-out;

27.  Hand written notes and computer generated graphics showing measurements of the derailment;

28.  Weather reports;

29.  Training sign-in sheet for Operating Rules class, April 26, 2004;

30.  Handwritten diagram of the derailment;

31.  *Rail America Atlantic Region Dispatch Center Incident Documentation form*;

32.  Applicable Code of Federal Regulations;

33.  Track Inspection reports;

34.  Official Railway Equipment Register;

35.  NECR Invoice to the Boston and Maine Corporation and the Springfield Terminal Railway Company, dated September 7, 2004;

36.  AAR Train Derailment Cause Finding;

37.  Photographs of the point of derailment;

38.  Photographs of the damage to the Connecticut River Line as a result of the derailment;

39.  Photographs of the pile-up scene of the railcars;

40.  Letter from Larry Ferguson to Charles Moore, dated July 9, 2004;

41.      STRC's *Conductor's Wheel Report*; and

42.      Agreement for Construction Services between the NECR and Engineers

Construction, Inc., dated January 5, 2004.

The NECR reserves the right to use any of the documents, data compilations and tangible

things identified and/or produced by the defendants, and incorporates herein by this reference the

documents, data compilations and tangible things set forth in the its and the defendants'

disclosures. The NECR reserves the right to supplement this exhibit list prior to trial.

**B.      Defendants-Counterclaimants' Exhibit List:**

1.      1990 Trackage Rights Order.

2.      Diagrams of derailment site.

3.      Excerpts from the Blue Book, which establishes standard rail industry

rates for track work.

4.      Standing agreement between NECR and ECI regarding track work,

including attachment setting forth rates.

5.      List of equipment rental rates charged by Klutt.

6.      Invoices and summaries of invoices from ECI, Vermont Rail, Laboready,

and other entities with which NECR allegedly contracted for post-

derailment track work.

7.      Invoices and summaries of invoices rendered to Guilford by NECR.

8.      Printouts from FRA track geometry inspection occurring in or about early

June 2004.

9. NECR train sheets for the segment of the line on which the derailment occurred.

10. NECR slow orders on the line before, on, and after July 3, 2004.

11. NECR (RailAmerica) track maintenance manual.

12. Relevant FRA Track Safety standards.

13. Relevant FRA regulations.

14. NECR track chart for the relevant line segment.

15. Memorandum from Charles Moore (NECR) to Scott Linn (NECR or RailAmerica), dated July 3, 2004.

16. Vermont Railway direct labor distribution sheets.

17. Photographs of the derailment location and the location where the cars left the tracks.

18. AAR Train Derailment Cause Finding (Apr. 1982; rev. Apr. 1983).

19. Accident/incident reports re derailment.

20. Transcript of disciplinary hearing (Aug. 9, 2004).

In addition, the Defendants reserve the right to use any exhibits listed by, or other items produced by, the Plaintiff. The Defendants also reserve the right to supplement this list of exhibits.

**C. The parties' objections to the exhibits:**

The plaintiff objects to Defendants' Exhibits 2, 3, 5, and 19.

The defendants object to Plaintiff's Exhibit 17.

33

Respectfully submitted,
by their attorneys:

NEW ENGLAND CENTRAL R.R., INC.,

/s/ Richard A. Davidson, Jr.
Michael B. Flynn            BBO# 559023
Richard A. Davidson, Jr.    BBO# 552988
FLYNN & ASSOCIATES, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169
(617) 773-5500

SPRINGFIELD TERMINAL RY. CO.
and the BOSTON AND MAINE CORP.,

/s/ Eric L. Hirschhorn
Winston & Strawn LLP
1700 K Street, NW
Washington, D.C. 20006
(202) 282-5706

/s/ Robert B. Culliford
Pan Am Systems, Inc. BBO# 638468
14 Aviation Avenue
Portsmouth, NH 03801
(978) 663-1024

Dated: January 29, 2007

34

# EXHIBIT "C"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------

NEW ENGLAND CENTRAL
RAILROAD, INC.
               Plaintiff,

      VS.               Civil Action No.
                            04-30235-MAP

SPRINGFIELD TERMINAL RAILWAY
COMPANY, ET AL.
               Defendants.

------------------------------

D E P O S I T I O N
-of-
MICHAEL LAWYER

Taken on Tuesday, January 9, 2007,
at the offices of
New England Central Railroad, Inc.
St. Albans, Vermont.

APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
RICHARD A. DAVIDSON, JR., ESQ.
Flynn & Associates, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169

ON BEHALF OF THE DEFENDANT:
ROBERT B. CULLIFORD, ESQ.
Senior Vice President and General Counsel
Pan Am Systems
14 Aviation Avenue
Portsmouth, NH 03801

NORMA J. MILLER, RPR
COURT REPORTERS ASSOCIATES
117 BANK STREET
BURLINGTON, VT 05401
(802) 862-4593

1  answer the questions orally.  Nodding, the

2  stenographer can't record.

3   A.  Yes.

4   Q.  Can you give us a brief overview of your

5  professional background?

6   A.  I started with the railroad in '97, in the

7  Accounting Department.  You'll have to forgive me, I

8  don't recall all the dates at which transitions

9  occurred.

10   Q.  That's okay.

11   A.  I did work for the Engineering Department and

12  the Mechanical Department, beginning in '98, at an

13  administrative function, and then that grew into

14  work for the Regional Vice President and the General

15  Manager, and in 2003, I became a roadmaster, and

16  that is my current position.

17   Q.  Can you describe what your duties as a

18  roadmaster would be?

19   A.  To oversee the Track Department on the New

20  England Central and the Connecticut Southern

21  Railroads; supervise the individuals that work here;

22  lay out capital projects; oversee the budget.

23   Q.  Could you give us a little more detail, then,

24  of in 2003 and 2004, sort of the specific experience

25  with engineering, particularly track maintenance and

1  rehabilitation?

2    A.  Could you please --

3    Q.  Could you describe some of the projects you've

4  been involved in, any courses you've taken to

5  educate yourself on these issues?

6    A.  Projects I've been involved in are just of

7  that railroad nature.  Tie installation, surfacing

8  projects, bridge work, and the normal maintenance,

9  as well.  Classes that I've attended, I don't recall

10  whether it was 2003 or 2004, but it was the latter

11  part of the year, I attended a track safety

12  standards course given by the University of

13  Tennessee.

14    Q.  And what did that entail, the curriculum?

15    A.  It was about a three-to-four-day course

16  involving instruction on track inspection and all

17  the parts of 213 and the CFR -- 49 CFR 213, which is

18  the track safety standard.

19    Q.  Are you qualified as a track inspector?

20    A.  No.

21    Q.  Okay, and today, just so we're all clear,

22  we're going to be talking about a segment of New

23  England Central's track, basically from milepost 11

24  to milepost 5.  Are you familiar with that stretch

25  of track?

1    A.   Okay.

2    Q.   And then it's marked milepost 11 decimal

3    10.16, and then there's a designation, "warp 62."

4    Do you know what that designation, warp 62, is in

5    reference to?

6    A.   Yes, it's a difference in cross level in a

7    62-foot core section of track.

8    Q.   Do you know if that condition, warp 62 as you

9    defined it, constitutes a track defect within the

10   parameters of the FRA track safety standards?

11   A.   It's dependent upon class of track.  What it

12   is saying is that in Class 3 track, the value that's

13   listed to the right of it is beyond acceptable for

14   Class 3.

15   Q.   Okay.

16   A.   And then it additionally says it is safe for

17   Class 2.

18   Q.   Okay.  At the time that this test was taken,

19   what was the class of the track?

20   A.   It is Class 3 track.

21   Q.   3?

22   A.   Yes.

23   Q.   Did you know prior to June 8th, 2004, whether

24   condition existed at Milepost -- help me, are we

25   talking about Milepost 10.16 here, or --

1   A.   Yes.

2   Q.   Did you know that this condition existed prior

3   to June 8th, 2004?

4   A.   No.

5   Q.   Did anyone from New England Central know that

6   this condition existed prior to June 8th, 2004?

7   A.   Not to my knowledge.

8   Q.   Does New England Central regularly inspect

9   this track?

10  A.   Yes.

11  Q.   How many times a week?

12  A.   Twice.

13  Q.   Did anyone from -- there also seems to be a

14  number of -- let's go through this.  Just for

15  example, the first line, warp 62 apparently existed?

16               MR. DAVIDSON:  Okay, are we talking

17  about the first line of page 803?

18               MR. CULLIFORD:  Yes, I apologize.

19  BY MR. CULLIFORD:

20  Q.   Also refers to this condition of warp 62,

21  correct?

22  A.   Yes.

23  Q.   As does the second?

24  A.   Okay.

25  Q.   Correct?

1  cause wheel lift?

2    A.  You're asking me to speak to something that

3  I'm not an expert on.

4    Q.  I'm asking -- I'm just asking you for your

5  position.

6    A.  I can't say what degree of lift would be

7  caused by what condition of track.  All I know is

8  that the CFR and the Federal Railroad Administration

9  give a list of criteria that are safe for certain

10 standards of track, and that's what we go by.

11   Q.  Okay, other than dropping the speed on the

12 line to the next class, what other remedial options

13 were available, if any?

14   A.  Repair the condition.

15   Q.  Was that considered?

16   A.  Yes.

17   Q.  Okay.  When was that option considered?

18   A.  It's considered immediately after the test,

19 but we repair them not necessarily in the order they

20 were found, but on a basis of when we can fix each

21 individual one.  Our machines may not have been in

22 the area at the time, so we were most likely fixing

23 other ones, but not that one at that given point.

24   Q.  At what given point?

25   A.  Well, right after the test.

1    Q.   Okay.   What about in the period between June

2  8th, 2004, and July 3rd, 2004?

3    A.   We had not done work on that specific defect.

4  We had been doing work on other ones.

5    Q.   Why would you not elect to perform work at

6  this location on this defect in the period June 8,

7  2004, to July 3rd, 2004?

8    A.   It wasn't that we had not elected to.   We

9  hadn't got to it yet.

10    Q.   So you gave priority to repairing other

11  defects over repairing this defect; is that a

12  correct statement?

13    A.   I don't know as it was on a prioritization

14  basis, just necessarily first come-first served, or

15  what we came across first.

16    Q.   So if one defect was worse than another, that

17  wouldn't enter into your thinking as to when you

18  address it?

19    A.   It would be based on the condition that

20  existed and how it would be prioritized, but they

21  were -- if they were something we could provide

22  remedial action by slow-ordering the track, we did.

23    Q.   Okay, was it you were addressing the defects

24  on a first-come-first-serve basis, or addressing

25  defects based on a prioritization?

1   A.   There's two levels of defect in my mind that

2  we look at.  One that shows a Class 0, which needs

3  to be addressed immediately.  That it is not

4  necessarily safe for operations.  Those are the

5  first.  Those are prioritized.  We have to do those

6  first.  And then after that, it becomes a basis of

7  when we can get the machine to them.  Usually we do

8  them in order, first come, first serve.  If there's

9  a larger problem that is going to take more time and

10  effort, we may jump over that and prioritize in that

11  respect.  There's not a great deal of thought that

12  goes into let's fix these, if we had 50 defects,

13  let's fix them in this order, 1, 2, 3, all the way

14  up to 50 -- that's not the case.  There are some

15  that require immediate attention, other ones that we

16  can do in a first-come-first-serve basis.

17   Q.  Could you take a look at Lawyer Exhibit 2

18  again, which is the test results?

19   A.  Okay.

20   Q.  Could you go through here and identify for me,

21  anyway, what some of the more significant defects

22  would be?

23   A.  As far as prioritization?

24   Q.  Yes.

25   A.  The first page would be marked in the third

1  column as 120.99.  It's a cross level defect.

2    Q.  And what type of defect is a cross level

3  defect?

4    A.  It's a the maximum allowable, and this is in

5  tangent track, cannot be more than three inches.

6  This is 3.31.

7    Q.  Does that have any relation at all to a warp

8  condition?

9    A.  No, they're two different defects.  They're

10  both with regard to geometry of track, but --

11    Q.  And why would you consider that to be a more

12  significant defect than a warp condition?

13    A.  Because the limiting class was 0, meaning that

14  it needed to be resolved before we could send

15  another train over it.

16    Q.  Okay, whether trains could operate over the

17  line -- Was your main consideration keeping trains

18  running when you decided which defects to address?

19    A.  Yes.

20    Q.  And that consideration was driven by basically

21  the track class that was identified by the test

22  truck?  What I'm trying to get at is on these test

23  results, wherever there's a limiting class of zero,

24  a train could not operate over that segment of track

25  until the defect was corrected; is that a true

1  statement?

2    A.  Yes.

3    Q.  So what causes -- I guess what I'm trying to

4  get to is what causes a limiting class of zero

5  versus a limiting class, say, of 2?

6    A.  With respect to cause, it would depend upon

7  the defect.

8    Q.  In other words, does a more severe defect lead

9  to a lower limiting class, is I guess basically what

10  I'm asking.

11    A.  Yes.

12    Q.  And during the period June 8th to July 3rd,

13  2004, were all of the areas identified by a limiting

14  class of zero addressed by New England Central?

15    A.  Yes.

16    Q.  Was that basically done right after June 8th,

17  2004?

18    A.  As I recall, everything was dealt with on June

19  8th that was found on June 8th with respect to

20  zeroes.

21    Q.  Then what's the next -- what would the next

22  category of defects be for remedial action?  You've

23  taken care of the limiting class zero.  What was

24  your plan -- or New England Central's plan, for that

25  matter -- to address the additional defects on this

Page 28

1   report?

2     A.   It would be dependent upon the type of defect

3   and what the repair would be.  For instance, if it

4   was a short gauge defect that didn't involve our

5   tamper and regulator to travel to it, we could take

6   a truck with a couple guys in it and repair the

7   defect.  So that was based, I guess, upon what the

8   repair would be and the magnitude of it.  If it was

9   a geometry condition or a surface condition that

10  would require the tamper to do work on it, we would

11  wait for the tamper to get to that point, because

12  it's not cost-effective to travel it up and down the

13  track.  You travel it in one direction and hit every

14  defect as you come to it, first-come, first-served.

15    Q.   And where did the -- okay, so for any of the

16  limiting Class 3 defects were tampers and

17  regulators --

18    A.   I don't recall specifically.

19    Q.   Would a tamper or a regulator be necessary to

20  rectify a condition identified as cross level?

21    A.   Not necessarily.

22    Q.   Could you flesh that out a bit?

23    A.   You could do it by hand.  Meaning -- well,

24  there's a couple different alternatives.  Jacking

25  the track with track jacks and tamping with a

1    tamping stick to get the stone underneath the ties

2    could be done.  It's a more labor-intensive and

3    time-consuming deal, but in this event, if we had a

4    zero, we would have done that if the tamper wasn't

5    close by.

6      Q.  Could that method have been used at Milepost

7    10.16, as well?

8      A.  Could have been, yeah.

9      Q.  So it's safe to say that after June 8th, you

10   and/or NECR came up with a plan to address the

11   defects noted on Lawyer Exhibit 2, correct?

12     A.  Yes.

13     Q.  Who was involved in those discussions?

14     A.  It would have been myself and Richard Boucher.

15     Q.  Anyone else?

16     A.  Possibly Joe Spirk, the chief engineer.

17     Q.  What about Charles Moore?

18     A.  He would have probably not been terribly

19   involved in the decision on how to address them.

20     Q.  How many discussions do you think you had with

21   Mr. Boucher regarding a plan to address these

22   defects?

23     A.  It would be hard to say.  We speak daily,

24   discuss status.

25     Q.  Would he ever submit anything in writing to

1    A.   I don't recall if I did.

2    Q.   You didn't want to -- it wasn't of primary

3  importance to you to know what this project would

4  cost?

5    A.   I don't recall whether we discussed numbers

6  specifically.

7    Q.   Do you generally ask ECI, or does anyone from

8  New England Central generally ask ECI, how much a

9  project is going to cost?

10   A.   Generally for the derailments, we get them

11  there to do the work and get it done.  Generally we

12  look at the numbers after, and it's based on their

13  time and materials.

14   Q.   To the best of your knowledge, is that what

15  occurred here?

16   A.   As I recall, yes.

17   Q.   Do you recall, as you've had this derailment

18  on July 3rd, 2004, do you recall what the goal of

19  the repair of the line was?  In other words, was the

20  goal to repair the line to the level -- the

21  condition it was in on July 3rd, 2004, or was the

22  goal to repair the line to a better condition?

23   A.   The goal was to restore it to Class 3 track.

24   Q.   It wasn't Class 3 on July 3rd, 2004; is that

25  correct?

Page 47

1    A.   There was -- yes, it was Class 3 track.   There

2   were a couple of restrictions within it that

3   required a Class 2 speed restriction to be placed on

4   it, but the entire five miles, if you will, for the

5   most part, was Class 3.

6    Q.   Do you recall when the last tie job or

7   significant maintenance work was done on this

8   portion of the line?

9             MR. DAVIDSON:   When you say this

10  portion of the line, what are you talking about?

11            MR. CULLIFORD:   Pardon me?

12            MR. DAVIDSON:   Where are you talking

13  about on the line?   Are you talking about the

14  Connecticut line?

15            MR. CULLIFORD:   I'm sorry, this

16  segment from Milepost 11 to Milepost 5, and just so

17  we're all clear, I thought we identified that's the

18  segment we're talking about, so --

19   A.   I don't recall.   You're talking prior to 2004?

20   Q.   Yes.

21   A.   I don't recall when the last programmed

22  maintenance was done there.

23   Q.   If I could ask you to take a look at this, are

24  you familiar with this document, sir?

25   A.   Yes.

# EXHIBIT "D"

Volume 1, Pages 1-180

Exhibits: 10-26

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

NEW ENGLAND CENTRAL RAILROAD, INC.,

           Plaintiff

v.                  Docket No. 04-30235-MAP

SPRINGFIELD TERMINAL RAILWAY

COMPANY and BOSTON AND MAINE

CORPORATION,

           Defendants

      ---------------------------

RULE 30(b)(6) DEPOSITION OF SPRINGFIELD TERMINAL

RAILWAY COMPANY by ROGER D. BERGERON

Thursday, January 11, 2007, 10:11 a.m.

Law Office of Robert H. D'Auria

41 North Road, Suite 205

Bedford, Massachusetts  01730


----Reporter:  Kathleen Mullen Silva, RPR, CRR----

Beacon Hill Court Reporting, Inc.

807 Main Street, 2nd Floor

Worcester, Massachusetts 01610

508.753.9286

16

```
 1   same now, sitting here in January three months
 2   later, as it was when they first described it to
 3   you?
 4       A.   Yes, I'd say, yeah.
 5       Q.   Now, this is the Rule 30(b)(6) deposition
 6   of the Springfield Terminal Railway Company and it's
 7   my understanding you've been identified to provide
 8   the testimony on behalf of the corporation today.
 9   Is that your understanding?
10       A.   That's my understanding.
11            MR. DAVIDSON:  Counsel, is there any
12   area of inquiry that we've identified in the notice
13   that Mr. Bergeron is not here to testify about?
14            MR. WRIGHT:  May I review the notice
15   briefly?
16            MR. DAVIDSON:  Sure.
17            (Discussion held off the record.)
18            MR. WRIGHT:  With regard to all of the
19   numbered items, I would say he'd be qualified to
20   testify as to everything with the exception of item
21   1.  He wasn't involved in the negotiation, drafting
22   and interpretation of the Trackage Rights Agreement.
23            MR. DAVIDSON:  We didn't ask that he was
24   involved in that.  We wanted to ask for someone to
```

1  speak to that.

2          MR. WRIGHT:  He can speak to it to the

3  extent that he has seen it, but...

4          MR. DAVIDSON:  Okay.  For the purposes

5  of today, would he be someone who is going to

6  testify on behalf of the company as to the

7  interpretation of the agreement?  Because I can

8  reserve on the negotiating and drafting, but the

9  real, obviously, concern is your company's

10  interpretation of the agreement.

11          MR. WRIGHT:  Sure.  I mean to the extent

12  that it doesn't call for a legal conclusion, I would

13  say that's fine.

14          MR. DAVIDSON:  Okay.  So for the

15  purposes of today, we have nine items on the notice

16  on Exhibit 10.  The plaintiff is going to reserve

17  their rights to ask you to produce someone as to the

18  negotiating and drafting of the Trackage Rights

19  Agreement that exists between the parties, and he's

20  going to testify about all other areas?

21          MR. WRIGHT:  Correct.

22          MR. DAVIDSON:  Okay.

23      Q.  We're here obviously regarding a derailment

24  that occurred on July 3 of 2004, correct?

```
 1       A.   Warp, W-a-r-p, 62.

 2       Q.   Now, in that report on that page, do you

 3   see any exceptions taken at 10.18 by the FRA?

 4       A.   At 10.18, no, I do not.

 5       Q.   Do you see any exceptions taken at 10.17?

 6       A.   No, I do not.

 7       Q.   What about 10.19?

 8       A.   No, I do not.

 9       Q.   The only exception -- let me make sure I

10   phrase this correctly -- at milepost 10 or

11   thereabouts, between 11 and 10, was the one at

12   10.16, correct, according to the geometry test

13   results?

14       A.   According to their decimal location,

15   there's an indication that at 10.16 there was a

16   warp.

17       Q.   In that report off to your right on that

18   same line, it gives a longitude and latitude of that

19   location, correct?

20       A.   That is correct.

21       Q.   And if you and I were to go with our GPS

22   and plug in that longitude and latitude, we could go

23   out and locate that according to that data, correct?

24       A.   You can get pretty close to it, correct.
```

83

```
 1        Q.   You should be able to get almost on top of
 2   it, correct?
 3        A.   Almost, but not quite.
 4        Q.   Almost.  I've given you the fudge factor
 5   there.
 6        A.   Yeah.
 7        Q.   Now, 10.16 and 10.18 are how many feet
 8   apart, those two mileposts?
 9        A.   Between 10.16 and 10.18?
10        Q.   Yeah.
11        A.   Theoretically, under railroad terms, it
12   would be 104 feet apart roughly.
13        Q.   How long is a freight car?
14        A.   65 feet.  Well, they come in various sizes.
15        Q.   Well, how long would you say that freight
16   car is in Exhibit 19?
17        A.   I don't know specifically how long this
18   freight car is.
19        Q.   Okay.
20        A.   But freight cars vary in length from, you
21   know, 55 feet over the coupler to over the coupler,
22   to 65 feet over the coupler to over the coupler.
23        Q.   So it's approximately -- it could be two
24   car lengths apart or it could be 1 1/2 car lengths
```

84

1    apart, those two mileposts, milepost 10.16 and

2    10.18?

3         A.   It could be.

4         Q.   It's 52.8 feet for every hundredth mile,

5    right?

6         A.   Yes.

7         Q.   Just want to make sure we're using the same

8    math, that's all.

9              Now, did you sketch out the mark on the

10   rail and diagram the length of the mark on the rail

11   from the flange as the wheel rose or lifted to the

12   time it left the rail?

13        A.   I'm not following.

14        Q.   When you found your point of derailment at

15   approximately 10.18, and you said earlier that you

16   saw this marking on a rail head, did you at any

17   point sketch that, draw it out?

18        A.   No, I did not draw it out.

19        Q.   Did you have a camera with you?

20        A.   I did not, no.

21        Q.   Did Mr. Griffiths?

22        A.   Not at the time, no.

23        Q.   So neither one of you took a picture of it

24   or drew it out?

1   fouled ballast, right?

2       A.   Yes, it would have.

3       Q.   Because you felt that was relevant to your

4   investigation, correct?

5       A.   Oh, yes.  Yes.  There was another condition

6   too, because opposite the fouled ballast right up

7   here (indicating) was the station 5 through 3.

8   Because of foul ballast, it had no alignment.  And

9   this was also part of being, you know, how did you

10  see it.  You had a series of low joints that we

11  picked up here.  And then you had this high rail,

12  and instead of being a perfect radius and smooth, it

13  was kicked in about an inch -- it was about an inch

14  and a half.

15      Q.   Now, these conditions you're talking about,

16  they can result from normal wear and tear by the

17  trains using the track, correct?

18      A.   Oh, yeah.

19      Q.   And they could be accentuated by a lot of

20  rain, especially with the spongy ballast, correct?

21      A.   Yes.  Oh, yeah.

22      Q.   So if someone had inspected it a couple of

23  days before and a number of trains had run down the

24  track, it could conceivably been not picked up

143

```
 1    because it didn't exist then, correct?

 2              MR. WRIGHT:  I'm going to object to that

 3    as being speculative.

 4        A.  It is impacted by train loading and

 5    climate.

 6        Q.  Okay.  And would a warm climate affect it?

 7        A.  It could.

 8        Q.  And a cold climate could affect it too?

 9        A.  Certainly.

10        Q.  Because you have expansion and contraction?

11        A.  That is correct.

12        Q.  The time of the day could even effect it,

13    could it not, depending on whether the sun's up or

14    the sun's not down?

15        A.  The geometry indicated --

16        Q.  It's a yes or no question.

17        A.  The answer is no.

18        Q.  So the sun heating the rail being in the

19    sky in July would not affect the expansion and

20    contraction of the rail?

21        A.  Oh, it does.

22        Q.  And that could affect the geometry too,

23    correct?

24        A.  Not generally.
```

144

1        Q.   What happens if the lower -- the inside of

2   the curve was in the shade and the outside of the

3   curve was in the sun?  One would expand and one

4   wouldn't with the sun, correct?

5        A.   That is correct.

6        Q.   And that could affect the geometry, right?

7   Correct?

8        A.   I suppose it could.

9        Q.   When you were out there, the inside of this

10  curve where you have A, B and C, in fact, there's

11  trees here, aren't there, on the west side of the

12  rail?  Not close, but there's trees right there?

13       A.   When you come in to the west rail, it's a

14  farmer's field and then there's vegetation out

15  through here, but not -- there's nothing within

16  striking distance of the operational railroad out

17  there.

18       Q.   What about on the east side?

19       A.   Same thing, but not within striking

20  distance of hitting equipment or rolling stock.

21       Q.   Okay.  Good.  And you were out there three

22  days after the derailment, correct?

23       A.   Yes.

24       Q.   So you don't know how many trains had come

**Roger D. Bergeron**
**January 11, 2007**

145

```
 1   down to that point or not before you took your

 2   measurements, correct?

 3       A.   I didn't know about operational

 4   characteristics, no.

 5       Q.   Do you know how many freight cars were in

 6   this train?

 7       A.   It was under 20.

 8       Q.   Do you know how many locomotives?

 9       A.   I believe two.

10       Q.   Now, your crew had a duty to operate the

11   train reasonably and safely, correct?

12       A.   Yes.

13       Q.   That's like a general rule?

14       A.   Without a doubt.

15       Q.   And you're familiar with the general

16   operating rules, not specific rules, but the general

17   operating safety rules?

18       A.   Yes.

19       Q.   And they're supposed to operate the train

20   reasonably safely regardless of what other rules

21   apply; that is the foremost rule, correct?

22       A.   Safety is the foremost rule, that is

23   correct.

24       Q.   And to always act reasonably and safely
```

158

```
 1   conclusion.

 2             MR. DAVIDSON:  Well, just for the

 3   record, you've agreed to provide someone to speak to

 4   the interpretation of the agreement.  I don't see

 5   how we could do it unless -- that's why I asked the

 6   question the way I did.

 7        A.   My interpretation of this --

 8        Q.   No, no, no, no.  Not yours; the railroad's,

 9   your company's.  What is your company's

10   understanding as to what that provision means, 7.1,

11   of the Trackage Rights Agreement?

12        A.   That we're responsible to remove -- "repair

13   the trackage and correct environmental damage, which

14   may be caused by its engine, cars, trains or other

15   on-track equipment (including damage by fire

16   originating therefrom) whether or not the condition

17   or arrangement of the trackage contributes in any

18   manner or to any extent to such loss, damage or

19   injury, and whether or not a third party may have

20   caused or contributed to such loss, damage or

21   injury, and for all loss or damage to its engines,

22   cars, trains or other on-track equipment while on

23   said trackage from any cause whatsoever, except in

24   the case of collision, in which event the provisions
```

1    or Section 7.2 shall apply."

2        Q.  Well, we didn't have a collision here

3    between two railroads, did we?

4        A.  No.

5        Q.  We had a derailment, correct?

6        A.  That is correct.

7        Q.  And we had property damage?

8        A.  That is correct.

9        Q.  And we had property damage not only to the

10   New England Central; we had property damage to the

11   rail cars in the possession or in the count of the

12   Springfield Terminal Railroad, correct?

13       A.  That is correct.

14       Q.  When I say "we," I mean the situation when

15   I say "we."

16       A.  Right.

17       Q.  So it's your understanding that if your

18   train and your cars do the damage to a track, you

19   know, this particular track being the line as

20   defined in the agreement, then the STRC would be

21   then responsible for all the damage that results

22   therefrom, correct?

23       A.  According to some of the language in that,

24   that's what it appears.

160

```
1        Q.   Do you see any exceptions in that
2    provision?
3        A.   In that provision, no.
4        Q.   Other than the exception for 7.2?
5        A.   No.   That's right.   Other than where it
6    says, "Except in the case of collision, in which
7    event the provision of 7.2 shall apply."
8        Q.   And 7.2 goes on for almost a whole page
9    after that and talks about what employees and
10   equipment and all that kind of fun stuff, which
11   really has nothing to do with this, correct?
12       A.   I would say correct.   I have to read 7.2 to
13   make sure of that.
14       Q.   I'm just saying generally.
15       A.   Probably generally, yes.
16       Q.   Now, each party to this agreement would be
17   the New England Central and the Springfield Terminal
18   Railway, correct, because the Springfield Terminal
19   is an assignee of the Boston & Maine, who has the
20   original agreement, correct?
21       A.   Mm-hmm.
22       Q.   Your rights for the Springfield flow from
23   the B&M's rights, the original party to the
24   agreement, is that correct?
```

# EXHIBIT "E"

000807

AUTOMATED TRACK INSPECTION PROGRAM

# TRACK GEOMETRY INSPECTION REPORT
ST Albans, VT to Windsor, VT
NECR-0456
NECR
9309 Feet before MP 131  to MP 1 - 1474



Federal Railroad Administration
Office of Safety
Washington, D.C.

Printed 06/08/04 12:21:59 PM
ENSCO Editor v $Revision: 1.27 $  $Date: 2004/02/12 17:53:36 $

NECR-0456
NH State Line to VT State Line
NECR

Exception Report
Quick Exception List
MP 131 to MP 121

Page 7
06/08/04
NECR-0456

| MP | Feet | Decimal | Parameter | Value | Length | TSC | L-P Class | Track | Latitude | Longitude |
|---|---|---|---|---|---|---|---|---|---|---|
| 14 | 003195 | 13.40 | Warp 62 | 2.53 | 14 | T | 1 3 | 5 | 43.631789 | -072.330938 |
| 14 | 003216 | 13.39 | Warp 62 | 2.50 | 21 | T | 1 3 | 5 | 43.631733 | -072.330955 |
| 14 | 003899 | 13.26 | Warp 62 | 2.29 | 20 | T | 1 3 | 5 | 43.629898 | -072.331450 |
| 13 | 005288 | 13.00 | Down MP | 13.00 | | | | | 43.626187 | -072.332610 |
| 13 | 001290 | 12.76 | Crosslevel | 1.94 | 2 | T | 2 3 | 5 | 43.622734 | -072.333647 |
| 13 | 001348 | 12.75 | Warp 62 | 2.20 | 59 | T | 2 3 | 5 | 43.622577 | -072.333684 |
| 12 | 005299 | 12.00 | Down MP | 12.00 | | | | | 43.612155 | -072.334521 |
| 12 | 000610 | 11.88 | Gage Wide | 57.88 | 4 | S | 1 3 | 5 | 43.610577 | -072.333751 |
| 12 | 001496 | 11.72 | Warp 62 | 2.23 | 60 | S | 2 3 | 5 | 43.609052 | -072.331236 |
| 11 | 005270 | 11.00 | Down MP | 11.00 | | | | | 43.600404 | -072.331130 |
| 11 | 004448 | 10.16 | Warp 62 | 2.21 | 62 | S | 2 3 | 5 | 43.593081 | -072.344186 |
| 10 | 005295 | 10.00 | Down MP | 10.00 | | | | | 43.592571 | -072.347304 |
| 10 | 000878 | 09.84 | RQ CB Ver P-P | 0.44 | | | | | 43.591586 | -072.350306 |
| 9 | 005336 | 09.00 | Down MP | 9.00 | | | | | 43.586660 | -072.365683 |
| 8 | 005236 | 08.00 | Down MP | 8.00 | | | | | 43.578776 | -072.381403 |
| 8 | 000496 | 07.91 | Gage Wide | 58.01 | 11 | C | 0 3 | 5 | 43.577664 | -072.382453 |
| 8 | 004697 | 07.11 | RQ CB Ver P-P | 0.51 | | | | | 43.566425 | -072.384375 |
| 7 | 005292 | 07.00 | Down MP | 7.00 | | | | | 43.564791 | -072.384383 |
| 6 | 005302 | 06.00 | Down MP | 6.00 | | | | | 43.550259 | -072.384217 |
| 5 | 005257 | 05.00 | Down MP | 5.00 | | | | | 43.536267 | -072.388402 |
| 4 | 005308 | 04.00 | Down MP | 4.00 | | | | | 43.523335 | -072.397012 |
| 3 | 005298 | 03.00 | Down MP | 3.00 | | | | | 43.509675 | -072.399006 |
| 2 | 005289 | 02.00 | Down MP | 2.00 | | | | | 43.497811 | -072.388749 |
| 1 | 005308 | 01.00 | Down MP | 1.00 | | | | | 43.483966 | -072.384225 |
| 1 | 001474 | 00.72 | Warp 62 | 2.68 | 39 | S | 1 3 | 5 | 43.479936 | -072.384727 |
| 1 | 003443 | 00.35 | Crosslevel | 2.64 | 102 | T | 1 3 | 5 | 43.475512 | -072.386703 |
| 1 | 004384 | 00.17 | Gage Wide | 57.88 | 3 | S | 1 3 | 5 | 43.473574 | -072.388652 |
| 1 | 005140 | 00.03 | Warp 62 | 3.26 | 62 | S | 0 3 | 5 | 43.470865 | -072.389253 |
| 1 | 005322 - | 00.01 | State Line | NH | | | | | 43.469802 | -072.388827 |
| 169 | 005541 | 169.00 | Down MP | 169.00 | | | | | 43.468446 | -072.388259 |
| 169 | 000283 | 168.86 | Warp 62 | 2.43 | 62 | S | 1 3 | 5 | 43.466661 | -072.388046 |
| 169 | 000303 | 168.85 | Warp 62 | 2.37 | 60 | S | 1 3 | 5 | 43.466606 | -072.388049 |
| 169 | 001366 | 168.31 | Lmt Speed 3 | 47.00 | | | | | 43.455785 | -072.387753 |
| 168 | 001974 | 168.00 | Down MP | 168.00 | | | | | 43.454719 | -072.387455 |
| 168 | 000163 | 167.94 | Warp 62 | 2.21 | 62 | S | 2 3 | 5 | 43.453352 | -072.387024 |
| 168 | 000317 | 167.89 | Lmt Speed 3 | 30.00 | | | | | 43.448625 | -072.387966 |
| 167 | 002830 | 167.00 | Down MP | 167.00 | | | | | 43.440687 | -072.390679 |
| 166 | 005289 | 166.00 | Down MP | 166.00 | | | | | 43.426254 | -072.392015 |

**NOTES:**
Runoff exceptions are for information only
RQ (Ride Quality) exceptions are for information only

# EXHIBIT "F"

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CENTRAL RAILROAD, INC.,
Plaintiff,

v.

SPRINGFIELD TERMINAL RAILWAY
COMPANY and BOSTON AND MAINE
CORPORATION,
Defendants

Civil Action No.:  04-30235-MAP

## NOTICE OF TAKING DEPOSITION

To:    Robert B. Culliford
       Sr. Vice-President & General Counsel
       Pam Am Systems, Inc.
       14 Aviation Avenue
       Portsmouth, NH  03801

**PLEASE TAKE NOTICE** that at **1:00 p.m.**, on **Thursday, January 11, 2007,**

at the Law Office of Robert H. D'Auria, 41 North Road, Suite 205, Bedford, MA 01730, the

plaintiff, New England Central Road, Inc., by its attorneys, will take the deposition of the person

at the Springfield Terminal Railway Company with the most knowledge concerning: (1) the

negotiation, drafting, and interpretation of the Trackage Rights Agreement between the parties; (2) the

B&M's, STRC's, or Central Maine's use of the Connecticut River Line; (3) the derailment on July 3, 2004;

(4) the investigation as to the cause of the derailment on July 3, 2004; (5) the damages which the B&M

and STRC claim in this litigation; (6) the condition of the Connecticut River Line; (7) the personnel,

medical, disciplinary and training files for the crew on the freight train that derailed on July 3, 2004; (8)

the weather conditions on the morning of July 3, 2004; (9) the existence and substance of internal

communications concerning the happening of the derailment on July 3, 2004, pursuant to the applicable



provisions of the Federal Rules of Civil Procedure, before a Notary Public in and for the

Commonwealth of Massachusetts or before some other officer authorized by law to administer

oaths. The oral examination will continue from day to day until completed.

You are invited to attend and cross-examine.

Respectfully submitted,

NEW ENGLAND CENTRAL RAILROAD, INC.,
by its attorneys,

Michael B. Flynn                    BBO# 559023
*mbflynn@flynnassoc.com*
Richard A. Davidson, Jr.      BBO# 552988
*radavidsonjr@flynnassoc.com*
FLYNN & ASSOCIATES, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169
(617) 773-5500

Dated: January 8, 2007

2

# EXHIBIT "G"

ARDC

# NEW ENGLAND CENTRAL RAILROAD CO. DAILY OPERATING BULLETIN NO. ~~185~~
## EFFECTIVE AT 0001 HOURS JULY ~~03~~, 2004

186

(Void at 0001 JULY ~~04~~, 2004 unless extended by Train Dispatcher)

001535

TRANS. RULE OF THE WEEK: ~~GCOR 7.5 TESTING HAND BRAKES~~

MECHANICAL RULE OF THE WEEK: ~~EYE AND FACE PROTECTION~~

MOW RULE OF THE WEEK: ~~ENGINEERING SAFETY: SPIKE MAUL~~

 Changed

## All Subdivisions

| Void | Item | Form | Limits | Speed | From - Until | Foreman | Flag At MP | Stop | F.INT. - DATE & TRK COND. |
|------|------|------|--------|-------|--------------|---------|------------|------|---------------------------|
| | 1 | | LATEST SUPERINTENDENT'S NOTICE 03-06 | | LATEST GENERAL ORDER 04-14 | | | | |
| | 2 | | WEEKEND DUTY OFFICER NORTHERN DIVISION STEVE LARRO 6/10 AND 6/11 | | | | | | |
| | 3 | | ALL CREWS MUST BE ON THE LOOKOUT FOR SUSPICIOUS PERSONS ON OR ABOUT RAILROAD PROPERTY. CREWS ARE INSTRUCTED TO REPORT THESE INSTANCES TO THE ARDC & TO LOCAL AUTHORITIES AS NECESSARY. | | | | | | |

## Palmer Subdivision

| Void | Item | Form | Limits | Speed | From - Until | Foreman | Flag At MP | Stop | F.INT. - DATE & TRK COND. |
|------|------|------|--------|-------|--------------|---------|------------|------|---------------------------|
| | 4 | C | NEW LONDON | WATCH FOR WORKERS ON BRIDGE NEW LONDON YARD | | | | | 06-23-04 |
| | 5 | A | 1.4 - 2.25 | 10 MPH | | | NO FLAGS | | DED 08-13-03 TIE |
| | 6 | A | 3.9 | 10 MPH | | | NO FLAGS | | DED 03-10-04 TIE |
| | 7 | A | 5.3 - 5.5 | 10 MPH | | | NO FLAGS | | DED 06-05-02 TIE |
| | 8 | A | 6.2 | 10 MPH | | | NO FLAGS | | DED 04-18-02 SRF |
| | 9 | C | THAMESVILLE - SIDING OOS BETWEEN MP12.4 AND MP12.5 | | | | | | DED 04-22-04 GAUG |
| | 10 | A | 14.15 | 10 MPH (NORWICH TUNNEL) | | | NO FLAGS | | MJP 09-05-03 WATER |
| | 11 | A | 16.8 | 10 MPH (BRIDGE) | | | NO FLAGS | | DED 05-25-04 BT |
| | 12 | A | 18.54 | 10 MPH | | | NO FLAGS | | DED 03-10-04 FROG |
| | 13 | A | 23.07 | 10 MPH | | | NO FLAGS | | DED 04-13-04 SRF |
| | 14 | A | 25.26 - 25.36 | 25 MPH | | | NO FLAGS | | DWW 05-07-04 |
| | 15 | A | 26.03 | 25 MPH | | | NO FLAGS | | DED 10-22-03 SRF |
| | 16 | A | 27.5 - 27.9 | 25 MPH | | | NO FLAGS | | DED 05-26-04 TIES |
| | 17 | B | WILLAMANTIC (TRACK 854) | | | CONTRACTOR | NO FLAGS | | MLL 06-15-04 |
| | 18 | C | 29.99 | TRACK 852 AIRLINE TRACK OOS | | | | | DED 04-24-03 |
| | 19 | A | 35.9 | 25 MPH | | | NO FLAGS | | DED 08-26-03 TIE |
| | 20 | A | 37.35 - 37.4 | 10 MPH | | | NO FLAGS | | DED 06-22-04-TIES |
| | 21 | A | 38.65 | 25 MPH | | | NO FLAGS | | |
| | 22 | A | 39.6 - 39.65 | 25 MPH | | | NO FLAGS | | DED 03-31-04 TIE |
| | 23 | A | 40.95 | 25 MPH | | | NO FLAGS | | DED 02-27-04 SRF |
| | 24 | A | 42.75 - 42.8 | 25 MPH | | | NO FLAGS | | DED 03-30-04 TIE |
| | 25 | A | 43.3 | 10 MPH | | | NO FLAGS | | DED 06-23-04 TIES |
| | 26 | A | 46.45 - 46.60 | 10 MPH | | | NO FLAGS | | DED 03-18-03-TIE |
| | 27 | A | 48.7 | 10 MPH | | | NO FLAGS | | DED 06-22-04-TIES |

## *Roxbury Subdivision*                                                      001538

| Vold | Items | Form | Limits | Speed | From - Until | Foreman | Flag At MP | Stop | F.INT. - DATE & TRK COND. |
|---|---|---|---|---|---|---|---|---|---|
| 84 | A | | 0.7 | 10 FRT 15 PSGR | | | NO FLAGS | | 06-10-04 SRF-TIE |
| 85 | A | | 5.06 - 5.1 | 25 FRT 30 PSGR  (CROSSING) | | | NO FLAGS | | RWB 2-03-01 SRF |
| 86 | C | | HARTLAND | NORTH SWITCH OOS | | | | | RTB 04-20-04 SWD |
| 87 | A | | 10.15 | 25 FRT 30 PSGR | | | NO FLAGS | | 06-10-04 SRF |
| 88 | A | | 11.7 | 25 FRT 30 PSGR | | | NO FLAGS | | 06-11-04  SRF |
| 89 | A | | 12.7 - 12.75 | 25 FRT 30 PSGR | | | NO FLAGS | | 06-10-04 SRF |
| 90 | A | | 13.4 | 25 FRT 30 PSGR | | | NO FLAGS | | RRB 06-12-04 SRF |
| 91 | A | | 14.25 - 14.3 | 10 FRT 15 PSGR | | | NO FLAGS | | 06-10-04 GAUG |
| 92 | C | | WHITE RIVER JCT YARD | TRACK 410 OOS SOUTH END | | | | | RWB 03-04-04 |
| 93 | C | | WHITE RIVER JCT YARD | TRACK 406 SOUTH END MIDDLE OF YARD TRACK OOS | | | | | RWB 04-21-04 |
| 94 | C | | WHITE RIVER JCT YARD | TRACK 404 IS DESIGNATED SIDING UNTIL FURTHER NOTICE | | | | | RWB 03-18-04 |
| 95 | C | | WHITE RIVER JCT YARD | TRACK 423 OOS SOUTH END FOR 200 FEET | | | | | RWB 04-29-04 GAUG |
| 96 | C | | WHITE RIVER JCT YARD | NORTH END TRACK 407 TARGET MISSING FROM THE SWITCH | | | | | RTB 06-28-04 |
| 97 | A | | 23.2 - 23.6 | 10 MPH | | | NO FLAGS | | RTB 05-07-04 GAUG |
| 98 | A | | 33.7 | 10 FRT 15 PSGR | (BRIDGE) | | NO FLAGS | | 06-10-04 GAUGE TIES |
| 99 | A | | 34.36 | 25 FRT 30 PSGR (CROSSING) | | | NO FLAGS | | RMC 05-28-04 SRF |
| 100 | A | | 35.01 | 25 FRT 30 PSGR MPH (BRIDGE) | | | NO FLAGS | | EAC 06-10-04 TIE |
| 101 | A | | 42.2 | 25 FRT 30 PSGR | | | NO FLAGS | | RRL 12-12-03 BS |
| 102 | A | | 46.3 | 25 FRT 30 PSGR (SWITCH) | | | NO FLAGS | | RRL-06-14-04 SRF-MUD |
| 103 | A | | 53.15 | 25 FRT 30 PSGR (CROSSING) | | | | | RRL 11-25-02 SRF |
| 104 | A | | 61.0 | 25 FRT 30 PSGR | | | NO FLAGS | | EAC 06-03-04 CULVERT |
| 105 | A | | 64.9 | 10 MPH | | | NO FLAGS | | RTB-06-24-04-RAIL |
| 106 | A | | 74.25 | 10 FRT 15 PSGR | (BRIDGE) | | NO FLAGS | | 06-10-04 GAUGE-TIE |
| 107 | C | | MONTPELIER JCT | SOUTH SWITCH TO THE WYE WHEN IN NORMAL POSITION (GREEN TARGET) WILL BE LINED FOR TRACK 334 THE SHORT LEG OF WYE INSTEAD OF TRACK 333 THE WYE SIDING | | | | | |
| 108 | C | | MONTPELIER JCT SIDING OOS | | | | | | RTB-06-22-04-TIE-KINK |
| 109 | A | | 76.5 - 76.66 | 25 FRT 30 PSGR | | | | | RRB 10-28-02-SRF MUD |
| 110 | A | | 85.95 | 25 FRT 30 PSGR (CROSSING) | | | | | RRL 06-02-04 SRF |
| 111 | A | | 89.4 | 25 FRT 30 PSGR | | | NO FLAGS | | 06-10-04 STONE |
| 112 | A | | 99.06 | 25 FRT 30 PSGR (CROSSING) | | | | | RRL 06-30-03 SRF-MUD |
| 113 | A | | 113.4 - 114.0 | 10 FRT 15 PSGR | | | NO FLAGS | | 06-10-04 SRF-RAIL |

# EXHIBIT "H"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------

NEW ENGLAND CENTRAL
RAILROAD, INC.
                    Plaintiff,

          VS.                    Civil Action No.
                                 04-30235-MAP

SPRINGFIELD TERMINAL RAILWAY
COMPANY, ET AL.
                    Defendants.

------------------------------


D E P O S I T I O N
-of-
RICK T. BOUCHER

Taken on Wednesday, January 10, 2007,
at the offices of
New England Central Railroad, Inc.
St. Albans, Vermont.

APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
RICHARD A. DAVIDSON, JR., ESQ.
Flynn & Associates, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169

ON BEHALF OF THE DEFENDANT:
ROBERT B. CULLIFORD, ESQ.
Senior Vice President and General Counsel
Pan Am Systems
14 Aviation Avenue
Portsmouth, NH 03801

NORMA J. MILLER, RPR
COURT REPORTERS ASSOCIATES
117 BANK STREET
BURLINGTON, VT 05401
(802) 862-4593

Page 4

```
 1        Wednesday, January 10, 2007, 10:04 a.m.

 2            RICK T. BOUCHER, being duly sworn, deposes

 3            and says as follows:

 4                    *    *    *

 5                    EXAMINATION

 6  BY MR. CULLIFORD:

 7    Q.   Morning.  How are you?

 8    A.   Good.  You?

 9    Q.   Yeah?

10    A.   Good.

11    Q.   Could you state your name and address for the

12  record, please?

13    A.   Rick T. Boucher, P.O. Box 171, Westminster

14  Station, Vermont, 05159.

15    Q.   And could you give us a brief overview of your

16  professional background?

17    A.   Track inspector.  Have been for the past -- I

18  guess probably going on four years now.

19    Q.   Okay.

20    A.   Started in '98, working on the production gang

21  as a laborer.

22    Q.   Are you an FRA-authorized track inspector?

23    A.   Yes, I am.

24    Q.   Since when?

25    A.   I don't remember the date.  I guess I don't
```

Page 8

1   response to discovering this defect?

2      A.   Not that I recall, I guess.

3      Q.   Okay.  But -- and help me here.  You were

4   aware that there was a defect at Milepost 10.16

5   after June 8th, 2004?

6      A.   Yeah.

7      Q.   After June 18th, 2004, when was the next time

8   you inspected the area at or around Milepost 10.16?

9      A.   I don't recall.

10     Q.   How often were you inspecting the track

11  between Milepost 11 and Milepost --

12     A.   Twice a week, under federal regulations.  I

13  don't recall dates.

14     Q.   Okay.  Was it within two days, three days,

15  that day?  You don't recall that?  Doesn't have to

16  be the specific date, just --

17     A.   I don't recall, yeah.

18     Q.   Do you recall how many times -- do you recall

19  the first time you inspected -- I don't need to know

20  the date -- or how soon thereafter, when you went

21  out and inspected at Milepost 10.16, did you note

22  the defect then?

23     A.   No.

24     Q.   You didn't?  You knew it existed, but you

25  didn't note --

1   A.   Right.

2   Q.   Then you're out there inspecting twice a week

3   thereafter, correct?

4   A.   Correct.

5   Q.   So you get to Milepost 10.16.   Did you see the

6   condition?   In other words, when you're at Milepost

7   10.16 on your next inspection, did you agree that a

8   defective condition existed, looking at it that day?

9   A.   Yes, and it was slowered.

10   Q.   That's not what I'm asking.   Do you agree with

11   what the FRA test truck found, that a condition

12   known as warp --

13   A.   Yes, I agree.

14   Q.   Based on your own personal observations, or

15   based on what you were told?

16   A.   No, based on the measurements and GPS readings

17   given, that it was gone back and determined that it

18   was in fact there.

19   Q.   Who determined that?

20   A.   Myself and R.R. Boucher.

21   Q.   So you did go out there after the test truck

22   had gone over it?

23   A.   Correct.

24   Q.   Knowing that the condition existed?

25   A.   Yes.

1   Q.   And you agreed with the determination of the

2   test truck?

3   A.   I mean it -- yes.

4   Q.   Okay.

5   A.   Agreed with the measurements that they'd given

6   us.

7   Q.   How did you agree with the measurements?  Did

8   you do your own measurements?

9   A.   Yes, we did.

10  Q.   Okay.  So during the period June 8th, 2004, to

11  July 3rd, 2004, you're inspecting twice a week; is

12  that correct?

13  A.   That's correct.

14  Q.   Did you inspect at Milepost 10.16 twice a

15  week?

16  A.   Yes.

17  Q.   Did you do any additional measurements between

18  the initial measurement you did to confirm the FRA

19  test car results and July 3rd, 2004?

20  A.   The date of -- or I guess I don't recall

21  exactly at what specific time we did the

22  measurements, but I know that we went well north and

23  south of the location through the curve.

24  Q.   Yeah?

25  A.   The measurements.

1    Q.   I understand that.  You did an initial

2  measurement to confirm the test results, correct?

3    A.   Correct.

4    Q.   What I'm asking you is were there any

5  subsequent measurements of the condition at Milepost

6  10.16 between your initial measurement and July 3rd,

7  2004, I guess I don't understand your question.

8    Q.   Pardon me?

9    A.   I guess I don't understand your question.

10   Q.   You performed one measurement, if I understand

11 what you're saying, soon after the test truck went

12 over the line?

13   A.   That's correct, yeah.

14   Q.   All's I'm asking is did you do another

15 measurement after the initial one?  We've got one in

16 the book.

17   A.   Yeah.

18   Q.   Did you ever do another measurement between

19 that initial measurement and July 3rd, 2004?

20   A.   Not that I can recall, I guess, no.

21   Q.   Do you recall going out there at your

22 twice-weekly inspections and noticing that the

23 condition remained the same, or was it worsening or

24 was it getting better?

25   A.   To my knowledge, it remained the same.

# EXHIBIT "I"

000875



# DAILY TRACK
# INSPECTION REPORT

Subdivision _Roxbury_

Mileage from _Windsor_ to _14.45_

Section No. _____

**TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION. IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.**

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | **RAIL** | Length_____ft._____in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn    5. Turn Stk. Rail<br>3. Weld end    6. Gr. Stk. Rail<br>4. Change Stk. Rail    7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod<br>2. Rep. No._____Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| | **JOINTS** | 1. Tamp    6. Replace bars<br>2. Tighten Bolts    7. Replace bond<br>3. Replace Bolts    8. Replace Insul.<br>4. Tight-Open    9. Install shims<br>5. Open-Close    10. Remove shims & tamp | | **SWITCH STANDS** | Type_____<br>1. Replace    5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| | **SPIKES** | 1. Gage Track    4. Spike Switch<br>2. Redrive    (Out of Service)<br>3. Replace | | **SWITCH PLATES** | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | **TIE PLATES** | 1. Replace    2. Replace Abrasion | | **GUARD RAIL** | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | **RAIL ANCHORS** | 1. Reset<br>2. Replace<br>3. Additional | | **CROSSINGS** | Name_____<br>1. Patch holes<br>2. Replace plank    7. Repair X Bucks<br>3. Spike plank    8. Surf. end of Xing<br>4. Inst. Flg. Rail    9. Clean Flange<br>5. Respike Flg. Rail    10. Insp. Sig. lights<br>6. Cut Brush    11. Remove Snow |
| | **FROG** | No._____Type_____Lgth._____<br>1. Replace<br>2. Weld    5. Surface<br>3. Tighten Bolts    6. Weld Hold Down<br>4. Rep. with rail    7. Replace Bolts | | **TIES & TIMBER** | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| | **SWITCH POINTS** | Type_____Weight_____Lgth._____<br>1. Tamp Heel    5. Adjust<br>2. Tamp point    6. Grind LH<br>3. Replace LH    7. Grind RH<br>4. Replace RH    8. Remove Snow | | **R.O.W.** | 1. Clean ditch<br>2. Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| | **SWITCH INSPECTION IN YARDS** | (Yard Name)    (Date)<br>(Yard Name)    (Date)<br>(Yard Name)    (Date) | | **REMARKS** | |

Signature _____ (Patrol Foreman)

Signature _____ (Foreman)

Date Inspected _7-30-04_

Date Corrected _7-30-04_

NECR 034 2/98

L.G. Printing



# DAILY TRACK
# INSPECTION REPORT

000876

Subdivision _Roxbury_

Mileage from _76.5_   to _14.45_   Section No. _____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION.
IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | **RAIL** | Length_____ft._____in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn     5. Turn Stk. Rail<br>3. Weld end     6. Gr. Stk. Rail<br>4. Change Stk. Rail     7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod<br>2. Rep. No._____Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| 37.4 | **JOINTS** | 1. Tamp  39.2     6. Replace bars  32.3<br>2. Tighten Bolts 37.65  7. Replace bond  32.05<br>3. Replace Bolts 37.19  8. Replace Insul.<br>4. Tight-Open  23     9. Install shims<br>5. Open-Close  32.2  10. Remove shims & tamp<br>32.7 | | **SWITCH STANDS** | Type_____<br>1. Replace     5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| | **SPIKES** | 1. Gage Track     4. Spike Switch<br>2. Redrive     (Out of Service)<br>3. Replace | | **SWITCH PLATES** | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | **TIE PLATES** | 1. Replace     2. Replace Abrasion | | **GUARD RAIL** | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | **RAIL ANCHORS** | 1. Reset<br>2. Replace<br>3. Additional | | **CROSSINGS** | Name_____<br>1. Patch holes<br>2. Replace plank     7. Repair X Bucks<br>3. Spike plank     8. Surf. end of Xing<br>4. Inst. Flg. Rail     9. Clean Flange<br>5. Respike Flg. Rail  10. Insp. Sig. lights<br>6. Cut Brush     11. Remove Snow |
| | **FROG** | No.____Type_____Lgth.____<br>1. Replace<br>2. Weld     5. Surface<br>3. Tighten Bolts     6. Weld Hold Down<br>4. Rep. with rail     7. Replace Bolts | | **TIES & TIMBER** | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| | **SWITCH POINTS** | Type____Weight____Lgth.____<br>1. Tamp Heel     5. Adjust<br>2. Tamp point     6. Grind LH<br>3. Replace LH     7. Grind RH<br>4. Replace RH     8. Remove Snow | | **R.O.W.** | 1. Clean ditch<br>2. Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| | **SWITCH INSPECTION IN YARDS** | (Yard Name)_____(Date)<br><br>(Yard Name)_____(Date)<br><br>(Yard Name)_____(Date) | | **REMARKS** | Greased Curves AT 05<br>Between 75.3, 74.8, 74.6<br>Greased All Switch's Between<br>montpelier and Roxbury, Grease Curve<br>at 37.8 worked on lubricator<br>woog Sidy is ok |

Signature _____ (Relief Foreman)

Signature _____ (Foreman)

Date Inspected _7-29-04_

Date Corrected _7-29-04_

NECR 0034  2/96

L.G. Printing



# DAILY TRACK
# INSPECTION REPORT

000877

Mileage from _____ to 22.36

Subdivision _Roxbury_

Section No. _____

**TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION. IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.**

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | RAIL | Length_____ft._____in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn    5. Turn Stk. Rail<br>3. Weld end    6. Gr. Stk. Rail<br>4. Change Stk. Rail    7. Weld Stk. Rail | | RODS | 1. Rep. Conn. Rod<br>2. Rep. No._____Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| | JOINTS | 1. Tamp    6. Replace bars<br>2. Tighten Bolts    7. Replace bond<br>3. Replace Bolts    8. Replace Insul.<br>4. Tight-Open    9. Install shims<br>5. Open-Close    10. Remove shims & tamp | | SWITCH STANDS | Type_____<br>1. Replace    5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| | SPIKES | 1. Gage Track    4. Spike Switch<br>2. Redrive      (Out of Service)<br>3. Replace | | SWITCH PLATES | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | TIE PLATES | 1. Replace    2. Replace Abrasion | | GUARD RAIL | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | RAIL ANCHORS | 1. Reset<br>2. Replace<br>3. Additional | | CROSSINGS | Name_____<br>1. Patch holes<br>2. Replace plank    7. Repair X Bucks<br>3. Spike plank    8. Surf. end of Xing<br>4. Inst. Flg. Rail    9. Clean Flange<br>5. Respike Flg. Rail    10. Insp. Sig. lights<br>6. Cut Brush    11. Remove Snow |
| | FROG | No.____Type_____Lgth.____<br>1. Replace<br>2. Weld    5. Surface<br>3. Tighten Bolts    6. Weld Hold Down<br>4. Rep. with rail    7. Replace Bolts | | TIES & TIMBER | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| | SWITCH POINTS | Type____Weight____Lgth.____<br>1. Tamp Heel    5. Adjust<br>2. Tamp point    6. Grind LH<br>3. Replace LH    7. Grind RH<br>4. Replace RH    8. Remove Snow | | R.O.W. | 1. Clean ditch<br>2. Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| | SWITCH INSPECTION IN YARDS | (Yard Name)_____(Date)____<br>(Yard Name)_____(Date)____<br>(Yard Name)_____(Date)____ | | REMARKS | _WRJCT Siding is OK_ |

Signature _____
(Patrol Foreman)

Signature _____
(Foreman)

Date Inspected  7-27-04

Date Corrected  7-27-04

NECR DO4  2/94

L.G. Printing

000878

# DAILY TRACK INSPECTION REPORT

**NECR**

Subdivision _Roxbury_

Mileage from _22.36_ to _76.5_    Section No. _____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION.
IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| _62.45_ | **RAIL** | Length _38_ ft. _1/2_ in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn   5. Turn Stk. Rail<br>3. Weld end   6. Gr. Stk. Rail<br>4. Change Stk. Rail   7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod<br>2. Rep. No. _____ Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| _62.45_ | **JOINTS** | 1. Tamp   6. Replace bars<br>2. Tighten Bolts   7. Replace bond<br>3. Replace Bolts   8. Replace Insul.<br>4. Tight-Open   9. Install shims<br>5. Open-Close   10. Remove shims & tamp | | **SWITCH STANDS** | Type _____<br>1. Replace   5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| _62.45_ | **SPIKES** | 1. Gage Track   4. Spike Switch<br>2. Redrive   (Out of Service)<br>3. Replace | | **SWITCH PLATES** | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | **TIE PLATES** | 1. Replace   2. Replace Abrasion | | **GUARD RAIL** | Type _____ Lgth. _____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| _62.45_ | **RAIL ANCHORS** | 1. Reset<br>2. Replace<br>3. Additional | | **CROSSINGS** | Name _____<br>1. Patch holes<br>2. Replace plank   7. Repair X Bucks<br>3. Spike plank   8. Surf. end of Xing<br>4. Inst. Flg. Rail   9. Clean Flange<br>5. Respike Flg. Rail   10. Insp. Sig. lights<br>6. Cut Brush   11. Remove Snow |
| | **FROG** | No. _____ Type _____ Lgth. _____<br>1. Replace<br>2. Weld   5. Surface<br>3. Tighten Bolts   6. Weld Hold Down<br>4. Rep. with rail   7. Replace Bolts | | **TIES & TIMBER** | 1. Replace ties under joints<br>2. Replace _____ ties<br>3.<br>Replace _____ timbers |
| | **SWITCH POINTS** | Type _____ Weight _____ Lgth. _____<br>1. Tamp Heel   5. Adjust<br>2. Tamp point   6. Grind LH<br>3. Replace LH   7. Grind RH<br>4. Replace RH   8. Remove Snow | | **R.O.W.** | 1. Clean ditch<br>2. Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| | **SWITCH INSPECTION IN YARDS** | (Yard Name) _____ (Date) _____<br>(Yard Name) _____ (Date) _____<br>(Yard Name) _____ (Date) _____ | | | **REMARKS** _Respiked Bridge Deck_<br>_26.45 and replaced it in_<br>_Some ties RR Boucher patroled_<br>_from 76.5 to 62.5_ |

Signature _____ (Patrol Foreman)

Signature _____ (Foreman)

Date Inspected _7-26-04_

Date Corrected _7-26-04_

NECR 0034  3/98

L.G. Printing



# DAILY TRACK
# INSPECTION REPORT

000879

Subdivision _Roxbury_

Mileage from **Windsor** to **46.30**

Section No._____

**TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION. IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.**

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | **RAIL** | Length_____ft._____in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn   5. Turn Stk. Rail<br>3. Weld end   6. Gr. Stk. Rail<br>4. Change Stk. Rail   7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod<br>2. Rep. No._____Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| 40.5<br>41.92<br>42 | **JOINTS** | 1. Tamp   6. Replace bars<br>(2) Tighten Bolts   7. Replace bond<br>3. Replace Bolts   8. Replace Insul.<br>4. Tight-Open   9. Install shims<br>5. Open-Close   10. Remove shims & tamp | | **SWITCH STANDS** | Type_____<br>1. Replace   5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| | **SPIKES** | 1. Gage Track   4. Spike Switch<br>2. Redrive   (Out of Service)<br>3. Replace | | **SWITCH PLATES** | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | **TIE PLATES** | 1. Replace   2. Replace Abrasion | | **GUARD RAIL** | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | **RAIL ANCHORS** | 1. Reset<br>2. Replace<br>3. Additional | | **CROSSINGS** | Name_____<br>1. Patch holes   7. Repair X Bucks<br>2. Replace plank   8. Surf. end of Xing<br>3. Spike plank   9. Clean Flange<br>4. Inst. Flg. Rail   10. Insp. Sig. lights<br>5. Respike Flg. Rail   11. Remove Snow<br>6. Cut Brush |
| | **FROG** | No._____Type_____Lgth._____<br>1. Replace<br>2. Weld   5. Surface<br>3. Tighten Bolts   6. Weld Hold Down<br>4. Rep. with rail   7. Replace Bolts | | **TIES & TIMBER** | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| | **SWITCH POINTS** | Type_____Weight_____Lgth._____<br>1. Tamp Heel   5. Adjust<br>2. Tamp point   6. Grind LH<br>3. Replace LH   7. Grind RH<br>4. Replace RH   8. Remove Snow | | **R.O.W.** | 1. Clean ditch<br>2. Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| 46.7 | **SWITCH INSPECTION IN YARDS** | _Randolph House_   **7-23**<br>(Yard Name)   (Date)<br><br>_____<br>(Yard Name)   (Date)<br><br>_____<br>(Yard Name)   (Date) | | REMARKS | WSA Siding is ok But<br>could be Stone & Surfacing 15 to<br>South Switch |

Signature **NECR** _(Patrol Foreman)_

Signature _____ _(Foreman)_

Date Inspected **7-23-04**

Date Corrected **7-23-04**

NECR DC04  2/98

L.G. Printing

000880



# DAILY TRACK INSPECTION REPORT

76.5

Subdivision _Roxbury_

Mileage from **46.30** to  **76.5**

Section No. _____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION.
IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | **RAIL** | Length_____ ft._____in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn    5. Turn Stk. Rail<br>3. Weld end    6. Gr. Stk. Rail<br>4. Change Stk. Rail    7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod<br>2. Rep. No._____Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| | **JOINTS** | 1. Tamp    6. Replace bars<br>2. Tighten Bolts    7. Replace bond<br>3. Replace Bolts    8. Replace Insul.<br>4. Tight-Open    9. Install shims<br>5. Open-Close    10. Remove shims & tamp | RX S. SW<br>RX N. SW | **SWITCH STANDS** | Type_____<br>1. Replace    5. Respike<br>2. Rep. Target<br>③ Oil Stand<br>4. Adjust for full thread |
| | **SPIKES** | 1. Gage Track    4. Spike Switch<br>2. Redrive    (Out of Service)<br>3. Replace | RX S. SW<br>RX N. SW | **SWITCH PLATES** | 1. Tighten Braces<br>2. Replace Plates<br>③ Oil Plate |
| | **TIE PLATES** | 1. Replace    2. Replace Abrasion | | **GUARD RAIL** | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | **RAIL ANCHORS** | 1. Reset<br>2. Replace<br>3. Additional | | **CROSSINGS** | Name_____<br>1. Patch holes<br>2. Replace plank    7. Repair X Bucks<br>3. Spike plank    8. Surf. end of Xing<br>4. Inst. Flg. Rail    9. Clean Flange<br>5. Respike Flg. Rail    10. Insp. Sig. lights<br>6. Cut Brush    11. Remove Snow |
| Roxbury S. Sw | **FROG** | No.____Type____Lgth.____<br>1. Replace<br>2. Weld    5. Surface<br>3. Tighten Bolts    6. Weld Hold Down<br>4. Rep. with rail    7. Replace Bolts<br>⑧ Grin Flow off | | **TIES & TIMBER** | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| | **SWITCH POINTS** | Type____Weight____Lgth.____<br>1. Tamp Heel    5. Adjust<br>2. Tamp point    6. Grind LH<br>3. Replace LH    7. Grind RH<br>4. Replace RH    8. Remove Snow | | **R.O.W.** | 1. Clean ditch<br>2. Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |

**REMARKS** Roxbury Siding is ok
Could use some Ties

| | | | |
|---|---|---|---|
| 60.1 | Roxbury S. Sw | 7-21 | |
| 64.2 | (Yard Name) | (Date) | |
| | Roxbury N. Sw | 7-21 | |
| 67.4 | (Yard Name) | (Date) | |
| | Northind | 7-21 | |
| | (Yard Name) | (Date) | |

**SWITCH INSPECTION IN YARDS**

Signature _____ (Patrol Foreman)

Signature _____ (Foreman)

Date Inspected **7-21-04**

Date Corrected **7-21-04**

NECR 0434 396

L.G. Printing



000881

# DAILY TRACK
# INSPECTION REPORT

Subdivision _Roxbury_

Mileage from _(illegible)_    to _16.70_

Section No. _____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION.
IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | **RAIL** | Length_____ft._____in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn   5. Turn Stk. Rail<br>3. Weld end   6. Gr. Stk. Rail<br>4. Change Stk. Rail   7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod<br>2. Rep. No._____Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| 30.4<br>30.43<br>30.57<br>30.64<br>30.8 | **JOINTS** | 1. Tamp   6. Replace bars<br>2. Tighten Bolts   7. Replace bond<br>3. Replace Bolts   8. Replace Insul.<br>4. Tight-Open   9. Install shims<br>5. Open-Close   10. Remove shims & tamp | | **SWITCH STANDS** | Type_____<br>1. Replace   5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| 30.95<br>30.91 | **SPIKES** | 1. Gage Track   4. Spike Switch<br>2. Redrive   (Out of Service)<br>3. Replace | | **SWITCH PLATES** | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | **TIE PLATES** | 1. Replace   2. Replace Abrasion | | **GUARD RAIL** | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | **RAIL ANCHORS** | 1. Reset<br>2. Replace<br>3. Additional | | **CROSSINGS** | Name_____<br>1. Patch holes<br>2. Replace plank   7. Repair X Bucks<br>3. Spike plank   8. Surf. end of Xing<br>4. Inst. Flg. Rail   9. Clean Flange<br>5. Respike Flg. Rail   10. Insp. Sig. lights<br>6. Cut Brush   11. Remove Snow |
| | **FROG** | No._____Type_____Lgth._____<br>1. Replace<br>2. Weld   5. Surface<br>3. Tighten Bolts   6. Weld Hold Down<br>4. Rep. with rail   7. Replace Bolts | | **TIES & TIMBER** | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| | **SWITCH POINTS** | Type_____Weight_____Lgth._____<br>1. Tamp Heel   5. Adjust<br>2. Tamp point   6. Grind LH<br>3. Replace LH   7. Grind RH<br>4. Replace RH   8. Remove Snow | | **R.O.W.** | 1. Clean ditch<br>2. Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| | **SWITCH INSPECTION IN YARDS** | (Yard Name)   (Date)<br>(Yard Name)   (Date)<br>(Yard Name)   (Date) | | **REMARKS** | _(RBTCT) Siding ok but_<br>_(will use stone g surface) 18. to 5.5sw_<br>_(RBTCT - Killed Bees on bridge Deck_<br>_28.45_ |

Signature _(illegible)_   (Patrol Foreman)

Signature _(illegible)_   (Foreman)

Date Inspected _7-20-04_

Date Corrected _7-20-04_

NECR 1004 3/98

L.G. Printing



# DAILY TRACK INSPECTION REPORT

000882

Subdivision _Roxbury_

Mileage from **46.3** to **76.5**

Section No._____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION.
IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | RAIL | Length_____ft._____in.<br>1. Replace Broken Rail  5. Turn Stk. Rail<br>2. Weld Eng. Burn  6. Gr. Stk. Rail<br>3. Weld end  7. Weld Stk. Rail<br>4. Change Stk. Rail | | RODS | 1. Rep. Conn. Rod<br>2. Rep. No._____Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| | JOINTS | 1. Tamp  6. Replace bars<br>2. Tighten Bolts  7. Replace bond<br>3. Replace Bolts  8. Replace Insul.<br>4. Tight-Open  9. Install shims<br>5. Open-Close  10. Remove shims & tamp | 76.4 | SWITCH STANDS | Type_____<br>1. Replace  5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread _reed Casey_ |
| | SPIKES | 1. Gage Track  4. Spike Switch<br>2. Redrive  (Out of Service)<br>3. Replace | | SWITCH PLATES | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | TIE PLATES | 1. Replace  2. Replace Abrasion | | GUARD RAIL | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | RAIL ANCHORS | 1. Reset<br>2. Replace<br>3. Additional | | CROSSINGS | Name_____<br>1. Patch holes  7. Repair X Bucks<br>2. Replace plank  8. Surf. end of Xing<br>3. Spike plank  9. Clean Flange<br>4. Inst. Flg. Rail  10. Insp. Sig. fights<br>5. Respike Flg. Rail  11. Remove Snow<br>6. Cut Brush |
| | FROG | No._____Type_____Lgth._____<br>1. Replace<br>2. Weld  5. Surface<br>3. Tighten Bolts  6. Weld Hold Down<br>4. Rep. with rail  7. Replace Bolts | | TIES & TIMBER | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| 75.6<br>75.88<br>75.9<br>76.4<br>76.5 | SWITCH POINTS | Type_____Weight_____Lgth._____<br>1. Tamp Heel  5. Adjust<br>2. Tamp point  6. Grind LH<br>3. Replace LH  7. Grind RH<br>4. Replace RH  8. Remove Snow<br>9. Greased | | R.O.W. | 1. Clean ditch<br>2. Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| 75.6<br>75.88<br>75.9 | SWITCH INSPECTION IN YARDS | Sw.Sw. Montpelier  #7-19  (Yard Name)  (Date)<br>Dick Emery  7-19  (Yard Name)  (Date)<br>Corrigan  7-19  (Yard Name)  (Date) | | REMARKS | Issued Slow order of 10mph<br>on Rail at 69.45 Account of Jslt<br>on x 65 |

_Switch Inspectors on Back_

Signature _____ (Patrol Foreman)

Signature _____ (Foreman)

Date Inspected _7 - 19 - 04_

Date Corrected _7 - 19 - 04_

NECR 0254  198

L.G. Printing

000883

# NECR

## DAILY TRACK INSPECTION REPORT

Subdivision _Roxbury_

Mileage from _Windsor_ to _38.58_

Section No. _____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION.
IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | **RAIL** | Length_____ft._____in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn   5. Turn Stk. Rail<br>3. Weld end   6. Gr. Stk. Rail<br>4. Change Stk. Rail   7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod<br>2. Rep. No._____Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| 13.4 36.4<br>15.2 37.1<br>15.5<br>236 | **JOINTS** | 1. Tamp   6. Replace bars<br>2. Tighten Bolts   7. Replace bond<br>3. Replace Bolts   8. Replace Insul.<br>4. Tight-Open   9. Install shims<br>5. Open-Close   10. Remove shims & tamp | | **SWITCH STANDS** | Type_____<br>1. Replace   5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| | **SPIKES** | 1. Gage Track   4. Spike Switch<br>2. Redrive   (Out of Service)<br>3. Replace | | **SWITCH PLATES** | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | **TIE PLATES** | 1. Replace   2. Replace Abrasion | | **GUARD RAIL** | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | **RAIL ANCHORS** | 1. Reset<br>2. Replace<br>3. Additional | | **CROSSINGS** | Name_____<br>1. Patch holes<br>2. Replace plank   7. Repair X Bucks<br>3. Spike plank   8. Surf. end of Xing<br>4. Inst. Flg. Rail   9. Clean Flange<br>5. Respike Flg. Rail   10. Insp. Sig. lights<br>6. Cut Brush   11. Remove Snow |
| | **FROG** | No.____Type____Lgth.____<br>1. Replace<br>2. Weld   5. Surface<br>3. Tighten Bolts   6. Weld Hold Down<br>4. Rep. with rail   7. Replace Bolts | | **TIES & TIMBER** | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| | **SWITCH POINTS** | Type_____Weight_____Lgth._____<br>1. Tamp Heel   5. Adjust<br>2. Tamp point   6. Grind LH<br>3. Replace LH   7. Grind RH<br>4. Replace RH   8. Remove Snow | | **R.O.W.** | 1. Clean ditch<br>2. Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| | **SWITCH INSPECTION IN YARDS** | (Yard Name)_____   (Date)_____<br>(Yard Name)_____   (Date)_____<br>(Yard Name)_____   (Date)_____ | | **REMARKS** | |

Signature _____ (Patrol Foreman)

Signature _____ (Foreman)

Date Inspected _7-16-04_

Date Corrected _7-16-04_

NECR 004 2/96

L.G. Printing



**DAILY TRACK INSPECTION REPORT**

000884

Subdivision _Roxbury_

Mileage from _46.3_ to _38_

Section No._____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY.  CIRCLE DEFECTS REQUIRING ATTENTION.
IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | **RAIL** | Length_____ft._____in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn      5. Turn Stk. Rail<br>3. Weld end              6. Gr. Stk. Rail<br>4. Change Stk. Rail   7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod<br>2. Rep. No._____ Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| 42.35<br>40.45 | **JOINTS** | 1. Tamp               6. Replace bars<br>②. Tighten Bolts    7. Replace bond<br>③. Replace Bolts    8. Replace Insul.<br>4. Tight-Open        9. Install shims<br>5. Open-Close      10. Remove shims & tamp | | **SWITCH STANDS** | Type_____<br>1. Replace              5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| | **SPIKES** | 1. Gage Track       4. Spike Switch<br>2. Redrive            (Out of Service)<br>3. Replace | | **SWITCH PLATES** | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | **TIE PLATES** | 1. Replace             2. Replace Abrasion | | **GUARD RAIL** | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | **RAIL ANCHORS** | 1. Reset<br>2. Replace<br>3. Additional | | **CROSSINGS** | Name_____<br>1. Patch holes<br>2. Replace plank       7. Repair X Bucks<br>3. Spike plank          8. Surf. end of Xing<br>4. Inst. Flg. Rail      9. Clean Flange<br>5. Respike Flg. Rail  10. Insp. Sig. lights<br>6. Cut Brush           11. Remove Snow |
| | **FROG** | No._____Type_____Lgth._____<br>1. Replace<br>2. Weld               5. Surface<br>3. Tighten Bolts   6. Weld Hold Down<br>4. Rep. with rail   7. Replace Bolts | | **TIES & TIMBER** | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| | **SWITCH POINTS** | Type_____Weight_____Lgth._____<br>1. Tamp Heel         5. Adjust<br>2. Tamp point         6. Grind LH<br>3. Replace LH         7. Grind RH<br>4. Replace RH        8. Remove Snow | | **R.O.W.** | 1. Clean ditch<br>2. Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| | **SWITCH INSPECTION IN YARDS** | (Yard Name)              (Date)<br><br>(Yard Name)              (Date)<br><br>(Yard Name)              (Date) | | REMARKS | _Patrolled  46.3  -  38_ |

Signature _RR Lile_ (Patrol Foreman)

Signature _RR Lile_ (Foreman)

Date Inspected _7-15-04_

Date Corrected _7-15-04_

NECR 634  2/94

L.G. Printing.

000885



# DAILY TRACK
# INSPECTION REPORT

Subdivision _Roxbury_

Mileage from _76.5_      to _46.3_     Section No. _____

**TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION. IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.**

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | **RAIL** | Length_____ft._____in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn    5. Turn Stk. Rail<br>3. Weld end    6. Gr. Stk. Rail<br>4. Change Stk. Rail    7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod<br>2. Rep. No._____Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| _56.6_<br>_56.55_<br>_56.5_<br>_56.4_ | **JOINTS** | 1. Tamp _56.25_   6. Replace bars _55.5_<br>②Tighten Bolts _56.1_   7. Replace bond _55.3_<br>③Replace Bolts _56.05_   8. Replace Insul.<br>4. Tight-Open _55.8_   9. Install shims<br>5. Open-Close _55.6_   10. Remove shims & tamp | | **SWITCH STANDS** | Type_____<br>1. Replace    5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| | **SPIKES** | 1. Gage Track    4. Spike Switch<br>2. Redrive       (Out of Service)<br>3. Replace | | **SWITCH PLATES** | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | **TIE PLATES** | 1. Replace    2. Replace Abrasion | | **GUARD RAIL** | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | **RAIL ANCHORS** | 1. Reset<br>2. Replace<br>3. Additional | | **CROSSINGS** | Name_____<br>1. Patch holes<br>2. Replace plank    7. Repair X Bucks<br>3. Spike plank    8. Surf. end of Xing<br>4. Inst. Flg. Rail    9. Clean Flange<br>5. Respike Flg. Rail    10. Insp. Sig. lights<br>6. Cut Brush    11. Remove Snow |
| | **FROG** | No.____Type_____Lgth.____<br>1. Replace<br>2. Weld    5. Surface<br>3. Tighten Bolts    6. Weld Hold Down<br>4. Rep. with rail    7. Replace Bolts | | **TIES & TIMBER** | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| | **SWITCH POINTS** | Type_____Weight_____Lgth.____<br>1. Tamp Heel    5. Adjust<br>2. Tamp point    6. Grind LH<br>3. Replace LH    7. Grind RH<br>4. Replace RH    8. Remove Snow | _56.7_ | **R.O.W.** | 1. Clean ditch<br>②Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| | **SWITCH INSPECTION IN YARDS** | (Yard Name)_____(Date)_____<br>(Yard Name)_____(Date)_____<br>(Yard Name)_____(Date)_____ | | **REMARKS** | _Patrolled 76.5 - 46.3_ |

Signature _R R Perle (Track Foreman)_

Signature _R L Pale (Foreman)_

Date Inspected _7-14-04_

Date Corrected _7-14-04_

L.G. Printing



# DAILY TRACK
# INSPECTION REPORT

000886

Subdivision _Roxbury_

Mileage from _76.5_ to _38_    Section No. _____

**TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY.  CIRCLE DEFECTS REQUIRING ATTENTION.
IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.**

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | **RAIL** | Length_____ft._____in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn    5. Turn Stk. Rail<br>3. Weld end    6. Gr. Stk. Rail<br>4. Change Stk. Rail    7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod<br>2. Rep. No._____Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| 75.4<br>55.2<br>49.35<br>39.1<br>39.07 | **JOINTS** | 1. Tamp    6. Replace bars<br>2. Tighten Bolts    7. Replace bond<br>③Replace Bolts    8. Replace Insul.<br>4. Tight-Open    9. Install shims<br>5. Open-Close    10. Remove shims & tamp | | **SWITCH STANDS** | Type_____<br>1. Replace    5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| | **SPIKES** | 1. Gage Track    4. Spike Switch<br>2. Redrive    (Out of Service)<br>3. Replace | | **SWITCH PLATES** | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | **TIE PLATES** | 1. Replace    2. Replace Abrasion | | **GUARD RAIL** | Type_____Lgth.____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | **RAIL ANCHORS** | 1. Reset<br>2. Replace<br>3. Additional | 75.05 | **CROSSINGS** | Name_____<br>1. Patch holes<br>2. Replace plank    7. Repair X Bucks<br>③Spike plank    8. Surf. end of Xing<br>4. Inst. Flg. Rail    9. Clean Flange<br>5. Respike Flg. Rail    10. Insp. Sig. lights<br>6. Cut Brush    11. Remove Snow |
| | **FROG** | No.____Type____Lgth.____<br>1. Replace<br>2. Weld    5. Surface<br>3. Tighten Bolts    6. Weld Hold Down<br>4. Rep. with rail    7. Replace Bolts | | **TIES & TIMBER** | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| | **SWITCH POINTS** | Type_____Weight_____Lgth.____<br>1. Tamp Heel    5. Adjust<br>2. Tamp point    6. Grind LH<br>3. Replace LH    7. Grind RH<br>4. Replace RH    8. Remove Snow | 72.9<br>48.1<br>43.37<br>39.2 | **R.O.W.** | 1. Clean ditch<br>②Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| | **SWITCH INSPECTION IN YARDS** | _____(Yard Name)    _____(Date)<br>_____(Yard Name)    _____(Date)<br>_____(Yard Name)    _____(Date) | | **REMARKS** | _Patrolled 76.5 – 38_<br>_Replaced Broken Angle Bar 55.2_ |

Signature _RL LaPele_
(Patrollerman)

Signature _RR LaPele_
(Foreman)

Date Inspected _7-12-04_

Date Corrected _7-12-04_

NECR CD4 1/96

L.G. Printing

000887



# DAILY TRACK
# INSPECTION REPORT

Subdivision _Roxbury_

**Mileage from** _Windsor_ to _3858_

Section No._____

---

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION.
IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

---

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | **RAIL** | Length_____ft._____in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn — 5. Turn Stk. Rail<br>3. Weld end — 6. Gr. Stk. Rail<br>4. Change Stk. Rail — 7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod<br>2. Rep. No._____Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| | **JOINTS** | 1. Tamp — 6. Replace bars<br>2. Tighten Bolts — 7. Replace bond<br>3. Replace Bolts — 8. Replace Insul.<br>4. Tight-Open — 9. Install shims<br>5. Open-Close — 10. Remove shims & tamp | | **SWITCH STANDS** | Type_____<br>1. Replace — 5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| | **SPIKES** | 1. Gage Track — 4. Spike Switch<br>2. Redrive — (Out of Service)<br>3. Replace | | **SWITCH PLATES** | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | **TIE PLATES** | 1. Replace — 2. Replace Abrasion | | **GUARD RAIL** | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | **RAIL ANCHORS** | 1. Reset<br>2. Replace<br>3. Additional | | **CROSSINGS** | Name_____<br>1. Patch holes<br>2. Replace plank — 7. Repair X Bucks<br>3. Spike plank — 8. Surf. end of Xing<br>4. Inst. Flg. Rail — 9. Clean Flange<br>5. Respike Flg. Rail — 10. Insp. Sig. lights<br>6. Cut Brush — 11. Remove Snow |
| | **FROG** | No._____Type_____Lgth._____<br>1. Replace<br>2. Weld — 5. Surface<br>3. Tighten Bolts — 6. Weld Hold Down<br>4. Rep. with rail — 7. Replace Bolts | | **TIES & TIMBER** | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| | **SWITCH POINTS** | Type_____Weight_____Lgth._____<br>1. Tamp Heel — 5. Adjust<br>2. Tamp point — 6. Grind LH<br>3. Replace LH — 7. Grind RH<br>4. Replace RH — 8. Remove Snow | _mp 1_ | **R.O.W.** | 1. Clean ditch<br>2. Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| | **SWITCH INSPECTION IN YARDS** | (Yard Name)_____ (Date)_____<br>(Yard Name)_____ (Date)_____<br>(Yard Name)_____ (Date)_____ | | **REMARKS** | _Reed Casey Patrol mp 10_<br>_to 14.5_ |

Signature _____ (Patrol Foreman)

Signature _____ (Foreman)

Date Inspected _7-12-04_

Date Corrected _7-12-04_

NECR 0434 196

L.G. Printing

000888



# DAILY TRACK
# INSPECTION REPORT

Subdivision _Roxbury_

Mileage from _0_  to _31.5_

Section No. _____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION.
IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | **RAIL** | Length_____ft._____in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn    5. Turn Stk. Rail<br>3. Weld end    6. Gr. Stk. Rail<br>4. Change Stk. Rail    7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod<br>2. Rep. No._____Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| | **JOINTS** | 1. Tamp    6. Replace bars<br>2. Tighten Bolts    7. Replace bond<br>3. Replace Bolts    8. Replace Insul.<br>4. Tight-Open    9. Install shims<br>5. Open-Close    10. Remove shims & tamp | | **SWITCH STANDS** | Type_____<br>1. Replace    5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| | **SPIKES** | 1. Gage Track    4. Spike Switch<br>2. Redrive    (Out of Service)<br>3. Replace | | **SWITCH PLATES** | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | **TIE PLATES** | 1. Replace    2. Replace Abrasion | | **GUARD RAIL** | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | **RAIL ANCHORS** | 1. Reset<br>2. Replace<br>3. Additional | | **CROSSINGS** | Name_____<br>1. Patch holes<br>2. Replace plank    7. Repair X Bucks<br>3. Spike plank    8. Surf. end of Xing<br>4. Inst. Flg. Rail    9. Clean Flange<br>5. Respike Flg. Rail    10. Insp. Sig. lights<br>6. Cut Brush    11. Remove Snow |
| | **FROG** | No._____Type_____Lgth._____<br>1. Replace<br>2. Weld    5. Surface<br>3. Tighten Bolts    6. Weld Hold Down<br>4. Rep. with rail    7. Replace Bolts | | **TIES & TIMBER** | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| | **SWITCH POINTS** | Type_____Weight_____Lgth._____<br>1. Tamp Heel    5. Adjust<br>2. Tamp point    6. Grind LH<br>3. Replace LH    7. Grind RH<br>4. Replace RH    8. Remove Snow | | **R.O.W.** | 1. Clean ditch<br>2. Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| | **SWITCH INSPECTION IN YARDS** | (Yard Name)    (Date)<br><br>(Yard Name)    (Date)<br><br>(Yard Name)    (Date) | | | REMARKS _West Siding Need Ballast_<br>_and Srdacing from 15 To Sooth_<br>_End_ |

Signature _____ (P_____ Foreman)

Signature _____ (Foreman)

Date Inspected _7-9-04_

Date Corrected _7-9-04_

NECR 1004 3/98

L.G. Printing



# DAILY TRACK
# INSPECTION REPORT

Subdivision _Roxbury_

Mileage from ⟶ 7(.5   to ⟶ 3(.5   Section No. _____

**TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION. IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.**

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| 65.9 | **RAIL** | Length 39 ft. 1/4 in.<br>①. Replace Broken Rail<br>2. Weld Eng. Burn<br>3. Weld end<br>4. Change Stk. Rail<br>5. Turn Stk. Rail<br>6. Gr. Stk. Rail<br>7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod<br>2. Rep. No._____ Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| 65.9 | **JOINTS** | ①. Tamp<br>②. Tighten Bolts<br>3. Replace Bolts<br>4. Tight-Open<br>5. Open-Close<br>⑥. Replace bars<br>7. Replace bond<br>8. Replace Insul.<br>9. Install shims<br>10. Remove shims & tamp | | **SWITCH STANDS** | Type_____<br>1. Replace          5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| 65.9 | **SPIKES** | 1. Gage Track<br>②. Redrive<br>3. Replace<br>4. Spike Switch<br>(Out of Service) | | **SWITCH PLATES** | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | **TIE PLATES** | 1. Replace          2. Replace Abrasion | | **GUARD RAIL** | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| 65.9 | **RAIL ANCHORS** | ①. Reset<br>2. Replace<br>3. Additional | | **CROSSINGS** | Name_____<br>1. Patch holes<br>2. Replace plank          7. Repair X Bucks<br>3. Spike plank          8. Surf. end of Xing<br>4. Inst. Flg. Rail          9. Clean Flange<br>5. Respike Flg. Rail          10. Insp. Sig. lights<br>6. Cut Brush          11. Remove Snow |
| | **FROG** | No._____Type_____Lgth._____<br>1. Replace<br>2. Weld          5. Surface<br>3. Tighten Bolts          6. Weld Hold Down<br>4. Rep. with rail          7. Replace Bolts | | **TIES & TIMBER** | 1. Replace ties under joints<br>2. Replace_____ ties<br>3.<br>Replace_____timbers |
| | **SWITCH POINTS** | Type_____Weight_____Lgth._____<br>1. Tamp Heel          5. Adjust<br>2. Tamp point          6. Grind LH<br>3. Replace LH          7. Grind RH<br>4. Replace RH          8. Remove Snow | | **R.O.W.** | 1. Clean ditch<br>②. Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| | **SWITCH INSPECTION IN YARDS** | (Yard Name)          (Date)<br><br>(Yard Name)          (Date)<br><br>(Yard Name)          (Date) | | **REMARKS** | cut in a 639¼"<br>Rail 115-LB at 65.9 With Ronny Cyffer |

Signature _____ (Patrol Foreman)

Signature _____ (Foreman)

Date Inspected  7-8-04

Date Corrected  7-8-04

NECR 0234  196

L.G. Printing



# DAILY TRACK
# INSPECTION REPORT

Subdivision _Roxbury_

Mileage from _22.36_ to _Windsor_ 

Section No._____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION.
IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | **RAIL** | Length_____ft._____in. 1. Replace Broken Rail 2. Weld Eng. Burn  6. Turn Stk. Rail 3. Weld end  6. Gr. Stk. Rail 4. Change Stk. Rail  7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod 2. Rep. No._____Rod 3. Rep. Cotter Pins 4. Tighten bolts |
| | **JOINTS** | 1. Tamp  6. Replace bars 2. Tighten Bolts  7. Replace bond 3. Replace Bolts  8. Replace Insul. 4. Tight-Open  9. Install shims 5. Open-Close  10. Remove shims & tamp | | **SWITCH STANDS** | Type_____ 1. Replace  5. Respike 2. Rep. Target 3. Oil Stand 4. Adjust for full thread |
| | **SPIKES** | 1. Gage Track  4. Spike Switch 2. Redrive  (Out of Service) 3. Replace | | **SWITCH PLATES** | 1. Tighten Braces 2. Replace Plates 3. Oil Plate |
| | **TIE PLATES** | 1. Replace  2. Replace Abrasion | | **GUARD RAIL** | Type_____Lgth._____ 1. Replace 2. Gage 3. Tighten bolts |
| | **RAIL ANCHORS** | 1. Reset 2. Replace 3. Additional | | **CROSSINGS** | Name_____ 1. Patch holes 2. Replace plank  7. Repair X Bucks 3. Spike plank  8. Surf. end of Xing 4. Inst. Flg. Rail  9. Clean Flange 5. Respike Flg. Rail  10. Insp. Sig. lights 6. Cut Brush  11. Remove Snow |
| | **FROG** | No._____Type_____Lgth._____ 1. Replace 2. Weld  5. Surface 3. Tighten Bolts  6. Weld Hold Down 4. Rep. with rail  7. Replace Bolts | | **TIES & TIMBER** | 1. Replace ties under joints 2. Replace_____ties 3. Replace_____timbers |
| | **SWITCH POINTS** | Type_____Weight_____Lgth._____ 1. Tamp Heel  5. Adjust 2. Tamp point  6. Grind LH 3. Replace LH  7. Grind RH 4. Replace RH  8. Remove Snow | | **R.O.W.** | 1. Clean ditch 2. Cut Brush 3. Repair Fence 4. Remove Obstruction near track 5. Inst. Flanger Marker 6. Replace Signs |
| | **SWITCH INSPECTION IN YARDS** | (Yard Name)  (Date) (Yard Name)  (Date) (Yard Name)  (Date) | | | REMARKS _WRJCT Need's Ballast and Surfacing from mp 15 To South Q_____ |

Signature _____ (Patrol Foreman)

Signature _____ (Foreman)

Date Inspected _7-7-04_

Date Corrected _7-7-04_

NECR 83-4  196

L.G. Printing



# DAILY TRACK
# INSPECTION REPORT

Subdivision _Roxbury_

Mileage from **22.36** to **76.5**

Section No. _____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION.
IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | RAIL | Length_____ft._____in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn 5. Turn Stk. Rail<br>3. Weld end 6. Gr. Stk. Rail<br>4. Change Stk. Rail 7. Weld Stk. Rail | | RODS | 1. Rep. Conn. Rod<br>2. Rep. No._____Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| 30, 4 | JOINTS | 1. Tamp 6. Replace bars<br>2. Tighten Bolts 7. Replace bond<br>3. Replace Bolts 8. Replace Insul.<br>4. Tight-Open 9. Install shims<br>5. Open-Close 10. Remove shims & tamp | | SWITCH STANDS | Type_____<br>1. Replace 5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| | SPIKES | 1. Gage Track 4. Spike Switch<br>2. Redrive (Out of Service)<br>3. Replace | | SWITCH PLATES | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | TIE PLATES | 1. Replace 2. Replace Abrasion | | GUARD RAIL | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | RAIL ANCHORS | 1. Reset<br>2. Replace<br>3. Additional | | CROSSINGS | Name_____<br>1. Patch holes<br>2. Replace plank 7. Repair X Bucks<br>3. Spike plank 8. Surf. end of Xing<br>4. Inst. Flg. Rail 9. Clean Flange<br>5. Respike Flg. Rail 10. Insp. Sig. lights<br>6. Cut Brush 11. Remove Snow |
| | FROG | No._____Type_____Lgth._____<br>1. Replace<br>2. Weld 5. Surface<br>3. Tighten Bolts 6. Weld Hold Down<br>4. Rep. with rail 7. Replace Bolts | | TIES & TIMBER | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| | SWITCH POINTS | Type_____Weight_____Lgth._____<br>1. Tamp Heel 5. Adjust<br>2. Tamp point 6. Grind LH<br>3. Replace LH 7. Grind RH<br>4. Replace RH 8. Remove Snow | | R.O.W. | 1. Clean ditch<br>2. Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| | SWITCH INSPECTION IN YARDS | (Yard Name)_____ (Date)_____<br><br>(Yard Name)_____ (Date)_____<br><br>(Yard Name)_____ (Date)_____ | | REMARKS | _Plugged & Respiked High Side of Bridge Deck at 28.5_ |

Signature _____ (Patrol Foreman)

Signature _____ (Foreman)

Date Inspected **7-6-04**

Date Corrected **7-6-04**

NECR 004  2/96

L.G. Printing



# DAILY TRACK
# INSPECTION REPORT



Subdivision _Roxbury_

**Mileage from** _O_ **to** _76.5_     Section No. _____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION. IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | **RAIL** | Length_____ft._____in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn    5. Turn Stk. Rail<br>3. Weld end    6. Gr. Stk. Rail<br>4. Change Stk. Rail    7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod<br>2. Rep. No._____Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| | **JOINTS** | 1. Tamp    6. Replace bars<br>2. Tighten Bolts    7. Replace bond<br>3. Replace Bolts    8. Replace Insul.<br>4. Tight-Open    9. Install shims<br>5. Open-Close    10. Remove shims & tamp | | **SWITCH STANDS** | Type_____<br>1. Replace    5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| | **SPIKES** | 1. Gage Track    4. Spike Switch<br>2. Redrive    (Out of Service)<br>3. Replace | | **SWITCH PLATES** | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | **TIE PLATES** | 1. Replace    2. Replace Abrasion | | **GUARD RAIL** | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | **RAIL ANCHORS** | 1. Reset<br>2. Replace<br>3. Additional | | **CROSSINGS** | Name_____<br>1. Patch holes<br>2. Replace plank    7. Repair X Bucks<br>3. Spike plank    8. Surf. end of Xing<br>4. Inst. Flg. Rail    9. Clean Flange<br>5. Respike Flg. Rail    10. Insp. Sig. lights<br>6. Cut Brush    11. Remove Snow |
| | **FROG** | No._____Type_____Lgth._____<br>1. Replace<br>2. Weld    5. Surface<br>3. Tighten Bolts    6. Weld Hold Down<br>4. Rep. with rail    7. Replace Bolts | | **TIES & TIMBER** | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| | **SWITCH POINTS** | Type_____Weight_____Lgth._____<br>1. Tamp Heel    5. Adjust<br>2. Tamp point    6. Grind LH<br>3. Replace LH    7. Grind RH<br>4. Replace RH    8. Remove Snow | | **R.O.W.** | 1. Clean ditch<br>2. Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| | **SWITCH INSPECTION IN YARDS** | (Yard Name)_____ (Date)_____<br>(Yard Name)_____ (Date)_____<br>(Yard Name)_____ (Date)_____ | | | **REMARKS** _West siding is etc_ |

Signature _____ (Patrol Foreman)

Signature _____ (Foreman)

Date Inspected _7 - 1 - 04_

Date Corrected _7 - 1 - 04_

NECR 03-4  2/96

L.G. Printing

000894



# DAILY TRACK
# INSPECTION REPORT

Subdivision _Roxbury_

Mileage from _76.50_ to _46.30_

Section No. _____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION.
IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | RAIL | Length_____ft._____in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn    5. Turn Stk. Rail<br>3. Weld end    6. Gr. Stk. Rail<br>4. Change Stk. Rail    7. Weld Stk. Rail | | RODS | 1. Rep. Conn. Rod<br>2. Rep. No._____Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| | JOINTS | 1. Tamp    6. Replace bars<br>2. Tighten Bolts    7. Replace bond<br>3. Replace Bolts    8. Replace Insul.<br>4. Tight-Open    9. Install shims<br>5. Open-Close    10. Remove shims & tamp | | SWITCH STANDS | Type_____<br>1. Replace    5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| | SPIKES | 1. Gage Track    4. Spike Switch<br>2. Redrive    (Out of Service)<br>3. Replace | | SWITCH PLATES | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | TIE PLATES | 1. Replace    2. Replace Abrasion | | GUARD RAIL | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | RAIL ANCHORS | 1. Reset<br>2. Replace<br>3. Additional | | CROSSINGS | Name_____<br>1. Patch holes<br>2. Replace plank    7. Repair X Bucks<br>3. Spike plank    8. Surf. end of Xing<br>4. Inst. Flg. Rail    9. Clean Flange<br>5. Respike Flg. Rail    10. Insp. Sig. lights<br>6. Cut Brush    11. Remove Snow |
| | FROG | No._____Type_____Lgth._____<br>1. Replace<br>2. Weld    5. Surface<br>3. Tighten Bolts    6. Weld Hold Down<br>4. Rep. with rail    7. Replace Bolts | | TIES & TIMBER | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| | SWITCH POINTS | Type_____Weight_____Lgth._____<br>1. Tamp Heel    5. Adjust<br>2. Tamp point    6. Grind LH<br>3. Replace LH    7. Grind RH<br>4. Replace RH    8. Remove Snow | | R.O.W. | 1. Clean ditch<br>2. Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| | SWITCH INSPECTION IN YARDS | (Yard Name)    (Date)<br>(Yard Name)    (Date)<br>(Yard Name)    (Date) | | | REMARKS _Inspect Track Montpelier<br>Jct To Randolph_ |

Signature _RRBa__ (Patrol Foreman)

Signature _RRBa__ (Foreman)

Date Inspected _6-29-04_

Date Corrected _6-29-04_

NECR 034  198

L.G. Printing



# DAILY TRACK
# INSPECTION REPORT

**000895**

Mileage from _0_ to _5 050_

Subdivision _Roxbury_

Section No._____

---

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION.
IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | **RAIL** | Length_____ft._____in. <br> 1. Replace Broken Rail <br> 2. Weld Eng. Burn  5. Turn Stk. Rail <br> 3. Weld end  6. Gr. Stk. Rail <br> 4. Change Stk. Rail  7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod <br> 2. Rep. No._____Rod <br> 3. Rep. Cotter Pins <br> 4. Tighten bolts |
| | **JOINTS** | 1. Tamp  6. Replace bars <br> 2. Tighten Bolts  7. Replace bond <br> 3. Replace Bolts  8. Replace Insul. <br> 4. Tight-Open  9. Install shims <br> 5. Open-Close  10. Remove shims & tamp | | **SWITCH STANDS** | Type_____ <br> 1. Replace  5. Respike <br> 2. Rep. Target <br> 3. Oil Stand <br> 4. Adjust for full thread |
| | **SPIKES** | 1. Gage Track  4. Spike Switch <br> 2. Redrive  (Out of Service) <br> 3. Replace | | **SWITCH PLATES** | 1. Tighten Braces <br> 2. Replace Plates <br> 3. Oil Plate |
| | **TIE PLATES** | 1. Replace  2. Replace Abrasion | | **GUARD RAIL** | Type_____Lgth._____ <br> 1. Replace <br> 2. Gage <br> 3. Tighten bolts |
| | **RAIL ANCHORS** | 1. Reset <br> 2. Replace <br> 3. Additional | | **CROSSINGS** | Name_____ <br> 1. Patch holes <br> 2. Replace plank  7. Repair X Bucks <br> 3. Spike plank  8. Surf. end of Xing <br> 4. Inst. Flg. Rail  9. Clean Flange <br> 5. Respike Flg. Rail  10. Insp. Sig. lights <br> 6. Cut Brush  11. Remove Snow |
| | **FROG** | No._____Type_____Lgth._____ <br> 1. Replace <br> 2. Weld  5. Surface <br> 3. Tighten Bolts  6. Weld Hold Down <br> 4. Rep. with rail  7. Replace Bolts | | **TIES & TIMBER** | 1. Replace ties under joints <br> 2. Replace_____ties <br> 3. <br> Replace_____timbers |
| | **SWITCH POINTS** | Type_____Weight_____Lgth.____ <br> 1. Tamp Heel  5. Adjust <br> 2. Tamp point  6. Grind LH <br> 3. Replace LH  7. Grind RH <br> 4. Replace RH  8. Remove Snow | _16.95_ <br> _17.95_ | **R.O.W.** | 1. Clean ditch <br> 2. Cut Brush <br> 3. Repair Fence <br> 4. Remove Obstruction near track <br> 5. Inst. Flanger Marker <br> 6. Replace Signs |
| | **SWITCH INSPECTION IN YARDS** | (Yard Name)_____  (Date)_____ <br> (Yard Name)_____  (Date)_____ <br> (Yard Name)_____  (Date)_____ | | | **REMARKS** _West 50m is ok,_ <br> _28. Bushy & patroled from_ <br> _16.4 to 50.5_ |

Signature _____
(Patrol Foreman)

Signature _____
(Foreman)

Date Inspected _6-29-04_

Date Corrected _6-29-04_

R 03-4  298

L.G. Printing



# DAILY TRACK
# INSPECTION REPORT

000896

Subdivision _Roxbury,_

**Mileage from** 46.30 **to** 76.5

Section No. _____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION.
IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | | INFORMATION |
|---|---|---|---|---|---|---|
| | **RAIL** | Length_____ft._____in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn  5. Turn Stk. Rail<br>3. Weld end  6. Gr. Stk. Rail<br>4. Change Stk. Rail  7. Weld Stk. Rail | | **RODS** | | 1. Rep. Conn. Rod<br>2. Rep. No._____Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| 56.1<br>56.14<br>56.2<br>56.23 | **JOINTS** | 1. Tamp  6. Replace bars<br>2. Tighten Bolts  7. Replace bond<br>3. Replace Bolts  8. Replace Insul.<br>4. Tight-Open  9. Install shims<br>5. Open-Close  10. Remove shims & tamp | | **SWITCH STANDS** | | Type_____<br>1. Replace  5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| 56.25<br>56.26 | **SPIKES** | 1. Gage Track  4. Spike Switch<br>2. Redrive  (Out of Service)<br>3. Replace | | **SWITCH PLATES** | | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | **TIE PLATES** | 1. Replace  2. Replace Abrasion | | **GUARD RAIL** | | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | **RAIL ANCHORS** | 1. Reset<br>2. Replace<br>3. Additional | | **CROSSINGS** | | Name_____<br>1. Patch holes<br>2. Replace plank  7. Repair X Bucks<br>3. Spike plank  8. Surf. end of Xing<br>4. Inst. Flg. Rail  9. Clean Flange<br>5. Respike Flg. Rail  10. Insp. Sig. lights<br>6. Cut Brush  11. Remove Snow |
| | **FROG** | No.____Type____Lgth.____<br>1. Replace<br>2. Weld  5. Surface<br>3. Tighten Bolts  6. Weld Hold Down<br>4. Rep. with rail  7. Replace Bolts | | **TIES & TIMBER** | | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| | **SWITCH POINTS** | Type____Weight____Lgth.____<br>1. Tamp Heel  5. Adjust<br>2. Tamp point  6. Grind LH<br>3. Replace LH  7. Grind RH<br>4. Replace RH  8. Remove Snow | | **R.O.W.** | | 1. Clean ditch<br>2. Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| 60.10<br>61.20<br>67.4 | **SWITCH INSPECTION IN YARDS** | Roxbury 50.5,5?  6-24<br>(Yard Name)  (Date)<br>—Siding could use Ties<br>Roxbury No. Sid  6-24<br>(Yard Name)  (Date)<br>Northfield Spur  6-24<br>(Yard Name)  (Date) | | | | REMARKS  Put slow order on at<br>64.9 R/S 10 mph All Trains Account<br>Cal |

Signature _[signature]_ (Patrol Foreman)

Signature _[signature]_ (Foreman)

Date Inspected 6-24-04

Date Corrected 6-24-04

L.G. Printing

000897



# DAILY TRACK
# INSPECTION REPORT

Subdivision _Roxbury_

**Mileage from** $\bigcirc$ **to** 46.30

Section No. _____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION.
IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | **RAIL** | Length_____ft._____in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn    5. Turn Stk. Rail<br>3. Weld end    6. Gr. Stk. Rail<br>4. Change Stk. Rail    7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod<br>2. Rep. No._____Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| _33.7_ | **JOINTS** | 1. Tamp    6. Replace bars<br>2. Tighten Bolts    7. Replace bond<br>3. Replace Bolts    8. Replace Insul.<br>4. Tight-Open    9. Install shims<br>5. Open-Close    10. Remove shims & tamp | | **SWITCH STANDS** | Type_____<br>1. Replace    5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| | **SPIKES** | 1. Gage Track    4. Spike Switch<br>2. Redrive    (Out of Service)<br>3. Replace | | **SWITCH PLATES** | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | **TIE PLATES** | 1. Replace    2. Replace Abrasion | | **GUARD RAIL** | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | **RAIL ANCHORS** | 1. Reset<br>2. Replace<br>3. Additional | | **CROSSINGS** | Name_____<br>1. Patch holes<br>2. Replace plank    7. Repair X Bucks<br>3. Spike plank    8. Surf. end of Xing<br>4. Inst. Flg. Rail    9. Clean Flange<br>5. Respike Flg. Rail    10. Insp. Sig. lights<br>6. Cut Brush    11. Remove Snow |
| | **FROG** | No._____Type_____Lgth._____<br>1. Replace<br>2. Weld    5. Surface<br>3. Tighten Bolts    6. Weld Hold Down<br>4. Rep. with rail    7. Replace Bolts | | **TIES & TIMBER** | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| | **SWITCH POINTS** | Type_____Weight_____Lgth._____<br>1. Tamp Heel    5. Adjust<br>2. Tamp point    6. Grind LH<br>3. Replace LH    7. Grind RH<br>4. Replace RH    8. Remove Snow | | **R.O.W.** | 1. Clean ditch<br>2. Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| | **SWITCH INSPECTION IN YARDS** | (Yard Name)_____ (Date)_____<br><br>(Yard Name)_____ (Date)_____<br><br>(Yard Name)_____ (Date)_____ | | **REMARKS** | _West Siding is ok_<br>_Removed whistlepost (that was_<br>_no longer needed) due to crossing_<br>_Removed 30.36 Identified Person_<br>_riding Train, stopped 323 Kick person off_<br>_Train & property with Rw. Bashir_ |

Signature _____
(Asst. Foreman)

Signature _____
(Foreman)

Date Inspected _6-23-04_

Date Corrected _6-23-04_

NECR 0C34  196

L.G. Printing



# DAILY TRACK
# INSPECTION REPORT

000898

**Mileage from**  61.93 **to** 76.5

Subdivision _Roxbury_

Section No._____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION. IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | **RAIL** | Length_____ft._____in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn   5. Turn Stk. Rail<br>3. Weld end   6. Gr. Stk. Rail<br>4. Change Stk. Rail   7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod<br>2. Rep. No._____Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| 62.18<br>63.67<br>64.3 | **JOINTS** | 1. Tamp   6. Replace bars<br>2. Tighten Bolts   7. Replace bond<br>3. Replace Bolts   8. Replace Insul.<br>4. Tight-Open   9. Install shims<br>5. Open-Close   10. Remove shims & tamp | | **SWITCH STANDS** | Type_____<br>1. Replace   5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| | **SPIKES** | 1. Gage Track   4. Spike Switch<br>2. Redrive   (Out of Service)<br>3. Replace | | **SWITCH PLATES** | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | **TIE PLATES** | 1. Replace   2. Replace Abrasion | | **GUARD RAIL** | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | **RAIL ANCHORS** | 1. Reset<br>2. Replace<br>3. Additional | | **CROSSINGS** | Name_____<br>1. Patch holes<br>2. Replace plank   7. Repair X Bucks<br>3. Spike plank   8. Surf. end of Xing<br>4. Inst. Flg. Rail   9. Clean Flange<br>5. Respike Flg. Rail   10. Insp. Sig. lights<br>6. Cut Brush   11. Remove Snow |
| | **FROG** | No._____Type_____Lgth._____<br>1. Replace<br>2. Weld   5. Surface<br>3. Tighten Bolts   6. Weld Hold Down<br>4. Rep. with rail   7. Replace Bolts | | **TIES & TIMBER** | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| | **SWITCH POINTS** | Type_____Weight_____Lgth._____<br>1. Tamp Heel   5. Adjust<br>2. Tamp point   6. Grind LH<br>3. Replace LH   7. Grind RH<br>4. Replace RH   8. Remove Snow | | **R.O.W.** | 1. Clean ditch<br>2. Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| 75.6<br>75.88<br>75.9 | **SWITCH INSPECTION IN YARDS** | So Su Mp 5tt _____ 6-22<br>(Yard Name)   (Date)<br>Duke Energy _____ 6-22<br>(Yard Name)   (Date)<br>Cerrigan _____ 6-22<br>(Yard Name)   (Date) | | **REMARKS** | Took Montpelier Siding out of service due to Tie Conditions & Sun kink South end |

_Sw inspection on back_

Signature _____ (Patrol Foreman)

Signature _____ (Foreman)

Date Inspected _6-22-04_

Date Corrected _6-22-04_

NECR 0254   3/98

L.G. Printing

000899



# DAILY TRACK
# INSPECTION REPORT

Subdivision _Pashey_

**Mileage from** _0_ to _61.83_

Section No._____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION. IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | **RAIL** | Length_____ft._____in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn          5. Turn Stk. Rail<br>3. Weld end              6. Gr. Stk. Rail<br>4. Change Stk. Rail       7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod<br>2. Rep. No._____Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| | **JOINTS** | 1. Tamp                  6. Replace bars<br>2. Tighten Bolts          7. Replace bond<br>3. Replace Bolts          8. Replace Insul.<br>4. Tight-Open             9. Install shims<br>5. Open-Close            10. Remove shims & tamp | | **SWITCH STANDS** | Type_____<br>1. Replace              5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| | **SPIKES** | 1. Gage Track          4. Spike Switch<br>2. Redrive              (Out of Service)<br>3. Replace | | **SWITCH PLATES** | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | **TIE PLATES** | 1. Replace             2. Replace Abrasion | | **GUARD RAIL** | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | **RAIL ANCHORS** | 1. Reset<br>2. Replace<br>3. Additional | | **CROSSINGS** | Name_____<br>1. Patch holes<br>2. Replace plank         7. Repair X Bucks<br>3. Spike plank           8. Surf. end of Xing<br>4. Inst. Flg. Rail        9. Clean Flange<br>5. Respike Flg. Rail     10. Insp. Slg. lights<br>6. Cut Brush            11. Remove Snow |
| | **FROG** | No._____Type_____Lgth._____<br>1. Replace<br>2. Weld                   5. Surface<br>3. Tighten Bolts         6. Weld Hold Down<br>4. Rep. with rail         7. Replace Bolts | | **TIES & TIMBER** | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| | **SWITCH POINTS** | Type_____Weight_____Lgth._____<br>1. Tamp Heel             5. Adjust<br>2. Tamp point            6. Grind LH<br>3. Replace LH            7. Grind RH<br>4. Replace RH            8. Remove Snow | | **R.O.W.** | 1. Clean ditch<br>2. Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| | **SWITCH INSPECTION IN YARDS** | (Yard Name)_____  (Date)_____<br><br>(Yard Name)_____  (Date)_____<br><br>(Yard Name)_____  (Date)_____ | | | |

**REMARKS** _West Sdg is ok_

Signature _____ (Patrol Foreman)

Signature _____ (Foreman)

Date Inspected _6-21-04_

Date Corrected _6-21-04_

NECR 0346  2/86

L.G. Printing

000300



# DAILY TRACK
# INSPECTION REPORT

Subdivision _Roxbury_

Section No. _____

**Mileage from** ~~29~~ *93* to *76.5*

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION.
IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | **RAIL** | Length_____ft._____in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn  5. Turn Stk. Rail<br>3. Weld end  6. Gr. Stk. Rail<br>4. Change Stk. Rail  7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod<br>2. Rep. No._____Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| | **JOINTS** | 1. Tamp  6. Replace bars<br>2. Tighten Bolts  7. Replace bond<br>3. Replace Bolts  8. Replace Insul.<br>4. Tight-Open  9. Install shims<br>5. Open-Close  10. Remove shims & tamp | | **SWITCH STANDS** | Type_____<br>1. Replace  5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| | **SPIKES** | 1. Gage Track  4. Spike Switch<br>2. Redrive  (Out of Service)<br>3. Replace | | **SWITCH PLATES** | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | **TIE PLATES** | 1. Replace  2. Replace Abrasion | | **GUARD RAIL** | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | **RAIL ANCHORS** | 1. Reset<br>2. Replace<br>3. Additional | | **CROSSINGS** | Name_____<br>1. Patch holes  7. Repair X Bucks<br>2. Replace plank  8. Surf. end of Xing<br>3. Spike plank  9. Clean Flange<br>4. Inst. Flg. Rail  10. Insp. Sig. lights<br>5. Respike Flg. Rail  11. Remove Snow<br>6. Cut Brush |
| | **FROG** | No.____Type_____Lgth._____<br>1. Replace<br>2. Weld  5. Surface<br>3. Tighten Bolts  6. Weld Hold Down<br>4. Rep. with rail  7. Replace Bolts | | **TIES & TIMBER** | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| | **SWITCH POINTS** | Type_____Weight_____Lgth._____<br>1. Tamp Heel  5. Adjust<br>2. Tamp point  6. Grind LH<br>3. Replace LH  7. Grind RH<br>4. Replace RH  8. Remove Snow | | **R.O.W.** | 1. Clean ditch<br>2. Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| | **SWITCH INSPECTION IN YARDS** | (Yard Name)_____(Date)_____<br><br>(Yard Name)_____(Date)_____<br><br>(Yard Name)_____(Date)_____ | | **REMARKS** | Greased Curves no 40, 41.05<br>41.5, 49.75, 49.8  49.9, 51, 51.9,<br>55.75, 56.1, 56.35  57, |

Signature _____ (Patrol Foreman)

Signature _____ (Foreman)

Date Inspected _6-17-04_

Date Corrected _6-17-04_

NECR 034  2/96

L.G. Printing

000901



# DAILY TRACK INSPECTION REPORT

**NECR**

Subdivision _Roxbury_

Mileage from ◯ to _29.93_    Section No._____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION.
IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION 29.9 29.92 |
|---|---|---|---|---|---|
| | **RAIL** | Length_____ft._____ in *1.98* | 26.95 26.38 26.4 26.6 26.69 | **RODS** | 1. Rep. Conn. Rod   Total instal 2. Rep. No._____ Rod 3. Rep. Cotter Pins   *#121* 4. Tighten bolts |
| | | 1. Replace Broken Rail   *12.17* | | | |
| | | 2. Weld Eng. Burn   5. Turn Stk. Rail | | | |
| | | 3. Weld end   6. Gr. Stk. Rail | | | |
| | | 4. Change Stk. Rail   7. Weld Stk. Rail | | | |
| *11.09* *11* *11.11* *11.15* *11.16* | **JOINTS** | 1. Tamp   6. Replace bars 2. Tighten Bolts *Bolts*   7. Replace bond 3. Replace Bolts   8. Replace insul. 4. Tight-Open   9. Install shims 5. Open-Close   10. Remove shims & tamp | 26.77 26.3 26.98 27.1 27.1 | **SWITCH STANDS** | Type_____ 1. Replace *Bolt*   5. Respike 2. Rep Target 3. Oil Stand 4. Adjust for full thread |
| *11.17* *11.18* *11.2* | **SPIKES** | 1. Gage Track   4. Spike Switch 2. Redrive *Bolts*   (Out of Service) 3. Replace | 27.71 27.15 27.16 | **SWITCH PLATES** | 1. Tighten Braces 2. Replace Plates 3. Oil Plate |
| *11.24* *11.25* *11.26* *11.3* | **TIE PLATES** | 1. Replace *Bolts*   2. Replace Abrasion | 28.16 28.69 28.07 29.1 | **GUARD RAIL** | Type_____Lgth._____ 1. Replace *Bolts* 2. Gage 3. Tighten bolts |
| *11.31* *11.35* *11.40* *11.46* | **RAIL ANCHORS** | 1. Reset 2. Replace *Bolt* ② 3. Additional | 29.13 29.16 29.17 29.2 29.25 29.29 29.3 | **CROSSINGS** | Name_____ 1. Patch holes *Bolts* 2. Replace plank   7. Repair X Bucks 3. Spike plank   8. Surf. end of Xing 4. Inst. Flg. Rail   9. Clean Flange 5. Respike Flg. Rail   10. Insp. Sig. lights 6. Cut Brush   11. Remove Snow |
| *11.48* *11.5* *11.50* *11.58* *11.59* *11.63* | **FROG** | No.___Type *Bolts* Lgth.___ 1. Replace 2. Weld   5. Surface 3. Tighten Bolts   6. Weld Hold Down 4. Rep. with rail   7. Replace Bolts | 29.41 29.44 29.52 | **TIES & TIMBER** | 1. Replace ties under joints 2. Replace ___ ties 3. Replace ___ timbers |
| *11.66* *11.71* *11.73* *11.74* *11.75* | **SWITCH POINTS** | Type___Weight___Lgth.___ 1. Tamp Heel   5. Adjust 2. Tamp point   6. Grind LH 3. Replace LH   7. Grind RH 4. Replace RH   8. Remove Snow | 29.79 | **R.O.W.** | 1. Clean ditch 2. Cut Brush   *Bolts* 3. Repair Fence 4. Remove Obstruction near track 5. Inst. Flanger Marker 6. Replace Signs |
| *11.76* *11.79* *11.8* *11.84* *11.94* *11.95* | **SWITCH INSPECTION IN YARDS** | (Yard Name)   *Bolts*   (Date) ② (Yard Name)   (Date) (Yard Name)   (Date) | | REMARKS | _W10G Sully is OK_ |

Signature _____ (Patrol Foreman)

Signature _____ (Foreman)

Date Inspected _6-16-04_

Date Corrected _6-16-04_

NECR 0034 1/98    L.G. Printing

C00902

# DAILY TRACK
# INSPECTION REPORT

**NECR**

Subdivision _Roxbury_

Mileage from _61.83_    to    _7.5_

Section No. _____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION.
IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| 66.75 | RAIL | Length _Replaced Toutings with Vertical Cuting Plugs RCW_ <br> 1. Replace Broken Rail   5. Turn Stk. Rail <br> 2. Weld Eng. Burn   6. Gr. Stk. Rail <br> 3. Weld end   7. Weld Stk. Rail <br> 4. Change Stk. Rail | | RODS | 1. Rep. Conn. Rod <br> 2. Rep. No. _____ Rod <br> 3. Rep. Cotter Pins <br> 4. Tighten bolts |
| 66.75 | JOINTS | 1. Tamp   6. Replace bars <br> 2. Tighten Bolts   7. Replace bond <br> 3. Replace Bolts   8. Replace Insul. <br> 4. Tight-Open   9. Install shims <br> 5. Open-Close   10. Remove shims & tamp | | SWITCH STANDS | Type_____ <br> 1. Replace   5. Respike <br> 2. Rep. Target <br> 3. Oil Stand <br> 4. Adjust for full thread |
| 66.75 | SPIKES | 1. Gage Track   4. Spike Switch <br> 2. Redrive   (Out of Service) <br> 3. Replace | | SWITCH PLATES | 1. Tighten Braces <br> 2. Replace Plates <br> 3. Oil Plate |
| | TIE PLATES | 1. Replace   2. Replace Abrasion | | GUARD RAIL | Type_____ Lgth._____ <br> 1. Replace <br> 2. Gage <br> 3. Tighten bolts |
| 66.75 | RAIL ANCHORS | 1. Reset <br> 2. Replace <br> 3. Additional | | CROSSINGS | Name_____ <br> 1. Patch holes <br> 2. Replace plank   7. Repair X Bucks <br> 3. Spike plank   8. Surf. end of Xing <br> 4. Inst. Flg. Rail   9. Clean Flange <br> 5. Respike Flg. Rail   10. Insp. Sig. lights <br> 6. Cut Brush   11. Remove Snow |
| | FROG | No._____ Type_____ Lgth._____ <br> 1. Replace <br> 2. Weld   5. Surface <br> 3. Tighten Bolts   6. Weld Hold Down <br> 4. Rep. with rail   7. Replace Bolts | | TIES & TIMBER | 1. Replace ties under joints <br> 2. Replace_____ ties <br> 3. <br> Replace_____ timbers |
| | SWITCH POINTS | Type_____ Weight_____ Lgth._____ <br> 1. Tamp Heel   5. Adjust <br> 2. Tamp point   6. Grind LH <br> 3. Replace LH   7. Grind RH <br> 4. Replace RH   8. Remove Snow | | R.O.W. | 1. Clean ditch <br> 2. Cut Brush <br> 3. Repair Fence <br> 4. Remove Obstruction near track <br> 5. Inst. Flanger Marker <br> 6. Replace Signs |
| | SWITCH INSPECTION IN YARDS | (Yard Name)   (Date) <br> (Yard Name)   (Date) <br> (Yard Name)   (Date) | | | REMARKS _Cut in two plugs to Repair verticals With RR Import._ |

Signature _____ (Patch/Foreman)

Signature _____ (Foreman)

Date Inspected _6-15-04_

Date Corrected _6-15-04_

TR 034  2/96

L.G. Printing



# DAILY TRACK
# INSPECTION REPORT

000903

Subdivision *Roxbury*

Mileage from ~~~~~~ to 61.83

Section No. _____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION. IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | **RAIL** | Length_____ft._____in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn    5. Turn Stk. Rail<br>3. Weld end    6. Gr. Stk. Rail<br>4. Change Stk. Rail    7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod<br>2. Rep. No._____Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| | **JOINTS** | 1. Tamp    6. Replace bars<br>2. Tighten Bolts    7. Replace bond<br>3. Replace Bolts    8. Replace Insul.<br>4. Tight-Open    9. Install shims<br>5. Open-Close    10. Remove shims & tamp | | **SWITCH STANDS** | Type_____<br>1. Replace    5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| | **SPIKES** | 1. Gage Track    4. Spike Switch<br>2. Redrive    (Out of Service)<br>3. Replace | | **SWITCH PLATES** | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | **TIE PLATES** | 1. Replace    2. Replace Abrasion | | **GUARD RAIL** | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | **RAIL ANCHORS** | 1. Reset<br>2. Replace<br>3. Additional | | **CROSSINGS** | Name_____<br>1. Patch holes<br>2. Replace plank    7. Repair X Bucks<br>3. Spike plank    8. Surf. end of Xing<br>4. Inst. Flg. Rail    9. Clean Flange<br>5. Respike Flg. Rail    10. Insp. Sig. lights<br>6. Cut Brush    11. Remove Snow |
| | **FROG** | No.____Type_____Lgth.____<br>1. Replace<br>2. Weld    5. Surface<br>3. Tighten Bolts    6. Weld Hold Down<br>4. Rep. with rail    7. Replace Bolts | | **TIES & TIMBER** | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| | **SWITCH POINTS** | Type____Weight_____Lgth.____<br>1. Tamp Heel    5. Adjust<br>2. Tamp point    6. Grind LH<br>3. Replace LH    7. Grind RH<br>4. Replace RH    8. Remove Snow | | **R.O.W.** | 1. Clean ditch<br>2. Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| | **SWITCH INSPECTION IN YARDS** | (Yard Name) _____ (Date) _____<br><br>(Yard Name) _____ (Date) _____<br><br>(Yard Name) _____ (Date) _____ | | | |

REMARKS *WKJG Stim Culd use Stone @ Surfacing from mp 15 to South End*

_____

_____

_____

Signature ~~~~ (Patrol Foreman)

Signature ~~~~ (Foreman)

Date Inspected 6-14-04

Date Corrected 6-14-04

34  398

L.G. Printing

00090



# DAILY TRACK
# INSPECTION REPORT

Subdivision _Roxbury_

Mileage from _33.9_ to _76.5_

Section No._____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION.
IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | RAIL | Length_____ft._____in. <br>1. Replace Broken Rail <br>2. Weld Eng. Burn    5. Turn Stk. Rail <br>3. Weld end    6. Gr. Stk. Rail <br>4. Change Stk. Rail    7. Weld Stk. Rail | | RODS | 1. Rep. Conn. Rod <br>2. Rep. No._____Rod <br>3. Rep. Cotter Pins <br>4. Tighten bolts |
| | JOINTS | 1. Tamp    6. Replace bars <br>2. Tighten Bolts    7. Replace bond <br>3. Replace Bolts    8. Replace Insul. <br>4. Tight-Open    9. Install shims <br>5. Open-Close    10. Remove shims & tamp | | SWITCH STANDS | Type_____ <br>1. Replace    5. Respike <br>2. Rep. Target <br>3. Oil Stand <br>4. Adjust for full thread |
| | SPIKES | 1. Gage Track    4. Spike Switch <br>2. Redrive    (Out of Service) <br>3. Replace | | SWITCH PLATES | 1. Tighten Braces <br>2. Replace Plates <br>3. Oil Plate |
| | TIE PLATES | 1. Replace    2. Replace Abrasion | _76.9_ | GUARD RAIL | Type_____Lgth._____ <br>1. Replace <br>2. Gage <br>3. Tighten bolts |
| | RAIL ANCHORS | 1. Reset <br>2. Replace <br>3. Additional | | CROSSINGS | Name_____ <br>1. Patch holes <br>2. Replace plank    7. Repair X Bucks <br>3. Spike plank    8. Surf. end of Xing <br>4. Inst. Flg. Rail    9. Clean Flange <br>5. Respike Flg. Rail    10. Insp. Sig. lights <br>6. Cut Brush    11. Remove Snow |
| | FROG | No._____Type_____Lgth._____ <br>1. Replace <br>2. Weld    5. Surface <br>3. Tighten Bolts    6. Weld Hold Down <br>4. Rep. with rail    7. Replace Bolts | | TIES & TIMBER | 1. Replace ties under joints <br>2. Replace_____ties <br>3. Replace_____timbers |
| _46.8_ | SWITCH POINTS | Type_____Weight_____Lgth._____ <br>1. Tamp Heel    5. Adjust <br>2. Tamp point    6. Grind LH <br>3. Replace LH    7. Grind RH <br>4. Replace RH    8. Remove Snow | | R.O.W. | 1. Clean ditch <br>2. Cut Brush <br>3. Repair Fence <br>4. Remove Obstruction near track <br>5. Inst. Flanger Marker <br>6. Replace Signs |
| _46.8_ | SWITCH INSPECTION IN YARDS | Tighten Hut Bolts <br>_Randolph Hersa_    _6-11_ <br>(Yard Name)    (Date) <br><br>_____ <br>(Yard Name)    (Date) <br><br>_____ <br>(Yard Name)    (Date) | | REMARKS | _____ <br>_____ <br>_____ <br>_____ |

Signature _____

Signature _____ (Foreman)

Date Inspected _6-11-04_

Date Corrected _6-11-04_

NECR 034   2/95

L.G. Printing



# DAILY TRACK
# INSPECTION REPORT

Mileage from **33.9** to **4/0**

Subdivision **Roxbury**

Section No._____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION.
IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | **RAIL** | Length_____ft._____in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn     5. Turn Stk. Rail<br>3. Weld end             6. Gr. Stk. Rail<br>4. Change Stk. Rail   7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod<br>2. Rep. No._____Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| 26,9<br>11.75 | **JOINTS** | 1. Tamp               6. Replace bars<br>2. Tighten Bolts    7. Replace bond<br>3. Replace Bolts    8. Replace Insul.<br>4. Tight-Open       9. Install shims<br>5. Open-Close      10. Remove shims & tamp | | **SWITCH STANDS** | Type_____<br>1. Replace              5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| 26.9<br>11.79 | **SPIKES** | 1. Gage Track       4. Spike Switch<br>2. Redrive              (Out of Service)<br>3. Replace | | **SWITCH PLATES** | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | **TIE PLATES** | 1. Replace              2. Replace Abrasion | | **GUARD RAIL** | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | **RAIL ANCHORS** | 1. Reset<br>2. Replace<br>3. Additional | | **CROSSINGS** | Name_____<br>1. Patch holes<br>2. Replace plank      7. Repair X Bucks<br>3. Spike plank          8. Surf. end of Xing<br>4. Inst. Flg. Rail       9. Clean Flange<br>5. Respike Flg. Rail  10. Insp. Sig. lights<br>6. Cut Brush            11. Remove Snow |
| | **FROG** | No.____Type_____Lgth.____<br>1. Replace<br>2. Weld                 5. Surface<br>3. Tighten Bolts     6. Weld Hold Down<br>4. Rep. with rail     7. Replace Bolts | | **TIES & TIMBER** | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| | **SWITCH POINTS** | Type____Weight____Lgth.____<br>1. Tamp Heel         5. Adjust<br>2. Tamp point        6. Grind LH<br>3. Replace LH       7. Grind RH<br>4. Replace RH       8. Remove Snow | 30.28<br>27.73<br>17.7<br>17.5<br>15.76 | **R.O.W.** | 1. Clean ditch          13.05<br>2. Cut Brush  Rel:3  12.99<br>3. Repair Fence<br>4. Remove Obstruction near track 12.8<br>5. Inst. Flanger Marker   12.78<br>6. Replace Signs |
| | **SWITCH INSPECTION IN YARDS** | (Yard Name)_____(Date)_____<br>(Yard Name)_____(Date)_____<br>(Yard Name)_____(Date)_____ | | **REMARKS** | WRCT Siding Needs Rail Changed 18.9 |

Signature _____ (Patrol Foreman)

Signature _____ (Foreman)

Date Inspected  6-10-04

Date Corrected  6-10-04

NECR 0034  1/94

L.G. Printing

000906



# DAILY TRACK
# INSPECTION REPORT

Mileage from ~~MP 8~~ to MP 16

Subdivision _Roxbury_

Section No. _____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION.
IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | **RAIL** | Length_____ft._____in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn    5. Turn Stk. Rail<br>3. Weld end    6. Gr. Stk. Rail<br>4. Change Stk. Rail    7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod<br>2. Rep. No._____ Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| 13.43<br>13.7 | **JOINTS** | 1. Tamp    6. Replace bars<br>2. Tighten Bolts    7. Replace bond<br>3. Replace Bolts    8. Replace Insul.<br>4. Tight-Open    9. Install shims<br>5. Open-Close    10. Remove shims & tamp | | **SWITCH STANDS** | Type_____    5. Respike<br>1. Replace<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| | **SPIKES** | 1. Gage Track    4. Spike Switch<br>2. Redrive    (Out of Service)<br>3. Replace | | **SWITCH PLATES** | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | **TIE PLATES** | 1. Replace    2. Replace Abrasion | | **GUARD RAIL** | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | **RAIL ANCHORS** | 1. Reset<br>2. Replace<br>3. Additional | | **CROSSINGS** | Name_____<br>1. Patch holes<br>2. Replace plank    7. Repair X Bucks<br>3. Spike plank    8. Surf. end of Xing<br>4. Inst. Flg. Rail    9. Clean Flange<br>5. Respike Flg. Rail    10. Insp. Sig. lights<br>6. Cut Brush    11. Remove Snow |
| | **FROG** | No.____Type_____Lgth.____<br>1. Replace<br>2. Weld    5. Surface<br>3. Tighten Bolts    6. Weld Hold Down<br>4. Rep. with rail    7. Replace Bolts | | **TIES & TIMBER** | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| | **SWITCH POINTS** | Type____Weight_____Lgth.____<br>1. Tamp Heel    5. Adjust<br>2. Tamp point    6. Grind LH<br>3. Replace LH    7. Grind RH<br>4. Replace RH    8. Remove Snow | | **R.O.W.** | 1. Clean ditch<br>2. Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| | **SWITCH INSPECTION IN YARDS** | _____(Yard Name) _____(Date)<br>_____(Yard Name) _____(Date)<br>_____(Yard Name) _____(Date) | | | |

REMARKS _West 5 dirr ok_

Signature _____ (Patrol Foreman)

Signature _____ (Foreman)

Date Inspected _6-8-04_

Date Corrected _6-8-04_

NECR 03-4  296

L.G. Printing

000907

# DAILY TRACK
# INSPECTION REPORT

**NECR**

Subdivision _Roxbury_

Section No. _____

Mileage from _Mo 16_ to _76.9_

**TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION.
IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.**

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| 21.3 | **RAIL** | Length ___39___ ft. _____ in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn     5. Turn Stk. Rail<br>3. Weld end     6. Gr. Stk. Rail<br>4. Change Stk. Rail     7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod<br>2. Rep. No. ____ Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| 21.3 | **JOINTS** | 1. Tamp     6. Replace bars<br>2. Tighten Bolts     7. Replace bond<br>3. Replace Bolts     8. Replace Insul.<br>4. Tight-Open     9. Install shims<br>5. Open-Close     10. Remove shims & tamp | | **SWITCH STANDS** | Type _____<br>1. Replace     5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| 21.3<br>26.40 | **SPIKES** | 1. Gage Track     4. Spike Switch<br>2. Redrive     (Out of Service)<br>3. Replace | | **SWITCH PLATES** | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | **TIE PLATES** | 1. Replace     2. Replace Abrasion | | **GUARD RAIL** | Type _____ Lgth. _____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| 21.3 | **RAIL ANCHORS** | 1. Reset<br>2. Replace<br>3. Additional | 53.1 | **CROSSINGS** | Name _____<br>1. Patch holes<br>2. Replace plank     7. Repair X Bucks<br>3. Spike plank     8. Surf. end of Xing<br>4. Inst. Flg. Rail     9. Clean Flange<br>5. Respike Flg. Rail     10. Insp. Sig. lights<br>6. Cut Brush     11. Remove Snow |
| | **FROG** | No. ____ Type ____ Lgth. ____<br>1. Replace<br>2. Weld     5. Surface<br>3. Tighten Bolts     6. Weld Hold Down<br>4. Rep. with rail     7. Replace Bolts | | **TIES & TIMBER** | 1. Replace ties under joints<br>2. Replace _____ ties<br>3.<br>Replace _____ timbers |
| | **SWITCH POINTS** | Type ____ Weight ____ Lgth. ____<br>1. Tamp Heel     5. Adjust<br>2. Tamp point     6. Grind LH<br>3. Replace LH     7. Grind RH<br>4. Replace RH     8. Remove Snow | | **R.O.W.** | 1. Clean ditch<br>2. Cut Brush<br>3. Repair Fence<br>4. Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| | **SWITCH INSPECTION IN YARDS** | (Yard Name) _____ (Date) _____<br>(Yard Name) _____ (Date) _____<br>(Yard Name) _____ (Date) _____ | | **REMARKS** | Changed 1/4" Rail at 21.3 & Removed Slow order (run) Thy 1/4"s Between Bo 66.75 & 66.9 (over) in mpt on them |

Signature _____ (Patrol Foreman)

Signature _____ (Foreman)

Date Inspected ___6-07-04___

Date Corrected ___6-07-04___

NECR 0034 198

L.G. Printing

000908



# DAILY TRACK INSPECTION REPORT

Subdivision _Roxbury_

Mileage from **38.3** to **76.5**

Section No. _____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION. IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | RAIL | Length_____ft._____in. 1. Replace Broken Rail 2. Weld Eng. Burn 3. Weld end 4. Change Stk. Rail 5. Turn Stk. Rail 6. Gr. Stk. Rail 7. Weld Stk. Rail | | RODS | 1. Rep. Conn. Rod 2. Rep. No._____Rod 3. Rep. Cotter Pins 4. Tighten bolts |
| | JOINTS | 1. Tamp 2. Tighten Bolts 3. Replace Bolts 4. Tight-Open 5. Open-Close 6. Replace bars 7. Replace bond 8. Replace Insul. 9. Install shims 10. Remove shims & tamp | | SWITCH STANDS | Type_____ 1. Replace 5. Respike 2. Rep. Target 3. Oil Stand 4. Adjust for full thread |
| | SPIKES | 1. Gage Track 2. Redrive 3. Replace 4. Spike Switch (Out of Service) | 39.3 39.35 | SWITCH PLATES | 1. Tighten Braces 2. Replace Plates ③ Oil Plate |
| | TIE PLATES | 1. Replace 2. Replace Abrasion | | GUARD RAIL | Type_____Lgth._____ 1. Replace 2. Gage 3. Tighten bolts |
| | RAIL ANCHORS | 1. Reset 2. Replace 3. Additional | | CROSSINGS | Name_____ 1. Patch holes 2. Replace plank 3. Spike plank 4. Inst. Flg. Rail 5. Respike Flg. Rail 6. Cut Brush 7. Repair X Bucks 8. Surf. end of Xing 9. Clean Flange 10. Insp. Sig. lights 11. Remove Snow |
| | FROG | No._____Type_____Lgth._____ 1. Replace 2. Weld 3. Tighten Bolts 4. Rep. with rail 5. Surface 6. Weld Hold Down 7. Replace Bolts | | TIES & TIMBER | 1. Replace ties under joints 2. Replace_____ties 3. Replace_____timbers |
| | SWITCH POINTS | Type_____Weight_____Lgth._____ 1. Tamp Heel 2. Tamp point 3. Replace LH 4. Replace RH 5. Adjust 6. Grind LH 7. Grind RH 8. Remove Snow | 73.05 | R.O.W. | 1. Clean ditch 2. Cut Brush 3. Repair Fence 4. Remove Obstruction near track 5. Inst. Flanger Marker ⑥ Replace Signs |
| | SWITCH INSPECTION IN YARDS | _Bethel_ (Yard Name)     _6-4-04_ (Date) _____ (Yard Name)     _____ (Date) _____ (Yard Name)     _____ (Date) | | REMARKS | _Patrolled 38.3 - 76.5_ _Changed broken comp bar 38.6_ _Installed Derail post Team_ _Track Bethel_ |

Signature _____ (Patrol Foreman)

Signature _____ (Foreman)

Date Inspected **6-4-04**

Date Corrected **6-4-04**

L.G. Printing

# DAILY TRACK INSPECTION REPORT

**NECR**

Subdivision _Roxbury_

Mileage from ___0___ to ___38.3___

Section No. _____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION. IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION |
|---|---|---|
| | **RAIL** | Length_____ft._____in. 1. Replace Broken Rail 2. Weld Eng. Burn  5. Turn Stk. Rail 3. Weld end  6. Gr. Stk. Rail 4. Change Stk. Rail  7. Weld Stk. Rail |
| 12.1 12.22 | **JOINTS** | 1. Tamp  6. Replace bars 2. Tighten Bolts  7. Replace bond 3. Replace Bolts  8. Replace Insul. 4. Tight-Open  9. Install shims 5. Open-Close  10. Remove shims & tamp |
| 12.22 12.27 12.31 | **SPIKES** | 1. Gage Track  4. Spike Switch 2. Redrive  (Out of Service) 3. Replace ✓Rail length |
| | **TIE PLATES** | 1. Replace  2. Replace Abrasion |
| | **RAIL ANCHORS** | 1. Reset 2. Replace 3. Additional |
| | **FROG** | No._____Type_____Lgth._____ 1. Replace 2. Weld  5. Surface 3. Tighten Bolts  6. Weld Hold Down 4. Rep. with rail  7. Replace Bolts |
| | **SWITCH POINTS** | Type_____Weight_____Lgth._____ 1. Tamp Heel  5. Adjust 2. Tamp point  6. Grind LH 3. Replace LH  7. Grind RH 4. Replace RH  8. Remove Snow |
| | **SWITCH INSPECTION IN YARDS** | (Yard Name) _____ (Date) _____ (Yard Name) _____ (Date) _____ (Yard Name) _____ (Date) _____ |

| MILEAGE | | INFORMATION |
|---|---|---|
| | **RODS** | 1. Rep. Conn. Rod 2. Rep. No._____Rod 3. Rep. Cotter Pins 4. Tighten bolts |
| | **SWITCH STANDS** | Type_____ 1. Replace  5. Respike 2. Rep. Target 3. Oil Stand 4. Adjust for full thread |
| | **SWITCH PLATES** | 1. Tighten Braces 2. Replace Plates 3. Oil Plate |
| | **GUARD RAIL** | Type_____Lgth._____ 1. Replace 2. Gage 3. Tighten bolts |
| | **CROSSINGS** | Name_____ 1. Patch holes 2. Replace plank  7. Repair X Bucks 3. Spike plank  8. Surf. end of Xing 4. Inst. Flg. Rail  9. Clean Flange 5. Respike Flg. Rail  10. Insp. Sig. lights 6. Cut Brush  11. Remove Snow |
| | **TIES & TIMBER** | 1. Replace ties under joints 2. Replace_____ties 3. Replace_____timbers |
| | **R.O.W.** | 1. Clean ditch 2. Cut Brush 3. Repair Fence 4. Remove Obstruction near track 5. Inst. Flanger Marker 6. Replace Signs |

REMARKS _Unable to inspect Siding Account of Train Penny I aprnul patroled from 38.3 to 76.5. I found US 14 foul at 21.33 put 10 mph on between 21.2 & 21.75_

Signature _____ (Patrol Foreman)

Signature _____ (Foreman)

Date Inspected _6-4-04_

Date Corrected _6-4-04_

NECR 0C34  398

L.G. Printing



# DAILY TRACK
# INSPECTION REPORT

~~09910

Subdivision _Roxbury_

Mileage from **35.41** to **6.05**          Section No. _____

**TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION. IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.**

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | **RAIL** | Length_____ ft._____in.<br>1. Replace Broken Rail<br>2. Weld Eng. Burn    5. Turn Stk. Rail<br>3. Weld end    6. Gr. Stk. Rail<br>4. Change Stk. Rail    7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod<br>2. Rep. No._____Rod<br>3. Rep. Cotter Pins<br>4. Tighten bolts |
| | **JOINTS** | 1. Tamp    6. Replace bars<br>2. Tighten Bolts    7. Replace bond<br>3. Replace Bolts    8. Replace Insul.<br>4. Tight-Open    9. Install shims<br>5. Open-Close    10. Remove shims & tamp | | **SWITCH STANDS** | Type_____<br>1. Replace    5. Respike<br>2. Rep. Target<br>3. Oil Stand<br>4. Adjust for full thread |
| | **SPIKES** | 1. Gage Track    4. Spike Switch<br>2. Redrive    (Out of Service)<br>3. Replace | | **SWITCH PLATES** | 1. Tighten Braces<br>2. Replace Plates<br>3. Oil Plate |
| | **TIE PLATES** | 1. Replace    2. Replace Abrasion | | **GUARD RAIL** | Type_____Lgth._____<br>1. Replace<br>2. Gage<br>3. Tighten bolts |
| | **RAIL ANCHORS** | 1. Reset<br>2. Replace<br>3. Additional | | **CROSSINGS** | Name_____<br>1. Patch holes<br>2. Replace plank    7. Repair X Bucks<br>3. Spike plank    8. Surf. end of Xing<br>4. Inst. Flg. Rail    9. Clean Flange<br>5. Respike Flg. Rail    10. Insp. Sig. lights<br>6. Cut Brush    11. Remove Snow |
| | **FROG** | No._____Type_____Lgth._____<br>1. Replace<br>2. Weld    5. Surface<br>3. Tighten Bolts    6. Weld Hold Down<br>4. Rep. with rail    7. Replace Bolts | | **TIES & TIMBER** | 1. Replace ties under joints<br>2. Replace_____ties<br>3.<br>Replace_____timbers |
| | **SWITCH POINTS** | Type____Weight____Lgth.____<br>1. Tamp Heel    5. Adjust<br>2. Tamp point    6. Grind LH<br>3. Replace LH    7. Grind RH<br>4. Replace RH    8. Remove Snow | 56.35 | **R.O.W.** | 1. Clean ditch<br>2. Cut Brush<br>3. Repair Fence<br>④ Remove Obstruction near track<br>5. Inst. Flanger Marker<br>6. Replace Signs |
| | **SWITCH INSPECTION IN YARDS** | (Yard Name)_____ (Date)_____<br><br>(Yard Name)_____ (Date)_____<br><br>(Yard Name)_____ (Date)_____ | | | |

REMARKS _Put Slow order of 10 mph_
_on track between 37.7 to 37.8_
_PTB 44 Account gage. issued 10 mph_
_At 64.9 Account of Rail_

Signature _____ (Track Foreman)

Signature _____ (Foreman)

Date Inspected **6-2-04**

Date Corrected **6-2-04**

NECR 0094  2/96

L.G. Printing

000911



# DAILY TRACK
# INSPECTION REPORT

Subdivision _Roxbury_

**Mileage from**   **to** 35.41   Section No. _____

TRACK FOREMAN OR INSPECTOR WILL PREPARE REPORT EACH DAY. CIRCLE DEFECTS REQUIRING ATTENTION.
IF MORE SPACE IS REQUIRED, USE BACK OF THIS SHEET.

| MILEAGE | | INFORMATION | MILEAGE | | INFORMATION |
|---|---|---|---|---|---|
| | **RAIL** | Length_____ft._____in. 1. Replace Broken Rail 2. Weld Eng. Burn  5. Turn Stk. Rail 3. Weld end  6. Gr. Stk. Rail 4. Change Stk. Rail  7. Weld Stk. Rail | | **RODS** | 1. Rep. Conn. Rod 2. Rep. No._____Rod 3. Rep. Cotter Pins 4. Tighten bolts |
| 9.65 9.66 11.45 11.49 | **JOINTS** | 1. Tamp  6. Replace bars 2. Tighten Bolts  7. Replace bond 3. Replace Bolts  8. Replace Insul. 4. Tight-Open  9. Install shims 5. Open-Close  10. Remove shims & tamp | | **SWITCH STANDS** | Type_____ 1. Replace  5. Respike 2. Rep. Target 3. Oil Stand 4. Adjust for full thread |
| | **SPIKES** | 1. Gage Track  4. Spike Switch 2. Redrive  (Out of Service) 3. Replace | | **SWITCH PLATES** | 1. Tighten Braces 2. Replace Plates 3. Oil Plate |
| | **TIE PLATES** | 1. Replace  2. Replace Abrasion | | **GUARD RAIL** | Type_____Lgth._____ 1. Replace 2. Gage 3. Tighten bolts |
| | **RAIL ANCHORS** | 1. Reset 2. Replace 3. Additional | | **CROSSINGS** | Name_____ 1. Patch holes 2. Replace plank  7. Repair X Bucks 3. Spike plank  8. Surf. end of Xing 4. Inst. Flg. Rail  9. Clean Flange 5. Respike Flg. Rail  10. Insp. Sig. lights 6. Cut Brush  11. Remove Snow |
| | **FROG** | No._____Type_____Lgth._____ 1. Replace 2. Weld  5. Surface 3. Tighten Bolts  6. Weld Hold Down 4. Rep. with rail  7. Replace Bolts | 1.8 | **TIES & TIMBER** | 1. Replace ties under joints 2. Replace_____ties 3. Replace_____timbers |
| | **SWITCH POINTS** | Type_____Weight_____Lgth._____ 1. Tamp Heel  5. Adjust 2. Tamp point  6. Grind LH 3. Replace LH  7. Grind RH 4. Replace RH  8. Remove Snow | | **R.O.W.** | 1. Clean ditch 2. Cut Brush TREE 3. Repair Fence 4. Remove Obstruction near track 5. Inst. Flanger Marker 6. Replace Signs |
| | **SWITCH INSPECTION IN YARDS** | (Yard Name)_____ (Date)_____ (Yard Name)_____ (Date)_____ (Yard Name)_____ (Date)_____ | | | |

**REMARKS** _Tamped Two Rail lengths By han at 3.5 Tamped 3/4 of Rail length AT 11.47 West Siding is Ok_

Signature _____ (Patrol Foreman)

Signature _____ (Foreman)

Date Inspected  6-1-04

Date Corrected  6-1-04

NECR 03-6  5/16                                                    L.G. Printing