UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CENTRAL RAILROAD, INC.,
Plaintiff,

v.

Civil Action No.:  04-30235-MAP

SPRINGFIELD TERMINAL RAILWAY
COMPANY and BOSTON AND MAINE
CORPORATION,
Defendants

## MEMORANDUM OF LAW IN SUPPORT OF THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

The Plaintiff, New England Central Railroad, Inc. ("NECR") hereby files this

*Memorandum of Law* in support of its *Motion for Summary Judgment*.  The NECR is requesting

this Honorable Court to enter judgment in its favor on:  (1) the allegations raised in its *Amended*

*Complaint*; and (2) the defendants' *Counterclaim*.  As further grounds therefore, the NECR

states as follows:

## I.    FACTUAL BACKGROUND:

In 1988, the National Railroad Passenger Corporation ("AMTRAK") purchased from the

defendant Boston & Maine Corporation ("B&M") a section of railroad track located between

Brattleboro, VT and Windsor, VT. This section of track is commonly known as the "Connecticut

River Line." See *Amended Complaint* at ¶ 9.  It is also part of the NECR's Roxbury Subdivision.

AMTRAK immediately thereafter conveyed the Connecticut River Line to the Central Vermont

Railway, Inc. ("CV").  Id. at ¶ 10.  CV was the NECR's predecessor.  In 1994, the NECR

purchased the CV's assets which included the tracks and the rights which are the subject of the

NECR's *Amended Complaint.* Id. at ¶ 11.

As part of the conveyance of the Connecticut River Line from the B&M to AMTRAK, and then to the CV, the CV was required by the Interstate Commerce Commission ("ICC") to grant back to the B&M certain rights (known as "Trackage Rights") to operate its freight trains over the CV's tracks between East Northfield, MA and White River Junction, VT. Id. at ¶ 12. Initially, the parties operated under a temporary "*Interim Agreement*" regarding the B&M's Trackage Rights. Id. at ¶ 13.

On May 18, 1989, the CV petitioned the ICC to impose permanent terms and conditions for the B&M's Trackage Rights over a 48.8 mile segment of the Connecticut River Line as well as certain CV track segments at both ends of the Connecticut River Line. Id. at ¶ 14. On February 6, 1990, the ICC imposed a *Modified Trackage Rights Agreement* (the "Agreement") governing the terms and conditions of the B&M's use of the CV's (now NECR's) main-line track between East Northfield, MA and White River Junction, VT. Id. at ¶ 15. A copy of the *Agreement* imposed by the ICC is attached as Exhibit "A." Thus, although the *Agreement* is simply a contract between the parties, it has been imposed by the ICC and is therefore considered to be an ICC order.[1]

The *Agreement* is still in effect and currently governs the rights, responsibilities and obligations of the NECR, the B&M and/or the defendant Springfield Terminal Railway Company ("STRC") with respect to the operation of trains over the NECR's mainline track between East Northfield, MA and White River Junction, VT. The STRC/B&M has been operating trains over the tracks subject to the *Agreement* since 1990.

It is clear that the *Agreement* is simply a private agreement between two parties (the

---

[1] In fact, the STRC/B&M consistently refer to the Agreement as a *Trackage Rights Order* ("TRO").

NECR and STRC/B&M), and that it imposes a number of typical obligations on both railroads. For instance, at issue in this case is a provision which allocates between the parties responsibility for certain losses:

> [E]ach party hereto shall be responsible for and shall assume <u>all loss, damage or injury...to persons or property,</u> including the cost of removing any trackage, repairing trackage and correcting environmental damage, which may be caused by its engines, cars, trains or other on-track equipment (including damage by fire originating therefrom) <u>whether or not the condition or arrangement of the trackage contributes in any manner or to any extent to such loss, damage or injury,</u> and whether or not a third party may have caused or contributed to such loss, damage or injury, and for all loss or damage to its engines, cars, trains or other on-track equipment while on said trackage from any cause whatsoever, except in the case of collision, in which event the provisions of Section 7.2 shall apply.

See Exh. A at § 7.1 (emphasis supplied.).[2] Pursuant to the clear and unambiguous language of this provision, the defendants are responsible for the losses and damages which were caused by the derailment <u>regardless of any other cause including the condition of the track.</u>

On July 3, 2004, employees of the STRC/B&M (Peter Kari and Joseph Scappace) were operating an STRC/B&M freight train over a section of the NECR's mainline (the Connecticut River Line*)* which is subject to the *Agreement.* See *Amended Complaint* at ¶ 20; see also the parties' *Joint Pre-Trial Conference Memorandum*, a copy of which is attached as Exhibit "B," at § II, "Statement of the Facts Established By Pleadings, Admissions or By Stipulations," at sub-¶ A, p. 9. The locomotives and freight cars involved in the derailment were either owned by and/or in the possession, custody and/or control of and being operated by the defendants. Exh. B at ¶ II. B, p. 10. The train derailed and caused extensive damage to the NECR's trackage and

---

[2] Any reference to the "trains, locomotives, cars or equipment of, or on the account of, one of the parties hereto" means "the trains, locomotives, cars and equipment <u>in the possession of or operated by one of the parties</u> and includes such trains, locomotives, cars and equipment which are owned by, leased to, or in the account of such party." Exh. A at § 9.7 (emphasis supplied).

related property in the area of the derailment. See *Amended Complaint* Id. at ¶ 21-26; Exh. B at ¶ II C, p. 10.

The initial derailment occurred at Mile Post 10.18 when a portion of a single freight car came off the tracks. Id. The defendants' crew failed to immediately recognize that this freight car had derailed and continued to operate the train as if there was nothing wrong, dragging the car approximately 5 miles, causing damage to the NECR's trackage and related structures all along the way. Id. Exh. B. at ¶¶ II. F and G, p. 10.

The derailed freight car ultimately, at Mile Post 5.7,[3] caused several other railcars to also derail, resulting in a pile up of railcars. Id. at ¶ II. H, p. 10. The pile up caused additional damage to the track and track structure at and around Mile Post 5.7. Id. at ¶ II. I, p. 10. The derailment shut down rail traffic over the Connecticut River Line for a period of time after the derailment. Id. at ¶ II. J, p. 10.

On June 8, 2004, less than one month before the derailment, the Federal Railroad Administration ("FRA") had conducted a "Track Geometry Test" on the Connecticut River Line.[4] Exh. B. at ¶ II. M, p. 11. According to the June 8, 2004 Track Geometry Inspection Report, there were areas on the Connecticut River Line where the classification of the track was reduced due to defects that were determined by the geometry test. The NECR immediately after receiving the Report imposed the reduced classifications at those areas and set about rectifying the most serious of the defects. See the transcript of the deposition of Michael Lawyer, the

---

[3] The train was traveling from north to south. The mile posts are descending when traveling in this direction.

[4] A "Geometry Test" is performed by a specially equipped weighted railcar that travels over the tracks and records various measurements of track conditions, including defects.

4

relevant portions of which are attached as Exhibit "C," at p. 23-29.[5]

The initial point of derailment was Mile Post 10.18. There were no defects found at this point by the June 8, 2004 Geometry Test. See transcript of the deposition of Roger Bergeron, a copy of the relevant portions of which are attached as Exhibit "D," at p. 82-84. The closest defect noted to the point of derailment was located at Mile Post 10.16, which was approximately 105.6 feet south of Mile Post 10.18. Id.; see also Track Geometry Inspection Report, a copy of the relevant portions of which is attached as Exhibit "E." Thus, by the time the derailed freight car reached the first defect at Mile Post 10.16, it had already come off the track and its wheels were on the ground. The allegedly defective condition of the track at Mile Post 10.16 therefore played no role in causing the derailment.

As a result of the derailment, the NECR was required to rebuild a substantial amount of its *Line* between Mile Post 10.18 and 5.7. This included the replacement of over 7,000 ties, 15,000 tie plates, a bridge deck, several segments of rail, tons of ballast, and the rebuilding of three grade crossings. In addition, the NECR suffered lost time incentive revenue from an agreement that it had with the National Railroad Passenger Corporation ("AMTRAK"),[6] losses incurred from care hire and delays, as well as moneys paid to its employees and materials required in order to restore the track back to its previous condition.

On or about December 2, 2004, the NECR filed its original *Complaint* in this case seeking, pursuant to § 7.1 of the *Agreement*, recovery of the damages it incurred as a result of the derailment. The NECR thereafter, on February 25, 2005 filed its *Amended Complaint*. In

---

[5] Mr. Lawyer is the NECR's Roadmaster. His duties include overseeing the condition of NECR's track, to operations of the NECR's track department and compliance with federal regulations concerning track condition, maintenance, inspection and repair.

[6] Certain AMTRAK passenger trains travel daily over the Connecticut River Line. Exh. B at ¶ N, p. 11.

Counts I - IV of the *Amended Complaint* the NECR has alleged that it has been injured by the defendants' failure to obey an order of the STB, by their failure to comply with the provisions of the *Agreement* and by their failure to pay the damages as required by § 7.1 of the *Agreement*, in violation of the federal *Interstate Commerce Commission Termination Act* (the "ICCTA"), 49 U.S.C. § 11704. The *Amended Complaint* also includes counts for common law breach of contract, negligence and wanton/willful conduct (Counts V - X).

## II.    DISCUSSION OF LAW:

### A.    The Interstate Commerce Commission Termination Act:

In 1887, Congress passed the Interstate Commerce Act ("ICA"), which established a statutory scheme for regulating the nation's railroads. The ICA was originally codified at 49 U.S.C. § 1, *et. seq.* The ICA established the ICC as the federal regulatory agency responsible for overseeing railroad transportation. Although the ICA has been changed and amended numerous times since its inception, it continues (in its present form) to govern interstate commerce. In 1995, Congress abolished the ICC by enacting the ICCTA. Pub. L. No. 104-88, Dec. 29, 1995, 109 Stat. 803. The ICCTA established the STB to take the place of the ICC and granted the STB exclusive jurisdiction over rail functions and proceedings. See 49 U.S.C. § 701(a). Congress' purpose in passing the ICCTA was to substantially reduce the regulation of railroads and other modes of surface transportation. See 49 U.S.C. § 10101; see also H.R. Rep. No. 104-311, at 82 (1995); Sen. Rep. No. 104-176, at 2 (1995).

### B.    The Defendants are Responsible For The Damages Caused By The Derailment Pursuant To The Clear And Unambiguous Terms of § 7.1 Of The *Agreement*:

The *Agreement* is, pursuant to § 9.9, governed by the law of the District of Columbia. The District of Columbia adheres to the "objective" law of contracts, which generally means that

"the written language embodying the terms of an agreement will govern the rights and liabilities

of the parties, [regardless] of the intent of the parties at the time they entered into the contract,

unless the written language is not susceptible of a clear and definite undertaking, or unless there

is fraud, duress, or mutual mistake." DPS Venture Group, Inc. v. Allen, 830 A.2d 850, 852

(D.C. 2003) *quoting* Geiger v. Crestar Bank, 778 A.2d 1085, 1091 (D.C. 2001). Where a

contract provision is clear and unambiguous its meaning should be determined as a matter of law

Burbridge v. Howard Univ., 305 A.2d 245, 247 (D.C. 1973); DPS Venture Group, 830 A.2d at

852-853. Contracts "are not rendered ambiguous by the mere fact that the parties do not agree

upon their proper construction." Burbridge, 305 A.2d at 247 (citations omitted). Instead,

> [A] contract is ambiguous when, and only when, it is, or the provisions in
> controversy are, reasonably or fairly susceptible of different constructions or
> interpretations, or of two or more different meanings, and it is not ambiguous
> where the court can determine its meaning without any other guide than a
> knowledge of the simple facts on which, from the nature of language in general,
> its meaning depends …

Id. *citing* 17A C.J.S. Contracts § 294 at p. 34-35 (1963). Interpretation is even more

straightforward where the contract employs neither technical terms nor words of art. Id.

In a written agreement, parties may provide that one indemnify the other against the

other's negligence. District of Columbia v. Murtaugh, 728 A.2d 1237, 1245 (D.C. 1999); W.M.

Schlosser Co. v. Maryland Drywall Co., 673 A.2d 647, 653 (D.C. 1996); District of Columbia v.

Royal, 465 A.2d 367, 368-69 (D.C. 1983). An indemnity provision can be construed to permit

an indemnitee to recover for his own negligence so long as the court is firmly convinced that

such an interpretation reflects the intention of the parties. Schlosser, 673 A.2d at 653; United

States v. Seckinger, 397 U.S. 203, 211 (1970). Such an intention should be "plainly evident

from the face of the contract." Murtaugh, 782 A.2d at 1245-1246 *quoting* Royal, 465 A.2d at

369.

    Courts applying D.C. law have held that an indemnitor is responsible not only for its own

negligence but that its liability also "stretches to encompass (the indemnitee's) negligence as

well" if the contractual provision in question clearly reflects such a purpose and the language of

the contract is sufficiently clear in this regard. Schlosser, 673 A.2d at 653 *quoting* Seckinger,

397 U.S. at 212-213.  Thus, for instance, in Schlosser, a contractual provision that provided

indemnity for "any and all claims…arising out of …or in connection with the execution of the

work" was held to be "so broad and sweeping as to plainly reveal an intent to encompass losses

incurred in whole or in part by the negligence of the indemnitee." Id. *quoting* Moses–Ecco Co.

v. Roscoe-Ajax Corp., 115 U.S. App. D.C. 366, 369, 320 F2d 685, 688 (1963); see also

Princemont Constr. Corp. v. Baltimore and Ohio R.R. Co., 131 A2d 877 (D.C. 1957).  Likewise

in Moses-Ecco, the court held that the following a provision which required the subcontractor to

"at all times indemnify…the contractor against any loss…arising or resulting from the

performance of this contract, including any and all loss…(which the) contractor may sustain or

incur on account of any claim, demand or suit made or brought against (it)" was held to be

sufficiently broad enough to impose on the subcontractor the responsibility for losses occasioned

by the contractor's negligence.  The court in Moses-Ecco noted that "no particular form or words

are needed but the intent to waive negligence must be clear." 115 U.S. App. D.C. at 369, 320

F.2d at 688 (citation omitted).

    In Princemont, the District of Columbia Court of Appeals, interpreting a provision which

stated that a sub-contractor agreed "to assume all liability for any and all loss and damage to

property and claims for injury to or death of person in connection with or growing out of the use

of said premises," held that when the terms of such an agreement are so broad and comprehensive, "the presumption is that if the parties had intended some limitation of the all-embracing language, they would have expressed such limitation." 131 A.2d at 878.

In reviewing these cases, the District of Columbia Court of Appeals in <u>Schlosser</u> determined that the language of these provisions (will "indemnify…from any and all claims;" will "indemnify against any loss;" and will "assume all liability for any and all loss") were all sufficiently comprehensive so as to include indemnification for damages resulting from the negligence of the indemnitee.[7] 673 A.2d at 654.

The *Agreement*, at § 7.1, allocates between the parties, in clearly expressed and unambiguous terms, the responsibility for how losses are to be incurred as a result of a derailment, such as the one which is the subject of this case. The language states simply that one railroad is responsible to the other for all damages "caused by its engines, cars, trains or other on-track equipment." The contract does not use technical terms or words which have special meaning requiring further explanation. It is difficult to imagine a simpler, more straightforward provision. Here, it has been stipulated and/or otherwise established that the derailment was caused by the defendants' equipment which was, at the time of the derailment, being operated by the defendants' employees. That is all that is necessary to trigger the provisions of § 7.1.

Moreover, the defendants have admitted that they are responsible for the derailment damages by virtue of § 7.1. Roger Bergeron, the defendants' current Vice-President for Special Projects and former Assistant Vice-President of Engineering, inspected the scene of the

---

[7] Courts rejecting this conclusion have all been confronted with far more limited language which confined the indemnitor's responsibility to its own negligence. See e.g. <u>Sekinger</u>, 397 U.S. at 204 ("[the contractor] shall be responsible for all damages to persons or property that occur as a result of <u>his fault or negligence</u>…") (emphasis added); <u>Royal</u>, 465 A.2d at 368 ("the contractor shall indemnify (for) … liability arising from or based on, or as a consequence or result, any act, omission or default of the contractor, his employees, or his sub-contractors, in the performance of, or in connection with, any work required, contemplated or performed under the contract").

derailment and conducted on behalf of the defendants an investigation as to the cause of the

derailment shortly after it occurred. He also worked with the NECR on clean up and remediation

efforts. He has given sworn testimony in this case as the defendants' Rule 30(b)(6) deponent,

thus his testimony binds the defendants. One of the areas of inquiry about which Mr. Bergeron

was designated to testify, was "the negotiation, drafting and interpretation of the *Trackage Rights*

*Agreement*." A copy of the Rule 30(b)(6) deposition notice is attached as Exhibit "F." Mr.

Bergeron has admitted that the defendants are responsible, pursuant to § 7.1, for the damages

caused by the derailment. See Exh. D at p. 158 - 160. More specifically, Mr. Bergeron testified

as follows:

> Q:    So it's your understanding that if your train and your cars do the damage
> to a track, you know, this particular track being the line as defined in the
> agreement, then the STRC would be then responsible for all the damage
> that results therefrom, correct?
> A:    According to some of the language in that, that's what it appears.
> Q:    Do you see any exceptions in that provision?
> A:    In that provision, no.
> Q:    Other than the exception for 7.2?
> A.    No that's right. Other than where it says, "Except in the case of collision,
> in which event the provision of 7.2 shall apply."
> Q:    And 7.2…really has nothing to do with this, correct?
> A:    I would say correct.

Id. at p. 159-160.[8]

Here also, the language is precisely the type of language which courts applying D.C. law

have held to be sufficiently comprehensive enough to require the indemnitor to be responsible

even for the indemnitee's negligence, especially given the circumstances of this case. The only

allegation of negligence that the defendants have raised against the NECR pertains to the

---

[8] The defendants' counsel originally questioned Mr. Bergeron's ability to testify about the "drafting and negotiating" of the Agreement. Exh. F at p. 16-17. However, Mr. Bergeron was allowed to testify as to the defendant's "interpretation" of the Agreement. Exh. F. at p. 16-17, 157-160. In any event, none of the defendants' objections were properly raised prior to the convening of the deposition.

condition of its track. Yet § 7.1 specifically states that regardless of whether or not the condition

of the track contributed to the incident, the defendants "shall be responsible for and shall assume

all loss, damage or injury ... including the costs for removing any trackage, repairing trackage

and correcting environmental damage, which may be caused by its engines, cars, trains or other

on-track equipment (including damages by fire originating therefrom)." The parties have

specifically excluded, from the calculus involved in determining their responsibility, the

condition of the track. The language of the *Agreement* is sufficient to indicate that the parties

intended for the defendants, their equipment having caused the derailment damages, to be

responsible to the NECR for the derailment damages, even if the condition of the track (and the

NECR's negligence for causing this condition to exist) were a factor in causing the derailment.

It should also not be overlooked that the only damages that the defendants are seeking

pertain to its damaged and/or destroyed railroad cars, including the costs associated therewith.

Exh. "B" at ¶ III. B. 22, p. 15. The parties clearly intended, through the use of specific and

unambiguous language, that the defendants would be responsible for any such damages to "its

engines, cars, trains, or other on-track equipment ... from any cause whatsoever... ." Exh. A at §

7.1. By the use of the term "any cause whatsoever" the parties clearly expressed the intention

that they would each bear the costs of damages to their own equipment incurred as a result of an

incident such as the July 3, 2004 derailment, regardless of how this damage was caused. The use

of this language is, pursuant to the well-established D.C. case law, comprehensive enough to

make the defendants here responsible for the damages they are now seeking, even if those

damages were caused by the condition of the track or some other form of the NECR's

negligence.

§ 7.1 of the *Agreement*, in clear and unequivocal terms, expresses that the railroad whose

11

equipment causes damage must pay for it (regardless of the condition of the track). Since it has

been established in this case that the defendants' equipment caused the derailment and

subsequent damages, judgment should be entered on the NECR's § 11704 Counts alleging

violations of an STB "Order" (Counts I – IV) and on its breach of contract count (Count V and

VIII). All that should remain to be tried in this case is the issue of the NECR's damages.

**C.**    **The Allegedly Defective Condition of The Track is Irrelevant and Does Not Relieve the Defendants From Responsibility Under § 7.1:**

The defendants have taken the position that they are not responsible for the derailment

damages because the condition of the track allegedly fell below Class II standards.   This is not

relevant to the determination of responsibility under § 7.1.  In addition, this allegation is also

contradicted by the established facts of this case, about which there can be no reasonable dispute.

In any event, the condition of the track does not relieve the defendants from the responsibility

imposed by § 7.1 to pay for the derailment damages.

**1.**    **Track Condition is Simply Not Relevant to the Determination of Liability Under § 7.1:**

The *Agreement* clearly expresses that the condition of the track is simply not relevant to a

determination of the allocation of responsibility.  More specifically, § 7.1 states, in clear and

unequivocal terms, that the railroad whose equipment caused the damage is responsible therefore

"whether or not the condition or arrangement of the trackage contributes in any manner or to any

extent to such loss, damage or injury." Exh. A.  Again, it is difficult to imagine a clearer

expression of the parties' intentions.  Given this language, the condition of the track is nothing

more than a "red herring."  For this reason alone, the defendants' argument that it should be

relieved from responsibility under § 7.1 because of an alleged deficiency in the condition of the

track should be rejected.

**2.    The Condition of the Track at Mile Post 10.18 Was in Compliance With the
        *Agreement*:**

Track condition is also not relevant because the evidence in this case is undisputed that at

Mile Post 10.18, where the derailment began, the track at least met Class II standards.  Even

though the FRA's testing found a defect at Mile Post 10.16, this defect reduced the classification

of this section of the track down from Class III to Class II, which was still within compliance

with the requirements of the *Agreement*.  Exh. B. at ¶ II. M, p. 11.

The NECR was required, pursuant to § 3.2 of the *Agreement,* to keep its tracks in not less

than Federal Railroad Administration ("FRA") Class II condition.  An FRA Class II rating

restricts the speed of freight trains to not more than 25 mph.  See 49 C.F.R. § 213.9.  For the

most part, the Connecticut River Line was generally maintained to FRA Class III standards,

which restricts the speed of freight trains to not more than 40 mph; therefore the *Line* is generally

maintained to a greater standard than that which is required under the *Agreement*.  See Exh. C at

p. 12-13, 46-47.

On June 8, 2004, the NECR's track at the initial point of derailment was in Class III

condition because there was no defect noted there in the Geometry Report.  See Exh. C at p. 12-

13, Exh. D at p. 82-84; see also Exh. E.  The only defect in the immediate area of the derailment

was at Mile Post 10.16.  Accordingly, on July 3, 2004 the track speeds at the point of derailment,

and for several miles in either direction, were set at 25 mph for freight trains which was in

compliance with the standards for Class II track set forth in the applicable federal regulations.

See *Daily Operating Bulletin*, a copy of which is attached as Exhibit "G," at p. 4 of 6, at Items

85-90.

The evidence will be undisputed in this case that: (a) the NECR complied with (in fact,

exceeded) the FRA's track inspection requirements; and (b) the condition of the track both at the point of derailment at (Mile Post 10.18) and throughout the Connecticut River Line in general was up to at least Class II standards. The FRA requires weekly inspections of Class III track. See 49 C.F.R. § 213.233(c). Here, the NECR inspected the Connecticut River Line, including the area of Mile Post 10.18, two times per week. See the transcript of the deposition of Rick T. Boucher, a copy of the relevant portions of which are attached at Exhibit "H," at p. 10-12;[9] see also *Daily Track Inspection Reports* for the months of June and July, 2004, copies of which are attached as Exhibit "I;" see also Exh. C at p. 13.

There is no credible, admissible evidence which could support a finding that the track, from Mile Post 11 to the location of the pile-up, was below Class II condition at the time of the derailment. Exh. C at p. 46-47. Any defects that dropped the classification of track in the area of the derailment, identified by the FRA Geometry Report as being below Class II, were addressed by the NECR before July 3, 2004. Id. at p. 25-29. On July 3, 2004, the NECR's track at the initial point of derailment was in Class III condition. Id. at p. 46-47. In addition, the reports of daily track inspections, which took place between the Geometry Test (June 8, 2004) and the date of derailment (July 3, 2004), show that there were no defects noted that would require the NECR to reduce the classification of the track below Class II in the area of the point of derailment. *See* Exh. I.

Moreover, the NECR has identified Mr. Bergeron as the only expert regarding the condition of the track at the time of the derailment. Mr. Bergeron has testified that, when he inspected the track <u>after</u> the derailment he noted a measurable defect in the cross elevation at Mile Post 10.18. However, he also admitted that he did not know if that condition was present at

---

[9] Mr. Boucher is an NECR track inspector on the Roxbury subdivision.

any time between the NECR's last inspection on July 1, 2004 and the date of the derailment. Exh. D at p. 142-145. He simply has no basis for concluding that the cross-elevation defect was present at any time before the day of the derailment. Mr. Bergeron's testimony in this regard is therefore completely speculative, is based on insufficient facts and data and the product of unreliable methodology which have not been applied reliably to the facts of this case and, therefore should be excluded. *See* Daubert v. Merrill-Dow Pharmaceuticals, 516 U.S. 869 (1995); Fed. R. Evid. 702, 703.[10]

    **3.**    **The Condition of the Track at Mile Post 10.18 Did Not Cause the Accident:**

    As discussed *supra*, there is no admissible evidence in this case that the condition of the track at the initial point of derailment was defective. The first defect was noted to be at milepost 10.16, 105.6 feet further down the track from the point of derailment. Thus, even if this Honorable Court should entertain the defendants' argument that track condition is in any way relevant to a determination of the responsibility for this derailment under § 7.1, the argument should nevertheless be rejected because there is simply no admissible evidence that the condition of the track played any role in causing this accident, since there was no defect at Mile Post 10.18.

**D.**    **The Defendants' Counterclaims Should be Dismissed Because The Condition of the Track Was Neither in Violation of the *Agreement* Nor Did it Cause the Derailment:**

    The defendants' *Counterclaim* (regarding the responsibility for the damages caused by the derailment) is based entirely on the allegation that the track was not up to Class II standards. See the *Defendants' Answer to Amended Complaint and Defendants' Counterclaims*, at ¶¶ 12-14, 39-44, 56. For the reasons discussed, *supra*, the track was actually up to this standard and there is no evidence that, even if the track condition was sub-standard, it played any role in

---

[10] The NECR plans to file a motion to exclude Mr. Bergeron's testimony once it has an opportunity to depose him as an expert, before the deadline imposed by the court for doing so.

causing the derailment. For these reasons alone, the *Counterclaim* should be dismissed.

**E.    The Defendants' Counterclaims Should Be Dismissed Because They Are Preempted By Federal Law:**

Railroad operations and facilities, including track structures and bridges, are governed by a comprehensive scheme of federal statutes and their implementing regulations, including the *Federal Railroad Safety Act* ("FRSA"). In 1966, Congress transferred the responsibility for rail safety to the Secretary of Transportation, *see* section 6(e) of the *Department of Transportation Act*, Pub.L.Co. 89-670, 80 Stat. 93 (1966), which in turn delegated those responsibilities to the Federal Railroad Administration ("FRA"), a unit of the Department of Transportation ("DOT"). *See* 49 C.F.R. § 1.49(m); *Act of October 15, 1966*, Pub. L. 89-670 § 6(e)(1), 80 Stat. 939, formerly codified at 49 U.S.C. § 1655(e)(1). The FRA has promulgated specific and detailed specifications and safety standards for all types of railroad equipment, activities and operations, including *Track Safety Standards* (49 C.F.R. Part 213). The FRSA's stated purpose is "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. Under the FRSA, the Secretary is given broad power to "prescribe regulations and issue orders for every area of railroad safety ..." Id. The FRSA contains an express preemption provision, which states:

> Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue to enforce a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement.

49 U.S.C. § 20106. Where the statute being construed contains an express preemption clause, such as § 20106, "the task of statutory construction must in the first instance focus on the plain wording of the clause...." CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993). The

United States Supreme Court has read § 20106's broad language to preempt state statutes and

rules, as well as all "legal duties imposed on railroads by the common law... ." Id. at p. 664.

Thus, if FRA regulations address the subject matter, the lawsuit cannot be sustained. See In re

Derailment Cases, 416 F. 3d 787 (8th Cir. 2005) (hereinafter referred to as the "Scottsbluff"

case).

The provisions of the FRSA's preemption clause mandate that "applicable federal

regulations may preempt any state 'law, rule, regulation, order, or standard relating to railroad

safety.' Legal duties imposed on railroads by the common law fall within the scope of these

broad phrases." Id.; Ouellette v. Union Tank Car Co., 902 F. Supp. 5, 9 (D. Mass. 1995). FRSA

preemption applies to any and all regulations pertaining to railroad operations and railroad

safety, whether enacted before or after the FRSA. *See, e.g.,* CSX Transp., Inc. v. Public Utilities

Comm'n of Ohio, 901 F.2d 497, 501 (6th Cir. 1990); Consol. Rail Corp. v. City of Bayonne, 724

F.Supp. 320 (D.N.J.1989); Tolentino v. United Parcel Service, et al., 2001 U.S. Dist. LEXIS

1395 (D. Mass. 2001).

All that is required to trigger the FRSA's preemption provision is that the subject of the

defendants' claim be "covered" by any of the FRA's regulations. Easterwood, 507 U.S. at 665,

674; see also CSX Trans., Inc. v. Williams, 406 F. 3d 667,672 (D.C. Cir. 2005) ("the FRSA

preemption provision ... authorizes the court only to determine whether the regulation covers the

subject matter ...") (emphasis in original). Here, the subject is the inspection and maintenance

of the track structure. The FRA has promulgated detailed and specific regulations on this subject

at 49 C.F.R. Parts 213, which is entitled *Track Safety Standards*, and it contains detailed and

specific regulations for minimum inspection and maintenance requirements for all components

of the track structure, including the roadbed and the area immediately adjacent to it and various

17

appurtenances to railroad tracks and railroad rights of way. *See e.g.* 49 C.F.R. § 213.7 and

subpart F – *Inspection*, 49 C.F.R. §§ 213.231 to 213.241. Part 213 also contains a number of

provisions which impose upon railroads specific requirements for the inspection and

maintenance of these areas and structures. Part 213 also has its own express preemption

provision which states as follows:

> Under 49 U.S.C. 20106, issuance of these regulations preempts
> any state law, regulation, or order covering the same subject matter
> except an additional or more stringent law, regulation, or order that
> is necessary to eliminate or reduce an essentially local safety
> hazard; is not compatible with a law, regulation, or order of the
> United States Government; and that does not impose an
> unreasonable burden on interstate commerce.

49 C.F.R. § 213.2. Part 213 also has specific provisions setting forth penalties for violations of

any requirements of the regulations set forth therein, including a schedule of fines. 49 C.F.R. §

213.15, and App. B. Subpart F sets forth specific "requirements for the frequency and manner of

inspecting track to detect deviations from the standards prescribed in this part." 49 C.F.R. §

213.231. Part 213 also contains specific sub-parts pertaining to the "roadbed"[11] and "track

appliances and track-related devices." 49 C.F.R. subparts B and E.

It is clear from the plain language of 49 C.F.R. Parts 213 that the FRA has issued

regulations which cover the trackage. Thus, the expressed preemption provisions of 49 U.S.C.

§ 20106 and 49 C.F.R. § 213.2 have been triggered. Here, moreover, not only do the federal

regulations pertaining to track standards and inspections fully cover the subject matter of the

allegations raised in the defendants' counterclaim, it is clear from the undisputed evidence in this

case that the NECR was in full compliance with these regulations at the time of the derailment

---

[11] As stated in § 213.31, "this sub-part prescribes minimum requirements for roadbed and areas immediately adjacent to roadbed."

(see discussion *supra*), or at least at the time it last inspected the track as required by the FRA.[12]

Given these circumstances, the defendants' counterclaims are preempted by the well-established

doctrine of federal preemption, and they must be dismissed.

**F.    The Defendants' Failure to Abide by the Terms of § 7.1 is a Violation of an Order of the STB:**

The NECR's *Complaint* at Counts I through IV alleges that the defendants violated 49

C.F.R. § 11704(a) and (b).  § 11704(a) provides as follows:

> A person injured because a rail carrier providing transportation or service subject
> to the jurisdiction of the Board under this part does not obey an order of the
> Board, except an order for the payment of money, may bring a civil action in a
> United Sates District Court to enforce that order under this subsection.

---

[12] Given that the NECR has complied with the applicable inspection requirements, it is therefore entitled to preemption without the Court having to find that preemption would apply even in the absence of compliance with the FRA's regulations.  However, the NECR is also cognizant of a growing number of cases, including a notable decision by this Honorable Court, which recognize that a railroad is entitled to preemption even in the face of its having violated the applicable regulatory scheme.

No less an authority than the Supreme Court has held that a railroad's failure to comply with the preempting federal regulation is irrelevant to the preemption analysis.  See Norfolk So. Ry. Co. v. Shanklin, 529 U.S. 344, 357-58 (2000) (adherence to railroad safety standards immaterial to the preemption analysis once coverage exists); see also Kalan Enter., L.L.C. v. BNSF Ry. Co., 415 F.Supp. 977, 980 (D. Minn. 206) (rejecting plaintiff's claim that defendant must prove compliance with the regulations); Mehl v. Canadian Pacific, 417 F.Supp. 1104, 1108 (D. North Dakota 2006) (The determination of whether state law is preempted by federal law does not concern an examination of the compliance with or the adequacy of the federal regulations.).  Shanklin holds that if federal "coverage" is found, "[i]t is this displacement of state law concerning the [subject matter], and not . . . adherence to the [federal] standard . . ., that preempts state tort actions." Id. at 358 (emphasis added).  Several other courts have since followed the precedent set in Shanklin that federal railroad preemption applies regardless of the railroad's compliance with the relevant federal standards.  See the Scottsbluff cases, 416 F 3d 787; Kalan, 415 F.Supp. 977; Mehl, 417 F.Supp. 1104; Bock v. St. Louis SW Ry. Co., 181 F. 3d 920, 923 (8th Cir. 1999) ("Due to preemption, the railroad was no longer duty bound in the tort sense, for causes of action based on the adequacy of the crossing safety devices.").

Moreover, as this Honorable Court has stated, the "FRSA's preemption language . . . does not differentiate between instances where a manufacturer has complied with a federal regulation and where it has not." Ouelette, 902 F.Supp. at 10.  This Court has also recognized that:

> While federal preemption often means that there is no remedy to a claimant, in many instances,
> unfortunately, this result is necessary to vindicate the intent of Congress.  By pervasively
> legislating the field of railroad safety, Congress demonstrated its intent to create uniform national
> standards and to preempt state regulation of railroads.

Id.

Here, the *Agreement* amounts to an "order of the Board." By failing to indemnify and otherwise pay the NECR for the damages it incurred as a result of the derailment, the defendants have disobeyed an order of the STB.[13] In addition, § 11704(b) provides that: "A rail carrier providing transportation subject to the jurisdiction of the Board under this part is liable for damages sustained by a person as a result of an act or omission of that carrier in violation of this part." Here, again, the "act or omission ... in violation of this part" is the defendants' failure to abide by the terms of § 7.1 and pay the NECR the damages it incurred as a result of the July 3, 2004 derailment.

Given all of the established facts as described herein, it is clear that there is no genuine dispute of material fact as to whether or not the defendants violated an "order of the Board." There is also no dispute that the NECR suffered damages as a result of the defendants' violation of the *Agreement*. Therefore, judgment should be entered in favor of the NECR on its § 11704 claims.

Moreover, it is equally clear and undisputed that the defendants have not suffered any damages as a result of the NECR's refusal to obey an "order of the Board" nor have they incurred any damages as a result of an act or omission of the NECR in violation of any part of. the ICCTA Therefore, the defendants Counterclaims alleging violations at §§ 11704(a) and (b) should be dismissed.

**G.      There is Simply No Evidence to Support The Defendants' Gross Negligence Claim:**

"To sustain a claim for gross negligence, a plaintiff must present facts that demonstrate that an individual defendant heedlessly and palpably violated a legal duty owed to plaintiff."

---

[13] The defendants, in the first count of their *Counterclaim*, have made a similar allegation. More specifically, the defendants have made the same allegation that the agreement constitutes an "order of the Board" but that the NECR violated the order by failing to maintain the track up to Class II standards. See *Defendants' Answer to Amended Complaint and Defendants' Counterclaims*.

20

Powers v. Office of Child Support, 173 Vt. 390, 399, 795 A.2d 1259 (2002), *citing* Mellin v.
Flood Brook Union Sch. Dist., 173 Vt. 202, 219-220, 790 A.2d 408, 423 (2002). "Stated
differently, one who fails to exercise 'even a slight degree of care' or acts indifferently to the
duty owed to another may be grossly negligent." Mellin, 173 Vt. at 220, *quoting* Rivard v. Roy,
124 Vt. 32, 35, 196 A.2d 497, 500 (1963). Generally, whether an individual was grossly
negligent is a question for the jury, except where reasonable persons cannot differ on the
question. Id., *citing* Hardingham v. United Counseling Serv. of Bennington County, Inc., 164 Vt.
478, 481, 672 A.2d 480, 483 (1995).

 Here, there can be no reasonable dispute that even if the NECR's track was in defective
condition at the time of the derailment, the NECR nevertheless is not guilty of grossly negligent
conduct. The evidence is undisputed that following the FRA's June 8, 2004 Track Geometry
Inspection Report, the NECR took measures to either repair its track or reduce the allowable
speed to safe track standards. Moreover, the evidence is undisputed that at the time of the
Geometry Track Inspection and up until at least July 1, 2004, the track at Mile Post 10.18 was in
Class III condition. The NECR continued, after receipt of the Track Geometry Inspection Report
and the performance of ongoing subsequent remedial measures, to inspect its track on a more
frequent basis than was required by the federal regulations. During the course of the inspections
that took place during the month of June and during the last inspection which occurred before the
derailment, no defects were noted at the point of derailment which would have caused a further
reduction in the class of the track. In fact, as of the day of the last inspection prior to the
derailment (which occurred on July 1, 2004), the condition of the track at the point of derailment
was found to be up to a class standard which complied with § 3.2 of the *Agreement*. Even the
defendants' expert, Mr. Bergeron, had admitted that any defective condition which may have

been present at the time of the derailment could very easily not have been present at the time of the last required inspection. These facts make it clear that even if the track was defective at Mile Post 10.18 at the time of derailment, there was no way for the NECR to have known this at any time prior thereto, and that it met and exceeded all applicable federal regulations with respect to its inspection requirements. Given these circumstances, the NECR was simply not guilty of gross negligence. Therefore, the defendants' claim for gross negligence must be dismissed.

## IV.    CONCLUSION:

WHEREFORE, for all the above-stated reasons, the plaintiff NECR respectfully requests that its *Motion for Summary Judgment* be <u>ALLOWED</u>.

## V. REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(D), the plaintiff respectfully states that oral argument may assist the Court and requests a hearing on its *Motion For Summary Judgment*.

<div style="margin-left:40%">

Respectfully submitted,
NEW ENGLAND CENTRAL RAILROAD, INC.
by its attorneys,

/s/ Michael B. Flynn .
Michael B. Flynn            BBO#559203
Richard A. Davidson, Jr.,      BBO#552988
FLYNN & ASSOCIATES, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA  02169
(617) 773-5500

</div>

DATED: <u>March 23, 2007</u>
G:\F & A\CASE FILES\RAILAMERICA\New England Central\BM - STRC-Hartland\pleadings\mmo support mosuj.doc