UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CENTRAL RAILROAD, INC.,
Plaintiff,

v.

SPRINGFIELD TERMINAL RAILWAY
COMPANY and BOSTON AND MAINE
CORPORATION,
Defendants

Civil Action No.: 04-30235-MAP

**PLAINTIFF, NEW ENGLAND CENTRAL RAILROAD, INC.'S,
CONCISE STATEMENT OF FACTS PURSUANT TO LOCAL RULE 56.1**

The plaintiff, New England Central Railroad, Inc. ("NECR"), hereby submits, pursuant to Local Rule 56.1, its *Concise Statement of Facts* in support of its respective *Motion for Summary Judgment*.

1. In 1988, the National Railroad Passenger Corporation ("AMTRAK") purchased from the defendant Boston & Maine Corporation ("B&M") a section of railroad track located between Brattleboro, VT and Windsor, VT. This section of track is commonly known as the "Connecticut River Line." See *Amended Complaint* at ¶ 9.

2. It is also part of the NECR's Roxbury Subdivision. AMTRAK immediately thereafter conveyed the Connecticut River Line to the Central Vermont Railway, Inc. ("CV"). Id. at ¶ 10.

3. CV was the NECR's predecessor.

4. In 1994, the NECR purchased the CV's assets which included the tracks and the rights which are the subject of the NECR's *Amended Complaint*. Id. at ¶ 11.

5.  As part of the conveyance of the Connecticut River Line from the B&M to AMTRAK, and then to the CV, the CV was required by the Interstate Commerce Commission ("ICC") to grant back to the B&M certain rights (known as "Trackage Rights") to operate its freight trains over the CV's tracks between East Northfield, MA and White River Junction, VT. Id. at ¶ 12.

6.  Initially, the parties operated under a temporary *"Interim Agreement"* regarding the B&M's Trackage Rights. Id. at ¶ 13.

7.  On May 18, 1989, the CV petitioned the ICC to impose permanent terms and conditions for the B&M's Trackage Rights over a 48.8 mile segment of the Connecticut River Line as well as certain CV track segments at both ends of the Connecticut River Line. Id. at ¶ 14.

8.  On February 6, 1990, the ICC imposed a *Modified Trackage Rights Agreement* (the "Agreement") governing the terms and conditions of the B&M's use of the CV's (now NECR's) main-line track between East Northfield, MA and White River Junction, VT. Id. at ¶ 15. A copy of the *Agreement* imposed by the ICC is attached as Exhibit "A."

9.  Thus, although the *Agreement* is simply a contract between the parties, it has been imposed by the ICC and is therefore considered to be an ICC order.

10. In fact, the STRC/B&M consistently refer to the Agreement as a *Trackage Rights Order* ("TRO").

11. It is clear that the *Agreement* is simply a private agreement between two parties (the NECR and STRC/B&M), and that it imposes a number of typical obligations on both railroads.

12. For instance, at issue in this case is a provision which allocates between the

2

parties responsibility for certain losses:

> [E]ach party hereto shall be responsible for and shall assume <u>all loss, damage or injury...to persons or property,</u> including the cost of removing any trackage, repairing trackage and correcting environmental damage, which may be caused by its engines, cars, trains or other on-track equipment (including damage by fire originating therefrom) <u>whether or not the condition or arrangement of the trackage contributes in any manner or to any extent to such loss, damage or injury,</u> and whether or not a third party may have caused or contributed to such loss, damage or injury, and for all loss or damage to its engines, cars, trains or other on-track equipment while on said trackage from any cause whatsoever, except in the case of collision, in which event the provisions of Section 7.2 shall apply.

See Exh. A at § 7.1 (emphasis supplied.).

13. Any reference to the "trains, locomotives, cars or equipment of, or on the account of, one of the parties hereto" means "the trains, locomotives, cars and equipment <u>in the possession of or operated by one of the parties</u> and includes such trains, locomotives, cars and equipment which are owned by, leased to, or in the account of such party." Exh. A at § 9.7 (emphasis supplied).

14. Pursuant to the clear and unambiguous language of this provision, the defendants are responsible for the losses and damages which were caused by the derailment <u>regardless of any other cause including the condition of the track</u>.

15. On July 3, 2004, employees of the STRC/B&M (Peter Kari and Joseph Scappace) were operating an STRC/B&M freight train over a section of the NECR's mainline (the Connecticut River Line) which is subject to the *Agreement*. See *Amended Complaint* at ¶ 20; see also the parties' *Joint Pre-Trial Conference Memorandum*, a copy of which is attached as Exhibit "B," at § II, "Statement of the Facts Established By Pleadings, Admissions or By Stipulations," at sub-¶ A, p. 9.

16.     The locomotives and freight cars involved in the derailment were either owned by and/or in the possession, custody and/or control of and being operated by the defendants. Exh. B at ¶ II. B, p. 10.

17.     The train derailed and caused extensive damage to the NECR's trackage and related property in the area of the derailment. See *Amended Complaint* Id. at ¶ 21-26; Exh. B at ¶ II C, p. 10.

18.     The initial derailment occurred at Mile Post 10.18 when a portion of a single freight car came off the tracks. Id.

19.     The defendants' crew failed to immediately recognize that this freight car had derailed and continued to operate the train as if there was nothing wrong, dragging the car approximately 5 miles, causing damage to the NECR's trackage and related structures all along the way. Id. Exh. B. at ¶¶ II. F and G, p. 10.

20.     The derailed freight car ultimately, at Mile Post 5.7, caused several other railcars to also derail, resulting in a pile up of railcars. Id. at ¶ II. H, p. 10.

21.     The train was traveling from north to south. The mile posts are descending when traveling in this direction.

22.     The pile up caused additional damage to the track and track structure at and around Mile Post 5.7. Id. at ¶ II. I, p. 10.

23.     The derailment shut down rail traffic over the Connecticut River Line for a period of time after the derailment. Id. at ¶ II. J, p. 10.

24.     On June 8, 2004, less than one month before the derailment, the FRA had conducted a "Track Geometry Test" on the Connecticut River Line. Exh. B. at ¶ II. M, p. 11.

25.     A "Geometry Test" is performed by a specially equipped weighted railcar that

travels over the tracks and records various measurements of track conditions, including defects.

26. According to the June 8, 2004 Track Geometry Inspection Report, there were areas on the Connecticut River Line where the classification of the track was reduced due to defects that were determined by the geometry test.

27. The NECR immediately after receiving the report imposed the reduced classifications at those areas and set about rectifying the most serious of the defects. See the transcript of the deposition of Michael Lawyer, the relevant portions of which are attached as Exhibit "C," at p. 12, 23-29.

28. Mr. Lawyer is the NECR's Roadmaster. His duties include overseeing the condition of NECR's track departments and compliance with federal regulations concerning track condition, maintenance, inspection and repair.

29. The initial point of derailment was Mile Post 10.18.

30. There were no defects found at this point by the June 8, 2004 Geometry Test. See transcript of the deposition of Roger Bergeron, a copy of the relevant portions of which are attached as Exhibit "D," at p. 82-84.

31. The closest defect noted to the point of derailment was located at Mile Post 10.16, which was approximately 105.6 feet south of Mile Post 10.18. Id.; see also Track Geometry Inspection Report, a copy of the relevant portions of which is attached as Exhibit "E."

32. Thus, by the time the derailed freight car reached the first defect at Mile Post 10.16, it had already come off the track and its wheels were on the ground.

33. The allegedly defective condition of the track at Mile Post 10.16 therefore played no role in causing the derailment.

34. As a result of the derailment, the NECR was required to rebuild a substantial

amount of its *Line* between Mile Post 10.18 and 5.7.

35.   This included the replacement of over 7,000 ties, 15,000 tie plates, a bridge deck, several segments of rail, tons of ballast, and the rebuilding of three grade crossings.

36.   In addition, the NECR suffered lost time incentive revenue from an agreement that it had with the National Railroad Passenger Corporation ("AMTRAK"), losses incurred from care hire and delays, as well as moneys paid to its employees and materials required in order to restore the track back to its previous condition.

37.   Certain AMTRAK passenger trains travel daily over the Connecticut River Line. Exh. B at ¶ N, p. 11.

38.   On or about December 2, 2004, the NECR filed its original *Complaint* in this case seeking, pursuant to § 7.1 of the *Agreement*, recovery of the damages it incurred as a result of the derailment.

39.   The NECR thereafter, on February 25, 2005 filed its *Amended Complaint*.

40.   In Counts I - IV of the *Amended Complaint* the NECR has alleged that it has been injured by the defendants' failure to obey an order of the STB, by their failure to comply with the provisions of the *Agreement* and by their failure to pay the damages as required by § 7.1 of the *Agreement*, in violation of the federal *Interstate Commerce Commission Termination Act* (the "ICCTA"), 49 U.S.C. § 11704.

41.   The *Amended Complaint* also includes counts for common law breach of contract, negligence and wanton/willful conduct (Counts V - X).

42.   In 1887, Congress passed the Interstate Commerce Act ("ICA"), which established a statutory scheme for regulating the nation's railroads. The ICA was originally codified at 49U.S.C. § 1, *et. seq.*

43. The ICA established the ICC as the federal regulatory agency responsible for overseeing railroad transportation.

44. Although the ICA has been changed and amended numerous times since its inception, it continues (in its present form) to govern interstate commerce.

45. In 1995, Congress abolished the ICC by enacting the ICCTA. Pub. L. No. 104-88, Dec. 29, 1995, 109 Stat. 803.

46. The ICCTA established the STB to take the place of the ICC and granted the STB exclusive jurisdiction over rail functions and proceedings. See 49 U.S.C. § 701(a).

47. Congress' purpose in passing the ICCTA was to substantially reduce the regulation of railroads and other modes of surface transportation. See 49 U.S.C. § 10101; see also H.R. Rep. No. 104-311, at 82 (1995); Sen. Rep. No. 104-176, at 2 (1995).

48. The *Agreement* is, pursuant to § 9.9, governed by the law of the District of Columbia.

49. The *Agreement*, at § 7.1, allocates between the parties, in clearly expressed and unambiguous terms, the responsibility for how losses are to be incurred as a result of a derailment, such as the one which is the subject of this case.

50. The language states simply that one railroad is responsible to the other for all damages "caused by its engines, cars, trains or other on-track equipment."

51. The contract does not use technical terms or words which have special meaning requiring further explanation.

52. Here, it has been stipulated and/or otherwise established that the derailment was caused by the defendants' equipment which was, at the time of the derailment, being operated by the defendants' employees. That is all that is necessary to trigger the provisions of § 7.1.

53. Moreover, the defendants have admitted that they are responsible for the derailment damages by virtue of § 7.1.

54. Roger Bergeron, the defendants' current Vice-President for Special Projects and former Assistant Vice-President of Engineering, inspected the scene of the derailment and conducted on behalf of the defendants an investigation as to the cause of the derailment shortly after it occurred.

55. He also worked with the NECR on clean up and remediation efforts.

56. He has given sworn testimony in this case as the defendants' Rule 30(b)(6) deponent, thus his testimony binds the defendants.

57. One of the areas of inquiry about which Mr. Bergeron was designated to testify, was "the negotiation, drafting and interpretation of the *Trackage Rights Agreement*." A copy of the Rule 30(b)(6) deposition notice is attached as Exhibit "F."

58. Mr. Bergeron has admitted that the defendants are responsible, pursuant to § 7.1, for the damages caused by the derailment. See Exh. D at p. 158 - 160.

59. More specifically, Mr. Bergeron testified as follows:

Q: So it's your understanding that if your train and your cars do the damage to a track, you know, this particular track being the line as defined in the agreement, then the STRC would be then responsible for all the damage that results therefrom, correct?
A: According to some of the language in that, that's what it appears.
Q: Do you see any exceptions in that provision?
A: In that provision, no.
Q: Other than the exception for 7.2?
A. No that's right. Other than where it says, "Except in the case of collision, in which event the provision of 7.2 shall apply."
Q: And 7.2…really has nothing to do with this, correct?
A: I would say correct.

Id. at p. 159-160.

8

60.     The defendants' counsel originally questioned Mr. Bergeron's ability to testify about the "drafting and negotiating" of the Agreement. Exh. F at p. 16-17. However, Mr. Bergeron was allowed to testify as to the defendant's "interpretation" of the Agreement. Exh. F. at p. 16-17, 157-160.

61.     The only allegation of negligence that the defendants have raised against the NECR pertains to the condition of its track.

62.     Yet § 7.1 specifically states that regardless of whether or not the condition of the track contributed to the incident, the defendants "shall be responsible for and shall assume all loss, damage or injury ... including the costs for removing any trackage, repairing trackage and correcting environmental damage, which may be caused by its engines, cars, trains or other on-track equipment (including damages by fire originating therefrom)."

63.     The parties have specifically excluded, from the calculus involved in determining their responsibility, the condition of the track.

64.     The only damages that the defendants are seeking pertain to its damaged and/or destroyed railroad cars, including the costs associated therewith. Exh. "B" at ¶ III. B. 22, p. 15.

65.     The parties clearly intended, through the use of specific and unambiguous language, that the defendants would be responsible for any such damages to "its engines, cars, trains, or other on-track equipment ... from any cause whatsoever... ." Exh. A at § 7.1.

66.     By the use of the term "any cause whatsoever" the parties clearly expressed the intention that they would each bear the costs of damages to their own equipment incurred as a result of an incident such as the July 3, 2004 derailment, regardless of how this damage was caused.

67.     § 7.1 of the *Agreement*, in clear and unequivocal terms, expresses that the railroad

9

whose equipment causes damage must pay for it (regardless of the condition of the track).

68. The defendants have taken the position that they are not responsible for the derailment damages because the condition of the track allegedly fell below Class II standards.

69. The *Agreement* also clearly expresses that the condition of the track is simply not relevant to a determination of the allocation of responsibility.

70. More specifically, § 7.1 states, in clear and unequivocal terms, that the railroad whose equipment caused the damage is responsible therefore "whether or not the condition or arrangement of the trackage contributes in any manner or to any extent to such loss, damage or injury." Exh. A.

71. Track condition is also not relevant because the evidence in this case is undisputed that at Mile Post 10.18, where the derailment began, the track at least met Class II standards.

72. Even though the FRA's testing found a defect at Mile Post 10.16, this defect reduced the classification of this section of the track down from Class III to Class II, which was still within compliance with the requirements of the *Agreement*. Exh. B. at ¶ II. M, p. 11.

73. The NECR was required, pursuant to § 3.2 of the *Agreement,* to keep the its tracks in not less than Federal Railroad Administration ("FRA") Class II condition. An FRA Class II rating restricts the speed of freight trains to not more than 25 mph. See 49 C.F.R. § 213.9.

74. For the most part, the Connecticut River Line was generally maintained to FRA Class III standards, which restricts the speed of freight trains to not more than 40 mph; therefore the *Line* is generally maintained to a greater standard than that which is required under the *Agreement*. See Exh. C at 46-47.

75. On June 8, 2004, the NECR's track at the initial point of derailment was in Class

III condition because there was no defect noted there in the Geometry Report. See Exh. C at p. 12-13; Exh. D at p. 82-84; see also Exh. E.

76. The only defect in the immediate area of the derailment was at Mile Post 10.16.

77. Accordingly, on July 3, 2004 the track speeds at the point of derailment, and for several miles in either direction, were set at 25 mph for freight trains which was in compliance with the standards for Class II track set forth in the applicable federal regulations. See *Daily Operating Bulletin*, a copy of which is attached as Exhibit "G," at p. 4 of 6, at Items 85-90.

78. The evidence will be undisputed in this case that: (a) the NECR complied with (in fact, exceeded) the FRA's track inspection requirements; and (b) the condition of the track both at the point of derailment at (Mile Post 10.18) and throughout the Connecticut River Line in general was up to at least Class II standards.

79. The FRA requires weekly inspections of Class III track. See 49 C.F.R. § 213.233(c).

80. Here, the NECR inspected the Connecticut River Line, including the area of Mile Post 10.18, two times per week. See the transcript of the deposition of Rick T. Boucher, a copy of the relevant portions of which are attached at Exhibit "H" at p. 10-12; see also *Daily Track Inspection Reports* for the months of June and July, 2004, copies of which are attached as Exhibit "I."

81. Mr. Boucher is an NECR track inspector on the Roxbury subdivision.

82. There is no evidence which could support a finding that the track, fro Mile Post 11 to the point of the pile-up, was below Class II condition at the time of the derailment. Exh. C at p. 46-47.

83. Any defects that dropped the classification of track in the area of the derailment,

11

identified by the FRA Geometry Report as being below Class II, were addressed by the NECR before July 3, 2004. Id. at p. 25-29.

84. On July 3, 2004, the NECR's track at the initial point of derailment was in Class III condition. Id. at p. 46-47.

85. In addition, the reports of daily track inspections, which took place between the Geometry Test (June 8, 2004) and the date of derailment (July 3, 2004), show that there were no defects noted that would require the NECR to reduce the classification of the track below Class II in the area of the point of derailment. *See* Exh. I.

86. Moreover, the NECR has identified Mr. Bergeron as the only expert regarding the condition of the track at the time of the derailment.

87. Mr. Bergeron has testified that, when he inspected the track <u>after</u> the derailment he noted a measurable defect in the cross elevation at Mile Post 10.18.

88. However, he also admitted that he did not know if that condition was present at any time between the NECR's last inspection on July 1, 2004 and the date of the derailment. Exh. D at p. 142-145.

89. He simply has no basis for concluding that the cross-elevation defect was present at any time before the day of the derailment.

90. The first defect was noted to be at milepost 10.16, 105.6 feet further down the track from the point of derailment.

91. The defendants' *Counterclaim* (regarding the responsibility for the damages caused by the derailment) is based entirely on the allegation that the track was not up to Class II standards. See the *Defendants' Answer to Amended Complaint and Defendants' Counterclaims*, at ¶¶ 12-14, 39-44, 56.

12

92. Railroad operations and facilities, including track structures and bridges, are governed by a comprehensive scheme of federal statutes and their implementing regulations, including the *Federal Railroad Safety Act* ("FRSA").

93. The NECR's *Complaint* at Counts I through IV alleges that the defendants violated 49 C.F.R. § 11704(a) and (b). § 11704(a) provides as follows:

> A person injured because a rail carrier providing transportation or service subject to the jurisdiction of the Board under this part does not obey an order of the Board, except an order for the payment of money, may bring a civil action in a United Sates District Court to enforce that order under this subsection.

94. Here, the *Agreement* amounts to an "order of the Board."

95. By failing to indemnify and otherwise pay the NECR for the damages it incurred as a result of the derailment, the defendants have disobeyed an order of the STB.

96. The defendants, in the first count of their *Counterclaim*, have made a similar allegation. More specifically, the defendants have made the same allegation that the agreement constitutes an "order of the Board" but that the NECR violated the order by failing to maintain the track up to Class II standards. See *Defendants' Answer to Amended Complaint and Defendants' Counterclaims*.

97. Given all of the established facts as described herein, it is clear that there is no genuine dispute of material fact as to whether or not the defendants violated an "order of the Board."

98. There is also no dispute that the NECR suffered damages as a result of the defendants' violation of the *Agreement*.

99. Moreover, it is equally clear and undisputed that the defendants have not suffered any damages as a result of the NECR's refusal to obey an "order of the Board" nor have they

13

incurred any damages as a result of an act or omission of the NECR in violation of any part of the ICCTA.

100.  The evidence is undisputed that following the FRA's June 8, 2004 Track Geometry Inspection Report, the NECR took measures to either repair its track or reduce the allowable speed to safe track standards.

101.  Moreover, the evidence is undisputed that at the time of the Geometry Track Inspection and up until at least July 1, 2004, the track at Mile Post 10.18 was in Class III condition. The NECR continued, after receipt of the Track Geometry Inspection Report the performance of ongoing subsequent remedial measures, to inspect its track on a more frequent basis than was require by the federal regulations.

102.  During the course of the inspections that took place during the month of June and during the last inspection which occurred before the derailment, no defects were noted at the point of derailment which would have caused a further reduction in the class of the track.

103.  In fact, as of the day of the last inspection prior to the derailment (which occurred on July 1, 2004), the condition of the track at the point of derailment was found to be up to a class standard which complied with § 3.2 of the *Agreement*.

104.    Even the defendants' expert, Mr. Bergeron, had admitted that any defective condition which may have been present at the time of the derailment, could very easily not have been present at the time of the last required inspection.

Respectfully submitted,
NEW ENGLAND CENTRAL RAILROAD, INC.
by its attorneys,

/s/ Michael B. Flynn   .
Michael B. Flynn            BBO#559203
Richard A. Davidson, Jr.,   BBO#552988
FLYNN & ASSOCIATES, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA  02169
(617) 773-5500

DATED: _____