# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NEW ENGLAND CENTRAL RAILROAD | : |
|  | : |
| Plaintiff/Counterdefendant, | : |
|  | : |
| -v.- | : Civil Action No. 04-30235-MAP |
|  | : |
| SPRINGFIELD TERMINAL RAILWAY COMPANY, et al., | : |
|  | : |
| Defendant/Counterclaimants. | : |

---

## MEMORANDUM
## OF REASONS IN OPPOSITION TO PLAINTIFF'S MOTION
## FOR SUMMARY JUDGMENT

---

Robert B. Culliford
Pan Am Systems, Inc.
14 Aviation Avenue
Portsmouth, NH 03801
(603) 766-2002

Eric L. Hirschhorn
Debra R. Coletti
Winston & Strawn LLP
1700 K Street, NW
Washington, DC 20007
(202) 282-5000

Attorneys for Defendants,
Springfield Terminal
Railway Company, et al.

Dated: April 24, 2007

Table of Contents

Page

Statement of the Case ............................................................................................ 2

Facts ........................................................................................................................ 3

    The Trackage Rights Order ................................................................................ 3

    The FRA Inspection of the Line ........................................................................ 7

    The Derailment .................................................................................................. 11

    The Investigative Hearing ................................................................................. 13

    The Investigation of the Derailment ................................................................. 16

Argument ................................................................................................................. 20

    I.    NECR is liable for ST/BM's damages and ST/BM is not liable for
        NECR's damages ...................................................................................... 20

        A.    Under § 7.1 of the TRO, NECR is liable for both parties'
             damages, and ST/BM is not liable for either party's
             damages, if NECR was guilty of gross negligence ....................... 20

        B.    No reasonable jury could conclude other than that NECR
             was guilty of gross negligence as a matter of law ........................ 22

        C.    No reasonable jury could conclude other than that NECR
             was guilty of negligence, at the very least, as a matter of
             law ............................................................................................... 26

        D.    No reasonable jury could conclude that ST/BM was guilty
             of negligence. .............................................................................. 27

    II.    NECR's violations of §§ 3.2 and 7.1 of the TRO and the Interstate
        Commerce Act are not preempted by the Federal Railroad Safety
        Act ........................................................................................................... 28

# Table of Contents

Page

III.   To the extent state causes of action are preempted by the FRSA
and the FRA's regulations, NECR's negligence claims against
ST/BM are preempted. .................................................................................29

IV.   Counts VII and X of the Amended Complaint must be dismissed
because NECR has adduced no evidence that would support a
finding that ST/BM was guilty of gross negligence or willful
misconduct. ................................................................................................31

V.   NECR is ineligible for summary judgment on Counts I and II of
the Amended Complaint because the TRO does not order ST/BM
to do anything in respect of the Derailment. ............................................31

VI.   NECR cannot qualify for summary judgment on Counts V and
VIII of the Amended Complaint because there is no evidence of a
contract between ST/BM and NECR. .........................................................32

Conclusion ...............................................................................................................33

# TABLE OF AUTHORITIES

## FEDERAL CASES AND ADMINISTRATIVE DECISIONS

*Amtrak—Conveyance of B & M in Conn River Line in VT & NH,*
4 I.C.C.2d 761 (1988) ................................................................................................ 3-4, 32

*Amtrak—Conveyance of B&M in Conn River Line in VT & NH,*
6 I.C.C.2d 539 (1990) ...................................................................................................... 4

*Anderson v. Liberty Lobby,*
477 U.S. 242 (1986) ........................................................................................................ 20

*Boston and Maine Corp. v. New England Central Ry. Co.*, 2006 STB LEXIS 17, STB
Finance Dkt. No. 34612 .................................................................................................... 3

*CSX Transport Inc. v. Easterwood,*
507 U.S. 658 (1993) ................................................................................................... 28, 29

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ........................................................................................................ 31

*College v. PB Diagnostic System, Inc.,*
50 F.3d 1115 (1st Cir. 1995) ........................................................................................... 20

*Cox v. Norfolk and Western Ry. Co.,*
998 F. Supp. 679 (S.D. W.Va. 1998) ............................................................................... 30

*Dan Barclay, Inc. v. Steward & Stevenson Serv., Inc.,*
761 F. Supp. 194 (D. Mass. 1991) .................................................................................. 20

*Defore v. Premore,*
No. 88-CV-241, 1992 WL 88043 (N.D.N.Y. April 27, 1992) ......................................... 23

*In re Derailment Cases,*
416 F.3d 787 (8th Cir. 2005) ........................................................................................... 30

*Flanders & Medeiros, Inc. v. Bogosian,*
65 F.3d 198 (1st Cir. 1995) ............................................................................................. 31

*Fleet Nat'l. Bank v. H&D Entertainment, Inc.,*
96 F.3d 532 (1st Cir. 1996) ............................................................................................. 20

*Kalan Enterprises, LLC v. BNSF Ry. Co.,*
415 F. Supp. 2d 977 (D. Minn. 2006) .............................................................................. 30

*Mehl v. Canadian Pac. Ry. Ltd.*,
    417 F. Supp. 2d 1104 (D.N.D. 2006)................................................................30

*Railroad Supply Co. v. Elyria Iron & Steel Co.*,
    244 U.S. 285 (1917)............................................................................ 12-14

*Seyler v. Burlington N. Santa Fe Corp.*,
    102 F. Supp. 2d 1226 (D. Kan. 2000).......................................................29-30

*Stuckey v. Illinois Central R. Co.*,
    1998 WL 97270 (N.D. Miss. Feb. 10, 1998) ................................................30

## STATE CASES

*Denis Bail Bonds, Inc. v. State of Vermont*,
    622 A.2d 495 (Vt. 1993)..........................................................................26

*District of Columbia v. Walker*,
    689 A.2d 40 (D.C. 1997) ..........................................................................22

*Mellin v. Flood Brook Union School District*,
    790 A.2d 408 (Vt. 2001) ..........................................................................31

*Powers v. Office of Child Support*,
    795 A.2d 1259 (Vt. 2002)..........................................................................31

*Shaw v. Moore*,
    162 A. 373 (Vt. 1932)..............................................................................31

*Watson v. Dimke*,
    872 A.2d 337 (Vt. 2005)..........................................................................26

## FEDERAL STATUTES, REGULATIONS, AND COURT RULES

28 U.S.C. § 2321(a), (2000)..........................................................................21, 22

28 U.S.C. §2342 (2000) ..............................................................................21, 22

28 U.S.C. § 2342(5) (2000) ..............................................................................3, 6

28 U.S.C. § 2344 (2000) ............................................................................3, 6, 21

49 C.F.R. § 1.49 (2005) ....................................................................................7

49 C.F.R. § 213 (2005) ..............................................................................26, 28

49 C.F.R. § 213.5 (2005) ...............................................................................................5, 10, 24

49 C.F.R. § 213.9 (2005) ..........................................................................................5, 18, 25, 29

49 C.F.R. § 213.53 (2005) ...................................................................................................5

49 C.F.R. § 213.55 (2005) ...................................................................................................5

49 C.F.R. § 213.57 (2005) ...................................................................................................5

49 C.F.R. § 213.63 (2005) ...............................................................................5, 8, 9, 10, 17, 25

49 C.F.R. § 213.109 (2005) .................................................................................................5

49 C.F.R. § 213.123 (2005) .................................................................................................5

49 C.F.R. § 213.241(b) (2005) ...........................................................................................19

49 C.F.R. § 215.11 (2005) .................................................................................................30

49 C.F.R. § 215.13 (2005) .................................................................................................30

49 U.S.C. § 103 (2000) ........................................................................................................7

49 U.S.C. § 702 (2000) ...................................................................................................6, 20

49 U.S.C. § 722(b) (2000) ..............................................................................................3, 6, 21

49 U.S.C. § 11704 (2000) ..............................................................................................28, 31

49 U.S.C. § 20106 (2000) ..............................................................................................28, 29

Fed. R. Civ. P. 56(c) ....................................................................................................20, 23

Fed. R. Evid. 802(6).................................................................................................14, 15, 16

Fed. R. Evid. 807 .............................................................................................................14

## OTHER AUTHORITIES

17A Am. Jur. 2d Contracts § 1 (2003).................................................................................33

Restatement (Second) of Contracts § 1 (1981) .....................................................................32

Williston On Contracts § 1:1 (4th ed. 2006)........................................................................32

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

NEW ENGLAND CENTRAL
RAILROAD, INC.,

       Plaintiff/Counterdefendant,

       -v.-                                    Civil Action No. 04-30235-MAP

SPRINGFIELD TERMINAL
RAILWAY COMPANY, et al.,

       Defendants/Counterclaimants.

---

## MEMORANDUM OF REASONS IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT[1]

       For the reasons set out below, Springfield Terminal Railway Company and Boston and

Maine Corporation ("ST/BM"), which are the defendants/counterclaimants herein, oppose the

motion for summary judgment[2] that has been filed by the plaintiff/counterdefendant, New

England Central Railroad, Inc. ("NECR").

       NECR argues that it is entitled to summary judgment for four reasons:

       (1)       NECR claims that the defective condition of NECR's track is irrelevant to

responsibility under the Interstate Commerce Commission's ("ICC's") 1990 Trackage Rights

Order ("TRO").

---

[1] Pursuant to this Court's February 6, 2007 Pretrial Scheduling Order [Dkt. #54], oppositions to motions for summary judgment originally were due April 20, 2007. The Court's April 18, 2007 endorsed order, however, extended the due date for filing such oppositions to April 24, 2007.

[2] Although styled a "Motion for Summary Judgment," NECR's motion seeks only *partial* summary judgment—namely, on the issue of *liability*. NECR's motion does not, and could not, seek summary judgment on the issue of *damages*. Thus, NECR's discussion of its damages is irrelevant to the instant motion. *See* Memorandum of Law in Support of the Plaintiff's Motion for Summary Judgment ("NECR Brief") at 5 [Dkt. #66].

(2)    NECR contends that the condition of its track did not violate the TRO and did not cause the July 3, 2004 derailment of an ST/BM train ("Derailment").

(3)    NECR argues that ST/BM's counterclaims, including ST/BM's *federal* counterclaim under the TRO and the Interstate Commerce Act, are preempted by federal law.

(4)    NECR claims that there is no disputed question of material fact concerning ST/BM's claim of gross negligence on the part of NECR.

As is explained below and in the accompanying documents, NECR's claims neither are accurate nor a ground for summary judgment in NECR's favor.

## Statement of the Case

NECR filed this action on December 3, 2004.  The amended complaint [Dkt. #16] seeks damages for the Derailment on theories of breach of the TRO (Counts I through IV), common law breach of contract (Counts V and VIII), common law negligence (Counts VI and IX), and gross negligence (Counts VII and X).

ST/BM has denied liability and has counterclaimed, seeking damages from NECR for the Derailment on theories of breach of the TRO and Interstate Commerce Act requirements that the tracks subject to the TRO (the "Line") be maintained safely and in Class 2 condition (First Counterclaim), that the misconduct on the part of NECR constituted a breach of contract (Second Counterclaim), and that the Derailment was due to NECR's negligence (Third Counterclaim), gross negligence (Fourth Counterclaim), and willful misconduct (Fifth Counterclaim) [Dkt. #33]. ST/BM's First Counterclaim—for breach of the TRO and Interstate Commerce Act requirements to maintain a safe line in Class 2 condition—is not based upon state law.

In January 2006, in a proceeding between ST/BM and NECR relating to the Derailment, the Surface Transportation Board ("STB") ruled that Section 7.1 of the TRO does not absolve

NECR of liability for damages due to its gross negligence or willful misconduct. *Boston and Maine Corp. v. New England Central Ry. Co.*, 2006 STB LEXIS 17, STB Finance Dkt. No. 34612 (served Jan. 10, 2006) ("January 2006 Decision"), at 3 (Exh. 2 to Declaration of Roger Bergeron in Opposition to Plaintiff's Motion for Summary Judgment ("Bergeron Opp. Decl.")). The January 2006 Decision also noted that the TRO had been imposed by the ICC and that certain provisions—including Section 7.1—were not agreed upon by Central Vermont and Boston and Maine. January 2006 Decision at 1, 3. NECR did not seek judicial review of the January 2006 Decision, *see* 28 U.S.C. §§ 2342(5), 2344 (2000) (petition for review must be filed within 60 days), and hence is bound thereby, *see* 49 U.S.C. § 722(b) (2000) (STB orders binding until and unless altered by STB or a court), as well as by principles of res judicata.

ST/BM's motion to dismiss NECR's state-law claims as preempted by the Interstate Commerce Act was denied on February 3, 2006 [Dkt. #30].

This Court's Pretrial Scheduling Order [Dkt. #54], issued February 6, 2007, authorized the filing of motions for summary judgment on or before March 23, 2007. By endorsed order dated March 20, 2007, the Court permitted briefs supporting and opposing the parties' summary judgment motions to be up to forty pages long.

## Facts

### *The Trackage Rights Order*

In 1988, the ICC compelled the Boston and Maine Corporation to sell approximately forty-eight miles of the Connecticut River Line to the National Railroad Passenger Corporation ("Amtrak"), which immediately resold the property to the Central Vermont Railway. *See Amtrak—Conveyance of B & M in Conn River Line in VT & NH*, 4 I.C.C.2d 761 (1988) (*"Amtrak I"*). The ICC order, which ultimately was upheld by the courts, required that the new

owner grant trackage rights to Boston and Maine. *Id.* Trackage rights are similar to the rights of a lessee of ordinary real property, giving the tenant railroad certain rights to operate trains over, and otherwise use, the tracks of the landlord railroad. Bergeron Opp. Decl. ¶ 6.

In February 1990, after Central Vermont and Boston and Maine were unable to agree upon the provisions of a trackage rights agreement, the ICC imposed a trackage rights order governing Boston and Maine's use of the Connecticut River Line (i.e., the TRO). *Amtrak— Conveyance of B&M in Conn River Line in VT & NH*, 6 I.C.C.2d 539 (1990) (*"Amtrak II"*). The TRO also covered several segments connecting to the transferred portion that already were owned by Central Vermont and over which Boston and Maine already had trackage rights.

NECR contends, erroneously, that the TRO "is simply a contract between [NECR and ST/BM]." NECR Brief at 2-3. That is not the case, however, because the predecessors of NECR and ST/BM who litigated *Amtrak II* disagreed over many terms of a proposed agreement— including Section 7.1. Indeed, that was the point of the ST/BM petition for reconsideration that led to the January 2006 Decision. Bergeron Opp. Decl ¶ 13 & Exh. 3 at 3-4 (noting that Boston and Maine had proposed an expressly *fault*-based version of § 7.1 to the ICC, while Central Vermont had proposed the version that the ICC ultimately adopted). Thus, the ICC *imposed* the TRO, including the version of § 7.1 proposed by NECR's predecessor, Central Vermont Railway. *See* January 2006 Decision, at 3 (Exh. 2 to Bergeron Opp. Decl.).

The Derailment occurred on a segment that was owned by Central Vermont before 1988 but that is subject to the TRO. The tracks subject to the TRO are referred to herein as "the Line." (The full text of the TRO is Exhibit 1 to the Bergeron Opp. Decl.)

The TRO makes CV "*solely responsible* for dispatching all operations over the Line and for the maintenance and repair of the Line, including the signals and the signal and dispatching

system which controls operations on it," as well as for "keep[ing] the Line, *at all times* throughout the term of this Agreement or any extensions thereof, in not less than FRA Class II condition." Bergeron Opp. Decl ¶ 9 & Exh. 1 (TRO § 3.2) (emphasis added); *see* 49 C.F.R. § 213.5 (2005) (track owner responsible for keeping track in compliance).

Track classes are established by the Federal Railroad Administration ("FRA"). *See* 49 C.F.R. § 213.9 (2005). The class to which a segment of track is classified depends upon such factors as gage, alignment, crosslevel, track surface, number of crossties per thirty-nine foot segment, use of tie plates, and the like. *See. e.g.,* 49 C.F.R. §§ 213.53, 213.55, 213.57, 213.63, 213.109, 213.123 (2005). Insofar as relevant, the speed limits for freight trains are:

| Class 1 | 10 |
| Class 2 | 25 |
| Class 3 | 40 |

49 C.F.R. § 213.9(a) (2005). The crosslevel difference permitted between any two points less than sixty-two feet apart may not exceed 3.00 inches for Class 1 track, 2.25 inches for Class 2 track, or 2.00 inches for Class 3 track. 49 C.F.R. § 213.63 (2005). Importantly, however, § 213.63 contains a footnote providing in relevant part as follows:

> However, to control harmonics on Class 2 through 5 jointed track with staggered joints, the crosslevel differences shall not exceed 1¼ inches in all of six consecutive pairs of joints, as created by 7 low joints.

*Id.* n. 2.

Section 7.1 of the TRO provides, in pertinent part:

> [E]ach party hereto shall be responsible for and shall assume all loss, damage or injury . . . to persons or property, including the cost of removing any trackage, repairing trackage and correcting environmental damage, which may be caused by its engines, cars, trains or other on-track equipment (including damage by fire originating therefrom) *whether or not the condition or arrangement of the trackage contributes in any manner or to any extent to such loss, damage or injury,* and whether or not a third party may have caused or contributed to such

> loss, damage or injury, and for all loss or damage to its engines, cars, trains or
> other on-track equipment while on said trackage from any cause whatsoever...

TRO § 7.1 (Exh. 1 to Bergeron Opp. Decl.) (emphasis added). Neither § 7.1 nor any

other provision of the TRO requires ST/BM to take, or refrain from taking, any action in

respect of the Derailment. *Id.*

The TRO remains in force. Bergeron Opp. Decl. ¶ 11. ST/BM is the successor in

interest to Boston and Maine. *Id.* NECR, which is the plaintiff/counterdefendant in this action,

is the successor in interest to Central Vermont. *Id.*

In January 2006, in a proceeding between ST/BM and NECR, the STB, which is the

successor to the ICC under the Interstate Commerce Act, *see* 49 U.S.C. § 702 (2000), ruled that

Section 7.1 of the TRO does not absolve NECR of liability for damages caused by NECR's gross

negligence or willful misconduct:

> To construe [TRO] Section 7.1 as excusing gross negligence and willful
> misconduct would not encourage safe operations, and it would contravene well-
> established precedent that disfavors such indemnification provisions. Thus, we do
> not believe that it was the intent of the [ICC] in imposing [TRO] Section 7.1 to
> allow the landlord carrier to escape liability for maintenance failures that are the
> result of its own gross negligence or willful misconduct, and we do not construe
> [TRO] Section 7.1 in that manner.

January 2006 Decision, at 3 (Exh. 2 to Bergeron Opp. Decl.).

The January 2006 Decision also noted that the TRO had been imposed by the ICC and

that certain provisions—including § 7.1—were not agreed upon by Central Vermont and Boston

and Maine. *Id.* at 1, 3. NECR did not seek judicial review of the January 2006 Decision, *see* 28

U.S.C. §§ 2342(5), 2344 (2000) (petition for review must be filed within 60 days), and hence is

bound thereby, 49 U.S.C. § 722(b) (2000) (STB orders binding until and unless altered by STB

or a court).

### *The FRA Inspection of the Line*

The FRA has plenary responsibility for rail safety in the United States.  Bergeron Opp. Decl. ¶ 14; 49 U.S.C. § 103 (2000); 49 C.F.R. § 1.49 (2005).  On June 8 and 9, 2004, the Line was inspected, under the FRA's Automated Track Inspection Program, by a T-2000 track geometry car (the "Inspection").  Bergeron Opp. Decl. ¶ 15.  NECR personnel accompanied the inspection car so that they could take remedial actions in light of the defects identified and relay information about such defects and remedial actions to NECR's dispatchers.  *Id.* ¶ 15 & Exhs. 4 (Richard Boucher[3] dep. at 6:6-10) and 5 (at p. 7—Bates #803).

During such an inspection, instruments on the inspection car automatically find and record defects, locating each defect using the Global Positioning System ("GPS").  *Id.* ¶ 16.  The system for relating defects identified by the inspection car to physical landmarks such as mile posts and bridges is not automated; instead, the railroad's track inspector calls out landmarks as they are passed and an inspector or operator punches a button to mark each such location.  *Id.* The imprecision of the "call-out," as well as the reaction time for the individual who pushes the marker button, means that that results of such an inspection typically are not precise as to related landmarks such as mile posts (though they are relatively precise as to GPS readings).  *Id.*

Indeed, it is normal practice when the track owner's inspection personnel revisit each defect site to begin by examining the track for several hundred feet on either side of the marked point.  *Id.* ¶ 17.  In the case of a post-derailment inspection involving a possible crosslevel defect, standard industry practice is to consider the track segment from 300 feet before the derailment to 100 feet after the derailment.  *Id.* ¶ 17 & Exh. 6 (*Train Derailment Cause Finding*, at V-9).  Moreover, a crosslevel defect of the sort involved in the Derailment is by definition at

---

[3] *Richard* Boucher is an NECR track supervisor.  *Rick* Boucher, who is Richard's son, is an NECR track inspector.

least sixty-two feet long; thus even were the inspection car reading precise, the defect could extend for at least sixty-two feet in either direction from the noted spot. *Id.* ¶ 17; *see* 49 C.F.R. § 213.63 & n. 1 (2005).

The Inspection revealed 251 defects in a 230-mile stretch of track. *Id.* ¶ 18 & Exhs. 5 and 7. Particularly troubling was the fact that 189 of the defects were such that the related track was in *less* than FRA Class 2 condition and that seventy-four defects were such that the related track was in FRA Class Zero (i.e., they were not in condition to have trains running over them). *Id.* ¶ 18 & Exhs. 5 and 7.

The identified defects included a crosslevel defect, also known as a warp, in the vicinity of Milepost ("MP") 10.16. *Id.* ¶ 19 & Exh. 4 (Richard Boucher dep. at 7:2-3). The warp near MP 10.18 exceeded the limit established by the FRA's track safety standards. *Id.* ¶ 19; *see* 49 C.F.R. § 213.63 & n. 2 (2005). Thus, NECR was aware of this defect at least twenty-five days before the Derailment occurred on July 3, 2004. Bergeron Opp. Decl. ¶ 19. Moreover, the FRA inspection report included the text of § 213.63 and its note 2. *Id.* ¶ 19 & Exh. 7 (at Bates #809). NECR's track inspector agreed with the test car's determination of a warp defect in the vicinity of MP 10.18. *Id.* ¶ 19 & Exh. 8 (Rick Boucher dep. at 10:5-13). Because the crosslevel defect exceeded one and one-quarter inches over the length of track specified in the FRA regulation, note 2 to § 213.63 rendered the segment Class 1 track rather than Class 2. *Id.* ¶ 20.

A recognized authority on the subject of derailment, *Train Derailment Cause Finding*, states that crosslevel (warp) defects are among the more common types that "cause or contribute to a derailment." Bergeron Opp. Decl. ¶ 21 & Exh. 6 (*Train Derailment Cause Finding,* at V-8).

> If a car with a high center of gravity is traveling at a speed such that its trucks are directly over successively low joints at the same time as the car rocks to the side of the low joints, the rocking will become more and more severe until the

8

wheels on the opposite side of the low joints lift off the rail. *The speed at which wheel lift occurs is between 10 and 25 miles per hour.*

*Id.* ¶ 21 & Exh. 6 (*Train Derailment Cause Finding*, at V-9) (emphasis added).

According to NECR's roadmaster, Mike Lawyer, "[a] warp would be that [the height difference between the two rails] changes too drastically in a 62-foot segment," and "[t]he rail car could rock if there is too much of a change in a certain distance at a certain speed." *Id.* ¶ 22 & Exh. 9 (Lawyer dep. at 19:9-20:7). NECR's track supervisor, Richard Boucher, conceded that a warp can cause harmonic rock and that under certain conditions, that in turn can cause wheel lift. *Id.* ¶ 22 & Exh. 4 (Richard Boucher dep. at 9:20-10:15).

Notwithstanding the foregoing facts, NECR hopes to avoid liability by contending that because the initial derailment occurred at MP 10.18 and the crosslevel defect was marked by the Inspection at MP 10.16, the defect could not have played a role in the derailment. NECR Brief at 5. Defects like this do not occur at *points* but occupy *segments* of track—including, in this instance, the segment where (as outlined below) the wheels of one car first left the track. Bergeron Opp. Decl. ¶ 23.

As a result of the Inspection, NECR placed slow orders at numerous locations on the Line, including the vicinity of MP 10.16. Normal industry practice, including that of the FRA and ST/BM, is not to impose slow orders on *fixed points* but on *segments* of track, having varying length depending upon the defect in question. *Id.* ¶ 24. This NECR did not do. *Id.*

A comparison of NECR's Daily Operating Bulletins for June 10 and 11, 2004, reveals that the slow order for the MP 10.16 vicinity, which set a "Class 2" speed limit of twenty-five miles per hour, *see* 49 C.F.R. § 213.9(a) (2005), was not established until two days after the Inspection. Bergeron Opp. Decl. ¶ 25 & Exhs. 10 (at p. 3 of 5—Bates #1397) and 11 (at p. 4 of 7—Bates #1403). This delay is highly improper and dangerous, as the ironclad industry practice

9

is to address any defect, at least on a temporary basis, before the next train uses the defective track segment. *Id.* ¶ 25; 49 C.F.R. § 213.5(a) (2005).

The slow order remained in effect on July 3, 2004, the day of the Derailment. Bergeron Opp. Decl. ¶ 26 & Exh. 12 (at p. 4 of 6—Bates #000018). The warp had not been repaired when the Derailment occurred, *see* Exhibit 9 (Lawyer dep. at 23:11-24:4) hereto at 23:11-24:4, and indeed had worsened over the month since the FRA inspection. Bergeron Opp. Decl. ¶ 26.

The proper remedial action would have been tamping up the ballast under the low (inside) end of the ties. *Id.* ¶ 27. This could have been accomplished using a self-lining, self-leveling tamper or, at least temporarily, manually by several workers using basic track tools. *Id.* ¶ 27 & Exh. 9 (Lawyer dep. at 28:2-29:8). Neither action was taken. The excuse offered by NECR's Richard Boucher was that the operator of NECR's tamping machine went on vacation. *Id.* ¶ 27 & Exh. 4 (Richard Boucher dep. at 9:3-11).

Instead, NECR took the easy—and improper—way out by dropping the segment to Class 2 status, which meant a maximum freight-train speed of twenty-five miles per hour. *Id.* ¶ 28; *see* 49 C.F.R. § 213.63 n. 2 (2005) (harmonic-rock exception from Class 2 in cases of warp defects). Ironically, the improper slow order issued by NECR probably created a *greater* derailment risk than would have existed had the segment remained at Class 3—a class whose maximum speed for freight trains of forty miles per hour is well above the harmonic-risk range of 12-25 mph addressed by note 2 to § 213.63. Bergeron Opp. Decl. ¶ 28.

NECR's track supervisor, Richard Boucher, measured the defect at MP 10.16 on June 8, 2004, but did not measure it again between then and the occurrence of the Derailment more than three weeks later. *Id.* ¶ 29 & Exh. 4 (Richard Boucher dep. at 11:3-11). Moreover, Mr. Boucher admitted that it would not have been the practice of NECR's track inspection department to do

so. *Id.* ¶ 29 & Exh. 4 (Richard Boucher dep. at 11:12-16).  Indeed, NECR's track inspector Rick

Boucher did not even record the defect on his subsequent inspection reports, *id.* ¶ 29 & Exh. 8

(Rick Boucher dep. at 8:18-9:1; 21:21-25:19), though the FRA's track safety rules require such

recording on *each* track inspection report until the defect has been corrected, *id.* ¶ 29 & Exh. 13

(at 5.140, first full ¶).  Thus, NECR had no way of knowing whether the condition had worsened,

despite that the FRA recognizes that such an occurrence is a distinct possibility and therefore

expects re-measurement *regularly* until the defect has been corrected.  *Id.* ¶ 30.  NECR's Richard

Boucher conceded that this defect could have caused wheel lift of the type that led to the

Derailment.  *Id.* ¶ 30 & Exh. 4 (Richard Boucher dep. at 9:20-12:6).

### *The Derailment*

In the early hours of July 3, 2004, a nineteen-car ST/BM freight train set out in a

southerly direction on the Line from White River Junction, Vermont.  *Id.* ¶ 31.  As the train

rounded a curve—the curve with the warp defect—near MP 10.18, one pair of the four wheels of

one truck[4] of a boxcar on the train lifted off the rails.  *Id.*  This "wheel lift"[5] occurred due to the

combination of the speed of the train (approximately twenty-three miles per hour), excessive

superelevation (more than six inches), the warp (or "crosslevel") defect, harmonic rocking

occurring in that speed range, and the relative lack of centrifugal force occasioned by that speed

range in the presence of that type of defect.  *Id.* ¶ 32.  Had NECR made the FRA-required

follow-up inspections and measurements, NECR would have been aware of all these factors.  *Id.*

Approximately twenty-two feet after lifting, the pair of wheels settled back down.  *Id.* ¶

33.  Instead of returning to being flush against the rail heads of their respective rails, however,

---

[4] A railroad truck is a "swiveling frame[] of wheels under each end of a railroad car, trolley car, or the like."
American Heritage Dictionary of the English Language 1376 (1971).

[5] Wheel lift is when "the flange of the wheel is allowed to come up onto the rail, or partially onto the rail head, as
opposed to riding on the gauged side of the rail."  Bergeron Opp. Decl. ¶ 32 & Exh. 9 (Lawyer dep. at 22:2-6).

one wheel of the pair came down on the ties and tie plates[6] outside its rail and the other came

down on the ties and tie plates inside the opposite rail. *Id.* ¶ 33 & Exh. 14 (Trombly dep. at 53:3-

20). Mr. Bergeron's investigation of the marks in and around the track structure showed that the

boxcar in question remained upright and, to any observer of the moving train, aligned with the

other cars as the train continued southward. *Id.* ¶ 34. Specifically, Mr. Bergeron's investigation

revealed that the two wheels remained tight against their respective rails, but on the wrong side

of the rails—a distance of only a few inches from where they were supposed to be. *Id.* The

now-misaligned wheels of the truck caused damage to the ties and tie plates over which they

traveled. *Id.*

 The ST/BM crew did not learn immediately that the pair of wheels had come off the rails.

*Id.* ¶ 35. The weather was foggy, *id.* ¶ 35 & Exhs. 15 (Kari dep. at 17:2-21; 39:7-16), 16

(Scappace dep. at 20:5-21) ("ground fog, river fog"), and the computerized records show that the

lead locomotive's ammeter did not reflect unusually high amperage for a train that was

accelerating up a 0.50 percent grade after passing a slow-ordered section of track, *id.* ¶ 35 &

Exh. 17. Moreover, the train crew did not feel any unusual jostling, *id.* ¶ 36 & Exh. 15 (Kari

dep. at 17:22-18:2), or anything else out of the ordinary, *id.* ¶ 36 & Exhs. 15 (Kari dep. at 20:14-

17), 16 (Scappace dep. at 97:17-98:3).

 Visibility was between 240 and 300 feet. *Id.* ¶ 37 & Exhs. 15 (Kari dep. at 18:13-18;

39:10-17), 16 (Scappace dep. at 85:5-86:3). Freight cars are approximately sixty feet long. *Id.* ¶

37. The boxcar in question was the sixth car of the train (the eighth car, if one counts the two

---

[6] "A railroad tie plate, sometimes called a 'wear plate,' is a rectangular piece of metal, originally with both surfaces flat, designed to be placed upon the tie immediately under the rail, for the purpose of protecting the tie from the wear, which, in soft wood, is very great, incident to the vibration of the rail caused by passing engines and trains, and for the purpose of holding the rail more firmly in place than it could otherwise be held by the spikes without the plate, thereby preserving the gauge of the track." *Railroad Supply Co. v. Elyria Iron & Steel Co.*, 244 U.S. 285, 287 (1917).

locomotives at the front), and hence was more than 400 feet behind the locomotive where the operator and conductor were located. *Id.* This meant that the crew could not consistently see the sixth car. *Id.* ¶ 37 & Exh. 15 (Kari dep. at 57:9-11). At any rate, the boxcar remained upright and was not noticeably out of alignment with the rest of the train. *Id.* ¶ 37 & Exh. 16 (Scappace dep. at 86:23-87:14). The engineer testified that he last looked back to check the train consist shortly before the cars went onto the ground at MP 5.7. *Id.* ¶ 37 & Exh. 15 (Kari dep. at 38:15-39:6).

At approximately MP 5.7, the pair of derailed wheels reached the "frog" portion of a switch[7] near Hartland, Vermont, at which time the truck turned sideways and the boxcar in question went onto the ground, taking with it the six cars behind it in the train. *Id.* ¶ 38 & Exh. 15 (Kari dep. at 25:22-27:2). Prior to this point there was no warning to the crew that a pair of wheels had derailed. *Id.* ¶ 39 & Exhs. 15 (Kari dep. at 33:9-11; 58:3-13), 16 (Scappace dep. at 34:16-20; 62:23-63:17; 97:17-98:3).

***The Investigative Hearing***

After the Derailment, NECR charged that the ST/BM crew had been negligent or otherwise acted improperly. Declaration of David A. Nagy in Opposition to Plaintiff's Motion for Summary Judgment ("Nagy Opp. Decl.") ¶ 4 & Exh. B. On August 9, 2004, ST/BM accordingly convened an investigative hearing, under the applicable labor-management agreement, for the crew members, J.C. Scappace, Jr. and A. Peter Kari. David Nagy, who now is ST/BM's Executive Director of Safety Training and was at that time Director of Manpower, was appointed as hearing officer. *Id.* ¶ 2, 5. NECR never convened or sought to convene any hearing

---

[7] A frog is "[a] device on intersecting railroad tracks that permits wheels to cross the junction." American Heritage Dictionary of the English Language 529 (1971).

into the conduct of the train crew, but simply banned them from NECR's line effective July 9, 2004. *Id.* ¶ 15 & Exh. B.

The charge against each crew member was "[f]ailure to properly perform [his] duties" in that the individual "allegedly failed to comply with provisions of General Code of [Operating] Rules [("GCOR")] 6.29.2 and Rule 6.21 (in effect on New England Central Railway) resulting in derailment of seven (7) railcars." *Id.* ¶ 5 & Exh. A at 1. The transcript of the hearing is Exhibit A to the Nagy Opposition Declaration; the transcript is within the business records exception to the hearsay rule. *See id.* ¶ 3; Fed. R. Evid. 802(6). Given that NECR had alleged misconduct on the part of the ST/BM train crew, and that the Derailment had occurred on NECR's track, Charles D. Hunter, Assistant General Manager of RailAmerica for NECR, attended the hearing and testified on behalf of NECR. *Id.* ¶ 6 & Exh. A at 1, 18-20.[8]

The hearing demonstrated that the train's recorder, which tracks such elements as speed, throttle position, brake applications, and air pressure in the train's brake lines, reflected that the train was traveling within the slow-ordered speed limit. *Id.* ¶ 7 & Exh. A at 10-11.

GCOR 6.29.2 provides in pertinent part that "[w]hile their train is moving, crew members must inspect it frequently and look for indications of defects in the train, especially when rounding curves." *Id.* ¶ 8 & Exh. A at 6. Mr. Scappace testified that GCOR 6.29.2 requires train crew members to inspect the train whenever possible, and that he looked back to check the train at North Hartland (i.e., near where the cars went onto the ground). *Id.* ¶ 9 & Exh. A at 30-31. He testified that derailed cars typically exhibit sparks, dust, and erratic movement, but that when he checked the train, he did not see any such conditions. *Id.* ¶ 9 & Exh. A at 31-32. Mr. Kari

---

[8] Given the relatively formal nature of the hearing, the testimony adduced there should be considered by the Court under the residual hearsay exception, *see* Fed. R. Evid. 807 (residual exception for hearsay if it bears indicia of reliability), to the extent it is not admitted under the business records exception, *see* Fed. R. Evid. 802(6). Moreover, NECR took the depositions of Messrs. Kari and Scappace during discovery in this action and questioned them about the derailment and the investigative hearing.

testified that he did not feel anything unusual until the cars went onto the ground. *Id.* ¶ 9 & Exh. A at 38.

Mr. Scappace also testified that taking the two engines into account, the boxcar whose pair of wheels initially derailed at MP 10.18 was well back in the train consist and hence was not visible from the locomotive. *Id.* ¶ 10 & Exh. A at 34. He noted that slowing the train would not have improved visibility because the distance between the crew and that boxcar would not have been changed. *Id.* ¶ 10 & Exh. A at 36.

GCOR 6.21 provides in pertinent part that "[w]hen conditions restrict visibility, regulate speed to ensure that crew members can observe and comply with *signal indication.*" *Id.* ¶ 11 & Exh. A at 6-7 (emphasis added). ST/BM foreman Michael Bump, who is an experienced engineer and was ST/BM's representative at the hearing, testified that 6.21 relates to *signal visibility* and not to general weather conditions such as fog or snow. *Id.* ¶ 11 & Exh. A at 15.

Mr. Bump also testified that patchy fog is common on the track segment where the Derailment occurred. *Id.* ¶ 12 & Exh. A at 17. NECR's witness, Mr. Hunter, testified to the same effect. *Id.* ¶ 12 & Exh. A at 20. Mr. Hunter conceded that GCOR 6.21 does not restrict speeds at night but claimed that it does restrict speeds in the presence of fog, at least where conditions limit *visibility of signals.* *Id.* ¶ 12 & Exh. A at 27-28. Mr. Scappace testified that there was patchy ground fog in the area at the time of the Derailment, *id.* ¶ 12 & Exh. A at 30, 34, and Mr. Kari agreed, *id.* ¶ 12 & Exh. A at 37.

Mr. Bump testified that he believed neither crew member had violated GCOR 6.21 or 6.29.2. *Id.* ¶ 13 & Exh. A at 40. Ultimately, there was no evidence adduced at the hearing to indicate that either crew member had violated GCOR 6.21 or 6.29.2. *Id.* Exh. A, *passim.* The decision-making officer for ST/BM, Warren J. Bostwick, found no violations of the GCOR

provisions cited by NECR—Rules 6.21 and 6.29.2—and no discipline was imposed on either crew member. *Id.* ¶ 14 & Exh. C.

### *The Investigation of the Derailment*

Roger D. Bergeron investigated the Derailment on behalf of ST/BM. Bergeron Op. Decl. ¶ 40. He has led or otherwise been involved in investigations of more than three thousand derailments, including several hundred that occurred on main lines. *Id.* ¶ 4.

Mr. Bergeron has been employed by ST/BM and their predecessors for 36 years. *Id.* ¶ 2. His positions during that period have included trackman in the late 1960s, engineering surveyor and a construction inspector in the early 1970s, resident engineer in the mid-1970s, a track supervisor from the late 1970s to early 1980s, a roadmaster and engineer of track in the mid-1980s, an engineer of production and construction until 1996, then assistant vice-president of engineering until 2006. *Id.*

Mr. Bergeron's current position includes responsibility for industrial development of railroad properties, track construction and design projects, preparing estimates for permitting commuter rail service on certain portions of ST/BM's track, and continuing responsibilities for overseeing track maintenance and construction. *Id.* ¶ 3. In that capacity he is qualified under Section 213.7 of the Federal Railroad Administration regulations regarding track safety generally and regarding track inspection, renewal, and replacement in particular. *Id.*

Mr. Bergeron determined that because of the relatively slow train speed (not in excess of twenty-five miles per hour) and the excessive superelevation of the outside rail on the curve at MP 10.18, most of the weight of the boxcar in question was over the inside rail of the curve. *Id.* ¶ 41. This meant, of course, that the opposite wheels—those on the outside rail of the curve—were bearing an unusually light load; that fact, plus the previously noted deviation in track

alignment, plus the harmonic motion that the FRA track safety regulations warn against at Class 2 speeds, caused one pair of those wheels to lift off the outside (high) rail of the curve at approximately MP 10.18. *Id.*

An additional factor was that the track where the pair of wheels initially came off (around MP 10.18) was misaligned by approximately one and one-quarter inches. *Id.* ¶ 42. Although Mr. Bergeron's inspection occurred after the Derailment, the physical evidence demonstrated that the misalignment was not of recent vintage, but had antedated the Derailment. *Id.*

Thus, the area around MP 10.18 had both an alignment defect and a crosslevel defect. Each type of defect can aggravate the other type, such that "[t]he combination of forces from alignment and surface defects in the same location . . . has a cumulative effect much greater than either defect alone. *Id.* ¶ 43 & Exh. 18 at 6-6.

All these factors were within the control of NECR, which had known at least since the Inspection approximately four weeks earlier that a dangerous condition existed at MP 10.18. Specifically, NECR knew that the elevation of the outside rail at MP 10.18 was higher than permitted by the FRA track safety regulations. *Id.* ¶ 44; *see* 49 C.F.R. § 213.63 (2005). Those regulations also provide that because of the danger of harmonic rocking, the presence of such superelevation requires that the speed limit *not* be that for Class 2 track—namely, twenty-five miles per hour—but that for Class *1* track, which is ten miles per hour. Bergeron Opp. Decl. ¶ 44; 49 C.F.R. § 213.63 n. 2 (2005).

NECR knew that this defect required correction but had failed to correct it. Bergeron Opp. Decl. ¶ 45 & Exh. 4 (Richard Boucher dep. at 6:14-9:11). The defect could have been corrected by "tamping up" the ballast under the inside (lower) rail of the curve so that the crosslevel difference in elevation was within the limit established by the track safety regulations.

*Id.* ¶ 45 & Exh. 4 (Richard Boucher dep. at 8:15-22).  The excuse offered by NECR for not doing this is that the operator of their tamping machine had gone on vacation.  *Id.* ¶ 45 & Exh. 4 (Richard Boucher dep. at 9:3-11).  NECR has offered no excuse for not using the temporary expedient of having workers with basic track tools add ballast (rock) beneath the lower ends of the relevant ties.  *Id.* ¶ 45.

 In conducting his investigation, Mr. Bergeron noticed that at least one joint of the lower rail at the MP 10.18 location was sinking into the mud.  *Id.* ¶ 46.  Moreover, the ballast at that point contained mud and contaminants and therefore did not properly transmit load to the subgrade.  *Id.*  This is an improper condition because it limits the ability of the track structure safely to handle the load.  *Id.*  Amazingly, NECR's track inspector could not recall noticing these conditions at the location in question.  *Id.* ¶ 46 & Exh. 8 (Rick Boucher dep. at 13:4-7).

 NECR potentially had available to it a second temporary option—namely, to slow-order that section of the Line to a *safe* speed, as permitted by the track safety regulations.  *Id.* ¶ 47; *see* 49 C.F.R. § 213.9 (2005) (allowing safe-speed slow order for up to 30 days).  NECR issued a slow order but did so without taking into account the disastrous potential combination of the crosslevel and alignment defects around MP 10.18 with a Class 2 speed limit of twenty-five miles per hour.  Bergeron Opp. Decl. ¶ 48.  NECR's failure to do so violates a basic element of track safety.  *Id.*  That is, NECR knew, or was indifferent to, the fact that the combined effect of the crosslevel defect, the alignment defect, and the Class 2 speed limit created a high likelihood of a derailment.  *Id.*  The question was not *whether* a derailment would occur under those conditions, but *when* it would occur.  *Id.* ¶ 49.

 Of particular interest is the fact that NECR has not suggested that Mr. Bergeron's analysis of the cause is incorrect.  When deposed, for example, NECR's track inspector and

roadmaster—surprisingly—testified that they did not know the cause of the Derailment. *Id.* ¶ 50 & Exhs. 8 (Rick Boucher dep. at 18:1-20), 9 (Lawyer dep. at 32:15-33:8). Richard Boucher, NECR's track supervisor, testified that he didn't investigate the cause of the Derailment and that NECR's Rick Boucher and Michael Lawyer did that. *Id.* ¶ 51 & Exh. 4 (Richard Boucher dep. at 13:6-17). Rick Boucher testified that although he participated in the NECR's investigation, he did not know the cause. *Id.* ¶ 52 & Exh. 8 (Rick Boucher dep. at 17:22-18:20). Finally, Michael Lawyer, who was offered by NECR as its corporate witness on track conditions before and after the Derailment, testified he did not know whether NECR had determined a cause of the Derailment. *Id.* ¶ 53 & Exh. 9 (Lawyer dep. at 32:15-33:8). Assuming that this testimony was truthful and not an effort to obscure the cause, it bespeaks either a concession that Mr. Bergeron is correct or a shocking lack of attention to track safety by NECR. *Id.* ¶ 54.

Moreover, NECR's track inspector admitted that although he was aware of the defect at MP 10.16, he did not note it (or, presumably, measure it) in any of his supposedly semiweekly inspection reports because he had not been the individual who *found* the defect. *Id.* ¶ 55 & Exh. 8 (Rick Boucher dep. at 8:18-9:1; 21:5-25:19). This is grossly improper, as the FRA's track safety regulations require that *each* inspection report note a defect from the time it is initially discovered until the time it has been corrected. *Id.* ¶ 55 & Exh. 13 (at 5.140, 1st full ¶); 49 C.F.R. § 213.241(b) (2005). The reason, of course, is that track defects do not correct themselves; indeed, they typically worsen if not attended to. Bergeron Opp. Decl. ¶ 55. Only by rechecking a known defect at each semiweekly inspection can the track owner be certain that matters are not deteriorating further. *Id.* For this reason, NECR cannot avoid liability by claiming, as it does, that "[d]uring the course of the inspections that took place during the month of June [2004] and during the last inspection which occurred before the derailment, no defects were noted at the

point of derailment which would have caused a further reduction in the class of the track." *See* NECR Brief at 21.

## Argument

NECR is entitled to summary judgment only if it can show "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). NECR, as the moving party, has the burden of showing that each of these criteria is satisfied, *id.*, and that no reasonable jury could return a verdict in ST/BM's favor, *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Accordingly, for purposes of NECR's motion, all facts are to be construed in the light most favorable to ST/BM, *see Fleet Nat'l Bank v. H&D Entertainment, Inc.*, 96 F.3d 532, 537 (1st Cir. 1996), and all inferences must be drawn in favor of ST/BM, *see Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1121 (1st Cir. 1995).

Moreover, where, as here, there are cross motions for summary judgment, the court "must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56." *See Dan Barclay, Inc. v. Steward & Stevenson Serv., Inc.*, 761 F. Supp. 194, 198 (D. Mass. 1991).

NECR has not come close to shouldering this burden and its motion accordingly should be denied.

## I. NECR is liable for ST/BM's damages and ST/BM is not liable for NECR's damages.

### A. Under § 7.1 of the TRO, NECR is liable for both parties' damages, and ST/BM is not liable for either party's damages, if NECR was guilty of gross negligence.

The STB is the successor to the ICC. 49 U.S.C. § 702 (2000). The TRO, including § 7.1, was promulgated by the ICC over the objection of ST/BM's predecessor in interest. January 2006 Decision, at 3 (Exh. 2 to Bergeron Opp. Decl.). The STB has determined, in a litigation

between NECR and ST/BM, that the liability provisions of § 7.1 do not absolve the track

owner—NECR—of liability for its own gross negligence or willful misconduct. *Id.* NECR did

not appeal the January 2006 Decision, *see* 28 U.S.C. § 2344 (2000) (60-day limit), and an STB

decision is binding upon all parties until overturned or modified by the STB or a court of

competent jurisdiction. 49 U.S.C. § 722(b) (2000).[9]

ST/BM agrees with NECR that § 7.1 was intended to allocate between the parties

responsibility for losses in the event of a derailment. *See* NECR Brief at 9. Moreover, ST/BM

agrees that the indemnification provisions of § 7.1 extend to the damages of both parties. *See*

NECR Brief at 8-9. In this case, however, that means that NECR is liable for the damages

incurred by ST/BM as well as those incurred by NECR itself.

Section 7.1 of the TRO provides, in pertinent part:

> *[E]ach party hereto shall be responsible for and shall assume all loss, damage or injury...to persons or property,* including the cost of removing any trackage, repairing trackage and correcting environmental damage, which may be caused by its engines, cars, trains or other on-track equipment (including damage by fire originating therefrom) *whether or not the condition or arrangement of the trackage contributes in any manner or to any extent to such loss, damage or injury...*

TRO § 7.1 (emphasis added) (Exh. 1 to Bergeron Opp. Decl.).

Notably, in a proceeding between ST/BM and NECR that paralleled this action, the STB

ruled that § 7.1 does not absolve NECR of gross negligence relating to a derailment. January

2006 Decision, at 3 (Exh. 2 to Bergeron Opp. Decl.). Relying on District of Columbia law, the

STB stated that "to construe Section 7.1 as excusing gross negligence and willful misconduct

would not encourage safe operations, and it would contravene well-established precedent that

disfavors such indemnification provisions." *Id.* The STB thus has determined conclusively that

---

[9] The sole court of competent jurisdiction in this instance is a court of appeals. *See* 28 U.S.C. §§ 2321(a), 2342 (2000).

if NECR was grossly negligent in its maintenance, inspection, or repair of the Line, ST/BM is not liable for any damages incurred by NECR. *Id.*

ST/BM agrees with NECR that ST/BM is seeking damages for its damaged and destroyed railcars, including associated costs, resulting from the Derailment. *See* NECR Brief at 11. Yet NECR is incorrect that § 7.1 of the TRO absolves NECR of liability for the damages its gross negligence caused ST/BM.

The text of § 7.1 provides that each party will be responsible "for *all loss or damage to its engines, cars, trains or other on-track equipment* while on said trackage *from any cause whatsoever…*" TRO § 7.1 (emphasis added) (Exh. 1 to Bergeron Opp. Decl.) NECR fails to mention, however, that the STB has explained that § 7.1 does not allow NECR to escape liability for damages caused by its gross negligence. Indeed, the STB declared in its January 2006 Decision that it was never the ICC's intent in imposing § 7.1 on the parties "to allow the landlord carrier to escape liability for maintenance failures that are the result of its own gross negligence or willful misconduct." January 2006 Decision, at 3 (Exh. 2 to Bergeron Opp. Decl.). Accordingly, the STB has ruled that if NECR was grossly negligent, NECR is liable for the damages it caused to ST/BM's engines, cars, trains or other on-track equipment.

Thus, § 7.1 must be interpreted by this Court as imposing liability on NECR if NECR is guilty of gross negligence. That liability covers damages to ST/BM as well as those to NECR.

**B.      No reasonable jury could conclude other than that NECR was guilty of gross negligence as a matter of law.**

The TRO, including § 7.1, is to be interpreted under District of Columbia law. TRO § 9.9 (Exh. 1 to Bergeron Opp. Decl.). Under that body of law, gross negligence is "the failure to exercise even slight care" and "negligence as would shock fair-minded men." *District of Columbia v. Walker*, 689 A.2d 40, 44 (D.C. 1997) (internal quotation marks omitted).

NECR's repeated failures with regard to basic elements of track safety were so deficient as to constitute gross negligence as a matter of law. At a minimum, they were sufficiently egregious that a reasonable jury could find gross negligence; that alone is sufficient to defeat NECR's quest for summary judgment. *See* Fed. R. Civ. P. 56; *Defore v. Premore*, No. 88-CV-241, 1992 WL 88043, at *8 (N.D.N.Y. April 27, 1992) (summary judgment denied where jury could find gross negligence or willful conduct).

- NECR knew for approximately a month that the crosslevel defect existed around MP 10.18, yet did not correct it using the tamping machine because the machine operator went on vacation.

- NECR has offered no explanation for not correcting the defect using manual labor and a track jack.

- When Mr. Bergeron examined the site of the defect following the Derailment, he found that at least one joint of the lower rail was sinking into the mud and that the ballast was contaminated and hence unsafe. The NECR track inspector claimed not to have noticed these conditions, though he supposedly was inspecting the track—including in particular all existing defects—twice weekly.

- Instead, NECR imposed a slow order that was manifestly improper under the federal track safety regulations because it failed to take account of the risk of harmonic rock addressed in note 2 to § 213.63 of the federal track safety regulations.

- The slow order, which is supposed to be imposed before any more trains traverse the track segment in question, was not imposed until two or three days after the Inspection, though NECR personnel were on the track geometry car and hence

23

were immediately aware of the defects.  This violated standard practice in the railroad industry.

- The slow order also violated industry standards because it was imposed on a single point rather than a segment of track.

- NECR's track inspector violated federal track safety regulations by failing even to record, let alone measure, the crosslevel defect on *any* of his supposedly semiweekly inspections.  He offered the lame excuse that because the defect already had been noted in the Inspection report, there was no need for him to note it on his own inspection write-ups.

- NECR's track supervisor measured the crosslevel defect shortly after the Inspection but failed to re-measure it thereafter despite the distinct possibility that the defect could worsen.

- There was an alignment defect at the MP 10.18 location that NECR completely failed to notice.

NECR owed ST/BM a duty to maintain the Line in a safe working condition at all times pursuant to the TRO and federal law.  *See* TRO § 3.2 (Exh. 1 to Bergeron Opp. Decl.); 49 C.F.R. § 213.5 (2005) (track owner responsible for keeping track in compliance).  Despite this duty, NECR neglected to do anything ameliorative about the crosslevel defect and failed to set a *proper* slower speed limit (i.e. Class 1—10 mph).

The applicable rule is straightforward:  "If a segment of track does not meet *all* of the requirements for its intended class, it is reclassified to the next lowest class of track for which it does meet *all the requirements* of [the FRA's track safety standards]."  49 C.F.R. § 213.9(b) (2005) (emphasis added).  A segment of track does not qualify for Class 2 if its crosslevel

difference exceeds the parameters of note 2 of § 213.63 of the track safety regulations. 49 C.F.R.

§ 213.63 n. 2 (2005). As NECR would have known had it taken the trouble to compare the track

geometry report resulting from the Inspection with the track safety regulations, the segment

including MP 10.18 (where the Derailment began) did not meet "all the requirements" for Class

2 and hence should have been placed in Class 1—a class for which the freight speed limit is ten

miles per hour, 49 C.F.R. § 213.9(a) (2005), a speed below the harmonic danger addressed by

note 2 to § 213.63.

This is more than mere negligence, for it is a failure to exercise even slight care insofar as

the segment around MP 10.18 was concerned. Indeed, as previously has been noted, the Class 2

slow order, with its harmonic-rock risk, likely created a *greater* derailment risk than if the speed

had been left at Class 3 (though a slow order to Class 1, with its ten mph speed limit, would have

been proper). Bergeron Opp. Decl. ¶ 28.

Moreover, NECR failed even to recognize the misaligned track at MP 10.18 and

neglected to record the defects from the track geometry report on each subsequent inspection

report. Bergeron Opp. Decl. ¶¶ 29, 55. These flagrant omissions by NECR, coupled with

NECR's failure to properly correct the crosslevel defect or impose an appropriate slow order,

proximately caused the Derailment and the resulting injuries to ST/BM and NECR.

The foregoing conduct by NECR constitutes gross negligence as a matter of law. In turn,

this means that ST/BM is not liable for NECR's damages and that NECR is liable for ST/BM's

damages under § 7.1 of the TRO (First Counterclaim), and that NECR is liable under ST/BM's

common law claim for gross negligence (Fourth Counterclaim).

**C.    No reasonable jury could conclude other than that NECR was guilty of negligence, at the very least, as a matter of law.**

ST/BM is entitled to summary judgment on liability as to ST/BM's negligence claim

against NECR (Third Counterclaim).  To establish liability for negligence, ST/BM must show

that: (1) NECR owed ST/BM a duty of care; (2) NECR breached that duty; (3) the breach was

the proximate cause of ST/BM's injuries; and (4) STBM suffered actual harm.  *Watson v. Dimke,*

872 A.2d 337 (Vt. 2005); *Denis Bail Bonds, Inc. v. State of Vermont,* 622 A.2d 495 (Vt. 1993).

As discussed above, NECR owed ST/BM a duty to maintain the Line in a safe

operational condition, and in Class 2 condition, at all times pursuant to the TRO and federal law.

See TRO § 3.2 (Bergeron Opp. Decl. Exh. 1); 49 C.F.R. pt. 213 (2005).  Portions of the Line,

however—including the segment where the Derailment began—were noncompliant with the

requirements of the TRO, in breach of applicable federal regulations, and unsafe for users such

as ST/BM.  As such, they presented a substantial risk of derailment.  NECR knew or should have

known of these adverse conditions, which were within NECR's control to correct, but

nevertheless failed to maintain the Line in a safe and legally sufficient condition.

NECR breached its duty to ST/BM through its multiple failures and violations.  NECR

failed to correct the crosslevel defect around MP 10.18 with either a tamping machine or a

manual procedure, despite knowing of the defect for nearly a month before the Derailment.

Bergeron Opp. Decl. ¶¶ 26-27, 44-45.  NECR failed to set a proper slower speed limit that would

take account of the risk of harmonic rock as addressed in the federal track safety regulations.  *Id.*

¶¶ 28, 48.  NECR violated standard industry practice by failing to impose a slow order following

the Inspection before any more trains negotiated the dangerous track segment in question.  *Id.* ¶

25.  NECR failed to even identify the misaligned track at MP 10.18.  *Id.* ¶ 42.  NECR violated

federal track safety regulations by neglecting to note and re-measure the crosslevel defect on

each subsequent inspection report, so as to ensure that the defect was not worsening. *Id.* ¶¶ 29, 55.

These failures and violations by NECR proximately caused the Derailment and the resulting harm to ST/BM. Accordingly, NECR was, at the very least, guilty of negligence as a matter of law, and ST/BM thus is entitled to summary judgment as to NECR's liability on the Third Counterclaim.

**D.    No reasonable jury could conclude that ST/BM was guilty of negligence.**

ST/BM is not liable for negligence as a matter of law. Indeed, NECR has adduced no evidence that would support a finding that ST/BM breached any duty to NECR. The derailed pair of wheels on the sixth car of the train moved only a few inches between their proper location on the rail heads to locations just beside each rail. *Id.* ¶ 34. The ammeter readings, which can be an indicator of a derailed car, were normal for a train negotiating a 0.50 percent grade and accelerating from a slow-ordered track segment. *Id.* ¶ 35. From their position in the locomotive, the crew could not consistently see the sixth car of the train consist. At any rate, the boxcar remained upright and was not noticeably out of alignment with the rest of the train. *Id.* ¶ 37. The train crew felt nothing unusual between MP 10.18, where the pair of wheels on the sixth car left the track, and MP 5.7, where that car and six of its fellows went onto the ground. *Id.* ¶ 36. The patchy fog in the area between MP 10.18 and MP 5.7 was an additional factor demonstrating that the crew did nothing improper. *Id.* ¶ 35.

Accordingly, no reasonable jury could conclude that any negligence on the part of ST/BM caused the Derailment or NECR's injuries. Thus, ST/BM is entitled to summary judgment against NECR on NECR's Counts VI, VII, IX, and X.

**II.    NECR's violations of §§ 3.2 and 7.1 of the TRO and the Interstate Commerce Act are not preempted by the Federal Railroad Safety Act.**

In its Brief, NECR notes that the Supreme Court has interpreted the Federal Railroad Safety Act's ("FRSA") express preemption provision, 49 U.S.C. § 20106, "to preempt *state* statutes and rules, as well as all 'legal duties imposed on railroads by the common law…'" NECR Brief at 17 (citing *CSX Transp. Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)) (emphasis added).  Moreover, NECR quotes authority for the proposition that the FRA's regulations promulgated pursuant to the FRSA may preempt any "*state* law, rule, regulation, order, or standard relating to railroad safety." *Id.* (emphasis added).  Even if ST/BM's *state* common law counts are preempted by the FRSA (i.e., 49 U.S.C. § 20106) and the FRA's federal regulations promulgated pursuant to it (i.e., 49 C.F.R. § 213), NECR's violations of §§ 3.2 and 7.1 of the TRO create a *federal* cause of action for ST/BM that is *not* preempted by § 20106 or the FRA regulations.

Section 3.2 of the TRO, issued by the ICC, makes NECR "*solely responsible* for dispatching all operations over the Line and for the maintenance and repair of the Line, including the signals and the signal and dispatching system which controls operations on it" as well as for "keep[ing] the Line, *at all times* throughout the term of this Agreement or any extensions thereof, in not less that FRA Class II condition." TRO § 3.2 (emphasis added) (Exh. 1 to Bergeron Opp. Decl.).  Moreover, Section 7.1 of the TRO does not absolve NECR of gross negligence or willful misconduct relating to a derailment.  *See* January 2006 Decision, at 3 (Exh. 2 to Bergeron Opp. Decl.).  Indeed, ST/BM's First Counterclaim—for breach of the TRO and Interstate Commerce Act requirements to maintain a safe line in Class 2 condition—is not based on state law, but upon 49 U.S.C. § 11704.

Accordingly, NECR's violations of §§ 3.2 and 7.1 of the TRO create a *federal* cause of

action for ST/BM—one that is not preempted by the FRSA or the FRA's regulations.

**III.    To the extent state causes of action are preempted by the FRSA and the FRA's regulations, NECR's negligence claims against ST/BM are preempted.**

If ST/BM's state law claims are preempted by the FRSA and the FRA's regulations, *see* NECR Brief at 17-18, NECR's negligence claims against ST/BM are likewise preempted. As NECR states, "All that is required to trigger the FRSA's preemption provision is that the subject of the [  ] claim be 'covered' by any of the FRA's regulations." NECR Brief at 17. Counts VI and IX of the Amended Complaint allege that ST/BM was negligent in operating the train, thus causing the Derailment. *See also* Joint Pre-Trial Conference Memorandum ("Joint Memo") at 4 [Dkt. # 53] ("it is the plaintiff's position that the defendants were negligent in their operation of the train"). In addition, NECR alleges that ST/BM was guilty of negligent inspection by "failing to properly take notice of the initial derailment and thereafter failed to properly inspect the train…" *Id.* NECR's negligent operation and negligent inspection claims are preempted by the FRA's regulations.

NECR alleges that ST/BM was negligent in its operation of the train because ST/BM "failed to protect their train from the alleged fog conditions *by slowing the speed of the train.*" *Id.* at 5 (emphasis added). The Supreme Court has concluded, however, that the FRSA preempts state tort claims based on a train's allegedly excessive speed. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993); *see* 49 C.F.R. 213.9 (2005) (establishing speed limits for different classes of track); *see also Seyler v. Burlington N. Santa Fe Corp.*, 102 F. Supp. 2d 1226, 1236 (D. Kan. 2000) ("Nearly every court which has addressed this issue has held that a state law claim based on failure to slow or stop a train under certain circumstances is preempted"). Further, several courts have concluded that adverse weather conditions do not constitute specific individual hazards so as to fall within the "essentially local safety hazard" exception, 49 U.S.C. § 20106(1),

to the FRSA's preemption provision. *Seyler*, 102 F. Supp. 2d at 1236; *see also Cox v. Norfolk and Western Ry*. Co., 998 F. Supp. 679, 685 (S.D. W.Va. 1998) (snow-covered tracks not specific, individual hazard; such condition not discrete and truly local ); *Stuckey v. Illinois Central R. Co*., 1998 WL 97270, at *5 (N.D. Miss. Feb. 10, 1998) (icy conditions that were not limited to subject grade crossing, but were found throughout area, not specific individualized hazards contemplated by Supreme Court in *Easterwood*). As the court in *Cox* reasoned:

> To hold that these [adverse weather] conditions are not preempted by the FRSA would mean that every time it was not a perfectly sunny day and a train accident occurred, a plaintiff could bring a state suit based on train speed. Such a result would swallow the federal regulations dealing with train speed, undermine the Secretary's ability to prescribe uniform operational speeds, and act contrary to Congress' intent that laws regulations and orders related to railroad safety be nationally uniform to the extent practicable.

*Cox*, 998 F. Supp. at 687.

For similar reasons, NECR's negligent inspection claims against ST/BM are also preempted. The FRA has adopted regulations covering inspection of freight trains. *See, e.g.,* 49 C.F.R. §§ 215.11, 215.13 (2005). The Eighth Circuit has stated, "It is clear that the FRA's regulations are intended to prevent negligent inspection by...*specifying certain aspects of freight cars that must be inspected...*" *In re Derailment Cases*, 416 F.3d 787, 794 (8th Cir. 2005) (emphasis added). Moreover, "there is no indication that the FRA meant to leave open a state tort cause of action to deter negligent inspection." *Id.*; *see also Kalan Enterprises, LLC v. BNSF Ry. Co.,* 415 F. Supp. 2d 977, 982 (D. Minn. 2006) ("Questions of train inspections fall squarely in the midst of FRA regulations."); *Mehl v. Canadian Pac. Ry. Ltd.*, 417 F. Supp. 2d. 1104 (D.N.D. 2006) (plaintiffs' negligent inspection claims preempted by FRA regulations).

Therefore, NECR's state law claims for negligent operation and negligent inspection are preempted by the FRSA and the FRA's regulations. Accordingly, Counts VI and IX of the

Amended Complaint must be dismissed.

IV.    **Counts VII and X of the Amended Complaint must be dismissed because NECR has adduced no evidence that would support a finding that ST/BM was guilty of gross negligence or willful misconduct.**

Under the common law, "gross negligence is equivalent to the failure to exercise even a slight degree of care…It is a heedless and palpable violation of legal duty respecting the rights of others." *Shaw v. Moore,* 162 A. 373 (Vt. 1932)*; accord Mellin v. Flood Brook Union School District,* 790 A.2d 408, 423 (Vt. 2001); *Powers v. Office of Child Support,* 795 A.2d 1259, 1266 (Vt. 2002).

Through the course of discovery, NECR has adduced no evidence to support a finding that ST/BM was guilty of gross negligence or willful misconduct.  Likewise, ST/BM does not anticipate any information will be provided in NECR's response to this motion that would support such a finding.

Summary judgment is "mandate[d] … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Flanders & Medeiros, Inc. v. Bogosian,* 65 F.3d 198, 206 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)).  Thus, Counts VII and X of the Amended Complaint must be dismissed as a matter of law.

V.    **NECR is ineligible for summary judgment on Counts I and II of the Amended Complaint because the TRO does not order ST/BM to do anything in respect of the Derailment.**

Counts I and II of the Amended Complaint allege that ST/BM has violated an order of the STB[10] and hence is liable under 49 U.S.C. § 11704(a).  The only relevant provision on which NECR relies for this allegation, though, is § 7.1 of the TRO, which NECR contends makes

---

[10] Technically, the TRO is an order of the STB's predecessor, the ICC.

ST/BM absolutely liable for the damage resulting from the Derailment.  Amended Complaint ¶¶ 18, 35-37 [Dkt. #16].

For one thing, the STB has ruled that ST/BM is ***not*** liable under § 7.1, and that NECR ***is*** liable, if NECR has committed gross negligence or willful misconduct.  January 2006 Decision, at 3 (Exh. 2 to Bergeron Opp. Decl.).  More importantly, even if ST/BM were to be adjudged liable for NECR's damages, it would be the *court's judgment*, not the TRO, that would *require* ST/BM to pay NECR (or, failing such payment, give NECR the power to execute against ST/BM's assets).  Indeed, neither § 7.1 nor any other provision of the TRO requires ST/BM to take, or refrain from taking, any action in respect of the Derailment.  *See* TRO (Exh. 1 to Bergeron Opp. Decl.); 49 U.S.C. § 11704(a) (2000).  Therefore, ST/BM is entitled to summary judgment it its favor on Counts I and II of the Amended Complaint.

## VI.    NECR cannot qualify for summary judgment on Counts V and VIII of the Amended Complaint because there is no evidence of a contract between ST/BM and NECR.

As the STB accurately pointed out, § 7.1 of the TRO was not agreed upon between Central Vermont and Boston and Maine (the predecessors, respectively, of NECR and ST/BM), but was imposed—over the objections of ST/BM's predecessor—by the ICC.  January 2006 Decision, at 1, 3 (Exh. 2 to Bergeron Opp. Decl.).  Indeed, the whole concept of having Central Vermont grant trackage rights was not agreed upon between the two railroads but was imposed by the ICC as a condition of the taking of Boston and Maine's track.  *See Amtrak I*, 4 I.C.C.2d at 798, 800.

A "contract" is "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty."  Restatement (Second) of Contracts § 1 (1981); 1 Williston on Contracts § 1:1 (4th ed. 2006).  Moreover, a

"contract" has been defined as "a private, *voluntary* allocation by which two or more parties distribute specific entitlements and obligations." 17A Am. Jur. 2d Contracts § 1 (2003) (emphasis added). The TRO is not a contract, any more than a court order requiring one party to take or refrain from taking a specified action is a contract. The party subject to such a direction may be subject to a contempt proceeding if it violates the terms of the court order but it does not commit a breach of contract in so doing.

Because the TRO was not agreed upon by Central Vermont and Boston and Maine, it was not a contract. Hence, as a matter of law, NECR can have no action for "breach of contract." For this reason, ST/BM is entitled to summary judgment in its favor on Counts V and VIII of the amended complaint.

## Conclusion

Accordingly, this Court should grant summary judgment in favor of ST/BM on the issue of liability due to NECR's gross negligence (ST/BM's First, Third, and Fourth Counterclaims), and should dismiss Counts III, IV, VI, VII, IX, and X of the Amended Complaint. At a minimum, NECR has offered no evidence of gross negligence or willful misconduct on the part of ST/BM, and Counts VII and X of the Amended Complaint therefore must be dismissed.

Even if ST/BM is not granted summary judgment on liability, the Court should dismiss Counts I, II, V, and VIII of the Amended Complaint [Dkt. #16] for failure to state a claim on which relief can be granted.

Respectfully submitted,

Eric L. Hirschhorn
Debra R. Coletti
Winston & Strawn LLP

1700 K Street, NW
Washington DC 20006
202-282-5700

Robert B. Culliford (BBO #638468)
Pan Am Systems, Inc.
Pease International Tradeport
14 Aviation Drive
Portsmouth NH 03801
603-766-2002

*Attorneys for Defendants/Counterclaimants*
*Springfield Terminal Railway Company*
*and Boston and Maine Corporation*

April 24, 2007