UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CENTRAL
RAILROAD, INC.,

    Plaintiff/Counterdefendant,

    -v.-                                          Civil Action No. 04-30235-MAP

SPRINGFIELD TERMINAL
RAILWAY COMPANY, et al.,

    Defendants/Counterclaimants.

**STATEMENT OF MATERIAL FACTS AS TO WHICH
THERE EXISTS A GENUINE ISSUE TO BE TRIED**

Pursuant to Local Rule 56.1, Springfield Terminal Railway Company and Boston and Maine Corporation (collectively, "ST/BM"), who are the defendants/counterclaimants herein, state that there is a genuine issue to be tried as to the following material facts of record:

1. The document governing ST/BM's trackage rights on the track of plaintiff/counterdefendant New England Central Railroad, Inc. ("NECR") is not an agreement but an order imposed by the Interstate Commerce Commission ("ICC") in 1990 following a contested proceeding between the predecessors in interest of ST/BM and NECR. Declaration of Roger D. Bergeron in Opposition to Plaintiff's Motion for Summary Judgment ("Bergeron Opp. Decl.") ¶ 7; *Amtrak—Conveyance of B&M in Conn River Line in VT & NH*, 6 I.C.C.2d 539, 559 (1990) ("*Amtrak II*").

2. The 1990 ICC trackage rights order ("TRO") is not "a contract between the parties" or a private agreement between the parties, as NECR asserts, *see* Memorandum of Law

in Support of the Plaintiff's Motion for Summary Judgment ("NECR Brief") [Dkt. 66] at 2-3, because it was not agreed to by the parties. Bergeron Opp. Decl. ¶ 13 & Exh. 3; *Boston and Maine Corp. v. New England Central Ry. Co.*, 2006 STB LEXIS 17, STB Finance Dkt. No. 34612 (served Jan. 10, 2006) ("January 2006 Decision"), at 3 (Exh. 2 to Bergeron Opp. Decl.).

3. Among the provisions of the TRO on which the parties to the 1990 proceeding did not agree is the provision that became § 7.1 of the TRO. Bergeron Opp. Decl. ¶ 13 & Exh. 3; January 2006 Decision, at 3 (Exh. 2 to Bergeron Opp. Decl.).

4. Section 7.1 of the TRO does not make ST/BM responsible for the loss and damages occasioned by the July 3, 2004 derailment near Hartland, Vermont (the "Derailment") regardless of the condition of NECR's track because the Surface Transportation Board ("STB") has ruled that § 7.1 does not absolve NECR of liability for damages resulting from NECR's gross negligence or willful misconduct. Bergeron Opp. Decl. ¶ 12 & Exh. 2.

5. The Derailment resulted in damage to NECR's property but the extent of that damage is not in issue at this point in the action because the parties' motions for summary judgment extend only to liability.

6. The ST/BM crew did not immediately recognize that one pair of wheels of one truck of a freight car in their train had come off the tracks because the locomotive's ammeter did not reflect unusually high amperage for a train accelerating up a 0.50 percent grade after passing a slow-ordered section of track, Bergeron Opp. Decl. ¶ 35, the weather was foggy, *id.*; Declaration of David A. Nagy in Opposition to Plaintiff/Counterdefendants' Motion for Summary Judgment ("Nagy Opp. Decl.") ¶ 12, the crew felt no unusual jostling or anything else out of the ordinary, Bergeron Opp. Decl. ¶ 36, the boxcar in question was upright and not

noticeably out of alignment with the remainder of the train, *id.*, ¶ 37, and the derailed wheels did not exhibit sparks, dust, or erratic movement, Nagy Opp. Decl. ¶9.

7. Although NECR suggests that slowing the train might have improved the crew's visibility, Joint Pre-Trial Conference Memorandum ("Joint Memo"), at 5 [Dkt. # 53], that was not required by GCOR 6.21 or 6.29.2 and would not have brought the crew any closer to the boxcar in question. Nagy Opp. Decl. ¶ 10.

8. After receiving the report of the June 8, 2004 Federal Railroad Administration ("FRA") track geometry inspection, NECR did not take adequate steps in respect of the track defects existing at and in the vicinity of Mile Post ("MP") 10.18, the track segment where the wheels of the boxcar initially left the track. Bergeron Opp. Decl. ¶¶ 17, 24-30, 45-48, 55 & Exhs. 4, 6, 8, 9-13.

9. The FRA track geometry inspection found a crosslevel defect in the track segment near where the wheels of the boxcar initially left the track. Bergeron Opp. Decl. ¶ 19 & Exh. 4.

10. Proper procedure is to view track defects, particularly including crosslevel and misalignment defects such as those that caused the Derailment, as affecting *segments* of track rather than merely *points* on the track. Bergeron Opp. Decl. ¶ 24.

11. The cause of the Derailment was the combination of the crosslevel and alignment defects in the segment of track including MP 10.18 and MP 10.16 and the improper speed order imposed on that segment by NECR in the wake of the June 8, 2004 FRA track geometry inspection. Bergeron Opp. Decl. ¶¶ 32, 41-42 & Exh. 12.

12. If, as NECR alleges, NECR Brief at 5, NECR rebuilt a substantial amount of its line between MP 10.18 and MP 5.7, that fact (1) is due in large measure to track conditions that antedated the Derailment, Bergeron Opp. Decl. ¶ 18 & Exh. 5, and (2) in any event is not at issue

here because NECR's motion for summary judgment includes no evidence as to the amount of NECR's alleged damages.

13. If, as NECR alleges, NECR suffered lost time incentive revenue from an agreement with Amtrak, such loss was due wholly or in large part to substandard track conditions that antedated the Derailment, including the many track defects that were noted in the June 8, 2004 FRA track geometry inspection report. Bergeron Opp. Decl. ¶ 18 & Exh. 5.

14. Although Congress' purpose in enacting the rail provisions of the ICC Termination Act of 1995, Pub. L. No. 104-88, ("ICCTA") included reducing the regulation of railroads, it also included such other purposes as "promot[ing] a safe and efficient rail transportation system," 49 U.S.C. § 10101(3) (2000), and "operat[ing] transportation facilities and equipment without detriment to the public health and safety," *id.* § 10101(8).

15. The allocation of responsibility for losses due to the Derailment for which § 7.1 of the TRO provides includes the interpretive gloss applied by the January 2006 Decision, namely that § 7.1 was not intended to, and does not, absolve NECR of damages caused to others or to itself by NECR's gross negligence or willful misconduct. January 2006 Decision at 3 (Exh. 2 to Bergeron Opp. Decl.).

16. It has not been stipulated or otherwise established that the Derailment and consequent damages were caused by ST/BM's equipment. Indeed, ST/BM vigorously disputes that allegation and has submitted evidence—evidence that remains largely, if not entirely, unrefuted—demonstrating that the causes of the Derailment and ensuing damages were the track defects that NECR ignored and NECR's imposition of a speed limit that violated the FRA's track safety standards. Bergeron Opp. Decl. ¶¶ 26-30, 44-48, 55 & Exhs. 4, 8, 9, 12-13; *see* 49 C.F.R. § 213.63 n. 2 (2005).

17.     ST/BM has not admitted, and does not admit, that it is responsible for the Derailment damages. The deposition testimony of Roger Bergeron that is cited by NECR does not constitute such an admission, but merely acknowledges what the text of § 7.1 of the TRO says. *See* Plaintiff New England Central Railroad, Inc.'s Concise Statement of Facts Pursuant to Local Rule 56.1 [Dkt. #67] ("NECR Statement of Facts"), ¶ 59. This ignores the STB's interpretation of § 7.1 as not absolving NECR of liability for damages caused by NECR's own gross negligence or willful misconduct. *See* January 2006 Decision at 3 (Exh. 2 to Bergeron Opp. Decl.).

18.     The condition of NECR's track where the initial derailment occurred (i.e., the segment including MP 10.18) was not up to FRA Class 2 standards, as required by § 3.2 of the TRO, at the time of the Derailment. This is evidenced by, inter alia, the fact that the FRA's track safety standards expressly provide that track having a crosslevel defect such as that present on NECR's track is Class 1 track and not a higher class. 49 C.F.R. § 213.63 n. 2 (2005); Bergeron Opp. Decl. ¶¶ 19-20 & Exh. 4.

19.     Given that the June 8, 2004 FRA track geometry inspection identified 251 track defects over 230 miles of track, Bergeron Opp. Decl. ¶ 18, NECR's claim that the line "is generally maintained to a greater standard than that which is required under the [TRO]," NECR Statement of Facts ¶ 74, is not accurate.

20.     The NECR track at and around the point of initial derailment, MP 10.18, was not in Class 3 condition, as alleged by NECR, NECR Statement of Facts ¶¶ 75-78, but in Class 1 condition due to the presence of the crosslevel defect identified by the FRA inspection, Bergeron Opp. Decl. ¶¶ 19-20 & Exh. 4; 49 C.F.R. § 213.63 n. 2 (2005).

21.     NECR failed in numerous respects to comply with accepted track inspection requirements. Among these failures were NECR's failure to correct the crosslevel defect around MP 10.18 with either a tamping machine or a manual procedure, Bergeron Opp. Decl. ¶¶ 27, 45, NECR's failure to set a proper slower speed limit that would take account of the risk of harmonic rock, *id.* ¶¶ 28, 48, NECR's failure to impose a slow order following the Inspection before any more trains negotiated the dangerous track segment in question, *id.* ¶ 25, NECR's failure to identify the misaligned track at MP 10.18, *id.* ¶ 42, and NECR's failure to note and re-measure the crosslevel defect on each subsequent inspection report, *id.* ¶ 55.

22.     Again notwithstanding NECR's contrary claim, NECR Statement of Facts ¶ 82, ST/BM has adduced ample evidence supporting a conclusion that NECR's track at and around MP 10.18 was below Class 2 condition at the time of the Derailment, Bergeron Opp. Decl. ¶¶ 19-20 & Exhs. 4, 8.

23.     Notwithstanding NECR's contrary argument, NECR Statement of Facts ¶ 83, the defects that dropped the classification of NECR's track in the area of MP 10.18 below Class 2 had not been addressed by NECR prior to the Derailment, Bergeron Opp. Decl. ¶¶ 44-45 & Exh. 4.

24.     At the time of the Derailment, NECR's track at and around the initial point of Derailment (MP 10.18) was in Class 1 condition, due in part to the crosslevel defect in the segment noted in the June 8, 2004 FRA track geometry report. Bergeron Opp. Decl. ¶¶ 19-20 & Exh. 4.

25.     The track defects at and around MP 10.18 (the initial point of derailment) existed before the Derailment. Bergeron Opp. Decl. ¶¶ 40, 42

26.     Roger Bergeron is qualified as an expert in the field of track safety. He has been employed by ST/BM and their predecessors for thirty-six years, serving as a trackman, engineering surveyor, construction inspector, resident engineer, track supervisor, roadmaster, engineer of track, engineer of production and construction, and assistant vice president of engineering before assuming his current position as Vice President for Special Projects in 2006. Bergeron Opp. Decl. ¶ 2.

27.     Mr. Bergeron is qualified under the FRA track safety regulations regarding track safety in general and track inspection, renewal, and replacement in particular. Bergeron Opp. Decl. ¶ 3; *see* 49 C.F.R. § 213.7 (2005).

28.     Mr. Bergeron has taken FRA and National Transportation Safety Board accident derailment courses, and is familiar with the FRA track safety standards (49 C.F.R. pt. 213), the FRA Track Safety Standards Compliance Manual, an Association of American Railroads publication entitled *Train Derailment Cause Finding* and the Canadian Pacific handbook on the same subject. Bergeron Opp. Decl. ¶ 4.

29.     In the course of his career, Mr. Bergeron has led or otherwise been involved in investigations of more than three thousand derailments, including several hundred that occurred on main lines. Bergeron Opp. Decl. ¶ 4.

30.     Mr. Bergeron concluded that the crosslevel defect at MP 10.18 that he identified after the Derailment was the same one identified by the June 8, 2004 FRA track geometry inspection, Bergeron Opp. Decl. ¶ 40, and that the alignment defect that he identified in the same track segment was not of recent vintage and also was identified on the FRA inspection report, *id.* ¶ 42.

31. ST/BM's counterclaims are not based only upon NECR's failure to maintain its track at FRA Class 2 standards but also upon NECR's negligence, gross negligence, and willful misconduct. Defendants' Answer to Amended Complaint and Defendants' Counterclaims ¶¶ 52-58, 59-65, 66-72.

32. ST/BM's refusal to pay the NECR for damages allegedly incurred due to the Derailment does not violate an order of the STB. For one thing, § 7.1 of the TRO apportions liability in cases of derailment but it does not order ST/BM to *do* anything. *See* TRO § 7.1 (Exh. 2 to Bergeron Opp. Decl). Moreover, even if § 7.1 constituted an "order" to pay under certain circumstances—namely, as adjudicated by the January 2006 Decision, the situation in which NECR was *not* guilty of either gross negligent or willful misconduct—the existence of those circumstances has yet to be demonstrated.

33. ST/BM has adduced evidence from which a reasonable jury could find that NECR failed and refused to obey an order of the STB by failing to take proper action to respond to the defects at and around MP 10.18—defects that caused the Derailment. Bergeron Opp. Decl. ¶¶ 19-20, 24-32, 41-48, 55 & Exhs. 4, 6, 8-13, 18.

34. Notwithstanding NECR's contrary claim, NECR Statement of Facts ¶ 100, the evidence is undisputed that following the FRA's June 8, 2004 track geometry inspection, NECR did not—at least insofar as the track segment around MP 10.18 is concerned—take measures to repair the defects or change the allowable speed to safe track standards, Bergeron Opp. Decl. ¶¶ 26-29, 44-48. NECR did not repair the defects there before the Derailment and, because NECR ignored the restriction imposed by note 2 to § 213.63, did not change the allowable speed to safe track standards. *Id.* ¶¶ 28, 44, 48.

35.    To the extent (if any) that NECR's post-June 8, 2004 inspections failed to note defects at and around the segment where the initial derailment occurred, *see* NECR Statement of Facts ¶ 102, the reason is that NECR's personnel, though aware of the defects, improperly failed to note them because they previously had been noted in the track geometry inspection. Bergeron Opp. Decl. ¶ 55.

Respectfully submitted,

*[signature]*

Eric L. Hirschhorn
Debra R. Coletti
Winston & Strawn LLP
1700 K Street, NW
Washington DC 20006
202-282-5700

Robert B. Culliford (BBO #638468)
Pan Am Systems, Inc.
Pease International Tradeport
14 Aviation Drive
Portsmouth NH 03801
603-766-2002

*Attorneys for Defendants/Counterclaimants*
   *Springfield Terminal Railway Company*
   *and Boston and Maine Corporation*

April 24, 2007