**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

NEW ENGLAND CENTRAL
RAILROAD, INC.,

Plaintiff/Counterdefendant,

-v.- Civil Action No. 04-30235-MAP

SPRINGFIELD TERMINAL
RAILWAY COMPANY, et al.,

Defendants/Counterclaimants.

**DECLARATION OF DAVID A. NAGY**
**IN OPPOSITION TO PLAINTIFF/COUNTERDEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

David A. Nagy declares as follows:

1. I am employed by the defendants/counterclaimants in this action, Springfield Terminal Railway Company and Boston and Maine Corporation (collectively, "ST/BM"), as Executive Director of Safety Training. I make this declaration in opposition to the motion for summary judgment filed by New England Central Railroad, Inc. ("NECR").

2. I served as hearing officer on the part of ST/BM in the investigative hearing outlined below. At that time I was Director of Manpower for ST/BM.

3. Hearing officers are appointed by management. The transcript of the hearing is annexed hereto as Exhibit A. Transcripts of such hearings are made and kept by ST/BM in the normal and regular course of its business.

4.       I have been advised that after the July 3, 2004 derailment of an ST/BM train at Hartland, Vermont, ("Derailment"), NECR charged that the ST/BM crew had violated General Code of Rules 6.29.2 and Rule 6.21 (in effect on New England Central Railway). The relevant correspondence is annexed hereto as Exhibit B.

5.       ST/BM accordingly convened an investigative hearing, under the applicable labor-management agreement, for the crew members, J.C. Scappace, Jr. and A. Peter Kari. The charge against each crew member was "[f]ailure to properly perform [his] duties" in that the individual "allegedly failed to comply with the provisions of General Code of Rules ("GCOR") 6.29.2 and Rule 6.21 (in effect on New England Central Railway) resulting in derailment of seven (7) railcars."

6.       Given that NECR had alleged misconduct on the part of the ST/BM train crew, and that the Derailment had occurred on NECR's track, Charles D. Hunter, Assistant General Manager of RailAmerica for NECR, attended the hearing as NECR's representative and testified as NECR's witness (Exhibit A, at pages 1, 18-29). NECR is owned by RailAmerica.

7.       The hearing (Exhibit A, at pages 10 and 11) demonstrated that the train's recorder, which tracks such elements as speed, throttle position, brake applications, and air pressure in the train's brake lines, reflected that the train was within the twenty-five mile per hour speed limit established by NECR.

8.       GCOR 6.29.2, which appears on page 6 of Exhibit A, provides in pertinent part that "[w]hile their train is moving, crew members must inspect it frequently and look for indications of defects in the train, especially when rounding curves."

9.       Mr. Scappace testified at page 30 that GCOR 6.29.2 requires train crew members to inspect the train whenever possible, and at page 31 that he looked back to check the train at

North Hartland (i.e., near where the cars went onto the ground). He testified at pages 31 and 32 that derailed cars typically exhibit sparks, dust, and erratic movement, but that when he checked the train, he did not see any such conditions. Mr. Kari testified at page 38 that he did not feel anything unusual until the cars went onto the ground.

10. Mr. Scappace also did not dispute, at page 34 of the hearing, a statement that taking the two engines into account, the boxcar that initially derailed was the ninth car of the train and hence was not visible from the locomotive. He noted on page 36 that slowing the train would not have improved visibility because the distance between the crew and that boxcar would not have been changed.

11. GCOR 6.21, which appears at pages 6 and 7 of Exhibit A, provides in pertinent part that "[w]hen conditions restrict visibility, regulate speed to ensure that crew members can observe and comply with signal indication." At page 15 of the hearing, ST/BM foreman Michael Bump, who is an experienced engineer and was ST/BM's representative at the investigative hearing, testified that 6.21 relates to signal visibility and not to general weather conditions such as fog or snow.

12. Mr. Bump also testified at page 17 of the hearing that patchy fog is common on the track segment where the Derailment occurred. NECR's witness, Mr. Hunter, testified to the same effect at page 20. At pages 27 and 28, NECR's Mr. Hunter conceded that GCOR 6.21 does not restrict speeds at night but contended that it does restrict speeds in the presence of fog, at least where conditions limit visibility of signals. Mr. Scappace testified at pages 30 and 34 that there was patchy ground fog in the area at the time of the Derailment, and Mr. Kari agreed at page 37.

13. Mr. Bump testified at page 40 that he believed neither crew member had violated GCOR 6.21 or 6.29.2.

14. I have been advised that the decision making officer for ST/BM, Warren J. Bostwick, found no violations of the cited rules, and no discipline was imposed on either crew member as a result of the hearing. Mr. Bostwick's letters to that effect are annexed hereto as Exhibit C.

15. So far as I am aware, NECR never convened or sought to convene any hearing into the conduct of the train crew, but simply banned them from NECR's line effective July 9, 2004. Relevant correspondence appears as part of Exhibit B hereto.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed April 19, 2007.

David A. Nagy

# EXHIBIT A
# Part I

# HEARING

A.P. KARI
J.C. SCAPPACE, JR.

August 9, 2004

M. Nagy: Good morning. My name's Dave Nagy and I'm the Director of Manpower for Springfield Terminal Railway, and I have been appointed the hearing officer for today's hearing. The date is August 9, 2004. The time now is 1000 hours and the place is the training room at East Deerfield. This hearing is being conducted on behalf of J. C. Scappace and A. Peter Kari, a conductor and engineer with the Springfield Terminal Railway. At this time I'd like to introduce ourselves. I'll start with myself and go to my left around the room, introduce yourself and state for the record your purpose for being here today.

*My name's Dave Nagy and I am the Director of Manpower and the hearing officer for today.*
*My name's James F. Olson. I'm the co-hearing officer.*
*I'm Charles D. Hunter, I'm Assistant General Manager for New England Central Railroad and I'm a witness.*
*Joseph Scappace, conductor.*
*Tom Bergeron, Local Chairman, UTU 587, representing Mr. Scappace and Mr. Kari.*
*A. P. Kari, Engineer _______.*
*Michael Bump Road Foreman, East Deerfield.*

M. Nagy: Thank you. This hearing, investigation hearing is being conducted with the following notices of investigation which I'll now read into the record. We have two notices, one being the investigation notice and then a postponement notice. I'll read the first one. To Mr. Peter Kari,

*"TO: A. Peter Kari*

*This is a Notice for you to attend a Hearing.*

*You may, if you desire, arrange to be accompanied by a representative as provided in the applicable schedule agreement, without expense to the Company.*

*You may produce witnesses on your own behalf without expense to the Company and you or your representative may cross-examine the witnesses. You are expected to be present throughout the entire proceeding.*

*A. Peter Kari* — *Engineer*
*Employee's Name* — *Occupation*

*117B Reeds Bridge* — *Conway, MA 01341-9713*
*Address*

*Mech. Dept. Conf. Room*
*River Road/Railroad Ave.*
*E. Deerfield, MA* — *1000 hrs.* — *Monday, July 19, 2004*
*Place Hearing to be Held* — *Time* — *Day and Date*

*This Notice is issued to develop the facts and place your responsibility, if any, in connection with the charge outlined below:*

*Failure to properly perform your duties, while employed as Engineer on Train WJED at Hartland, VT on July 3, 2004 at approximately 0640 hours, when you allegedly failed to comply with provisions of General Code of Rules 6.29.2 and Rule 6.21 (in effect on New England Central Railway) resulting in derailment of seven (7) railcars.*

*(signed)*
*M. C. Bump*
*Road Foreman*

*Witness: William Mount, Manager of Safety-NECR*

*CC: M. G. Maloof, UTU Gen. Chmn, Fax #508-626-2524"*

ST011190

M. Nagy: That notice was postponed. The representative for NECR has to leave for emergency reasons and the postponement notice I'll read for the record now.

"Dear Mr. Kari

*The hearing originally scheduled to be held on Monday July 19, 2004 at 1000 hours in E. Deerfield, MA in connection with the following:*

*Failure to properly perform your duties, while employed as Engineer on Train WJED at Hartland, VT on July 3, 2004 at approximately 0640 hours, when you allegedly failed to comply with provisions of General Code of Rules 6.29.2 and Rule 6.21 (in effect on New England Central Railway) resulting in derailment of seven (7) railcars.*

*has been rescheduled for Monday, August 9, 2004 at 1000 hours in East Deerfield, MA per mutual agreement between M. G. Maloof, UTU Gen. Chmn. and the Carrier.*

*All particulars pertaining to the original notice, except as stated above, remain in effect.*

*David Nagy*
*Director of Manpower*
*CC: M. G. Maloof, UTU Gen. Chmn, Fax #508-626-2524"*

M. Nagy: Also, the original witness for the NECR, Mr. Mount, couldn't make it so they changed the witness for the NECR, his name is Charles Hunter of NECR Railway, for Mr. Kari. The notice for Mr. J. C. Scappace, Jr.

"*TO: J. C. Scappace, Jr.*

*This is a Notice for you to attend a Hearing.*

*You may, if you desire, arrange to be accompanied by a representative as provided in the applicable schedule agreement, without expense to the Company.*

*You may produce witnesses on your own behalf without expense to the Company and you or your representative may cross-examine the witnesses. You are expected to be present throughout the entire proceeding.*

| *J. C. Scappace, Jr.* | *Conductor* |
|---|---|
| *Employee's Name* | *Occupation* |
| *84 Phillips Street* | *Greenfield, MA 01301-2826* |
| *Address* | |

| *Mech. Dept. Conf. Room River Road/Railroad Ave. E. Deerfield, MA* | *1000 hrs.* | *Monday, July 19, 2004* |
|---|---|---|
| *Place Hearing to be Held* | *Time* | *Day and Date* |

*This Notice is issued to develop the facts and place your responsibility, if any, in connection with the charge outlined below:*

*Failure to properly perform your duties, while employed as Conductor on Train WJED at Hartland, VT on July 3, 2004 at approximately 0640 hours, when you allegedly failed to comply with provisions of General Code of Rules 6.29.2 and Rule 6.21 (in effect on New England Central Railway) resulting in derailment of seven (7) railcars.*

*(signed)*
*M. C. Bump*
*Road Foreman*

*Witness: William Mount, Manager of Safety-NECR*

*CC: M. G. Maloof, UTU Gen. Chmn, Fax #508-626-2524"*

ST011191

M. Nagy: This was also superseded by a postponement notice that same day. I'll read that into the record.

"Dear Mr. Scappace

The hearing originally scheduled to be held on Monday July 19, 2004 at 1000 hours in E. Deerfield, MA in connection with the following:

Failure to properly perform your duties, while employed as Conductor on Train WJED at Hartland, VT on July 3, 2004 at approximately 0640 hours, when you allegedly failed to comply with provisions of General Code of Rules 6.29.2 and Rule 6.21 (in effect on New England Central Railway) resulting in derailment of seven (7) railcars.

has been rescheduled for Monday, August 9, 2004 at 1000 hours in East Deerfield, MA per mutual agreement between M. G. Maloof, UTU Gen. Chmn. and the Carrier.

All particulars pertaining to the original notice, except as stated above, remain in effect.

David Nagy
Director of Manpower
CC: M. G. Maloof, UTU Gen. Chmn, Fax #508-626-2524"

M. Nagy: Again, a change in the representative for the NECR. The change went to a carbon copy to Charles Hunter of the NECR. I'll submit both those notices as Exhibits A and B for the record. Mr. Scappace and Kari, did you receive, will you review these notices and state for the record please if you received copies of each of these notices and attest to the fact that those are your signatures. Mr. Scappace?

M. Scappace: Yes I received them.

M. Nagy: Mr. Kari?

M. Kari: Yes I did.

M. Nagy: At t his time I will ask all persons who identified themselves as witnesses to please leave the room. I want to caution the witness not to discuss the investigation hearing while you're outside the premises, to testify at any time following your testimony.

??? Could you hang on for a second?

M. Nagy: Yuh.

??? I wanna make copies of these.

M. Nagy: I'm gonna take a break to make some copies.

M. Olson: We'll take a short recess.

Tape off/on

ST011192

M. Nagy: Okay, we're back from a little recess, it's 10:13 and we'll move on with Mr. Scappace and Kari. Did you receive proper notice to attend this investigation today, Mr. Scappace?

M. Scappace: Yes I did.

M. Nagy: Mr. Kari?

M. Kari: Yes I did.

M. Nagy: Were you also notified that you could be accompanied by a representative of your choice subject to the terms of the applicable labor agreement without expense to the company, Mr. Scappace?

M. Scappace: Yes.

M. Nagy: Mr. Kari?

M. Kari: Yes I did.

M. Nagy: Are you accompanied by a representative of your choice, and if so, please identify that individual, Mr. Scappace.

M. Scappace: Yes, Mr. Bergeron.

M. Nagy: Mr. Kari?

M. Kari: Mr. Bergeron.

M. Nagy: Do you understand that you will be expected to be present during the entire hearing Mr. Scappace?

M. Scappace: Yes I do.

M. Nagy: Mr. Kari?

M. Kari: Yes I do.

M. Nagy: Do you understand that you may produce witnesses on your behalf or without the expense of the company, Mr. Scappace?

M. Scappace: Yes I do.

M. Nagy: And Mr. Kari?

M. Kari: Yes I do.

M. Nagy: Have you arranged for any witnesses to testify on your behalf, Mr. Scappace?

M. Scappace: No I haven't.

M. Nagy: Mr. Kari?

M. Kari: No I have not.

M. Nagy: Okay. Mr. Scappace, would you state for the record your current mailing address.

M. Scappace: 84 Phillips Street, Greenfield, MA 01301.

M. Nagy: Mr. Kari.

M. Kari: 64 Matthews Rd., Dartmouth, MA 01341 (???)

M. Nagy: Okay, Mr. Scappace, your present occupation with Springfield Terminal Railway is?

M. Scappace: I'm a utility person in East Deerfield yard.

M. Nagy: And Mr. Kari?

M. Kari: Engineer, East Deerfield.

M. Nagy: Mr. Scappace, how long have you been employed as a utility man with the Springfield Terminal Railway Company?

M. Scappace: Oh, well, I'm a conductor. I've been there for 33 years.

M. Nagy: 33 years. And Mr. Kari?

M. Kari: I've been here 30 years. An engineer 26 of those.

M. Nagy: 26 as an engineer?

M. Kari: Yes.

M. Nagy: What were your occupations on the date of the alleged charges, Mr. Scappace?

M. Scappace: I was a conductor on WJED.

M. Nagy: And Mr. Kari?

M. Kari: Engineer on WJED.

M. Nagy: Have you ever received a copy of the Springfield Terminal Railway Company safety rulebook that governs their employees, Mr. Scappace?

M. Scappace: Yes I have.

M. Nagy: And Mr. Kari?

M. Kari: Yes I have.

M. Nagy: Are you familiar with the safety rules that Springfield Terminal Railway Company stated in the hearing notice that you have allegedly violated on 7/3/2004, Mr. Scappace?

M. Scappace: They're not the same.

M. Nagy: Excuse me?

M. Scappace: That's the General Code.

M. Nagy: Yuh.

M. Scappace: You cited the general code, not the Springfield Terminal.

M. Nagy: That's right. It's stated on the hearing notice that allegedly violated the General Code, not the safety rulebook, I'm sorry. So are you familiar with the general code rules that were stated here.

M. Scappace: Yes I am.

M. Nagy: For the benefit of the record and those who are present, I'll read the General Code rules into the record.

***6.29.2 Train Inspections by Crew Members***

*When a walking inspection of the train is required, and physical characteristics prevent a complete train inspection, inspect as much of the train as possible. The train may then be complete train inspection, inspect as much of the train as possible. The train may then be moved, but may not exceed 5 mph for the distance necessary to complete the inspection.*

***While their train is moving, crew members must inspect it frequently and look for indications of defects in the train, especially when rounding curves.***

*When inspecting their train, crew members must observe the train closely for any of the following:*

- *Overheated journals*
- *Sticking brakes.*
- *Sliding wheels.*
- *Wheels not properly positioned on the rail.*
- *Dragging equipment*
- *Insecure contents.*
- *Signs of smoke or fire.*
- *Any other dangerous condition .*

*Crew members who discover defects while the train is moving must stop the train promptly and correct any defects, if possible. If the defective car must be set out, they must not attempt to move the car to the setout point unless it is safe to do so.*

*When a car is set out because of an overheated journal, and fire must be completely extinguished and precautions taken to prevent further ignition.*

***6.21 Precautions Against Unusual Conditions***

ST011195

*Protect trains and engines against any known condition that may interfere with their safety.*

***When conditions restrict visibility, regulate speed to ensure that crew members can observe and comply with signal indications.***

*In unusually heavy rain, storm or high water, trains and engines must approach bridges, culverts and other potentially hazardous points prepared to stop. If they cannot proceed safety, they must stop until it is safe to resume movement.*

M. Nagy: Mr. Scappace, Mr. Kari, are you and your representative prepared prepared to proceed with the hearing?

M. Scappace: I am ready, yes.

M. Nagy: Mr. Kari?

M. Kari: I'm ready.

M. Nagy: Mr. Bergeron?

M. Bergeron: Yes, we're ready to proceed.

M. Nagy: Okay. I'll now call upon the charging officer, Mr. Mike Bump, to present the carrier's case against Mr. Scappace and Mr. Kari. Mike?

M. Bump: (??)

M. Nagy: You're gonna have to speak up a little bit, Mike.

M. Bump; (???) these two rules that (????) in violation of from what I can see, there is (???) 6.21 and 6.29.2.

M. Nagy: So you're charging them with 6.29.2.

M. Bump: Right.

M. Nagy: And 6.21.

M. Bump: Right.

M. Nagy: These are the two rules that you're charging?

M. Bump: Right.

M. Nagy: Okay. I'll make sure that should go in as Exhibit C, those rules also. Mike, let's start with what are your qualifications on the Springfield Terminal Railroad?

M. Bump:    I've been here since 1998. Qualified everywhere up on the NECR. Previously worked on the NECR. I know the rules up there very well. Became a road foreman of engines here approximately about, approximately one month ago.

M. Nagy:    And what is your current management position that you hold for the carrier?

M. Bump:    Road foreman of engines.

M. Nagy:    Will you state for the reason, for the hearing would you state the reasoning for initiating this hearing.

M. Bump:    The reason for initiating was these two rules were brought about by the New England Central in regard to rule violations that they felt that they violated.

M. Nagy:    How did you come to these charges then?

M. Bump:    These charges according to the rulebook, general code, New England Central rulebook 6.92 and 6.29 I believe it is.

M. Nagy:    Okay. After your investigation of the charges and interview with the crew, do you believe that the crew violated any of these charges?

M. Bump:    No I don't.

M. Nagy:    Was the engine downloaded, do you know?

M. Bump:    Yes it was. It was done by road foreman Mark Williams.

M. Nagy:    Okay. Was the crew drug and alcohol tested?

M. Bump:    They were when they got back to East Deerfield that day.

M. Nagy:    Do you know the reason for the derailment?

M. Bump:    Yes, I went up there with several people and we looked at it and we reached a conclusion what the reason for the derailment was, which, from what we understand, was tie conditions, elevation on the curve. There was a 25 mile an hour restriction at this point to begin with that had been on there for a month. The geometry car had been over there a month before and reduced it from 40 to 25.

M. Nagy:    Okay, now on the Conn River where the derailment happened, to the best of your knowledge is fog or weather conditions a factor in that area?

M. Bump:    It's a common thing up there. A common thing.

M. Nagy: The fog seems to be there

M. Bump: The fog

M. Nagy: day in and day out?

M. Bump: The fog is one of those things ______ noted for it.

M. Nagy: When you run trains in that area, the NECR controls that section of track?

M. Bump: That is correct

M. Nagy: And to they, they tell you when speeds must be reduced or restricted for weather conditions?

M. Bump: It would be by track _____ , bulletin order, to that effect.

M. Nagy: In the rule 6.29.2, the train inspections by the crew, it states frequently, what would be your opinion be – frequently checking the train?

M Bump: Well frequently would be, that's the thing, how often is frequent. You can check on every curve but you can't sometimes see it every time. I mean, that thing is how often is frequent. I can look back now and things could be fine, and in two seconds after I turn around they can all go the opposite way. What's frequently, you know. You've got a grade crossing coming up, do you look ahead or do you turn around and look back? I look ahead.

M. Nagy: In looking at 6.21 precautions against unusual conditions. Protect trains and engines against any known conditions that interefere with their safety. When conditions restrict visibility, regulate speed to ensure that crew members can observe and comply with signal indications. What does this have to do with what happened on that day of the derailment?

M. Bump: As far as I'm concerned, nothing. I have run trains up there for New England Central and my time that I was there, when I was there, I have been in blizzards, rain, snowstorms, whatever, and I never once remember reducing speed on the train.

M. Nagy: In your opinion, when you're going around curves with crossings in them, how do you observe your train and protect the crossings also?

M. Bump: Well if I was going around a curve with a crossing, I'd be looking straight ahead at that crossing.

M Nagy: Okay. Were there any crossings that you know of in that section of track?

M. Bump:        There's at least two that I know of, with that, one's a farm crossing, one's a public crossing at, or in that general area, uh, then there was one crossing that's just south of the point of the derailment.

M. Nagy:        You stated that Mark Williams downloaded the engine. Do you know if, if there was any, in reference to the speed, were they going the speed

M. Bump:        The speed, the speed, everything was well under the speed limit. In fact they was a couple of miles below as far as the restriction where the derailment happened.

M. Nagy:        You and Mark Williams had this conversation?

M. Bump:        Yup.

M. Nagy:        Did the crew have all their paperwork that you know of?

M. Bump:        Yes they did.

M. Nagy:        Jimmy, do you have any questions?

M. Olson:       Yeah, I have a couple. You were an engineer?

M. Bump:        Yes.

M. Olson:       In your experience, if there's a car on the ground in your train, can you always tell that it's on the ground by looking back?

M. Bump:        No you can't.

M. Olson:       Can you actually see the wheels on a car when you look back?

M. Bump:        No you can't.

M. Olson:       Even though you're on tangent track?

M. Bump:        No you can't, nope.

M. Olson:       I want to refer to rule 6.21, the NECR rule 6.21 which says precautions against unusual conditions. I read that, that that rule pertains to signal indications. Is that correct?

M. Bump:        Unusual conditions, what's an unusual condition? That's what my question is. I mean

M. Olson:       Well, it reads protect trains and engines against any known conditions that may interfere with their safety. When conditions

| | |
|---|---|
| | restrict visibility, regulate speed to ensure the crew members can observe and comply with signal indications. |
| M. Bump: | The signals, to me, would be the only thing that would restrict you. The signals themselves. |
| M. Olson: | Did our crew do anything to violate any signal indications? |
| M. Bump: | No they didn't. Nope. |
| M. Olson: | Does rule 6.21 have anything to do with observing behind you? As you read it? |
| M. Bump: | 6.21. That's the |
| M. Olson: | Show him that. That's the one signal indication. |
| M. Bump: | Signal indication. No, that's got nothing to do with |
| M. Olson: | With observing your train? |
| M. Bump: | with observing your train, no. |
| M. Olson: | Okay. You stated the engine was downloaded. How fast was this train going during the derailment? |
| M. Bump: | At the point of derailment, when the derailment happened, it was 23 miles an hour. In that particular area there's a 25 mile an hour restriction because of the temporary speed restriction. |
| M. Olson: | Did they maintain 23 miles per hour through the derailment? |
| M. Bump: | Yes they did. |
| M. Olson: | For approximately 5 miles? |
| M. Bump: | Well, the 23 miles an hour where the derailment happened. After you clear that point with that temporary speed restriction, there's a track speed of 40 miles an hour. |
| M. Olson: | Did they up their speed to 40? |
| M. Bump: | They got up to 36 because it's up hill and you, no way you're gonna get up to 40. |
| M. Olson: | In your experience as an engineer, with a pair of wheels on the ground or one truck on the ground, is it always possible for an engineer to feel something in his train? |
| M. Bump: | No, he may not feel a thing at all. I've had it happen to me. |

M. Olson: Had Mr. Kari felt something would he have stopped that train?

M. Bump; Yes he would have.

M. Olson: Had Mr. Scappace felt something, would he have mentioned it to Mr. Kari?

M. Bump: Yes he would have.

M. Olson: And now I wanna refer to the drug test. What were the results of the drug tests on these two individuals?

M. Bump: The drug tests, they were drug tested at East Deerfield when they got back to East Deerfield in a cab, I was still at Hartland, Mr. Williams was down here. And as far as I know, everything on the drug tests was fine.

M. Olson: Had they failed the drug test, what would have happened to these individuals?

M. Bump: They would have been pulled out of service and so forth.

M. Olson: I have no further questions at this time.

M. Nagy: Okay. Mr. Bergeron, do you have any questions for Mr. Bump?

M. Bergeron: Yes I do, on the date in question, Mr. Kari and Mr. Scappace were on what assignment?

M. Bump: WJED.

M. Bergeron: And that runs from where?

M. Bump: White River into East Deerfield.

M. Bergeron: And does it run over a portion of track owned by other than the Springfield Terminal Railroad?

M. Bump: Yes it does. New England Central.

M. Bergeron: And what is the point that they, or the mileage that they run, do you know? Or where do they start? They start in White River, is that correct?

M. Bump: White River all the way to East ___________.

M. Bergeron: And is that track all belonged by the

M. Bump: New England Central.

ST011201

M. Bergeron: New England Central Railroad. On the date in question, a car, I believe I've been informed, a pair of wheels or one wheel was on the ground?

M. Bump: Yes.

M. Bergeron: And where did, where did the derailment start?

M. Bump: It started at a 25 mile an hour restriction up at, I think it was what, 10.1, 10.1 something like that, where there was a 25 mile an hour restriction in that curve to begin with, put on there by the New England Central.

M. Bergeron: What is the normal track speed in the area where the car first went off the track?

M. Bump: __normal speed__.

M. Bergeron: And what was the speed restriction, if any, the date in question?

M. Bump: 25 at that point, according to the speed summary they had put on there.

M. Bergeron: And do you know why there was a speed restriction placed on that portion of track?

M. Bump: Yes, the geometry car, from what I was told, had been over that approximately a month before, and it put that restriction on. The geometry test car. And then after going up and looking at the point of derailment where it happened, it was pretty obvious with the track conditions what was wrong.

M. Bergeron: So the reason that the FRA, are they the ones that inspected the track?

M. Bump: They would be prior to the geometry car from the FRA or

M. Bergeron: So the reason that the FRA would place a speed restriction on that portion of track is because of track conditions.

M. Bump: Correct, correct.

M. Bergeron: Did anybody from the Springfield Terminal inspect the derailment site or track conditions on the date of this derailment?

M. Bump: Yes, I went up there, several people went up there. Mr. Dunn, there was about 3 or 4 of us, and we all pretty much came to the same conclusions why that restriction was on there.

M. Bergeron: And what was, what were those conclusions? What was the cause of the derailment?

ST011202

M. Bump: The elevation on the curve and the rail was low joints. Tie conditions. The ties on that side of the rail were __________ drooping. It was pretty obvious as to why that 25 mile an hour restriction was put on.

M. Bergeron: So they had cross lateral deviation in the tracks?

M. Bump: Basically the elevation with the ___ joints and it was just _____.

M. Bergeron: Rocky conditions and so forth?

M. Bump: Correct.

M. Olson: We're gonna have to take a short recess to change the tape.

End of Side A of Tape 1

M. Nagy: Alright, we're back on record at 10:34. Mr. Bergeron, proceed with your questions of Mr. Bump.

M. Bergeron: Yes, Mr. Bump, I'd refer you to General Code rule 6.21 concerning precautions against unusual conditions. You say that you yourself was an engineer on New England Central Railroad?

M. Bump: That's correct, yup.

M. Bergeron: And what is the procedure up there as far as reducing speed for unusual conditions?

M. Bump: I have never had to reduce speed in weather conditions. My power, track _______ or anything. I've been in blizzards and snow storms and there's never been anything issued to us whatsoever. And that was

M. Bergeron: Well referring to rule 6.21 is it your understanding that this rule pertains to signal indication as far as visibility, unusual track conditions whether you have washouts, of anything, you know, potential washouts, it doesn't, does it pertain to, you know, visibility because of darkness or foggy conditions?

M. Bump: As far as I'm concerned, no it doesn't. It doesn't pertain to foggy, if, if I get a foggy condition or it's dark at night and I've got a clear signal and I get a track __warrant???______ I'm going. Nothing, nothing is there to tell me to reduce the speed of my train. If there is a torrential hurricane, I would, you know. Hurricane conditions, common sense. But in fog or snow or, you know, rain, or at night, I have never had to reduce my speed because of that.

M. Bergeron: So it, rule 6.21 basically pertains to visibility for signal indication and not for train speed or handling because of weather conditions?

M. Bump: Right. Basically.

M. Bergeron: I refer you to rule 6.29.2 train inspection by crew members. On the date in question, do you know what the weather conditions were?

M. Bump: When I went out there that morning, I was hitting fog on the way up when I drove out there. Later in the day, after everything happened, it was a sunny day just like today. But when I was going up there, there was patches of fog. When I was driving up there at approximately 7:15 in the morning.

M. Bergeron: Did you, did you interview the train and engine crew?

M. Bump: Yes I did.

| | |
|---|---|
| M. Bergeron: | And what type of information did they give to you as to visibility conditions that day? |
| M. Bump: | They said it had been foggy. When they came on the White River at that point it had been foggy. |
| M. Bergeron: | Did they indicate to you as to the visibility as far as distance that day as to approximately how far they could see? |
| M. Bump: | Approximately, from what Mr. Scappace and Mr. Kari said, it was approximately, the second engine, first head car, that was it. |
| M. Bergeron: | They could see, what, 3 or 4 car lengths, is that correct? |
| M. Bump: | The most, yes. |
| M. Bergeron: | And you being an engineer yourself, what is basically your instinct in operating a train under foggy conditions. Would you, would you look ahead more than you'd look behind you as far as visibility for signals or any obstructions and so forth? |
| M. Bump: | Yes I would. Yes I would. I'd be, in foggy conditions, I'd be looking ahead more. But I would look in back because of the conditions of making sure I see that signal. I'm _________ that I know where it is but I wanna be sure I see it. |
| M. Bergeron: | So I mean if you could only see 3 or 4 car lengths behind you, obviously you could only see 3 or 4 car lengths in front of you |
| M. Bump: | Right. |
| M. Bergeron: | and ah, you would have more of an instinct to |
| M. Bump: | look ahead. |
| M. Bergeron: | Because of the conditions. |
| M. Bump: | Exactly, correct. |
| M. Bergeron: | Does, are you aware of whether or not any restrictions are placed on train or engine crews as to the speed of a train operating at night or as opposed to day? |
| M. Bump: | No, there's no restrictions as far as the train operating at night. |
| M. Bergeron: | So |
| M. Bump: | Track speed, timetable speed and signal conditions, signal indication?? _____. |

ST011205

| | |
|---|---|
| M. Bergeron: | So any track, track speed is, I mean, I'm sorry, train speed is warranted by track conditions and not visibility, is that correct? |
| M. Bump: | Right. In this case they had a track warrant, they had good signal indication, they saw all signals. No problems |
| M. Bergeron: | I have no further questions at this time. |
| M. Nagy: | Okay, Mr. Bump, you stated earlier that when traveling, when on the NECR track where the incident happened, that fog was an ongoing everyday type of situation down there off and on. |
| M. Bump: | It was, yeah, off and on. I mean it could be foggy here but you could walk 10, 20 feet and there's no fog. I mean |
| M. Nagy: | And you stated that the NECR don't, hadn't put in any restrictions that you know of for those conditions in the past. |
| M. Bump: | That, I have never had any restrictions put on me at all. |
| M. Nagy: | Since |
| M. Bump: | When I worked |
| M. Nagy: | Since the incident, have, are they, by yourself or any other crews reported that they have put any speed restrictions on it |
| M. Bump: | Not to my knowledge. |
| M. Nagy: | on foggy days since the incident? |
| M. Bump: | Not to my knowledge, no. |
| M. Nagy: | Okay. I have no other questions. Do you have any other questions? |
| M. Olson: | I have no further questions. But would Mr. Scappace and Mr. Kari have a chance to ask questions of Mr. Bump? |
| M. Nagy: | Sure. Mr. Scappace, do you have any questions for Mr. Bump? |
| M. Scappace: | No I do not. |
| M. Nagy: | Mr. Kari? |
| M. Kari: | No I don't. |
| M. Nagy: | Okay at this time we'll take a little recess to get the NECR in here. |

(Tape off/on)

# EXHIBIT A
# Part 2

Okay, we're back on the record. The time now is 10:43. We've asked Mr. Charles Hunter from the NECR to join us as a witness. We'll start questioning Mr. Hunter. For the record, Mr. Hunter, can you state for the record your management position and your title please.

M. Hunter: I'm the Assistant General Manager for Rail America, New England Central and Connecticut Southern Railroads.

M. Nagy: And how long have you been at that position?

M. Hunter: Since January 1st this year.

M. Nagy: Okay. And what is your presence today for the carrier as a carrier's witness involved in this incident? Would you state for the record your reason for being here.

M. Hunter: To represent the New England Central Railroad as far as the general code of operating rules.

M. Nagy: Are you familiar with the charges brought upon by the conductor and engineer?

M. Hunter: Yes I did read the hearing notice.

M. Nagy: And are you aware that these charges are, alleged charges, happened on your railroad?

M. Hunter: Yes sir.

M. Nagy: When trains are operating on your railroad, and they have speed restrictions or unusual conditions such as fog, how do you report these to the crews on the trains out there?

M. Hunter: How do we report these

M. Nagy: On the NECR, report speed reductions or special notices to the crews for unusual conditions under 6.29.2 or 6.21, if you were gonna get this out under the general rules of safety there?

M. Hunter: Okay. We do not report those situations to the crews directly, as far as weather conditions, unless there is, I guess you would say, a weather alert. We do have a computerized weather system. If there is a specific weather alert, they will call them on the radio and notify them of that situation.

M. Nagy: Under normal circumstances, how is it, how is it done? Is that done verbally on the radio?

M. Hunter: Yes, it would be over the radio.

M. Nagy:     Speed restrictions would be done over the radio under normal circumstances?

M. Hunter:     Speed, a speed restriction for, are you talking about weather, David?

M. Nagy:     Well, we're talking about just how, how you'd get speed restrictions or any unusual circumstances regarding the speed or train handling on your property

M. Hunter:     Okay, it would be through the daily operating bulletin or an individual speed restriction.

M. Nagy:     Okay, so under 6, the general rule 6.29.2 and 6.21 that these two men are being charged with, that, both these rules would have been done how, in a bulletin or

M. Hunter:     These rules mainly apply to the crews in the field as instructions to those crews that if they encounter these situations themselves this is how to deal with those situations in the field.

M. Nagy:     Okay. And on behalf of the NECR, are you allegedly saying that they violated these two rules on your property?

M. Hunter:     Yes, it is possible.

√ M. Nagy:     Okay. It states in here under 6.29.2 that when walking inspection of the train is required and physical characteristics preventing a complete train inspection, inspect as much of the train as possible. The train may then be completely inspected as much of the train as possible. The train may be moved or may not exceed 5 miles per hour for the distance necessary to complete the inspection. And further down it states while there is, while the train is moving crew members must inspect it frequently and look for indications of defects in their train, especially when rounding curves. Frequently, the word frequently, what would you describe the word frequently means as far as checking their trains.

M. Hunter:     When they have an opportunity as far as going around a curve, they should be looking back on their train to observe these indications.

M. Nagy:     So when they go around curves they inspect their trains?

M. Hunter:     Correct.

M. Nagy:     If there's crossings in the curves, how would you, how would you inspect the train and proceed over crossings also?

M. Hunter:    You would take care of the crossing first because that would be a priority and then take a look after you are, had taken care of your duties with the crossing.

M. Nagy:    Okay. In the section of track that, that we're talking about and the NECR, are their crossings and curves in that section of track?

M. Hunter:    There are curves. I'm not sure if there are crossings located in those curves.

M. Nagy:    It talks about weather conditions. That day, the day of the incident, do you know what the weather conditions were?

M. Hunter:    According to our dispatch office, the weather report indicated that it was clear.

M. Nagy:    It was clear. So no restrictions were given out at that time, and there were no unusual conditions going on?

M. Hunter:    None known, no restrictions given out accordingly, correct.

M. Nagy:    Are you aware that the crew reported that it was, there was some patchy fog on that day in that area?

M. Hunter:    No, I was not aware of that.

M. Nagy:    Okay. Is fog a problem on the Conn River on your, on your property?

M. Hunter:    It does occur.

M. Nagy:    It does occur. No set time or any reasons first thing in the morning or late in the afternoon, it just goes and comes off and on?

M. Hunter:    I don't have firsthand knowledge of that. I'm not sure.

M. Nagy:    Has that section of track, the NECR, where the incident happened, has it been tested at all lately by a test car or FRA or yourself?

M. Hunter:    It was tested this year, I don't know what the date was.

M. Nagy:    Were there any speed changes because of the test?

M. Hunter:    In that section of track where they did derail there was a 25 mile and hour restriction in place, it's my understanding. Where they initially derailed.

M. Nagy:    When a crew's on tangent track and they're taking the train down the track, how often do you feel they should observe their train?

M. Hunter: On tangent track, there's no specific time period according to the rules.

M. Nagy: Okay. If a car were to derail, a set of trucks??? derail, would you be able to notice that?

M. Hunter: It would depend on how close it is and your weather conditions.

M. Nagy: This happened at 6:40 in the morning. You stated you're not sure of the weather condition at the time, or was clear at that time.

M. Hunter: According to the dispatch office it was clear, but I was not there that day.

M. Nagy: Were you there to investigate the incident when it happened?

M. Hunter: No sir.

M. Nagy: No? Who was there for the NECR?

M. Hunter: I believe it was Charles Moore, Regional Vice President and Michael Lawyer, Roadmaster.

M. Nagy: Michael Lawyer?

M. Hunter: Yes.

M. Nagy: And are they present today?

M. Hunter: No sir.

M. Nagy: No? Did they give you a report or anything to fill out?

M. Hunter: Yes, I have a report, Initial Rail Equipment Accident/Incident Report.that Mr. Moore did fill out.

M. Nagy: Okay, this is the incident report that Mr. Moore filled out

M. Hunter: Correct

M . Nagy: on that date?

M. Hunter: Yes.

M. Nagy: And we'll show this as Exhibit D. And it appears to be an Initial Rail Equipment Accident/Incident Report. The date of the incident was July 3, 2004. The time of the incident was 6:40 AM. The name of the Railroad was New England Central Railroad, Inc. The name of the other railroad was Springfield Terminal. Railroad responsibility for track maintenance was the New England Central

Railroad. Incident number was, it looks like, IO 04-300. And it shows with an 'x' mark that it was light out at the time. The type of the incident, a derailment. It was a derailment. Copy to environmental claims, no. It was faxed I guess to Attention; Bill Hoffman. Environmental control administration 800-432-2481. The weather conditions, it says clear. 70 degrees. The division was Roxbury subdivision. Nearest city was Hartland. FRA track class is number 3. Milepost of the incident was 10.18. The state was Vermont. Specific site was between Milepost 10.18 and MP 5.58. Doesn't indicate a speed, it just says they were pulling. The track type was Main track. Operating method was ABS and TWC. The train number was WJED. Total locomotives in the train were two. The locomotives were not derailed. Total cars in the consist was 14 loads and 5 empties. Total cars derailed was 7. Number of hazmat cars damaged or derailed was zero. The number of hazmat cars released, releasing product was zero. Employees involved were P. Kari, Engineer and J. Scappace, Conductor. On duty time was 0500. The railroad experience for Mr. Kari was 30+ and Mr. Scappace was 30+. Reasonable cause test, it says yes for Mr. Scappace and yes for Mr. Kari. Under the narrative: Springfield Terminal (Guilford) train WJED operating southbound on NECR main track with 2 engines, 14 loads and 5 empties on the main track manned by ST employees, derailed trailing truck of the 6th car (CNIS 413224) from head end at MP 10.18. ST crew drug car approximately 5 miles (traversing an open deck bridge and 3 road crossings) before the derailed truck struck the frog located at the north switch of the Hartland siding (MP 5.58) resulting in this car turning on its side and derailing the subsequent 6 cars. All expenses resulting from this derailment will be the responsibility of Springfield Terminal (Guilford) per ICC Finance Docket 31250. Clearing of the derailment and rerailing of equipment was done by ST. Track work is being performed by the NECR and outside contractor which will be billed to the ST along with all other associated expenses. Number 27, Primary cause is under investigation. And it says here damage estimate, no damage cost estimate, no medical damage estimate at all. Is the incident FRA reportable? Yes. Name of the Railroad official was Charles Moore. 802-527-3401. And it's signed and dated on 7/8/04.

?M. Bergeron? Can we have a short recess so we can have a copy of that please?

M. Nagy: Sure we'll take a short recess to make copies of that.

Back on record at 10:59, copy of the incident report was given to Mr. Bergeron. Do you have any questions for him, Mr. Olson?

M. Olson: Just a couple. Mr. Hunter, you say you've been with the NECR since January.

M. Hunter: Correct.

M. Olson: Can you tell me what your past railroad experience is?

M. Hunter: I've been in the business for about 23 years. Prior to this job I was general manager for the St. Lawrence & Atlantic Railroad out of Auburn, ME. Held various positions over the years, trainmaster, train dispatcher, agent, clerk, conductor.

✓ M. Olson: I'm gonna refer to Exhibit C which has two rules cited on it. The rule I'm interested in is 6.21 precautions against unusual conditions. I'll read it to you

*Protect trains and engines against any known condition that may interfere with their safety.*

***When conditions restrict visibility, regulate speed to ensure that crew members can observe and comply with signal indications.***

*In unusually heavy rain, storm or high water, trains and engines must approach bridges, culverts and other potentially hazardous points prepared to stop. If they cannot proceed safety, they must stop until it is safe to resume movement.*

After looking at that, Mr. Hunter, does that rule, 6.21 pertain to signal indications?

M. Hunter: The second paragraph pertains to signal indications. The first line, *Protect trains and engines against any known condition that may interfere with their safety* does not just specifically deal with signals.

M. Olson: I'd like you to look at my Exhibit C, Mr. Hunter. The second paragraph is highlighted and this exhibit was sent to us from, I believe, the NECR, this Exhibit C. Why is that highlighted, that section **when conditions restrict visibility**?

M. Hunter: I don't know.

M. Olson: You will also note that in 6.29.2 the second paragraph is highlighted on that. Would that be an indication that that is what your railroad believes the violations were?

M. Hunter: Not to my knowledge.

M. Olson: Okay. In your experience is it possible for a car to go on the ground and not be noticed or observed to be on the ground for some time? Is that a possibility?

M. Hunter: It is possible.

M. Olson: In this case, they're citing 5 mile, approximately 5 miles on the ground. Had this car drifted far from the rail prior to going 5 miles, would, would it not have stopped the train at that point? I guess what I'm getting at is indications being the way they are, these

ST011212

wheels were close to the rail for that 5 miles. Is that a correct statement?

M. Hunter: That I don't know.

M. Olson; Did you actually see the derailment site?

M. Hunter: No sir I did not.

M. Olson: Okay. In your estimation does rule 6.21 have anything to do with observing behind you? Observing your train behind you.

M. Hunter: Yeah, the first sentence, *Protect trains and engines against any known condition that may interfere with their safety*, to comply with that, if there's something going on behind you with your train you would have to be observing that.

M. Olson: I have no further questions.

M. Nagy: Mr. Bergeron, do you have any questions?

M. Bergeron: Yes I do. Mr. Hunter, you say you've been in rail service for approximately how many years?

M. Hunter: 24.

M. Bergeron: And would that be as an engineer conductor or

M. Hunter: Never worked as an engineer. I did start out as a conductor originally.

M. Bergeron: Alright so you have worked in train service then.

M. Hunter: Correct.

M. Bergeron: The, on the date in question, train WJED that operates over your property, is that correct?

M. Hunter: Yes.

M. Bergeron: And they're governed by your rules, is that correct?

M. Hunter: Yes sir.

M. Bergeron: Are you familiar with the territory?

M. Hunter: I have ridden over it.

M. Bergeron: And the, the overall terrain from, say, White River to the derailment site, is this, does this track follow the river south?

M. Hunter:         Yes.

M. Bergeron:       Basically?

M. Hunter:         Yes.

M. Bergeron:       You stated that, or you read it into the hearing record under Exhibit D, a report filled out by your railroad which stated the conditions on the date in question.  Where was this information transmitted from?

M. Hunter:         From the train dispatcher's office in St. Albans.

M. Bergeron:       And approximately how many miles is that from the derailment site?

M. Hunter:         I would guess probably close to a hundred.

M. Bergeron:       A hundred miles?

M. Hunter:         Yes.

M. Bergeron:       And would the weather conditions be the same in St. Albans as they were at the derailment site?

M. Hunter:         No they were going off their weather service that they have that covers the entire railroad.

M. Bergeron:       So it'd be the entire system then.

M. Hunter:         Yes.

M. Bergeron:       How big of a system is that?

M. Hunter:         Well the weather service covers the New England Central, Connecticut Southern, all the railroads they dispatch out of St. Albans all over the U.S.

M. Bergeron:       So in the report filled out under Exhibit D, it said that the weather conditions at that time and date were clear.  Would that be

M. Hunter:         That is specific

M. Bergeron:       the entire system?

M. Hunter:         No sir that would be specific to this area in question.

M. Olson:          We're gonna have to take a short recess to change the tape.

End of Side B of Tape 1

M. Nagy: Okay we're back on record at 11:07. Mr. Bergeron was questioning Mr. Hunter. Would you continue please.

M. Bergeron: Yes, Mr. Hunter, did you investigate the particular site in question where this train went on the ground?

M. Hunter: No sir.

M. Nagy: But you did have people from your railroad that did?

M. Hunter: Yes we did.

M. Bergeron: What was the speed restrictions in that area if any?

M. Hunter: It's my understanding it was a 25 mile an hour speed restriction where the train initially derailed.

M. Bergeron: What was the normal speed in that territory?

M Hunter: 40.

M. Bergeron: 40. And what was the reason for a speed restriction being placed in that territory?

M. Hunter: I don't know.

M. Bergeron: Would it normally be because of track conditions?

M. Hunter: Yes, it would be track conditions, but I don't know the specific track condition.

M. Bergeron: But there was a restriction placed in that area.

M. Hunter: Yes, correct.

M. Bergeron: Are speeds of trains on your railroad governed by track conditions or, or what does, let me rephrase myself here. What does determine the speed of a train on your railroad?

M. Hunter: You have your specific speed restrictions which are given out by the train dispatcher, and then the rules that are in question today cover conditions, unusual conditions that the crew can encounter that they are required to regulate their speed.

M. Bergeron: So the speed of a train on your railroad is, normal speed would be the speed that is in your

M. Hunter: Timetable.

M. Bergeron: timetable.

M. Hunter: Yes.

M. Bergeron: And then any restrictions would be placed on, what do you have, train orders? What do you, bulletin orders?

M. Hunter: We have bulletin, daily operating bulletin and

M. Bergeron: Of any speed restrictions.

M. Hunter: Correct.

M. Bergeron: Okay. They would normally be because of track conditions or any other conditions?

M. Hunter: Yes.

M. Bergeron: Do you have trains other than Springfield Terminal operate over your train lines?

M. Hunter: Yes we have, also have Amtrak as well as our own trains.

M. Bergeron: And Amtrak they are, what, a scheduled train?

M. Hunter: Yes.

M. Bergeron: Are you familiar with Rule 6.21 of your general code?

M. Hunter: Yes.

M. Bergeron: And what restrictions are placed on crews concerning weather conditions?

M. Hunter: You mean by the train dispatcher?

M. Bergeron: No, by rule.

M. Hunter: By rule?

M. Bergeron: It

M. Hunter: Okay, if conditions restrict visibility, they're to regulate their speed to ensure that they can observe and comply with signal conditions to protect their train against any known condition that may interfere with their safety. Basically they have to regulate the speed that they feel is safe to properly comply with the rules in the field.

M. Bergeron: Does trains, are they required to go at a slower speed at night because of visibility?

M. Hunter: No sir.

M. Bergeron:    Are they required to run at a less speed in foggy conditions?

M. Hunter:      If the conditions restrict their visibility, according to the rule, yes.

M. Bergeron:    You, you said that Amtrak runs over your territory and that's a scheduled train, is that correct?

M. Hunter:      Yes.

M. Bergeron:    Do they still run at the same schedule at night?

M. Hunter:      Yes they do.

M. Bergeron:    Do they still run at the same schedule if the visibility is less during the day because of fog?

M. Hunter:      Those crews have to comply with the same rules as your trains and our trains. Everybody complies with the same rules.

M. Bergeron:    If a train was operating at normal speed, or if it was operating at a restricted speed, or less than normal, would that change the visibility as to how far back you could see in your train?

M. Hunter:      How far back you could see? I would say no.

M. Bergeron:    So any restrictions that were placed on a crew for reducing visibility would be basically the rule, is for to see signals ahead, or obstructions ahead. Is that correct?

M. Hunter:      Conditions ahead.

M. Bergeron:    I have no further questions at this time but reserve the right to ask additional questions in the future if I need to.

M. Nagy:        Alright. Mr. Hunter, you replaced Mr. Moore for this hearing.

M. Hunter:      Mr. Mount.

M. Nagy:        Mr. Mount, I'm sorry. I'm sorry about that, Mr. Mount for the hearing. Do you feel that because you weren't at the scene when the incident happened that he has informed you and educated you on what happened that day and what he feels happened that day?

M. Hunter:      Yes.

M. Nagy:        Do you take exception to the way the ST crew members handled their train on that day?

M. Hunter:      We feel that if the conditions were foggy that under those conditions if that was the situation they would have regulated their

speed to a slower speed. If it was in fact foggy, we feel that they should have been watching behind them to look to see if the train was on the ground throughout the curve in the railroad territory. So yes.

M. Nagy: Now you stated that you have run over that part of the, section of the track.

M. Hunter: Yes.

M. Nagy: Are you considered qualified on that section of the track?

M. Hunter: No sir.

M. Nagy: No. I have no further questions.

M. Olson: I have no questions.

M. Nagy: Mr. Bergeron do you have any other questions?

M. Bergeron: Not at this time.

M. Nagy: Okay. Mr. Scappace do you have any questions for Mr. Hunter?

M. Scappace: No I do not.

M. Nagy: And you Mr. Kari?

M. Kari: No I do not.

M. Nagy: Okay, we'll take a break here and __dismiss the witness????__.

*Tape off/on*

Okay we're back on record at 11:17. The carrier's witness has left and we'll continue with our investigation with Mr. Scappace and Mr. Kari. Mr. Scappace, are you aware of the alleged charges against you and the rules that they say you violated?

M. Scappace: I'm aware of them, yes.

M. Nagy: You stated your qualifications, but on WJED, the train that was involved in this incident and traveled on the NECR track, how long have you been traveling on that track for as long as you've been employed with us at ST?

M. Scappace: Oh, 19 years.

M. Nagy: On the date in question did you have all your paperwork, timetable and NECR paperwork to travel on that track?

M. Scappace:      Yes I did.

M. Nagy:          As far as observing your train, how often do you feel you should observe your train, in your opinion?

M. Scappace:      Whenever you go around a curve.  Whenever you can.  Whenever possible.

M. Nagy:          Again, in that rule 6.29.2 it says in the highlighted area, while their train is moving crew members must inspect it frequently and look for indications of defects in the train, especially when rounding curves.  Frequently.  What would be your explanation for frequently.

M. Scappace:      Whenever possible.  Whenever you're able to.

M. Nagy:          On the day of the incident, you had two units pulling your train.  Which way were they facing that day?  Do you remember?

M. Scappace:      One was south and one was north.

M. Nagy:          Alright.  When going around curves, been able to look back and observe your train if there are crossings, what do you feel should be done if there are crossings in the curve?

M. Scappace:      I pay attention to the crossings.

M. Nagy:          And the morning of the incident, there was fog in that area of the track?

M. Scappace:      Yes there was.

M. Nagy:          Was it patchy fog or was it a consistent fog?

M. Scappace:      Patchy ground fog.

M. Nagy:          Patchy ground fog?  Were you able to see all your signals okay?

M. Scappace:      Yes.

M. Nagy:          Were you told by bulletin or by the dispatcher as you traveled on the NECR track that, to reduce your speed for any reasons?

M. Scappace:      No we were not.  Except by the bulletin orders that exist, the slow downs that come out daily.

M. Nagy:          At the time of the incident, what was the visibility like?

M. Scappace:      It was patchy fog.  The sun was coming up and was gonna burn it off eventually.  It was just patchy ground fog by fields and the river right there.

M. Nagy: Do you remember the last time you looked back prior to the incident?

M. Scappace: It was at North Hartland. There's a reverse curve on my side. And I didn't notice anything back there. There was some fog there but nothing that would cause my attention to be drawn to it, no.

M. Nagy: Have the NECR in the past 19 years that you've been working on their track, is it normal to hear from the dispatcher or the bulletin to reduce speed for foggy conditions?

M. Scappace: Never.

M. Nagy: You've never been told that. When you, how were you told of the incident that happened? How did you find out? When did you finally observe the problem?

M. Scappace: Well, at Hartland the train gave a pull and the train went into emergency. I turned around and took a look. I could see some cars all over the place to my east side.

M. Nagy: And that was, at that, at that moment there was also ground fog?

M. Scappace: Patchy fog. Very mild.

M. Nagy: Was the sun coming up behind you or was it coming towards you?

M. Scappace: From the east.

M. Nagy: From the east.

M. Scappace: So it'd be to the left.

M. Nagy: To the left of you. Jimmy, do you have some questions?

M. Olson: Just a couple. In your past experience as a conductor, have you ever had a car go on the ground in your train?

M. Scappace: Yes.

M. Olson: Have you observed it on the ground?

M. Scappace: Yes I have.

M. Olson: And what, what type of indications do you get that it's on the ground?

M. Scappace: Sparks, dust. You can see it moving erratically.

| | |
|---|---|
| M. Olson: | In this particular incident, while you were observing your train, did you notice any of that? |
| M. Scappace: | Nothing. |
| M. Olson: | Nothing. Did you feel anything unusual? |
| M. Scappace: | While dragging it? No. |
| M. Olson: | When it tipped over? |
| M. Scappace: | When it finally, when it finally ________ yes. |
| M. Olson: | That's the first indication you got that you were on the ground. |
| M. Scappace: | Yes. |
| M. Olson: | Had you noticed anything like that, what would you normally do ____???. |
| M. Scappace: | ____?___. |
| M. Olson: | You would have stopped your train? |
| M. Scappace: | Stopped the train. |
| M. Olson: | I have no further questions. |
| M. Nagy: | Mr. Bergeron? |
| M. Bergeron: | Yes, Mr. Scappace, you've been employed as a conductor for approximately 30+ years? |
| M. Scappace: | Yes. |
| M. Bergeron: | And at the date in question you were the conductor on WJED? |
| M. Scappace: | Yes I was. |
| M. Bergeron: | And you operate from White River to East Deerfield? |
| M. Scappace: | Yes I do. |
| M. Bergeron: | And you operate over a portion of track owned by the New England Central Railroad, is that correct? |
| M. Scappace: | Yes I do. |
| M. Bergeron: | On the date in question, you filled out an accident report concerning the derailment of train WJED, is that correct? |

M. Scappace:     Yes I did.

M. Bergeron:     Is this the accident report that you filled out?

M. Scappace:     It's one like it. I don't know what happened to the original I wrote. It was lost. It was originally made out on the 3rd of July.

M. Bergeron:     At this time we'd like to present a copy of the accident report, incident report filled out by Mr. Scappace and have that part of the hearing.

M. Nagy:     Okay. This will be Exhibit E and this is the incident report from Springfield Terminal Railroad, Railway on behalf of Mr. Scappace. The date was July 3rd. 0640 in the AM. The weather was foggy and the temperature was 58 degrees. Approximate milepost was 5.7. The place was Hartland, VT. And it was on the main line. Nearest station was Hartland. The train was WJED, number 3. The engine numbers were 372 and 370. Number of cars on the train, there were 14 loads and 5 empties. Total tonnage is 1970. A thousand nine hundred and seventy. Type of track was the main line during the day. The speed at the time of the incident was 23 miles per hour. That was recorded. The timetable direction was south. The kind of train was a freight train. And method of railroad operation was a radio. Was equipment unattended? No. Number of cars carrying hazardous material, it says two. No hazardous material cars damaged in the derailment. The engineer was Mr. Pete Kari. The conductor was Joe Scappace, Jr. Hours, minutes on duty. Engineer was on duty for one hour and forty minutes. The conductor was one hour and forty minutes. No personal injuries. Circumstances: Car derailed near mileage 10. Car rode inside gauge. Not noticeable due to foggy conditions. Derailed completely at Hartland. _____ mileage 5.7. And it was signed by Joe Scappace, Jr. the conductor. The place was East Deerfield on July 4, er, July 25th. The initial report was done on July 4, it says initially made out on July 3, but it was done on July 4th. The cars derailed are listed on the back of the incident report. There are seven of them. And we'll put this in as evidence. Okay, Mr. Bergeron.

M. Bergeron:     Can I get a copy of that back because that's my original?

M. Nagy:     Okay, we'll make copies of that. We'll go off record to make copies.

*Tape off/on*

Okay we're back on record at 11:31. And Mr. Bergeron was, continue with his questions.

M. Bergeron:     Mr. Scappace, you stated that you've been operating between
                 White River Junction and East Deerfield approximately 20 years,
                 is that correct?

M. Scappace:     19, 20 years, yes.

M. Bergeron:     And, so you're very, very familiar with the territory, is that correct?

M. Scappace:     Yes I am.

M. Bergeron:     And, basically, do the tracks run from White River to East
                 Deerfield, follow the Connecticut River, is that why they call it the
                 Conn River?

M. Scappace:     Yes it is.

M. Bergeron:     And foggy conditions are pretty much a common site?

M. Scappace:     Yes they are.

M. Bergeron:     And on the date in question, you indicated in the incident report
                 that you filled out that you had foggy conditions that day?

M. Scappace:     Yes we did.

M. Bergeron:     Approximately how many, or what was the visibility, let's say in car
                 lengths?

M. Scappace:     4, 5 at the most.

M. Bergeron:     4 or 5 car lengths?

M. Scappace:     you could see clearly, yes.  Somewhat clear.  Like I said, it was
                 patchy fog off and on.

M. Bergeron:     And you had two units on train WJED is that correct?

M. Scappace:     Yes we did.

M. Bergeron:     And the car in question, the initial car that was derailed,
                 approximately how far back was that from the lead unit?

M. Scappace:     Well counting everything, there was, be, what number 9.
                 Counting the two engines, it was __ 7. I never, it was number 7
                 as far as cars go, so that would make it number 9 from the head
                 end where I was.

M. Bergeron:     So it was approximately 9 car lengths back and the visibility didn't
                 allow you to see 9 cars.

M. Scappace:     Right.

# EXHIBIT A
# Part 3

M. Bergeron:      Is that correct?

M. Scappace:      Clearly.

M. Bergeron:      In Exhibit D that has been introduced into the hearing record, it was read, it states in there that there was a, a set of trucks that were derailed on a car. On the date in question, did you have the opportunity to find out at a later time as to what actually was on the ground?

M. Scappace:      Well right after the derailment occurred we went back to inspect damage. And we walked about a half a mile and all we could find on the, as far as track damage goes, we found one, one set of marks that were very close to the inside of the rail and the outside that were riding, so that led us to believe it was just one half a truck, one set of wheels, one axle. The other half was still on the rail.

M. Bergeron:      And the marks were close to both rails, is that correct?

M. Scappace:      Yes they were.

M. Bergeron:      In your experience as a conductor, is it pretty much instinct as far as checking behind you as well as ahead when you're traveling on the train?

M. Scappace:      Yes it is.

M. Bergeron:      And under foggy conditions, is it fair to say that instinct would cause you to look ahead more than behind because of foggy conditions?

M. Scappace:      Yes it would be.

M. Bergeron:      I'd like to refer you to rule 6.21 of the general code for the New England Central Railroad. Are you familiar with this rule?

M. Scappace:      Yes I am.

M. Bergeron:      And what is your interpretation or understanding of the rule concerning unusual conditions? Let me broaden that question in that when you have known conditions concerning weather, whether it might be heavy rains or snows or high winds, how would you operate the train? Or would you operate the train any different as a conductor?

M. Scappace:      Depending on the situation. They have come out with weather alerts in the past. Whether it be via radio or by a bulletin order. They have come out with them on Form A's and additions to their track warrants, them being the dispatchers, NECR. But seeing,

when you're in the field and you can see heavy winds, the trees are starting to sway, a big storm coming, you're gonna be on the alert for what's going on in front of you more than anything else to make sure you're not gonna

M. Bergeron:    So you're understanding that this rule here, 6.21, pertains to any unknown conditions because of the change of weather that might affect the operation of your train

M. Scappace:    Right, I would say extreme conditions when they exist.

M. Bergeron:    Washouts, trees down and things of that nature?

M. Scappace:    Yes. And in heavy conditions, yes.

M. Bergeron:    Alright, so as far as visibility goes with fog, has the NECR ever issued instructions to reduce your speed because of visibility because of fog or

M. Scappace:    Never.

M. Bergeron:    Snow conditions?

M. Scappace:    Never.

M. Bergeron:    How about at night, are you required to run at a less speed because of visibility at night?

M. Scappace:    No change, no.

M. Bergeron:    If you, if you did operate on the day in question at less speed than what your train was operating, would that have changed your visibility as far as being able to see farther back in your train?

M. Scappace:    No it would not.

M. Bergeron:    I have no further questions at this time.

M. Nagy:    Okay. Do you have any questions Mr. Olson?

M . Olson:    No I don't.

M. Nagy:    Mr. Kari, you've stated for the record your qualifications. How many years have you run on the NECR territory?

M. Kari:    Off and on, 30.

M. Nagy:    Off and on 30. That day that the incident happened, at the time of the incident did you have all your paperwork from the NECR that you needed?

M. Kari: Yes _?

M. Nagy: As far as the incident, when did you first notice the incident, or feel something going on with the train?

M. Kari: When I made my second application to slow down to the 25 mile and hour speed restriction, I put the second application on and emergency _____ double jerks????? .

M. Nagy: Mr. Scappace stated it was foggy that day, patchy foggy. Do you agree with him that it was patchy foggy that day also?

M. Kari: Yes it was.

M. Nagy: And were you able to see the signals okay that day?

M. Kari: Yes I could.

M. Nagy: The dispatcher didn't tell you either on the radio of any problems of fog, any weather conditions to reduce your train?

M. Kari: No he did not.

M. Nagy: Rule 6.21 precautions against unusual conditions, protect trains and engines against any known conditions that may interfere with your safety, do you feel you violated that at all?

M. Kari: No I don't.

M. Nagy: Have you read the complete rule?

M. Kari: Yes I have.

M. Nagy: Do you feel you did anything wrong with that rule?

M. Kari: No sir.

M. Nagy: And 6.29.2 train instructions by the crew members. Everything done according to that rule on the day that you took the train out? That you're aware of?

M. Kari: Yes.

M. Nagy: I have no questions. Mr. Olson, do you have any questions?

M. Olson: None, but we'll have to take a short recess to change this tape.

M. Nagy: Okay.

End of Side A of Tape 1

M. Nagy: We're back on record after changing the tape at 11:41. Mr. Olson, do you have any questions for Mr. Kari?

M. Olson: Maybe just a couple. Mr. Kari, did you observe your train whenever possible on this particular date?

M. Kari: Yes I did.

M. Olson: Have you had in the past, in your years of experience, had cars been derailed in your train that you have noticed?

M. Kari: Yes.

M. Olson: So you know what you're looking for when something is on the ground?

M. Kari: ______?__, yes.

M. Olson: Did you notice anything at all unusual in this train?

M. Kari: No I did not.

M. Olson: Did you feel anything unusual?

M. Kari: Nope.

M. Olson: Had you felt anything, what would you have done?

M. Kari: I would have stopped the train.

M. Olson: I have no further questions.

M. Nagy: Okay, Mr. Bergeron, do you have any questions for Mr. Kari?

M. Bergeron: Yes I do. Mr. Kari, you've been an engineer on the railroad for 30+ years, is that correct?

M. Kari: Ah, 26.

M. Bergeron: 26 years.

M. Kari: __?

M. Bergeron: Is it pretty much instinct as far as observing your train as well as looking ahead?

M. Kari: Yes it is.

M. Bergeron: I refer you to rule 6.21 of the general code of the New England Central Railroad. You're familiar with that rule?

M. Kari:         Yes I am.

M. Bergeron:     Do you feel that you complied with Rule 6.21 on the date that your train was derailed, train WJED?

M. Kari:         Yes I did.

M. Bergeron:     Have you ever been issued any instructions as to reducing your speed or changing your speed because of foggy conditions?

M. Kari:         No I haven't.

M. Bergeron:     On the date in question you were, could you tell us approximately how many car lengths you could see visibility-wise?

M. Kari:         4 or 5.

M. Bergeron:     I also refer you to general code number 6.29.2.  Are you familiar with this rule?

M. Kari:         Yes I am.

M. Bergeron:     Do you feel that you complied with the requirements of this rule during the operations of your train on the date in question?

M. Kari:         Yes I did.

M. Bergeron:     I have no further questions at this time.

M. Nagy:         Okay, Mr. Olson, do you have any questions?

M. Olson:        I have no further questions.

M. Nagy:         Okay, do you have any further questions for the carrier's witness, Mr. Bergeron, at this time?

M. Bergeron:     Yes I do.  I have questions for Mr. Bump.

M. Nagy:         Okay, you can start questioning Mr. Bump whenever you're ready.

M. Bergeron:     Mr. Bump, did you have, you stated that you did inspect the derailment on the date in question.

M. Bump:         That is correct, yes.

M. Bergeron:     And the New England Central Railroad has, or we have in the hearing Exhibit D, a report filled out by the New England Central Railroad, in particular that portion of the report that states that there was trailing trucks derailed.  Do you know whether or not there was a full set of trucks or just two wheels were derailed?

M. Bump: I believe it was a full set of trucks, but it was on the inside.

M. Bergeron: Did somebody inspect the track conditions? Did it indicate that there was a

M. Bump: It indicated, it indicated that there was at least, I thought there was one axle on the ground.

M. Bergeron: One axle on the ground?

M. Bump: One axle. That was my understanding. ________ say that it's a whole set of trucks. All I can say it was like one axle from what I could see.

M. Bergeron: You've listened to the testimony of Mr. Scappace. You've listened to the testimony of Mr. Kari. And you've also listened to the testimony of Mr. Hunter. Do you feel that Mr. Scappace and Mr. Kari operated train WJED on the date in question in keeping with the requirements of rule 6.21 and rule 6.29.2 of the general code of the New England Central Railroad?

M. Bump: I believe fully that they were keeping within the rules, yes.

M. Bergeron: I have no further questions.

M. Nagy: Okay. Do you have any questions for the carrier's witness, Mr. Bergeron, any further questions?

M. Bergeron: No I don't.

M. Nagy: Okay. Mr. Bergeron, are you agreeable to waive the lengthy reading of the discipline rule with the understanding that the rule will be included with the transcript as an exhibit?

M. Bergeron: Yes.

M. Nagy: Mr. Scappace and Mr. Kari, in the event that you are found responsible for the charges leveled against you and for the purpose of assisting management in the assessment of discipline, a record of any relevant discipline from your service folder will be appended to the transcript. Mr. Scappace and Mr. Kari, do you feel that this investigation hearing was conducted in a fair and impartial manner? Mr. Scappace?

M. Scappace: Yes I do.

M. Nagy: And Mr. Kari?

M. Kari: Yes I do.

M. Nagy: Mr. Scappace and Mr. Kari, according to the agreement, only yourselves and your general chairman are entitled to a copy of the transcript for this investigation hearing. Is that your understanding also, Mr. Scappace?

M. Scappace: Yes it is.

M. Nagy: Mr. Kari?

M. Kari: Yes.

M. Nagy: If there's no other comments at this time, ah, Mr. Bergeron?

M. Bergeron: Yes. I'd like to make a note on the record that we will let the hearing transcript speak for itself as to the contents of this hearing.

M. Nagy: So noted. At this time I declare the hearing adjourned, then, at 11:47. Thank you.

End of Side B of Tape 2
THE END

BOSTON & MAINE CORPORATION
MAINE CENTRAL RAILROAD COMPANY
SPRINGFIELD TERMINAL RAILWAY COMPANY



IRON HORSE PARK
NO. BILLERICA, MASS. 01862

Certified Mail
Return Receipt Requested
7003 2260 0000 2041 2234

July 27, 2004

A.Peter Kari
64 Matteaus Road
Conway, Ma. 01341-9713

Dear Mr. Kari
The hearing originally scheduled to be held on Monday July 19, 2004 at 1000 hours in E.Deerfield Ma. in connection with the following:

Failure to properly perform your duties while employed as Engineer on train WJED at Hartland, VT on July 3, 2004 at approximately 0640 hours, when you allegedly failed to comply with provisions of General Code of Rules 6.29.2 and Rule 6.21 (in effect on New England Central Railway) resulting in derailment of seven (7) railcars.

has been rescheduled for Monday August 9,2004 at 1000 hours in East Deerfield Ma..per mutual aggrement between M.G.Maloof UTU Gen Chmn and the Carrier.

All particulars pertaining to the original notice,except as stated above,remain in effect.

David Nagy
Director Of Manpower

Cc MG Maloof-UTU Gen Chmn-fax 508-626-2524
Cc Charles Hunter of NECR Railway-fax 860-291-1701



BOSTON & MAINE CORPORATION
MAINE CENTRAL RAILROAD COMPANY
SPRINGFIELD TERMINAL RAILWAY COMPANY

IRON HORSE PARK
NO. BILLERICA, MASS. 01862

Certified Mail
Return Receipt Requested
7003 2260 0000 2041 2227

July 27, 2004

J.C.Scappace Jr.
84 Phillips Street
Greenfield, Ma. 01301-2826

Dear Mr. Scappace
The hearing originally scheduled to be held on Monday July 19, 2004 at 1000 hours in E.Deerfield Ma. in connection with the following:

Failure to properly perform your duties while employed as Conductor on train WJED at Hartland, VT on July 3, 2004 at approximately 0640 hours, when you allegedly failed to comply with provisions of General Code of Rules 6.29.2 and Rule 6.21 (in effect on New England Central Railway) resulting in derailment of seven (7) railcars.

has been rescheduled for Monday August 9,2004 at 1000 hours in East Deerfield Ma..per mutual aggrement between M.G.Maloof UTU Gen Chmn and the Carrier.

All particulars pertaining to the original notice,except as stated above,remain in effect.

David Nagy
Director Of Manpower

Cc MG Maloof-UTU Gen Chmn-fax 508-626-2524
Cc Charles Hunter of NECR Railway-fax 860-291-1701

EX, A

**BOSTON & MAINE CORPORATION**
**MAINE CENTRAL RAILROAD COMPANY**
**SPRINGFIELD TERMINAL RAILWAY COMPANY**

**IRON HORSE PARK**
**NO. BILLERICA, MASS. 01862**

CERTIFIED MAIL
RETURN RECEIPT REQUESTED
7003 1680 0000 3977 2032

July 13, 2004

NOTICE OF HEARING

To: J. C. Scappace Jr.

This is a Notice for you to attend a Hearing.

You may, if you desire, arrange to be accompanied by a representative as provided in the applicable schedule agreement, without expense to the Company.

You may produce witnesses on your own behalf, without expense to the Company, and you or your representative may cross-examine the witnesses. You are expected to be present throughout the entire proceeding.

| J. C. Scappace Jr | Conductor |
|---|---|
| Employee's Name | Occupation |

84 Phillips Street Greenfield, MA 01301-2826
Address

| Mech Dept Conf Room<br>River Road / Railroad Ave<br>E. Deerfield, MA | 1000 hrs | Monday, July 19, 2004 |
|---|---|---|
| Place Hearing to be Held | Time | Day and Date |

This Notice is issued to develop the facts and place your responsibility, if any, in connection with the charge outlined below:

Failure to properly perform your duties, while employed as Conductor on Train WJED at Hartland, VT on July 3, 2004, at approximately 0640 hours, when you allegedly failed to comply with provisions of General Code of Rules 6.29.2 and Rule 6.21 (in effect on New England Central Railway) resulting in derailment of seven (7) railcars.

M. C. Bump /dap

M. C. Bump
Road Foreman

Witness: William Mount, Manager of Safety-NECR

cc: M. G. Maloof – UTU Gen Chmn – fax# 508-626-2524

ST011233

Ex. B

**BOSTON & MAINE CORPORATION**
**MAINE CENTRAL RAILROAD COMPANY**
**SPRINGFIELD TERMINAL RAILWAY COMPANY**

**IRON HORSE PARK**
**NO. BILLERICA, MASS. 01862**

CERTIFIED MAIL
RETURN RECEIPT REQUESTED
7003 1680 0000 3977 2049

July 13, 2004

NOTICE OF HEARING

To: A. Peter Kari

This is a Notice for you to attend a Hearing.

You may, if you desire, arrange to be accompanied by a representative as provided in the applicable schedule agreement, without expense to the Company.

You may produce witnesses on your own behalf, without expense to the Company, and you or your representative may cross-examine the witnesses. You are expected to be present throughout the entire proceeding.

A. Peter Kari — Engineer
Employee's Name — Occupation

117B Reeds Bridge Conway, MA 01341-9713
Address

Mech Dept Conf Room
River Road/Railroad Ave
E. Deerfield, MA — 1000 hrs — Monday, July 19, 2004
Place Hearing to be Held — Time — Day and Date

This Notice is issued to develop the facts and place your responsibility, if any, in connection with the charge outlined below:

Failure to properly perform your duties, while employed as Engineer on Train WJED at Hartland, VT on July 3, 2004, at approximately 0640 hours, when you allegedly failed to comply with provisions of General Code of Rules 6.29.2 and Rule 6.21 (in effect on New England Central Railway) resulting in derailment of seven (7) railcars.

M. C. Bump /dap

M. C. Bump
Road Foreman

Witness: William Mount, Manager of Safety-NECR

cc: M. G. Maloof – UTU Gen Chmn – fax# 508-626-2524

ST011234

**6.29.2 Train Inspections by Crew Members**

When a walking inspection of the train is required, and physical characteristics prevent a complete train inspection, inspect as much of the train as possible. The train may then be complete train inspection, inspect as much of the train as possible. The train may then be moved, but may not exceed 5 MPH for the distance necessary to complete the inspection.

**While their train is moving, crew members must inspect it frequently and look for indications of defects in the train, especially when rounding curves.**

When inspecting their train, crew members must observe the train closely for any of the following:

- Overheated journals.
- Sticking brakes.
- Sliding wheels.
- Wheels not properly positioned on the rail.
- Dragging equipment.
- Insecure contents.
- Signs of smoke or fie.
- Any other dangerous condition.

Crew members who discover defects while the train is moving must stop the train promptly and correct any defects, if possible. If the defective car must be set out, they must not attempt to move the car to the setout point unless it is safe to do so.

When a car is set out because of an overheated journal, and fire must be completely extinguished and precautions taken to prevent further ignition.

**6.21 Precautions Against Unusual Conditions**

Protect trains and engines against any known condition that may interfere with their safety.

**When conditions restrict visibility, regulate speed to ensure that crew members can observe and comply with signal indications.**

In unusually heavy rain, storm, or high water, trains and engines must approach bridges, culverts, and other potentially hazardous points prepared to stop. If they cannot proceed safely, they must stop until it is safe to resume movement.

**Initial Rail Equipment Accident/Incident Record** TA 001

1. Date of Accident/Incident(YY/MM/DD) 04/07/03
2. Time of Accident/Incident 6:40 AM X PM
Light X Dark
3. Name of Railroad: New England Central Railroad, Inc
4. Name of Other Railroad: Springfield Terminal (If involved)
5. Railroad responsible for Track Maintenance: New England Central Railroad
6. Incident Number: IO 04-300
7. Type of Accident/Incident(Derailment,Collision,Obstruction,Other(describe)): **Derailment**

8. *Copy to Environmental Claims yes ☐ no ☒ FAX 610-458-7448 ATTN: Bill Hoffman
(*If Hazmat Involved) Envionmental Control Administration (24 hour no.) (800) 432-2481

9. Weather Conditions: Clear 70 deg.
10. Division: Roxbury Sub
11. Nearest City/Town: Hartland
12. FRA Track Class: 3
13. Milepost: 10.18 (to tenths)
14. State: Vermont
15. Specific Site: between MP 10.18 & MP 5.58
16. Speed: ______ shoving ☐ pulling ☒, actual ☐ estimated ☐
17. Track Type(Main,Yard,Siding,Industry): Main Operating Method: ABS/TWC (i.e. yard limits)
18. Train/Job Number: WJED
19. Total Locomotive Units in Train: 2
20. Total Cars in Consist: 14 lds 5 mtys
21. Total Locomotives Derailed: 0
22. Total Cars Derailed: 7 lds 0 mtys
23. Number of Hazmat Cars Damaged or Derailed: 0 Evacuation: yes ☐ no ☐
24. Number of Hazmat Cars Releasing Product: 0 Hazmat Commodity Released: ______

If crossing: public ☐ private ☐ Equipped with: ______
Crossing Equip. Functional: yes ☐ no ☐ Inspected: yes ☐ no ☐ Train ☐ Car ☐ struck Train ☐ Car ☐

**Employees involved:** 1) P. Kari (Engineer) 2) J. Scappace (Conductor) 3) ______

| | 1) | 2) | 3) |
|---|---|---|---|
| On Duty Time: | 05:00 | 05:00 | |
| Railroad Experience (how long?): | 30 plus yrs | 30 plus yrs. | |
| Reasonable cause test | yes ☒ no ☐ | yes ☒ no ☐ | yes ☐ no ☐ |

| 25. Persons Injured/Killed | Injured | Killed | | Injured | Killed |
|---|---|---|---|---|---|
| Worker on duty-employee | | | Worker on duty-contractor | | |
| Employee Not on Duty | | | Contractor-Other | | |
| Passengers on Trains | | | Worker on duty-volunteer | | |
| Nontrespassers/on RR property | | | Volunteer-Other | | |
| Trespassers | | | Nontrespassers/off railroad property | | |

26. Narrative: (use additional sheet if necessary)
Springfield Terminal (Guilford) train WJED operating southbound on NECR main track with 2 engines, 14 loads and 5 empties on the main track manned by ST employees, derailed trailing truck of the 6th car (CNIS 413224) from head end at MP 10.18. ST crew drug car approximately 5 miles (traversing an open deck bridge and 3 road crossings) before the derailed truck struck the frog located at the north switch of the Hartland siding (MP 5.58) resulting in this car turning on it's side and derailing the subsequent 6 cars. All expenses resulting from this derailment will be the responsibility of Springfield terminal (Guilford) per ICC finance Docket 31250. Clearing of the derailment and rerailing of equipment was done by the ST. Track work is being performed by the NECR and outside contractor which will be billed to the ST along with all other associated expenses.

27. Primary Cause: Under investigation
28. Contributing Cause: ______

Damage estimates: (in US dollars)
Cost of Clearing ______
Medical 0
29. Track, Signal, Way & Structure Damage ______
30. Equipment ______
Labor Incurred ______
Lading ______

31. Is incident FRA/TC Reportable? yes ☒ no ☐
32. Name of Railroad Official: Charles Moore
33. Telephone Number: 802-527-3401
34. Signature: [signature] C. Moore
35. Date: 7-8-04

10/20/99, for all non-FI Incidents
This form meets requirements of FRA F 6180.97

ST011236

Ex. E

☐ BOSTON & MAINE CORPORATION
☐ MAINE CENTRAL RAILROAD COMPANY
☐ SPRINGFIELD TERMINAL RAILWAY COMPANY

GTSF 100

Accident/Incident No.
FOR OFFICE USE ONLY

# ACCIDENT/INCIDENT REPORT

## SECTION 1 – GENERAL DATA

Date of Accident 3 JULY 2004 Time 0640 M Weather Foggy Temperature 58 °F (specify if minus) Mile post (to nearest tenth) 5.7

Place HARTLAND VT Track Name or Number MAIN LINE Nearest Station HARTLAND

Operating Data

Train/Switcher No. 1-WER-3 Engine(s) No. 372-370

No. of cars in train at time of incident/ Loaded 14 Empty 5 Caboose — Total Tonnage 1970

Type of Track ☒ Main ☐ Siding ☐ Yard ☐ Industry Speed at time of incident 23 M.P.H. Estimated/Recorded RECORDED

Visibility ☐ Dawn ☐ Dusk ☐ Day ☐ Dark Kind of Train (State whether – Freight, Pass., Work, Yard) FRT Timetable Direction SOUTH

Method of Railroad operation (Place X in Appropriate Box(es)) ☐ Manual Block ☐ Interlocking ☐ Cab Signal ☐ Automatic Block ☐ Traffic Control ☐ Yard Rules ☐ Time Table ☒ Radio ☐ Train Orders ☐ Verbal Perm. ☐ Other (specify) GENERAL CODE

Was equipment unattended NO No. of cars carrying hazardous materials 2 No. hazardous materials cars damaged or derailed 0

Train Crew

Hours/Minutes on Duty (Engineer and Conductor Only)

Engineer A.P. KARL Engineer Hrs. 1 Mins. 40

Conductor J C SCAPPACE JR Conductor Hrs. 1 Mins. 40

Reserve Engineer — Brakeman —

Brakeman — Brakeman —

Asst. Conductor — Other (specify) —

## SECTION 2 – PERSONAL INJURIES

| NAME OF INJURED | AGE | OCCUPATION | RESIDENCE | NATURE AND EXTENT OF INJURY/ILLNESS |
|---|---|---|---|---|
| | | | | |

N/A

Witnesses: Name Residence Name Residence

(1) (2)

(3) (4)

Name and address of Physician Name and address of hospital

Initials and No. of car or engine (if involved)

If Employee, did he remain at work? Will he lose time later? Social Security Number

If Employee, ☐ Spare Man ☐ Regular Man (If regular man, show assigned rest days)

## SECTION 3 – CIRCUMSTANCES

CAR DERAILED NEAR MILEAGE 10. CAR RODE INSIDE GAUGE. NOT NOTICEABLE DUE TO FOGGY CONDITIONS. DERAILED COMPLETELY AT HARTLAND SIDING MILEAGE 5.7.

Signature [signature] Occupation Cond

Place, Date and Time This Report Completed EDMMD 25 JULY 04 SLIP INITIALLY MADE OUT 3 JULY 04

INSTRUCTIONS: All accidents, HOWEVER SLIGHT, should be reported. All questions in pertinent sections MUST be answered giving full details of accident. It is important to obtain names of as many witnesses as possible. This report MUST be made out legibly.

ST011237

COMPLETE BOTH SIDES WHERE APPLICABLE

## ECTION 4 — ON RAIL EQUIPMENT

It equipment derailed or damaged

| Car Initial | Car Number | Position in Train | Indicate First Car Involved | Contents | Gross Tons |
|---|---|---|---|---|---|
| ENTS | 41322 | 7 | ✓ | Wood | 130 |
| CNA | 415366 | 8 | | | |
| CN | 41407 | 9 | | Wood Pulp | |
| CN | 414231 | | | Old | |
| FC | 137815 | | | News Print | |
| CN | 400427 | 11 | | News Print | 120 |
| CN | 404343 | 12 | | | |

## ECTION 5 — GRADE CROSSING DATA

S. D.O.T. Grade Crossing Identification No. ________ Highway Name or Number ________ (if private crossing, so state)

EQUIPMENT INVOLVED

(Place X in Appropriate Box(es))

☐ Auto ☐ Truck ☐ Pedestrian ☐ Truck/Trailer ☐ School Bus ☐ Motorcycle ☐ Bus

☐ Other (specify) ________ Registration ________

Estimated speed of highway vehicle ____ m.p.h. Direction of vehicle ________

☐ Stalled on Crossing ☐ Stopped on Crossing ☐ Moving Over Crossing

☐ Train Struck Highway User ☐ Train Struck by Highway User

Was the highway user or rail equipment involved in the impact transporting hazardous material ☐ Yes ☐ No

CROSSING WARNING

(Place X in Appropriate Box(es))

1 ☐ Gates
2 ☐ Cantilever FLS
3 ☐ Standard FLS
4 ☐ Wig Wags
5 ☐ Hwy. Traffic Signals
6 ☐ Audible
7 ☐ Crossbucks
8 ☐ Stop Signs
9 ☐ Watchman
10 ☐ Flagged by crew
11 ☐ Other (specify) ________
12 ☐ None

If crossing was equipped with automatic warning devices, were they operating? ☐ Yes ☐ No

Was the view of track obstructed by: ☐ Permanent Structure ☐ Standing Equipment ☐ Passing Train ☐ Highway Vehicles ☐ Not Obstructed ☐ Other (specify) ________

If accident was investigated by State Police, Local Police or Sheriff's Department, indicate name and location of investigating officer. ________

Engine Headlight ☐ BRIGHT ☐ DIM ☐ EXTINGUISHED ENGINE BELL RINGING ☐ Yes ☐ No

Was Engine Whistle Being Sounded? ☐ Yes ☐ No

Draw in Road Crossing; Show Direction of Vehicle and Rail Movement Using Timetable Directions.

N W E S

ST011238

INSTRUCTIONS: All accidents, HOWEVER SLIGHT, should be reported. All questions in pertinent sections MUST be answered giving full details of accident. It is important to obtain names of as many witnesses as possible. This report MUST be made out legibly.

# EXHIBIT B

PENGAD 800-631-6989 DEPOSITION EXHIBIT Lawyer 1A 1/9/07 NM

Saturday, July 3, 2004

To: Scott Linn

From: Charlie Moore

Subject: Guilford (Springfield Terminal RR) derails on the New England Central Railroad, MP10.18 (Roxbury Sub), Hartland, VT, July 3, 2004 at 6:45AM

Guilford (ST) southbound train WJED with two units (MEC 372 & 370), 14 loads and five empties traveling at 25MPH as evidenced by the download of the event recorder derailed the trailing truck of the 6th head car, CNIS 413224, at MP 10.18 in a three degree right hand curve. The crew pulled the car approximately five miles to the North switch of the Hartland Siding. At this point, the car struck the frog, turning onto its side to the East across the siding, derailing the subsequent six cars.

The cars involved in the derailment were delivered to the ST by NECR on July 1, 2004 at White River Jct.

| | | | |
|---|---|---|---|
| 6th car | CNIS 413224 | woodpulp | first car to derail. North Truck. Car on its side. 150 ft separated car from 7th head car. |
| 7th car | CNA 415566 | woodpulp | upright, South end buried. |
| 8th car | CNA 414072 | woodpulp | upright, jack knifed. |
| 9th car | CNA 414231 | woodpulp | upright, jack knifed, listing to East. |
| 10th car | IC 151815 | bagged flour | upright, jack knifed, listing to East. |
| 11th car | CN 400027 | newsprint | upright, South Truck & L 3&4 derailed. |
| 12th car | CN 404343 | newsprint | upright, L 3&4 derailed. |

Saturday, July 3, 6:40AM – date and time of derailment
Sunday, July 4, 2:00PM – ST shoved cars to aside to make room for track work.
Monday, July 5, 2004, 2:30AM – track back in service for ten MPH.
Tuesday, July 6 – ST on scene building trucks.
Wednesday, July 7 – ST rerailed cars.
Thursday, July 8 – Pulled cars in hospital train to East Northfield.

ST reported to the NECR Dispatcher St. Albans during the initial request for information that they were traveling at approximately 32 MPH, 200 amps, throttle position 2 and braking with automatic. The event recorder download for engine MEC 372 indicates 25 MPH, Throttle position 4, 400 amps and an eight pound automatic brake application. When the printout details for the second unit, MEC 370 was requested, ST management informed me that it was unavailable as their practice is to download the controlling locomotive only.

Copy of the NECR/ST (Guilford) agreement has been sent to Robby Devin, Dan Hershman and Gary Laakso for their review concerning the derailment and liability. In the event ST fails to comply with the agreement (to make NECR whole for damages)

there could be a hit to NECR capital for a portion of the track work. Legal is currently reviewing the agreement regarding the track damage and necessary work required to restore to track speed.

The mainline was obstructed requiring Amtrak to bus around the derailment for three day's. In addition the speed restriction placed in this are is increasing Amtrak's running times by approximately 30 minutes which is impactin the on time performance revenues. Gulford will be invoiced for this loss in OTP incentives.

Train was being operated by ST crew members, Engineer Kari and Conductor Scappace. Both are regular assigned to this assighment and have operated in this area for several years. Both were FRA drug tested by the ST. For the crews failure to comply with GCOR 6.29.2 to "inspect their train frequently, especially when rounding curves", they have been excluded for good cause shown, from operating over the NECR lines effective Friday, July 9, 2004 for a period of time to be determined.

NECR is maintaining records to track loss of revenue and expenses associated with this derailment, Amtrak, carhie, management and employee expense, taxi and customer service issues.

NECR Roadmaster Mike Lawyer will be furnishing track measurements (including measurements under load), pictures of the area, and a video of the track damages along with an estimate of material and labor to rebuild the main track. We anticipate the need to replace approximately 7000 ties on the 5 mile section plus spike and tie plates. We have used 10 track panels at the end point of derailment near the north end of the Hartland siding and have alos used 200 tons of sotone. The #10, 115 lb. turnout at the north end of the siding will also require replacement.

When talking with ST Management (Larry Ferguson) they tried to convince me the reason the crew did not know the car was derailed was due to fog in the area and they could not see. Report of NECR crew members on train #601 operating throught the area at 5:15AM took no exceptions to the track or the weather conditions. Referencing the dispatcher's sheet for the 6AM weather and contacting Weatherdata indications are that the weather was clear with visibility being 7 miles. Even if there had been fog in the area, GCOR rule 6.21 states "Protect trains and engines against any known condition that may interfere with their safety. When conditions restrict visibility, regulate speed to ensure that crew members can observe and comply with signal indications." Both of these ST employees attended NECR's Safety and GCOR rules class for Non-RailAmerica transportation employees on April 26, 2004. The above mentioned rules were covered in the presentation by Atlantic Region Manager of Safety Bill Mount and these rules were also included on the examination.

There were no Hazardous material involved in this derailment.

There were no personal injuries as a result of this derailment.

Crew was operating in TWC/ABS territory and had main track authority with Track Warrant ROSB0305 with box #2 checked to proceed from S. Siding Switch White River to Windsor. Track Warrant Box #16 Track Bulletin #185 in effect. The Track Warrant was OK'd at 06:15 and cleared at 07:57.

There were no permanent slow orders in this area and one 25 MPH speed restriction at MP 10.15 for a surfacing defect. It should be note that the actual POD was actually just north of this defect and that the track was in compliance with FRA track standards. Thjis track section was last inspected on July 1, 2004 by NECR track inspector R. T. Boucher and no exceptions noted. The FRA Track Geometry Car, T2000 tested through this area on June 8, 2004 and noted a 62 ft. warp. Remedial action was taken by placing a 25 MPH speeed restriction for trains at MP 10.15.

I requested from Guilford VP Transportation, Sid Culliford to furnish me a commitment letter stating that the Springfield Terminal would be responsible for damages to the NECR. I have not received a reply after making two verbal requests.

The cause is still under investigation. The track in in compliance with FRA track standards and the crew was operating in accordance with the maximum speed for the area, but exceptions was taken to their train handling procedures using stretch braking un higher than accepted throttle position. The loading pattern for the newsprint and woodpulp could not be determined due to cars being on their side and jack knifed. I have asked the ST to weight the cars and advise of the weights.

The actual car body of the rail cars received minimal damage as a result of the derailment. The undercarriage did receive some damage and the car which was on it's side received some damage to the door on the east side. There was no loss of lading and no apparent damage. During the rerailing process by the ST the cars received extensive damage including some lading damage.

000191

Sent via Fax Transmission and First Class Mail

Thursday, July 8, 2004

To: Larry Ferguson
Springfield Terminal Ry. Co. (Guilford)

From: Charlie Moore
New England Central Railroad

Reference to our conversation this date along with Gary Burke (ST) and Mike Lawyer (NECR) discussing the Springfield Terminal derailment which occurred on July 3, 2004 while Springfield Train, WJED was operating southbound via trackage rights on NECR main track, with 2 MEC locomotives, 14 loads and 5 empties derailing CNIS 413224 at MP 10.18 and dragging this car a distance of approximately 5 miles traversing 1 bridge and 3 crossings and after striking the frog located at the north end (MP 5.58) of the Hartland, VT siding turned this car on it's side and derailing the subsequent 6 cars.

As a result of this incident and failure of Springfield Terminal crew members J.C. Scappace, Jr. (Conductor) and A.P. Kari (Engineer) to comply with the provisions of General Code Rules 6.29.2 and Rule 6.21., which have been duplicated below for your quick reference, these two ST employees, per Section 5.3 ST/NECR trackage rights agreement are to be excluded for good cause shown from operating over the NECR lines covered by the agreement effective Friday, July 9, 2004.

As information, both Kari and Scappace attended RailAmerica's Safety and General Code of Operating Rules class held on April 26, 2004 where these specific rules were covered and also included on the examination.

You mentioned during our phone conversation that you were informed of fog conditions in this area. The NECR operated a northbound train through this area one hour prior to the ST move and they took no exceptions to the weather conditions and in fact reported the area to be clear. Also, for your information, we monitor the weather in our dispatching center using a professional contractor who reports the weather at 6:41AM to be clear skies and 7 miles of visibility. Even if the crew had experienced foggy conditions, under the provisions of GCOR 6.21 crews are required to regulate speed when conditions restrict visibility.

I have also included in this fax transmission a copy of the incident report for your information.

EXHIBIT
Ferguson
27
1/12/07 KMS

ST010471

**6.29.2 Train Inspections by Crew Members**

When a walking inspection of the train is required, and physical characteristics prevent a complete train inspection, inspect as much of the train as possible. The train may then be complete train inspection, inspect as much of the train as possible. The train may then be moved, but may not exceed 5 MPH for the distance necessary to complete the inspection.

**While their train is moving, crew members must inspect it frequently and look for indications of defects in the train, especially when rounding curves.**

When inspecting their train, crew members must observe the train closely for any of the following:

- Overheated journals.
- Sticking brakes.
- Sliding wheels.
- Wheels not properly positioned on the rail.
- Dragging equipment.
- Insecure contents.
- Signs of smoke or fie.
- Any other dangerous condition.

Crew members who discover defects while the train is moving must stop the train promptly and correct any defects, if possible. If the defective car must be set out, they must not attempt to move the car to the setout point unless it is safe to do so.

When a car is set out because of an overheated journal, and fire must be completely extinguished and precautions taken to prevent further ignition.

**6.21 Precautions Against Unusual Conditions**

Protect trains and engines against any known condition that may interfere with their safety.

**When conditions restrict visibility, regulate speed to ensure that crew members can observe and comply with signal indications.**

In unusually heavy rain, storm, or high water, trains and engines must approach bridges, culverts, and other potentially hazardous points prepared to stop. If they cannot proceed safely, they must stop until it is safe to resume movement.

000193

**Initial Rail Equipment Accident/Incident Record** TA 001

1. Date of Accident/Incident (YY/MM/DD) 04/07/03
2. Time of Accident/Incident 6:40 AM X PM

3. Name of Railroad: New England Central Railroad, Inc
4. Name of Other Railroad: Springfield Terminal (if involved)
5. Railroad responsible for Track Maintenance: New England Central Railroad

Light X Dark

6. Incident Number: IO 04-300

7. Type of Accident/Incident (Derailment, Collision, Obstruction, Other (describe))
**Derailment**

8. *Copy to Environmental Claims yes ☐ no ☒ FAX 610-458-7448 ATTN: Bill Hoffman
(*If Hazmat Involved) Envionmental Control Administration (24 hour no.) (800) 432-2481

9. Weather Conditions: Clear 70 deg.
10. Division: Roxbury Sub
11. Nearest City/Town: Hartland
12. FRA Track Class: 3
13. Milepost: 10.18 (to tenths)
14. State: Vermont

15. Specific Site: between MP 10.18 & MP 5.58

16. Speed: ______ shoving ☐ pulling ☒ , actual ☐ estimated ☐

17. Track Type (Main, Yard, Siding, Industry): Main
Operating Method: ABS/TWC (i.e. yard limits)

18. Train/Job Number: WJED
19. Total Locomotive Units in Train: 2
20. Total Cars in Consist: 14 lds 5 mtys
21. Total Locomotives Derailed: 0
22. Total Cars Derailed: 7 lds 0 mtys

23. Number of Hazmat Cars Damaged or Derailed: 0
Evacuation: yes ☐ no ☐
24. Number of Hazmat Cars Releasing Product: 0
Hazmat Commodity Released: ______

**If crossing:** public ☐ private ☐ Equipped with: ______
Crossing Equip. Functional: yes ☐ no ☐ Inspected: yes ☐ no ☐ Train ☐ Car ☐ struck Train ☐ Car ☐

**Employees involved:** 1) P. Kari (Engineer) 2) J. Scappace (Conductor) 3) ______

| | 1) | 2) | 3) |
|---|---|---|---|
| On Duty Time: | 05:00 | 05:00 | |
| Railroad Experience: | 30 plus yrs (how long?) | 30 plus yrs. (how long?) | (how long?) |
| Reasonable cause test | yes ☒ no ☐ | yes ☒ no ☐ | yes ☐ no ☐ |

| 25. Persons Injured/Killed | Injured | Killed | | Injured | Killed |
|---|---|---|---|---|---|
| Worker on duty-employee | | | Worker on duty-contractor | | |
| Employee Not on Duty | | | Contractor-Other | | |
| Passengers on Trains | | | Worker on duty-volunteer | | |
| Nontrespassers/on RR property | | | Volunteer-Other | | |
| Trespassers | | | Nontrespassers/off railroad property | | |

**26. Narrative:** use additional sheet if necessary

Springfield Terminal (Guilford) train WJED operating southbound on NECR main track with 2 engines, 14 loads and 5 empties on the main track manned by ST employees, derailed trailing truck of the 6th car (CNIS 413224) from head end at MP 10.18. ST crew drug car approximately 5 miles (traversing an open deck bridge and 3 road crossings) before the derailed truck struck the frog located at the north switch of the Hartland siding (MP 5.58) resulting in this car turning on it's side and derailing the subsequent 6 cars. All expenses resulting from this derailment will be the responsibility of Springfield terminal (Guilford) per ICC finance Docket 31250. Clearing of the derailment and rerailing of equipment was done by the ST. Track work is being performed by the NECR and outside contractor which will be billed to the ST along with all other associated expenses.

27. Primary Cause: Under investigation
28. Contributing Cause: ______

Damage estimates: (in US dollars)
Cost of Clearing ______
Medical 0
29. Track, Signal, Way & Structure Damage ______
30. Equipment ______
Labor Incurred ______
Lading ______

**31. Is incident FRA/TC Reportable?** yes ☒ no ☐

32. Name of Railroad Official: Charles Moore
33. Telephone Number: 802-527-3401
34. Signature: [signature] C. Moore
35. Date: 7-8-04

10/20/99, for all non-PI Incidents
This form meets requirements of FRA F 6180.97

ST010473



000194

ST010474



BOSTON & MAINE CORPORATION
MAINE CENTRAL RAILROAD COMPANY
SPRINGFIELD TERMINAL RAILWAY COMPANY

IRON HORSE PARK
NO. BILLERICA, MASS. 01862

TRANSPORTATION DEPARTMENT
(978) 663-9319

July 9, 2004

Mr. Charles Moore
Acting General Manager
New England Central Railroad
Two Federal Street, Suite 201
St. Albans, VT 05478

**By Fax: (802) 527-3482**
**Two Pages**

**Re: July 3, 2004 Derailment**

Dear Mr. Moore:

Pursuant to your memorandum of July 8, 2004, please accept this letter in response to the documents that you have provided in relation to the above-referenced derailment. While these documents were helpful to allow ST to better understand the position of NECR as to responsibility for this derailment, we must respectfully disagree with NECR's position for several reasons.

First and foremost, we strongly disagree with the characterization by the NECR Initial Accident/Incident Record that "all expenses resulting from this derailment will be the responsibility of Springfield Terminal...per ICC Finance Docket 31250." To the contrary, our physical inspection of the derailment area, as supported by a review of the records produced as a result of the June 8, 2004 FRA T-2000 inspection of this line of railroad clearly demonstrates that responsibility for this derailment lies squarely with NECR. More particularly, as I am sure you are aware, the ICC decision governing the operations of ST over NECR lines requires that, "[NECR] shall keep the Line, *at all times throughout the term of this Agreement or any extensions thereof*, in not less than FRA Class II condition." Because all available evidence clearly shows that this line is in a condition that fails to meet the requisite FRA Class II standards in many instances, NECR is in violation of the very essence of this agreement and cannot look to ST to assume the cost of this derailment.

Moreover, the conditions at the particular site of the derailment did not meet FRA Class II standards, because the ballast there was so deteriorated as to be unable to maintain proper track crosslevel, surface and alignment. The existence of this condition is consistent with the poor maintenance practices of the NECR along the entire line—practices that in several instances have resulted in conditions on the line being unacceptable in any FRA class. Similarly, had NECR inspected the area of the

derailment between the time of the June 8th FRA inspection and the date of the derailment, a qualified inspector would have realized that the physical condition of the ballast could not support operations in any track class. Since the cause of the derailment resulted from improperly maintained track geometry—specifically irregular crosslevel—this oversight by NECR is yet another example of a location where the line does not meet the requisite FRA Class II standards. On a related issue, please note that in light of this new information, our Engineering Department has grave concerns with the standards being applied to track maintenance by NECR and the manner in which NECR identifies track segments for slow orders to drop that segment to the appropriate track class, and request a copy of those standards for further review given ST's operations over this line.

Apparently in recognition of NECR's failure to maintain the line safely and to its proper class, your letter also attempts to blame the ST crew for the recent derailment by relying upon two sections of the NECR's General Code Rules that have no relationship to the events of July 3, 2004. Specifically, in response to questioning by ST's road foreman on site, the crew stated that they were inspecting their train frequently and saw nothing unusual prior to reaching the frog that caused the cars to derail. Furthermore, the simple facts are that there were two locomotives on this train, the first car to override the rail was seven cars behind the second locomotive, there were no sparks or smoke visible, the train was moving uphill, and the crew did not recognize any increase in amperes that would indicate that more power was necessary to drag a car that was off the rail. Simply put, there are no facts of which we are aware to support a finding that the crew was not following the requirements of General Code Rule 6.29.2. Likewise, ST is at a loss to understand the applicability of General Code Rule 6.21, as ST is not aware of any facts that would indicate any difficulty in observing and complying with signal indications, which is the basis for any violation of this rule.

Nevertheless, in an effort to show how seriously ST takes the allegations made in your letter, ST will investigate the actions of the crew and will begin disciplinary proceedings if appropriate. NECR is requested and encouraged to provide any information it may have to support these allegations.

In closing, I would also remind you that ST has offered to assist in the response to this derailment, an offer that has so far not been accepted by NECR. This offer remains open, and I would request a response at your earliest convenience.

Sincerely,

Larry L. Ferguson

Larry L. Ferguson
Director-Train Operations

**Moore, Charles (NECR)**

000172

**To:** ARDC-Dispatchers

**Cc:** Richardson, Bob (NECR/Palmer); Larro, Steve E. (NECR)

**Subject:** Springfield Employees Banned from NECR

**Importance:** High

**All ARDC Train Dispatchers - Until further notice, Springfield Terminal (Guilford) employees J.C. Scappace, Jr. and A.P. Kari have been excluded from operating over the NECR lines. This is effective Friday, July 9, 2004.**

**Charlie Moore**



BOSTON & MAINE CORPORATION
MAINE CENTRAL RAILROAD COMPANY
SPRINGFIELD TERMINAL RAILWAY COMPANY

IRON HORSE PARK
NO. BILLERICA, MASS. 01862

000101

**TRANSPORTATION DEPARTMENT**
**(978) 663-9319**

August 23, 2004

Mr. Charles Moore
Acting General Manager
New England Central Railroad
Two Federal Street, Suite 201
St. Albans, VT 05478

**By Fax: (802) 527-3482**
**Two Pages**

**Re: ST Crew Members:**
**J.C. Scapacce, Jr.**
**A.P. Kari**

Dear Mr. Moore:

Further to your letter of July 8, 2004 alleging that the above-referenced Springfield Terminal Railway Company crew members had violated General Code Rules 6.29.2 and 6.21, please note that on August 9, 2004 a hearing was held to determine the validity of these allegations. At this hearing, Mr. Charles Hunter, Assistant General Manager of NECR, was given the opportunity to present evidence in support of the alleged violation of these operating rules, and the crew members offered testimony to rebut these allegations.

After this hearing and a thorough review of all the evidence presented, it is clear that the facts underlying the events of July 3, 2004 do not support a finding that the ST crew members violated any operating rules on that day. Moreover, NECR was given the opportunity to present witnesses and other evidence to support a finding that these rules were violated, and failed to do so either prior to the hearing, during the hearing, or since the hearing. Accordingly, since NECR can only exclude ST employees from operating on that portion of the Conn River Line that is subject to the 1990 Trackage Rights Agreement for "good cause shown", and no such showing has been made, I am writing to inform you that Mr. Scapacce and Mr. Kari will resume operations on the line effective Friday, August 28, 2004.

Thank you for your attention to this matter. Please feel free to contact me if you should have any questions or comments.

000105

Sincerely,

Larry L. Ferguson
Director-Train Operations

000175

VIA FAX 978-663-1096

Mr. Larry L. Ferguson
Director-Train Operations
Guilford Rail System
Iron Horse Park
No. Ballerica, MA 01862

RE: You're Letter of August 23, 2004 – Derailment of July 3, 2004

Dear Mr. Ferguson:

Thank you for your letter of August 23, 2004. The Springfield Terminal ("ST") crew of J.C. Scapacce, Jr. and A.P. Kari remain barred from operating on New England Central railroad ("NECR") for "good cause shown" determined by NECR. The trackage rights agreement in Section 5.3 provides for NECR to make the determination, not ST. As you may know, that is a standard provision in trackage rights agreements. NECR's determination was not subject to ST approval. The crew remains banned from NECR property.

Sincerely,

8/27/04

Charles W. Moore

**Moore, Charles (NECR)**

000177

**To:** ARDC-Dispatchers

**Cc:** Richardson, Bob (NECR/Palmer); Larro, Steve E. (NECR); gcmlaw@sover.net

**Subject:** St Employees Scapacce and Kari Banned

**Importance:** High

**All ARDC Train Dispatchers**
**Atttention - Tom Murphy**

**Reference to my previous email excluding ST employees Scapacce and Kari from operating on the NECR. THIS IS STILL IN EFFECT AND THESE TWO EMPLOYEES ARE NOT TO BE ALLOWED TO OPERATE ON THE NECR.**

**Charlie Moore**
**cc/Larro & Richardson**
**Larry Ferguson, Director Train Operations, Springfield Terminal Railway Company - As information and reference to your letter of August 23, 2004.**

# EXHIBIT C



BOSTON & MAINE CORPORATION
MAINE CENTRAL RAILROAD COMPANY
SPRINGFIELD TERMINAL RAILWAY COMPANY

IRON HORSE PARK
NO. BILLERICA, MASS. 01862

000119

Certified Mail
Return Receipt Requested
7003 1680 0000 3977 2100

August 23, 2004

Mr. A. Peter Kari
117B Reeds Bridge
Conway, MA 01341-9713

Dear Mr. Kari:

On Monday, August 9, 2004, a hearing was conducted in E. Deerfield, MA., because you had been charged with the following:

- Failure to properly perform your duties, while employed as Engineer on Train WJED at Hartland, VT on July 3, 2004, at approximately 0640 hours, when you allegedly failed to comply with provisions of General Code of Rules 6.29.2 and Rule 6.21 (in effect on New England Central Railway) resulting in derailment of seven (7) railcars.

Review of the hearing transcript reveals that no discipline will be assessed.

Sincerely,

W. J. Bostwick
General Manager-West
Transportation Department

cc: MG Maloof – UTU General Chairman
Personnel Dept.
file

BOSTON & MAINE CORPORATION
MAINE CENTRAL RAILROAD COMPANY
SPRINGFIELD TERMINAL RAILWAY COMPANY

IRON HORSE PARK
NO. BILLERICA, MASS. 01862

000120

Certified Mail
Return Receipt Requested
7003 1680 0000 3977 2117

August 23, 2004

Mr. J. C. Scappace, Jr.
84 Phillips Street
Greenfield, MA 01301-2826

Dear Mr. Scappace:

On Monday, August 9, 2004, a hearing was conducted in E. Deerfield, MA., because you had been charged with the following:

- Failure to properly perform your duties, while employed as Conductor on Train WJED at Hartland, VT on July 3, 2004, at approximately 0640 hours, when you allegedly failed to comply with provisions of General Code of Rules 6.29.2 and Rule 6.21 (in effect on New England Central Railway) resulting in derailment of seven (7) railcars.

Review of the hearing transcript reveals that no discipline will be assessed.

Sincerely,

W. J. Bostwick
General Manager-West
Transportation Department

cc: MG Maloof – UTU General Chairman
Personnel Dept.
file