UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CENTRAL RAILROAD, INC., <br> Plaintiff, <br><br> v. <br><br> SPRINGFIELD TERMINAL RAILWAY <br> COMPANY and BOSTON AND MAINE <br> CORPORATION, <br> Defendants | Civil Action No.:  04-30235-MAP |

**THE PLAINTIFF NEW ENGLAND CENTRAL RAILROAD, INC.'S
OPPOSITION TO THE DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT**

The plaintiff New England Central Railroad, Inc. ("NECR") hereby submits this

*Opposition* to the Defendants' *Motion for Partial Summary Judgment*.  As grounds therefore, the

NECR states that the defendants are not entitled to summary judgment because:  (1) the NECR

was not, as a matter of law, negligent or grossly negligent; (2) there is ample evidence of the

defendants' gross negligence; (3) the defendants' counterclaims are preempted by federal law;

(4) the modified *Trackage Rights Agreement* imposes on the defendants the obligation to

indemnify regardless of the condition of the track; and (5) the NECR's breach of contract counts

state claims upon which relief may be granted.

In support of its *Opposition*, the NECR expressly incorporates herein by this reference

the following:

1. *Memorandum of Law in Support of the Plaintiff's Opposition to the Defendants' Motion for Partial Summary Judgment*;

2. *Plaintiff New England Central Railroad, Inc.*'s *Concise Statement of Facts in Support Of Its Opposition To The Defendant's Motion For Summary Judgment In Response To The Defendants Concise Statement Of Facts;*

3. the transcript of the deposition of Richard R. Boucher, a copy of the relevant portions of which is attached as Exhibit "J," at p. 8-12, 29-31;

4. the transcript of the deposition of Rick T. Boucher, a copy of the relevant portions of which is attached as Exhibit "K," at p. 9, 11-13, 21-22;

5. the transcript of the deposition of Michael Lawyer, a copy of the relevant portions of which is attached as Exhibit "L," at p. 15-18, 24-28, 66;

6. the transcript of the deposition of Roger Bergeron, a copy of the relevant portions of which is attached as Exhibit "M," at p. 90-94, 118, 152-153, 172-174;

7. Initial Rail Equipment Accident/Incident Record, a copy of which is attached as Exhibit "N;"

8. Incident Documentation Form, a copy of which is attached as Exhibit "O;"

9. *Second Cause Of Action, Formal Complaint and Petition for Declaratory Order Before the Surface Transportation Board*, copy of which is attached as Exhibit "P;" and

10. *January 10, 2006 Surface and Transportation Board Decision*, a copy which is attached as Exhibit "Q."

WHEREFORE, for the foregoing reasons, in addition to the reasons stated in the

*Memorandum of Law* in support of this *Opposition*, the plaintiff NECR respectfully requests that

the defendants' *Motion for Summary Judgment* be <u>DENIED</u>.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(D), the plaintiff NECR respectfully states that oral argument may assist the Court and requests a hearing on its *Opposition* to the Defendants' *Motion for Partial Summary Judgment.*

> Respectfully submitted,
> NEW ENGLAND CENTRAL RAILROAD, INC.
> by its attorneys,
>
> /s/ Michael B. Flynn
> Michael B. Flynn            BBO#559203
> Richard A. Davidson, Jr.,     BBO#552988
> FLYNN & ASSOCIATES, P.C.
> 400 Crown Colony Drive, Suite 200
> Quincy, MA  02169
> (617) 773-5500

DATED:  April 24, 2007

G:\F & A\CASE FILES\RAILAMERICA\New England Central\BM - STRC-Hartland\pleadings\NECR Opposition to Defendant's Motion for Partial Summary Judgment 4-24-07.doc

3

# EXHIBIT "J"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------

NEW ENGLAND CENTRAL
RAILROAD, INC.
           Plaintiff,

    VS.                   Civil Action No.
                          04-30235-MAP

SPRINGFIELD TERMINAL RAILWAY
COMPANY, ET AL.
           Defendants.

------------------------------

D E P O S I T I O N
-of-
RICHARD R. BOUCHER

Taken on Wednesday, January 10, 2007,
at the offices of
New England Central Railroad, Inc.
St. Albans, Vermont.

APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
RICHARD A. DAVIDSON, JR., ESQ.
Flynn & Associates, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169

ON BEHALF OF THE DEFENDANT:
ROBERT B. CULLIFORD, ESQ.
Senior Vice President and General Counsel
Pan Am Systems
14 Aviation Avenue
Portsmouth, NH 03801

NORMA J. MILLER, RPR
COURT REPORTERS ASSOCIATES
117 BANK STREET
BURLINGTON, VT 05401
(802) 862-4593

1   se, on the opposite side, you'd have a borderline

2   Class 3.

3   Q.  What would be the condition of those joints

4   that would give rise to a warp?

5   A.  They'd be considered a low joint.

6   Q.  One low/one high, or both low?

7   A.  No, both low.

8   Q.  Okay.

9   A.  Typically.

10   Q.  Pardon?

11   A.  Typically.

12   Q.  Okay, in this situation that the condition

13   that existed?

14   A.  That was, yes.

15   Q.  Okay.  Do you know what the proper remedial

16   action would be, pursuant to the FRA track safety

17   standards, once a warp condition is found?

18   A.  What the remedial action would be?

19   Q.  Yes.

20   A.  Well, in that case, it would have been to tamp

21   it.

22   Q.  Okay.  Any other options?

23   A.  None other than be restricted to -- you drop

24   it to the class that it's -- that it meets the

25   requirements that it meets.

1    Q.   Do you know what was done in this instance?

2    A.   It was dropped to a Class 2.

3    Q.   Do you know why it wasn't tamped?

4    A.   Why it wasn't tamped?  Yeah.

5    Q.   Why?

6    A.   We hadn't got there yet with our surfacing

7    equipment.

8    Q.   Why not?

9    A.   I had a -- if my memory serves me, I had -- my

10   operator went on vacation, and I didn't have an

11   operator for the machine.

12   Q.   Okay.

13   A.   It was in the scope of work to be done.  We

14   just hadn't got that far with the equipment.

15   Q.   When did you expect to get that work done?

16   A.   It would have been done, I would guess, within

17   the next week or two.

18   Q.   Okay.

19   A.   Depending on what events took place.

20   Q.   Can you describe to us your understanding of

21   how a warp condition could affect a train going over

22   this section of track?

23   A.   How it could affect a train going over it?

24   Q.   Sure.

25   A.   How a warp would affect it?

1    Q.   Yeah.

2    A.   Well, it can cause rock in the train, sure.

3    Q.   Can you describe what you mean by rock?

4    A.   Well, it's a -- we call it harmonic rock, so

5    if you got a low joint and then another low joint,

6    and if they're within a prescribed distance, it can

7    cause rock motion in the train -- roll, rock,

8    whatever you want to call it.

9    Q.   Could rock result in a condition known as

10   wheel lift?  Are you familiar with that term?

11   A.   Yeah.

12   Q.   Could that condition result as a --

13   A.   Could it result?

14   Q.   Yeah.

15   A.   If it was extreme enough, yeah.

16   Q.   What would make it extreme?  Do you know, in

17   generalities?

18   A.   In generality, it would have been -- unless if

19   your joints were real low, excessively low.

20   Q.   Do you know if that condition existed at

21   Milepost 10.16?

22   A.   It did not.  Definitely did not.

23   Q.   Why not?

24   A.   Because I took the track measurements.  I

25   GPSed them that day.  We get this GPS reading.

1    Q.   This is on June 8th, 2004?

2    A.   Yes, I GPSed it and identified the defect.

3    Q.   Subsequent to June 8th, 2004, up to July 3rd,

4    2004, did you ever take another measurement at that

5    location?

6    A.   Did I personally?

7    Q.   Yes.

8    A.   No.

9    Q.   Do you know if anyone from New England Central

10   ever took another measurement?

11   A.   I'm not sure about that.

12   Q.   Would it have been a common practice in the

13   Track Inspection Department to take another

14   measurement?

15   A.   To take another one?  Not unless it hasn't

16   been restricted or the slow order was --

17   Q.   Were you aware of this condition before June

18   8th, 2004?

19   A.   Definitely not.  It would have been restricted

20   before.

21   Q.   Would you call this condition -- is it a

22   difficult condition to notice without testing?

23   A.   Some are.  This particular one, static

24   measurements, you didn't have it.  You had to add in

25   load.  So you -- when you're taking track

1  measurements, you look for indications that the

2  track may be pumping, or any movement in the ties.

3  In this particular case, as I remember, it was

4  within half an inch, but if you added in under load,

5  the combination of the two joints within 62 feet,

6  could you come up with it.

7   Q.  Did you go out there again to Milepost 10.16,

8  after June 8th, 2004, between between June 8th, 2004

9  and --

10  A.  After the car run.

11  Q.  But I just wanted to be clear about the

12  timeline, between June 8th, and July 3rd, 2004, did

13  you go out there again?

14  A.  I may have gone through that area, but not

15  sure.

16  Q.  In what capacity would you have gone through

17  the area?

18  A.  Maybe inspecting or high-railing for some

19  reason.  I high-rail frequently.  I do track

20  inspections.

21  Q.  Okay, did you notice that the condition was

22  worsening?

23  A.  No.

24  Q.  Okay, if we could talk about the derailment of

25  July 3rd, 2004, you're familiar with that?

Page 29

1   later and replace your rail.  But that could be down

2   the road.

3      Q.  Okay.  Fine.

4      A.  A lot of times we use temporary.  I don't

5   recall what they did in this case, but a lot of

6   times they use temporary panels.

7              (Deposition Exhibit 9 was marked for

8              identification.)

9  BY MR. CULLIFORD:

10     Q.  Okay.  If I could just refer you back one last

11  time to --

12     A.  Mm-hm.

13     Q.  -- Lawyer Exhibit 2, and I've got two

14  questions and then I'll be done.

15     A.  Sure.

16     Q.  Does this report -- the report generated by

17  the FRA test truck -- and I'm talking about the

18  entire report now, not just page 803, okay?

19     A.  Mm-hm.

20     Q.  Is that a significant amount of defects, in

21  your estimation, for a stretch of track this length?

22     A.  Not according to the FRA, it isn't.

23     Q.  I'm asking according to you.

24     A.  According to me, I've never seen reports from

25  other railroads.

1   Q.  I'm not asking about other railroads.  You've

2  been in this business -- let me put it this way.

3  You've been in this business for 28 years.  Have you

4  ever seen this number of track defects on a line of

5  this size at the same time?

6   A.  On this particular line, it's the only line

7  I've ever worked.

8   Q.  Okay, on this particular line, then?

9   A.  So I can't compare it to any other railroad.

10   Q.  I'm not asking you to compare it to another

11  railroad.  I'm asking -- you've worked for 28 years

12  on one stretch of railroad.  My question is in those

13  28 years, have you ever seen this many defects on

14  that stretch of railroad?

15   A.  Yes.

16   Q.  When?

17   A.  When?

18   Q.  Yes.

19   A.  On -- We've had reports similar to this

20  through the years.  I can't give you exact years.

21   Q.  How frequently, then?  Is this a frequent

22  occurrence on the New England Central?

23   A.  A frequent occurrence?  I don't know, I

24  wouldn't call it frequent, but --

25   Q.  What I'm trying to ask you is how did we get

Page 31

1  to this point?  Was maintenance cut?  Was capital

2  cut?  Then how did all these defects arise?

3    A.  Those are pretty standard track defects, I

4  would say, on any railroad.  Not that I --

5    Q.  I don't dispute that they're standard track

6  defects.  FRA's noted all of them.  But the sheer

7  number of them?

8    A.  Mm-hm.

9    Q.  That doesn't disturb you?

10   A.  Disturb me?  No.

11   Q.  But through the years, this hasn't been a

12  frequent occurrence, correct, to have this sheer

13  number of defects?

14   A.  That many?  We may have had that many in the

15  past.  I'd have to look back at all the --

16   Q.  I'm not asking about whether it ever happened,

17  I'm agreeing with you it probably did happen.  I'm

18  asking about the frequency of how many times it has

19  happened.  Is this a regular occurrence to have one,

20  two, three, four, five, six, seven pages of defects

21  on New England Central's line, or is this some sort

22  of extraordinary event?  Does this occur every year,

23  does it occur every ten years, does it occur every

24  20 years?

25   A.  Sometimes more, sometimes less.

# EXHIBIT "K"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------

NEW ENGLAND CENTRAL
RAILROAD, INC.
                    Plaintiff,

        VS.                    Civil Action No.
                               04-30235-MAP

SPRINGFIELD TERMINAL RAILWAY
COMPANY, ET AL.
                    Defendants.
------------------------------


D E P O S I T I O N
-of-
RICK T. BOUCHER

Taken on Wednesday, January 10, 2007,
at the offices of
New England Central Railroad, Inc.
St. Albans, Vermont.


APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
RICHARD A. DAVIDSON, JR., ESQ.
Flynn & Associates, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169

ON BEHALF OF THE DEFENDANT:
ROBERT B. CULLIFORD, ESQ.
Senior Vice President and General Counsel
Pan Am Systems
14 Aviation Avenue
Portsmouth, NH 03801

NORMA J. MILLER, RPR
COURT REPORTERS ASSOCIATES
117 BANK STREET
BURLINGTON, VT 05401
(802) 862-4593

Page 6

1  inspection on June 8th, 2004. Are you familiar with
2  that inspection?
3     A. Yes.
4     Q. Now, just so I can keep this straight, were
5  you on the inspection car on June 8th, 2004?
6     A. No, I was not.
7     Q. Okay. Now it's finally clear. Are you aware
8  that the test car inspection of June 8th, 2004,
9  found a defective condition at approximately
10  Milepost 10.16?
11    A. Am I aware of?
12    Q. Pardon me?
13    A. Pardon me, could you repeat the question,
14  please?
15    Q. Sure, well, let me show you something first to
16  show you. This is Lawyer Exhibit 2. You'll see in
17  the upper right-hand corner there's a number 000797.
18  If you could just flip over to where that number is
19  000803. First of all, have you ever seen this
20  document before?
21    A. No, I haven't.
22    Q. You haven't? Okay. Okay, let's try it this
23  way. Prior to June 8th, 2004 -- we can move away
24  from this document for now. Prior to June 8th,
25  2004, were you inspecting as a track inspector for

Page 7

1  New England Central?
2     A. Yes.
3     Q. Were you inspecting the stretch of track
4  between Milepost 11 and Milepost 5?
5     A. Yeah.
6     Q. During the course of your inspections, did you
7  ever note a defect at Milepost 10.16?
8     A. No.
9     Q. You did not? After June 8th, 2004, did anyone
10  inform you that the test car had found a defect in
11  Milepost 10.16?
12    A. Yes.
13    Q. Who informed you of that?
14    A. Supervisor.
15    Q. Do you recall -- would you have been involved
16  at that point in deciding the appropriate remedial
17  action to be taken in response to that defect?
18    A. No.
19    Q. Who would have?
20    A. It was supervisor.
21    Q. And by supervisor, just who are you referring
22  to?
23    A. R.R. Boucher.
24    Q. Okay. Did he ever -- did R.R. Boucher ever
25  communicate to you what remedial action was taken in

Page 8

1  response to discovering this defect?
2     A. Not that I recall, I guess.
3     Q. Okay. But -- and help me here. You were
4  aware that there was a defect at Milepost 10.16
5  after June 8th, 2004?
6     A. Yeah.
7     Q. After June 18th, 2004, when was the next time
8  you inspected the area at or around Milepost 10.16?
9     A. I don't recall.
10    Q. How often were you inspecting the track
11  between Milepost 11 and Milepost --
12    A. Twice a week, under federal regulations. I
13  don't recall dates.
14    Q. Okay. Was it within two days, three days,
15  that day? You don't recall that? Doesn't have to
16  be the specific date, just --
17    A. I don't recall, yeah.
18    Q. Do you recall how many times -- do you recall
19  the first time you inspected -- I don't need to know
20  the date -- or how soon thereafter, when you went
21  out and inspected at Milepost 10.16, did you note
22  the defect then?
23    A. No.
24    Q. You didn't? You knew it existed, but you
25  didn't note --

Page 9

1     A. It was already documented.
2     Q. Yeah, but did you see it? Did you look at it
3  and say, Oh, I see now that that's a defect?
4     A. I believe it was predetermined before I had to
5  inspect it.
6     Q. I understand that, but okay, this is what I'm
7  asking you. Prior to June 8th, 2004, you were
8  inspecting the track?
9     A. Correct.
10    Q. You hadn't noticed a defect --
11    A. No.
12    Q. -- correct?
13    A. No.
14    Q. You were informed that there was a defect
15  there?
16    A. Correct.
17    Q. So when you went out there again and you're at
18  Milepost 10.16, did you note the defect? Did you
19  say, okay, that condition exists?
20    A. Prior to?
21    Q. After you were informed that it existed. You
22  didn't know it existed prior to June 8th?
23    A. Right.
24    Q. You found out on June 8th, or soon thereafter,
25  that it did exist?

Page 10

1   A. Right.
2   Q. Then you're out there inspecting twice a week
3   thereafter, correct?
4   A. Correct.
5   Q. So you get to Milepost 10.16. Did you see the
6   condition? In other words, when you're at Milepost
7   10.16 on your next inspection, did you agree that a
8   defective condition existed, looking at it that day?
9   A. Yes, and it was slowered.
10  Q. That's not what I'm asking. Do you agree with
11  what the FRA test truck found, that a condition
12  known as warp --
13  A. Yes, I agree.
14  Q. Based on your own personal observations, or
15  based on what you were told?
16  A. No, based on the measurements and GPS readings
17  given, that it was gone back and determined that it
18  was in fact there.
19  Q. Who determined that?
20  A. Myself and R.R. Boucher.
21  Q. So you did go out there after the test truck
22  had gone over it?
23  A. Correct.
24  Q. Knowing that the condition existed?
25  A. Yes.

Page 11

1   Q. And you agreed with the determination of the
2   test truck?
3   A. I mean it -- yes.
4   Q. Okay.
5   A. Agreed with the measurements that they'd given
6   us.
7   Q. How did you agree with the measurements? Did
8   you do your own measurements?
9   A. Yes, we did.
10  Q. Okay. So during the period June 8th, 2004, to
11  July 3rd, 2004, you're inspecting twice a week; is
12  that correct?
13  A. That's correct.
14  Q. Did you inspect at Milepost 10.16 twice a
15  week?
16  A. Yes.
17  Q. Did you do any additional measurements between
18  the initial measurement you did to confirm the FRA
19  test car results and July 3rd, 2004?
20  A. The date of -- or I guess I don't recall
21  exactly at what specific time we did the
22  measurements, but I know that we went well north and
23  south of the location through the curve.
24  Q. Yeah?
25  A. The measurements.

Page 12

1   Q. I understand that. You did an initial
2   measurement to confirm the test results, correct?
3   A. Correct.
4   Q. What I'm asking you is were there any
5   subsequent measurements of the condition at Milepost
6   10.16 between your initial measurement and July 3rd,
7   2004, I guess I don't understand your question.
8   Q. Pardon me?
9   A. I guess I don't understand your question.
10  Q. You performed one measurement, if I understand
11  what you're saying, soon after the test truck went
12  over the line?
13  A. That's correct, yeah.
14  Q. All's I'm asking is did you do another
15  measurement after the initial one? We've got one in
16  the book.
17  A. Yeah.
18  Q. Did you ever do another measurement between
19  that initial measurement and July 3rd, 2004?
20  A. Not that I can recall, I guess, no.
21  Q. Do you recall going out there at your
22  twice-weekly inspections and noticing that the
23  condition remained the same, or was it worsening or
24  was it getting better?
25  A. To my knowledge, it remained the same.

Page 13

1   Q. Okay, did you notice that the track at
2   Milepost 10.16 was also out of alignment?
3   A. No.
4   Q. Okay. Did you notice a condition such as a
5   low joint where the joint on the low-end side was
6   sinking in the mud or the ballast was foul?
7   A. I don't recall.
8   Q. Okay, and seeing as how this condition existed
9   pretty close to a crossing, do you, as a normal
10  course of practice, sort of use a heightened sense
11  of an investigation at or near public grade
12  crossings?
13  A. Public grade or --
14  Q. Public at-grade crossings, yes, or private.
15  A. Yes.
16  Q. What more would you do at or near a public or
17  private at-grade crossing that you wouldn't do, say,
18  in the middle of nowhere?
19  A. Well, no, I feel I do an adequate job of the
20  entire lines.
21  Q. I understand that, and I'm glad you do.
22  A. I guess you say I stop for each crossing. I
23  guess other than that.
24  Q. What do you do when you stop at each crossing
25  would probably be a good question.

Page 18

1   Q. Do you recall what the cause of the derailment
2   on July 3rd, 2004, was?
3   A. No.
4   Q. Okay, did I hear you correctly, though, you
5   did participate in the investigation?
6   A. Yes.
7   Q. And then what did you do, hand your findings
8   off to someone else?
9   A. I believe B and M was right there writing down
10  the track measurements as we were.
11  Q. But I'm not asking about B and M. I'm asking
12  about you and/or New England Central investigating
13  the derailment and determining the cause?
14  A. I didn't have anything to do with determining
15  the cause, other than assisting and taking track
16  measurements with the roadmaster.
17  Q. And who was the roadmaster?
18  A. Mike Lawyer.
19  Q. Okay. Do you have those measurements?
20  A. No, I do not.
21  Q. Okay. Do you know who does have them?
22  A. Well, other than B and M, Mike Lawyer.
23  Q. Okay, good. Did you participate in any -- in
24  preparing any budgets or cost estimates for either
25  the damage caused -- well, let's take that first

Page 19

1   question, is did you participate in any cost
2   estimates for the damage caused by the derailment to
3   the New England Central's line?
4   A. No.
5   Q. Did you participate in any budgets or cost
6   estimates for work to be done --
7   A. No.
8   Q. -- on the line?
9   A. No.
10  Q. Do you know who would have done that work?
11  A. I imagine the contractor, Mike Lawyer.
12  Q. Okay. If I could just ask you to look at one
13  thing, which is Lawyer Exhibit 3. Are you familiar
14  with that document, sir?
15  A. Yes.
16  Q. Could you identify it?
17  A. RailAmerica Engineering Standards and
18  Policies.
19  Q. Could you describe the purpose of that
20  document, to the best of your knowledge?
21  A. It's a guidelines, policies that we have to
22  follow.
23  Q. Guidelines for what?
24  A. For the railroad.
25  Q. For?

Page 20

1   A. For the line in which we inspect.
2   Q. Okay. Is that what you're saying?
3   A. Yeah, policies and standards.
4   Q. If I could just ask you to turn to -- and this
5   is difficult because there are no numbers, but it's
6   noted as 001044 would be the number -- it's a track
7   inspection report. Are you familiar with this
8   document, sir?
9   A. No.
10  Q. No? Okay. Does New England Central use a
11  different track inspection report form?
12  A. Yes, they do.
13  Q. Does the New England Central's track
14  inspection report contain all of the information
15  requested here?
16  A. Yes, to my knowledge.
17  Q. Do the New England Central track inspection
18  reports which you --
19  A. Other than I guess other than -- yeah, to my
20  knowledge.
21  Q. Do they contain a section to describe the
22  exception or condition on the track noted?
23  A. Yes.
24  Q. Do they contain a section to identify the
25  remedial action taken in response to the

Page 21

1   description?
2   A. Yes. Under "remarks."
3   Q. Pardon?
4   A. Remarks.
5   Q. So when you're out there, what you're saying
6   is that you have a form, and if you see a defect,
7   you note it on the form?
8   A. Correct.
9   Q. Even if that's a continuing defect, would you
10  still do that?
11  A. Not required. That I --
12  Q. Okay, you note the defect on the first day you
13  see it; is that correct?
14  A. Correct.
15  Q. And then do you note what remedial action will
16  be taken, or do you fix it that day?
17  A. If we're able to fix it.
18  Q. But if you're not able to, do you note a date
19  by which the remedial action will be taken?
20  A. They're given 30 days.
21  Q. Okay. So this is what I'm trying to get to,
22  and I don't want to confuse anybody, but you go out
23  there, you see a defect, you note it, and you know
24  you have 30 days to fix it, correct? So when you go
25  out there the next time on your track inspection

Page 22

```
1   report, do you note the defect again?
2   A.  Not within 30 days.
3   Q.  Okay.  Okay.  On your track inspection
4   reports, did you note the defect at Milepost 10.16
5   once you were aware of it?
6   A.  Not that I recall.
7   Q.  Why not?
8   A.  It was already documented from the geometry
9   car.
10  Q.  But it wasn't documented by you, was it?
11  A.  No.
12  Q.  It was never documented by you?
13  A.  No.
14  Q.  And you'd never seen that inspection report,
15  correct?
16  A.  This particular one?
17  Q.  I apologize.  We'll go back to Lawyer Exhibit
18  2.  Had you ever seen this document, sir?
19  A.  No.
20  Q.  So you never saw any documentation that noted
21  the defect at Milepost 10.16?
22  A.  General DOB.
23  Q.  You saw what?
24  A.  Daily operating bulletin.
25  Q.  But you never saw anything generated by the
```

Page 23

```
1   Track Inspection Department noting the defect?
2   A.  The --
3   Q.  And when the remedial action will be taken?
4          MR. DAVIDSON:  All right, answer the
5   question.
6   A.  Daily track bulletin gives the slow order.
7   It's a required document to have every day.
8   Q.  But you're the track inspector who's supposed
9   to do an inspection and note defects, correct, on
10  your track inspection?
11  A.  Found by myself.
12  Q.  Well, you went out and looked at the spot and
13  agreed that it was a defect, correct?
14  A.  Correct.
15  Q.  But you never noted.  It you just kind of
16  relied on what others were doing; is that correct?
17         MR. DAVIDSON:  I don't think that's a
18  fair characterization of his testimony in the
19  slightest.
20         MR. CULLIFORD:  I'm asking if it's
21  correct.  I'm not characterizing the testimony.  I'm
22  just asking if it's correct.
23         MR. DAVIDSON:  Well, the tone and
24  tenor of your last series of questioning says the
25  opposite.  He's testified --
```

Page 24

```
1          MR. CULLIFORD:  You're not going -- My
2   tone and tenor will not be reflected on the record,
3   but --
4          MR. DAVIDSON:  He's testified that
5   they went out right after they got the report and
6   verified that the track was, in fact, defective, so
7   he confirmed it on his own with his supervisor, and
8   then he noted it in the daily operating bulletin.
9   He saw it there; there's no reason -- He's testified
10  there's no reason to further note it in his reports,
11  but he sees it every day on the restrictions, still.
12  That's what he's testified to, and you're turning it
13  around somehow.
14         MR. CULLIFORD:  I'm not turning it
15  around.  I'm simply asking this.
16         MR. DAVIDSON:  I'm misunderstanding
17  what you're saying; it sounds like he's
18  misunderstanding what you're saying, as well.
19         MR. CULLIFORD:  I'm not trying to be
20  argumentative.  I apologize.
21         MR. DAVIDSON:  You're not.  I'm just
22  telling you it's not clear.
23  BY MR. CULLIFORD:
24  Q.  Are you aware of whether FRA requires the
25  information contained on this track inspection
```

Page 25

```
1   report?  In other words, this is what I'm trying to
2   get to, and we'll leave your report alone for a
3   minute, but the track inspection report would
4   contain all of this information.  Are you aware of
5   whether this is required by the FRA track safety
6   standards?
7   A.  Yes, it is.
8   Q.  Okay, and now presuming for the moment that
9   your track inspection safety reports have the same
10  thing, alls I'm asking is did you note anywhere for
11  the purposes of your records -- wait.  Are you
12  required to maintain your track inspection reports
13  for a certain period of time by the FRA?
14  A.  Yes.  One year.
15  Q.  For the purposes of your own records that FRA
16  requires you to keep and the information required to
17  be in them, did you note this defect in your track
18  inspection reports?
19  A.  Not that I recall.
20  Q.  Okay, if I could just refer you one more time
21  back to Lawyer Exhibit 2.  Okay?  Does this seem --
22  this is basically a seven-page document noting
23  conditions and defects.  Does this seem like a lot
24  of defects to you for a rail line of the size of New
25  England Central or a rail line that was tested?  I'm
```

# EXHIBIT "L"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------

NEW ENGLAND CENTRAL
RAILROAD, INC.
             Plaintiff,

        VS.                      Civil Action No.
                                 04-30235-MAP

SPRINGFIELD TERMINAL RAILWAY
COMPANY, ET AL.
             Defendants.

------------------------------

D E P O S I T I O N
-of-
MICHAEL LAWYER

Taken on Tuesday, January 9, 2007,
at the offices of
New England Central Railroad, Inc.
St. Albans, Vermont.

APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
RICHARD A. DAVIDSON, JR., ESQ.
Flynn & Associates, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169

ON BEHALF OF THE DEFENDANT:
ROBERT B. CULLIFORD, ESQ.
Senior Vice President and General Counsel
Pan Am Systems
14 Aviation Avenue
Portsmouth, NH 03801

NORMA J. MILLER, RPR
COURT REPORTERS ASSOCIATES
117 BANK STREET
BURLINGTON, VT 05401
(802) 862-4593

Page 14

1   A. Yes.
2   Q. And the third line, correct?
3   A. Yes.
4   Q. Also, further down the page at Milepost 13, it
5   refers to it again, correct? This would be the last
6   line of that first segment, basically?
7   A. Well, you say at Milepost 13. For
8   clarification, it's not at Milepost 13. It is at
9   12.75, I believe you're referring to, and it does
10  have the same condition there.
11  Q. Okay. And then further down at, let's say the
12  second -- the third-to-last box, Milepost 1 or
13  Milepost .72?
14  A. Yes.
15  Q. It also refers to this condition, correct?
16  A. Yes.
17  Q. And Milepost 1 or Milepost .03, it also refers
18  to this condition, correct?
19  A. Yes.
20  Q. With the conditions we've just talked about,
21  did you have any knowledge of their existence prior
22  to June 8th, 2004?
23  A. No.
24  Q. Did anyone from New England Central have
25  knowledge of their existence prior to June 8th,

Page 15

1   2004?
2   A. Not to my knowledge.
3   Q. Okay, so you've got a condition at Milepost
4   10.16 identified as warp 62. Do you know what
5   corrective action should be taken in response to
6   identifying this condition?
7   A. Yes.
8   Q. What is that?
9   A. You have an option of lowering the track to
10  the next acceptable speed that it does meet the
11  standards for, or repairing the condition.
12  Q. And what was the remedial action elected or
13  chosen by New England Central in response to
14  discovering this condition that Milepost 10.16?
15  A. The track speed was lowered to a temporary
16  speed restriction.
17  Q. And what was that speed?
18  A. 25 freight, 30 passenger.
19  Q. And would that be consistent with Class 2
20  track?
21  A. Yes, it would.
22  Q. When was that remedial action taken?
23  A. The same date of this test, June 8th, 2004.
24  Q. Was that action taken based on the test
25  results before you, or did someone go out and look

Page 16

1   at the site?
2   A. It was based on these test results.
3   Q. Did someone eventually go out and look at the
4   site?
5   A. Yes.
6   Q. When and whom?
7   A. I don't recall whether it was that day or the
8   following. It would have been Richard Boucher.
9   Q. Okay, Richard T. or Richard R.?
10  A. Actually for clarification, Richard T. does
11  not exist. It's Rick T. His legal name is Rick,
12  not Richard. Richard R. would have been the one
13  that inspected this.
14  Q. Okay. Did you ever discuss the results of
15  Mr. Boucher's physical inspection of Milepost 10.16?
16  A. Immediately after the test?
17  Q. Yes.
18  A. Or after the derailment?
19  Q. After the test.
20  A. After the test, I don't recall having a
21  specific conversation with him regarding individual
22  defects.
23  Q. Okay, then let me ask you this. Who on behalf
24  of New England Central elected to drop the speed in
25  response to identifying this defect?

Page 17

1   A. It would have likely been Richard. I don't
2   recall for sure.
3   Q. You wouldn't be involved in a decision to
4   address a track defect?
5   A. Track inspectors are given the authority to
6   drop the track speed as they see fit, given the
7   information that they have, without first conferring
8   with me.
9   Q. Okay. Then how did you ultimately discover
10  that the track speed had been lowered?
11  A. It was done when we were on the geometry car
12  the day that this test was conducted.
13  Q. Okay. All right, then, help me out, because
14  I'm confusing myself. You're on the test truck.
15  You go over this stretch of track, correct? And
16  this comes up -- does this come up almost
17  immediately on the --
18  A. Yes.
19  Q. So was Richard Boucher on the test car with
20  you, as well?
21  A. Yes.
22  Q. So you're both on this test car, and obviously
23  the defect shows up. You didn't discuss that with
24  him?
25  A. Not necessarily.

Page 18

1    Q. Well, how did you know that the slow order or
2    the speed would be reduced in response to that if
3    the decision was made -- in other words, what I
4    think you testified to and this is why I need your
5    help, is that the decision to reduce the speed on
6    this section of line was made while on the test car.
7    Did -- was that conveyed to you by Mr. Boucher on
8    the test car?
9    A. Our practice while on the test car is that
10   when a condition exists or pops up from the test
11   that needs the speed limited due to a defect, we
12   reduce the speed first, immediately after we go over
13   it, or before the track is given up behind the car,
14   and then verify it in the field in the subsequent
15   days, as soon as possible.
16   Q. So when you were on the test car, there was no
17   conversation between you and Richard Boucher saying,
18   "I'm going to drop the speed"?
19   A. Not specifically.
20   Q. But you, based on -- I'm sorry?
21   A. It's a given practice.
22   Q. So you assume that that was the remedial
23   action taken that day?
24   A. Yes.
25   Q. So did you ever go back to confirm that that

Page 19

1    remedial action was taken?
2    A. It should have been placed on a temporary Form
3    C bulletin, and then translated over to our daily
4    operating bulletin in the subsequent days. That
5    should be traceable.
6    Q. Okay, and it would remain on that bulletin
7    until it was corrected?
8    A. Yes.
9    Q. Do you know how this condition of warp or warp
10   62 could affect train operations?
11   A. As opposed -- are you talking about the track
12   speed could affect it, or what --
13   Q. No, the train going -- you identified -- could
14   you repeat your definition of what warp is?
15   A. It's a difference in cross level in a 62-foot
16   segment of track.
17   Q. What does that mean to a layman?
18   A. One rail is higher than another, or the --
19   Excuse me while I figure out the best way to explain
20   it. When you look at the two rails in proportion to
21   each one, one is higher than the other in some
22   cases, as it would be in a curve. A warp would be
23   that it changes too drastically in a 62-foot
24   segment.
25   Q. Okay, so this drastic change, does that

Page 20

1    affect, at whatever speed, how a train would operate
2    over that segment of track?
3    A. It would affect it in rocking, mostly.
4    Q. What do you mean by rock?
5    A. The rail car could rock if there is too much
6    of a change in a certain distance at a certain
7    speed.
8    Q. What would that certain speed be, do you know?
9    A. That's too general. I -- specifically I
10   couldn't tell you what speed would cause what amount
11   of rock. It's based on several factors. There's
12   the car loading. There's no given amount that a car
13   rocks for a certain defect. It's car loading,
14   center of gravity, all that would take into
15   consideration.
16   Q. Do you know if FRA publishes any guidelines or
17   regulations regarding when rock would occur?
18   A. Not when rock would occur. They have
19   guidelines that tell you the maximum allowable,
20   which is what this is referring to, this report from
21   the exception list there. There is a table in the
22   CFR that tells you what the maximum allowable change
23   in a 62-foot segment of track is for each section of
24   track.
25   Q. Correct, but the FRA does publish guidelines

Page 21

1    to some extent?
2    A. Outside of the regulation, I'm not aware of a
3    guideline.
4    Q. Okay. So you're not aware of a theory, let's
5    call it for now, that rock would be more likely to
6    occur under these conditions at a slower speed?
7    A. A theory, no. I'm familiar with the
8    regulation only.
9    Q. Do the regulations say that rock would -- the
10   slower the speed, the more likely rock would occur?
11   A. No, it doesn't speak to rock. It -- you asked
12   what a car would do if it gave -- if it was
13   subjected to this condition.
14   Q. Yeah.
15   A. And I told you it would rock. That's why
16   there's a restriction placed on it, but I don't know
17   of any guidance from the FRA that tells you this
18   specifically.
19   Q. Would anyone from New England Central be aware
20   of that?
21   A. Not to my knowledge.
22   Q. Are you familiar with the term, "wheel lift"?
23   A. Yes.
24   Q. Could you describe what that refers to -- in
25   to your knowledge in the railroad industry,

Page 22

1  obviously?
2      A. Wheel lift would typically be the flange of
3  the wheel is allowed to come up onto the rail, or
4  partially onto the rail head, as opposed to riding
5  on the gauged side of the rail, and it's usually an
6  imbalance that causes it.
7      Q. What do you mean by an imbalance?
8      A. Something causes the other side of the car to
9  go down, so the wheel lifts on the opposite -- it
10  rocks.
11      Q. So if one side of the rail is higher than the
12  other, could that cause wheel lift?
13      A. That's kind of general. In a curve, it's
14  standard to have one side higher than another.
15      Q. If one side is higher than the other, so as to
16  result in the warp condition, could that cause wheel
17  lift?
18      A. Please repeat that. You lost me.
19      Q. Okay, I understand that one rail can be higher
20  than the other, but if one rail -- if that -- that's
21  fine, but at the same time, if one rail is higher
22  than the other and a condition of warp is created,
23  correct?
24      A. Yes.
25      Q. Could that condition of warp in that instance

Page 23

1  cause wheel lift?
2      A. You're asking me to speak to something that
3  I'm not an expert on.
4      Q. I'm asking -- I'm just asking you for your
5  position.
6      A. I can't say what degree of lift would be
7  caused by what condition of track. All I know is
8  that the CFR and the Federal Railroad Administration
9  give a list of criteria that are safe for certain
10  standards of track, and that's what we go by.
11      Q. Okay, other than dropping the speed on the
12  line to the next class, what other remedial options
13  were available, if any?
14      A. Repair the condition.
15      Q. Was that considered?
16      A. Yes.
17      Q. Okay. When was that option considered?
18      A. It's considered immediately after the test,
19  but we repair them not necessarily in the order they
20  were found, but on a basis of when we can fix each
21  individual one. Our machines may not have been in
22  the area at the time, so we were most likely fixing
23  other ones, but not that one at that given point.
24      Q. At what given point?
25      A. Well, right after the test.

Page 24

1      Q. Okay. What about in the period between June
2  8th, 2004, and July 3rd, 2004?
3      A. We had not done work on that specific defect.
4  We had been doing work on other ones.
5      Q. Why would you not elect to perform work at
6  this location on this defect in the period June 8,
7  2004, to July 3rd, 2004?
8      A. It wasn't that we had not elected to. We
9  hadn't got to it yet.
10      Q. So you gave priority to repairing other
11  defects over repairing this defect; is that a
12  correct statement?
13      A. I don't know as it was on a prioritization
14  basis, just necessarily first come-first served, or
15  what we came across first.
16      Q. So if one defect was worse than another, that
17  wouldn't enter into your thinking as to when you
18  address it?
19      A. It would be based on the condition that
20  existed and how it would be prioritized, but they
21  were -- if they were something we could provide
22  remedial action by slow-ordering the track, we did.
23      Q. Okay, was it you were addressing the defects
24  on a first-come-first-serve basis, or addressing
25  defects based on a prioritization?

Page 25

1      A. There's two levels of defect in my mind that
2  we look at. One that shows a Class 0, which needs
3  to be addressed immediately. That it is not
4  necessarily safe for operations. Those are the
5  first. Those are prioritized. We have to do those
6  first. And then after that, it becomes a basis of
7  when we can get the machine to them. Usually we do
8  them in order, first come, first serve. If there's
9  a larger problem that is going to take more time and
10  effort, we may jump over that and prioritize in that
11  respect. There's not a great deal of thought that
12  goes into let's fix these, if we had 50 defects,
13  let's fix them in this order, 1, 2, 3, all the way
14  up to 50 -- that's not the case. There are some
15  that require immediate attention, other ones that we
16  can do in a first-come-first-serve basis.
17      Q. Could you take a look at Lawyer Exhibit 2
18  again, which is the test results?
19      A. Okay.
20      Q. Could you go through here and identify for me,
21  anyway, what some of the more significant defects
22  would be?
23      A. As far as prioritization?
24      Q. Yes.
25      A. The first page would be marked in the third

Page 26

1  column as 120.99. It's a cross level defect.
2     Q. And what type of defect is a cross level
3  defect?
4     A. It's the maximum allowable, and this is in
5  tangent track, cannot be more than three inches.
6  This is 3.31.
7     Q. Does that have any relation at all to a warp
8  condition?
9     A. No, they're two different defects. They're
10  both with regard to geometry of track, but --
11     Q. And why would you consider that to be a more
12  significant defect than a warp condition?
13     A. Because the limiting class was 0, meaning that
14  it needed to be resolved before we could send
15  another train over it.
16     Q. Okay, whether trains could operate over the
17  line -- Was your main consideration keeping trains
18  running when you decided which defects to address?
19     A. Yes.
20     Q. And that consideration was driven by basically
21  the track class that was identified by the test
22  truck? What I'm trying to get at is on these test
23  results, wherever there's a limiting class of zero,
24  a train could not operate over that segment of track
25  until the defect was corrected; is that a true

Page 27

1  statement?
2     A. Yes.
3     Q. So what causes -- I guess what I'm trying to
4  get to is what causes a limiting class of zero
5  versus a limiting class, say, of 2?
6     A. With respect to cause, it would depend upon
7  the defect.
8     Q. In other words, does a more severe defect lead
9  to a lower limiting class, is I guess basically what
10  I'm asking.
11     A. Yes.
12     Q. And during the period June 8th to July 3rd,
13  2004, were all of the areas identified by a limiting
14  class of zero addressed by New England Central?
15     A. Yes.
16     Q. Was that basically done right after June 8th,
17  2004?
18     A. As I recall, everything was dealt with on June
19  8th that was found on June 8th with respect to
20  zeroes.
21     Q. Then what's the next -- what would the next
22  category of defects be for remedial action? You've
23  taken care of the limiting class zero. What was
24  your plan -- or New England Central's plan, for that
25  matter -- to address the additional defects on this

Page 28

1  report?
2     A. It would be dependent upon the type of defect
3  and what the repair would be. For instance, if it
4  was a short gauge defect that didn't involve our
5  tamper and regulator to travel to it, we could take
6  a truck with a couple guys in it and repair the
7  defect. So that was based, I guess, upon what the
8  repair would be and the magnitude of it. If it was
9  a geometry condition or a surface condition that
10  would require the tamper to do work on it, we would
11  wait for the tamper to get to that point, because
12  it's not cost-effective to travel it up and down the
13  track. You travel it in one direction and hit every
14  defect as you come to it, first-come, first-served.
15     Q. And where did the -- okay, so for any of the
16  limiting Class 3 defects were tampers and
17  regulators --
18     A. I don't recall specifically.
19     Q. Would a tamper or a regulator be necessary to
20  rectify a condition identified as cross level?
21     A. Not necessarily.
22     Q. Could you flesh that out a bit?
23     A. You could do it by hand. Meaning -- well,
24  there's a couple different alternatives. Jacking
25  the track with track jacks and tamping with a

Page 29

1  tamping stick to get the stone underneath the ties
2  could be done. It's a more labor-intensive and
3  time-consuming deal, but in this event, if we had a
4  zero, we would have done that if the tamper wasn't
5  close by.
6     Q. Could that method have been used at Milepost
7  10.16, as well?
8     A. Could have been, yeah.
9     Q. So it's safe to say that after June 8th, you
10  and/or NECR came up with a plan to address the
11  defects noted on Lawyer Exhibit 2, correct?
12     A. Yes.
13     Q. Who was involved in those discussions?
14     A. It would have been myself and Richard Boucher.
15     Q. Anyone else?
16     A. Possibly Joe Spirk, the chief engineer.
17     Q. What about Charles Moore?
18     A. He would have probably not been terribly
19  involved in the decision on how to address them.
20     Q. How many discussions do you think you had with
21  Mr. Boucher regarding a plan to address these
22  defects?
23     A. It would be hard to say. We speak daily,
24  discuss status.
25     Q. Would he ever submit anything in writing to

Page 66

1  the weather would be in Hartland, Vermont, on the
2  morning of July 3rd, 2004?
3    A. When I got there.
4    Q. What time did you get there?
5    A. I couldn't tell you exactly what time. I can
6  tell you that it would have been at least two hours
7  after my notification.
8    Q. Okay.
9    A. Making it no earlier than probably 8:30.
10   Q. Did you talk to anybody -- when you arrived in
11 Hartland, did you talk to anybody about what the
12 weather had been like at the time of the derailment?
13   A. No.
14   Q. Do you know who would know, other than
15 obviously the crew on the train, what the weather
16 was like at the time of the derailment?
17   A. As I recall, Gene Trombley at the time was in
18 Windsor, Vermont, at a relative's, when I contacted
19 him to come help us with the derailment.
20   Q. And where is Windsor, Vermont, in relation to
21 Hartland, Vermont?
22   A. Well, it's ten miles, give or take a mile,
23 from the derailment site.
24   Q. Is it similar terrain to Hartland, Vermont?
25   A. I would say yes.

Page 67

1    Q. Okay, what did he tell you? Did you ask him
2  about the weather?
3    A. Not that morning. There was a subsequent
4  conversation while we were investigating it,
5  probably several days later, and he recalled it was
6  sunny.
7    Q. Did he confirm that he was awake -- The
8  derailment occurred around 6 in the morning. Strike
9  that. I'll follow up with him on that. Thank you.
10 Are you aware that New England Central has prevented
11 the crew operating the train, the B & M train, on
12 July 3rd, 2004, from operating on the line, on New
13 England Central's property -- strike that.
14      Are you aware that pursuant to the trackage
15 rights agreement between New England Central and the
16 Boston & Maine Corporation, Springfield Terminal,
17 that New England Central has not permitted the crew
18 operating the train, subject to the July 3rd, 2004,
19 derailment, they're not allowed to operate on New
20 England Central's line. Did you know that?
21   A. Excuse me, that was a fairly long statement.
22   Q. Yeah, does New England Central permit the crew
23 operating the train involved in the July 3rd
24 derailment, can that crew today operate on New
25 England Central's property?

Page 68

1    A. I can't say with certainty, but I believe they
2  are allowed to now.
3    Q. They are?
4    A. I believe there was a short instance where
5  they were not, but I guess Charles Moore would be
6  better versed to answer that question, or Charles
7  Hunter, our current general manager.
8        MR. DAVIDSON: You're asking him that
9  question in terms of personally, because that's one
10 of the areas --
11       MR. CULLIFORD: The next question
12 is -- Yes, you're absolutely right --
13 BY MR. CULLIFORD:
14   Q. On behalf of New England Central, do you know
15 if that crew is allowed to operate?
16       MR. DAVIDSON: I'm going to be object.
17 He's not identified to answer to any of the
18 disciplinary issues that resulted from the
19 derailment. We'll identify someone else, if you
20 would like to have someone speak to that.
21       MR. CULLIFORD: Can we go off the
22 record real quick?
23       (A discussion took place off the record.)
24       MR. CULLIFORD: With the exception of
25 I've got some questions about the Amtrak agreement

Page 69

1  and the -- we're done.
2        MR. DAVIDSON: And the weather.
3        MR. CULLIFORD: Personally, and as a
4  30(b)(6) witness.
5        MR. DAVIDSON: So we'll suspend the
6  30(b)(6), and he's done personally?
7        MR. CULLIFORD: Yes.
8        (The deposition concluded at at 11:36 a.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT "M"

Volume 1, Pages 1-180

Exhibits: 10-26

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

NEW ENGLAND CENTRAL RAILROAD, INC.,

Plaintiff

v.                    Docket No. 04-30235-MAP

SPRINGFIELD TERMINAL RAILWAY

COMPANY and BOSTON AND MAINE

CORPORATION,

Defendants

------------------------------

RULE 30(b)(6) DEPOSITION OF SPRINGFIELD TERMINAL

RAILWAY COMPANY by ROGER D. BERGERON

Thursday, January 11, 2007, 10:11 a.m.

Law Office of Robert H. D'Auria

41 North Road, Suite 205

Bedford, Massachusetts  01730


----Reporter:  Kathleen Mullen Silva, RPR, CRR----

Beacon Hill Court Reporting, Inc.

807 Main Street, 2nd Floor

Worcester, Massachusetts 01610

508.753.9286

Roger D. Bergeron
January 11, 2007

(Pages 90 to 93)

90

1  us, yes.
2          MR. DAVIDSON: Could we have this marked
3  I think 20, 21, please.
4          (Marked, Exhibits 20-21, photocopies of
5  photographs.)
6      Q. Dan Griffiths was the one who was, you
7  thought, trying to get the pictures?
8      A. To the best of my knowledge, yes.
9      Q. And you have not seen any photographs in
10 the possession of the STRC that they took themselves
11 since your termination, correct?
12     A. To the best of my knowledge, no.
13     Q. Do you know whether or not the car that
14 derailed, which you don't remember the number of it,
15 was caused to derail by a car following it, or was
16 it caused to derail because of something that
17 happened to it at that point?
18     A. There was one car -- only one truck of one
19 car derailed at milepost 10.2, in that general area,
20 and that's what the marks indicated, is one truck
21 derailed of one car.
22     Q. But you don't know what caused that to
23 derail in terms of forces from other cars, do you?
24     A. I don't know if it was caused by a force of

91

1  another car.
2      Q. Isn't it true that derailments can occur
3  because of load shifting?
4      A. That is correct.
5      Q. Isn't it true that derailments can occur
6  because of a defective center of gravity in the rail
7  car?
8      A. That is correct.
9      Q. You weren't able to establish whether or
10 not the loads in the rail car that derailed shifted,
11 were you?
12     A. I didn't determine that, no.
13     Q. In fact, the STRC didn't determine it
14 either because the rail car was on its side when
15 they got there, correct?
16     A. I believe the car was on its side when they
17 got there, that is correct.
18     Q. So it would be impossible, once the car is
19 on its side, to determine the load shift, wouldn't
20 it be?
21     A. Not necessarily.
22     Q. How would you be able to determine a load
23 shifting with a rail car on its side after
24 derailment? We're talking about boxcars. We're not

92

1  talking about open-loaded cars, open top-loaded cars
2  or anything. We're talking about boxcars.
3      A. Evidence of shifting is -- you'd have to
4  look at or inspect the lading. What I'm saying is
5  it's not impossible to do it if it's like newsprint
6  or bales of steel coils, things of that nature. You
7  know, newsprint and all that stuff there, not only
8  is it loaded, but it's also like packed into cars.
9  So to see its proximity to the door and to the
10 ceiling and all that, even with the car on the side,
11 you'd be able to see a missing or shift in a roll.
12     Q. Even if the car was on its side?
13     A. You could very well, yeah, on newsprints
14 and heavy coils and things of that nature, even if
15 it's on its side, yes.
16     Q. What was the lading in the car that
17 derailed?
18     A. I don't know. I'm not too sure.
19     Q. Did you ever make that determination at the
20 scene?
21     A. I never inspected inside the car at the
22 scene.
23     Q. Did you ever ask anyone what was the lading
24 in that box car?

93

1      A. I believe I did.
2      Q. And you don't recall what it was?
3      A. Not right now, no.
4      Q. Now, excessive speed can also cause a
5  derailment, correct?
6      A. Yeah, excessive speed can cause a
7  derailment.
8      Q. The load shifting could cause a derailment?
9      A. That is correct.
10     Q. Binding of the -- well, a stiff truck
11 itself could cause a derailment, couldn't it?
12     A. Oh, yeah.
13     Q. Car rocking action could cause a
14 derailment?
15     A. That is correct.
16     Q. And there's a number of things that can
17 cause a car to start rocking, correct?
18     A. That is correct.
19     Q. A defect in the car could cause that?
20     A. That's correct.
21     Q. A defect in the track could cause that?
22     A. That is correct.
23     Q. A combination of things could cause that?
24     A. That is correct.

24

**Roger D. Bergeron**
**January 11, 2007**

---

94

1    Q. The actual truck suspension and side
2  bearings could also have an effect and cause a
3  derailment, is that a true statement?
4    A. That's a true statement.
5    Q. What did you do to determine whether or not
6  the trucks on the derailed car were stiff or not
7  stiff?
8    A. I spoke with the mechanical officer about
9  the condition of the car.
10    Q. Did you ask him that specifically?
11    A. I asked him if there was anything in the
12  car that would have contributed to wheel lift in the
13  derailment that he noticed.
14    Q. And he said no?
15    A. He said the best that he'd seen, to his
16  knowledge -- he didn't take any exception to what
17  he'd seen at the derailment site at the time.
18    Q. But you don't know if he specifically
19  examined the trucks on the derailed car, do you,
20  specifically?
21    A. Specifically, no. I wasn't there, no.
22    Q. And you don't know whether or not the load
23  shifted or not? Did you ever ask him that question?
24    A. I asked if he took any exception to

---

95

1  anything inside the car or anything. He said he
2  didn't see anything in the lading. I believe when I
3  first asked him, he said he hadn't been in the car
4  yet.
5    Q. At any point in time before you made your
6  determination, did you talk to anyone who had been
7  in that rail car?
8    A. Before?
9    Q. Before you made your determination as to
10  the cause of the derailment.
11    A. No.
12    Q. So you didn't know whether or not the load
13  shifted when you made your determination, correct?
14    A. As far as the lading, no.
15    Q. You never interviewed the crew, did you?
16    A. No, I did not.
17    Q. Did the STRC ever obtain a written
18  statement from the crew?
19    A. To my -- I didn't.
20    Q. But did the company? You're testifying on
21  behalf of the company right now.
22    A. Well, in the hearing --
23    Q. I'm not asking in the hearing. A written
24  hearing, not oral testimony, but a written statement

---

96

1  where they sat down and wrote out what they believed
2  happened.
3    A. I believe, and in the transcript I've seen
4  a copy of a GTI incident report made out by the
5  conductor.
6    Q. I'm not asking about reports. I'm asking
7  did anyone ever obtain a written statement from the
8  crew, either the engineer or the conductor, where
9  they wrote out what they believe occurred, happened
10  and the sequence of what happened. I'm not asking
11  about any reports. I'm asking for a verbatim
12  statement, "I, so and so, Kari, being the whatever
13  officer on the engine of train whatever," you know,
14  describing what happened?
15    A. When I reviewed the transcript of the
16  hearing, in the transcript was that report. That is
17  made out by the conductor, and that is his
18  information as to what happened as to the cause of
19  derailment.
20    Q. I understand he wrote a report. I'm asking
21  at the scene, did anyone get a statement from either
22  crew member? That's what I'm asking.
23    A. I don't know.
24    Q. You don't know. That's a fine answer. So

---

97

1  you didn't rely on any written statement from the
2  crew that you obtained to make a determination?
3    A. No written statements, no.
4    Q. During the course of your investigation,
5  isn't it true that it's deemed to be important to
6  document and record the crew's observations and
7  actions immediately before the derailment?
8    A. Could you ask the question again?
9    Q. Sure. Let me rephrase it this way:
10  According to the train derailment cause findings by
11  the AAR that your company has adopted, isn't it true
12  that the interview has a purpose to secure and
13  document, as well as record the observations and the
14  actions of the crew?
15    A. That is correct.
16    Q. And that wasn't done in this case, was it?
17    A. I don't say it was done.
18    Q. Well, have you ever reviewed a written
19  statement of the crew's observations and actions
20  prior to you making your determination as to the
21  cause of the derailment?
22    A. No, I did not.
23    Q. And as far as you understand, you know of
24  no written statements, do you?

---

**Roger D. Bergeron**
**January 11, 2007**

(Pages 118 to 121)

118

1    A.  Not between the point of derailment and
2  station negative 3.
3    Q.  What about before the point of derailment?
4    A.  Yes.
5    Q.  Would you indicate for us which station
6  that you find an exception as a certified track
7  inspector, according to your measurements that you
8  did on whatever day that was -- it says July 3 on
9  it.
10    A.  No.  July 6.
11    Q.  Okay.  July 6.
12    A.  About 11:30.
13    Q.  Does that refresh your memory as to when
14  you were out there?
15    A.  Yeah.
16    Q.  So you were out there three days after the
17  derailment, correct?
18    A.  That is correct.
19    Q.  Okay.  Good.
20    A.  Now, what was the question?
21    Q.  Would you mark which station that you find
22  an exception with in terms of being a certified
23  track inspector as to the measurements that you
24  took.

119

1    A.  It would be station 3.
2    Q.  And what about station 3 that you found an
3  exception?
4    A.  Between station 3 and the point of
5  derailment, at station 3 we have a 6 1/4 inch static
6  reading with an additional -- it looks like a
7  quarter of an inch.  It might even be a half -- with
8  an additional -- I can't really make it out on this.
9  It's either an eighth -- 1/8.  It's an additional
10  reading, or maybe 1/6, 1/8.  It's very hard to make
11  it out on this copy.
12    Q.  Okay.  What about that?
13    A.  Between that and the point of derailment,
14  the difference in crosslevel is -- it's about an
15  inch and three eighths, roughly.
16    Q.  Okay.  What should it be?
17    A.  Between -- I don't establish the speed on
18  the New England Central for the curvature.
19    Q.  Well, that section of track was set at 25
20  miles per hour class 2.  Does that conform with
21  class 2 requirements of the FRA?
22    A.  Between these readings here --
23    Q.  We were just talking about 3 and the point
24  of derailment.  Are you changing -- are you leaving

120

1  those points?
2    A.  Yes, I am.
3    Q.  Where are you talking about now?
4    A.  Now what I'm talking about is a reading
5  that goes between 5 and another mark of a joint, and
6  that says 6 1/2 plus 3/8.  And then the reading
7  between a second one that says 5 and another one
8  that says 6 1/2 and another one that says 5 5/8 and
9  the crosslevel here that says 5-inch.  In those
10  differences here, you have the beginnings of what
11  they -- it's 213.63, that's the federal requirement.
12  And it's the difference in your rock-off hazards.
13    Q.  And where is that contained in the federal
14  regulations?
15    A.  It's 49 CFR Part 213.63, that's a standard
16  that covers track surface.
17    Q.  Now, for the sake of the record, you
18  pointed to a number of places here.  For the sake of
19  the record, would you please go back and reference
20  those by the station numbers that you have, and if
21  you need to add in additional letters for your inner
22  curve, that would be fine.  Would you please label
23  this one A, B and C.
24    A.  (Witness marking diagram.)

121

1    Q.  Now, where were you taking your
2  measurements from before in your previous testimony?
3  You pointed to a 5-inch --
4    A.  Oh.  (Witness marking document.)
5    Q.  Okay.  Would you describe those for the
6  jury?
7    A.  I just marked for the transcript A, B and C
8  as being on what I know to be the west rail --
9    Q.  Correct.
10    A.  -- on this chart here.  The areas that I
11  was talking about where I gave 5, 5, 5 5/8 and 5
12  7/8, when we gave it earlier, were readings that
13  were indicated as joints on the east rail that
14  aren't marked with anything.
15    Q.  Would you mark those with D, E and so forth
16  until you exhaust your markings.
17    A.  (Witness complies.)
18    Q.  Now, would you describe for the jury again
19  what you take exception to from those calculations?
20    A.  It's the geometry readings that you take
21  when you go with E plus A, F plus B and G plus C.
22  When you get those six pairs of joints, you end up
23  with a reading that -- and I don't know
24  specifically -- I don't know the wording exactly out

**Roger D. Bergeron**
**January 11, 2007**

(Pages 150 to 153)

150

1    Q. And White River Junction is near where this
2 derailment occurred, correct?
3    A. Oh, yes, very near.
4    Q. How close would you say it's to where the
5 derailment occurred?
6    A. White River Junction. I can tell you right
7 by the chart. White River Junction is milepost 17.2
8 and where it derailed was 10.7.
9    Q. So about 7 miles?
10    A. 7 miles, yes.
11        (Marked, Exhibit 25, dispatching sheet.)
12    Q. In order to prepare for your testimony
13 today, as well as reviewing for the B&M's and the
14 STRC's deposition earlier this week, did you have a
15 chance to look at the inspection reports for this
16 line?
17    A. Yes.
18    Q. In fact, have you come to the knowledge
19 that the line was inspected approximately two days
20 before the derailment by the NECR's track inspector,
21 approximately July 1?
22    A. I don't know if I'd reach that conclusion.
23    Q. Well, did you see an inspection report
24 dated July 1?

151

1    A. I was provided with a list of --
2    Q. Yes or no, sir?
3    A. No, I did not.
4    Q. You never saw the -- what inspection
5 reports were you reviewing?
6    A. I was provided with a list of NECR
7 inspection reports. I was told they were inspection
8 reports, but it looked more like a work product for
9 a maintenance crew.
10    Q. Have you ever seen this document that's
11 entitled NECR daily track inspection report for July
12 2004?
13    A. Yes, I have.
14    Q. Was that part of your review?
15    A. I have reviewed this, yes, this was part of
16 my review.
17    Q. And that says that the line between the
18 mileposts in question was inspected on July 1,
19 correct?
20    A. It says that -- well, I guess -- it says
21 the daily track inspection report -- I'll read
22 directly from it. The document says "000," it looks
23 like either "292" or "392." And it says, "Mileage 0
24 to 76.5 Roxbury sub."

152

1    Q. Stop right there. Is that milepost 0 --
2 your understanding?
3    A. Mileage 0 to 76.5.
4    Q. Okay.
5    A. And then there's no information filled out.
6 And the categories go, "Rail, joints, spikes, tie
7 plates, rail anchors, frog, switch point, switch
8 inspection in yards, mileage, switch stand, switch
9 plates, guardrail, crossing, ties and timber and
10 right-of-way." Under "remarks" column it says, "WR
11 junction siding is okay," and the date is 7/1/04.
12    Q. There's no exception taken at any mileage
13 indication for any portion of that line, correct?
14    A. There's nothing filled in on this report
15 except the remarks column that says "WR junction
16 siding is okay." Or that could be "UK," but
17 something "okay."
18    Q. In fact, at the top of the report, doesn't
19 it say the track foreman or inspector will prepare
20 report each day, "Circle defects requiring
21 attention. If more space is required, use back of
22 sheet," correct?
23    A. That is correct.
24    Q. So if nothing was circled, that would

153

1 indicate there were no defects found, correct?
2    A. I guess, yeah.
3    Q. Now, in fact, have you ever seen the report
4 for June 29, '04 for that same section of track?
5 Have you ever seen this document?
6    A. I believe I looked through a document.
7    Q. For that date?
8    A. Yes.
9    Q. In fact, no exceptions were taken to any
10 portion of the line that day either, was there?
11    A. Yeah.
12    Q. Where?
13    A. The report that I'm looking for is 000895,
14 that's what I'm looking at. It's from 0 to 50.5.
15 Again, under the remarks column it says that White
16 River Junction siding is okay. It says something
17 Boucher patrolled from 74 to 50, and then it says,
18 under "ROW," "Remove obstructions near track" and
19 then there's two numbers in the number column, 16.95
20 and 19.95.
21    Q. Now, were those the only two records you
22 reviewed from the inspection reports?
23    A. No, it was not.
24    Q. Did you review all of June and all of

**Roger D. Bergeron**
**January 11, 2007**

(Pages 170 to 173)

170

1   Q. Did anyone ask you for information or data
2 to support their position or their opinion regarding
3 those issues, i.e. did Larry Ferguson or someone
4 like him come to you and say, "Hey, I need this
5 information because it's my position these guys
6 should be back on the line. I need this information
7 to support my position"?
8   A. No, no one did.
9   Q. You've also been identified today to talk
10 about the damages that the STRC is claiming in this
11 case. What knowledge do you have regarding the
12 damages that you're claiming?
13   A. The mechanical department damages are the
14 only damages I know that I have been appointed.
15      MR. DAVIDSON: Off the record.
16      (Discussion held off the record.)
17      MR. DAVIDSON: Back on the record. The
18 STRC is going to identify someone else to testify as
19 to the damages that they're claiming in their
20 counterclaim in this lawsuit and we'll work out a
21 date and time to get that together. We're also
22 going to have someone else identified regarding
23 negotiating, drafting of the Trackage Rights
24 Agreement. And that's what we reserved on so far.

171

1 Am I right?
2      MR. WRIGHT: To my knowledge, yes.
3   Q. A couple last things here. Have you ever
4 been party to an FRA geometry report on the B&M or
5 STRC?
6   A. Yes.
7   Q. Have you ever been someone who was involved
8 with the actual testing?
9   A. Yes.
10   Q. So you've actually ridden in a test car
11 before?
12   A. Yes.
13   Q. When you ride in a test car, what was your
14 role?
15   A. I've been track supervisor, roadmaster,
16 engineer of track for a territory.
17   Q. Let me stop you right there. Have you done
18 it in each one of those capacities?
19   A. Yes.
20   Q. In any of those capacities, were you the
21 person responsible for reading the data as it was
22 being generated during the test ride?
23   A. Directly, yes, I have.
24   Q. So if you were riding down the track in the

172

1 test car and the geometry car is telling you that
2 you have an exception, let's say at milepost 5 and
3 it's telling you you can go from class 3 to class 2
4 track, what would you do in response to that on the
5 geometry car?
6   A. Either remove the track from service or
7 protect it with a slow one.
8   Q. There would be no reason to remove it from
9 service if you're going from class 2 to 3, would
10 there?
11   A. From a 3 to a 2?
12   Q. Correct.
13   A. If it was undisputable, no, there would be
14 none.
15   Q. So you could reduce it down to class 2,
16 which means you're just reducing it from 40 miles an
17 hour to 25, correct?
18   A. Class 3 allows you to do -- or the speeds
19 are class 2 is 25 for freight and 30 for passenger.
20   Q. I'm only talking about freight, because
21 we're both freight railroads.
22   A. If we're strictly talking freight, it's 25
23 miles an hour, correct.
24   Q. Now, that's one of the remedial actions you

173

1 can take immediately, correct?
2   A. That is correct.
3   Q. And you're doing that to protect the track
4 and the trains coming down?
5   A. Subsequent movements behind you on the
6 line.
7   Q. Now, the other remedial action you do is to
8 repair it, correct?
9   A. The initial remedial action, if I was the
10 track supervisor of the territory, is to put the
11 appropriate speed restriction or remove the track
12 from service. If it was field verified, then that
13 guy could put it back into class 2. If I found a
14 condition that I thought, even though it says class
15 2, I still may want to check it because it was
16 suspect. I might take it out of the service until
17 one of my people field verified it, and I would tell
18 him by radio to check this spot here and give him
19 the location to fields verify.
20   Q. If your employee found that, in fact, there
21 was a defect there, but it only reduced it down to
22 class 2, you could still operate it with the
23 restricted speed?
24   A. That is correct. If under field

44

**Roger D. Bergeron**
**January 11, 2007**

(Pages 174 to 177)

174

1 verification, it was found that there wasn't any
2 other extenuating circumstances, the ties were tight
3 to the rail and in pretty good shape and all that,
4 then the speed restriction would be enough to make
5 the initial remedial action appropriate.
6     Q.  Then after that, after you verified it and
7 it existed, you would then take the second remedial
8 action, which would be then to fix or repair it,
9 correct, to bring it back up to class 3?
10    A.  Correct.
11    Q.  Because you want to be running at class 3
12 in a freight railroad of your size, right?
13    A.  That is correct.  I mean, if -- well, in
14 general.  I mean, if -- that may not be true.
15    Q.  Okay.  What situation would that exist
16 where that's not true?
17    A.  If I found enough conditions out there that
18 the initial remedial repair to 25 miles an hour
19 really wouldn't make sense because I found other
20 conditions that would promote poor train handling,
21 like there was a ten miles an hour the mile before
22 that, there would be no sense in let's get this up
23 to 40 miles an hour, when actually we're asking an
24 engineer to kind of pick up and slow down and pick

175

1 up and slow down.  So what you would do is you would
2 gather all that data.  The answer to the question is
3 it's not necessarily everything is listed back to
4 the class.  I guess that's the answer.
5     Q.  Ultimately you want your freight railroad
6 to be running at the highest class it can be running
7 at, correct?
8     A.  At the highest timetable speed.
9     Q.  If you can get up to class 3, that would be
10 optimal, correct?
11    A.  That is correct.
12    Q.  So in that situation just described, if you
13 had some other places on that same line that were
14 down to class 1, you would obviously put together a
15 program to take care of the different defects to
16 bring everything back up to class 3?
17    A.  That is correct.
18    Q.  That's all I meant.  I didn't mean it in
19 isolation.  I meant you would then make it part of a
20 repair program or a fix program.
21    A.  Yes.
22    Q.  All right.
23        MR. DAVIDSON:  I just want to reserve on
24 that.

176

1     Q.  Now, let me ask you this question:  Is
2 there anything that you've testified to so far today
3 where your answer would be different on behalf of
4 the Boston & Maine?
5     A.  No.
6     Q.  With that representation and with your
7 agreement that you will carefully review your
8 transcript of your testimony, that you'll let us
9 know within 30 days if there's any information that
10 is different on behalf of the Boston & Maine, I'll
11 be glad to suspend this deposition for the time
12 being, and I'll be glad to suspend the Boston &
13 Maine's 30(b)(6) as well.
14        Is that agreeable, counsel?
15        MR. WRIGHT:  It sounds reasonable.
16    Q.  This way we don't have to go through the
17 same questions all over again.  The answers for the
18 Boston & Maine would be the same as they are for the
19 Springfield on the questions we've gone over today?
20    A.  That is correct.
21        MR. DAVIDSON:  We're going to suspend.
22 We're going to wrap some things up with the other
23 witnesses, and we'll start tomorrow morning with the
24 other guys.

177

1        MR. WRIGHT:  Okay.
2        MR. DAVIDSON:  And we'll get the
3 engineer and conductor and Larry.
4        MR. WRIGHT:  That's correct.
5        (Marked, Exhibit 26, STB Finance Docket
6 Number 31250.)
7        (3:21 p.m., proceedings adjourned.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

# EXHIBIT "N"

Initial Rail Equipment Accident/Incident Record          TA 001

1. Date of Accident/Incident(YY/MM/DD)    04/07/03    2. Time of Accident/Incident    6:40    AM  X
    PM

3. Name of Railroad    New England Central Railroad, Inc    Light  X
4. Name of Other Railroad    Springfield Terminal    (If involved)    Dark
5. Railroad responsible for Track Maintenance    New England Central Railroad    6. Incident Number    IO 04-300

7. Type of Accident/Incident(Derailment,Collision,Obstruction,Other{describe})
**Derailment**

8. *Copy to Environmental Claim: yes ☐    no ☒    FAX 610-458-7448    **ATTN: Bill Hoffman**
(*If Hazmat Involved)    Enviromental Control Administration (24 hour no.)    (800) 432-2481

9. Weather Conditions    Clear 70 deg.    10. Division    Roxbury Sub    11.    Nearest City/Town    Hartland
12. FRA Track Class    3    13. Milepost    10.18    (to tenths)    14. State    Vermont

15. Specific Site    between MP 10.18 & MP 5.58

16. Speed:    _____    shoving ☐  pulling ☒ ,    actual ☐    estimated ☐

17. Track Type(Main, Yard,Siding,Industry)    Main    Operating Method:    ABS/TWC  (i.e. yard limits)

18. Train/Job Number    WJED    19. Total Locomotive Units in Train    2    20. Total Cars in Consist    14  lds  5  mtys
    21. Total Locomotives Derailed    0    22. Total Cars Derailed    7  lds  0  mtys

23. Number of Hazmat Cars Damaged or Derailed    0    Evacuation:    yes ☐    no ☐
24. Number of Hazmat Cars Releasing Product    0    Hazmat Commodity Released    _____

| If crossing: | public ☐ | private ☐ | Equipped with: | | |

| Crossing Equip. Functional: | yes ☐ | no ☐ | Inspected: | yes ☐ | no ☐ | Train ☐ Car ☐ | struck | Train ☐ Car ☐ |

**Employees involved:**    1) P. Kari (Engineer)    2) J. Scappace (Conductor)    3)

On Duty Time:    1)    05:00    2)    05:00    3)
Railroad Experience:    1) 30 plus yrs (how long?)    2) 30 plus yrs. (how long?)    3)  (how long?)
Reasonable cause test    1) yes ☒  no ☐    2) yes ☒  no ☐    3) yes ☐ no ☐

| 25. Persons Injured/Killed | Injured | Killed | | Injured | Killed | |
|---|---|---|---|---|---|---|
| Worker on duty-employee | | | Worker on duty-contractor | | | |
| Employee Not on Duty | | | Contractor-Other | | | |
| Passengers on Trains | | | Worker on duty-volunteer | | | |
| Nontrespassers on RR property | | | Volunteer-Other | | | |
| Trespassers | | | Nontrespassers/off railroad property | | | |

26. Narrative:
use additional
sheet if necessary

**Springfield Terminal (Guilford) train WJED operating southbound on NECR main track with 2 engines, 14 loads and 5 empties on the main track manned by ST employees, derailed trailing truck of the 6th car (CNIS 413224) from head end at MP 10.18. ST crew drug car approximately 5 miles (traversing an open deck bridge and 3 road crossings) before the derailed truck struck the frog located at the north switch of the Hartland siding (MP 5.58) resulting in this car turning on it's side and derailing the subsequent 6 cars. All expenses resulting from this derailment will be the responsibility of Springfield terminal (Guilford) per ICC finance Docket 31250. Clearing of the derailment and reralling of equipment was done by the ST. Track work is being performed by the NECR and outside contractor which will be billed to the ST along with all other associated expenses.**

27. Primary Cause:    Under investigation    28. Contributing Cause:

Damage estimates:    Cost of Clearing    _____    29. Track, Signal, Way & Structure Damage    Labor Incurred    _____
(in US dollars)    Medical    0    _____    30. Equipment    Lading    _____

31. Is incident FRA/TC Reportable?    yes ☒    no ☐

32. Name of Railroad Official    Charles Moore    33. Telephone Number    802-527-3401
    10/20/99, for all non-PI Incidents

34. Signature    _____    35. Date    _____    This form meets requirements of FRA F 6180.97

# EXHIBIT "O"

# RAIL AMERICA' S ATLANTIC REGION DISPATCH CENTER

## INCIDENT DOCUMENTATION FORM

RAILROADS (CIRCLE) TPW  NECR  ACSO  OTVR  SCRF  VSRR  CPDR  NVVA  CA

TIME: _0641_  LOADS/EMPTIES: _14-5_  TONS: _1780_  DATE: _7/3_

WEATHER CONDITIONS: _Clean._  Temperature: _____

TRAIN: _WJCO_  ENGINE NUMBER(S): _MEC 372- 370_ LOCATION: _S.S. Royb. Sal._

ENGINEER: _Karl._  MILEAGE: _535_

CONDUCTOR: _Scappaco_  MAIN TRACK  (YES)

CONDUCTOR: _____  OBSTRUCTED  NO

PAGED (CIRCLE)

OFFICIALS CONTACTED: _Law yon._  TIME: _0642_  YES  (NO)

_Murphy_  TIME: _0643_  YES  (NO)

_Laino._  TIME: _0650_  YES  (NO)

_Ron Dag._  TIME: _0648_  YES  (NO)

_Rm. Chief_  TIME: _0650_  YES  (NO)

_____  TIME: _____  YES  NO

INJURIES: _None_

FRA NOTIFIED: 800-424-8802 _____  REPORT NUMBER: _____

## OPERATING INFORMATION:

APPROXIMATE SPEED  _22_  AMPS  _Aprox 200_

THROTTLE POSITION  _2nd (Knotch)._

BRAKING  (CIRCLE)  INDEPENDENT  DYNAMIC  (AUTOMATIC)

CROSSING INVOLVED (CIRCLE)  YES  (NO)

MAINTAINER NOTIFIED  _____  TIME: _____

FORM CONTINUED ON REVERSE SIDE

MRT 070701

# EXHIBIT "P"

**BEFORE THE**
**SURFACE TRANSPORTATION BOARD**

---

**BOSTON AND MAINE CORPORATION**
**and**
**SPRINGFIELD TERMINAL RAILWAY COMPANY**

**v.**

**NEW ENGLAND CENTRAL RAILROAD, INC.**

---

Docket No. _____

---

**FORMAL COMPLAINT AND PETITION FOR DECLARATORY ORDER**

---

### JURISDICTION

1.      The Board has jurisdiction to adjudicate this formal complaint pursuant to 49

U.S.C. §§ 11701 and 11704(b).  The Board has jurisdiction to issue a declaratory order pursuant

to 49 U.S.C. § 721 and 5 U.S.C. § 554(e) to terminate a controversy or remove uncertainty.

### PARTIES

2.      The Boston and Maine Corporation ("B&M") is a common carrier by rail subject

to the jurisdiction of the Board pursuant to 49 U.S.C. § 10501(a).  B&M maintains its principal

place of business  at Iron Horse Park, North Billerica, Massachusetts 01862.

3.    The Springfield Terminal Railway Company ("ST") is a common carrier by rail subject to the jurisdiction of the Board pursuant to 49 U.S.C. § 10501(a).  ST maintains its principal place of business at Iron Horse Park, North Billerica, Massachusetts 01862.

4.    New England Central Railroad, Inc. ("NECR") is a common carrier by rail subject to the jurisdiction of the Board pursuant to 49 U.S.C. § 10501(a).  NECR maintains its principal place of business at 2 Federal Street, Suite 201, St. Albans, Vermont 05478.

## FACTS COMMON TO ALL CLAIMS

5.    In a decision served February 6, 1990, the Board's predecessor in interest, the Interstate Commerce Commission ("ICC"), imposed the terms and conditions of a trackage rights order ("TRO") upon the B&M and NECR's predecessor in interest, Central Vermont Railway, Inc. ("CV").

6.    The TRO was imposed by the ICC as part of the compensation to be paid to B&M in an eminent domain proceeding brought by the National Railroad Passenger Corporation ("Amtrak") to acquire a line of railroad located between White River Junction, Vermont and East Northfield, Massachusetts (the "Line").

7.    CV acquired its interest in the Line from Amtrak subsequent to the eminent domain proceeding and subject to the requirement that CV grant trackage rights to B&M.

8.    ST subsequently succeeded to the rights of B&M under the trackage rights agreement and currently operates trains on the Line.

9.    NECR acquired the assets of CV, including the Line and CV's rights and responsibilities under the TRO, in 1995.  NECR continues to own and operate the Line.

2

10.     As the owner of the Line, NECR is required to inspect and maintain the line to a standard that is in compliance with the TRO and the Track Safety Standards promulgated by the Federal Railroad Administration ("FRA").

11.     NECR also is required to maintain the Line in a safe condition for its intended uses.

12.     NECR failed to inspect or maintain the Line to such standards in multiple locations along the Line, including the location where the derailment described below began.

13.     Moreover, specialized testing performed on or about June 8, 2004 by FRA on the Line had disclosed that there were multiple locations along the line that were unsafe, did not meet FRA Class II standards, and were otherwise in violation of the FRA Track Safety Standards.

14.     The results of this testing were provided to NECR before the Derailment, yet NECR failed to correct these dangerous conditions on the Line.

15.     On or about July 3, 2004, an ST train was operating southbound on the Line when a car partially derailed near Hartland, Vermont.

16.     Upon reaching a switch on the Line, the partially derailed car fully derailed, along with six additional cars.

17.     The cause of this derailment (the "Derailment") was a defective, unsafe track condition.

### FORMAL COMPLAINT FOR DAMAGES

#### First Cause of Action—Breach of the Interstate Commerce Act and an Order Issued Thereunder

18.     B&M and ST repeat and reallege the allegations of Paragraphs 1 through 17 as if fully set forth here.

3

19.    Part A of Subtitle IV of Title 49 of the United States Code (the "Interstate Commerce Act" or "ICA") and the TRO ordered by the ICC require NECR to maintain the Line at not less than FRA Class II condition.

20.    The Line and, in particular, the portion of the Line where the Derailment began, was not being maintained by NECR at the time of the Derailment in a safe condition, nor was it being maintained in accordance with the TRO or the FRA Track Safety Standards.

21.    NECR knew or should have known that the Line was not in Class II condition and not safe at the time of the Derailment.

22.    NECR's failure to maintain the Line safely and in Class II condition was the cause of the Derailment.

23.    NECR's failure to maintain the Line safely and in Class II condition violated the ICA and the TRO.

24.    NECR's failure to maintain the Line safely and in Class II condition damaged B&M and ST in excess of $100,000, including damaged or destroyed railroad cars, excess per diem costs, wrecking and rerailing costs and excess crew costs.

<u>Second Cause of Action—Breach of Contract</u>

25.    B&M and ST repeat and reallege the allegations contained in Paragraphs 1 through 24 as if fully set forth here.

26.    Pursuant to Sections 3.2 and 3.3 of the TRO, NECR is solely responsible for the maintenance and repair of the Line at all times to not less than FRA Class II condition in exchange for the payment of a trackage rights fee by ST.

4

27.    The Derailment was caused by the failure of NECR to maintain the Line in accordance with its obligations under the TRO and the Track Safety Standards established by the FRA.

28.    This failure of NECR to perform its obligations constituted a breach of the TRO, which is a contract between NECR, on the one hand, and B&M and ST, on the other.

29.    As a result of NECR's breach of contract, B&M and ST suffered damages in excess of $100,000, including damaged or destroyed railroad cars, excess per diem costs, wrecking and rerailing costs and excess crew costs.

### Third Cause of Action—Tortious Injury to B&M and ST Due to Gross Negligence, Recklessness, and Willful Misconduct of NECR

30.    B&M and ST repeat and reallege the allegations contained in Paragraphs 1 through 29 as if fully set forth here.

31.    NECR had a duty to maintain the Line in safe condition for B&M, ST and all other users thereof.

32.    Portions of the Line—including the section where the Derailment began—were in substandard condition, in breach of applicable federal regulations, unsafe for users such as B&M and ST, and hence presented a substantial risk of derailment of B&M and ST's trains.

33.    NECR knew of these adverse conditions.

34.    NECR nevertheless failed to maintain the Line in an appropriate, safe, and legally sufficient condition.

35.    NECR therefore breached its duty to B&M and ST in a grossly negligent, reckless, and willful manner.

5

36.    B&M and ST were injured in excess of $100,000, including damaged or destroyed railroad cars, excess per diem costs, wrecking and rerailing costs and excess crew costs, as the result of NECR's misconduct.

## REQUEST FOR DECLARATORY ORDER

37.    B&M and ST repeat and reallege the allegations contained in Paragraphs 1 through 36 as if fully set forth here.

38.    NECR's breach of its duties under the ICA, the TRO, and at common law was grossly negligent, reckless, or willful.

39.    NECR's breach of such duties was the proximate cause of the Derailment.

40.    NECR has taken the position that under the terms of the TRO, ST is solely responsible for all expenses arising out of the Derailment, including expenses relating to the repair of the track and other expenses incurred by NECR, even if the sole cause of the Derailment was NECR's breach of its duties under the ICA, the TRO, and at common law.

41.    In furtherance of this position, NECR has demanded payment by B&M and ST of approximately $750,000, allegedly constituting NECR's expenses in respect of the Derailment.

42.    In support of this position, NECR apparently relies upon Section 7.1 of the TRO, which NECR interprets as apportioning to B&M and ST all responsibility for the Derailment even if the Derailment was caused solely by NECR's grossly negligent, reckless, or willful misconduct.

43.    Such an interpretation does not reflect the intent of the parties, or of the ICC, at the time the terms and conditions of the TRO were imposed.

44.    Such an interpretation also would be contrary to public policy and the intent of the ICA, the Federal Rail Safety Act, and other applicable statutes, regulations, and orders.

6

WHEREFORE, B&M and ST respectfully request that the Board enter an order—

(1)    declaring that the TRO does not apportion any liability to B&M or ST for damages caused by NECR's gross negligence, recklessness, and willful misconduct;

(2)    awarding B&M and ST compensatory, incidental, and punitive damages due to NECR's violation of the ICA, the TRO (as order and as contract), and NECR's common law duties;

(3)    awarding B&M and ST their costs in connection with this proceeding, including a reasonable attorneys' fee; and

(4)    awarding B&M and ST such other and further relief as may be just.

B&M and ST suggest that this proceeding be handled under the Board's Modified Procedures.

Respectfully submitted,

Eric L. Hirschhorn
Winston & Strawn LLP
1400 L Street, NW
Washington DC 20005
Tel. 202-371-5706

Robert B. Culliford
Guilford Rail System
Iron Horse Park
North Billerica MA 01862
Tel. 978-663-1029

Dated:    October 29, 2004

7

## CERTIFICATE OF SERVICE

I certify that on this ___1st___ day of November 2004, I served a copy of the foregoing document upon the respondent, New England Central Railroad, Inc., by facsimile and overnight courier, at the following address and facsimile number:

Chief Legal Officer
New England Central Railroad, Inc.
2 Federal Street, Suite 201
St. Albans, Vermont 05478

Fax no. 802-527-3455.

The cover page of the facsimile transmitting and the cover of the envelope containing such copy bear the legend, "Service of STB Complaint."

_Bonnie J. Boling_
Bonnie J. Boling

DC:382015.6

# EXHIBIT "Q"

35695
EB

SERVICE DATE – JANUARY 10, 2006

SURFACE TRANSPORTATION BOARD

DECISION

STB Finance Docket No. 34612

BOSTON AND MAINE CORPORATION
and
SPRINGFIELD TERMINAL RAILWAY COMPANY
v.
NEW ENGLAND CENTRAL RAILROAD, INC.

Decided:  January 9, 2006

We are granting, in part, the petition of Boston and Maine Corporation (B&M) and Springfield Terminal Railway Company (ST) (jointly, "BM/ST" or "complainants") for reconsideration of our prior decision dismissing their complaint and petition for a declaratory order arising out of the derailment of a BM/ST train on track owned by the New England Central Railroad, Inc. (NEC).

BACKGROUND

In Amtrak – Conveyance of B&M in Conn River Line in VT & NH, 4 I.C.C.2d 761 (1988) (Amtrak I), the Board's predecessor agency, the Interstate Commerce Commission (ICC), required B&M to convey its 48.8-mile "Connecticut River Line" to the National Railroad Passenger Corporation (Amtrak), subject to the requirement that Amtrak grant specified trackage rights back to B&M. The ICC also authorized Central Vermont Railway, Inc. (CV) to acquire the conveyed line from Amtrak and to operate it, subject to B&M's trackage rights. The carriers were directed to negotiate a trackage rights arrangement containing certain core requirements designed to ensure that the tenant carrier would be able to continue to conduct rail freight operations over the line.

During their negotiations, the carriers operated under a temporary trackage rights agreement. When the parties were unable to agree on certain terms for a permanent agreement, the ICC issued a decision in Amtrak – Conveyance of B&M in Conn River Line in VT & NH, 6 I.C.C.2d 539 (1990) (Amtrak II), clarifying its core requirements, resolving the disagreements, and adopting the detailed trackage rights terms and conditions attached as an appendix to that decision, herein called "the trackage rights order" (TO). Many provisions of the temporary agreement were not in dispute and were carried over into the TO without further discussion. In

STB Finance Docket No. 34612

subsequent transactions, NEC acquired CV's assets, including its rights and responsibilities under the TO, and B&M assigned its trackage rights over the line to its subsidiary, ST.

On November 1, 2004, BM/ST filed a complaint and petition for declaratory order arising out of the derailment of an ST train operating on NEC's Connecticut River Line track on or about July 3, 2004. ST's train was operating on NEC's track pursuant to the TO issued in Amtrak II. Complainants alleged that the derailment was caused by NEC's failure to maintain the track as required by the TO and Federal Railroad Administration (FRA) regulations and that, as a consequence, BM/ST suffered damages in excess of $100,000. BM/ST requested compensatory, incidental, and punitive damages based on breach of contract (the TO) and tortious injury due to gross negligence, recklessness, and willful misconduct by NEC. NEC responded that any claims based on the condition of the track are barred by Section 7.1 of the TO.[1] BM/ST argued that NEC's interpretation of Section 7.1 is contrary to public policy because it would apportion all responsibility for the derailment to BM/ST even if the derailment was caused solely by grossly negligent, reckless, or willful misconduct by NEC. NEC has brought an action in Federal district court to recover damages. New England Central R.R. v. Boston and Maine Corp., Civ. Action No. 04-30235 – MAP (D. Mass., filed Dec. 3, 2004).

By decision served on February 24, 2005 (February 2005 Decision), we dismissed BM/ST's complaint and petition for a declaratory order. We explained that this dispute is not within the Board's primary jurisdiction because the dispute is founded primarily on claims of breach of contract and tortious actions. We reasoned that the dispute involves neither the interpretation of core operational provisions of the TO nor service questions, but is, rather, a dispute over liability for a derailment, an area over which the Board has little expertise and limited jurisdiction. For this reason, we concluded that the court is the appropriate forum to resolve the parties' dispute.

---

[1] Section 7.1 of the TO provides (6 I.C.C.2d at 564):

7.1 Save as herein otherwise provided, each party hereto shall be responsible for and shall assume all loss, damage or injury (including injury resulting in death) to persons or property, including the cost of removing any trackage, repairing trackage and correcting environmental damage, which may be caused by its engines, cars, trains or other on-track equipment (including damage by fire originating therefrom) whether or not the condition or arrangement of the trackage contributes in any manner or to any extent to such loss, damage or injury, and whether or not a third party may have caused or contributed to such loss, damage or injury, and for all loss or damage to its engines, cars, trains or other on-track equipment while on said trackage from any cause whatsoever, except in the case of collision, in which event the provisions of Section 7.2 shall apply.

- 2 -

STB Finance Docket No. 34612

On March 10, 2005, BM/ST filed a petition for reconsideration of that decision. Complainants do not dispute our finding that this controversy predominantly involves claims of breach of contract and tortious actions arising from a train derailment and that the court is better suited to resolving such fact-bound issues. But complainants argue that the Board should, at a minimum, decide whether Section 7.1 of the TO was intended by the ICC to absolve the track owner (now NEC) from liability claims that are based on gross negligence or willful misconduct. On March 30, 2005, NEC filed a reply in opposition to BM/ST's petition for reconsideration.

## DISCUSSION AND CONCLUSIONS

In the February 2005 Decision, we mistakenly assumed that Section 7.1 was not in dispute when the TO was adopted and concluded that the Board's expertise was not required to determine the intent of the parties regarding Section 7.1. We will grant reconsideration to the extent required to provide guidance on the proper interpretation of the provision that the agency imposed.

As noted by complainants, the Board has expressly declined to impose a contested provision that would excuse a carrier from liability resulting from its own gross negligence or willful misconduct, finding such a provision to be contrary to public policy. See National R.R. Passenger Corp. – Applic. – 49 U.S.C. 24308(a), 3 S.T.B. 157, 162 (1998). The concerns expressed by the Board in that case apply with equal force here. The statute requires that the Board implement policies that "promote a safe and efficient rail transportation system" and "operate transportation facilities and equipment without detriment to the public health and safety." 49 U.S.C. 10101(3), (8). To construe TO Section 7.1 as excusing gross negligence and willful misconduct would not encourage safe operations, and it would contravene well-established precedent that disfavors such indemnification provisions.[2] Thus, we do not believe that it was the intent of the agency in imposing TO Section 7.1 to allow the landlord carrier to escape liability for maintenance failures that are the result of its own gross negligence or willful misconduct, and we do not construe TO Section 7.1 in that manner.

The remaining issues involved in the complaint are fact-bound, and they predominantly involve claims of breach of contract and tort. For the reasons discussed in the February 2005 Decision, we will continue to defer to the courts the resolution of the remaining issues.

It is ordered:

1. Complainants' petition for reconsideration is granted to the extent discussed above.

---

[2] See National R.R. Passenger Corp. v. Consolidated Rail Corp., 698 F. Supp. 951, 971-72 (D.D.C. 1988), rev'd on other grounds, 892 F.2d 1066 (D.C. Cir. 1990); see also Harris v. Howard University, Inc., 28 F. Supp. 2d 1, 14 (D.D.C. 1988).

- 3 -

STB Finance Docket No. 34612

2. This decision is effective on its date of service.

By the Board, Chairman Buttrey, and Commissioner Mulvey.


Vernon A. Williams
Secretary


- 4 -