UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CENTRAL RAILROAD, INC., <br> Plaintiff, <br><br> v. <br><br> SPRINGFIELD TERMINAL RAILWAY COMPANY and BOSTON AND MAINE CORPORATION, <br> Defendants | Civil Action No.: 04-30235-MAP |

**PLAINTIFF, NEW ENGLAND CENTRAL RAILROAD, INC.'S,
CONCISE STATEMENT OF FACTS IN SUPPORT OF ITS OPPOSITION
TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND RESPONSE TO THE DEFENDANTS' *CONCISE STATEMENT OF FACTS***

The plaintiff, New England Central Railroad, Inc. ("NECR"), hereby submits, pursuant to Local Rule 56.1, its *Concise Statement of Facts* in support of its *Opposition* to the defendants' *Motion for Summary Judgment*, as well as its *Response* to the defendants' *Concise Statement of Facts*. Unless otherwise noted, the exhibits identified herein refer to the exhibits attached to the NECR's *Motion for Summary Judgment*.

### I.  THE NECR'S CONCISE STATEMENT:

1 - 104.    The NECR relies on, specifically incorporates by this reference and restates as is fully set forth herein, ¶¶ 1 – 104 of the *Concise Statement of Facts* in support of the NECR's *Motion for Summary Judgment*. The NECR additionally incorporates the statements of fact made in its *Response to the Defendants' Concise Statement of Facts*. See § II, *infra*.

## II.   THE NECR'S RESPONSE TO THE DEFENDANTS' *CONCISE STATEMENT OF FACTS*:

The NECR responds to the numbered paragraphs of the defendants' *Concise Statement of Facts* as follows:

4.   Denied. The parties had agreed to a number of substantive provisions pertaining to the use of the Line, even before the final version of the *Trackage Rights Agreement* (the "Agreement") was ultimately imposed, and had been operating under an *Interim Agreement*. Exh. A, ICC Finance Docket No. 31250 at p. 540-41. When the parties were unable to reach a mutually satisfactory final agreement, the NECR's predecessor petitioned the ICC to impose a final agreement adopting various terms that it proposed. Id. at p. 541. The B&M did not object to all of the proposed changes. Id. The ICC ultimately imposed a version of the *Interim Agreement* which incorporated some of the modifications proposed by both parties. Most importantly, the B&M stated no objection (and therefore agreed to) the revised language of § 7.1 that had been proposed by the NECR's predecessor, and which the ICC ultimately imposed. Id. at p. 555. The ICC also noted that "the revisions will not change the essence of section 7" as it existed in the *Interim Agreement*." Id.

8.   Denied. § 7.1 of the *Agreement* imposes on the defendants the obligation to pay all of the costs associated with the derailment. Exh. A.

13.   Denied. The January 6, 2000 decision does not refer to § 7.1. *See* Exh. 2 to Mr. Bergeron's *Declaration*. The history of § 7.1 was also not at issue before the STB. Moreover, 7.1 was agreed to by the B&M. *See supra* at ¶ II.4.

19–23. Denied. The exact location of the warp defect that was registered on the Track Geometry Inspection Report was calculated by latitude and longitude coordinates, was further

determined by precise GPS tracking and was also manually measured by the NECR's track inspector and track supervisor. Exh. E and Exh. H at p. 10; *see also* the transcript of the deposition of Richard R. Boucher, copies of the relevant excerpts of which are attached as Exhibit "J," at p. 10-11. All of these methods confirmed with specificity that the location of the defect was pinpointed precisely at milepost 10.16. In addition, when the NECR's inspectors performed their measurements in the field, they did so several hundred feet north and south of milepost 10.16 and determined that there was no defect at milepost 10.18. *See* additional excerpts of the deposition of Rick T. Boucher, copies of which are attached as Exhibit "K," at p. 21; Exh. L at p. 11-12.

25. Denied. The defects which were noted on the Track Geometry Inspection Report were standard defects. Exh. J at p. 29-31. The number of defects noted was neither unusual nor excessive. Id. In the five miles between the between the point at which the boxcar's wheels first came off the track (milepost 10.18) and the point at which the rest of the train derailed (milepost 5.7), the track classification was predominantly class III, with a couple of restrictions down to class II. Exh. C at p. 46.

26. Denied. The defect was noted to be precisely at milepost 10.16, not in its "vicinity." See *supra at* ¶ 19-23.

27. Denied. The defect was noted to be precisely at milepost 10.16, not "near milepost 10.18." See *supra at* ¶ 19-23. Also, the warp defect which was noted at milepost 10.16 did not exceed the limits established by the FRA's track safety standards – instead, the reduction in classification to class II was perfectly acceptable under the circumstances. Exh. C at p. 12; Exh. J at p. 8-9; *see also* additional excerpts of the deposition of Michael Lawyer, copies of which are attached as Exhibit "L," at p. 15-18. This was also specifically set forth by the FRA in

3

its Track Geometry Inspection Report. Exh. E.

29. Denied. The defect was noted to be precisely at milepost 10.16, not in its "vicinity." See *supra at* ¶ 19-23.

32. Denied. Mr. Boucher testified that harmonic rock could only be caused by "<u>excessively</u>" low joints. Exh. J. at p. 10. He also testified that this condition did not exist at milepost 10.16. Id.

34. Denied. The class II speed limit of 25 mph was established immediately. Exh. K at p. 17-18.

35. Denied. 49 C.F.R. § 213.5(a) does not require that a defect be addressed "before the next train uses the defective track segment." In any event, the NECR did address the defect immediately by reducing the classification of the track to class II, thereby bringing the track "into compliance" as required by 49 C.F.R. § 213.5(a). Exh. L at 17-18.

38-41. Denied. One of the appropriate remedial measures is to simply reduce the track classification to its next acceptable level. Exh. C at p. 12; Exh. J at p. 8-9; Exh. L at p. 15-18. This is what the NECR did at milepost 10.16. Id. This was proper and permitted by the FRA. In fact, authority for the reduction to class II was specifically set forth in the Track Geometry Inspection Report. Exh. E. In addition, the NECR had 30 days from the date of the geometry inspection (i.e. until July 8, 2004 – five days after the derailment) to fix the defect. Exh. K at p. 21. The NECR had already (on the same day as the geometry testing) fixed the defects which required reduction to class 0 classification[1] and was moving its tamper from one end of the Line to the other, remedying less serious defects (such as the warp at milepost 10.16) along the way. Exh. L at 24-28. The tamper had simply not made it up the Line as far as milepost 10.16 by the

---

[1] Class 0 simply means that the track had to be shut down to all traffic until the defect was fixed.

4

time of the derailment. Finally, 49 C.F.R. § 213.63 (at n. 2) simply does not state that there is a "harmonic-risk rock range of 10-25 mph" or anything even remotely resembling such a specific calculation.

43.   Denied. The FRA's track safety rules <u>do not</u> require that defects detected by a geometry car be recorded on subsequent track reports until the defective condition has been corrected. 49 C.F.R. § 213; *see also* Mr. Bergeron's *Declaration* at Exh. 12; Exh. K at p. 21-22. This is another in a long string of factual averments (see *supra*) that Mr. Bergeron has simply fabricated, apparently in an attempt to support the defendants' legal arguments. Moreover, the NECR exceeded all applicable FRA inspection requirements, having inspected the track twice weekly in the month before the derailment (the FRA required only weekly inspections of the track). 49 C.F.R. § 213.233; Exh. H at p. 10-12; Exh. I. The NECR also denies that the "FRA recognizes that" the condition could worsen – this is simply an unsupported allegation that Mr. Bergeron made up for purposes of the defendants' motion. More importantly, the NECR did inspect the track regularly and affirmatively determined, based on these twice weekly inspections (the last of which was performed two days before the derailment) including the taking of measurements, that the condition had remained exactly the same since June 8, 2004, and had not worsened at all. Exh. J at p. 11-12; Exh. L at p. 11-13. Finally, Mr. Bergeron himself admitted that certain track defects could actually improve due to changing weather conditions. *See* additional excerpts of the deposition of Roger Bergeron, copies of which are attached as Exhibit "M," at p. p. 142-145.

44.   Denied. Mr. Boucher testified that harmonic rock could only be caused by "<u>excessively</u>" low joints. Exh. J. at p. 10. He also testified that this condition did not exist at milepost 10.16. <u>Id</u>.

5

46, 48. Denied. The defect was noted to be precisely at milepost 10.16, not "near MP 10.18." See *supra at* ¶ 19-23.

50. Denied. See *supra* at ¶ 43.

55. Denied. The wheels were on the outside of the gauge and dragging along the ground, ripping up ties, plates, asphalt and ballast. *See Initial Rail Equipment Accident/Incident Record*, a copy of which is attached as Exhibit "N."

61. Denied. The weather was clear and sunny, with no reported fog or other vision obstructions. Exh. L at p. 66; see also *Incident Documentation Form*, a copy of which is attached as Exhibit "O."

66, 68. Denied. *See supra* at ¶ 55.

98-99. Denied. The track was specifically noted by NECR's inspectors to have <u>not</u> been out of alignment at any time before July 3, 2004. Exh. K at p. 13.

100-102. Denied. See *supra* at ¶ 24, 43, 98-99.

103-104, 106-107. Denied. One of the appropriate remedial measures is to simply reduce the track classification to its next acceptable level. Exh. C at p. 12; Exh. J at p. 8-9; Exh. L at p. 15-18. This is what the NECR did at milepost 10.16. Id. This was proper and permitted by the FRA. In fact, authority for the reduction to class II was specifically set forth in the Track Geometry Inspection Report. Exh. E. In addition, the NECR had 30 days from the date of the Geometry Inspection (i.e. until July 8, 2004 – five days after the derailment) to fix the defect. Exh. K at p. 21. The NECR had already (on the same day as the geometry testing) fixed the defects which required reduction to class 0 classification and was moving its tamper from one end of the Line to the other, remedying less serious defects (such as the warp at milepost 10.16) along the way. Exh. L at 24-28. The tamper had simply not made it up the Line as far as

6

milepost 10.16 by the time of the derailment. Finally, 49 C.F.R. § 213.63 (at n. 2) simply does not state that there is a "harmonic-risk rock range of 10-25 mph" or anything even remotely resembling such a specific calculation.

113-115. Denied. *See supra* at ¶ 24, 38-41, 43, 98-99.

116, 121. The NECR objects to these statements as they are matters of personal opinion and conjecture and are not statements of material fact which require a response.

122. Denied. Mr. Boucher actually testified that he was not required to note the defect because it had already been noted by the Track Geometry Report and recorded in the NECR's *Daily Operating Bulletins*. Exh. K at p. 9, 21-22.

123-125. Denied. *See supra* at ¶ 43.

                              Respectfully submitted,
                              NEW ENGLAND CENTRAL RAILROAD, INC.
                              by its attorneys,

                              /s/ Michael B. Flynn
                              Michael B. Flynn      BBO#559203
                              Richard A. Davidson, Jr.,   BBO#552988
                              FLYNN & ASSOCIATES, P.C.
                              400 Crown Colony Drive, Suite 200
                              Quincy, MA  02169
                              (617) 773-5500

DATED: April 24, 2007