UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CENTRAL RAILROAD, INC.,<br>Plaintiff,<br><br>v.<br><br>SPRINGFIELD TERMINAL RAILWAY COMPANY and BOSTON AND MAINE CORPORATION,<br>Defendants. | Civil Action No.: 04-30235-MAP |

**MEMORANDUM OF LAW IN SUPPORT OF THE PLAINTIFF'S
OPPOSITION TO THE DEFENDANTS' MOTION
FOR PARTIAL SUMMARY JUDGMENT**

The plaintiff New England Central Railroad, Inc. ("NECR") hereby files this *Memorandum of Law in Support of* its *Opposition to the Defendants' Motion for Partial Summary Judgment.* It is the NECR's position that the defendants are not entitled to summary judgment on the grounds that: (1) the NECR was not, as a matter of law, negligent or grossly negligent; (2) the defendants' counterclaims are preempted by federal law; (3) there is ample evidence of the defendants' gross negligence; (4) the modified *Trackage Rights Agreement* imposes on the defendants the obligation to indemnify regardless of the condition of the track; and (5) the NECR's breach of contract counts state claims upon which relief may be granted. As further grounds therefore, the NECR states as follows:

**I.      FACTUAL BACKGROUND:**

The NECR relies on and hereby specifically incorporates by this reference the factual background section of the *Memorandum of Law in Support of the Plaintiff's Motion For*

*Summary Judgment* (the "*Original Memorandum*"). Unless otherwise specifically noted, the exhibits identified herein refer to the exhibits which were attached to the plaintiff's original *Motion For Summary Judgment*. The NECR also sets forth the following additional facts:

**A.     Additional Facts Pertaining to the *Trackage Rights Agreement*:**

The parties' and/or their predecessors had agreed to a number of substantive provisions pertaining to the use of the Line, even before the final version of the *Trackage Rights Agreement* (the "Agreement") was ultimately imposed, and had been operating under an *Interim Agreement*. Exh. A, ICC Finance Docket No. 31250 at p. 540-541. When they were unable to reach a mutually satisfactory final agreement, the NECR's predecessor petitioned the ICC to impose a final agreement adopting various terms that it proposed. Id. at p. 541. The B&M did not object to all of the proposed changes. Id. The ICC ultimately imposed a version of the *Interim Agreement* which incorporated some of the modifications proposed by both parties. Most importantly, the B&M stated no objection (and therefore agreed to) the revised language of § 7.1 that had been proposed by the NECR's predecessor, and which the ICC ultimately imposed. Id. at p. 555. The ICC also noted that "the revisions will not change the essence of section 7" as it existed in the *Interim Agreement*. Id.

**B.     Additional Facts Pertaining to the Alleged Track Defect:**

The exact location of the warp defect that was registered on the Track Geometry Inspection Report was calculated by latitude and longitude coordinates, was further determined by precise GPS tracking and was also manually measured by the NECR track inspector and track supervisor who were responsible for dealing with the defect. Exh. E and Exh. H at p. 10; *see also* the transcript of the deposition of Richard R. Boucher, copies of the relevant excerpts of which are attached as Exhibit "J," at p. 10-11. All of these methods confirmed with specificity

that the location of the defect was pinpointed precisely at milepost 10.16. In addition, when the NECR's inspectors performed their measurements in the field, they did so several hundred feet north and south of milepost 10.16 and determined that there was no defect at milepost 10.18. See additional excerpts of the deposition of Rick T. Boucher, copies of which are attached as Exhibit "K," at p. 21; *see also* Exh. L at p. 11-12.

The defects which were noted on the Track Geometry Inspection Report were standard defects. Exh. J at p. 29-31. The number of defects noted were neither unusual nor excessive. Id. In the five miles between the point at which the boxcar's wheels first came off the track (milepost 10.18) and the point at which the rest of the train derailed (milepost 5.7), the track classification was predominantly class III, with a couple of restrictions down to class II. Exh. C at p. 46.

The warp defect which was noted at milepost 10.16 did not exceed the limits established by the FRA's track safety standards – instead, the reduction to class II was perfectly acceptable under the circumstances. Exh. C at p. 12; Exh. J at p. 8-9; see also additional excerpts of the deposition of Michael Lawyer, copies of which are attached as Exhibit "L," at p. 15-18. This was also specifically set forth by the FRA in its Track Geometry Inspection Report. Exh. E.

The NECR addressed the defect immediately by reducing the classification of the track to class II, thereby bringing the track "into compliance" as required by 49 C.F.R. § 213.5(a). Exh. L at 17-18. One of the appropriate remedial measures in such a situation is to simply reduce the track classification to its next acceptable level. Exh. C at p. 12; Exh. J at p. 8-9; Exh. L at p. 15-18. This is what the NECR did at milepost 10.16. Id. This was proper and permitted by the FRA.[1] In fact, authority for the reduction to class II was specifically set forth in the Track

---

[1] 49 C.F.R. § 213.63 (at n. 2) simply does not state, as the defendants have suggested, that there is a "harmonic-risk rock range of 10-25 mph" or anything even remotely resembling such a specific calculation. The FRA's track safety

Geometry Inspection Report. Exh. E. In addition, the NECR had 30 days from the date of the Geometry Inspection (i.e. until July 8, 2004 – five days after the derailment) to fix the defect. Exh. K at p. 21. The NECR had already (on the same day as the Geometry Testing) fixed the defects which required reduction to class 0 classification[2] and was moving its tamper from one end of the Line to the other, remedying less serious defects (such as the warp at milepost 10.16) along the way. Exh. L at 24-28. The tamper (a large mechanical device used to fix these types of defects) had simply not made it up the Line as far as milepost 10.16 by the time of the derailment.

Moreover, the NECR exceeded all applicable FRA inspection requirements, having inspected the track twice weekly in the month before the derailment (the FRA required only weekly inspections of the track). 49 C.F.R. § 213.233; Exh. H at p. 10-12; Exh. I. More importantly, the NECR did inspect the track regularly and affirmatively determined, based on these twice weekly inspections (the last of which was performed two days before the derailment) and by the taking of measurements, that the condition had remained exactly the same since June 8, 2004 and had not further deteriorated. Exh. J at p. 11-12; Exh. L at p. 11-13. The track was also specifically noted by NECR's inspectors to have <u>not</u> been out of alignment at any time before July 3, 2004. Exh. K at p. 13. Mr. Bergeron himself admitted that certain track defects could actually improve due to changing weather conditions. *See* additional excerpts of the deposition of Roger Bergeron, copies of which are attached as Exhibit "M," at p. 142-145.

---

rules also <u>do not</u> require that defects detected by geometry car be recorded on subsequent track reports until the defective condition has been corrected. 49 C.F.R. § 213; see also Mr. Bergeron's *Declaration* at Exh. 12; Exh. K at p. 21-22.

[2] Class 0 simply means that the track had to be shut down to all traffic until the defect was fixed.

4

C. **Additional Facts Pertaining to the Happening of the Derailment**:

The wheels of the derailed boxcar, once they came off the rail, were on the outside of the gauge and dragging along the ground, ripping up ties, plates, asphalt and ballast. See *Initial Rail Equipment Accident/Incident Record*, a copy of which is attached as Exhibit "N." This was a distance of several inches outside of the normal position of a train car's wheels and at least eight inches (the top of the rail is six to eight inches above the tie-plate) below where the wheels usually ride on the rail. The weather was clear and sunny, with no reported fog or other vision obstructions. Exh. L at p. 66; see also *Incident Documentation Form*, a copy of which is attached as Exhibit "O."

II. **DISCUSSION OF LAW**:

A. **The NECR Was Not, As A Matter of Law, Either Negligent or Grossly Negligent**:

1. **The Condition of the Track is Not Relevant**:

The defendants' entire argument is based on proving that the condition of the track at the point of the derailment was less in then Class II condition at the time of the derailment. The defendants' allegation in this regard is premised almost entirely on the self-serving *Declaration* submitted by their employee/expert Roger Bergeron.[3] However, the NECR has clearly stated, in §§ II. B. and II. C. of its *Original Memorandum*[4] that the allegedly defective condition of the track is not relevant to a determination of responsibility for the damages caused by the derailment, pursuant to the clear and unambiguous terms of § 7.1 of the *Trackage Rights Agreement*. The only issue to be determined for establishing liability under § 7.1 is the

---

[3] The NECR brings to the Court's attention that it will be promptly filing a *Motion To Strike Roger Bergeron's Declaration and/or in the Alternative to Stay Summary Judgment Proceedings Until Such Time as Mr. Bergeron Has Been Deposed*. The focus of this Motion will be the numerous factual inaccuracies and discrepancies in Mr. Bergeron's *Declaration*.

[4] §§ II.B. and II. C. of the *Original Memorandum* are relied on and specifically incorporated herein by this reference.

5

ownership of the equipment which was involved in the derailment. To this extent, Mr. Bergeron has admitted that the *Agreement* imposes on the defendants the obligation to indemnify under the circumstances of this case. *Original Memorandum* at p. 10, and Exh. D at p. 158-160.

### 2. There is At Least a Question of Material Fact in Dispute With Respect to the NECR's Gross Negligence:

According to the defendants' arguments, the only way they would be entitled to recovery is by proving that the NECR was grossly negligent with the respect to the happening of the derailment.[5] The defendants' only allegations in support of this claim are the issues pertaining to the condition of the NECR's track. As the NECR has repeatedly stated, § 7.1 of the *Agreement* makes this issue completely irrelevant. Nevertheless, for the sake of addressing the defendants' arguments, it is the NECR's position that there is at least a question of material fact in dispute as to whether or not it was grossly negligent with respect to the condition of its track.[6]

As a threshold matter, the NECR notes that the defendants, in their *Memorandum of Reasons in Support of Defendants' Motion for Partial Summary Judgment*, have argued that their common law gross negligence claims should be governed by District of Columbia law. The grounds for this argument are apparently that the *Trackage Rights Agreement* states that its terms should be interpreted according to District of Columbia law. The NECR does not dispute that District of Columbia law does control with respect to the interpretation of the *Agreement;* however, the NECR's gross negligence claims are a horse of a different color. In sum, although

---

[5] For this reason alone, the defendants' negligence claims must be dismissed.

[6] It is the NECR's position that it is actually entitled to summary judgment on the defendants' negligence and gross negligence claims. *See* the NECR's *Original Memorandum* at § II. G. at p. 20-22, which is relied on and specifically incorporated herein by this reference. The NECR does not intend to waive the argument as stated in its *Original Memorandum* that its conduct was, as a matter of law, neither negligent nor grossly negligent. However, the NECR states, in the alternative here, the reasons why summary judgment should not, on the other hand, be granted to the defendants on this issue.

the STB has recently decided that the NECR shall not be relieved from responsibility under the terms of the *Trackage Rights Agreement* if it was grossly negligent, this does not make the issue of its gross negligence a contractual issue or otherwise an issue which should be interpreted according to District of Columbia law. Instead, gross negligence is simply a common law action (which has been pled and defined as such by the defendants).[7] Thus, Vermont law provides the standards by which any gross negligence claims should be defined in this case.

"To sustain a claim for gross negligence, a plaintiff must present facts that demonstrate that an individual defendant heedlessly and palpably violated a legal duty owed to plaintiff." Powers v. Office of Child Support, 173 Vt. 390, 399, 795 A.2d 1259 (2002), *citing* Mellin v. Flood Brook Union Sch. Dist., 173 Vt. 202, 219-220, 790 A.2d 408, 423 (2002). "Stated differently, one who fails to exercise 'even a slight degree of care' or acts indifferently to the duty owed to another may be grossly negligent." Mellin, 173 Vt. at 220, *quoting* Rivard v. Roy, 124 Vt. 32, 35, 196 A.2d 497, 500 (1963). Generally, whether an individual was grossly negligent is a question for the jury, except where reasonable persons cannot differ on the question. Id., *citing* Hardingham v. United Counseling Serv. of Bennington County, Inc., 164 Vt. 478, 481, 672 A.2d 480, 483 (1995).

There are, at the least, disputes of material fact with respect to the NECR's allegedly grossly negligent conduct which require that this issue be submitted, if at all, to a jury. The defendants' entire argument regarding the condition of track is based on Mr. Bergeron's *Declaration*. Yet nowhere in the *Declaration*, or in any other part of the defendants' submissions, did they present any clear, undisputed or unspeculative evidence that there was a defect at the point of the derailment (milepost 10.18) which existed for prior to the derailment for

---

[7] At p. 19 and 22 of the *Defendant's Memorandum of Reasons* they have defined the elements of their gross negligence and negligence cases in terms of common law standards.

a sufficient enough length of time for the NECR to have noticed it and taken appropriate corrective measures. Instead, Mr. Bergeron, in his *Declaration,* has opined that based on an inspection of the area of the derailment which he conducted three days after it occurred, that there was a defective condition at milepost 10.18 which caused or contributed to cause the derailment. *See Bergeron Declaration; see also* additional portions of Mr. Bergeron's deposition, copies of which are attached as Exhibit "M," at p. 118. Much of the evidence pertaining to the condition of the track at the time of the derailment stems from an FRA conducted geometry inspection report which found a defect in the rail at milepost 10.16. Exh. E. There is no dispute in this case that the initial point of derailment was at milepost 10.18. Thus, the point of derailment occurred 105.6 feet before the box car in question reached the only point at which there was an FRA defect noted on the Track Inspection Geometry Report in the immediate vicinity of the derailment site.

According Mr. Bergeron's *Declaration* he has now developed the opinion that the defect noted by the Geometry Report at milepost 10.16 was actually present at milepost 10.18. *See Bergeron Declaration.* This is apparently based on his unsubstantiated opinion that geometry test reports are not very accurate as to the actual location of the defects that are noticed by the geometry car readings. Yet, in stark contract to the opinion expressed in this *Declaration*, Mr. Bergeron has actually testified at his deposition that these readings were quite accurate. See Exh. D at p. 82-84. He also testified that the Geometry Report gave a precise longtitude and latitude coordinate of the exact point at which the defect was noted (that being milepost 10.16). Id. The conclusions set forth in Mr. Bergeron's self-serving *Declaration* also ignore and contradict the testimony of the NECR's track inspectors who were responsible for dealing with the defect, both of whom testified at their depositions that they confirmed the location of the

8

defect by GPS satellite coordinates, measured the tracks at the GPS coordinates to confirm the warp defect was actually present and determined, in this scientifically precise manner, that the exact point of the defect was milepost 10.16. Exh. H at p. 10; Exh J. at p. 10-11; Exh. K. at p. 21.

There are also a number of other reasons to doubt the veracity of the opinions stated in Mr. Bergeron's *Declaration*, including the following:

- he testified at his deposition that the defect which he now claims was at milepost 10.18 could actually have been caused by something which occurred between the time of the geometry car testing and the day of the derailment (Exh. D at p. 142-145);

- the "harmonic rock" that Mr. Bergeron opines was the cause of the derailment, would have to have occurred at a point even further north of milepost 10.18 (in other words even further from the known defect of milepost 10.16) in order for the truck of the boxcar to have eventually lifted over the rail at milepost 10.18;

- Mr. Bergeron also acknowledged at his deposition that he did not know whether the derailment was caused by some force that the other cars in the train applied to the boxcar which originally derailed (Exh. M at p. 90-91);

- Mr. Bergeron also admitted that many other factors may have caused the derailment. (Id. at p. 91-94);

- Mr. Bergeron acknowledged at his deposition that the NECR's track inspection reports indicated that there were no defects at milepost 10.18 (in direct contradiction of his currently expressed opinions) between the time of the geometry testing and July 1, 2004, the last date that an FRA required inspection was performed prior to the date of the derailment (Id. at p. 152-153); and

- in direct contradiction of his opinion that the NECR should have reduced the track speed at milepost 10.18 down to a class I standard (10 mph), Mr. Bergeron testified differently at his deposition that one potential remedial action for the NECR was simply to have reduced the track speed classification Class III to Class II.

In addition, there is ample evidence in this case that the NECR acted with due care under the circumstances. For instance:

- the condition of the track at the point of the derailment (milepost 10.18) was in class II condition because there was no defect noted at that point in the geometry report;

9

- even the warp defect at milepost 10.16 required a reduction to only class II standards and was therefore in compliance with the requirements of the *Trackage Rights Agreement*;

- the NECR exceeded all applicable FRA track inspection requirements regarding inspections of the track in the vicinity of the derailment;

- it was entirely permissible, according to even the FRA (as stated in the Geometry Report), for the NECR to have reduced the track classification only down to class II, not class I as is now being opined by Mr. Bergeron in his *Declaration*;

- the NECR took appropriate FRA-approved remedial measures immediately after learning of the defect at milepost 10.16 and thereafter instituted a program to repair the defective conditions noted on the Line;

- the NECR's track inspectors affirmatively determined as a result of their inspection and by measuring the track in question, that there were no defects at milepost 10.18 and that the condition of the track at milepost 10.16 had not further deteriorated in the month before the derailment; and

- at the time of the derailment, the NECR still had five more days to actually repair the defect at milepost 10.16.

*See* the NECR's *Original Memorandum*, § I. at p. 4-5 and § II. C. 2. at p. 13-15, all of which are hereby relied on and specifically incorporated herein by this reference; *see also* Discussion *supra* at p. 2-5.

All of these factors clearly establish, as the NECR argued in its *Original Memorandum*, that even if its track was in defective condition at the time of the derailment, it is nevertheless not guilty of grossly negligent conduct, as a matter of law, because it clearly exercised at least "the slight degree of care" which is all that is required to remove a case from the realm of gross negligence. The mere vitriol of Mr. Bergeron's *Declaration* does not change the fact that there was no defect at 10.18 known to the NECR and that it appropriately responded to the defects that were noted by the Geometry Report by reducing track classifications as authorized by the FRA. Compliance with the regulatory and case specific mandates of a federal governing body certainly establishes the exercise of at least a "slight degree of care." As such, judgment should be entered

10

for the NECR on the defendants' gross negligence claims. At the least, the facts outlined herein have established that there are genuine questions of material of fact on these issues which need to be submitted to a jury.[8]

### B. There Exists At Least a Dispute of Material Fact that the Defendants' Were Guilty of Gross Negligence:

It is undisputed in this case that after the wheels of the boxcar in question came off the rails, it was then pulled more than five miles until the remainder of the train became derailed. Although the train's crew denied noticing that the car's wheels had come off the tracks, the jury will be entitled to consider the following facts:

- the car was at least 8 inches lower than the other cars around it (since the rails themselves are 8 inches high) and it is undisputed that from the point at which the car's wheels came off the tracks until the point that the crew finally noticed that there was a problem, the car was being dragged along outside of the track (the wheel is usually aligned inside of the track) and at a much lower point than the rest of the train;

- the damage to the track over which the car was dragged included damage to wood, asphalt and metal structures which clearly could have been observed as it was happening; and

- the weather conditions were not foggy in the slightest and instead were "clear" and "sunny" at the time of the accident.

In addition, while the train was moving on the *Line*, the defendants' engineer and conductor were required to operate the train in accordance with the *General Code of Operating Rules* (the "GCOR"), a uniform set of rules which are followed by several railroads. The GCOR, at § 6.29.2 (entitled *Train Inspections by Crew Members*), required both the engineer and conductor to inspect the train "frequently" and "observe the train closely" for a number of defective conditions including railcar "wheels not properly positioned on the rail" and "dragging

---

[8] The NECR submits that the same conclusion should be reached even if District of Columbia law regarding gross negligence standards are applied to this case. In fact, the D.C. standard is not significantly different from Vermont's - it requires a showing that the defendant failed to exercise "slight care" and that its conduct would "shock fair-minded men." District of Columbia V. Walker, 689 A.2d, 40, 44 (D.C.1997).

11

equipment." *See* GCOR Rule 6.29.2, set forth in the *Declaration* of David A. Nagy, at Exhibit B., p. 6 of 15. The crew was also required to stop the train if they discovered any of the listed defects, promptly correct them or take other evasive action. Id. If visibility was restricted, the crew was required by another rule to slow the train down. Id. at GCOR Rule 6.21.

It is simply inconceivable, given these facts, that the train crew would not have noticed that the boxcar's wheels had come off the rails and was causing damage, had they simply complied with the applicable rules requiring train car inspections. There is, therefore, at least a question of fact as to whether or not their failure to do so constituted the "failure to exercise even a slight degree of care" which is required by the applicable law governing gross negligence. As such, summary judgment on the NECR's claims in this regard is not warranted at this time.

**C.     The Defendants Are Not Entitled to Judgment As a Matter of Law on Either Contributory or Comparative Negligence:**

The NECR does not dispute that the District of Columbia "is one of the few jurisdictions in which the claimant's contributory negligence can act as a complete defense to the defendant's liability for negligence." Jarrett v. Woodward Bros., Inc., 751 A. 2d 972, 985 (D.C. App. 2000). However, this is solely a common law negligence principle which has absolutely no application to the NECR's statutory or breach of contract claims. Moreover, that the *Trackage Rights Agreement* is to be interpreted under District of Columbia law makes no difference – D.C.'s contributory negligence defense would only apply only to common law negligence claims governed by D.C. law.   Here, none of the parties' common law claims are governed by D.C. law. Therefore, D.C.'s contributory negligence doctrine does not serve to bar any of the NECR's claims. Finally, given the multitude of factual issues in this case, it simply cannot be said that the NECR was, as a matter of law, contributorily negligent of more than 50% comparatively negligent. For these reasons, the defendants are simply not entitled to summary judgment.

12

**D.      The Defendants' Counterclaims are Preempted by Federal Law:**

The defendants are also not entitled to summary judgment on their counterclaims against the NECR because these claims are preempted by federal law, and should therefore be dismissed in their entirety. In support of this argument, the NECR relies on and specifically incorporates herein by this reference its *Original Memorandum* at § II.E., p. 16 – 19.

**E.      The *Trackage Rights Agreement* at § 7.1 Requires the Defendants to Indemnify the NECR Without Regard to the Condition of the Track:**

The defendants have argued that the *Trackage Rights Agreement* does not impose on them any obligations with respect to the derailment. Nothing could be further from the truth. § 7.1 of the *Trackage Rights Agreement* required them to bear the responsibility and pay all the costs associated with the derailment. *See* the NECR's *Original Memorandum* at § I, p. 3, § II. B. at p. 9-12, and § II. F. at p. 19-20, all of which are relied on and specifically incorporated on herein by this reference. The clear and unequivocal language of § 7.1 imposes this obligation on the defendants and there can simply be no dispute in this regard.

**F.      The *Trackage Rights Agreement* is a Valid, Enforceable Contract:**

In 1988, the parties agreed to a number of substantive provisions pertaining to the use of the Line, even before the final version of the *Trackage Rights Agreement* (the "Agreement") was ultimately imposed, and had for nearly two years operated under an *Interim Agreement* which contained these agreed-to provisions. Exh. A at p. 540-541. This *Interim Agreement* included at § 7.1 an indemnity provision which allocated the responsibility for paying the costs of damages caused by derailments. Id. at 555. When the parties were unable to reach a mutually satisfactory final agreement, the NECR's predecessor petitioned the ICC to impose a final agreement adopting various terms that it proposed. Id. at p. 541. The B&M did not object to all of the proposed changes. Id. The ICC ultimately imposed a version of the *Interim Agreement* which

incorporated some of the modifications proposed by both parties. Most importantly, the B&M stated no objection (and therefore agreed to) the revised language of § 7.1 that had been proposed by the NECR's predecessor, and which the ICC ultimately imposed. Id. at p. 555. The ICC noted that "the revisions will not change the essence of section 7" as it existed in the *Interim Agreement*." Id.

On February 6, 1990, the ICC issued its decision regarding the final *Agreement* covering the parties' relationship. *See* Exh A. In its decision, the ICC stated that since the parties agreed on many of the elements of the *Interim Agreement* that it will "use the Interim Agreement, as do the parties themselves, as the starting point for establishing the final terms and conditions." Id. 541-542. Therefore, where there existed no dispute regarding a section of the Interim Agreement, that section was included into the final agreement without dispute. At no point during this process did B&M declare any intention to modify, alter or delete the language of § 7.1 of the *Agreement*. In fact, the ICC decision specifically states, that

> CV proposes a revised section 7 to address release and indemnification in greater detail than the Interim Agreement. B&M states no objections. Because we find that the revisions will not change the essence of section 7, we will impose as terms sections 7.1 through 7.6 as proposed by CV.

Id. at 555. Neither defendant ever appealed the ICC's order imposing the *Trackage Rights Agreement*.

The ICC's clarification of ambiguities did not change the substance or essence of the *Agreement*, and solely operated to clarify its terms. Further, when the B&M had strong objections regarding interpretation of specific sections, it expressly made those objections known. They raised numerous objections and modifications to other specific sections of the *Agreement*, and at no time objected to the version of § 7.1 that was ultimately made part of the *Agreement*. The defendants' failure to object under these circumstances shows that they had no

intention or desire to change the original agreement relating to § 7.1 and that they in fact agreed to its terms.

### 1. The *Trackage Rights Agreement* Constitutes a Contract Between the Parties and § 7.1 is a Valid Enforceable Contract Provision:

Since the parties agreed to § 7.1, regarding indemnity, the provision became a final part of the *Agreement* after the ICC's determination of all ambiguities. A contract is "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Restatement (Second) of Contracts § 1 (2007). Contract formation "requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." Restatement (Second) of Contracts § 17 (2007). "[U]nder general contract principles contracts may be express or, where agreement is manifested by conduct, implied in fact. Both are formed by mutual manifestations of assent." Riggs v. Aetna Ins. Co., 454 A.2d 818, 821 (D.C. 1983); *see also*, Restatement (Second) of Contracts § 19 (2007) ("The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act."). Additionally, a finding of an implied in fact contract "is inferred from the conduct of the parties in the milieu in which they dealt." Emerine v. Yancey, 680 A.2d 1380, 1383 (D.C. 1996).

Here the B&M essentially manifested its assent to the agreement by not objecting to the proposed language, which was ultimately made part of the *Agreement*. Thus, a valid contract existed between the parties, § 7.1 must now be imposed according to the plain meaning of its language and this Court must deny the defendants' *Motion*.

Even if this Honorable Court determines that the circumstances are insufficient to show expressed assent, the defendants' nevertheless assented by their conduct. The defendants have followed the terms of this *Agreement* for almost 20 years, and not once in that time have they

15

challenged its validity. Moreover, they have stipulated that the *Agreement* governs their rights and duties with respect to the operation of trains over the rail. Therefore, a valid contract exists between the parties and summary judgment in the defendants' favor is not proper.

### 2. The Defendants Are Estopped By Their Own Affirmative Claims That the Final *Agreement* Constitutes a Contract Between the Parties:

As early as 2004 the defendants have formally asserted, argued and claimed that the final *Agreement* constitutes a contract. They are now attempting to assert that the *Agreement* is an involuntary order which does not bind them under contract. The B&M/STRC's current position is completely inconsistent with their position taken in front of both the STB and this Court. On November 1, 2004, B&M/STRC brought a complaint against NECR claiming breach of contract. *See Second Cause of Action, Formal Complaint and Petition Before the Surface and Transportation Board* at. p. 4-5, a copy of which is attached hereto as Exhibit "P." In the instant case, they once again claimed that NECR's actions constituted a breach of the contract between the parties. By their own admission then, the final *Agreement* constitutes a contract, and therefore the NECR's breach of contract claim must stand.

Additionally, the STB did not declare that § 7.1 was not agreed to by the parties. *See January 10, 2006 Surface Transportation Board Decision*, a copy of which is attached hereto as Exhibit "Q." It is true that not all sections of the *Interim Agreement* were agreed to, and therefore imposed by the ICC; however, the STB did not specifically identify which sections were agreed to by the parties, or imposed by the ICC. Further, the STB stated in its decision that "[c]omplainants do not dispute our finding that this controversy predominantly involves claims of breach of contract and tortious acts." Id. at p.3. The defendants suggest in their *Motion* that NECR should have appealed the STB decision under 28 U.S.C. §§ 2342 (5) and 2344 (2000). However, since the STB made absolutely no decision regarding agreements related to § 7.1, no

issue was ripe for appeal, and this argument is completely moot. This argument does, however, apply to the defendants' conduct with respect to the 1990 ICC decision – it failed to object to or appeal from the imposition of the *Agreement* and must now be deemed to have accepted the provisions that were imposed.

### III. CONCLUSION:

**WHEREFORE**, for all of the above-stated reasons, the plaintiff NECR respectfully requests that defendants' *Motion for Summary Judgment* be DENIED.

### IV. REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(D), the plaintiff respectfully states that oral argument may assist the Court and requests a hearing on the defendants' *Motion For Summary Judgment*.

Respectfully submitted,
NEW ENGLAND CENTRAL RAILROAD
by its attorneys,

/s/ Michael B. Flynn
Michael B. Flynn          BBO#559203
Richard A. Davidson, Jr., BBO#552988
Jennifer S. Bernstein     BBO#667433
FLYNN & ASSOCIATES, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA  02169
(617) 773-5500

DATED: April 24, 2007
G:\F & A\CASE FILES\RAILAMERICA\New England Central\BM - STRC-Hartland\pleadings\mmo.support.NECR.oppn.dfs.mosuj.doc