UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CENTRAL RAILROAD, INC.,<br>Plaintiff,<br><br>v.<br><br>SPRINGFIELD TERMINAL RAILWAY<br>COMPANY and BOSTON AND MAINE<br>CORPORATION,<br>Defendants | Civil Action No.:  04-30235-MAP |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO STRIKE
THE DECLARATION OF ROGER D. BERGERON FILED IN SUPPORT OF THE
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND/OR FOR OTHER
APPROPRIATE RELIEF**

The plaintiff, New England Central Railroad ("NECR"), has moved, pursuant to Fed. R.

Civ. P. 26, 37, and 56, that this Honorable Court strike the *Declaration of Roger D. Bergeron in*

*Support of Defendant/Counterclaimant's Motion for Partial Summary Judgment* ("Declaration"),

on the grounds that: (1) the defendants failed to disclose or provide information set forth by Mr.

Bergeron in his *Declaration* within their automatic required disclosures or answers to the

NECR's interrogatories, and failed to provide a written expert report concerning Mr. Bergeron's

opinions; (2) Mr. Bergeron destroyed notes and data concerning his calculations and

measurements taken at the point of derailment, he and an assistant failed to preserve evidence

concerning the appearance track structures at the point of derailment, the defendants failed to

produce a complete copy of Mr. Bergeron's subsequent notes, and the defendants "lost"

Conductor Scappace's initial incident report, as well as two copies thereof; (3) Mr. Bergeron is

clearly not qualified to render opinions concerning operational and mechanical concerns; and (4)

Mr. Bergeron substantially misled the court as to the testimony of other witnesses regarding facts and circumstances of the condition of the track, the FRA geometry testing, and the happening of the derailment.

In the alternative, the NECR has requested that the court order that Mr. Bergeron produce an expert written report setting forth a complete statement, basis, and the reasons for his opinions pursuant to Fed. R. Civ. P. 26(a)(2)(B); that it be given an opportunity to depose Mr. Bergeron and then retain and identify its own expert concerning the matters on which Mr. Bergeron opines; and to provide to the court an affidavit opposing the assertions made by Mr. Bergeron.

## I.    FACTUAL BACKGROUND:

On July 3, 2004, the defendants' employees operated the defendants' freight train over a section of the NECR's mainline which is subject to a *Trackage Rights Agreement* between the parties. The defendants' train derailed causing extensive damage to the NECR's trackage and related property and, thereafter, resulted in this litigation. During the course of this litigation, the parties were, *inter alia*, subject to the Fed. R. Civ. P. 26 automatic required discovery, a court imposed *Scheduling Order*, the NECR propounded written discovery upon defendants, and the defendants failed to provide to the NECR a written expert report concerning Mr. Bergeron's alleged expert opinions.

### A.    The Defendants were Obligated to Provide to the NECR the Information Contained within Mr. Bergeron's *Declaration* as Part of their Automatic Required Discovery Disclosure:

The defendants were obligated, pursuant to Fed. R. Civ. P. 26(a)(1)(B), to provide to the NECR "all documents, data compilations, and tangible things" that were in their "possession, custody, or control" that they "may use to support their claims or defenses." Despite the obligations established by the applicable rules of procedure, the defendants: (1) failed to

2

preserve, and in fact destroyed, Mr. Bergeron's original handwritten notes and calculation data

created and noted at the derailment scene which allegedly documented track defects and

conditions at Mile Post 10.18 from which Mr. Bergeron's opinion is derived or results, *see Rule*

*30(b)(6) Deposition of Springfield Terminal Railway Company*, at p. 123 to 124, attached hereto

as Exhibit "A;" (2) failed to provide the second page of Mr. Bergeron's other or subsequent

notes, Exh. A, at p. 112; (3) failed to document and preserve visual evidence concerning the

alleged condition of the track structure at Mile Post 10.18, Exh. A, at p. 83 to 86, 90, and 141;

and (4) "lost" the original and two copies of the conductor's company required initial incident

report concerning the derailment, *see Deposition of Joseph C. Scappace, Jr.*, at p. 46 to 56, 59,

and 61, attached hereto as Exhibit "B."

      **B.**    **The Defendants were Obligated to Answer and/or Supplement their Answers
to Interrogatories Propounded by the NECR Seeking the Information on
which Mr. Bergeron Opines:**

      In addition, the NECR propounded interrogatories on each defendant which, *inter alia*,

asked them to identify their trial expert witnesses, including each person's full name, address,

employment and educational background. *See Defendant Boston and Maine Corporation's*

*Answers to Plaintiff, New England Central Railroad, Inc.'s Interrogatories, Interrogatory No.:*

*22,* a copy attached hereto as Exhibit "C," and *Defendant Springfield Terminal Railway*

*Company's Answers to Plaintiff, New England Central Railroad, Inc.'s Interrogatories,*

*Interrogatory No. 24*, a copy attached hereto as Exhibit "D." In addition, and with respect to

each expert witness, the defendants were asked to provide the detailed subject matter upon which

each expert was expected to testify; the substance of the facts and opinions of each expert; and

required a summary of the grounds for each expert's opinion. Exh. C and D. The defendants

initially objected to each interrogatory, but then stated that they would supplement their answers

"as necessary prior to trial." Id. Each set of interrogatory answers were dated October 17, 2006, and signed by Roger D. Bergeron. Id. The defendants, despite being permitted by the court to identify Mr. Bergeron late as an expert witness in February 2007, *see docket text Endorsed Order granting [55] Motion for permission to designate expert witness out of time*, failed to provide supplemental answers to the expert interrogatories propounded by the NECR.

## II.    DISCUSSION OF LAW:

The defendants have "without substantial justification" failed to disclose information required by Fed R. Civ. P 26(a) and must not be permitted to use the "non-disclosed expert witness information" in support of their motion for partial summary judgment. Lohnes v. Level 3 Communications, Inc., 272 F.3d 49, 60 (1st Cir. 2001); Fed. R. Civ. P. 37(c)(1). Traditionally, Fed. R. Rule 37(c)(1) is invoked to preclude expert trial testimony, but it can also be applied to motions for summary judgment. Lohnes, 272 F.3d at 60; *citing* Trost v. Trek Bicycle Corp., 162 F.3d 1004, 1007-09 (8th Cir. 1998) (finding that a products liability defendant, whose summary judgment motion relied partially on the plaintiff's lack of expert testimony, would have been significantly prejudiced by plaintiff's untimely expert disclosure).

## 1.    THE DEFENDANTS FAILED TO DISCLOSE OR PROVIDE INFORMATION SET FORTH BY MR. BERGERON, AS CONTAINED WITHIN HIS DECLARATION IN THEIR AUTOMATIC REQUIRED DISCLOSURES, ANSWERS TO INTERROGATORIES, OR AS A WRITTEN EXPERT REPORT:

The defendants were required to provide to the NECR a detailed report which included Mr. Bergeron's "qualifications" and "a complete statement of all opinions to be expressed and the basis and reasons therefor." Fed. R. Civ. P. 26(a)(2)(A) and (B). The First Circuit has held these directives to be mandatory, since the adoption of Fed R. Civ. P. 37(c)(1), which it has stated "clearly contemplates stricter adherence to discovery requirements, and harsher sanctions for breaches of this rule." Klonoski, M.D. v. Mahlab, M.D., 156 F.3d 255, 269 (1st Cir. 1998).

The purpose of the expert disclosure rule is "to facilitate a 'fair contest with the basic issues and facts disclosed to the fullest practical extent.'" <u>Lohnes</u>, 272 F.3d at 60; *quoting* <u>Thibeault v. Square D. Co.</u>, 960 F.2d 239, 244 (1st Cir. 1992). These rules seek to prevent the "unfair tactical advantage" that the defendants have gained by failing to unveil their expert in a timely fashion, and thereby depriving the NECR of the opportunity to "depose the proposed expert, challenge his credentials, solicit expert opinions of his own, or conduct expert-related discovery," as well as the opportunity to properly defend their motion seeking summary judgment. <u>Id</u>. "[T]he required sanction in the ordinary case is mandatory preclusion." <u>Klonoski</u>, *supra*.

In deciding whether to exclude Mr. Bergeron's testimony, this court must look at "the history of the litigation, the proponent's need for the challenged evidence, the justification (if any) for the late disclosure, and the opponent's ability to overcome its adverse effects." <u>Macaulay v. Anas</u>, 321 F.3d 45, 51 (1st Cir. 2003).

       a.      <u>**History of the Litigation**</u>:

This litigation was commenced in 2004, has involved pleadings before the Surface Transportation Board, the parties have taken fourteen witness depositions, as well as have provided detailed responses to discovery requests. The case is presently in the reply stage regarding motions for summary judgment and the discovery deadline has long past. The defendants sought and were permitted to identify Mr. Bergeron as an expert by motion on February 16, 2007, but have failed to provide supplemental automatic disclosures or supplemental answers to the applicable interrogatories concerning his testimony, as required by Fed. R. Civ. P. 26(e), and failed to provide a written detailed report as required by Fed. R. Civ. P. 26(a)(2)(B). Over two months have passed since the defendants identified Mr. Bergeron as an expert witness, yet they have failed to take any step to otherwise comply with the strict

requirements relating to disclosing his alleged expert testimony. It can hardly be deemed "fair" to the NECR that Mr. Bergeron's alleged expert opinions were first disclosed in a declaration in support of their motion seeking summary judgment.

**b.      The NECR's need for the Evidence:**

The NECR clearly needed to know the substance of, the basis for, and background and qualifications of Mr. Bergeron in order to understand the basis of his opinions as he is the only witness who has opined as to the cause of the derailment. As will be discussed *infra*, the substance of Mr. Bergeron's declaration, is based in a large part, on either misrepresentations of the witnesses' deposition testimony or he contradicts his own prior sworn testimony given as the defendants' Rule 30(b)(6) witness. The NECR has been caught completely by surprise by Mr. Bergeron's distortion of the evidence of this case. Had the NECR be made aware of the substance of Mr. Bergeron's proposed opinions, then it would have conducted his expert deposition to pierce his testimony, it would have obtained affidavits from witnesses to check his assertions, and would have retained its own experts to provide opinions to the court to clarify the issues.

**c.      There is no Justification for the Late Disclosure:**

There is simply no justification for this late disclosure by Mr. Bergeron of his alleged expert opinions. The NECR placed the defendants on notice that Mr. Bergeron was required to provide an expert report, pursuant to Fed. R. Civ. P. 26(a)(2)(B) when the defendants sought to identify him late. The defendants' have chosen to proceed without making the required report (as well as failing to supplement their automatic disclosures or their answers to interrogatories) and now must suffer the consequences of such decision.

This is even more significant due to the fact that the defendants were well aware of the

short amount of time between the *Pre-Trial Conference* and the court imposed deadline for filing the motions seeking summary judgment.

### d.       The NECR cannot Overcome the Adverse Effects of Mr. Bergeron's testimony:

The NECR cannot overcome the adverse effects of Mr. Bergeron's testimony as he calls into question the care and attention that the NECR places on its maintenance and inspection of the railroad, the professionalism of the Maintenance of Way and Track Inspection employees of the NECR, and questions the competency of the railroad and its employees' ability to abide by and adhere to the applicable federal regulatory scheme. The declaration must be stricken or the NECR must be given the opportunity to depose Mr. Bergeron and then identify its own expert witnesses to refute the statements made in the *Declaration*.

Further, the parties are in the mist of replying to each other's responses to the motions seeking summary judgment and the arguments on said motions are to be heard on May 17, 2007, which is only three weeks away. There simply is not enough time to depose Mr. Bergeron, obtain the transcript of his testimony, retain experts, and then have the experts render considered opinions on these topics.

### 2.       MR. BERGERON MUST BE PROHIBITED FROM PROVIDING EXPERT TESTIMONY DUE TO THE FACT THAT HE SPOLIATED EVIDENCE:

Mr. Bergeron must be prohibited from providing expert testimony due to the fact that he personally, as well as the defendants, spoliated material evidence relevant to this case. In a diversity action, the federal court must apply substantive state law and federal procedural law. Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1983). The *Rules of Evidence* are generally considered to be procedural which means that, even in diversity actions, the court should apply federal law with respect to evidentiary issues. Headley v. Chrysler Motor Corp., 141 F.R.D. 362, 364-65

(D.Mass. 1991).  With respect to spoliation of evidence issues in diversity suits, federal law

controls.  Chapman v. Bernard's, Inc., 167 F. Supp. 2d 406, 413 (D.Mass. 2001).

Spoliation of evidence is defined as the "intentional, negligent, or malicious destruction

of relevant evidence."  Townsend v. American Insulated Panel Co., Inc., 174 F.R.D. 1, 4

(D.Mass. 1997).  The defendants had a duty to preserve material evidence both during litigation

and pre-litigation stages when the party knows or reasonable should know that the evidence may

be relevant.  Blinzler v. Marriott, Inc., 81 F.3d 1148, 1158-59 (1st Cir. 1996).  This court has the

"inherent power to exclude evidence that has been improperly altered or damaged" by the

defendants "where necessary to protect the non-offending party" here the NECR "from undue

prejudice."  Chapman, 167 F. Supp. 2d at 413, *citing* Sacramona v. Bridgestone/Firestone, Inc.,

106 F.3d 444, 446 (1st Cir. 1997).

Once the court has determined that the defendants have spoliated evidence, it may then

impose the appropriate sanctions against the defendants which may include the dismissal of their

claims (in the case the defendants' counterclaims), the exclusion of evidence, or a jury

instruction on the spoliation inference.  Townsend, 174 F.R.D. at 4, *citing* Corales v. Sea-Land

Service, Inc., 172 F.R.D. 10, 13 (D.P.R. 1997).  In determining what sanctions to impose, the

court weighs the following factors:

> Whether the NECR was prejudiced by the destruction of evidence;
> whether the prejudice can be cured; the practical importance of the
> evidence; whether the destruction was in good faith or bad faith;
> and the potential for abuse of the evidence if it is not excluded or
> the defendants are not otherwise sanctioned.

Corales, 172 F.R.D. at 13; Headley, 141 F.R.D. at 365; Northern Assurance Co. v. Ware, 145

F.R.D. 281, 283 (D.Me. 1993).  While bad faith is a consideration in issuing sanctions for

spoliation of evidence, it is not required for sanctions to be imposed.  Where the NECR is

prejudiced, as the result of the destruction of evidence, even when the destruction is the result of

carelessness, sanctions may be imposed by the court. Sacramona, 106 F.3d at 444; Kelley v.

United Airlines, Inc., 176 F.R.D. 422, 427 (D.Mass. 1997). Herein, the NECR seeks to strike

Mr. Bergeron's *Declaration* and proposed testimony in this case, should it ever reach trial, due to

the fact that it has been highly prejudiced by the fact that: (1) Mr. Bergeron destroyed his

original field notes, drawings and data; (2) he failed to document the track structure conditions

which he observed despite acknowledging their significance at the time of his inspection; (3) the

defendants have failed to provide the second page of his notes which were created with

information from the original notes that he destroyed; and (4) the defendants' "lost" the

conductor's company required initial incident report, as well as the two additional copies sent to

management employees by the conductor, concerning the derailment.[1]

### a.    Mr. Bergeron's Original Notes and Data from Mile Post 10.18:

Mr. Bergeron's notes are significant due to the fact that he relies on the data that was

on the notes in order to advance his explanation as to how the derailment occurred. The notes

contained raw calculations, measurements, readings, and drawings concerning the track layout

and structure at Mile Post 10.18. Mr. Bergeron threw out the original information after he made

another drawing from the discarded writings. Exh. A. at p. 124. Those original notes,

calculations, measurements, readings and drawings can never be reproduced again. This is even

more significant given the fact that Mr. Bergeron never informed anyone at the NECR as to the

results of his calculations nor did he share his data with the NECR; therefore, the NECR never

had an opportunity to take its own measurements and readings at Mile Post 10.18 to verify or

dispute Mr. Bergeron's assertions. Exh. A, at p. 137.

---

[1] The NECR reserves the right to request additional trial sanctions such as the dismissal of the defendants' counter-claims and defenses; exclusion of additional evidence, and/or for a jury instruction invoking the spoliation inference.

b.    **Failure to Document the Track Structure Conditions:**

Mr. Bergeron claims that he saw fouled and contaminated ballast at Mile Post 10.18 on the date of his investigation. Id. at p. 140. He knew at that time that the alleged condition would be significant to document that condition. Id. at p. 140 to 142. The alleged fouled and contaminated ballast has become central to his opinion as to the condition of the track structure at the time of the derailment and claims that the conditions existed pre-derailment. Id; *Declaration*, at ¶ 37-38, 42. It was so important to Mr. Bergeron that he instructed a subordinate to photograph the condition in order to document it. Exh. A, at p. 141 to 142. No such photographs have been produced to the NECR by the defendants. Like the data and original field notes that were destroyed, this evidence was not preserved by the defendants.

c.    **The Defendants Failed to Produce the Second Page of Mr. Bergeron's Cleaned-Up Field Notes and Data:**

Mr. Bergeron testified that the "notes" that were provided to the NECR in discovery contained additional information on the back side which was not produced. Exh. A., at p. 112. There were only two pages to his notes. Id. The second page of his notes that have not been produced in discovery contained information from communications with other employees, the identity of the car involved in the derailment, the identity of the railcar which derailed first and "things of that nature." Id. Clearly, Mr. Bergeron does not recall all the information which was contained on the second page of the notes, so it is impossible to know the precise significance of the information contained on the second page; therefore, the court must draw the inference that the information contained on said second page is harmful or contrary either Mr. Bergeron's opinion and/or the defendants' claims.

**d.**    **The Defendants' "Lost" the Conductor's Company Required Initial Incident Report Concerning the Derailment which he Provided to the Defendants in Duplicate and to Two Different Management Employees:**

The defendants "lost" the conductor's company required initial incident report concerning the derailment which he provided to the defendants without any explanation as to what happened to the original report, the report that was facsimiled to the defendants' dispatcher's office in Billerica, MA, or the hard copy that was affixed to the manager's door in East Deerfield, MA.  Exh. B, at p. 46 to 56, 59, and 61.  The original report and two copies of that report have gone missing; therefore, the court must draw the inference that the information contained in the initial report is harmful or contrary either Mr. Bergeron's opinion and/or the defendants' claims.

For the foregoing reasons, the defendants must be sanctioned for their intentional or deliberate destruction of notes and data created at the derailment site, failure to preserve critical physical evidence of the appearance of the track structure, as well as for their negligent handling of the secondary notes and the initial incident report.

**3.**    **THE DEFENDANTS FAILED TO PROVIDE A WRITTEN REPORT FROM MR. BERGERON AS REQUIRED BY FED. R. CIV. P. 26(a)(2)(A):**

The defendants were required to provide a written report concerning Mr. Bergeron's expert opinion, pursuant to Fed. R. Civ. P. 26(a)(2)(B), to the NECR after he was identified as an expert witness in this action.  *See* Minnesota Mining and Manufacturing Co. v. Signtech USA, Ltd., 177 F.R.D. 459 (D. Minn. 1998)(In a case in which it appears that the witness in question, although employed by the defendant, is being called solely or principally to offer expert testimony, there is little justification for construing the rules as excusing the report requirement).  The NECR placed the defendants on notice that Mr. Bergeron was required to provide an expert report, pursuant to Fed. R. Civ. P. 26(a)(2)(B), and that it would not conduct a deposition without

said report. *See Memorandum of Reasons in Support of Unopposed Motion for Permission to Designate Expert Witness Out-of-Time*, at p. 3, a copy is attached hereto as Exhibit "E." There is no justification for the defendants' failure to provide the required written report; therefore, such failure must be sanctioned by striking Mr. Bergeron's *Declaration*.

**4.    MR. BERGERON IS CLEARLY NOT QUALIFIED TO RENDER THE TRAIN OPERATION OPINIONS WHICH HE ASSERTS:**

Mr. Bergeron, to the extent that he has opined concerning issues relating to railroad operations and/or mechanical issues, is not qualified to render such opinions, therefore any reference to such opinions within his declarations must be stricken. Mr. Bergeron has testified that during his career with the railroad that he has been a trackman (laborer), engineering surveyor, construction inspector, resident engineer, a track supervisor, roadmaster, engineer of track, engineer of production and contruction, and now holds the position of assistant vice-president of engineering. *See Declaration of Roger D. Bergeron in Support of Defendant/Counterclaimants' Motion for Partial Summary Judgment* ("Declaration"), ¶ 2. He has been employed by the defendants or their predecessor entities for the last 36 years. Id. Mr. Bergeron attended college where he studied civil engineering and architecture, but never graduated. Id, at p. 12 and 13. His responsibilities for the defendant, at the time of the derailment, consisted of the maintenance and inspection of all track and roadbed structures and signal apparatus. Exhs. C and D, at *Answer to Interrogatory No. 1*; *Declaration* at ¶ 3. At no time, has Mr. Bergeron held himself as having training, experience, and/or qualifications concerning railroad operations and/or mechanical concerns. Given the foregoing, the following paragraphs of the *Declaration* must be stricken, as the opinions contained therein occupy areas of expertise of either train operations and/or mechanical related issues on which Mr. Bergeron is not qualified to opine: 28 to 30, 32 to 34, and 37.

12

5. **MR. BERGERON SUBSTANTIALLY HAS MISLED THE COURT AS TO THE FACTS AND CIRCUMSTANCES OF THE DERAILMENT:**

Mr. Bergeron substantially misled the court, in his *Declaration*, as to the material facts and circumstances relating to the derailment. His self-serving affidavit cannot "defeat a motion for summary judgment when those statements are 'without factual support in the record.'" Buie v. Quad/Graphics, Inc., 366 F.3d 496, 503 (7th Cir. 2004). Mr. Bergeron's affidavit must be based on his personal knowledge, "set forth such facts as would be admissible in evidence," and must show that he is "competent to testify to the matters stated therein." Patterson v. County of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004). Further, and more importantly, "a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony." Radobenko v. Automated Equip. Corp., 520 F.2d 540, 544 (9th Cir. 1975). Mr. Bergeron, despite having allegedly reviewed the deposition testimony of other witnesses in this case, substantially seeks to mislead the court as to the substance of those witnesses' testimony in his *Declaration* and has contradicted his previous sworn deposition testimony as the defendants' Rule 30(b)(6) designee, examples of which are as follows:

a. **Location of the Defect:**

Mr. Bergeron has gone to great lengths in his *Declaration* to locate a track defect from the F.R.A. geometry testing at, near, or in the vicinity of Mile Post 10.18, the point of derailment. *Declaration*, at ¶ 18, 21 to 22, 28, 37 to 39, 40, 42, and 44. The actual defect found by the F.R.A. geometry testing was located at Mile Post 10.16 by precise GPS Tracking. Mile Post 10.16 is 105.6 feet south from the point of derailment at Mile Post 10.18. *See Deposition of Richard R. Boucher*, at p. 6, 10 to 12, a copy attached hereto as Exhibit "F;" *Deposition of Rick T. Boucher,* at p. 7, 9 to 11, a copy attached hereto as Exhibit "G;" Exh. A, p. 83. The location

of the F.R.A. geometry testing defect was found at Mile Post 10.16 by pinpoint GPS tracking conducted by the NECR on the day of the F.R.A. geometry testing. Id; Exh. A, at p. 82. The NECR's methods confirmed with specificity that the location of the defect at Mile Post 10.16 and not at Mile Post 10.18. The defendants simply have no evidence that the F.R.A. geometry test on June 8, 2004, located any defect at the point of derailment, Mile Post 10.18.

> **b.** **The Defect Found at Mile Post 10.16 did not Exceed F.R.A. Class II Standards:**

Mr. Bergeron describes alignment and cross level defects at Mile Post 10.18, which he located after the derailment, and sets forth that they are the defect that the F.R.A. geometry test found and that when he observed them the physical evidence demonstrated that the misalignment was not of recent vintage and had pre-dated the derailment. *Declaration*, at ¶ 18, 28, 37-38, and 40.[2] Yet, when Mr. Bergeron testified as the Rule 30(b)(6) designee on behalf of the defendants he stated that the fouled ballast conditions that he saw three days after the derailment could have resulted from normal wear and tear by trains using the track, that they could be accentuated by rain and spongy ballast, that the track is impacted by train loading and climate (both a warm and cool climate could have affected the track), the sun radiating on the rails could affect expansion and contraction of the rail. Exh. A, p. 141 to 145. Simply put, Mr. Bergeron was unable to testify as to how long the alleged ballast condition existed prior to his inspection.

Further, the warp defect which was noted by the F.R.A. geometry testing at milepost 10.16 did not exceed the limits established by the FRA's track safety standards – instead, the reduction in classification to Class II was perfectly acceptable under the circumstances. Exh. H, at p. 12, 15 to 18; Exh. F at p. 8 to 9; *also see* the FRA in its *Track Geometry Inspection Report*, a copy attached hereto as Exhibit "I."

**c.    The NECR Testified that Harmonic Rock Could only be Caused by "Excessively" Low Joints and that Condition did not Exist at Mile Post 10.16:**

Richard R. Boucher did *generally* acknowledge that harmonic rock could be caused by a series of low joints over a prescribe distance as set forth by Mr. Bergeron. *Declaration*, at ¶ 20. But, Mr. Bergeron fails to report to the court that Mr. Boucher then further testified that harmonic rock could only be caused by "excessively" low joints and that condition did not exist at Mile Post 10.16. Exh. F, at p 9 to 11. Therefore, Mr. Boucher did not provide testimony to support the defendants' contention as to the happening or occurrence of the derailment.

**d.    The NECR Followed the Proper Remedial Action upon Learning of the Defect at Mile Post 10.16:**

In his *Declaration* at ¶ 24 to 25, Mr. Bergeron states that the proper remedial action, upon learning of the warp at Mile Post 10.16, would have been "tamping up the ballast under the low (inside) end of the ties and that the NECR took the easy – and improper – way out, dropping the segment to Class 2 status." These statements are contrary to what he testified to at deposition when he set forth that the proper remedial action would be to "either remove the track from service or protect it with a slow" order. Exh. A, p. 172 to 175. He went on to say that there would be no reason to remove the track from service if it was reduced in class from Class III to Class II and the defect was undisputable once it is field identified. Id. That is exactly what the NECR did in this case, i.e. it reduced the classification of the track immediately and, on the same day of the testing, its employees verified that the location and nature of the defect. *See* subsection (a) above. This was proper and permitted by the FRA. In fact, authority for the reduction to class II was specifically set forth in the *Track Geometry Inspection Report*. Exh. I.

---

[2] As set forth in subsection (a) above, the defect noted by the F.R.A. geometry testing was located by GPS at Mile Post 10.16, not Mile Post 10.18, and that the speed over that track was then reduced from Class III to Class II.

**e.    The F.R.A.'s Track Safety Rules to not Require Defects Detected by a Geometry Car be Recorded on Subsequent Track Inspection Reports:**

At ¶ 26 in his *Declaration*, states that Rick T. Boucher did not record the defect at Mile Post 10.16 on his subsequent inspection reports and that the F.R.A. regulations require such recording on each inspection report until the defect has been corrected.  This assertion is simply not correct as the track safety rules <u>do not</u> require that defects detected by a geometry car be recorded on subsequent track reports until the defective condition has been corrected.  49 C.F.R. § 213; *see also* Exhibit 12 to the *Declaration*; Exh. G, at p. 21-23.  Moreover, the NECR exceeded the applicable F.R.A. inspection requirements, having inspected the track twice weekly in the month before the derailment (the FRA required only weekly inspections of the track).  49 C.F.R. § 213.233; Exh. G, at p. 7 to 8.

At ¶ 27 of his *Declaration*, Mr. Bergeron set forth that the NECR had no way of knowing whether the condition had worsened at Mile Post 10.16.  This statement is completely unsupported by the testimony given at deposition and by the substance of the track inspection reports.  Exh. G, 7 to 8, and 12.  In fact, Rick T. Boucher testified that between June 8th and July 3rd he had been doing his twice weekly inspections and saw that the condition at Mile Post 10.16 remained the same.  There is no other evidence to contradict Mr. Boucher's testimony.

**f.    At Deposition Mr. Bergeron did not State that the Defendants Followed the Canadian Pacific Handbook on *Train Derailment Cause Finding*:**

In his *Declaration* at ¶ 39, Mr. Bergeron set forth that he is familiar with the F.R.A. Safety Standards Compliance Manual, Association of American Railroad's publication on Train Derailment Cause Finding and the Canadian Pacific handbook on the same subject, but that the defendants generally follow the AAR publication in investigating derailments.  Further, he cites as authority for his opinion page 6-6 of the Canadian Pacific derailment manual concerning the

cumulative effect of alignment and cross level defects. When he was deposed as the Rule

30(b)(6) witness on behalf of both defendants, he was specifically asked what materials his

railroad utilizes in its investigation of derailments and he stated that the NECR's management

uses the *AAR Train Derailment Cause and Finding Manual* in its investigation of derailments, as

well as the applicable timetable, safety rules and special instructions, the NORAC Operation

Rules, and maintenance of way manual of the railroad. Exh. A, at p. 30 and 33. He never

testified that the Canadian Pacific manual had any applicability to his railroad's investigation of

derailments.

Further, and significantly, he was specifically asked whether there were any other

policies and procedures in place at his railroad, regarding investigating derailments, that were in

effect for his railroad other than the AAR manual and he stated not to his knowledge. Id. at p.

31. He further stated that it was a written policy of the defendants that its employees were to use

the AAR manual for investigating derailments. Id. The Canadian Pacific guidelines had no

applicability to the defendants' derailment accident investigation.

Last, the defendants failed to identify or provide to the NECR a copy of the applicable

Canadian Pacific derailment manual as part of its initial automatic disclosure as required by Fed.

R. Civ. P. 26, therefore any reference to said manual or its use as authority in this case must be

stricken.

g.      **Mr. Bergeron has No Knowledge of the Weight or Content of the Railcar
        which Derailed at Mile Post 10.18:**

At ¶ 37 of his *Declaration*, Mr. Bergeron states in his ultimate conclusion that "most of

the weight of the boxcar in question was over the inside rail of the curve...the opposite wheels –

those on the outside rail of the curve – were bearing an unusually light load." Yet, in his

deposition he stated that he did not know if the railcar's load shifted when he made his

17

determination as to the cause of the derailment and conceded that load shifting could cause a derailment. Exh. A, at p. 91, 93 and 95. He also failed to determine whether or not forces from other railcars caused the railcar to derail and whether the railcar had a defective center of gravity which can cause a derailment. Id. at p. 90 to 91. He never inspected the inside of the railcar which initially derailed at the scene to check the lading. Id. at p. 92. Therefore, Mr. Bergeron's opinion as to which rail was bearing "most of the weight" of the railcar must be stricken as he has no knowledge as to such forces as exerted by the railcar at the time of the derailment.

### III.    CONCLUSION:

For all of the foregoing reasons, the NECR requests that this Honorable Court strike the *Declaration of Roger D. Bergeron in Support of Defendant/Counterclaimant's Motion for Partial Summary Judgment.*

### IV.    REQUEST FOR HEARING

In accordance with L.R. 7.1(D), the NECR believes that oral argument may assist the court and wishes to be heard, and, therefore requests that the court schedule a hearing on the within motion.

CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the attached pleading was sent by 1st Class U.S. Mail - Postage Prepaid/In Hand/Facsimile/Electronic Mail to all counsel of record.

Signed under the pains and penalties of perjury.

Dated:  4-26-07

Respectfully submitted,
NEW ENGLAND CENTRAL RAILROAD, INC.,
by its attorneys,

/s/  Richard A. Davidson, Jr.

Michael B. Flynn                              BBO# 559023
mbflynn@flynnassoc.com
Richard A. Davidson, Jr.                   BBO# 552988
radavidsonjr@flynnassoc.com
FLYNN & ASSOCIATES, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169
(617) 773-5500

Dated:  April 26, 2007

# EXHIBIT

# "A"

Volume 1, Pages 1-180

Exhibits: 10-26

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

NEW ENGLAND CENTRAL RAILROAD, INC.,

        Plaintiff

v.                    Docket No. 04-30235-MAP

SPRINGFIELD TERMINAL RAILWAY

COMPANY and BOSTON AND MAINE

CORPORATION,

        Defendants

-----------------------------

RULE 30(b)(6) DEPOSITION OF SPRINGFIELD TERMINAL

RAILWAY COMPANY by ROGER D. BERGERON

Thursday, January 11, 2007, 10:11 a.m.

Law Office of Robert H. D'Auria

41 North Road, Suite 205

Bedford, Massachusetts 01730

----Reporter: Kathleen Mullen Silva, RPR, CRR----

Beacon Hill Court Reporting, Inc.

807 Main Street, 2nd Floor

Worcester, Massachusetts 01610

508.753.9286

**Roger D. Bergeron**
**January 11, 2007**

12

```
 1  most of the construction inspection was like '76,

 2  '77, in that time frame there.

 3      Q.  Okay.  What about resident engineer?

 4      A.  That continued.  So like '77, '78, in that

 5  area.

 6      Q.  Did you have a position with the railroad

 7  prior to your various positions in the survey crew?

 8      A.  I worked summers while I was going to

 9  school in the track department.

10      Q.  Where did you go to school?

11      A.  Wentworth Institute.

12      Q.  When did you attend Wentworth?

13      A.  Various stages, from '69 through '73 and

14  '74.  I haven't graduated.

15      Q.  Okay.  What were you studying at Wentworth?

16      A.  Engineering and architecture.

17      Q.  What kind of engineering were you studying?

18      A.  Civil.

19      Q.  Is there some reason why you didn't

20  graduate?  Chose not to?

21      A.  Commitment to family and then other

22  activities.

23      Q.  What did you do for the track department

24  while you worked at Wentworth?
```

 1      A.   Summers I worked in various capacities as a

 2   track man, which is an entry level position doing

 3   manual labor in the track department; equipment

 4   operator.   I operated various pieces of equipment

 5   for them.   I was an assistant foreman, where I was

 6   authorized to oversee different people in track

 7   crews doing activities.   Then as a foreman

 8   ultimately where I was able to take track time and

 9   then do some projects.   It was mostly summers, like

10   four- or five-month durations and then I would go

11   back to school.

12      Q.   Have you had any other positions in your

13   professional career, other than with the Boston &

14   Maine or with the Guilford System?

15      A.   No, I have not.

16      Q.   So your whole work history exists from the

17   time you graduated high school to the present

18   working for either the Boston & Maine or the

19   Guilford Rail or now Pan Am Railways?

20      A.   That's true.

21      Q.   Okay.   You've never had a consulting

22   business on the side?

23      A.   No, I have not.

24      Q.   Have you ever been compensated by any other

**Roger D. Bergeron**
**January 11, 2007**

30

```
 1   timetable and safety and special instructions of the

 2   railroad.  We're a member of the NORAC rules

 3   committee training.  So there's references to

 4   derailment and derailment responses in the NORAC

 5   rules.  There is in our timetable and special

 6   instructions and there is in our maintenance of way

 7   manual.

 8      Q.  What specifically is in the Guilford

 9   timetable regarding derailment accident

10   investigations?

11      A.  It would cover everything from radio

12   procedures, you know, notification, what to do in

13   emergencies.

14      Q.  I'm not asking about what a crew should do.

15   I'm asking what in particular is contained within

16   the Guilford timetables regarding the instructions

17   or policies and procedures on investigating a

18   derailment.

19      A.  In the timetable there would probably be

20   nothing on investigating.

21      Q.  What about the NORAC rules?

22      A.  On investigating, nothing.

23      Q.  What about the maintenance of way manual?

24      A.  Well, the maintenance of way manual would
```

1    be the reference manual that you would use for the

2    engineering discipline in the investigation of the

3    derailment.

4        Q.   Now, would that be true if you were

5    operating over another railroad's line; would that

6    be applicable?

7        A.   No, it would not.

8        Q.   So in terms of 2004, were there any other

9    policies and procedures in place regarding

10   investigating a derailment other than the AAR manual

11   that were in effect for the Guilford system?

12       A.   Not to my knowledge.

13       Q.   Now, the AAR manual itself, were those

14   policies and procedures that are contained within

15   that manual, were they to be followed by the

16   Guilford employees in terms of investigating the

17   derailments?

18       A.   That would be the guideline to follow.

19       Q.   How were the Guilford employees made aware

20   that they were to use the AAR manual for

21   investigating derailments?

22       A.   As a guideline, it's a company policy.

23       Q.   Was it a written policy or verbal policy?

24       A.   It's a written policy.

33

```
 1      A.   No, it is not part of a rule testing.

 2      Q.   It was just generally made aware to

 3   management employees through a written policy that

 4   they are to use the AAR investigating derailment

 5   manual?

 6      A.   That is correct.

 7      Q.   Do you know if that manual was produced in

 8   this case in the course of discovery?

 9      A.   Yes, I believe it has.  I believe I've seen

10   it in the production of documents.

11      Q.   What have you reviewed before you came in

12   today for this deposition?  Before you answer the

13   question, I don't want to know about any of your

14   conversations with counsel.  All right?  I just want

15   to know what you reviewed.

16      A.   What I've reviewed is a series of documents

17   that have been given to us from New England Central,

18   Vermont Rail, Engineers Contractors, Inc.  I'm

19   pretty sure that's the name of the company that had

20   it.  I guess a subsidiary of the New England

21   Central, which would be some notes from a dispatcher

22   that is on some other name.  I can't think of the

23   name of that.  But I've seen some notes there.  And

24   then in our internal notes that we supplied for
```

82

1    A.   Warp, W-a-r-p, 62.

2    Q.   Now, in that report on that page, do you

3 see any exceptions taken at 10.18 by the FRA?

4    A.   At 10.18, no, I do not.

5    Q.   Do you see any exceptions taken at 10.17?

6    A.   No, I do not.

7    Q.   What about 10.19?

8    A.   No, I do not.

9    Q.   The only exception -- let me make sure I

10 phrase this correctly -- at milepost 10 or

11 thereabouts, between 11 and 10, was the one at

12 10.16, correct, according to the geometry test

13 results?

14    A.   According to their decimal location,

15 there's an indication that at 10.16 there was a

16 warp.

17    Q.   In that report off to your right on that

18 same line, it gives a longitude and latitude of that

19 location, correct?

20    A.   That is correct.

21    Q.   And if you and I were to go with our GPS

22 and plug in that longitude and latitude, we could go

23 out and locate that according to that data, correct?

24    A.   You can get pretty close to it, correct.

**Roger D. Bergeron**
**January 11, 2007**

1    Q.   You should be able to get almost on top of

2    it, correct?

3    A.   Almost, but not quite.

4    Q.   Almost.  I've given you the fudge factor

5    there.

6    A.   Yeah.

7    Q.   Now, 10.16 and 10.18 are how many feet

8    apart, those two mileposts?

9    A.   Between 10.16 and 10.18?

10    Q.   Yeah.

11    A.   Theoretically, under railroad terms, it

12    would be 104 feet apart roughly.

13    Q.   How long is a freight car?

14    A.   65 feet.  Well, they come in various sizes.

15    Q.   Well, how long would you say that freight

16    car is in Exhibit 19?

17    A.   I don't know specifically how long this

18    freight car is.

19    Q.   Okay.

20    A.   But freight cars vary in length from, you

21    know, 55 feet over the coupler to over the coupler,

22    to 65 feet over the coupler to over the coupler.

23    Q.   So it's approximately -- it could be two

24    car lengths apart or it could be 1 1/2 car lengths

84

1    apart, those two mileposts, milepost 10.16 and

2    10.18?

3        A.   It could be.

4        Q.   It's 52.8 feet for every hundredth mile,

5    right?

6        A.   Yes.

7        Q.   Just want to make sure we're using the same

8    math, that's all.

·9                Now, did you sketch out the mark on the

10   rail and diagram the length of the mark on the rail

11   from the flange as the wheel rose or lifted to the

12   time it left the rail?

13       A.   I'm not following.

14       Q.   When you found your point of derailment at

15   approximately 10.18, and you said earlier that you

16   saw this marking on a rail head, did you at any

17   point sketch that, draw it out?

18       A.   No, I did not draw it out.

19       Q.   Did you have a camera with you?

20       A.   I did not, no.

21       Q.   Did Mr. Griffiths?

22       A.   Not at the time, no.

23       Q.   So neither one of you took a picture of it

24   or drew it out?

Roger D. Bergeron
January 11, 2007

85

1        A.   At --

2        Q.   At the time.

3        A.   At the time of first arrival on the site,

4    the answer is no.

5        Q.   As your investigation progressed during the

6    day --

7        A.   Yes.

8        Q.   -- and from the time you left, did you then

9    draw it or photograph it?

10       A.   Photograph it, I believe we tried to

11   photograph it, yeah.

12       Q.   What happened with those photographs?  You

13   said you tried to photograph it.

14       A.   The mark on top of the rail was very light,

15   like I said.  It was very, very light.

16       Q.   So were you able to get a photograph of it?

17       A.   I don't know if we -- I don't remember

18   seeing a photograph specifically of the length of

19   the mark on top of the rail.

20       Q.   Did you do it with a disposable camera?

21       A.   I think he did, yes.

22       Q.   When you say "he," who's he?

23       A.   Dan Griffiths.

24       Q.   Do you know if that film was ever

1    developed?

2        A.   I don't know.

3        Q.   Have you seen photographs at the

4    Springfield since you came to your determination as

5    to the cause of the derailment that were in

6    Springfield's custody, other than those which were

7    produced by us?

8        A.   The first pictures that I've noticed were

9    ones that were done -- I believe the ones that I've

10   seen, everything's been produced by New England

11   Central.

12       Q.   But you have a memory sitting here today

13   that Dan Griffiths was trying to get photographs out

14   there?

15       A.   Yeah, I asked him to try to get a

16   photograph of the derailment area, yes.

17       Q.   Do you remember him purchasing a disposable

18   camera?

19       A.   I'm not too sure it's a disposable or he

20   tried to get a digital, but he tried to get pictures

21   of that area.  I have no recollection of seeing any

22   photographs.

23       Q.   Do you remember him actually trying to take

24   the physical picture, looking at the rails to try to

**Roger D. Bergeron**
**January 11, 2007**

90

1    us, yes.

2                    MR. DAVIDSON:   Could we have this marked

3    I think 20, 21, please.

4                    (Marked, Exhibits 20-21, photocopies of

5    photographs.)

6        Q.   Dan Griffiths was the one who was, you

7    thought, trying to get the pictures?

8        A.   To the best of my knowledge, yes.

9        Q.   And you have not seen any photographs in

10   the possession of the STRC that they took themselves

11   since your termination, correct?

12       A.   To the best of my knowledge, no.

13       Q.   Do you know whether or not the car that

14   derailed, which you don't remember the number of it,

15   was caused to derail by a car following it, or was

16   it caused to derail because of something that

17   happened to it at that point?

18       A.   There was one car -- only one truck of one

19   car derailed at milepost 10.2, in that general area,

20   and that's what the marks indicated, is one truck

21   derailed of one car.

22       Q.   But you don't know what caused that to

23   derail in terms of forces from other cars, do you?

24       A.   I don't know if it was caused by a force of

**Roger D. Bergeron**
**January 11, 2007**

91

1    another car.

2         Q.  Isn't it true that derailments can occur

3    because of load shifting?

4         A.  That is correct.

5         Q.  Isn't it true that derailments can occur

6    because of a defective center of gravity in the rail

7    car?

8         A.  That is correct.

9         Q.  You weren't able to establish whether or

10   not the loads in the rail car that derailed shifted,

11   were you?

12        A.  I didn't determine that, no.

13        Q.  In fact, the STRC didn't determine it

14   either because the rail car was on its side when

15   they got there, correct?

16        A.  I believe the car was on its side when they

17   got there, that is correct.

18        Q.  So it would be impossible, once the car is

19   on its side, to determine the load shift, wouldn't

20   it be?

21        A.  Not necessarily.

22        Q.  How would you be able to determine a load

23   shifting with a rail car on its side after

24   derailment?  We're talking about boxcars.  We're not

**Roger D. Bergeron**
**January 11, 2007**

92

1   talking about open-loaded cars, open top-loaded cars

2   or anything.  We're talking about boxcars.

3       A.  Evidence of shifting is -- you'd have to

4   look at or inspect the lading.  What I'm saying is

5   it's not impossible to do it if it's like newsprint

6   or bales of steel coils, things of that nature.  You

7   know, newsprint and all that stuff there, not only

8   is it loaded, but it's also like packed into cars.

9   So to see its proximity to the door and to the

10  ceiling and all that, even with the car on the side,

11  you'd be able to see a missing or shift in a roll.

12      Q.  Even if the car was on its side?

13      A.  You could very well, yeah, on newsprints

14  and heavy coils and things of that nature, even if

15  it's on its side, yes.

16      Q.  What was the lading in the car that

17  derailed?

18      A.  I don't know.  I'm not too sure.

19      Q.  Did you ever make that determination at the

20  scene?

21      A.  I never inspected inside the car at the

22  scene.

23      Q.  Did you ever ask anyone what was the lading

24  in that box car?

Roger D. Bergeron
January 11, 2007

93

1      A.   I believe I did.

2      Q.   And you don't recall what it was?

3      A.   Not right now, no.

4      Q.   Now, excessive speed can also cause a

5  derailment, correct?

6      A.   Yeah, excessive speed can cause a

7  derailment.

8      Q.   The load shifting could cause a derailment?

9      A.   That is correct.

10     Q.   Binding of the -- well, a stiff truck

11  itself could cause a derailment, couldn't it?

12     A.   Oh, yeah.

13     Q.   Car rocking action could cause a

14  derailment?

15     A.   That is correct.

16     Q.   And there's a number of things that can

17  cause a car to start rocking, correct?

18     A.   That is correct.

19     Q.   A defect in the car could cause that?

20     A.   That's correct.

21     Q.   A defect in the track could cause that?

22     A.   That is correct.

23     Q.   A combination of things could cause that?

24     A.   That is correct.

**Roger D. Bergeron**
**January 11, 2007**

95

1    anything inside the car or anything.  He said he

2    didn't see anything in the lading.  I believe when I

3    first asked him, he said he hadn't been in the car

4    yet.

5         Q.  At any point in time before you made your

6    determination, did you talk to anyone who had been

7    in that rail car?

8         A.  Before?

9         Q.  Before you made your determination as to

10   the cause of the derailment.

11        A.  No.

12        Q.  So you didn't know whether or not the load

13   shifted when you made your determination, correct?

14        A.  As far as the lading, no.

15        Q.  You never interviewed the crew, did you?

16        A.  No, I did not.

17        Q.  Did the STRC ever obtain a written

18   statement from the crew?

19        A.  To my -- I didn't.

20        Q.  But did the company?  You're testifying on

21   behalf of the company right now.

22        A.  Well, in the hearing --

23        Q.  I'm not asking in the hearing.  A written

24   hearing, not oral testimony, but a written statement

**Roger D. Bergeron**
**January 11, 2007**

112

1      Q.   Are these the notes you're talking about?

2      A.   Part of it, yes, that is correct.

3      Q.   When you say "part of it," was there more

4    to that?

5      A.   Yes.

6      Q.   What else was with that?

7      A.   There's notes to the back of this.

8      Q.   What were the notes on the back?

9      A.   It was some information from a telephone

10   conversation with Mike Walsh.  It was mostly, you

11   know, the car, the car that derailed first and

12   things of that nature.

13     Q.   Okay.  Is there any information on that

14   sheet that you have in front of you which would

15   indicate to you which wheel lifted first?

16     A.   No.

17     Q.   That would be on the back side of that page

18   or page 2?

19     A.   Yeah, I believe so.

20     Q.   Was there only two pages, the front and

21   back side?

22     A.   Yes.

23     Q.   I don't know why we don't have a page 2.

24     A.   There would be a whole other one page with

**Roger D. Bergeron**
**January 11, 2007**

123

1   your calculations include -- strike that.

2              At point A you have 61 1/2 plus 3/8 and

3   then you have a line and then underneath that you

4   have 56 3/4.  Would you explain to the jury what

5   that means?

6        A.  Okay.  The 6 1/2 plus 3/8 is the

7   crosslevel, the difference in height between the

8   rail on the east rail and the rail on the west rail.

9   The 56 3/4 is the gage of the track at that

10  particular spot, 5/8 of an inch below the rail at a

11  plane equal to that at that point A.

12       Q.  What piece of equipment did you use when

13  you made these measurements?

14       A.  A level board gage combination.

15       Q.  Okay.  Is that a tool that you can use by

16  yourself or do you need assistance with that?

17       A.  You can use it by yourself.

18       Q.  Did you, in fact, use it by yourself?

19       A.  Yes, I did.

20       Q.  So you were taking the measurements and you

21  were writing those down yourself?

22       A.  That is correct.

23       Q.  What was Mr. Griffiths doing while you were

24  doing this?

**Roger D. Bergeron**
**January 11, 2007**

124

```
 1      A.  He was standing walking with me.

 2      Q.  So he was just standing with you while you

 3  were doing the work?

 4      A.  When I was taking the readings on the first

 5  passthrough, that is correct.

 6      Q.  Is this the actual diagram that was created

 7  that day, or is this a cleaner copy of that?

 8      A.  This is a cleaner copy of that.

 9      Q.  Do you have the original numbers and

10  original data that you took?

11      A.  I'm not too sure.  No, I don't think so.

12      Q.  Any reason why you didn't keep it?

13      A.  It was a sloppy copy.  I mean --

14      Q.  I understand it was sloppy.  Is there any

15  reason why you didn't keep it?

16      A.  No.

17      Q.  So it no longer exists?

18      A.  I don't believe so.

19          MR. DAVIDSON:  Can we mark this the next

20  exhibit, please.

21          (Marked, Exhibit 23, track chart, Bates

22  ST010386.)

23      Q.  Do you know if anyone, during the course of

24  their inspection of the car that derailed, ever
```

**Roger D. Bergeron**
**January 11, 2007**

137

1   considered as having staggered joints.  Joints

2   within the 7 low joints outside of the regular joint

3   spacing shall not be considered as joints for

4   purposes of this footnote."

5       Q.   So what are these joints?

6       A.   The joints are 39 feet.

7       Q.   Did you inform anyone at the NECR of the

8   results of your calculations?

9       A.   No, I did not.

10      Q.   Is there any reason why you didn't?

11      A.   The track was in compliance -- it was out

12  of service when I looked at it, when I was done with

13  my inspection.

14      Q.   But you say it was in compliance with what?

15      A.   It was in compliance with ten miles an hour

16  when it was done and put back into service.

17      Q.   So you never shared your data with the

18  NECR?

19      A.   No, I did not.

20      Q.   Who would be your counterpart or the person

21  you were talking to at the NECR at that time

22  regarding this issue and the derailment?

23      A.   Probably Mike Lawyer, as I was told.

24      Q.   Did you actually talk to him?

**Roger D. Bergeron**
**January 11, 2007**

140

1    stick out when you're comparing them to welded rail

2    because welded rail is smoother all the way through?

3        A.   No.   There was fouled ballast section too

4    under these joints.   It was not a stable -- there's

5    two terms.   Contaminated and foul ballast, and

6    that's when the ballast is so laced with like mud

7    and stuff that it's spongy.   I don't know if any of

8    those terms you're used to.   But there was like

9    fouled ballast in this area too of the joint.

10       Q.   Would you mark on the exhibit where the

11   fouled ballast was on the actual rail, between the

12   two rails.

13       A.   Right here (indicating).

14       Q.   Just for the record would you put a circle

15   around that.

16       A.   (Witness complies.)

17       Q.   The witness has put the initials "FB"

18   northeast of -- excuse me -- to the upper right-hand

19   side of the point marked "B" and to the bottom left

20   side of the point marked "H."

21       A.   Actually --

22       Q.   Now, when you saw the fouled ballast there

23   on your inspection, did you talk to Mr. Griffiths

24   about that?

**Roger D. Bergeron**
**January 11, 2007**

141

```
 1      A.   I'm not -- he was --

 2      Q.   He was with you?

 3      A.   He was with me, yes.

 4      Q.   Did you mention to him, "Look at the fouled

 5  ballast"?

 6      A.   Oh, yeah.

 7      Q.   When you did that, did you say, "Hey, make

 8  sure you get a picture of that as well when you get

 9  a picture of the marking on the rail"?

10      A.   The direction to Mr. Griffiths was when we

11  were leaving this area here.

12      Q.   Okay.

13      A.   I said, "See if you can get a couple of

14  shots showing the joints in that area right around

15  the crossing."  That is the limit of what I

16  instructed him to do.

17      Q.   So get a picture of the joints in the area

18  around the crossing?

19      A.   Crossing.

20      Q.   That would include this area which you've

21  marked "FB," correct?

22      A.   Yes.

23      Q.   It was your intent at that time to document

24  the condition of this curve which included the
```

142

1    fouled ballast, right?

2        A.   Yes, it would have.

3        Q.   Because you felt that was relevant to your

4    investigation, correct?

5        A.   Oh, yes.   Yes.   There was another condition

6    too, because opposite the fouled ballast right up

7    here (indicating) was the station 5 through 3.

8    Because of foul ballast, it had no alignment.   And

9    this was also part of being, you know, how did you

10   see it.   You had a series of low joints that we

11   picked up here.   And then you had this high rail,

12   and instead of being a perfect radius and smooth, it

13   was kicked in about an inch -- it was about an inch

14   and a half.

15       Q.   Now, these conditions you're talking about,

16   they can result from normal wear and tear by the

17   trains using the track, correct?

18       A.   Oh, yeah.

19       Q.   And they could be accentuated by a lot of

20   rain, especially with the spongy ballast, correct?

21       A.   Yes.   Oh, yeah.

22       Q.   So if someone had inspected it a couple of

23   days before and a number of trains had run down the

24   track, it could conceivably been not picked up

**Roger D. Bergeron**
**January 11, 2007**

143

1    because it didn't exist then, correct?

2              MR. WRIGHT:  I'm going to object to that

3    as being speculative.

4        A.  It is impacted by train loading and

5    climate.

6        Q.  Okay.  And would a warm climate affect it?

7        A.  It could.

8        Q.  And a cold climate could affect it too?

9        A.  Certainly.

10       Q.  Because you have expansion and contraction?

11       A.  That is correct.

12       Q.  The time of the day could even effect it,

13   could it not, depending on whether the sun's up or

14   the sun's not down?

15       A.  The geometry indicated --

16       Q.  It's a yes or no question.

17       A.  The answer is no.

18       Q.  So the sun heating the rail being in the

19   sky in July would not affect the expansion and

20   contraction of the rail?

21       A.  Oh, it does.

22       Q.  And that could affect the geometry too,

23   correct?

24       A.  Not generally.

**Roger D. Bergeron**
**January 11, 2007**

144

1    Q.    What happens if the lower -- the inside of

2    the curve was in the shade and the outside of the

3    curve was in the sun?  One would expand and one

4    wouldn't with the sun, correct?

5    A.    That is correct.

6    Q.    And that could affect the geometry, right?

7    Correct?

8    A.    I suppose it could.

9    Q.    When you were out there, the inside of this

10   curve where you have A, B and C, in fact, there's

11   trees here, aren't there, on the west side of the

12   rail?  Not close, but there's trees right there?

13   A.    When you come in to the west rail, it's a

14   farmer's field and then there's vegetation out

15   through here, but not -- there's nothing within

16   striking distance of the operational railroad out

17   there.

18   Q.    What about on the east side?

19   A.    Same thing, but not within striking

20   distance of hitting equipment or rolling stock.

21   Q.    Okay.  Good.  And you were out there three

22   days after the derailment, correct?

23   A.    Yes.

24   Q.    So you don't know how many trains had come

**Roger D. Bergeron**
**January 11, 2007**

145

1    down to that point or not before you took your

2    measurements, correct?

3        A.   I didn't know about operational

4    characteristics, no.

5        Q.   Do you know how many freight cars were in

6    this train?

7        A.   It was under 20.

8        Q.   Do you know how many locomotives?

9        A.   I believe two.

10       Q.   Now, your crew had a duty to operate the

11   train reasonably and safely, correct?

12       A.   Yes.

13       Q.   That's like a general rule?

14       A.   Without a doubt.

15       Q.   And you're familiar with the general

16   operating rules, not specific rules, but the general

17   operating safety rules?

18       A.   Yes.

19       Q.   And they're supposed to operate the train

20   reasonably safely regardless of what other rules

21   apply; that is the foremost rule, correct?

22       A.   Safety is the foremost rule, that is

23   correct.

24       Q.   And to always act reasonably and safely

**Roger D. Bergeron**
**January 11, 2007**

172

1    test car and the geometry car is telling you that

2    you have an exception, let's say at milepost 5 and

3    it's telling you you can go from class 3 to class 2

4    track, what would you do in response to that on the

5    geometry car?

6        A.    Either remove the track from service or

7    protect it with a slow one.

8        Q.    There would be no reason to remove it from

9    service if you're going from class 2 to 3, would

10   there?

11       A.    From a 3 to a 2?

12       Q.    Correct.

13       A.    If it was undisputable, no, there would be

14   none.

15       Q.    So you could reduce it down to class 2,

16   which means you're just reducing it from 40 miles an

17   hour to 25, correct?

18       A.    Class 3 allows you to do -- or the speeds

19   are class 2 is 25 for freight and 30 for passenger.

20       Q.    I'm only talking about freight, because

21   we're both freight railroads.

22       A.    If we're strictly talking freight, it's 25

23   miles an hour, correct.

24       Q.    Now, that's one of the remedial actions you

173

1   can take immediately, correct?

2       A.   That is correct.

3       Q.   And you're doing that to protect the track

4   and the trains coming down?

5       A.   Subsequent movements behind you on the

6   line.

7       Q.   Now, the other remedial action you do is to

8   repair it, correct?

9       A.   The initial remedial action, if I was the

10  track supervisor of the territory, is to put the

11  appropriate speed restriction or remove the track

12  from service.  If it was field verified, then that

13  guy could put it back into class 2.  If I found a

14  condition that I thought, even though it says class

15  2, I still may want to check it because it was

16  suspect.  I might take it out of the service until

17  one of my people field verified it, and I would tell

18  him by radio to check this spot here and give him

19  the location to fields verify.

20      Q.   If your employee found that, in fact, there

21  was a defect there, but it only reduced it down to

22  class 2, you could still operate it with the

23  restricted speed?

24      A.   That is correct.  If under field

174

```
 1   verification, it was found that there wasn't any
 2   other extenuating circumstances, the ties were tight
 3   to the rail and in pretty good shape and all that,
 4   then the speed restriction would be enough to make
 5   the initial remedial action appropriate.
 6        Q.   Then after that, after you verified it and
 7   it existed, you would then take the second remedial
 8   action, which would be then to fix or repair it,
 9   correct, to bring it back up to class 3?
10        A.   Correct.
11        Q.   Because you want to be running at class 3
12   in a freight railroad of your size, right?
13        A.   That is correct.  I mean, if -- well, in
14   general.  I mean, if -- that may not be true.
15        Q.   Okay.  What situation would that exist
16   where that's not true?
17        A.   If I found enough conditions out there that
18   the initial remedial repair to 25 miles an hour
19   really wouldn't make sense because I found other
20   conditions that would promote poor train handling,
21   like there was a ten miles an hour the mile before
22   that, there would be no sense in let's get this up
23   to 40 miles an hour, when actually we're asking an
24   engineer to kind of pick up and slow down and pick
```

1    up and slow down.  So what you would do is you would

2    gather all that data.  The answer to the question is

3    it's not necessarily everything is listed back to

4    the class.  I guess that's the answer.

5        Q.  Ultimately you want your freight railroad

6    to be running at the highest class it can be running

7.   at, correct?

8        A.  At the highest timetable speed.

9        Q.  If you can get up to class 3, that would be

10   optimal, correct?

11       A.  That is correct.

12       Q.  So in that situation just described, if you

13   had some other places on that same line that were

14   down to class 1, you would obviously put together a

15   program to take care of the different defects to

16   bring everything back up to class 3?

17       A.  That is correct.

18       Q.  That's all I meant.  I didn't mean it in

19   isolation.  I meant you would then make it part of a

20   repair program or a fix program.

21       A.  Yes.

22       Q.  All right.

23           MR. DAVIDSON:  I just want to reserve on

24   that.

# EXHIBIT

# "B"



                                    Volume 1, Pages 1- 101

                                    Exhibits: 31-32

            UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MASSACHUSETTS

              ----------------------------

NEW ENGLAND CENTRAL RAILROAD, INC.,

                Plaintiff

v.                            Docket No. 04-30235-MAP

SPRINGFIELD TERMINAL RAILWAY

COMPANY and BOSTON AND MAINE

CORPORATION,

                Defendants

              ----------------------------

        DEPOSITION OF JOSEPH C. SCAPPACE, JR.

        Friday, January 12, 2007, 1:12 p.m.

        Law Office of Robert H. D'Auria

            41 North Road, Suite 205

          Bedford, Massachusetts  01730


----Reporter:  Kathleen Mullen Silva, RPR, CRR----

        Beacon Hill Court Reporting, Inc.

            807 Main Street, 2nd Floor

          Worcester, Massachusetts 01610

                508.753.9286



**Joseph C. Scappace, Jr.**
**January 12, 2007**

46

```
 1   you filled out?

 2        A.   For what?

 3        Q.   For this derailment.

 4        A.   One.

 5        Q.   Are you sure about that?

 6        A.   Mm-hmm.

 7        Q.   When did you fill that out?

 8        A.   When I got in that night.  Oh, I made

 9   out -- I had to make out two, because one of them

10   didn't get through somewhere to the chief, and I had

11   to make out a second one.

12        Q.   Do you remember roughly when you made the

13   second one out?

14        A.   It's on the -- I think it's on the accident

15   report.  A couple of days afterwards.

16        Q.   When you made the initial accident

17   report -- I'm going to show you a document that's

18   already been marked Exhibit 22.  Do you recognize

19   that document?

20        A.   Mm-hmm.

21        Q.   What do you recognize that document to be?

22        A.   An accident report.

23        Q.   Is that the one you completed for this

24   derailment?
```

**Joseph C. Scappace, Jr.**
**January 12, 2007**

47

```
1      A.   Yes.

2      Q.   What is the date that you signed that

3  report?

4      A.   25th of July.

5      Q.   Did you write anything on that report to

6  the right of the date?

7      A.   Yup.  "Slip initially made out on 3 July

8  2004."

9      Q.   Do you have any idea as to why they asked

10 you to provide to them another accident/incident

11 report?

12     A.   Because they didn't have the first one.

13     Q.   Who did you give the first one to?

14     A.   I left a copy of it on the train master's

15 door in Deerfield, and I faxed a copy to the chief

16 dispatcher down in Billerica.

17     Q.   Now, the train master's door in Deerfield,

18 who would that be at the time?

19     A.   That's M. Galvis.

20     Q.   Spell that for us.

21     A.   G-a-v-i -- G-a-l-v-i-s, Galvis.

22     Q.   Is Mr. Galvis still with the company?

23     A.   Yes, he is.

24     Q.   What's his position now?
```

Joseph C. Scappace, Jr.
January 12, 2007

48

1     A.   Superintendent, western division.

2     Q.   Who did you fax it to in Billerica?

3     A.   Chief dispatcher.

4     Q.   Do you know who that person was?

5     A.   No.

6     Q.   Where did you get the fax number to fax it

7  over?

8     A.   It's on the fax machine in Deerfield.

9     Q.   It's going to seem crazy, but did you

10 actually watch the document go through the fax

11 machine?

12    A.   Yes.

13    Q.   Did you get a receipt?

14    A.   No.

15    Q.   What did you do with the original document

16 that you filled out?

17    A.   I had it to make this out.  I don't know.

18 I don't know.  I just had this.  I remade it out.

19         MR. DAVIDSON:  We'd ask that you look

20 for the faxed version and the one that the gentleman

21 had out in the western district.

22         MR. WRIGHT:  Can we go off the record

23 for just a minute.

24         (Discussion held off the record.)

49

1    Q.   Where did you get the information that's

2    contained in this report to fill this report out?

3    A.   I made it out.

4    Q.   Did you have any documents with you to

5    assist you in drafting that?

6    A.   Notes and memory.

7    Q.   What notes did you have?

8    A.   What I write in my log.

9    Q.   Do you still have your logbook?

10   A.   Yes.

11        MR. DAVIDSON:   I'd like a copy of his

12   logbook please.

13   A.   No.   That's my logbook.   That's not

14   anything to do with the company.

15        MR. DAVIDSON:   Can we go off the record.

16        MR. WRIGHT:   Off the record.

17        (Discussion held off the record.)

18        MR. DAVIDSON:   Back on the record.

19   Q.   This logbook that you have, it's a logbook

20   that you keep during the course of your workday,

21   correct?

22   A.   Yes.

23   Q.   And this is a logbook -- how many volumes

24   is this logbook?   How many different books are

50

1    there?

2        A.   One per year.

3        Q.   One per year.  Is it a calendar book?  Does

4    it have a calendar in it?

5        A.   I forget.  Sometimes they do, sometimes

6    they don't.  Right now I'm using a Palm Pilot.  I

7    changed things around a little bit, keeping up with

8    the times.

9        Q.   But back in July of 2004, did you have a

10   palm pilot?

11       A.   No.  It's in a book.

12       Q.   When you say "a book" --

13       A.   Written book, a ledger.

14       Q.   What size is this ledger that you had in

15   2004?  Is it one that fits in your pocket or your

16   bag?

17       A.   It's in my bag.

18       Q.   Is it eight and a half?

19       A.   No.  Small.  It's a small ledger.  You

20   know, small logbook, cash book.  That's all it was.

21       Q.   About this big (indicating)?

22       A.   Roughly, yeah.

23       Q.   So it would be four and a quarter by six

24   and a half, something like that.  Do you remember

51

```
1   what color the cover was?

2       A.  No, I don't.  Black.

3       Q.  You would keep notes in your logbook about

4   things you wanted to remember about particular

5   trips?

6       A.  Sometimes, yes.

7       Q.  So if an event like a derailment came up,

8   that's a pretty significant event?

9       A.  I'd put a few items in there like I did

10  with this I think, yeah.

11      Q.  And you'd have other entries in there for

12  other dates potentially?

13      A.  Yes.

14      Q.  You don't record everything there every

15  day?

16      A.  I record time off duty/time on duty, how

17  much overtime.  If there's anything specifically I

18  wanted to remember about that trip, I'd put it down

19  there.

20      Q.  Okay.  Besides your logbook, what other

21  notes did you have or writings?

22      A.  Nothing.

23      Q.  You said a couple of minutes ago --

24      A.  I tried to find the original.  I had it
```

1   once.

2       Q.   When was that?

3       A.   On the 3rd of July.

4       Q.   After that, did you ever see the original

5   again?

6       A.   No.

7       Q.   So as we sit here two and a half years

8   later, there's no way you could tell me if there was

9   any differences between what's on this report and

10  what was on the original report, correct?

11      A.   No, I couldn't.

12      Q.   So they could have been different?

13           MR. WRIGHT:   I'm going to object to

14  that.   It's speculative.

15      A.   The dates are going to be different,

16  especially this one, and a few other things, but as

17  far as the information itself, like the time on

18  duty, the date, Hartland, you know, temperature,

19  5.7, Hartland siding, mainline.

20      Q.   Is this your writing in the middle of the

21  form?

22      A.   Yes, it is.

23      Q.   What does it signify to you when you put

24  "N/A"?

Joseph C. Scappace, Jr.
January 12, 2007

53

```
 1        A.   None applicable.

 2        Q.   Why is that none applicable?

 3        A.   Personal injuries.

 4        Q.   To no one, correct, to you or Mr. Kari?

 5        A.   No personal knowledge, no.

 6        Q.   You're required by the company to fill out

 7   this form; it's known as a GTSF 100?

 8        A.   Yes.

 9        Q.   That's pursuant to your safety rules?

10        A.   Yes.

11        Q.   Any time you have property damage or

12   derailment you're required to file one of these?

13        A.   Yes.

14        Q.   And you're required to file one of these as

15   soon as you can after the accident, correct?

16        A.   Yes.

17        Q.   And you did that that day?

18        A.   Yes, I did.

19        Q.   And you sat down in East Deerfield?

20        A.   Yes, I did.

21        Q.   And you sat down at a desk or table?

22        A.   Desk.

23        Q.   Were you all by yourself?

24        A.   No.  Mr. Kari was there.
```

Joseph C. Scappace, Jr.
January 12, 2007

54

| | |
|---|---|
| 1 | Q. Was he assisting you in any way filling out |
| 2 | this form? |
| 3 | A. No. |
| 4 | Q. Did he provide you any information that |
| 5 | went into the form? |
| 6 | A. No. |
| 7 | Q. As you were drafting it? |
| 8 | A. No. |
| 9 | Q. When did you get down to East Deerfield? |
| 10 | A. I don't remember. I don't remember. I'd |
| 11 | have to get my log to find out. |
| 12 | Q. I just want to make sure I'm clear. You |
| 13 | didn't have the original when you filled this one |
| 14 | out on July 25? |
| 15 | A. No. |
| 16 | Q. And it's fair to say that this is filled |
| 17 | out 22 days after the original was filled out? |
| 18 | A. Yes. |
| 19 | Q. Who asked you to fill this document out? |
| 20 | A. I don't remember. |
| 21 | Q. Do you remember how you were told to -- |
| 22 | A. Someone said they didn't have a copy of the |
| 23 | accident report. And I said I faxed one in. I |
| 24 | think it was Mr. Galvis. I said, "I put one on your |

55

1 | door when you were getting the equipment ready to go

2 | up and take care of this derailment," and they said,

3 | "Well, you need an accident report." So I looked

4 | for my copy and I took out my log and found the

5 | information there. I started writing it out and I

6 | had a list of the train -- where did I get the list

7 | of the train from? I think I still had a copy of

8 | the list, the consist or something.

9 |    Q. I thought you just testified that the

10 | consist was left with the locomotive.

11 |    A. There was a copy of it left.

12 |    Q. How many copies of the consist did you

13 | have?

14 |    A. I don't remember, but I think -- I'm trying

15 | to remember here if I had -- I don't remember. I

16 | forget if it was just in my log or if it was a list

17 | I had made.

18 |    Q. Do you normally make a list of the cars?

19 |    A. Well, sure, because you have to write them

20 | in here, what's wrong with them.

21 |    Q. Where did you keep that list?

22 |    A. I don't remember. Probably in my log, in

23 | my ledger.

24 |    Q. Would it have been on another piece of

**Joseph C. Scappace, Jr.**
**January 12, 2007**

56

1   paper as well?

2       A.   Yes.

3       Q.   So until you take a look at your log, you

4   really don't know where you got that information?

5       A.   I don't remember.

6       Q.   Okay.  That's fair.  I'm just trying to

7   find out what your memory is.

8       A.   I'm trying to think, because when I made

9   this out, I had the information.

10      Q.   And you're referring to page 2 of the

11  exhibit, correct?

12      A.   Mm-hmm.

13      Q.   Did anyone provide you that information

14  when you made this out?  Did you say to someone,

15  "Hey, I don't have it anymore.  Can you give me the

16  derailed cars"?

17      A.   I don't remember.

18      Q.   Do you recall on the first one you did on

19  July 3 that you had the information at that time?

20      A.   It was the same information I had later.

21      Q.   Well, slow down.  You said you just don't

22  recall when you got the information or where you got

23  the information from for this document, which is

24  Exhibit 22?

59

1    A.   That's why this is two weeks.

2    Q.   You had a two-week vacation starting on

3  July 4?

4    A.   I think it was two weeks.  I forget.

5    Q.   At least one week?

6    A.   Oh, yes.

7    Q.   How long had that been scheduled?

8    A.   Since the previous year.

9    Q.   Do you normally take the 4th of July week?

10  Some people do.  They take the same week every year.

11   A.   It doesn't work that way.  Seniority rules

12  on vacation.

13   Q.   Do you remember what day of the week July 3

14  was that year?

15   A.   Saturday.

16   Q.   This was the last run you were going to

17  make before you went on vacation?

18   A.   Mm-hmm.

19   Q.   Would it be fair to say that as soon as you

20  got this done, you were on vacation?

21   A.   Well, that and after a drug screen.

22   Q.   Why was it necessary to have a drug screen?

23   A.   It's procedure from the FRA.

24   Q.   Slow down a little.  You misunderstood me.

Joseph C. Scappace, Jr.
January 12, 2007

61

1    those are the mileposts.

2        Q.   So Bellows Falls is 1.48 and Saxonville is

3    1.52.

4        A.   No, no, 148, 152.

5        Q.   Okay.  Did you ever get confirmation that

6    people received your copies of this Exhibit 22?

7        A.   No.

8        Q.   Did anyone come up to you afterwards and

9    say, "Hey, I got the report"?

10       A.   No.

11       Q.   Where is the original of that report?

12       A.   I do not know.

13       Q.   Did you retain it?

14       A.   I thought I did, but I don't know where it

15   is now.

16       Q.   So you only provided copies to the people

17   in the company who needed them?

18       A.   Yes.

19       Q.   Do you have a filing system or a holding

20   system at the house regarding your work at the

21   railroad?

22       A.   No.   Just the log.

23       Q.   Besides your log, do you have a drawer or a

24   place in your house where you keep your railroad

# EXHIBIT

# "C"

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CENTRAL<br>RAILROAD, INC.,<br><br>                    Plaintiff,<br><br>          -v.-<br><br>SPRINGFIELD TERMINAL<br>RAILWAY COMPANY, et al.,<br><br>                    Defendants-<br>                    Counterclaimants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)          Civil Action No. 04-30235-MAP |

## DEFENDANT BOSTON AND MAINE CORPORATION'S ANSWERS TO PLAINTIFF, NEW ENGLAND CENTRAL RAILROAD, INC.'S INTERROGATORIES

Interrogatory No. 1

State the name, address and title of the person(s) responding to these interrogatories on behalf of the B&M and indicate the nature and duration of their association with the B&M, whether they are an employee, agent, or corporate officer of the B&M, and describe their duties and responsibilities now and on July 3, 2004.

Answer to Interrogatory No. 1

These interrogatories were responded to by Assistant Vice President of Engineering Roger Bergeron who maintains a business address at 1700 Iron Horse Park, North Billerica, Massachusetts 01862. Mr. Bergeron is an employee of the Boston and Maine Corporation with thirty-six (36) years of service who is currently responsible for overseeing the maintenance and inspection of all track and roadbed structures and signal apparatus. Mr. Bergeron was engaged in these same duties and responsibilities on July 3, 2004.

Interrogatory No. 2

Identify each person who has knowledge of any fact relating in any manner to the events, transactions, and/or occurrences that are described in any pleading setting forth a

<u>Answer to Interrogatory No. 20</u>

Defendant incorporates by reference to herein, its answer to interrogatory number 19.

<u>Interrogatory No. 21</u>

List all of the applicable rules and regulations, by title, edition and issuing entity, which governed or were applicable to the B&M crew's operation of the train over the Line which were in effect on July 3, 2004.

<u>Answer to Interrogatory No. 21</u>

a) Guilford Rail System Safety Rules, 2004 edition, issued by the Guilford Rail System.

b) New England Central Railroad Timetable No. 6, Effective 0001 Eastern Daylight Time April 1, 2001, issued by the New England Central Railroad.

c) General Code of Operating Rules, Effective April 2, 2000, issued by the General Code of Operating Rules Committee.

d) New England Central Railroad Co. Daily Operating Bulletin No. 185, effective at 0001 hours July 3, 2004, issued by the New England Central Railroad Co.

e) Timetable No. 3, effective December 4, 2000, issued by the Springfield Terminal Railway Company, the Maine Central Railroad Company, and the Boston and Maine Corporation.

f) Springfield Terminal Railway Company General Order No. 03-01, effective 0001 hours on December 3, 2001, issued by the Springfield Terminal Railway Company, the Maine Central Railroad Company, and the Boston and Maine Corporation.

g) Springfield Terminal Railway Company General Order No. 03-02, effective 0001 hours on March 1, 2002, issued by the Springfield Terminal Railway Company, the Maine Central Railroad Company, and the Boston and Maine Corporation.

<u>Interrogatory No. 22</u>

Identify fully and completely each person whom you expect to call as an expert witness at the trial of the above-entitled case, including each person's full name, address, employment and educational background, and, with respect to each such witness, please further state:

(a) fully and in complete detail the subject matter upon which each expert is expected by you to testify;

(b) the substance of the facts and opinions to which you expect each expert to testify; and

(c) set forth a summary of the grounds for each opinion which you expect each expert to give.

<u>Answer to Interrogatory No. 22</u>

Defendant objects to this interrogatory on the grounds that it calls for the legal opinions, theories, and conclusions of defense counsel. Without waiving the foregoing objection, the Defendant states that on information and belief, a decision has not yet been made with regard to the identity of each person expected to be called as an expert witness at trial at this time. Defendant will supplement this answer as necessary prior to trial.

<u>Interrogatory No. 23</u>

Please provide a complete organizational chart as to depict the chain of authority within the B&M, by listing each employee's name, usual job location or reporting yard, and title, from the crew of the train to the person with highest position as of July 3, 2004.

<u>Answer to Interrogatory No. 23</u>

B&M does not have any such document and is not required to create a document solely at the request of NECR.

Signed under the pains and penalties of perjury this 17th day of October, 2006

Roger D. Bergeron

# EXHIBIT

# "D"

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CENTRAL<br>RAILROAD, INC.,<br><br>Plaintiff,<br><br>-v.-<br><br>SPRINGFIELD TERMINAL<br>RAILWAY COMPANY, et al.,<br><br>Defendants-<br>Counterclaimants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 04-30235-MAP |

## DEFENDANT SPRINGFIELD TERMINAL RAILWAY COMPANY'S ANSWERS TO PLAINTIFF, NEW ENGLAND CENTRAL RAILROAD, INC.'S INTERROGATORIES

Interrogatory No. 1

State the name, address and title of the person(s) responding to these interrogatories on behalf of the STRC and indicate the nature and duration of their association with the STRC, whether they are an employee, agent, or corporate officer of the STRC, and describe their duties and responsibilities now and on July 3, 2004.

Answer to Interrogatory No. 1

These interrogatories were responded to by Assistant Vice President of Engineering Roger Bergeron who maintains a business address at 1700 Iron Horse Park, North Billerica, Massachusetts 01862. Mr. Bergeron is an agent of the Springfield Terminal Railway Company with thirty-six (36) years of service who is currently responsible for overseeing the maintenance and inspection of all track and roadbed structures and signal apparatus. Mr. Bergeron was engaged in these same duties and responsibilities on July 3, 2004.

Interrogatory No. 2

Identify each person who has knowledge of any fact relating in any manner to the events, transactions, and/or occurrences that are described in any pleading setting forth a

Company, the Maine Central Railroad Company, and the Boston and Maine Corporation.

Interrogatory No. 24

Identify fully and completely each person whom you expect to call as an expert witness at the trial of the above-entitled case, including each person's full name, address, employment and educational background, and, with respect to each such witness, please further state:

     (a) fully and in complete detail the subject matter upon which each expert is expected by you to testify;

     (b) the substance of the facts and opinions to which you expect each expert to testify; and

     (c) set forth a summary of the grounds for each opinion which you expect each expert to give.

Answer to Interrogatory No. 24

Defendant objects to this interrogatory on the grounds that it calls for the legal opinions, theories, and conclusions of defense counsel. Without waiving the foregoing objection, the Defendant states that on information and belief, a decision has not yet been made with regard to the identity of each person expected to be called as an expert witness at trial at this time. Defendant will supplement this answer as necessary prior to trial.

Interrogatory No. 25

Please provide a complete organizational chart as to depict the chain of authority within the STRC, by listing each employee's name, usual job location or reporting yard, and title, from the crew of the train to the person with highest position as of July 3, 2004. In creating said chart, kindly include each employee and their supervisors who had any role in investigating the happening of the derailment on July 3, 2004.

Answer to Interrogatory No. 25

STRC does not have such a document and is not obligated to create one solely for NECR.

Signed under the pains and penalties of perjury this 17th day of October, 2006

Roger D. Bergeron

# EXHIBIT

# "E"

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

NEW ENGLAND CENTRAL
RAILROAD, INC.,

        Plaintiff,

   -v.-                          Civil Action No. 04-30235-MAP

SPRINGFIELD TERMINAL
RAILWAY COMPANY, et al.,

        Defendants.

## MEMORANDUM OF REASONS
## IN SUPPORT OF
## UNOPPOSED MOTION FOR PERMISSION
## TO DESIGNATE EXPERT WITNESS OUT OF TIME

        Springfield Terminal Railway Company and Boston and Maine Corporation ("ST/BM"),

which are the defendants/counterclaimants herein, have moved, pursuant to Fed. R. Civ. P. 16(b),

Loc. R. 16.1(g), and ¶ 1 of this Court's pretrial scheduling order of February 6, 2007 [Dkt. #54],

for an order permitting ST/BM to designate their employee, Mr. Roger Bergeron, as an expert

witness for ST/BM, after the deadline set for that action under the Court's pretrial scheduling

order of March 17, 2006 [Dkt. #34].

        Mr. Bergeron previously has been designated, and his deposition taken, as a non-expert

witness for ST/BM in this action. Declaration of Roger Bergeron ("Bergeron Declaration"), ¶ 6.

He is certified to inspect, restore, and renew railroad track under the Federal Railroad

Administration's track safety regulations, *see* 49 C.F.R. § 213.7 (2006), and has many years of

experience in the field of track safety and track construction. Bergeron Declaration ¶¶ 2-3.

Much of Mr. Bergeron's testimony about the derailment, the condition of NECR's track, and the cause of the derailment is expected to qualify as opinion testimony of a lay witness under Rule 701 of the Federal Rules of Evidence, and hence not to require his designation as an expert. ST/BM have realized, however, that some of his testimony may be viewed as being based upon "scientific, technical, or other specialized knowledge within the scope of Rule 702," in which case he must be designated as an expert for the testimony to be in order. Moreover, it is NECR's position that Mr. Bergeron's proposed testimony on these issues is scientific, technical and specialized and therefore subject to Rule 702. Accordingly, and in the interest of ensuring that the jury is offered a full understanding of the relevant facts, ST/BM wish to ensure that he is able to present testimony covered by Rule 702 as well as that covered by Rule 701.

Mr. Bergeron is an employee of ST/BM whose duties as such do not regularly involve giving expert testimony. Bergeron Declaration ¶ 4. His sole prior testimony as an expert occurred more than twenty years ago. *Id.* ST/BM accordingly believe that no expert report from him is required. *See* Fed. R. Civ. P. 26(a)(2)(B).[1] ST/BM have advised NECR of their willingness to make Mr. Bergeron available for a further deposition, should the Court permit his designation as an expert.

Mr. Michael Flynn, counsel for NECR, has advised counsel for ST/BM that NECR does not object to the designation of Mr. Bergeron on timeliness grounds but that NECR reserves its rights to depose Mr. Bergeron, *see* Fed. R. Civ. P. 26(b)(4)(A), to propound one or more rebuttal expert witnesses, *see* Fed. R. Civ. P. 26(a)(2)(C), to take the position that Mr. Bergeron is required to provide an expert report and disclosures required by Fed. R. Civ. P. 26(a)(2)(B), and

---

[1] Counsel for NECR has indicated that he may take the position that an expert report is required from Mr. Bergeron notwithstanding his status as a party employee whose duties do not regularly involve giving expert testimony.

2

to object to Mr. Bergeron's testimony on any ground other than timeliness, *see* Fed. R. Evid.

702.

ST/BM believe that there is good cause for this late designation, namely, the late

realization that some of Mr. Bergeron's testimony may fall under Fed. R. Evid. 702 rather than

Fed. R. Evid. 701. The Court's pretrial scheduling order [Dkt. #34], which was issued March 17,

2006, required that ST/BM make its expert designations by October 15, 2006, and that NECR

make its expert designations by November 15, 2006. Neither side made an expert designation

before its respective deadline, although counsel for the parties thereafter had discussed the

possibility of late designation and discovery of experts.

Fed. R. Civ. P. 16(b) and Local Rule 16.1(g) permit modification of the initial scheduling

order for good cause and with the approval of the Court. Moreover, the 1983 comments of the

Advisory Committee on the Civil Rules indicate that in appropriate circumstances, this can be

accomplished without the need for a formal motion. ST/BM provided a timely designation of

Mr. Bergeron as a non-expert witness, but recognize that they also should have designated him

as an expert under Rule 702 to ensure that if he is to offer technical testimony about this matter,

the requisites of that rule are met.

ST/BM apologizes to the Court for any inconvenience that this late designation may

occasion, and asks that the Court permit designation of Mr. Bergeron at this time under Rule

702. Should the Court grant this request, ST/BM will make Mr. Bergeron available promptly for

a further deposition by NECR. It is NECR's position that if the late designation is allowed, a

report and the disclosures required by Rule 26 should be produced prior to any such deposition.

3

Respectfully submitted,

Eric L. Hirschborn
Winston & Strawn LLP
1700 K Street, NW
Washington DC 20006
202-282-5706

Robert B. Culliford (BBO #638468)
14 Aviation Avenue
Portsmouth, NH 03801
(603) 766-2002

*Attorneys fo r D efendants/Counterclaimants
Springfield Terminal Railway Company
and Boston and Maine Corporation*

February 16, 2007

4

# EXHIBIT

# "F"

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------

NEW ENGLAND CENTRAL
RAILROAD, INC.
                    Plaintiff,

        VS.                     Civil Action No.
                                04-30235-MAP

SPRINGFIELD TERMINAL RAILWAY
COMPANY, ET AL.
                    Defendants.
------------------------------


D E P O S I T I O N
-of-
RICHARD R. BOUCHER

Taken on Wednesday, January 10, 2007,
at the offices of
New England Central Railroad, Inc.
St. Albans, Vermont.



APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
RICHARD A. DAVIDSON, JR., ESQ.
Flynn & Associates, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169

ON BEHALF OF THE DEFENDANT:
ROBERT B. CULLIFORD, ESQ.
Senior Vice President and General Counsel
Pan Am Systems
14 Aviation Avenue
Portsmouth, NH 03801

NORMA J. MILLER, RPR
COURT REPORTERS ASSOCIATES
117 BANK STREET
BURLINGTON, VT 05401
(802) 862-4593

1   2004, FRA rail test car inspection.

2   A.  Yes.

3   Q.  Did that inspection include Milepost 5 to

4   Milepost 11?

5   A.  Yes.

6   Q.  Were you on that test car?

7   A.  Yes.

8   Q.  What was your role on the test car that day?

9   A.  I was keeping track of the restrictions and

10  relaying them to the train dispatch.

11  Q.  Okay.  If I could refer you to Lawyer Exhibit

12  2.  Have you ever seen this document, sir?  Take a

13  minute to look at it.

14  A.  This?

15  Q.  Yeah.

16  A.  I need my glasses for that.  Yes.

17  Q.  Could you identify it?

18  A.  Identify it?

19  Q.  What is it?

20  A.  This is the exception list from the FRA car,

21  I'm assuming, right?

22  Q.  June 8th, 2004?

23  A.  That's what it states here, yeah.

24  Q.  Okay.  Are you aware that this test car

25  inspection uncovered a defect at Milepost 10.16?

1   Q.  Yeah.

2   A.  Well, it can cause rock in the train, sure.

3   Q.  Can you describe what you mean by rock?

4   A.  Well, it's a -- we call it harmonic rock, so

5   if you got a low joint and then another low joint,

6   and if they're within a prescribed distance, it can

7   cause rock motion in the train -- roll, rock,

8   whatever you want to call it.

9   Q.  Could rock result in a condition known as

10  wheel lift?  Are you familiar with that term?

11  A.  Yeah.

12  Q.  Could that condition result as a --

13  A.  Could it result?

14  Q.  Yeah.

15  A.  If it was extreme enough, yeah.

16  Q.  What would make it extreme?  Do you know, in

17  generalities?

18  A.  In generality, it would have been -- unless if

19  your joints were real low, excessively low.

20  Q.  Do you know if that condition existed at

21  Milepost 10.16?

22  A.  It did not.  Definitely did not.

23  Q.  Why not?

24  A.  Because I took the track measurements.  I

25  GPSed them that day.  We get this GPS reading.

1    Q.    This is on June 8th, 2004?

2    A.    Yes, I GPSed it and identified the defect.

3    Q.    Subsequent to June 8th, 2004, up to July 3rd,

4    2004, did you ever take another measurement at that

5    location?

6    A.    Did I personally?

7    Q.    Yes.

8    A.    No.

9    Q.    Do you know if anyone from New England Central

10   ever took another measurement?

11   A.    I'm not sure about that.

12   Q.    Would it have been a common practice in the

13   Track Inspection Department to take another

14   measurement?

15   A.    To take another one?  Not unless it hasn't

16   been restricted or the slow order was --

17   Q.    Were you aware of this condition before June

18   8th, 2004?

19   A.    Definitely not.  It would have been restricted

20   before.

21   Q.    Would you call this condition -- is it a

22   difficult condition to notice without testing?

23   A.    Some are.  This particular one, static

24   measurements, you didn't have it.  You had to add in

25   load.  So you -- when you're taking track

Page 12

1   measurements, you look for indications that the

2   track may be pumping, or any movement in the ties.

3   In this particular case, as I remember, it was

4   within half an inch, but if you added in under load,

5   the combination of the two joints within 62 feet,

6   could you come up with it.

7      Q.  Did you go out there again to Milepost 10.16,

8   after June 8th, 2004, between between June 8th, 2004

9   and --

10     A.  After the car run.

11     Q.  But I just wanted to be clear about the

12  timeline, between June 8th, and July 3rd, 2004, did

13  you go out there again?

14     A.  I may have gone through that area, but not

15  sure.

16     Q.  In what capacity would you have gone through

17  the area?

18     A.  Maybe inspecting or high-railing for some

19  reason.  I high-rail frequently.  I do track

20  inspections.

21     Q.  Okay, did you notice that the condition was

22  worsening?

23     A.  No.

24     Q.  Okay, if we could talk about the derailment of

25  July 3rd, 2004, you're familiar with that?

# EXHIBIT

# "G"

1                UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
2
   _____
3  NEW ENGLAND CENTRAL                    COPY
   RAILROAD, INC.
4                    Plaintiff,

5            VS.                    Civil Action No.
                                    04-30235-MAP
6  SPRINGFIELD TERMINAL RAILWAY
   COMPANY, ET AL.
7                    Defendants.
   _____
8

9                 D E P O S I T I O N
                        -of-
10              RICK T. BOUCHER

11        Taken on Wednesday, January 10, 2007,
                   at the offices of
12        New England Central Railroad, Inc.
                 St. Albans, Vermont.
13

14

15 APPEARANCES:
   ON BEHALF OF THE PLAINTIFF:
16 RICHARD A. DAVIDSON, JR., ESQ.
   Flynn & Associates, P.C.
17 400 Crown Colony Drive, Suite 200
   Quincy, MA 02169
18
   ON BEHALF OF THE DEFENDANT:
19 ROBERT B. CULLIFORD, ESQ.
   Senior Vice President and General Counsel
20 Pan Am Systems
   14 Aviation Avenue
21 Portsmouth, NH 03801

22                NORMA J. MILLER, RPR
             COURT REPORTERS ASSOCIATES
23               117 BANK STREET
              BURLINGTON, VT 05401
24               (802) 862-4593

25

             COURT REPORTERS ASSOCIATES

1    New England Central?

2        A.   Yes.

3        Q.   Were you inspecting the stretch of track

4    between Milepost 11 and Milepost 5?

5        A.   Yeah.

6        Q.   During the course of your inspections, did you

7    ever note a defect at Milepost 10.16?

8        A.   No.

9        Q.   You did not?  After June 8th, 2004, did anyone

10    inform you that the test car had found a defect in

11    Milepost 10.16?

12        A.   Yes.

13        Q.   Who informed you of that?

14        A.   Supervisor.

15        Q.   Do you recall -- would you have been involved

16    at that point in deciding the appropriate remedial

17    action to be taken in response to that defect?

18        A.   No.

19        Q.   Who would have?

20        A.   It was supervisor.

21        Q.   And by supervisor, just who are you referring

22    to?

23        A.   R.R. Boucher.

24        Q.   Okay.  Did he ever -- did R.R. Boucher ever

25    communicate to you what remedial action was taken in

COURT REPORTERS ASSOCIATES

1    A.   It was already documented.

2    Q.   Yeah, but did you see it?  Did you look at it

3    and say, Oh, I see now that that's a defect?

4    A.   I believe it was predetermined before I had to

5    inspect it.

6    Q.   I understand that, but okay, this is what I'm

7    asking you.  Prior to June 8th, 2004, you were

8    inspecting the track?

9    A.   Correct.

10   Q.   You hadn't noticed a defect --

11   A.   No.

12   Q.   -- correct?

13   A.   No.

14   Q.   You were informed that there was a defect

15   there?

16   A.   Correct.

17   Q.   So when you went out there again and you're at

18   Milepost 10.16, did you note the defect?  Did you

19   say, okay, that condition exists?

20   A.   Prior to?

21   Q.   After you were informed that it existed.  You

22   didn't know it existed prior to June 8th?

23   A.   Right.

24   Q.   You found out on June 8th, or soon thereafter,

25   that it did exist?

COURT REPORTERS ASSOCIATES

1    A.   Right.

2    Q.   Then you're out there inspecting twice a week

3    thereafter, correct?

4    A.   Correct.

5    Q.   So you get to Milepost 10.16.  Did you see the

6    condition?  In other words, when you're at Milepost

7    10.16 on your next inspection, did you agree that a

8    defective condition existed, looking at it that day?

9    A.   Yes, and it was slowered.

10   Q.   That's not what I'm asking.  Do you agree with

11   what the FRA test truck found, that a condition

12   known as warp --

13   A.   Yes, I agree.

14   Q.   Based on your own personal observations, or

15   based on what you were told?

16   A.   No, based on the measurements and GPS readings

17   given, that it was gone back and determined that it

18   was in fact there.

19   Q.   Who determined that?

20   A.   Myself and R.R. Boucher.

21   Q.   So you did go out there after the test truck

22   had gone over it?

23   A.   Correct.

24   Q.   Knowing that the condition existed?

25   A.   Yes.

1    Q.  And you agreed with the determination of the

2    test truck?

3    A.  I mean it -- yes.

4    Q.  Okay.

5    A.  Agreed with the measurements that they'd given

6    us.

7    Q.  How did you agree with the measurements?  Did

8    you do your own measurements?

9    A.  Yes, we did.

10    Q.  Okay.  So during the period June 8th, 2004, to

11    July 3rd, 2004, you're inspecting twice a week; is

12    that correct?

13    A.  That's correct.

14    Q.  Did you inspect at Milepost 10.16 twice a

15    week?

16    A.  Yes.

17    Q.  Did you do any additional measurements between

18    the initial measurement you did to confirm the FRA

19    test car results and July 3rd, 2004?

20    A.  The date of -- or I guess I don't recall

21    exactly at what specific time we did the

22    measurements, but I know that we went well north and

23    south of the location through the curve.

24    Q.  Yeah?

25    A.  The measurements.

12

1    Q.    I understand that.    You did an initial

2    measurement to confirm the test results, correct?

3    A.    Correct.

4    Q.    What I'm asking you is were there any

5    subsequent measurements of the condition at Milepost

6    10.16 between your initial measurement and July 3rd,

7    2004, I guess I don't understand your question.

8    Q.    Pardon me?

9    A.    I guess I don't understand your question.

10    Q.    You performed one measurement, if I understand

11    what you're saying, soon after the test truck went

12    over the line?

13    A.    That's correct, yeah.

14    Q.    All's I'm asking is did you do another

15    measurement after the initial one?    We've got one in

16    the book.

17    A.    Yeah.

18    Q.    Did you ever do another measurement between

19    that initial measurement and July 3rd, 2004?

20    A.    Not that I can recall, I guess, no.

21    Q.    Do you recall going out there at your

22    twice-weekly inspections and noticing that the

23    condition remained the same, or was it worsening or

24    was it getting better?

25    A.    To my knowledge, it remained the same.

1    description?

2       A.   Yes.   Under "remarks."

3       Q.   Pardon?

4       A.   Remarks.

5       Q.   So when you're out there, what you're saying

6    is that you have a form, and if you see a defect,

7    you note it on the form?

8       A.   Correct.

9       Q.   Even if that's a continuing defect, would you

10   still do that?

11      A.   Not required.   That I --

12      Q.   Okay, you note the defect on the first day you

13   see it; is that correct?

14      A.   Correct.

15      Q.   And then do you note what remedial action will

16   be taken, or do you fix it that day?

17      A.   If we're able to fix it.

18      Q.   But if you're not able to, do you note a date

19   by which the remedial action will be taken?

20      A.   They're given 30 days.

21      Q.   Okay.   So this is what I'm trying to get to,

22   and I don't want to confuse anybody, but you go out

23   there, you see a defect, you note it, and you know

24   you have 30 days to fix it, correct?   So when you go

25   out there the next time on your track inspection

1    report, do you note the defect again?

2       A.   Not within 30 days.

3       Q.   Okay.  Okay.  On your track inspection

4    reports, did you note the defect at Milepost 10.16

5    once you were aware of it?

6       A.   Not that I recall.

7       Q.   Why not?

8       A.   It was already documented from the geometry

9    car.

10      Q.   But it wasn't documented by you, was it?

11      A.   No.

12      Q.   It was never documented by you?

13      A.   No.

14      Q.   And you'd never seen that inspection report,

15   correct?

16      A.   This particular one?

17      Q.   I apologize.  We'll go back to Lawyer Exhibit

18   2.  Had you ever seen this document, sir?

19      A.   No.

20      Q.   So you never saw any documentation that noted

21   the defect at Milepost 10.16?

22      A.   General DOB.

23      Q.   You saw what?

24      A.   Daily operating bulletin.

25      Q.   But you never saw anything generated by the

1    Track Inspection Department noting the defect?

2        A.   The --

3        Q.   And when the remedial action will be taken?

4                    MR. DAVIDSON:   All right, answer the

5    question.

6        A.   Daily track bulletin gives the slow order.

7    It's a required document to have every day.

8        Q.   But you're the track inspector who's supposed

9    to do an inspection and note defects, correct, on

10   your track inspection?

11       A.   Found by myself.

12       Q.   Well, you went out and looked at the spot and

13   agreed that it was a defect, correct?

14       A.   Correct.

15       Q.   But you never noted.   It you just kind of

16   relied on what others were doing; is that correct?

17                   MR. DAVIDSON:   I don't think that's a

18   fair characterization of his testimony in the

19   slightest.

20                   MR. CULLIFORD:   I'm asking if it's

21   correct.   I'm not characterizing the testimony.   I'm

22   just asking if it's correct.

23                   MR. DAVIDSON:   Well, the tone and

24   tenor of your last series of questioning says the

25   opposite.   He's testified --

                    COURT REPORTERS ASSOCIATES

# EXHIBIT

# "H"

1
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2
-------------------------------
3
NEW ENGLAND CENTRAL                        COPY
RAILROAD, INC.
4                              Plaintiff,

5            VS.                    Civil Action No.
                                   04-30235-MAP
6    SPRINGFIELD TERMINAL RAILWAY
     COMPANY, ET AL.
7                              Defendants.
-------------------------------
8

9                      D E P O S I T I O N
                              -of-
10                       MICHAEL LAWYER

11             Taken on Tuesday, January 9, 2007,
                     at the offices of
12            New England Central Railroad, Inc.
                  St. Albans, Vermont.
13

14

15   APPEARANCES:
     ON BEHALF OF THE PLAINTIFF:
16   RICHARD A. DAVIDSON, JR., ESQ.
     Flynn & Associates, P.C.
17   400 Crown Colony Drive, Suite 200
     Quincy, MA 02169
18
     ON BEHALF OF THE DEFENDANT:
19   ROBERT B. CULLIFORD, ESQ.
     Senior Vice President and General Counsel
20   Pan Am Systems
     14 Aviation Avenue
21   Portsmouth, NH 03801

22                     NORMA J. MILLER, RPR
                    COURT REPORTERS ASSOCIATES
23                      117 BANK STREET
                     BURLINGTON, VT 05401
24                      (802) 862-4593

25

1    A.   Okay.

2    Q.   And then it's marked milepost 11 decimal

3  10.16, and then there's a designation, "warp 62."

4  Do you know what that designation, warp 62, is in

5  reference to?

6    A.   Yes, it's a difference in cross level in a

7  62-foot core section of track.

8    Q.   Do you know if that condition, warp 62 as you

9  defined it, constitutes a track defect within the

10  parameters of the FRA track safety standards?

11    A.   It's dependent upon class of track.  What it

12  is saying is that in Class 3 track, the value that's

13  listed to the right of it is beyond acceptable for

14  Class 3.

15    Q.   Okay.

16    A.   And then it additionally says it is safe for

17  Class 2.

18    Q.   Okay.  At the time that this test was taken,

19  what was the class of the track?

20    A.   It is Class 3 track.

21    Q.   3?

22    A.   Yes.

23    Q.   Did you know prior to June 8th, 2004, whether

24  condition existed at Milepost -- help me, are we

25  talking about Milepost 10.16 here, or --

COURT REPORTERS ASSOCIATES

1    2004?

2        A.    Not to my knowledge.

3        Q.    Okay, so you've got a condition at Milepost

4    10.16 identified as warp 62.  Do you know what

5    corrective action should be taken in response to

6    identifying this condition?

7        A.    Yes.

8        Q.    What is that?

9        A.    You have an option of lowering the track to

10    the next acceptable speed that it does meet the

11    standards for, or repairing the condition.

12        Q.    And what was the remedial action elected or

13    chosen by New England Central in response to

14    discovering this condition that Milepost 10.16?

15        A.    The track speed was lowered to a temporary

16    speed restriction.

17        Q.    And what was that speed?

18        A.    25 freight, 30 passenger.

19        Q.    And would that be consistent with Class 2

20    track?

21        A.    Yes, it would.

22        Q.    When was that remedial action taken?

23        A.    The same date of this test, June 8th, 2004.

24        Q.    Was that action taken based on the test

25    results before you, or did someone go out and look

1   at the site?

2       A.   It was based on these test results.

3       Q.   Did someone eventually go out and look at the

4   site?

5       A.   Yes.

6       Q.   When and whom?

7       A.   I don't recall whether it was that day or the

8   following.  It would have been Richard Boucher.

9       Q.   Okay, Richard T. or Richard R.?

10      A.   Actually for clarification, Richard T. does

11  not exist.  It's Rick T.  His legal name is Rick,

12  not Richard.  Richard R. would have been the one

13  that inspected this.

14      Q.   Okay.  Did you ever discuss the results of

15  Mr. Boucher's physical inspection of Milepost 10.16?

16      A.   Immediately after the test?

17      Q.   Yes.

18      A.   Or after the derailment?

19      Q.   After the test.

20      A.   After the test, I don't recall having a

21  specific conversation with him regarding individual

22  defects.

23      Q.   Okay, then let me ask you this.  Who on behalf

24  of New England Central elected to drop the speed in

25  response to identifying this defect?

1    A.   It would have likely been Richard.   I don't

2    recall for sure.

3    Q.   You wouldn't be involved in a decision to

4    address a track defect?

5    A.   Track inspectors are given the authority to

6    drop the track speed as they see fit, given the

7    information that they have, without first conferring

8    with me.

9    Q.   Okay.   Then how did you ultimately discover

10   that the track speed had been lowered?

11   A.   It was done when we were on the geometry car

12   the day that this test was conducted.

13   Q.   Okay.   All right, then, help me out, because

14   I'm confusing myself.   You're on the test truck.

15   You go over this stretch of track, correct?   And

16   this comes up -- does this come up almost

17   immediately on the --

18   A.   Yes.

19   Q.   So was Richard Boucher on the test car with

20   you, as well?

21   A.   Yes.

22   Q.   So you're both on this test car, and obviously

23   the defect shows up.   You didn't discuss that with

24   him?

25   A.   Not necessarily.

COURT REPORTERS ASSOCIATES

1    Q.  Well, how did you know that the slow order or

2    the speed would be reduced in response to that if

3    the decision was made -- in other words, what I

4    think you testified to and this is why I need your

5    help, is that the decision to reduce the speed on

6    this section of line was made while on the test car.

7    Did -- was that conveyed to you by Mr. Boucher on

8    the test car?

9    A.  Our practice while on the test car is that

10   when a condition exists or pops up from the test

11   that needs the speed limited due to a defect, we

12   reduce the speed first, immediately after we go over

13   it, or before the track is given up behind the car,

14   and then verify it in the field in the subsequent

15   days, as soon as possible.

16   Q.  So when you were on the test car, there was no

17   conversation between you and Richard Boucher saying,

18   "I'm going to drop the speed"?

19   A.  Not specifically.

20   Q.  But you, based on -- I'm sorry?

21   A.  It's a given practice.

22   Q.  So you assume that that was the remedial

23   action taken that day?

24   A.  Yes.

25   Q.  So did you ever go back to confirm that that

COURT REPORTERS ASSOCIATES

# EXHIBIT

## "I"

000807

AUTOMATED TRACK INSPECTION PROGRAM

# TRACK GEOMETRY INSPECTION REPORT

ST Albans, VT to Windsor, VT
NECR-0456
NECR
9309 Feet before MP 131 to MP 1 - 1474



Federal Railroad Administration
Office of Safety
Washington, D.C.

Printed 06/08/04 12:21:59 PM
ENSCO Editor v $Revision: 1.27 $  $Date: 2004/02/12 17:53:36 $

000803

NECR-0456
NH State Line to VT State Line
NECR

Exception Report
Quick Exception List
MP 131 to MP 121

Page 7
06/08/04
NECR-0456

| MP | Feet | Decimal | Parameter | Value | Length | TSC | L-P Class | Track | Latitude | Longitude |
|---|---|---|---|---|---|---|---|---|---|---|
| 14 | 003195 | 13.40 | Warp 62 | 2.53 | 14 | T | 1 3 | 5 | 43.631789 | -072.330938 |
| 14 | 003216 | 13.39 | Warp 62 | 2.50 | 21 | T | 1 3 | 5 | 43.631733 | -072.330955 |
| 14 | 003899 | 13.26 | Warp 62 | 2.29 | 20 | T | 1 3 | 5 | 43.629898 | -072.331450 |
| 13 | 005288 | 13.00 | Down MP | 13.00 | | | | | 43.626187 | -072.332610 |
| 13 | 001290 | 12.76 | Crosslevel | 1.94 | 2 | T | 2 3 | 5 | 43.622734 | -072.333647 |
| 13 | 001348 | 12.75 | Warp 62 | 2.20 | 59 | T | 2 3 | 5 | 43.622577 | -072.333684 |
| | | | | | | | | | | |
| 12 | 005299 | 12.00 | Down MP | 12.00 | | | | | 43.612155 | -072.334521 |
| 12 | 000610 | 11.88 | Gage Wide | 57.88 | 4 | S | 1 3 | 5 | 43.610577 | -072.333751 |
| 12 | 001496 | 11.72 | Warp 62 | 2.23 | 60 | S | 2 3 | 5 | 43.609052 | -072.331236 |
| 11 | 005270 | 11.00 | Down MP | 11.00 | | | | | 43.600404 | -072.331130 |
| 11 | 004448 | 10.16 | Warp 62 | 2.21 | 62 | S | 2 3 | 5 | 43.593081 | -072.344186 |
| 10 | 005295 | 10.00 | Down MP | 10.00 | | | | | 43.592571 | -072.347304 |
| | | | | | | | | | | |
| 10 | 000878 | 09.84 | RQ CB Ver P-P | 0.44 | | | | | 43.591586 | -072.350306 |
| 9 | 005336 | 09.00 | Down MP | 9.00 | | | | | 43.586660 | -072.365683 |
| 8 | 005236 | 08.00 | Down MP | 8.00 | | | | | 43.578776 | -072.381403 |
| 8 | 000496 | 07.91 | Gage Wide | 58.01 | 11 | C | 0 3 | 5 | 43.577664 | -072.382453 |
| 8 | 004697 | 07.11 | RQ CB Ver P-P | 0.51 | | | | | 43.566425 | -072.384375 |
| 7 | 005292 | 07.00 | Down MP | 7.00 | | | | | 43.564791 | -072.384383 |
| | | | | | | | | | | |
| 6 | 005302 | 06.00 | Down MP | 6.00 | | | | | 43.550259 | -072.384217 |
| 5 | 005257 | 05.00 | Down MP | 5.00 | | | | | 43.536267 | -072.388402 |
| 4 | 005308 | 04.00 | Down MP | 4.00 | | | | | 43.523335 | -072.397012 |
| 3 | 005298 | 03.00 | Down MP | 3.00 | | | | | 43.509675 | -072.399006 |
| 2 | 005289 | 02.00 | Down MP | 2.00 | | | | | 43.497811 | -072.388749 |
| 1 | 005308 | 01.00 | Down MP | 1.00 | | | | | 43.483966 | -072.384225 |
| | | | | | | | | | | |
| 1 | 001474 | 00.72 | Warp 62 | 2.68 | 39 | S | 1 3 | 5 | 43.479936 | -072.384727 |
| 1 | 003443 | 00.35 | Crosslevel | 2.64 | 102 | T | 1 3 | 5 | 43.475512 | -072.386703 |
| 1 | 004384 | 00.17 | Gage Wide | 57.88 | 3 | S | 1.3 | 5 | 43.473574 | -072.388652 |
| 1 | 005140 | 00.03 | Warp 62 | 3.26 | 62 | S | 0 3 | 5 | 43.470865 | -072.389253 |
| 1 | 005322 - | 00.01 | State Line | NH | | | | | 43.469802 | -072.388827 |
| 169 | 005541 | 169.00 | Down MP | 169.00 | | | | | 43.468446 | -072.388259 |
| | | | | | | | | | | |
| 169 | 000263 | 168.86 | Warp 62 | 2.43 | 62 | S | 1 3 | 5 | 43.466661 | -072.388046 |
| 169 | 000303 | 168.85 | Warp 62 | 2.37 | 60 | S | 1 3 | 5 | 43.466606 | -072.388049 |
| 169 | 001366 | 168.31 | Lmt Speed 3 | 47.00 | | | | | 43.455785 | -072.387753 |
| 168 | 001974 | 168.00 | Down MP | 168.00 | | | | | 43.454719 | -072.387455 |
| 168 | 000163 | 167.94 | Warp 62 | 2.21 | 62 | S | 2 3 | 5 | 43.453352 | -072.387024 |
| 168 | 000317 | 167.89 | Lmt Speed 3 | 30.00 | | | | | 43.448625 | -072.387966 |
| | | | | | | | | | | |
| 167 | 002830 | 167.00 | Down MP | 167.00 | | | | | 43.440687 | -072.390679 |
| 166 | 005289 | 166.00 | Down MP | 166.00 | | | | | 43.426254 | -072.392015 |

NOTES:
Runoff exceptions are for information only
RQ (Ride Quality) exceptions are for information only