UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

NEW ENGLAND CENTRAL
RAILROAD, INC.,

      Plaintiff/Counterdefendant,

      -v.-                                                Civil Action No. 04-30235-MAP

SPRINGFIELD TERMINAL
RAILWAY COMPANY, et al.,

      Defendants/Counterclaimants.

---

## DEFENDANTS/COUNTERCLAIMANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to this Court's Pretrial Scheduling Order of February 6, 2007 [Dkt. #54], Springfield Terminal Railway Company and Boston and Maine Corporation (collectively, "ST/BM"), which are the defendants/counterclaimants herein, submit this Reply Memorandum in Support of their Motion for Partial Summary Judgment.

The principal issue in this case is whether Plaintiff/Counterdefendant New England Central Railroad Company's ("NECR") repeated failures with regard to basic elements of track safety were so deficient as to constitute gross negligence. In short, they were, and it was NECR's flagrant omissions and failures that caused the derailment of an ST/BM train on NECR's track near Hartland, Vermont on July 3, 2004 (the "Derailment").

NECR contends that ST/BM has an obligation to indemnify NECR for its damages relating to the Derailment, regardless of the condition of the track. In January 2006, however, the Surface Transportation Board ("STB") ruled that Section 7.1 of the Trackage Rights Order ("TRO") that the Interstate Commerce Commission ("ICC") imposed on the predecessors of

ST/BM and NECR in 1990 does *not* absolve NECR of liability for damages due to NECR's gross negligence or willful misconduct. *Boston and Maine Corp. v. New England Central Ry. Co.*, 2006 STB LEXIS 17, STB Finance Dkt. No. 34612 (served Jan. 10, 2006) ("January 2006 Decision") at 3 (Exh. 2 to Roger D. Bergeron Declaration in Support of Defendants/Counterclaimants' Motion for Partial Summary Judgment ("Bergeron Declaration") [Dkt. 61]). ST/BM's opening papers and this reply demonstrate that NECR was grossly negligent. NECR thus is liable for both parties' damages relating to the Derailment.

Moreover, NECR has adduced no evidence of gross negligence, or even negligence, on the part of ST/BM and no evidence of a contract between ST/BM and NECR. Finally, federal law does not preempt ST/BM's federal counterclaim under the TRO and the Interstate Commerce Act.

## Response to NECR's "Additional Facts"

I.  **The TRO—including § 7.1— was *imposed* on the predecessors of ST/BM and NECR and is not a contract between ST/BM and NECR.**

NECR asserts erroneously that ST/BM's predecessor agreed to the language of § 7.1. Memorandum of Law in Support of the Plaintiff's Opposition to the Defendants' Motion for Partial Summary Judgment ("NECR Opp.") [Dkt. # 76] at 2. In fact, § 7.1 of the TRO was not agreed upon between Central Vermont and Boston and Maine, but was imposed—over the objections of ST/BM's predecessor—by the ICC. *See* January 2006 Decision at 1.

In *Amtrak—Conveyance of B&M in Conn River Line in VT & NH*, 6 I.C.C.2d 539 (1990), *("Amtrak II")*, Central Vermont proposed a version of § 7.1—the one that the ICC ultimately imposed. Supplemental Declaration of Roger D. Bergeron in Support of Defendants/Counterclaimants' Motion for Partial Summary Judgment ("Bergeron Supp. Decl.") ¶ 2 & Exh. 1 (ST/BM's Petition for Reconsideration at 3-4). Boston and Maine, by contrast,

proposed a version of § 7.1 identical to that in the temporary agreement between the parties—i.e., an expressly *fault*-based apportionment of liability. *Id.* Boston and Maine did not agree to Central Vermont's proposed version of § 7.1 because, as the STB correctly observed, the ICC *imposed* the TRO, including the version of § 7.1 submitted by Central Vermont. *See* January 2006 Decision at 3. That Boston and Maine did not seek judicial review of the decision imposing the TRO is irrelevant because § 7.1 always has excluded cases of gross negligence from its purview. All the January 2006 Decision did was to make that explicit.

NECR contends that because ST/BM has brought breach of contract claims relating to the Derailment, ST/BM is estopped from arguing the TRO is not a contract. *See* NECR Opp. at 16. This is incorrect. The first cause of action in ST/BM's STB Complaint was for breach of the Interstate Commerce Act and the TRO issued thereunder. *See* NECR Opp. Exh. P at p. 3. ST/BM's breach of contract claim thus was pleaded in the alternative because ST/BM did not know whether the STB would rule that the TRO was a contract or an order.

## II.     NECR failed to properly identify and remedy defects in the track segment where the Derailment occurred.

NECR claims that the Federal Railroad Administration's ("FRA") June 8, 2004 track inspection (the "Inspection") and subsequent manual inspections by NECR's employees confirmed that the crosslevel defect was "*pinpointed precisely* at MP 10.16." *See* NECR Opp. at 2-3 (emphasis added). Such feat is implausible, however, because defects like that do not occur at *points* but occupy *segments* of track. Bergeron Supp. Decl. ¶ 3. NECR also refers to the deposition testimony of its track inspector, Rick Boucher, to purportedly support its contention that NECR affirmatively determined that no defect existed at MP 10.18. *See* NECR Opp. at 3. Rick Boucher's testimony does not bear this out. Instead, Rick Boucher expressly conceded that it was NECR's practice *not* to record continuing defects—like the crosslevel defect identified by

the Inspection in the track segment where the derailment occurred—on NECR's subsequent track inspection reports. *See* NECR Opp. Exh. K at pp. 21-22. Thus, NECR's failure to record the defect on subsequent inspection reports—in violation of the FRA's requirement that such recording appear on *each* track inspection report until the defect has been corrected, *see* Exhibit 12 to Bergeron Declaration (at 5.140, first full ¶), does not prove the absence of a defect.

During an automated track inspection, instruments on the inspection car automatically find and record defects. Bergeron Supp. Decl. ¶ 4. The system for relating defects identified by the inspection car to physical landmarks such as mileposts and bridges, however, is not automated. *Id.* Instead, the railroad's track inspector calls out defects as they are relayed to him by FRA personnel. An inspector or operator then punches a button to mark each such location. *Id.* The imprecision of the "call-out," as well as the reaction time for the individual who pushes the marker button, means that the results of such an inspection typically are not precise as to landmarks such as mileposts. *Id.* ¶ 5. Moreover, a crosslevel defect of the sort involved in the Derailment is by definition at least sixty-two feet long; thus, even were the inspection car reading precise, the defect could extend for at least sixty-two feet in either direction from the noted spot. *Id.* ¶ 6; *see* 49 C.F.R. § 213.63 & n. 1 (2005).

NECR further alleges that it was "perfectly acceptable" to reduce the track speed for the segment with the crosslevel defect from Class 3 to Class 2. *See* NECR Opp. at 3. For this assertion, NECR cites the FRA's "Quick Exception List." *Id.* & Exh. E. The Quick Exception List is not a conclusive document, though, but a rough computer printout intended to be subject to manual field verification. Bergeron Supp. Decl. ¶ 7. In fact the FRA discourages reliance solely upon the Quick Exception List as the basis for determining what remedial action is appropriate or permissible. *Id.* In this case, the segment near MP 10.18 where the Derailment

4

began did not meet all the requirements for Class 2 and thus should have been reduced to Class 1—a speed that is below the harmonic rock danger addressed by note 2 to 49 C.F.R. § 213.63.

Moreover, NECR claims that it inspected the Line regularly after the Inspection and determined that the crosslevel defect "had remained exactly the same since June 8, 2004 and had not further deteriorated." NECR Opp. at 4. The testimony of Richard Boucher cited by NECR, *see id.*, Exh. J at 12, does not corroborate this claim. Rather, Richard Boucher testified only that he did not *notice* that the crosslevel defect was worsening. Further, despite NECR's contradictory assertion, NECR's inspectors did not affirmatively determine that the track at MP 10.18 was in alignment prior to the Derailment. *See* NECR Opp. at 4. Rick Boucher testified only that he did not *notice* that the track was out of alignment. *id.*, Exh. K at 13.

### III. Roger Bergeron's Declaration statements regarding his investigation of the Derailment are truthful and consistent with his deposition testimony.

NECR misconstrues the Declaration statements and deposition testimony of Mr. Bergeron. *See* NECR Opp. at 9. First, Mr. Bergeron did not state that the fouled ballast condition at MP 10.18 might have been caused between the time of the Inspection and the Derailment. *See id.* In fact, it is Mr. Bergeron's opinion that the ballast degradation noted during his investigation was so severe that it had to have existed for at least a month prior to his inspection. Bergeron Supp. Decl. ¶ 8. In addition, although Mr. Bergeron testified that he did not know whether other cars in the train consist applied force to the boxcar that initially derailed, Mr. Bergeron has seen no evidence—and NECR has offered none—to this effect. *Id.* ¶ 9.

Mr. Bergeron did not admit that many other factors might have caused the Derailment. *See* NECR Opp. at 9. Rather, the deposition testimony of Mr. Bergeron cited by NECR merely acknowledges that, generally speaking, other factors might cause or contribute to a derailment.

Lastly, NECR asserts—without citation to the record—that Mr. Bergeron testified that it would have been a proper remedial action for NECR to reduce the track speed in the vicinity of MP 10.18 from Class 3 to Class 2. *See* NECR Opp. at 9. On the contrary, Mr. Bergeron expressly stated that the segment of track with the warp defect should have been dropped to Class *1* because of the requirements of Part 213, especially note 2 to 49 C.F.R. § 213.63. Bergeron Supp. Decl. ¶ 10 & Exh. 2 (Bergeron dep. at 122:18-23).

## Argument

I.  **NECR is liable for ST/BM's damages and ST/BM is not liable for NECR's damages.**

   A.  **The condition of the Line is relevant because Section 7.1 of the TRO does *not* absolve NECR of liability for damages caused by NECR's gross negligence.**

NECR maintains on the one hand that the defective condition of the Line is irrelevant to responsibility for damages caused by the Derailment, *see* NECR Opp. at 5, but on the other that "the STB has recently decided that the NECR shall not be relieved from responsibility under the terms of the [TRO] if it was grossly negligent," *id.* at 7. These two assertions are irreconcilable.

ST/BM has not admitted, and does not admit, that it is responsible for the Derailment damages. *See* NECR Opp. at 6. The deposition testimony of Roger Bergeron cited by NECR does not constitute such an admission, but merely acknowledges what the literal text of § 7.1 says. *Id.* This ignores the STB's interpretation of § 7.1 as not absolving NECR of liability for damages caused by NECR's gross negligence. *See* January 2006 Decision at 3.

As NECR itself acknowledges, the condition of the Line *is* relevant. *See* NECR Opp. at 7. Accordingly, under § 7.1 NECR may not escape liability either for its damages or ST/BM's damages relating to the Derailment if NECR was grossly negligent.

6

**B.    No reasonable jury could conclude other than that NECR was guilty of gross negligence as a matter of law.**

NECR agrees that the TRO, including § 7.1, is to be interpreted under District of Columbia law, *see* NECR Opp. at 6, but then disputes that the issue of NECR's gross negligence should be determined under District of Columbia law, *id.* at 7. The STB, however, has ruled that § 7.1 of the TRO does not absolve NECR of liability due to its gross negligence and § 7.1 is to be interpreted according to District of Columbia law. As such, it follows that the question of NECR's gross negligence, and hence liability under § 7.1, is governed by District of Columbia law. In any event, as NECR admits, the District of Columbia and Vermont standards for gross negligence are not materially different.[1] *See id.* at 11, n. 8.

NECR's repeated failures with regard to basic elements of track safety were so deficient as to constitute gross negligence as a matter of law. NECR owed ST/BM a duty to maintain the Line in safe condition, and in Class 2 condition, at all times. *See* TRO § 3.2 (Exh. 1 to Bergeron Declaration); 49 C.F.R. pt. 213 (2005). Portions of the Line, however—including the segment where the Derailment began—were noncompliant with the requirements of the TRO, in breach of applicable federal regulations, and unsafe for users such as ST/BM.

NECR failed to correct the crosslevel defect on the segment near MP 10.18 with either a tamping machine or a manual procedure, despite knowing of the defect for nearly a month before the Derailment. Bergeron Declaration ¶¶ 23-24, 41. NECR has offered no explanation for not correcting the defect using manual labor and a track jack. Further, NECR failed to set a *proper*

---

[1] Under District of Columbia law, gross negligence is "the failure to exercise even slight care" and "negligence as would shock fair-minded men." *District of Columbia v. Walker*, 689 A.2d 40, 44 (D.C. 1997) (internal quotation marks omitted). Under Vermont law, gross negligence is the failure to exercise a "slight degree of care" and it is "a heedless and palpable violation of legal duty respecting the rights of others." *Shaw v. Moore*, 162 A. 373 (Vt. 1932); *Mellin v. Flood Brook Union School District*, 790 A.2d 408, 423 (Vt. 2001); *Powers v. Office of Child Support*, 795 A.2d 1259, 1266 (Vt. 2002).

slower speed limit (i.e., Class 1—10 mph) that would take account of the risk of harmonic rock addressed in note 2 to 49 C.F.R. § 213.63. *Id.* ¶¶ 25, 43-44.

NECR argues that reduction to Class 2 was adequate. NECR Opp. at 10. NECR is wrong: "If a segment of track does not meet *all* of the requirements for its intended class, it is reclassified to the next lowest class of track for which it does meet *all the requirements* of [the FRA's track safety standards]." 49 C.F.R. § 213.9(b) (2005) (emphasis added). As NECR would have known had it reviewed the track safety regulations, the segment including MP 10.18 did not meet "all the requirements" for Class 2 and hence should have been placed in Class 1—a speed below the harmonic rock danger addressed by note 2 to § 213.63. This is more than mere negligence, for it is a failure to exercise even slight care insofar as the relevant segment was concerned.

Moreover, NECR apparently failed to even identify the misaligned track at MP 10.18. Bergeron Declaration ¶ 38. NECR also violated federal track safety standards by neglecting to record the crosslevel defect on each subsequent inspection report. *Id.* ¶ 51. The foregoing conduct by NECR constitutes gross negligence as a matter of law.

II. **No reasonable jury could conclude that ST/BM was negligent, let alone grossly negligent.**

As a matter of law, ST/BM is not liable for negligence, let alone gross negligence. ST/BM concededly was required to operate the train in accordance with the General Code of Operating Rules ("GCOR"). *See* NECR Opp. at 11. And this ST/BM did. In fact, following the investigative hearing regarding the Derailment the decision-making officer of ST/BM found no violations of the GCOR provisions by ST/BM's crew. Declaration of David A. Nagy In Support of Defendants/Counterclaimants' Motion for Partial Summary Judgment ("Nagy Declaration") [Dkt. 62] ¶ 14 & Exh. C. Moreover, ST/BM's conductor testified that GCOR 6.29.2 requires

8

train crew members to inspect the train whenever possible, and that he looked back to check the train at North Hartland (i.e., near where the cars went onto the ground). *Id.* ¶ 9 & Exh. A (at 30-31). He testified also that derailed cars typically exhibit sparks, dust, and erratic movement, but that when he checked the train, he saw no such conditions. *Id.* ¶ 9 & Exh. A (at 31-32).

An NECR official testified at the investigative hearing but offered no evidence of negligence on the part of the ST/BM train crew. *Id.* ¶ 6 & Exh. A (at 18-29). Moreover, NECR never even held a hearing but simply declared the ST/BM crew *persona non grata* on NECR's track without according them even a semblance of due process. *Id.* ¶ 15.

NECR has adduced no evidence that would support a finding that ST/BM was negligent. The derailed pair of wheels on the sixth car of the train moved only a few inches between their proper location on the rail heads to locations just beside each rail. Bergeron Declaration ¶ 31. NECR offers no authority for its assertion that the damage to the track caused by the derailed car "*clearly* could have been observed as it was happening." NECR Opp. at 11 (emphasis added). To the contrary, visibility was between 240 and 300 feet, Bergeron Declaration ¶ 34 & Exhs. 14 (at 18:13-18; 39:10-17), 15 (at 85:5-86:3), and the boxcar whose pair of wheels initially derailed was over 400 feet back from the locomotive where ST/BM's operator and conductor were located. *Id.* In any event, the boxcar remained upright and, to any observer of the moving train, aligned with the other cars as the train traveled southward. *Id.* ¶ 34 & Exh. 15 (at 86:23-87:14).

Further, ST/BM's ammeter readings, which can be an indicator of a derailed car, were normal for a train negotiating a 0.50 percent grade and accelerating from a slow-ordered track segment. *Id.* ¶ 32 & Exh. 16. The train crew also felt nothing unusual between MP 10.18 and MP 5.7. *Id.* ¶ 33 & Exhs. 14 (at 20:14-7), 15 (at 97:17-98:3). Thus, no reasonable jury could conclude that negligence on the part of ST/BM caused the Derailment.

**III. ST/BM's *federal* counterclaim regarding NECR's violations of §§ 3.2 and 7.1 of the TRO and the Interstate Commerce Act is not preempted.**

NECR states that ST/BM's counterclaims are preempted by federal law. NECR Opp. at 13. But NECR's violations of §§ 3.2 and 7.1 of the TRO create a *federal* cause of action for ST/BM, *see* 49 U.S.C. § 11704, that is *not* preempted by the Federal Rail Safety Act ("FRSA"), 49 U.S.C. § 20106, or the FRA's regulations. *See CSX Transp. Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) ("[A]pplicable federal regulations may preempt any *state* 'law, rule, regulation, order or standard relating to railroad safety.'") (emphasis added).

Section 3.2 of the TRO makes NECR "*solely responsible* for dispatching all operations over the Line and for the maintenance and repair of the Line" as well as for "keep[ing] the Line, *at all times* throughout the term of this Agreement or any extensions thereof, in not less that FRA Class II condition." TRO § 3.2 (emphasis added). Moreover, § 7.1 of the TRO does not absolve NECR of gross negligence relating to a derailment. *See* January 2006 Decision at 3. Indeed, ST/BM's First Counterclaim—for breach of the TRO and Interstate Commerce Act requirements to maintain a safe line in Class 2 condition—is not based on state law, but upon 49 U.S.C. § 11704. Accordingly, NECR's violations of §§ 3.2 and 7.1 of the TRO create a *federal* cause of action for ST/BM—one that is not preempted by the FRSA or the FRA's regulations.

## Conclusion

For the reasons set out in ST/BM's opening papers and this reply, ST/BM's motion for partial summary judgment should be granted and NECR's motion for summary judgment should be denied.

Respectfully submitted,

/s/ signature

Eric L. Hirschhorn
Debra R. Coletti

        Winston & Strawn LLP
        1700 K Street, NW
        Washington DC 20006
        202-282-5700

        Robert B. Culliford (BBO #638468)
        Pan Am Systems, Inc.
        Pease International Tradeport
        14 Aviation Drive
        Portsmouth NH 03801
        603-766-2002

        *Attorneys for Defendants/Counterclaimants*
          *Springfield Terminal Railway Company*
          *and Boston and Maine Corporation*

May 4, 2007