UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

NEW ENGLAND CENTRAL
RAILROAD, INC.,

       Plaintiff/Counterdefendant,

       -v.-                                             Civil Action No. 04-30235-MAP

SPRINGFIELD TERMINAL
RAILWAY COMPANY, et al.,

       Defendants/Counterclaimants.

---

## SUPPLEMENTAL DECLARATION OF ROGER D. BERGERON IN SUPPORT OF DEFENDANTS/COUNTERCLAIMANTS' MOTION FOR SUMMARY JUDGMENT

Roger D. Bergeron declares as follows:

1.    I am employed by the defendants/counterclaimants in this action, Springfield Terminal Railway Company and Boston and Maine Corporation (collectively, "ST/BM"), as Vice-President of Special Projects. I make this supplemental declaration in support of ST/BM's motion for partial summary judgment, both as a percipient witness and, pursuant to the Court's endorsed order of February 21, 2007, as an expert witness. To the extent the opinions expressed herein are considered those of an expert, they are within the bounds of reasonable engineering certainty and represent my professional opinion.

2.    In *Amtrak-Conveyance of B&M in Conn River Line in VT & NH*, 6 I.C.C.2d 539 (1990), *("Amtrak II")*, Central Vermont, Plaintiff/Counterdefendant New England Central Railroad, Inc.'s ("NECR") predecessor, submitted a version of § 7.1—the one that the ICC ultimately imposed. ST/BM's predecessor, Boston and Maine, by contrast, proposed a version of § 7.1 identical to that in the temporary agreement between the parties—i.e., an expressly *fault-*

based apportionment of liability. Indeed, that was the point of ST/BM's Petition for Reconsideration that led to the Surface Transportation Board's ("STB") ruling in January 2006, *Boston and Maine Corp. v. New England Central Ry. Co.*, 2006 STB LEXIS 17, STB Finance Dkt. No. 34612 (served Jan. 10, 2006) ("January 2006 Decision"). *See* ST/BM's Petition for Reconsideration, which is annexed hereto as Exhibit 1, at 3-4.

3. Crosslevel defects of the sort identified by the Federal Railroad Administration's ("FRA") June 8, 2004 track inspection (the "Inspection") do not occur at *points*, but occupy *segments* of track.

4. During a FRA automated inspection, instruments on the inspection vehicle automatically find and record defects. The system for relating defects identified by the inspection vehicle to physical landmarks such as mileposts and bridges, however, is not automated. Instead, the railroad's track inspector calls out defects as they are relayed to him by FRA personnel. An inspector or operator then punches a button to mark each such location.

5. The imprecision of the "call-out," as well as the reaction time for the individual who pushes the marker button, means that the results of such an inspection are not precise as to landmarks such as mileposts.

6. Moreover, a crosslevel defect of the sort involved in the derailment is by definition at least sixty-two feet long. Thus, even were the inspection vehicle reading precise, the defect could extend for at least sixty-two feet in either direction from the noted spot. *See* 49 C.F.R. § 213.63 & n. 1 (2005).

7. The FRA's Quick Exception List generated during the Inspection is not a conclusive document, but a rough computer printout intended to be subject to manual field

verification. In fact, the FRA discourages reliance solely upon the Quick Exception List as the basis for determining what remedial action is appropriate or permissible.

8. The ballast degradation that I noted at the MP 10.18 location was so severe that it had to have existed for at least a month prior to my investigation of the Derailment.

9. I have seen no evidence suggesting that the other cars in the train consist applied force to the boxcar that initially derailed around MP 10.18.

10. Due to the crosslevel defect in the segment where the derailment occurred, that segment of track should have been dropped to Class *1* because of the requirements of Part 213, especially note 2 to 49 C.F.R. § 213.63. *See* Exhibit 2 hereto (Bergeron dep. at 122:18-23).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed May __, 2007.

_____
Roger D. Bergeron

# EXHIBIT 1

**BEFORE THE
SURFACE TRANSPORTATION BOARD**

---

BOSTON AND MAINE CORPORATION
and
SPRINGFIELD TERMINAL RAILWAY COMPANY

v.

NEW ENGLAND CENTRAL RAILROAD, INC.

---

Finance Docket No. 34612

---

**PETITION FOR RECONSIDERATION
IN PART**

---

The petitioners, Boston and Maine Corporation ("BM") and Springfield Terminal Railway Company ("ST") hereby petition for reconsideration of part of the Board's decision in this proceeding served February 24, 2005 ("Decision"). In particular, BM and ST seek reconsideration of the Board's decision not to interpret—by means of a declaratory order proceeding—Section 7.1 of the Trackage Rights Order ("TO") imposed in 1990 by the Board's predecessor, the Interstate Commerce Commission ("ICC"), in *Amtrak—Conveyance of B&M in Conn River Line in VT & NH*, 6 I.C.C.2d 539 (1990) ("*Amtrak II*").

The BM/ST complaint seeks damages for the July 2004 derailment of its train from the New England Central Railroad's ("NEC") track but it also seeks a declaratory order from the

Board as to the meaning of Section 7.1—a provision that was imposed by the Board's predecessor, the ICC. *See id.* at 564. It may be that, as the Decision states, the courts are better able to evaluate the facts attendant upon the derailment. *See* Decision at 3, 4. It also may be that the courts are better able than the Board to handle tort and breach of contract claims. *See id.* at 1. The key *legal* issue in the dispute, however, is one that the Board, as successor to the ICC, is uniquely qualified to decide: Was Section 7.1 of the TO intended by the ICC to absolve a track owner whose track is in substandard condition due to its own gross negligence or willful misconduct from liability for a derailment resulting from the condition of that track?

In another case involving the same TO, the Court of Appeals for the First Circuit described the Board as being "*uniquely suited*" to determine the meaning of the TO, as well as to make decisions about national rail transportation policy. *Rymes Heating Oils, Inc. v. Springfield Terminal Ry. Co.*, 358 F.3d 82, 91 (1st Cir. 2004) (emphasis added); *accord Hansen v. Norfolk & W. Ry. Co.*, 689 F.2d 707, 712 (7th Cir. 1982) (noting appropriateness of primary jurisdiction referral for interpretation of ICC's own order). In addition to being about the meaning of the TO, the dispute between BM/ST and NEC raises a significant question of transportation policy—namely, whether as a matter of public policy a track owner can absolve itself, in advance, of gross negligence and even willful misconduct in the discharge of its track safety responsibilities.

The Board previously has addressed this issue: "[P]ublic policy generally disfavors requiring one party to be responsible for another's gross negligence or willful and wanton misconduct." *Nat'l R. Passenger Corp.—Applic.— 49 U.S.C. 24308(a)*, 3 S.T.B. 157, 162 (1998). Moreover, the TO is to be interpreted under District of Columbia law, *Amtrak II*, 6 I.C.C.2d at 567 (§ 9.9 of TO), which considers "[c]ontract provisions which appear to indemnify against willful, wanton, reckless, or intentional misconduct by the indemnitee [to be] contrary to

2

public policy." *Nat'l R. Passenger Corp. v. Consolidated Rail Corp.*, 698 F. Supp. 951, 970-71 & n. 6 (D.D.C. 1988) (applying D.C. law), *vacated and remanded on other grounds*, 892 F.2d 1066 (1990); *see Wisconsin Ave. Assocs., Inc. v. 2720 Wisconsin Ave. Coop. Ass'n*, 441 A.2d 956, 964-65 (D.C. 1982) (invalidating contract provision as violative of public policy).

Moreover, this is an issue that the parties to this proceeding jointly suggested that the Board address as "a preliminary—and possibly dispositive—issue of law." Letter from Robert B. Culliford, Corporate Counsel, BM/ST, to Vernon A. Williams, Secretary, STB (Dec. 20, 2004) (copy annexed as Exhibit 1).

The Decision states that the content of Section 7.1 was "not in dispute" in *Amtrak II.*, Decision at 1. That is incorrect. The temporary trackage rights agreement that preceded the TO, *see* Decision at 1, provided for shared liability "in proportion to the respective relative fault of each [railroad] for the occurrence which gave rise to the liability." Interim Trackage Rights Agreement Between Central Vermont Railway, Inc. and Boston and Maine Corp. §§ 7.1-7.2 (Sept. 9, 1988) ("Temporary Agreement") (copy annexed as Exhibit 2). Thus the Temporary Agreement—a contract as to which the predecessors of BM/ST and NEC agreed—provided for apportionment of responsibility based upon negligence.

In the *Amtrak II* proceeding, NEC's predecessor, Central Vermont Railway ("CV"), submitted the version of Section 7.1 that the ICC ultimately adopted and that is at issue here (copy of CV proposal annexed as Exhibit 3). CV's twenty-two page brief in support of its proposed version made no mention of liability beyond the passing remark that "liability indemnification is spelled out" in the proposal. Verified Pet. of Central Vermont Railway, Inc. for Imposition of Terms and Conditions of Trackage Rights on Connecticut River Line, and for Other Relief, STB Finance Docket No. 31259, at 6 (May 18, 1989).

3

BM, by contrast, proposed a version of Sections 7.1 and 7.2 identical to that in the Temporary Agreement—i.e., providing for shared liability "in proportion to the respective relative fault of each [railroad] for the occurrence which gave rise to the liability" (copy of BM proposal annexed as Exhibit 4). BM's brief also made no mention of liability issues and the parties' subsequent responses to one another did not address liability, either.

The ICC decision addressed the issue only briefly:

> CV proposes a revised section 7 to address release and indemnification in greater detail than the Interim Agreement. B&M states no objection. Because we find the revisions *will not change the essence of section 7*, we will impose as terms sections 7.1 through 7.6 as proposed by CV.

*Amtrak II*, 6 I.C.C.2d at 554 (emphasis added).

That BM did not seek judicial review of the decision imposing the TO thus is understandable and is no bar here, for no reasonable person could interpret Section 7.1 as having the limitless scope that NEC now would assign to it. The silence of the parties' four *Amtrak II* filings on the point underscores this conclusion, as does the ICC's statement that the CV version "will not change the essence of section 7" of the Temporary Agreement—a provision that apportioned liability based upon relative fault. Thus there can be no reasonable claim that BM agreed or acceded to NEC's strained current interpretation of Section 7.1.

In addition to the fact that the Board is far more qualified than a court to explain the meaning of a provision ordered by the ICC, the legal issue raised by the declaratory order portion of the proceeding is one that should be uniform for all STB-imposed trackage rights. *See, e.g., Nat'l R. Passenger Corp.—Applic.— 49 U.S.C. 24308(a)*, 3 S.T.B. 157, 162 (1998) (rejecting a provision similar to § 7.1 because it would violate public policy). This is a classic instance of the utility of the primary jurisdiction doctrine. *See Pejepscot Indus. Park, Inc. v. Maine Central R. Co.*, 215 F.3d 195, 205-06 (1st Cir. 2000) ("promote uniformity"); *Hansen*, 689 F.2d at 710-11

4

(same). The Board should not refrain from deciding this legal issue even if it then leaves to the courts the task of finding the facts to which the Board's legal conclusions are to be applied.

WHEREFORE, BM and ST respectfully request that the Board reconsider its decision served February 24, 2005, open a declaratory order proceeding on the limited issue of whether Section 7.1 of the TO absolves NEC of liability if NEC's gross negligence or willful misconduct was a cause of the July 3, 2004 derailment, and set a briefing schedule.[1] BM and ST note that the parties previously had suggested that opening statements be due within thirty days after the Board's order opening a proceeding and that replies be submitted within twenty days after the service of opening statements. Letter from Robert B. Culliford, Corporate Counsel, BM/ST, to Vernon A. Williams, Secretary, STB (Dec. 20, 2004) (copy annexed as Exhibit 1).

Respectfully submitted,

*[signature]*

Eric L. Hirschhorn
Winston & Strawn LLP
1400 L Street, NW
Washington DC 20005
Tel. 202-371-5706

Robert B. Culliford
Guilford Rail System
Iron Horse Park
North Billerica MA 01862
Tel. 978-663-1029

---

[1] Should the Board deny reconsideration here, BM and ST assume that it would not refuse to interpret § 7.1 were it asked to do so by the U.S. District Court that currently is hearing NEC's action against BM/ST. *See Engelhard Corp.—Petition for Declaratory Order—Springfield Terminal Railway Corp. and Consolidated Rail Corp.* STB Docket No. 42075, at 2 (served Apr. 1, 2003) (noting that "[p]etitions for issuance of a declaratory order premised on referral from a federal court are routinely accepted. *See Delegation of Authority—Declaratory Order Proceedings*, 5 I.C.C.2d 675, 676 (1989)").

*Attorneys for Petitioners Boston and Maine Corp. and Springfield Terminal Railway Co.*

Dated: March 10, 2005

# EXHIBIT 2

```
                        Volume 1, Pages 1-180

                        Exhibits: 10-26

        UNITED STATES DISTRICT COURT

      FOR THE DISTRICT OF MASSACHUSETTS

NEW ENGLAND CENTRAL RAILROAD, INC.,

            Plaintiff

v.                      Docket No. 04-30235-MAP

SPRINGFIELD TERMINAL RAILWAY

COMPANY and BOSTON AND MAINE

CORPORATION,

            Defendants

    --------------------------------

RULE 30(b)(6) DEPOSITION OF SPRINGFIELD TERMINAL

    RAILWAY COMPANY by ROGER D. BERGERON

    Thursday, January 11, 2007, 10:11 a.m.

        Law Office of Robert H. D'Auria

            41 North Road, Suite 205

        Bedford, Massachusetts   01730


----Reporter:  Kathleen Mullen Silva, RPR, CRR----

        Beacon Hill Court Reporting, Inc.

        807 Main Street, 2nd Floor

        Worcester, Massachusetts 01610

                508.753.9286
```

**Page 122**

1 of the FRA regulation, but it's...
2 Q. What is your understanding as to what the
3 requirement is?
4 A. That none of these here can exceed an inch
5 and a quarter.
6 Q. Do they exceed an inch and a quarter?
7 A. Yeah. Oh, yeah.
8 Q. Which ones exceed an inch and a quarter?
9 Let's back up. When you say "exceed an inch and a
10 quarter," what do you mean, "exceed an inch and a
11 quarter"?
12 A. It's that the -- the warp factor. The
13 difference in crosslevel, when 62 feet exceeds an
14 inch and a quarter.
15 Q. So when you're talking about 213.63, you're
16 talking about this chart, correct?
17 A. Yes.
18 Q. Okay. What class of track should this have
19 been, or what speed restrictions should have been in
20 place due to your calculations on the warp?
21 A. 10.
22 Q. And that would be class what?
23 A. 1.
24 Q. When you made your calculations, some of

**Page 123**

1 your calculations include -- strike that.
2 At point A you have 61 1/2 plus 3/8 and
3 then you have a line and then underneath that you
4 have 56 3/4. Would you explain to the jury what
5 that means?
6 A. Okay. The 6 1/2 plus 3/8 is the
7 crosslevel, the difference in height between the
8 rail on the east rail and the rail on the west rail.
9 The 56 3/4 is the gage of the track at that
10 particular spot, 5/8 of an inch below the rail at a
11 plane equal to that at that point A.
12 Q. What piece of equipment did you use when
13 you made these measurements?
14 A. A level board gage combination.
15 Q. Okay. Is that a tool that you can use by
16 yourself or do you need assistance with that?
17 A. You can use it by yourself.
18 Q. Did you, in fact, use it by yourself?
19 A. Yes, I did.
20 Q. So you were taking the measurements and you
21 were writing those down yourself?
22 A. That is correct.
23 Q. What was Mr. Griffiths doing while you were
24 doing this?

**Page 124**

1 A. He was standing walking with me.
2 Q. So he was just standing with you while you
3 were doing the work?
4 A. When I was taking the readings on the first
5 passthrough, that is correct.
6 Q. Is this the actual diagram that was created
7 that day, or is this a cleaner copy of that?
8 A. This is a cleaner copy of that.
9 Q. Do you have the original numbers and
10 original data that you took?
11 A. I'm not too sure. No, I don't think so.
12 Q. Any reason why you didn't keep it?
13 A. It was a sloppy copy. I mean --
14 Q. I understand it was sloppy. Is there any
15 reason why you didn't keep it?
16 A. No.
17 Q. So it no longer exists?
18 A. I don't believe so.
19 MR. DAVIDSON: Can we mark this the next
20 exhibit, please.
21 (Marked, Exhibit 23, track chart, Bates
22 ST010386.)
23 Q. Do you know if anyone, during the course of
24 their inspection of the car that derailed, ever

**Page 125**

1 obtained the stencil lubrication dates for the
2 equipment?
3 A. I don't know that personally.
4 Q. Have you ever seen that information?
5 A. Yes. Oh, yes.
6 Q. On this particular rail car?
7 A. No, not on this particular rail car.
8 Q. All the questions for the next couple
9 minutes, and I'll let you know when I vary, are
10 involving the car that derailed in this derailment.
11 All right? I asked you if you'd seen that data. I
12 meant for that particular rail car in that
13 derailment. You've never seen that data?
14 A. No, I did not.
15 Q. So that didn't factor into your analysis?
16 A. No, it did not.
17 Q. Do you know whether anyone observed any
18 prior derailment damage to this particular rail car?
19 A. No, I do not.
20 Q. Do you know whether or not anyone made a
21 determination whether there was sufficient
22 lubrication in the trucks in this particular rail?
23 A. No, I do not.
24 Q. Do you know if anyone found any foreign