# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

---

NEW ENGLAND CENTRAL
RAILROAD, INC.,

    Plaintiff/Counterdefendant,

      -v.-                       Civil Action No. 04-30235-MAP

SPRINGFIELD TERMINAL
RAILWAY COMPANY, et al.,

    Defendants/Counterclaimants.

---

## MEMORANDUM OF REASONS
## IN SUPPORT OF
## DEFENDANTS' MOTIONS *IN LIMINE*

Springfield Terminal Railway Company and Boston and Maine Corporation (collectively, "ST/BM"), who are the defendants/counterclaimants herein, have moved, pursuant to this Court's Order of February 6, 2007 [Dkt. #54], for the following relief *in limine*.

1.      The Court should prohibit the plaintiff, New England Central Railroad, Inc. ("NECR") from introducing evidence in its direct (or rebuttal) case about the cause of the Derailment. When deposed, NECR employees (including NECR's Rule 30(b)(6) witness regarding track conditions, Michael Lawyer) professed lack of knowledge about the cause or uncertainty about whether NECR had determined the cause.

2.      NECR failed to designate an expert on the issue of trainmen's standard of care. Accordingly, the Court should prohibit NECR from adducing evidence in its direct (or rebuttal) case regarding such standard or whether the ST/BM train crew met such standard.

3.      This Court has adopted the Surface Transportation Board's decision that the liability standard under Section 7.1 of the ICC's 1990 Trackage Rights Order is gross negligence. The text of Section 7.1 accordingly is irrelevant as a matter of evidentiary fact; even were it relevant, its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. The Court therefore should prohibit NECR from introducing Section 7.1 in evidence, publishing Section 7.1 to the jury, or otherwise making use of Section 7.1 in the hearing of the jury (though presumably this provision, as interpreted by the STB and the Court, will be reflected in the Court's jury instructions).

4.      NECR has included in its list of trial exhibits the FRA accident report filed by ST/BM. Joint Pre-Trial Conference Memorandum [Dkt. #53], at 30 (Prop. Exh. 17). ST/BM timely objected to that exhibit. *Id.* at 33. The Court should bar the proposed exhibit because 49 U.S.C. § 20903 renders accident reports filed by railroads with the Federal Railroad Administration inadmissible in a party's direct case. The Court also should rule, though, that such reports may be used to refresh witnesses' recollections and may be used (including introduction into evidence) to impeach witnesses.

## Relevant Facts

This action arises out of a derailment that occurred in the early hours of July 3, 2004 (the "Derailment"). The train that derailed was owned and operated by ST/BM. The track on which the Derailment occurred was owned by NECR, which is responsible for track maintenance. ST/BM's use of the NECR track in question is governed by a 1990 Trackage Rights Order of the Interstate Commerce Commission (the "TRO"). *See Nat'l R.R. Passenger Corp.—Conveyance of B&M Corp. Interests in Conn. River Line in Vt. & N.H.*, 6 I.C.C.2d 539, 564 (1990). This Court has interpreted § 7.1 of the TRO to provide that NECR is liable if the Derailment occurred

2

due to gross negligence on the part of NECR. Memorandum and Order [Dkt. #92] at 3-4 (July 24, 2007).

ST/BM contends that the condition of NECR's track caused the Derailment, that NECR is guilty of gross negligence, and that accordingly, NECR should absorb its own damages and be held liable for ST/BM's damages. NECR contends, on the other hand, that it was not grossly negligent, that ST/BM was negligent, and that accordingly, ST/BM should absorb its own damages and be held liable for NECR's damages.

*Cause of the Derailment.* No less than four NECR employees involved in track maintenance and safety activities—including Michael Lawyer, who was designated as NECR's Rule 30(b)(6) witness on track conditions—testified at their depositions that they were unaware whether NECR had determined the cause of the Derailment and that in any event, they personally were unaware of the cause. Specifically, NECR's track inspector and roadmaster— surprisingly—testified that they did not know the cause of the Derailment. Rick Boucher Dep. at 18:1-20 (Exh. 1 hereto); Michael Lawyer Dep. at 32:15-33:8 (Exh. 2 hereto). Richard Boucher, NECR's track supervisor,[1] testified that he didn't investigate the cause of the Derailment and that NECR's Rick Boucher and Michael Lawyer had done that. Richard Boucher Dep. at 13:6-17 (Exh. 2 hereto). Rick Boucher testified that although he participated in the NECR's investigation, he did not know the cause. Rick Boucher Dep. at 17:22-18:20 (Exh. 1 hereto). Finally, Michael Lawyer, who was offered by NECR as its corporate witness on track conditions before and after the Derailment, *see* Fed. R. Civ. P. 30(b)(6), testified that he didn't know whether NECR had determined a cause of the Derailment. Michael Lawyer Dep. at 32:15-33:8 (Exh. 3 hereto).

---

[1] NECR employs *Rick* Boucher as a track inspector and *Richard* Boucher as a track supervisor.

*Use of accident reports filed with FRA.*  NECR has designated the accident reports filed with the Federal Railroad Administration ("FRA") by ST/BM as trial exhibits.  *See* Joint Pre-Trial Conference Memorandum [Dkt. #53], at 30 (Prop. NECR Exh. #17).  ST/BM timely has objected to such use of these documents.  *Id.* at 33.

*Standard of care for train crew.*  NECR has alleged negligence on the part of the ST/BM train crew.  *See, e.g.,* Amended Complaint [Dkt. #16], ¶¶ 22, 35, 53-60, 65-72.  NECR has not designated an expert witness on the standard of care for trainmen.

*Relevance of Section 7.1 of TRO.*  Section 7.1 of the TRO reads in pertinent part as follows:

> [E]ach party hereto shall be responsible for and shall assume all loss, damage or injury . . . to persons or property, including the cost of removing any trackage, repairing trackage and correction environmental damage, which may be caused by its engines, cars, trains or other on-track equipment . . . whether or not the condition or arrangement of the trackage contributes in any manner or to any extent to such loss, damage or injury . . . and for all loss or damage to its engines, cars, trains or other on-track equipment while on said trackage from any cause whatsoever . . . .

First and foremost, this provision is irrelevant to the jury's determination, which will be limited to whether NECR was guilty of gross negligence or willful misconduct.  For that reason alone the provision is irrelevant to the task of the jury.  Moreover, this provision, read literally and without benefit of this Court's interpretation, suggests—incorrectly—that ST/BM is liable for the Derailment even if NECR was guilty of gross negligence.

## Argument

### I.    NECR witnesses may not testify as to the cause of the Derailment.

No less than four NECR employees involved in track maintenance and safety—including Michael Lawyer, NECR's Rule 30(b)(6) witness on track conditions relating to the Derailment—testified at their depositions that they were unaware whether NECR had determined the cause of

4

the Derailment and that in any event, they were not personally knowledgeable of the cause. A corporate deponent has an affirmative duty under Federal Rule of Civil Procedure 30(b)(6) to produce such number of persons as will be able to give complete, knowledgeable and binding answers on its behalf. *See* James Wm. Moore et al., *Moore's Federal Practice*, ¶ 30.25[3] (3d ed. 1998); *see also Reilly v. NatWest Mkts. Group, Inc.*, 181 F.3d 253 (2d Cir. 1999); *King v. Pratt & Whitney*, 161 F.R.D. 475 (S.D. Fla. 1995) (if designated deponent cannot answer questions regarding subject matter in notice, organization has failed to comply with its obligations under Fed. R. Civ. P. 30(b)(6)).

Thus, NECR either failed to satisfy its Rule 30(b)(6) obligation to designate persons to testify as to matters known or reasonably available to the corporation, or NECR simply does not possess knowledge as to the cause of the Derailment. Under either scenario, the Court should prohibit NECR from introducing evidence in its direct (or rebuttal) case about which deposed NECR employees (including NECR's Rule 30(b)(6) witness regarding track conditions) were asked, but as to which such witnesses professed lack of knowledge or failure to recall.

**II.  Accident reports filed by ST/BM with the FRA may not be used in NECR's case in chief or rebuttal case, but may be used to refresh witnesses' recollection or for impeachment purposes.**

NECR has listed as a trial exhibit the accident report(s) filed by ST/BM with the FRA. *See* Joint Pre-Trial Conference Memorandum [Dkt. #53], at 30 (Prop. NECR Exh. #17). ST/BM timely has objected to such use of these documents. *Id.* at 33. 49 U.S.C. § 20903 provides, however, that "[n]o part of an accident or incident report filed by a railroad carrier under section 20901 of this title . . . may be used in a civil action for damages resulting from a matter

mentioned in the report." The statute is clear and ST/BM has found no case law suggesting that it means anything different from what it says.[2]

The statute does not, though, bar two collateral uses of accident/incident reports filed with the FRA—namely, to refresh a witness' recollection and for impeachment purposes. *Yanick v. Pennsylvania R. Co.*, 192 F. Supp. 373, 375-77 (E.D.N.Y. 1961); *see Ritts v. American Overseas Airlines, Inc.*, 97 F. Supp. 457 (S.D.N.Y. 1947) (interpreting Civil Aviation Act analog of § 20903); *Maxwell v. Fink*, 58 N.W.2d 415, 419 (Wisc. 1953) (same).

Accordingly, NECR should be prohibited from introducing any accident/incident reports filed by ST/BM with the FRA, but the parties should be permitted to make use of such documents for refreshment or impeachment purposes.

**III.    NECR may not adduce evidence as to the standard of care for the ST/BM train crew or as to whether the train crew met that standard.**

NECR has alleged negligence on the part of the ST/BM train crew, *see, e.g.,* Amended Complaint [Dkt. #16], ¶¶ 22, 35, 53-60, 65-72, but NECR has not designated an expert witness on the standard of care for trainmen. To establish negligence, the plaintiff must demonstrate that the defendant violated its duty of care to the plaintiff. *Greene v. Am. Radio Sys. Corp.*, 2001 WL 432496 (Mass. App. Div. April 20, 2001). This includes presenting expert testimony establishing the appropriate standard of care if the subject in question is related to some occupation or profession that is beyond the ken of the average layperson. *See District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000).

---

[2] The prohibition on the use of *reports filed with the FRA* does not extend to internal memoranda, including drafts of reports for FRA filing, *Villa v. Burlington N. & S.F. Ry. Co.*, 397 F.3d 1041, 1047 (8th Cir. 2005), nor does it extend to the testimony of eyewitnesses as to what they perceived, even if that information was used in preparing a report to the FRA, *Mower v. McCarthy*, 245 P.2d 224, 231-32 (Utah 1952) (interpreting 45 U.S.C. § 41, which is predecessor of 49 U.S.C. § 20903); *Gerow v. Seaboard Air Line Ry. Co.*, 123 S.E. 473, 474 (N.C. 1924); *Hines v. Kelley*, 252 S.W. 1033, 1036-37 (Tex. 1923). The original statute from which 49 U.S.C. 20903 is derived was enacted in 1910. Act of May 6, 1910, ch. 208, § 4, 36 Stat. 350, 351.

The proper standard of care for a train crew is not within the understanding of the average layperson, and NECR has not claimed otherwise.  Thus, NECR is obligated to designate an expert to testify as to the applicable standard.  NECR has not done so.  Accordingly, the Court should prohibit NECR from adducing evidence in its direct (or rebuttal) case regarding such standard or whether the ST/BM trainmen met such standard.  *See, e.g., McCue v. P. Gioioso & Sons, Inc.*, 2005 WL 2863144 at *4 (Mass. Super. Oct. 5, 2005) (plaintiff unable to establish defendant's breach of standard of care where plaintiff failed to designate his own expert on the applicable standard of care).

**IV.    NECR may not use Section 7.1 of the TRO because that provision is irrelevant and prejudicial.**

Federal Rule of Evidence 402 provides that only relevant evidence is admissible, and Federal Rule of Evidence 401 defines as "relevant" such "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 402, 401.

This Court has ruled that the liability standard under Section 7.1 of the TRO is gross negligence.  Memorandum and Order [Dkt. #92] at 3-4 (July 24, 2007).  Accordingly, Section 7.1 is irrelevant as a matter of evidentiary fact.  Indeed, the text of Section 7.1 is not probative of whether NECR was grossly negligent in its inspection, maintenance and repair of the track (i.e., the issue for the jury's determination).  Because Section 7.1 is irrelevant to the jury's determination, the Court should prohibit NECR from introducing the provision in evidence.

Further, even if Section 7.1 had some negligible probative value, such value is substantially outweighed by the danger of unfair prejudice, confusion and misleading the jury.  Federal Rule of Evidence 403 provides that relevant evidence may be excluded if the danger of unfair prejudice, confusion of the issues or misleading of the jury substantially outweighs the

evidence's probative value. Fed. R. Evid. 403; *see also Raymond v. Raymond Corp.*, 938 F.2d 1518 (1st Cir. 1991) (concluding that district court properly excluded prejudicial and confusing evidence under Rule 403); *La Plante v. Am. Honda Motor Co., Inc.*, 27 F.3d 731 (1st Cir. 1994) (holding unfairly prejudicial evidence inadmissible under Rule 403); WEINSTEIN'S FEDERAL EVIDENCE § 403.05 (2006) ("Relevant evidence may be excluded under Rule 403 whenever it might confuse the issues or mislead the jury.").

Section 7.1, read literally and without the benefit of this Court's interpretation, implies— incorrectly—that ST/BM is liable for the Derailment even if NECR was guilty of gross negligence. For that reason, even if Section 7.1 somehow were relevant to the jury's determination, any probative value of the provision is outweighed by the danger that the text of Section 7.1 will cause unfair prejudice to ST/BM, and confuse or mislead the jury. The Court therefore should prohibit NECR from introducing Section 7.1 in evidence, publishing Section 7.1 to the jury, or otherwise making use of Section 7.1 within the hearing of the jury.

## Conclusions

Accordingly, this Court should enter an order providing as follows:

1.        NECR is prohibited from introducing any evidence in its direct (or rebuttal) case about the cause of the Derailment because NECR employees (including NECR's Rule 30(b)(6) witness regarding track conditions, Michael Lawyer), when asked during their depositions, professed lack of knowledge or failure to recall.

2.        NECR, having failed to designate an expert on the issue of trainmen's standard of care, is prohibited from adducing evidence in its direct (or rebuttal) case regarding such standard or whether the ST/BM train crew met such standard.

3.     NECR is prohibited from introducing Section 7.1 of the TRO in evidence, publishing Section 7.1 to the jury, or otherwise making use of Section 7.1 within the hearing or sight of the jury.

4.     NECR may not introduce in evidence or otherwise make use of accident reports filed with the FRA by ST/BM, but either party may use such reports to refresh witnesses' recollection and to impeach witnesses.

Respectfully submitted,

Eric L. Hirschhorn
Debra R. Coletti
Winston & Strawn LLP
1700 K Street, NW
Washington DC 20006
202-282-5700

Robert B. Culliford (BBO #638468)
Pan Am Systems, Inc.
Pease International Tradeport
14 Aviation Drive
Portsmouth NH 03801
603-766-2002

*Attorneys for Defendants/Counterclaimants
Springfield Terminal Railway Company
and Boston and Maine Corporation*

August 10, 2007

# EXHIBIT 1

Page 1

1               UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
2

       - - - - - - - - - - - - - - - - - - - - -
3    NEW ENGLAND CENTRAL                    COPY
     RAILROAD, INC.
4                        Plaintiff,
5          VS.                      Civil Action No.
                                    04-30235-MAP
6    SPRINGFIELD TERMINAL RAILWAY
     COMPANY, ET AL.
7                        Defendants.
       - - - - - - - - - - - - - - - - - - - - -
8
9                  D E P O S I T I O N
                        -of-
10                 RICK T. BOUCHER
11        Taken on Wednesday, January 10, 2007,
                at the offices of
12        New England Central Railroad, Inc.
                St. Albans, Vermont.
13
14
15   APPEARANCES:
     ON BEHALF OF THE PLAINTIFF:
16   RICHARD A. DAVIDSON, JR., ESQ.
     Flynn & Associates, P.C.
17   400 Crown Colony Drive, Suite 200
     Quincy, MA 02169
18
     ON BEHALF OF THE DEFENDANT:
19   ROBERT B. CULLIFORD, ESQ.
     Senior Vice President and General Counsel
20   Pan Am Systems
     14 Aviation Avenue
21   Portsmouth, NH 03801
22              NORMA J. MILLER, RPR
          COURT REPORTERS ASSOCIATES
23             117 BANK STREET
            BURLINGTON, VT 05401
24             (802) 862-4593
25

Rick T. Boucher - 1/10/07

Page 6

1 inspection on June 8th, 2004. Are you familiar with
2 that inspection?
3    A. Yes.
4    Q. Now, just so I can keep this straight, were
5 you on the inspection car on June 8th, 2004?
6    A. No, I was not.
7    Q. Okay. Now it's finally clear. Are you aware
8 that the test car inspection of June 8th, 2004,
9 found a defective condition at approximately
10 Milepost 10.16?
11    A. Am I aware of?
12    Q. Pardon me?
13    A. Pardon me, could you repeat the question,
14 please?
15    Q. Sure, well, let me show you something first to
16 show you. This is Lawyer Exhibit 2. You'll see in
17 the upper right-hand corner there's a number 000797.
18 If you could just flip over to where that number is
19 000803. First of all, have you ever seen this
20 document before?
21    A. No, I haven't.
22    Q. You haven't? Okay. Okay, let's try it this
23 way. Prior to June 8th, 2004 -- we can move away
24 from this document for now. Prior to June 8th,
25 2004, were you inspecting as a track inspector for

Page 7

1 New England Central?
2    A. Yes.
3    Q. Were you inspecting the stretch of track
4 between Milepost 11 and Milepost 5?
5    A. Yeah.
6    Q. During the course of your inspections, did you
7 ever note a defect at Milepost 10.16?
8    A. No.
9    Q. You did not? After June 8th, 2004, did anyone
10 inform you that the test car had found a defect in
11 Milepost 10.16?
12    A. Yes.
13    Q. Who informed you of that?
14    A. Supervisor.
15    Q. Do you recall -- would you have been involved
16 at that point in deciding the appropriate remedial
17 action to be taken in response to that defect?
18    A. No.
19    Q. Who would have?
20    A. It was supervisor.
21    Q. And by supervisor, just who are you referring
22 to?
23    A. R.R. Boucher.
24    Q. Okay. Did he ever -- did R.R. Boucher ever
25 communicate to you what remedial action was taken in

Page 8

1 response to discovering this defect?
2    A. Not that I recall, I guess.
3    Q. Okay. But -- and help me here. You were
4 aware that there was a defect at Milepost 10.16
5 after June 8th, 2004?
6    A. Yeah.
7    Q. After June 18th, 2004, when was the next time
8 you inspected the area at or around Milepost 10.16?
9    A. I don't recall.
10    Q. How often were you inspecting the track
11 between Milepost 11 and Milepost --
12    A. Twice a week, under federal regulations. I
13 don't recall dates.
14    Q. Okay. Was it within two days, three days,
15 that day? You don't recall that? Doesn't have to
16 be the specific date, just --
17    A. I don't recall, yeah.
18    Q. Do you recall how many times -- do you recall
19 the first time you inspected -- I don't need to know
20 the date -- or how soon thereafter, when you went
21 out and inspected at Milepost 10.16, did you note
22 the defect then?
23    A. No.
24    Q. You didn't? You knew it existed, but you
25 didn't note --

Page 9

1    A. It was already documented.
2    Q. Yeah, but did you see it? Did you look at it
3 and say, Oh, I see now that that's a defect?
4    A. I believe it was predetermined before I had to
5 inspect it.
6    Q. I understand that, but okay, this is what I'm
7 asking you. Prior to June 8th, 2004, you were
8 inspecting the track?
9    A. Correct.
10    Q. You hadn't noticed a defect --
11    A. No.
12    Q. -- correct?
13    A. No.
14    Q. You were informed that there was a defect
15 there?
16    A. Correct.
17    Q. So when you went out there again and you're at
18 Milepost 10.16, did you note the defect? Did you
19 say, okay, that condition exists?
20    A. Prior to?
21    Q. After you were informed that it existed. You
22 didn't know it existed prior to June 8th?
23    A. Right.
24    Q. You found out on June 8th, or soon thereafter,
25 that it did exist?

eba2ed49-23ba-4953-841a-540d20aabde4

Rick T. Boucher - 1/10/07

Page 10

1   A. Right.
2   Q. Then you're out there inspecting twice a week
3   thereafter, correct?
4   A. Correct.
5   Q. So you get to Milepost 10.16. Did you see the
6   condition? In other words, when you're at Milepost
7   10.16 on your next inspection, did you agree that a
8   defective condition existed, looking at it that day?
9   A. Yes, and it was slowered.
10  Q. That's not what I'm asking. Do you agree with
11  what the FRA test truck found, that a condition
12  known as warp --
13  A. Yes, I agree.
14  Q. Based on your own personal observations, or
15  based on what you were told?
16  A. No, based on the measurements and GPS readings
17  given, that it was gone back and determined that it
18  was in fact there.
19  Q. Who determined that?
20  A. Myself and R.R. Boucher.
21  Q. So you did go out there after the test truck
22  had gone over it?
23  A. Correct.
24  Q. Knowing that the condition existed?
25  A. Yes.

Page 11

1   Q. And you agreed with the determination of the
2   test truck?
3   A. I mean it -- yes.
4   Q. Okay.
5   A. Agreed with the measurements that they'd given
6   us.
7   Q. How did you agree with the measurements? Did
8   you do your own measurements?
9   A. Yes, we did.
10  Q. Okay. So during the period June 8th, 2004, to
11  July 3rd, 2004, you're inspecting twice a week; is
12  that correct?
13  A. That's correct.
14  Q. Did you inspect at Milepost 10.16 twice a
15  week?
16  A. Yes.
17  Q. Did you do any additional measurements between
18  the initial measurement you did to confirm the FRA
19  test car results and July 3rd, 2004?
20  A. The date of -- or I guess I don't recall
21  exactly at what specific time we did the
22  measurements, but I know that we went well well north and
23  south of the location through the curve.
24  Q. Yeah?
25  A. The measurements.

Page 12

1   Q. I understand that. You did an initial
2   measurement to confirm the test results, correct?
3   A. Correct.
4   Q. What I'm asking you is were there any
5   subsequent measurements of the condition at Milepost
6   10.16 between your initial measurement and July 3rd,
7   2004, I guess I don't understand your question.
8   Q. Pardon me?
9   A. I guess I don't understand your question.
10  Q. You performed one measurement, if I understand
11  what you're saying, soon after the test truck went
12  over the line?
13  A. That's correct, yeah.
14  Q. All's I'm asking is did you do another
15  measurement after the initial one? We've got one in
16  the book.
17  A. Yeah.
18  Q. Did you ever do another measurement between
19  that initial measurement and July 3rd, 2004?
20  A. Not that I can recall, I guess, no.
21  Q. Do you recall going out there at your
22  twice-weekly inspections and noticing that the
23  condition remained the same, or was it worsening or
24  was it getting better?
25  A. To my knowledge, it remained the same.

Page 13

1   Q. Okay, did you notice that the track at
2   Milepost 10.16 was also out of alignment?
3   A. No.
4   Q. Okay. Did you notice a condition such as a
5   low joint where the joint on the low-end side was
6   sinking in the mud or the ballast was foul?
7   A. I don't recall.
8   Q. Okay, and seeing as how this condition existed
9   pretty close to a crossing, do you, as a normal
10  course of practice, sort of use a heightened sense
11  of an investigation at or near public grade
12  crossings?
13  A. Public grade or --
14  Q. Public at-grade crossings, yes, or private.
15  A. Yes.
16  Q. What more would you do at or near a public or
17  private at-grade crossing that you wouldn't do, say,
18  in the middle of nowhere?
19  A. Well, no, I feel I do an adequate job of the
20  entire lines.
21  Q. I understand that, and I'm glad you do.
22  A. I guess you say I stop for each crossing. I
23  guess other than that.
24  Q. What do you do when you stop at each crossing,
25  would probably be a good question.

4 (Pages 10 to 13)

Case 3:04-cv-30235-MAP    Document 61-9    Filed 03/23/2007    Page 5 of 7
Rick T. Boucher - 1/10/07

Page 14

1    A. As I do with the entire track, is visually
2    inspect the rail.
3    Q. Okay, of the actual rails in the road or the
4    area leading into the crossing?
5    A. As much as I can see.
6    Q. Well, what determines how much you can see?
7    A. I guess how wide my eyes are open.
8    Q. Okay, so you should be able to see everything,
9    I'm assuming.
10   A. Yeah. I mean --
11   Q. Yeah, okay. Were you involved with the
12   response to the derailment, the repair of the track,
13   subsequent to July 3rd, 2004?
14   A. No.
15   Q. No? Did you go out and inspect the track when
16   the repair was completed?
17   A. Yes.
18   Q. Okay. Was part of your -- I think you
19   answered this. Part of your territory included
20   where the train actually came off the tracks,
21   correct, where they were on their side?
22   A. Yeah.
23   Q. Was that area -- Prior to July 3rd, 2004, was
24   that area jointed rail or welded rail?
25   A. Prior -- it's jointed high side and welded on

Page 15

1    the low, I believe.
2    Q. Okay.
3    A. And it's been that way as long as I --
4    Q. Do you recall if that area today is now welded
5    rail on both sides?
6    A. No, it is not.
7    Q. It's not. Do you recall, as a result of this
8    derailment, welded rail being put in anywhere along
9    that stretch of track? You don't?
10   A. No.
11   Q. Okay.
12   A. Prior to this derailment?
13   Q. Post.
14   A. I mean there is welded rail, so it had to have
15   been put in sometime.
16   Q. Right, but since July 3rd, 2004?
17   A. Prior to?
18   Q. Post, after July 3rd, 2004, there was a
19   derailment?
20   A. No. After?
21   Q. Yes.
22   A. No rail that I know of.
23   Q. Okay. Do you recall what the condition of the
24   ties were between Milepost 5 and Milepost 11 prior
25   to July 3rd, 2004?

Page 16

1    A. I would say good.
2    Q. All of them?
3    A. Yes.
4    Q. Do you know how old those ties were?
5    A. No.
6    Q. Do you know when the last time a tie job had
7    been through that?
8    A. From what I believe, ten years, I guess.
9    Within the last ten.
10   Q. Do you know, as a matter of course, what the
11   average life of a tie is?
12   A. No. It varies. I mean --
13   Q. Okay. On what basis do you state that the
14   last tie job was probably ten years ago?
15   A. I can't recall the dates.
16   Q. Yeah, but you seem to believe that the last
17   tie job was ten years?
18   A. Within that.
19   Q. On what facts do you form that belief? Were
20   you told that?
21   A. Yes. Told.
22   Q. Who told you that?
23   A. Supervisor.
24   Q. R.R. Boucher?
25   A. That's correct.

Page 17

1    Q. Did you participate in preparing any cost
2    estimates or scopes of work relating to the repair
3    of the rail line after the derailment?
4    A. The only thing I participated in was driving
5    high-rail truck while the contractor was videotaping
6    or camcorder.
7    Q. Right, okay. Did you discuss costs?
8    A. No.
9    Q. Did you discuss budgets?
10   A. No.
11   Q. Work plans? While you were out there, you
12   didn't say we'll do X, Y, and Z here?
13   A. No. No. Was just driving the truck.
14   Q. Did you film it?
15   A. I was driving the truck, and he was filming.
16   That was it. There was no discussion.
17   Q. Do you participate in determining the cause of
18   derailments in -- let me put it to you this way. Do
19   you participate in investigations into the cause of
20   derailments?
21   A. Yeah.
22   Q. Did you participate in an investigation into
23   the cause of the derailment on July 3rd, 2004?
24   A. Yes, I did. Assisted Mike Lawyer in taking
25   measurements.

Case 3:04-cv-30235-MAP     Document 61-9     Filed 03/23/2007     Page 6 of 7
Rick T. Boucher - 1/10/07

Page 18

1  Q. Do you recall what the cause of the derailment
2  on July 3rd, 2004, was?
3  A. No.
4  Q. Okay, did I hear you correctly, though, you
5  did participate in the investigation?
6  A. Yes.
7  Q. And then what did you do, hand your findings
8  off to someone else?
9  A. I believe B and M was right there writing down
10  the track measurements as we were.
11  Q. But I'm not asking about B and M. I'm asking
12  about you and/or New England Central investigating
13  the derailment and determining the cause?
14  A. I didn't have anything to do with determining
15  the cause, other than assisting and taking track
16  measurements with the roadmaster.
17  Q. And who was the roadmaster?
18  A. Mike Lawyer.
19  Q. Okay. Do you have those measurements?
20  A. No, I do not.
21  Q. Okay. Do you know who does have them?
22  A. Well, other than B and M, Mike Lawyer.
23  Q. Okay, good. Did you participate in any -- in
24  preparing any budgets or cost estimates for either
25  the damage caused -- well, let's take that first

Page 19

1  question, is did you participate in any cost
2  estimates for the damage caused by the derailment to
3  the New England Central's line?
4  A. No.
5  Q. Did you participate in any budgets or cost
6  estimates for work to be done --
7  A. No.
8  Q. -- on the line?
9  A. No.
10  Q. Do you know who would have done that work?
11  A. I imagine the contractor, Mike Lawyer.
12  Q. Okay. If I could just ask you to look at one
13  thing, which is Lawyer Exhibit 3. Are you familiar
14  with that document, sir?
15  A. Yes.
16  Q. Could you identify it?
17  A. RailAmerica Engineering Standards and
18  Policies.
19  Q. Could you describe the purpose of that
20  document, to the best of your knowledge?
21  A. It's a guidelines, policies that we have to
22  follow.
23  Q. Guidelines for what?
24  A. For the railroad.
25  Q. For?

Page 20

1  A. For the line in which we inspect.
2  Q. Okay. Is that what you're saying?
3  A. Yeah, policies and standards.
4  Q. If I could just ask you to turn to -- and this
5  is difficult because there are no numbers, but it's
6  noted as 001044 would be the number -- it's a track
7  inspection report. Are you familiar with this
8  document, sir?
9  A. No.
10  Q. No? Okay. Does New England Central use a
11  different track inspection report form?
12  A. Yes, they do.
13  Q. Does the New England Central's track
14  inspection report contain all of the information
15  requested here?
16  A. Yes, to my knowledge.
17  Q. Do the New England Central track inspection
18  reports which you --
19  A. Other than I guess other than -- yeah, to my
20  knowledge.
21  Q. Do they contain a section to describe the
22  exception or condition on the track noted?
23  A. Yes.
24  Q. Do they contain a section to identify the
25  remedial action taken in response to the

Page 21

1  description?
2  A. Yes. Under "remarks."
3  Q. Pardon?
4  A. Remarks.
5  Q. So when you're out there, what you're saying
6  is that you have a form, and if you see a defect,
7  you note it on the form?
8  A. Correct.
9  Q. Even if that's a continuing defect, would you
10  still do that?
11  A. Not required. That I --
12  Q. Okay, you note the defect on the first day you
13  see it; is that correct?
14  A. Correct.
15  Q. And then do you note what remedial action will
16  be taken, or do you fix it that day?
17  A. If we're able to fix it.
18  Q. But if you're not able to, do you note a date
19  by which the remedial action will be taken?
20  A. They're given 30 days.
21  Q. Okay. So this is what I'm trying to get to,
22  and I don't want to confuse anybody, but you go out
23  there, you see a defect, you note it, and you know
24  you have 30 days to fix it, correct? So when you go
25  out there the next time on your track inspection

Rick T. Boucher - 1/10/07

Page 22

1  report, do you note the defect again?
2    A.  Not within 30 days.
3    Q.  Okay.  Okay.  On your track inspection
4  reports, did you note the defect at Milepost 10.16
5  once you were aware of it?
6    A.  Not that I recall.
7    Q.  Why not?
8    A.  It was already documented from the geometry
9  car.
10    Q.  But it wasn't documented by you, was it?
11    A.  No.
12    Q.  It was never documented by you?
13    A.  No.
14    Q.  And you'd never seen that inspection report,
15  correct?
16    A.  This particular one?
17    Q.  I apologize.  We'll go back to Lawyer Exhibit
18  2.  Had you ever seen this document, sir?
19    A.  No.
20    Q.  So you never saw any documentation that noted
21  the defect at Milepost 10.16?
22    A.  General DOB.
23    Q.  You saw what?
24    A.  Daily operating bulletin.
25    Q.  But you never saw anything generated by the

Page 23

1  Track Inspection Department noting the defect?
2    A.  The --
3    Q.  And when the remedial action will be taken?
4    MR. DAVIDSON:  All right, answer the
5  question.
6    A.  Daily track bulletin gives the slow order.
7  It's a required document to have every day.
8    Q.  But you're the track inspector who's supposed
9  to do an inspection and note defects, correct, on
10  your track inspection?
11    A.  Found by myself.
12    Q.  Well, you went out and looked at the spot and
13  agreed that it was a defect, correct?
14    A.  Correct.
15    Q.  But you never noted.  It you just kind of
16  relied on what others were doing; is that correct?
17    MR. DAVIDSON:  I don't think that's a
18  fair characterization of his testimony in the
19  slightest.
20    MR. CULLIFORD:  I'm asking if it's
21  correct.  I'm not characterizing the testimony.  I'm
22  just asking if it's correct.
23    MR. DAVIDSON:  Well, the tone and
24  tenor of your last series of questioning says the
25  opposite.  He's testified --

Page 24

1    MR. CULLIFORD:  You're not going -- My
2  tone and tenor will not be reflected on the record,
3  but --
4    MR. DAVIDSON:  He's testified that
5  they went out right after they got the report and
6  verified that the track was, in fact, defective, so
7  he confirmed it on his own with his supervisor, and
8  then he noted it in the daily operating bulletin.
9  He saw it there; there's no reason -- He's testified
10  there's no reason to further note it in his reports,
11  but he sees it every day on the restrictions, still.
12  That's what he's testified to, and you're turning it
13  around somehow.
14    MR. CULLIFORD:  I'm not turning it
15  around.  I'm simply asking this.
16    MR. DAVIDSON:  I'm misunderstanding
17  what you're saying; it sounds like he's
18  misunderstanding what you're saying, as well.
19    MR. CULLIFORD:  I'm not trying to be
20  argumentative.  I apologize.
21    MR. DAVIDSON:  You're not.  I'm just
22  telling you it's not clear.
23  BY MR. CULLIFORD:
24    Q.  Are you aware of whether FRA requires the
25  information contained on this track inspection

Page 25

1  report?  In other words, this is what I'm trying to
2  get to, and we'll leave your report alone for a
3  minute, but the track inspection report would
4  contain all of this information.  Are you aware of
5  whether this is required by the FRA track safety
6  standards?
7    A.  Yes, it is.
8    Q.  Okay, and now presuming for the moment that
9  your track inspection safety reports have the same
10  thing, alls I'm asking is did you note anywhere for
11  the purposes of your records -- wait.  Are you
12  required to maintain your track inspection reports
13  for a certain period of time by the FRA?
14    A.  Yes.  One year.
15    Q.  For the purposes of your own records that FRA
16  requires you to keep and the information required to
17  be in them, did you note this defect in your track
18  inspection reports?
19    A.  Not that I recall.
20    Q.  Okay, if I could just refer you one more time
21  back to Lawyer Exhibit 2.  Okay?  Does this seem --
22  this is basically a seven-page document noting
23  conditions and defects.  Does this seem like a lot
24  of defects to you for a rail line the size of New
25  England Central or a rail line that was tested?  I'm

7 (Pages 22 to 25)

# EXHIBIT 2

Page 1

1                    UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
2

3     -------------------------------
      NEW ENGLAND CENTRAL
      RAILROAD, INC.
4                           Plaintiff,
5              VS.                        Civil Action No.
                                          04-30235-MAP
6     SPRINGFIELD TERMINAL RAILWAY
      COMPANY, ET AL.
7                           Defendants.
      -------------------------------
8
9                        D E P O S I T I O N
                              -of-
10                       RICHARD R. BOUCHER
11          Taken on Wednesday, January 10, 2007,
                        at the offices of
12           New England Central Railroad, Inc.
                     St. Albans, Vermont.
13
14
15    APPEARANCES:
      ON BEHALF OF THE PLAINTIFF:
16    RICHARD A. DAVIDSON, JR., ESQ.
      Flynn & Associates, P.C.
17    400 Crown Colony Drive, Suite 200
      Quincy, MA 02169
18
      ON BEHALF OF THE DEFENDANT:
19    ROBERT B. CULLIFORD, ESQ.
      Senior Vice President and General Counsel
20    Pan Am Systems
      14 Aviation Avenue
21    Portsmouth, NH 03801
22                       NORMA J. MILLER, RPR
                    COURT REPORTERS ASSOCIATES
23                       117 BANK STREET
                    BURLINGTON, VT 05401
24                       (802) 862-4593
25

COPY

Richard R. Boucher - 1/10/07

Page 6

1    2004, FRA rail test car inspection.
2    A. Yes.
3    Q. Did that inspection include Milepost 5 to
4    Milepost 11?
5    A. Yes.
6    Q. Were you on that test car?
7    A. Yes.
8    Q. What was your role on the test car that day?
9    A. I was keeping track of the restrictions and
10   relaying them to the train dispatch.
11   Q. Okay. If I could refer you to Lawyer Exhibit
12   2. Have you ever seen this document, sir? Take a
13   minute to look at it.
14   A. This?
15   Q. Yeah.
16   A. I need my glasses for that. Yes.
17   Q. Could you identify it?
18   A. Identify it?
19   Q. What is it?
20   A. This is the exception list from the FRA car,
21   I'm assuming, right?
22   Q. June 8th, 2004?
23   A. That's what it states here, yeah.
24   Q. Okay. Are you aware that this test car
25   inspection uncovered a defect at Milepost 10.16?

Page 7

1    A. Yes, I am.
2    Q. Do you know what that defect was?
3    A. Yeah, it was a warp, I believe.
4    Q. Would you like to -- if you'd like to look at
5    page -- if you go by the numbers up on the right, it
6    would be 803 where the next mark is?
7    A. Yup.
8    Q. Does that refresh your recollection?
9    A. Mm-hm.
10   Q. And so it was a warp condition?
11   A. Yes.
12   Q. Could you describe your understanding of what
13   a warp condition is?
14   A. What a warp condition is is a combination of
15   cross level from one side to the other.
16   Q. Meaning what? That exists every day, doesn't
17   it?
18   A. Yeah, to some extent.
19   Q. Could you explain what you mean by cross level
20   from one side to the other, just for a lay person
21   such as me?
22   A. Well, if, for instance, you have a join on one
23   side that's -- say it's down an inch, and then
24   within 62 feet, everything's measured 62-foot cores,
25   so if you had another joint within that 62 feet, per

Page 8

1    se, on the opposite side, you'd have a borderline
2    Class 3.
3    Q. What would be the condition of those joints
4    that would give rise to a warp?
5    A. They'd be considered a low joint.
6    Q. One low/one high, or both low?
7    A. No, both low.
8    Q. Okay.
9    A. Typically.
10   Q. Pardon?
11   A. Typically.
12   Q. Okay, in this situation that the condition
13   that existed?
14   A. That was, yes.
15   Q. Okay. Do you know what the proper remedial
16   action would be, pursuant to the FRA track safety
17   standards, once a warp condition is found?
18   A. What the remedial action would be?
19   Q. Yes.
20   A. Well, in that case, it would have been to tamp
21   it.
22   Q. Okay. Any other options?
23   A. None other than be restricted to -- you drop
24   it to the class that it's -- that it meets the
25   requirements that it meets.

Page 9

1    Q. Do you know what was done in this instance?
2    A. It was dropped to a Class 2.
3    Q. Do you know why it wasn't tamped?
4    A. Why it wasn't tamped? Yeah.
5    Q. Why?
6    A. We hadn't got there yet with our surfacing
7    equipment.
8    Q. Why not?
9    A. I had a -- if my memory serves me, I had -- my
10   operator went on vacation, and I didn't have an
11   operator for the machine.
12   Q. Okay.
13   A. It was in the scope of work to be done. We
14   just hadn't got that far with the equipment.
15   Q. When did you expect to get that work done?
16   A. It would have been done, I would guess, within
17   the next week or two.
18   Q. Okay.
19   A. Depending on what events took place.
20   Q. Can you describe to us your understanding of
21   how a warp condition could affect a train going over
22   this section of track?
23   A. How it could affect a train going over it?
24   Q. Sure.
25   A. How a warp would affect it?

4ea86ecd-2ff6-4609-94cf-76484430cfc7

Richard R. Boucher - 1/10/07

**Page 10**

1  Q. Yeah.
2  A. Well, it can cause rock in the train, sure.
3  Q. Can you describe what you mean by rock?
4  A. Well, it's a -- we call it harmonic rock, so
5  if you got a low joint and then another low joint,
6  and if they're within a prescribed distance, it can
7  cause rock motion in the train -- roll, rock,
8  whatever you want to call it.
9  Q. Could rock result in a condition known as
10  wheel lift? Are you familiar with that term?
11  A. Yeah.
12  Q. Could that condition result as a --
13  A. Could it result?
14  Q. Yeah.
15  A. If it was extreme enough, yeah.
16  Q. What would make it extreme? Do you know, in
17  generalities?
18  A. In generality, it would have been -- unless if
19  your joints were real low, excessively low.
20  Q. Do you know if that condition existed at
21  Milepost 10.16?
22  A. It did not. Definitely did not.
23  Q. Why not?
24  A. Because I took the track measurements. I
25  GPSed them that day. We get this GPS reading.

**Page 11**

1  Q. This is on June 8th, 2004?
2  A. Yes, I GPSed it and identified the defect.
3  Q. Subsequent to June 8th, 2004, up to July 3rd,
4  2004, did you ever take another measurement at that
5  location?
6  A. Did I personally?
7  Q. Yes.
8  A. No.
9  Q. Do you know if anyone from New England Central
10  ever took another measurement?
11  A. I'm not sure about that.
12  Q. Would it have been a common practice in the
13  Track Inspection Department to take another
14  measurement?
15  A. To take another one? Not unless it hasn't
16  been restricted or the slow order was --
17  Q. Were you aware of this condition before June
18  8th, 2004?
19  A. Definitely not. It would have been restricted
20  before.
21  Q. Would you call this condition -- is it a
22  difficult condition to notice without testing?
23  A. Some are. This particular one, static
24  measurements, you didn't have it. You had to add in
25  load. So you -- when you're taking track

**Page 12**

1  measurements, you look for indications that the
2  track may be pumping, or any movement in the ties.
3  In this particular case, as I remember, it was
4  within half an inch, but if you added in under load,
5  the combination of the two joints within 62 feet,
6  could you come up with it.
7  Q. Did you go out there again to Milepost 10.16,
8  after June 8th, 2004, between between June 8th, 2004
9  and --
10  A. After the car run.
11  Q. But I just wanted to be clear about the
12  timeline, between June 8th, and July 3rd, 2004, did
13  you go out there again?
14  A. I may have gone through that area, but not
15  sure.
16  Q. In what capacity would you have gone through
17  the area?
18  A. Maybe inspecting or high-railing for some
19  reason. I high-rail frequently. I do track
20  inspections.
21  Q. Okay, did you notice that the condition was
22  worsening?
23  A. No.
24  Q. Okay, if we could talk about the derailment of
25  July 3rd, 2004, you're familiar with that?

**Page 13**

1  A. Mm-hm.
2  Q. And the response to that derailment, both the
3  investigation and the repair of the rail line, if we
4  could spend a few minutes on that.
5  A. Okay.
6  Q. Did you investigate this derailment from a
7  standpoint of determining the cause?
8  A. No.
9  Q. Do you know who did?
10  A. RT, the track inspector, and the roadmaster.
11  Q. The track inspector being?
12  A. R.T.
13  MR. DAVIDSON: R.T. Boucher the
14  gentleman who was here before.
15  MR. CULLIFORD: Your son.
16  A. Yeah, he was the inspector. I got down there
17  later in the day.
18  Q. What was your role when you did get down
19  there?
20  A. Doing track repairs so we could run trains.
21  Q. Okay.
22  A. I walked a good portion of it --
23  Q. Okay.
24  A. -- to determine what needed to be repaired so
25  we could get trains over it.

4ea86ecd-2ff6-4609-94cf-76484430cfc7

# EXHIBIT 3

Michael Lawyer - 1/09/07

Page 1

1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2

         --------------------------------
3  NEW ENGLAND CENTRAL                        COPY
   RAILROAD, INC.
4                         Plaintiff,
5            VS.                          Civil Action No.
                                         04-30235-MAP
6  SPRINGFIELD TERMINAL RAILWAY
   COMPANY, ET AL.
7                         Defendants.
         --------------------------------
8
9                  D E P O S I T I O N
                         -of-
10                   MICHAEL LAWYER
11          Taken on Tuesday, January 9, 2007,
                  at the offices of
12          New England Central Railroad, Inc.
                  St. Albans, Vermont.
13
14
15  APPEARANCES:
    ON BEHALF OF THE PLAINTIFF:
16  RICHARD A. DAVIDSON, JR., ESQ.
    Flynn & Associates, P.C.
17  400 Crown Colony Drive, Suite 200
    Quincy, MA 02169
18
    ON BEHALF OF THE DEFENDANT:
19  ROBERT B. CULLIFORD, ESQ.
    Senior Vice President and General Counsel
20  Pan Am Systems
    14 Aviation Avenue
21  Portsmouth, NH 03801
22              NORMA J. MILLER, RPR
            COURT REPORTERS ASSOCIATES
23              117 BANK STREET
             BURLINGTON, VT 05401
24              (802) 862-4593
25

Case 3:04-cv-30235-MAP     Document 61-10     Filed 03/23/2007     Page 3 of 6
Michael Lawyer - 1/09/07

Page 18

1   Q. Well, how did you know that the slow order or
2   the speed would be reduced in response to that if
3   the decision was made -- in other words, what I
4   think you testified to and this is why I need your
5   help, is that the decision to reduce the speed on
6   this section of line was made while on the test car.
7   Did -- was that conveyed to you by Mr. Boucher on
8   the test car?
9       A. Our practice while on the test car is that
10  when a condition exists or pops up from the test
11  that needs the speed limited due to a defect, we
12  reduce the speed first, immediately after we go over
13  it, or before the track is given up behind the car,
14  and then verify it in the field in the subsequent
15  days, as soon as possible.
16      Q. So when you were on the test car, there was no
17  conversation between you and Richard Boucher saying,
18  "I'm going to drop the speed"?
19      A. Not specifically.
20      Q. But you, based on -- I'm sorry?
21      A. It's a given practice.
22      Q. So you assume that that was the remedial
23  action taken that day?
24      A. Yes.
25      Q. So did you ever go back to confirm that that

Page 19

1   remedial action was taken?
2       A. It should have been placed on a temporary Form
3   C bulletin, and then translated over to our daily
4   operating bulletin in the subsequent days. That
5   should be traceable.
6       Q. Okay, and it would remain on that bulletin
7   until it was corrected?
8       A. Yes.
9       Q. Do you know how this condition of warp or warp
10  62 could affect train operations?
11      A. As opposed -- are you talking about the track
12  speed could affect it, or what --
13      Q. No, the train going -- you identified -- could
14  you repeat your definition of what warp is?
15      A. It's a difference in cross level in a 62-foot
16  segment of track.
17      Q. What does that mean to a layman?
18      A. One rail is higher than another, or the --
19  Excuse me while I figure out the best way to explain
20  it. When you look at the two rails in proportion to
21  each one, one is higher than the other in some
22  cases, as it would be in a curve. A warp would be
23  that it changes too drastically in a 62-foot
24  segment.
25      Q. Okay, so this drastic change, does that

Page 20

1   affect, at whatever speed, how a train would operate
2   over that segment of track?
3       A. It would affect it in rocking, mostly.
4       Q. What do you mean by rock?
5       A. The rail car could rock if there is too much
6   of a change in a certain distance at a certain
7   speed.
8       Q. What would that certain speed be, do you know?
9       A. That's too general. I -- specifically I
10  couldn't tell you what speed would cause what amount
11  of rock. It's based on several factors. There's
12  the car loading. There's no given amount that a car
13  rocks for a certain defect. It's car loading,
14  center of gravity, all that would take into
15  consideration.
16      Q. Do you know if FRA publishes any guidelines or
17  regulations regarding when rock would occur?
18      A. Not when rock would occur. They have
19  guidelines that tell you the maximum allowable,
20  which is what this is referring to, this report from
21  the exception list there. There is a table in the
22  CFR that tells you what the maximum allowable change
23  in a 62-foot segment of track is for each section of
24  track.
25      Q. Correct, but the FRA does publish guidelines

Page 21

1   to some extent?
2       A. Outside of the regulation, I'm not aware of a
3   guideline.
4       Q. Okay. So you're not aware of a theory, let's
5   call it for now, that rock would be more likely to
6   occur under these conditions at a slower speed?
7       A. A theory, no. I'm familiar with the
8   regulation only.
9       Q. Do the regulations say that rock would -- the
10  slower the speed, the more likely rock would occur?
11      A. No, it doesn't speak to rock. It -- you asked
12  what a car would do if it gave -- if it was
13  subjected to this condition.
14      Q. Yeah.
15      A. And I told you it would rock. That's why
16  there's a restriction placed on it, but I don't know
17  of any guidance from the FRA that tells you this
18  specifically.
19      Q. Would anyone from New England Central be aware
20  of that?
21      A. Not to my knowledge.
22      Q. Are you familiar with the term, "wheel lift"?
23      A. Yes.
24      Q. Could you describe what that refers to -- in
25  to your knowledge in the railroad industry,

782b682f-c05b-4b2d-87cb-cf36d984e9b2

Michael Lawyer - 1/09/07

**Page 22**

1 obviously?
2   A.  Wheel lift would typically be the flange of
3 the wheel is allowed to come up onto the rail, or
4 partially onto the rail head, as opposed to riding
5 on the gauged side of the rail, and it's usually an
6 imbalance that causes it.
7   Q.  What do you mean by an imbalance?
8   A.  Something causes the other side of the car to
9 go down, so the wheel lifts on the opposite -- it
10 rocks.
11   Q.  So if one side of the rail is higher than the
12 other, could that cause wheel lift?
13   A.  That's kind of general.  In a curve, it's
14 standard to have one side higher than another.
15   Q.  If one side is higher than the other, so as to
16 result in the warp condition, could that cause wheel
17 lift?
18   A.  Please repeat that.  You lost me.
19   Q.  Okay, I understand that one rail can be higher
20 than the other, but if one rail -- if that -- that's
21 fine, but at the same time, if one rail is higher
22 than the other and a condition of warp is created,
23 correct?
24   A.  Yes.
25   Q.  Could that condition of warp in that instance

**Page 23**

1 cause wheel lift?
2   A.  You're asking me to speak to something that
3 I'm not an expert on.
4   Q.  I'm asking -- I'm just asking you for your
5 position.
6   A.  I can't say what degree of lift would be
7 caused by what condition of track.  All I know is
8 that the CFR and the Federal Railroad Administration
9 give a list of criteria that are safe for certain
10 standards of track, and that's what we go by.
11   Q.  Okay, other than dropping the speed on the
12 line to the next class, what other remedial options
13 were available, if any?
14   A.  Repair the condition.
15   Q.  Was that considered?
16   A.  Yes.
17   Q.  Okay.  When was that option considered?
18   A.  It's considered immediately after the test,
19 but we repair them not necessarily in the order they
20 were found, but on a basis of when we can fix each
21 individual one.  Our machines may not have been in
22 the area at the time, so we were most likely fixing
23 other ones, but not that one at that given point.
24   Q.  At what given point?
25   A.  Well, right after the test.

**Page 24**

1   Q.  Okay.  What about in the period between June
2 8th, 2004, and July 3rd, 2004?
3   A.  We had not done work on that specific defect.
4 We had been doing work on other ones.
5   Q.  Why would you not elect to perform work at
6 this location on this defect in the period June 8,
7 2004, to July 3rd, 2004?
8   A.  It wasn't that we had not elected to.  We
9 hadn't got to it yet.
10   Q.  So you gave priority to repairing other
11 defects over repairing this defect; is that a
12 correct statement?
13   A.  I don't know as it was on a prioritization
14 basis, just necessarily first come-first served, or
15 what we came across first.
16   Q.  So if one defect was worse than another, that
17 wouldn't enter into your thinking as to when you
18 address it?
19   A.  It would be based on the condition that
20 existed and how it would be prioritized, but they
21 were -- if they were something we could provide
22 remedial action by slow-ordering the track, we did.
23   Q.  Okay, was it you were addressing the defects
24 on a first-come-first-serve basis, or addressing
25 defects based on a prioritization?

**Page 25**

1   A.  There's two levels of defect in my mind that
2 we look at.  One that shows a Class 0, which needs
3 to be addressed immediately.  That it is not
4 necessarily safe for operations.  Those are the
5 first.  Those are prioritized.  We have to do those
6 first.  And then after that, it becomes a basis of
7 when we can get the machine to them.  Usually we do
8 them in order, first come, first serve.  If there's
9 a larger problem that is going to take more time and
10 effort, we may jump over that and prioritize in that
11 respect.  There's not a great deal of thought that
12 goes into let's fix these, if we had 50 defects,
13 let's fix them in this order, 1, 2, 3, all the way
14 up to 50 -- that's not the case.  There are some
15 that require immediate attention, other ones that we
16 can do in a first-come-first-serve basis.
17   Q.  Could you take a look at Lawyer Exhibit 2
18 again, which is the test results?
19   A.  Okay.
20   Q.  Could you go through here and identify for me,
21 anyway, what some of the more significant defects
22 would be?
23   A.  As far as prioritization?
24   Q.  Yes.
25   A.  The first page would be marked in the third

782b682f-c05b-4b2d-87cb-cf36d984e9b2

Page 26

1  column as 120.99.  It's a cross level defect.
2  Q.  And what type of defect is a cross level
3  defect?
4  A.  It's a the maximum allowable, and this is in
5  tangent track, cannot be more than three inches.
6  This is 3.31.
7  Q.  Does that have any relation at all to a warp
8  condition?
9  A.  No, they're two different defects.  They're
10  both with regard to geometry of track, but --
11  Q.  And why would you consider that to be a more
12  significant defect than a warp condition?
13  A.  Because the limiting class was 0, meaning that
14  it needed to be resolved before we could send
15  another train over it.
16  Q.  Okay, whether trains could operate over the
17  line -- Was your main consideration keeping trains
18  running when you decided which defects to address?
19  A.  Yes.
20  Q.  And that consideration was driven by basically
21  the track class that was identified by the test
22  truck?  What I'm trying to get at is on these test
23  results, wherever there's a limiting class of zero,
24  a train could not operate over that segment of track
25  until the defect was corrected; is that a true

Page 27

1  statement?
2  A.  Yes.
3  Q.  So what causes -- I guess what I'm trying to
4  get to is what causes a limiting class of zero
5  versus a limiting class, say, of 2?
6  A.  With respect to cause, it would depend upon
7  the defect.
8  Q.  In other words, does a more severe defect lead
9  to a lower limiting class, is I guess basically what
10  I'm asking.
11  A.  Yes.
12  Q.  And during the period June 8th to July 3rd,
13  2004, were all of the areas identified by a limiting
14  class of zero addressed by New England Central?
15  A.  Yes.
16  Q.  Was that basically done right after June 8th,
17  2004?
18  A.  As I recall, everything was dealt with on June
19  8th that was found on June 8th with respect to
20  zeroes.
21  Q.  Then what's the next -- what would the next
22  category of defects be for remedial action?  You've
23  taken care of the limiting class zero.  What was
24  your plan -- or New England Central's plan, for that
25  matter -- to address the additional defects on this

Page 28

1  report?
2  A.  It would be dependent upon the type of defect
3  and what the repair would be.  For instance, if it
4  was a short gauge defect that didn't involve our
5  tamper and regulator to travel to it, we could take
6  a truck with a couple guys in it and repair the
7  defect.  So that was based, I guess, upon what the
8  repair would be and the magnitude of it.  If it was
9  a geometry condition or a surface condition that
10  would require the tamper to do work on it, we would
11  wait for the tamper to get to that point, because
12  it's not cost-effective to travel it up and down the
13  track.  You travel it in one direction and hit every
14  defect as you come to it, first-come, first-served.
15  Q.  And where did the -- okay, so for any of the
16  limiting Class 3 defects were tampers and
17  regulators --
18  A.  I don't recall specifically.
19  Q.  Would a tamper or a regulator be necessary to
20  rectify a condition identified as cross level?
21  A.  Not necessarily.
22  Q.  Could you flesh that out a bit?
23  A.  You could do it by hand.  Meaning -- well,
24  there's a couple different alternatives.  Jacking
25  the track with track jacks and tamping with a

Page 29

1  tamping stick to get the stone underneath the ties
2  could be done.  It's a more labor-intensive and
3  time-consuming deal, but in this event, if we had a
4  zero, we would have done that if the tamper wasn't
5  close by.
6  Q.  Could that method have been used at Milepost
7  10.16, as well?
8  A.  Could have been, yeah.
9  Q.  So it's safe to say that after June 8th, you
10  and/or NECR came up with a plan to address the
11  defects noted on Lawyer Exhibit 2, correct?
12  A.  Yes.
13  Q.  Who was involved in those discussions?
14  A.  It would have been myself and Richard Boucher.
15  Q.  Anyone else?
16  A.  Possibly Joe Spirk, the chief engineer.
17  Q.  What about Charles Moore?
18  A.  He would have probably not been terribly
19  involved in the decision on how to address them.
20  Q.  How many discussions do you think you had with
21  Mr. Boucher regarding a plan to address these
22  defects?
23  A.  It would be hard to say.  We speak daily,
24  discuss status.
25  Q.  Would he ever submit anything in writing to

Page 30

1  you?
2      A. No.
3      Q. Why not?
4      A. There was no need. We talk daily.
5      Q. Was it NECR's plan to fund these remedial
6  actions in response to the defects noted on the plan
7  from NECR funds, or were you seeking any sort of
8  public, state, federal funding to perform this work?
9      A. No. NECR funds would have been used.
10     Q. Does NECR receive much public funding for
11 maintenance and/or capital work on the line?
12     A. Very little.
13     Q. Does Amtrak pay NECR a trackage rights fee or
14 a fee to utilize the track?
15     A. Yes.
16     Q. Is part of that fee aimed towards maintenance
17 of the track?
18     A. Yes.
19     Q. Would that be public funding?
20     A. I guess that would revert back to what the
21 Amtrak structure is. I don't know if I could speak
22 to that.
23     Q. How much annually, on average, does NECR
24 receive from Amtrak?
25         MR. DAVIDSON: Objection. He's not

Page 31

1  identified to speak to those issues. There are
2  people in the company --
3         MR. CULLIFORD: Okay, good point.
4         MR. DAVIDSON: -- more qualified than
5  Mr. Lawyer to answer those questions. And if you
6  want to go down that road, we can schedule someone
7  else to be in here to talk about the Amtrak issues,
8  in terms of funding, accounts, and all that other
9  kind of fun stuff.
10        MR. CULLIFORD: Let me check one
11 thing. I see what you're saying, though.
12        MR. DAVIDSON: I believe that would be
13 Tammy Campbell, correct?
14        THE WITNESS: Probably.
15        MR. CULLIFORD: Well, let me ask you
16 this, then. We seem to be making good progress.
17 There's going to be one or two questions hopefully
18 about the performance pay.
19        MR. DAVIDSON: That's outside the
20 scope of your work, right? Amtrak, the payments?
21        THE WITNESS: Yeah, I don't get
22 involved with billing and --
23        MR. CULLIFORD: What I'm trying to get
24 to is should we keep going down this road, and then
25 at the end maybe talk to somebody else?

Page 32

1         MR. DAVIDSON: About Amtrak issues and
2  Amtrak payments and funding and all that, yeah, it
3  would be someone else.
4         MR. CULLIFORD: That's fine. So we'll
5  finish up here, and then we'll come back. Okay.
6  BY MR. CULLIFORD:
7      Q. To the best of your knowledge, or the best of
8  New England Central's knowledge, can a warp
9  condition identified at Milepost 10.16 cause a
10 derailment?
11     A. Could you restate that question?
12     Q. Let me put it to you this way: Is another
13 term for a warp condition super elevation?
14     A. No, not necessarily.
15     Q. Okay. Has New England Central, or have you
16 personally, identified the cause of this derailment?
17     A. I have not personally, no.
18     Q. Do you know if New England Central has or --
19     A. I don't know if we determined the cause.
20     Q. Do you know who on behalf of New England
21 Central is required to identify the cause of a
22 derailment, either for reporting to FRA or for
23 internal use?
24     A. Generally, all of the departments feed
25 information to the general manager, who determines

Page 33

1  the cause based on that. It's a combined effort.
2      Q. On July 3rd, 2004, who was the general
3  manager?
4      A. It was vacant, and Regional Vice President
5  Charles Moore was assuming those roles.
6      Q. Do you know if Mr. Moore made a determination
7  as to the cause of this derailment?
8      A. I'm not aware of one.
9      Q. I'd like to show you another document if I
10 could, sir. We're done with the report for now.
11 Are you familiar with this document, sir?
12     A. Yes, I am.
13     Q. Would you identify what it is?
14     A. RailAmerica Engineering Standards and
15 Policies.
16     Q. And could you describe the relationship
17 between New England Central and RailAmerica?
18     A. RailAmerica is the holding company that owns
19 New England Central.
20     Q. Okay. Are these standards and policies
21 intended -- Is New England Central required to
22 perform its operations in compliance with these
23 standards and policies?
24     A. Required as a standard? It's something we
25 should follow. Policies are more of a requirement.