UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CENTRAL RAILROAD, INC.,
Plaintiff,

v.

SPRINGFIELD TERMINAL RAILWAY
COMPANY and BOSTON AND MAINE
CORPORATION,
Defendants

Civil Action No.:   04-30235-MAP

## PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF THE DEFENDANTS' LIABILITY EXPERT, ROGER D. BERGERON

The plaintiff, New England Central Railroad, Inc. ("NECR"), hereby files this *Motion in Limine to Exclude the Testimony of the Defendants' Liability Expert, Roger D. Bergeron.* As grounds therefore, the defendant states as follows:

### I.      FACTUAL BACKGROUND:

On July 3, 2004, employees of the STRC/B&M (Peter Kari and Joseph Scappace) were operating an STRC/B&M freight train over a section of the NECR's mainline (the Connecticut River Line*)* which is subject to the *Trackage Rights Agreement* ("Agreement") in effect between the parties*. See Amended Complaint* at ¶ 20; *see also* the parties' *Joint Pre-Trial Conference Memorandum* ("Memorandum"), at § II.  The locomotives and freight cars involved in the derailment were either owned by and/or in the possession, custody and/or control of and being operated by the defendants.  Id.  The train derailed and caused extensive damage to the NECR's trackage and related property in the area of the derailment.  See *Amended Complaint* Id. at ¶ 21-26; *Memorandum*, at ¶ II, C.

The initial derailment occurred at Mile Post 10.18 when a portion of a single freight car came off the tracks. Id. The defendants' crew failed to immediately recognize that this freight car had derailed and continued to operate the train as if there was nothing wrong, dragging the car approximately 5 miles, causing damage to the NECR's trackage and related structures all along the way. *Memorandum*, at ¶¶ II, F and G. The derailed freight car ultimately, at Mile Post 5.7,[1] caused several other railcars to also derail, resulting in a pile up of railcars. Id. at ¶ II, H. The pile up caused additional damage to the track and track structure at and around Mile Post 5.7. Id. at ¶ II, I. The derailment shut down rail traffic over the Connecticut River Line for a period of time after the derailment. Id. at ¶ II, J.

**A.    June 8, 2004, FRA Track Geometry Test:**

On June 8, 2004, less than one month before the derailment, the Federal Railroad Administration ("FRA") had conducted a "Track Geometry Test" on the Connecticut River Line.[2] *Memorandum*, at ¶ II, M. According to the June 8, 2004 Track Geometry Inspection Report, there were areas on the Connecticut River Line where the classification of the track was reduced due to defects that were determined by the geometry test. The NECR immediately after receiving the Report imposed the reduced classifications at those areas and set about rectifying the most serious of the defects. *See* the transcript of the deposition of Michael Lawyer, the relevant portions of which are attached as Exhibit "A," at p. 23-29.[3]

---

[1] The train was traveling from north to south. The mile posts are descending when traveling in this direction.

[2] A "Geometry Test" is performed by a specially equipped weighted railcar that travels over the tracks and records various measurements of track conditions, including defects.

[3] Mr. Lawyer is the NECR's Roadmaster. His duties include overseeing the condition of NECR's track, to operations of the NECR's track department and compliance with federal regulations concerning track condition, maintenance, inspection and repair.

**B.**    **Point of Derailment and Nearest FRA Defect:**

The initial point of derailment was MP 10.18. There were no defects found at this point

by the June 8, 2004, *Track Geometry Test. See Rule 30(b)(6) Deposition of Springfield Terminal*

*Railway by Roger Bergeron*, a copy of the relevant portions of which are attached as Exhibit

"B," at p. 82-84. The closest defect noted to the point of derailment was located at MP 10.16,

which was approximately 105.6 feet south of MP 10.18. Id.; see also *Track Geometry Inspection*

*Report*, a copy of the relevant portions of which is attached as Exhibit "C." Thus, by the time the

derailed freight car reached the defect at MP 10.16, it had already come off the track and its

wheels were on the ground. The allegedly defective condition of the track at MP 10.16, therefore

played no role in causing the derailment.

**C.**    **Derailment Damage to the NECR's Line Between MP 10.18 and MP 5.7:**

As a result of the derailment, the NECR was required to rebuild a substantial amount of

its *Line* between MP 10.18 and 5.7 which included the replacement of over 7,000 ties, 15,000 tie

plates, a bridge deck, segments of rail, tons of ballast, and rebuilding three grade crossings. The

NECR also suffered lost time incentive revenue from an agreement that it had with the National

Railroad Passenger Corporation ("AMTRAK"),[4] losses incurred from car hire and delays, as well

as moneys paid to its employees and materials required in order to restore the track back to its

previous condition.

**D.**    **Mr. Bergeron's Expert Opinion Testimony:**

Mr. Bergeron, to the extent that he has opined concerning issues relating to railroad

operations and/or mechanical issues, is not qualified to render such opinions, therefore any

reference to such opinions within his declarations must be stricken. Mr. Bergeron has testified

---

[4] Certain AMTRAK passenger trains travel daily over the Connecticut River Line. Exh. B at ¶ N, p. 11.

that during his career with the railroad that he has been a trackman (laborer), engineering

surveyor, construction inspector, resident engineer, a track supervisor, roadmaster, engineer of

track, engineer of production and construction, and at the times relevant held the position of

assistant vice-president of engineering. *See Declaration of Roger D. Bergeron in Support of*

*Defendant/Counterclaimants' Motion for Partial Summary Judgment* ("Declaration"), ¶ 2. He

has been employed by the defendants or their predecessor entities for the last 36 years. Id. Mr.

Bergeron attended college where he studied civil engineering and architecture, but never

graduated. Exhibit "B," at 12-13. His responsibilities for the defendants, at the time of the

derailment, consisted of the maintenance and inspection of all track and roadbed structures and

signal apparatus. *Declaration* at ¶ 3. At no time, has Mr. Bergeron held himself as having

training, experience, and/or qualifications concerning railroad operations and/or mechanical

matters.

## II.    DISCUSSION OF LAW:

### A.    Mr. Bergeron's Opinions Concerning Railroad Operations or Mechanical Matters are Inherently Unreliable:

The defendants intend to prove the NECR's alleged gross negligence through Mr.

Bergeron's alleged expert testimony; however, Mr. Bergeron must be precluded from testifying

concerning operational and/or mechanical issues or matters due to the fact that his opinions are

based on solely his own speculation and, therefore, fail to meet the requirements of Fed. R. Evid.

702 and the standards established by the Supreme Court in Daubert v. Merrill-Dow

Pharmaceuticals, Inc., 509 U.S. 579, 592-93 (1993) (requiring that to be admissible, an expert's

opinion must be based on "methods and procedures of science," and not simply pure speculation)

and failed to follow the defendants' procedures for investigating the cause of derailments. In the

absence of the requisite expert testimony, the defendants cannot meet their burden of proving the

4

cause of the derailment and thus their claim of gross negligence.

The admissibility of expert testimony is governed by Fed. R. Evid. 702,[5] which states in

pertinent part:

> [i]f scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The rule generally embodies the following factors, which were established by

the Supreme Court in Daubert v. Merrill Dow Pharmaceuticals, Inc. and Kumho Tire Co. v.

Carmichael, which a trial judge must consider when determining the admissibility of expert

testimony:

1. whether the expert's technique or theory can be or has been
   tested – that is, whether the expert's theory can be
   challenged in some objective sense, or whether it is instead
   simply a subjective, conclusory approach that cannot
   reasonably be assessed for reliability;

2. whether the technique or theory has been subject to peer
   review and publication;

3. the known or potential rate of error of the technique of
   theory when applied;

4. the existence and maintenance of standards and controls;
   and,

5. whether the technique or theory has been generally
   accepted in the scientific community.

---

[5] Fed. R. Evid. 702, and Daubert v. Merrill Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1317 (9th Cir. 1995) govern
the admissibility of expert testimony in FELA cases. *See* Claar v. Burlington N. R.R. Co., 29 F.3d 499, 504 (9th
Cir. 1994) (explaining that "[t]he standard of causation under the FELA and the standards for admission of expert
testimony under the Federal Rules of Evidence do not affect one another."); *see also* Eggar v. Burlington N. R.R.
Co., 1991 U.S. Dist. LEXIS 19240, *5-6 (D. Mont. 1991) (stating that the standard of proof applicable to FELA
cases does not modify "the evidentiary standards for evaluating the admissibility of expert testimony.").

Fed. R. Evid. 702, *2000 Amendment*; *see also* <u>Daubert</u>, 509 U.S. at 591-95.[6]

Trial judges are responsible for acting as gatekeepers who serve "to exclude unreliable expert testimony." Fed. R. Evid. 702, *2000 Amendments*; *see also* <u>Daubert</u>, 509 U.S. 579. When faced with the proffer of expert testimony under Rule 702, the trial judge, pursuant to Fed. R. Evid. 104(a),[7] must make a preliminary assessment of whether the testimony's underlying reasoning or methodology is scientifically or technically valid and can be properly applied to the facts at issue. <u>Daubert</u>, 509 U.S. at 592-93; <u>Kumho</u>, 526 U.S. 137, 141 (1999). The <u>Daubert</u> Court reasoned that an expert's opinion must be based on "methods and procedures of science," rather than on "subjective belief or unsupported speculation" to be admissible. <u>Daubert</u>, 509 U.S. at 592-93.

The more subjective and controversial the expert's inquiry, the more likely the testimony is to be excluded as unreliable. *See* <u>O'Conner v. Commonwealth Edison Co.</u>, 13 F.3d 1090 (7th Cir. 1994). An expert's opinion cannot be based solely on the weight of his own authority: "[n]othing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." <u>Polaino v. Bayer Corp.</u>, 122 F. Supp. 2d 63, 67 (D. Mass. 2000), *quoting* <u>General Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997). In addition, "[t]he expert must explain precisely how [he] went about

---

[6] Courts have used additional factors in determining whether an expert's testimony is sufficiently reliable to be admitted into evidence. *See, e.g.* <u>Daubert</u>, 43 F.3d at 1317 (stating that one such additional factor is whether an expert is "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying"); *see also* <u>Claar</u>, 29 F.3d 499 (excluding the expert's testimony for failure to account for obvious alternative explanations). In <u>In re: Paoli R.R. Yard PCB Litigation</u>, the court suggested that the following additional factors should be considered: (1) the existence of standards controlling the technique's operation; (2) the relationship of the technique to methods which have been established to be reliable; (3) the qualifications of the expert witness testifying based on the methodology; and (4) the non-judicial uses to which the method had been put. 35 F.3d 717, 742 n.8 (3rd Cir. 1994).

[7] Under Fed. R. Evid. 104(a), the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence. *See* <u>Bourjaily v. United States</u>, 483 U.S. 171 (1987).

6

reaching [his] conclusions and point to some objective source...to show that [he has] followed

the scientific method, as it is practiced by (at least) a recognized minority of scientists in [his]

field." Lust v. Merrell Dow Pharmaceuticals, Inc., 89 F.3d 594, 597 (9th Cir. 1996), *citing*

Daubert, 43 F.3d at 1317.

For several reasons, Mr. Bergeron's opinions simply cannot pass muster under Rule 702,

Daubert and its progeny. He has not based his opinions on any regulations, guidelines or

industry standards governing the specific conditions that existed at the time of the derailment

concerning the operation and/or mechanical operation of the railcars. He has failed to personally

follow any scientific method and has pointed to no scientific studies or tests to support his

opinions concerning the operational and/or mechanical aspects of the cause of the derailment.

Further, even if he did have the requisite experience, Mr. Bergeron failed to follow the rules and

procedures adopted by the defendants concerning investigating the cause of derailments.

Mr. Bergeron was not responsible for and made no inspection of the mechanical aspects

of the derailment investigation.[8] Mr. Bergeron was at the derailment site to gather facts and

investigate the derailment under the engineering discipline and is an FRA certified track

inspector. Exh. B, p. 24, 54-55. He was the person who, on behalf of the defendants, made a

determination as to the cause of the derailment. Id. at .52-53.

The transportation, mechanical and engineering officers of the defendant did not assist

Mr. Bergeron in determining the cause of the derailment. Id,. at 53-54. Mr. Bergeron was

unable to personally interpret and required the assistance of a mechanical officer to review and

---

[8] Jimmy Austin from the Mechanical Department was responsible for the re-railing operations and Walter Rice from the Engineering Department was responsible for track issued for the Springfield Terminal Railway Company ("STRC") at the derailment site. Exh. B, 18. Jimmy Austin was in charge of the derailment site on behalf of the STRC. Id. at 23.

interpret the event recorder download.[9] He also viewed the marks on the rail at the point of the derailment as part of his investigation, but he is not a field engineer. Id. at 57. The derailment pile-up site had already been altered by other workers by the time he arrived. Id. at 60. Mr. Bergeron relied on a mechanical officer to tell him that no mechanical components led to the derailment, but he did not know how the mechanical officer was able to come to that conclusion and failed to investigate those component parts himself. Id. at 69-70. Mr. Bergeron's sole contact with the operations officer was to inquire about the speed of the train, the throttle position of the engine, and the crew's rest time. Id. at 72-74. The track department officer never sat with Mr. Bergeron and discussed his findings or the derailment. Id. at 74.

Mr. Bergeron is not a qualified locomotive engineer and he is not aware whether the crew was ever interviewed concerning the derailment, therefore he has no knowledge, except for being read the event recorder download, as to whether the train was being properly operated at the moment of the derailment. Id. at 103 and 108. He further admits that he did not follow the defendants' rules and procedures for investigating derailments and did not investigate many of the possible causes for the derailment. Id. at 105, 126-131. In sum, his testimony is not at all based on any scientific principles, but solely on his subjective opinion, based on his observations at or near MP 10.18 as to what caused the derailment.

Mr. Bergeron's opinions are also not based on sufficient facts or data, nor are they the product of any reliable principles or methods which have been applied to this case. He did not inspect the railcar which derailed, appeared at the derailment site after it was changed or modified by clean-up crews, and did not inspect the mechanical component parts of the railcars which did and did not derail.

---

[9] The trains are equipped with an event recorder which records the settings of the throttle, brakes, and other various operating components as the train is operated on the tracks.

It is clear that under both Rule 702 and <u>Daubert</u>, to be admissible an expert's opinions must be based on scientific methods, not mere speculation or conjecture. That is simply not the case here. Mr. Bergeron's opinions are nothing more than speculation and conjecture, are also irrelevant pursuant to Fed. R. Evid. 401 and 402, and are therefore inadmissible.

### 1.    Mr. Bergeron Is Not Qualified to Opine as to the Cause of the Derailment:

Mr. Bergeron is expected to offer opinions on the cause of the derailment which includes disciplines from the engineer, mechanical and operational fields. He is solely a certified track inspector who has no training or experience in the mechanical and operational disciplines. He is not a mechanical engineer nor does he have the education, training or expertise in machinery design, operational analysis or even accident reconstruction in this area. He is not a certified locomotive engineer nor has he had any training and experience in locomotive operations. He is simply a certified track inspector and business development agent for the defendants.

**WHEREFORE,** for all of the above-stated reasons, the plaintiff's *Motion in Limine* should be <u>allowed</u>.

Respectfully submitted,
NEW ENGLAND CENTRAL RAILROAD, INC.,
by its attorneys,

_/s/ Richard A. Davidson, Jr._

| | |
|---|---|
| Michael B. Flynn | BBO# 559023 |
| *mbflynn@flynnassoc.com* | |
| Richard A. Davidson, Jr. | BBO# 552988 |
| *radavidsonjr@flynnassoc.com* | |
| FLYNN & ASSOCIATES, P.C. | |
| 400 Crown Colony Drive, Suite 200 | |
| Quincy, MA 02169 | |
| (617) 773-5500 | |

Dated: August 10, 2007

# EXHIBIT "A"

1

1    UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF MASSACHUSETTS

2

3    - - - - - - - - - - - - - - - - - - - - - - - - - -

     NEW ENGLAND CENTRAL                    COPY
     RAILROAD, INC.

4                        Plaintiff,

5         VS.                        Civil Action No.
                                     04-30235-MAP

6    SPRINGFIELD TERMINAL RAILWAY
     COMPANY, ET AL.

7                        Defendants.

     - - - - - - - - - - - - - - - - - - - - - - - - - -

8

9              D E P O S I T I O N
                    -of-
10             MICHAEL LAWYER

11       Taken on Tuesday, January 9, 2007,
              at the offices of
12       New England Central Railroad, Inc.
             St. Albans, Vermont.

13

14

15   APPEARANCES:
     ON BEHALF OF THE PLAINTIFF:
16   RICHARD A. DAVIDSON, JR., ESQ.
     Flynn & Associates, P.C.
17   400 Crown Colony Drive, Suite 200
     Quincy, MA 02169

18

     ON BEHALF OF THE DEFENDANT:
19   ROBERT B. CULLIFORD, ESQ.
     Senior Vice President and General Counsel
20   Pan Am Systems
     14 Aviation Avenue
21   Portsmouth, NH 03801

22             NORMA J. MILLER, RPR
           COURT REPORTERS ASSOCIATES
23             117 BANK STREET
           BURLINGTON, VT 05401
24             (802) 862-4593

25

1  cause wheel lift?

2     A.  You're asking me to speak to something that

3  I'm not an expert on.

4     Q.  I'm asking -- I'm just asking you for your

5  position.

6     A.  I can't say what degree of lift would be

7  caused by what condition of track.  All I know is

8  that the CFR and the Federal Railroad Administration

9  give a list of criteria that are safe for certain

10  standards of track, and that's what we go by.

11     Q.  Okay, other than dropping the speed on the

12  line to the next class, what other remedial options

13  were available, if any?

14     A.  Repair the condition.

15     Q.  Was that considered?

16     A.  Yes.

17     Q.  Okay.  When was that option considered?

18     A.  It's considered immediately after the test,

19  but we repair them not necessarily in the order they

20  were found, but on a basis of when we can fix each

21  individual one.  Our machines may not have been in

22  the area at the time, so we were most likely fixing

23  other ones, but not that one at that given point.

24     Q.  At what given point?

25     A.  Well, right after the test.

1    Q.   Okay.   What about in the period between June

2    8th, 2004, and July 3rd, 2004?

3    A.   We had not done work on that specific defect.

4    We had been doing work on other ones.

5    Q.   Why would you not elect to perform work at

6    this location on this defect in the period June 8,

7    2004, to July 3rd, 2004?

8    A.   It wasn't that we had not elected to.   We

9    hadn't got to it yet.

10   Q.   So you gave priority to repairing other

11   defects over repairing this defect; is that a

12   correct statement?

13   A.   I don't know as it was on a prioritization

14   basis, just necessarily first come-first served, or

15   what we came across first.

16   Q.   So if one defect was worse than another, that

17   wouldn't enter into your thinking as to when you

18   address it?

19   A.   It would be based on the condition that

20   existed and how it would be prioritized, but they

21   were -- if they were something we could provide

22   remedial action by slow-ordering the track, we did.

23   Q.   Okay, was it you were addressing the defects

24   on a first-come-first-serve basis, or addressing

25   defects based on a prioritization?

COURT REPORTERS ASSOCIATES

1    A.   There's two levels of defect in my mind that
2    we look at.   One that shows a Class 0, which needs
3    to be addressed immediately.   That it is not
4    necessarily safe for operations.   Those are the
5    first.   Those are prioritized.   We have to do those
6    first.   And then after that, it becomes a basis of
7    when we can get the machine to them.   Usually we do
8    them in order, first come, first serve.   If there's
9    a larger problem that is going to take more time and
10   effort, we may jump over that and prioritize in that
11   respect.   There's not a great deal of thought that
12   goes into let's fix these, if we had 50 defects,
13   let's fix them in this order, 1, 2, 3, all the way
14   up to 50 -- that's not the case.   There are some
15   that require immediate attention, other ones that we
16   can do in a first-come-first-serve basis.
17   Q.   Could you take a look at Lawyer Exhibit 2
18   again, which is the test results?
19   A.   Okay.
20   Q.   Could you go through here and identify for me,
21   anyway, what some of the more significant defects
22   would be?
23   A.   As far as prioritization?
24   Q.   Yes.
25   A.   The first page would be marked in the third

COURT REPORTERS ASSOCIATES

1    column as 120.99.  It's a cross level defect.

2      Q.  And what type of defect is a cross level

3    defect?

4      A.  It's a the maximum allowable, and this is in

5    tangent track, cannot be more than three inches.

6    This is 3.31.

7      Q.  Does that have any relation at all to a warp

8    condition?

9      A.  No, they're two different defects.  They're

10   both with regard to geometry of track, but --

11     Q.  And why would you consider that to be a more

12   significant defect than a warp condition?

13     A.  Because the limiting class was 0, meaning that

14   it needed to be resolved before we could send

15   another train over it.

16     Q.  Okay, whether trains could operate over the

17   line -- Was your main consideration keeping trains

18   running when you decided which defects to address?

19     A.  Yes.

20     Q.  And that consideration was driven by basically

21   the track class that was identified by the test

22   truck?  What I'm trying to get at is on these test

23   results, wherever there's a limiting class of zero,

24   a train could not operate over that segment of track

25   until the defect was corrected; is that a true

COURT REPORTERS ASSOCIATES

1    statement?

2      A.   Yes.

3      Q.   So what causes -- I guess what I'm trying to

4    get to is what causes a limiting class of zero

5    versus a limiting class, say, of 2?

6      A.   With respect to cause, it would depend upon

7    the defect.

8      Q.   In other words, does a more severe defect lead

9    to a lower limiting class, is I guess basically what

10   I'm asking.

11     A.   Yes.

12     Q.   And during the period June 8th to July 3rd,

13   2004, were all of the areas identified by a limiting

14   class of zero addressed by New England Central?

15     A.   Yes.

16     Q.   Was that basically done right after June 8th,

17   2004?

18     A.   As I recall, everything was dealt with on June

19   8th that was found on June 8th with respect to

20   zeroes.

21     Q.   Then what's the next -- what would the next

22   category of defects be for remedial action?  You've

23   taken care of the limiting class zero.  What was

24   your plan -- or New England Central's plan, for that

25   matter -- to address the additional defects on this

COURT REPORTERS ASSOCIATES

1  report?

2     A.  It would be dependent upon the type of defect

3  and what the repair would be.  For instance, if it

4  was a short gauge defect that didn't involve our

5  tamper and regulator to travel to it, we could take

6  a truck with a couple guys in it and repair the

7  defect.  So that was based, I guess, upon what the

8  repair would be and the magnitude of it.  If it was

9  a geometry condition or a surface condition that

10  would require the tamper to do work on it, we would

11  wait for the tamper to get to that point, because

12  it's not cost-effective to travel it up and down the

13  track.  You travel it in one direction and hit every

14  defect as you come to it, first-come, first-served.

15     Q.  And where did the -- okay, so for any of the

16  limiting Class 3 defects were tampers and

17  regulators --

18     A.  I don't recall specifically.

19     Q.  Would a tamper or a regulator be necessary to

20  rectify a condition identified as cross level?

21     A.  Not necessarily.

22     Q.  Could you flesh that out a bit?

23     A.  You could do it by hand.  Meaning -- well,

24  there's a couple different alternatives.  Jacking

25  the track with track jacks and tamping with a

1  tamping stick to get the stone underneath the ties

2  could be done.  It's a more labor-intensive and

3  time-consuming deal, but in this event, if we had a

4  zero, we would have done that if the tamper wasn't

5  close by.

6      Q.  Could that method have been used at Milepost

7  10.16, as well?

8      A.  Could have been, yeah.

9      Q.  So it's safe to say that after June 8th, you

10 and/or NECR came up with a plan to address the

11 defects noted on Lawyer Exhibit 2, correct?

12     A.  Yes.

13     Q.  Who was involved in those discussions?

14     A.  It would have been myself and Richard Boucher.

15     Q.  Anyone else?

16     A.  Possibly Joe Spirk, the chief engineer.

17     Q.  What about Charles Moore?

18     A.  He would have probably not been terribly

19 involved in the decision on how to address them.

20     Q.  How many discussions do you think you had with

21 Mr. Boucher regarding a plan to address these

22 defects?

23     A.  It would be hard to say.  We speak daily,

24 discuss status.

25     Q.  Would he ever submit anything in writing to

COURT REPORTERS ASSOCIATES

# EXHIBIT "B"

Volume 1, Pages 1-180

Exhibits: 10-26

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

NEW ENGLAND CENTRAL RAILROAD, INC.,

Plaintiff

v.                    Docket No. 04-30235-MAP

SPRINGFIELD TERMINAL RAILWAY

COMPANY and BOSTON AND MAINE

CORPORATION,

Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - -

RULE 30(b)(6) DEPOSITION OF SPRINGFIELD TERMINAL

RAILWAY COMPANY by ROGER D. BERGERON

Thursday, January 11, 2007, 10:11 a.m.

Law Office of Robert H. D'Auria

41 North Road, Suite 205

Bedford, Massachusetts  01730


- - - -Reporter:  Kathleen Mullen Silva, RPR, CRR- - - -

Beacon Hill Court Reporting, Inc.

807 Main Street, 2nd Floor

Worcester, Massachusetts 01610

508.753.9286

Roger D. Bergeron
January 11, 2007

82

1        A.   Warp, W-a-r-p, 62.

2        Q.   Now, in that report on that page, do you

3    see any exceptions taken at 10.18 by the FRA?

4        A.   At 10.18, no, I do not.

5        Q.   Do you see any exceptions taken at 10.17?

6        A.   No, I do not.

7        Q.   What about 10.19?

8        A.   No, I do not.

9        Q.   The only exception -- let me make sure I

10   phrase this correctly -- at milepost 10 or

11   thereabouts, between 11 and 10, was the one at

12   10.16, correct, according to the geometry test

13   results?

14       A.   According to their decimal location,

15   there's an indication that at 10.16 there was a

16   warp.

17       Q.   In that report off to your right on that

18   same line, it gives a longitude and latitude of that

19   location, correct?

20       A.   That is correct.

21       Q.   And if you and I were to go with our GPS

22   and plug in that longitude and latitude, we could go

23   out and locate that according to that data, correct?

24       A.   You can get pretty close to it, correct.

Roger D. Bergeron
January 11, 2007

83

1    Q.   You should be able to get almost on top of

2    it, correct?

3    A.   Almost, but not quite.

4    Q.   Almost.  I've given you the fudge factor

5    there.

6    A.   Yeah.

7    Q.   Now, 10.16 and 10.18 are how many feet

8    apart, those two mileposts?

9    A.   Between 10.16 and 10.18?

10    Q.   Yeah.

11    A.   Theoretically, under railroad terms, it

12    would be 104 feet apart roughly.

13    Q.   How long is a freight car?

14    A.   65 feet.  Well, they come in various sizes.

15    Q.   Well, how long would you say that freight

16    car is in Exhibit 19?

17    A.   I don't know specifically how long this

18    freight car is.

19    Q.   Okay.

20    A.   But freight cars vary in length from, you

21    know, 55 feet over the coupler to over the coupler,

22    to 65 feet over the coupler to over the coupler.

23    Q.   So it's approximately -- it could be two

24    car lengths apart or it could be 1 1/2 car lengths

Roger D. Bergeron
January 11, 2007

84

1    apart, those two mileposts, milepost 10.16 and

2    10.18?

3        A.   It could be.

4        Q.   It's 52.8 feet for every hundredth mile,

5    right?

6        A.   Yes.

7        Q.   Just want to make sure we're using the same

8    math, that's all.

9             Now, did you sketch out the mark on the

10   rail and diagram the length of the mark on the rail

11   from the flange as the wheel rose or lifted to the

12   time it left the rail?

13       A.   I'm not following.

14       Q.   When you found your point of derailment at

15   approximately 10.18, and you said earlier that you

16   saw this marking on a rail head, did you at any

17   point sketch that, draw it out?

18       A.   No, I did not draw it out.

19       Q.   Did you have a camera with you?

20       A.   I did not, no.

21       Q.   Did Mr. Griffiths?

22       A.   Not at the time, no.

23       Q.   So neither one of you took a picture of it

24   or drew it out?

# EXHIBIT "C"

Exception Report
## Quick Exception List
MP 131 to MP 121

NECR-0456
NH State Line to VT State Line
NECR

Page 7
06/08/04
NECR-0456

| MP | Feet | Decimal | Parameter | Value | Length | TSC | L-P Class | Track | Latitude | Longitude |
|----|------|---------|-----------|-------|--------|-----|-----------|-------|----------|-----------|
| 14 | 003195 | 13.40 | Warp 62 | 2.53 | 14 | T | 1 3 | 5 | 43.631789 | -072.330938 |
| 14 | 003216 | 13.39 | Warp 62 | 2.50 | 21 | T | 1 3 | 5 | 43.631733 | -072.330955 |
| 14 | 003899 | 13.26 | Warp 62 | 2.29 | 20 | T | 1 3 | 5 | 43.629898 | -072.331450 |
| 13 | 005288 | 13.00 | Down MP | 13.00 | | | | | 43.626187 | -072.332610 |
| 13 | 001290 | 12.76 | Crosslevel | 1.94 | 2 | T | 2 3 | 5 | 43.622734 | -072.333647 |
| 13 | 001348 | 12.75 | Warp 62 | 2.20 | 59 | T | 2 3 | 5 | 43.622577 | -072.333684 |
| 12 | 005299 | 12.00 | Down MP | 12.00 | | | | | 43.612155 | -072.334521 |
| 12 | 000610 | 11.88 | Gage Wide | 57.88 | 4 | S | 1 3 | 5 | 43.610577 | -072.333751 |
| 12 | 001496 | 11.72 | Warp 62 | 2.23 | 60 | S | 2 3 | 5 | 43.609052 | -072.331236 |
| 11 | 005270 | 11.00 | Down MP | 11.00 | | | | | 43.600404 | -072.331130 |
| 11 | 004448 | 10.16 | Warp 62 | 2.21 | 62 | S | 2 3 | 5 | 43.593081 | -072.344186 |
| 10 | 005295 | 10.00 | Down MP | 10.00 | | | | | 43.592571 | -072.347304 |
| 10 | 000878 | 09.84 | RQ CB Ver P-P | 0.44 | | | | | 43.591586 | -072.350306 |
| 9 | 005336 | 09.00 | Down MP | 9.00 | | | | | 43.586660 | -072.365683 |
| 8 | 005236 | 08.00 | Down MP | 8.00 | | | | | 43.578776 | -072.381403 |
| 8 | 000496 | 07.91 | Gage Wide | 58.01 | 11 | C | 0 3 | 5 | 43.577664 | -072.382453 |
| 8 | 004697 | 07.11 | RQ CB Ver P-P | 0.51 | | | | | 43.566425 | -072.384375 |
| 7 | 005292 | 07.00 | Down MP | 7.00 | | | | | 43.564791 | -072.384383 |
| 6 | 005302 | 06.00 | Down MP | 6.00 | | | | | 43.550259 | -072.384217 |
| 5 | 005257 | 05.00 | Down MP | 5.00 | | | | | 43.536267 | -072.388402 |
| 4 | 005308 | 04.00 | Down MP | 4.00 | | | | | 43.523335 | -072.397012 |
| 3 | 005298 | 03.00 | Down MP | 3.00 | | | | | 43.509675 | -072.399006 |
| 2 | 005289 | 02.00 | Down MP | 2.00 | | | | | 43.497811 | -072.388749 |
| 1 | 005308 | 01.00 | Down MP | 1.00 | | | | | 43.483966 | -072.384225 |
| 1 | 001474 | 00.72 | Warp 62 | 2.68 | 39 | S | 1 3 | 5 | 43.479936 | -072.384727 |
| 1 | 003443 | 00.35 | Crosslevel | 2.64 | 102 | T | 1 3 | 5 | 43.475512 | -072.386703 |
| 1 | 004384 | 00.17 | Gage Wide | 57.88 | 3 | S | 1 3 | 5 | 43.473574 | -072.388652 |
| 1 | 005140 | 00.03 | Warp 62 | 3.26 | 62 | S | 0 3 | 5 | 43.470865 | -072.389253 |
| 1 | 005322 - | 00.01 | State Line | NH | | | | | 43.469802 | -072.388827 |
| 169 | 005541 | 169.00 | Down MP | 169.00 | | | | | 43.468446 | -072.388259 |
| 169 | 000283 | 168.86 | Warp 62 | 2.43 | 62 | S | 1 3 | 5 | 43.466661 | -072.388046 |
| 169 | 000303 | 168.85 | Warp 62 | 2.37 | 60 | S | 1 3 | 5 | 43.466606 | -072.388049 |
| 169 | 001366 | 168.31 | Lmt Speed 3 | 47.00 | | | | | 43.455785 | -072.387753 |
| 168 | 001974 | 168.00 | Down MP | 168.00 | | | | | 43.454719 | -072.387455 |
| 168 | 000163 | 167.94 | Warp 62 | 2.21 | 62 | S | 2 3 | 5 | 43.453352 | -072.387024 |
| 168 | 000317 | 167.89 | Lmt Speed 3 | 30.00 | | | | | 43.448625 | -072.387966 |
| 167 | 002830 | 167.00 | Down MP | 167.00 | | | | | 43.440687 | -072.390679 |
| 166 | 005289 | 166.00 | Down MP | 166.00 | | | | | 43.426254 | -072.392015 |

**NOTES:**
Runoff exceptions are for information only
RQ (Ride Quality) exceptions are for information only