UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CENTRAL RAILROAD, INC.,
Plaintiff,

v.

Civil Action No.:   04-30235-MAP

SPRINGFIELD TERMINAL RAILWAY
COMPANY and BOSTON AND MAINE
CORPORATION,
Defendants

## PLAINTIFF'S MOTION IN LIMINE TO STRIKE THE DEFENDANTS' COUNTER-CLAIM, EXCLUDE WITNESSES, EVIDENCE AND/OR THEORIES OF LIABILITY – DUE TO THE DEFENDANTS' SPOLIATION OF MATERIAL/RELEVENT EVIDENCE

The plaintiff, New England Central Railroad, Inc. ("NECR"), hereby files this *Motion in Limine to Strike the Defendants' Counterclaim, Exclude Witnesses, Evidence and/or Theories of Liability – Due to the Defendants' Spoliation of Material/Relevant Evidence*. As grounds therefore, the plaintiff states the defendants have lost, destroyed or failed to preserve relevant factual evidence discovered or ascertained during the course of their investigation into the cause or happening of the derailment the substance of which the defendants rely upon in asserting the gross negligence counterclaim against the NECR.

Specifically, the defendants: (1) failed to preserve and, in fact, destroyed Mr. Bergeron's handwritten notes and calculations taken at the derailment scene; (2) failed to preserve their conductor's initial incident report concerning the derailment authored by the defendant's conductor; and (3) failed to preserve, by means of photographic evidence, the condition of the curve where Mr. Bergeron claims existed an obvious visual defect that caused the derailment.

The NECR seeks to the court to dismiss the defendants' gross negligence counterclaim; exclude Mr. Bergeron, his assistant, Engineer Kari, and Conductor Scappace from testifying at trial; exclude any and all evidence and/or information obtained or observed by Mr. Bergeron and/or his assistant at the derailment site; and/or, exclude any and all evidence contained within Conductor Scappace's incident report. In the alternative, the NECR seeks that the court instruct the jury as to the defendants' spoliation of relevant and material evidence in this action, as well as permit the NECR to argue all reasonable inferences therefrom to the jury.

## I.    FACTUAL BACKGROUND:

The defendants' Fed. R. Civ. P. 30(b)(6) designee, Roger D. Bergeron, investigated the cause and/or happening of the derailment and took notes, drew diagrams, and made visual observations on which the defendants, at trial, will rely upon in support of their allegations that the NECR was guilty of gross negligence in the maintenance and repair of its track. The defendants' conductor's original incident report, and copies thereof, completed on July 3, 2007, are missing and/or lost. Last, Mr. Bergeron observed "obvious" visual defects in the track at the curve located at or before MP 10.18 which he instructed his assistant to photograph and said photographs have not been produced.

### A.    Mr. Bergeron's Original Notes and Drawings:

The original Bergeron notes and drawings contained a number of calculations, measurement, and readings concerning the track layout and structure of the curve at or before Mile Post 10.18 where the defendants claim the cause of the derailment began. *See Rule 30(b)(6) Deposition of Springfield Terminal Railway Company*, p. 111-124, attached hereto as Exhibit "A." The original information contained in the notes and drawings was thrown away by Mr. Bergeron after he made a second drawing from the original information. Id.

2

Mr. Bergeron never shared his data with the NECR once he was done with his inspections and calculations of the curve in the NECR track at or before MP 10.18. Id. at 137. He stated that at that time the track was in compliance with then present speed restriction of 10 m.p.h. and he was done with his inspection, thus giving the impression that there was no need to share the information. Id. Mr. Bergeron's testimony was disingenuous, at best, in that he focused his investigation on the curve of the track where he knew that the NECR had not investigated as to a cause of the derailment, intentionally withheld the data and the results of his investigation, and knew that the NECR would re-surface that section of track as part of the derailment repairs to the line. Within days, the conditions at the curve, as allegedly found by Mr. Bergeron, were forever lost due to the fact that the NECR would re-surface the track which included lifting and re-setting the ballast and rails.

## B.    The Conductor's Original July 3rd Incident Report and Copies Missing:

The defendants' conductor was required to complete a full report as to the happening of the derailment, he completed the initial report, affixed a copy to his supervisor's door in East Deerfield, MA and then facsimiled a copy to the defendants' dispatching center in Billerica, MA. *See Deposition of Joseph C. Scappace, Jr.,* p. 46-56, 59, and 61, attached hereto as Exhibit "B." The defendants have failed to produce the original initial report, the copies of the reports posted on his supervisor's door or the one facsimiled to the dispatching center in Billerica or any copy of any of the three reports. The conductor drafted a "replacement" report about twenty days after he drafted the initial report and based his "replacement" report upon his notes, records, and memory at that time. Id. at p. 49. None of his notes or records, which he relied upon to draft the "replacement" report, were produced by the defendants.

3

**C.**    **The Defendants' Failed to Preserve Relevant Visual Evidence at the Curve:**

While Mr. Bergeron was at the scene he had an assistant with him, who was also an employee of the defendants, to whom he gave instructions of which that the assistant was to photograph the area of the track where Mr. Bergeron took his measurements and where he determined that the derailment occurred due to an obvious visual condition of the "defective" track. Exhibit "A," p. 140-142. Mr. Bergeron knew at the time that the conditions which needed to be photographed were significant to his investigation as to his determination as to the cause of the derailment. Id. In fact, the conditions which Mr. Bergeron observed later became the focus of his opinions as to the cause of the derailment which have been presented to this court in support of the defendants' motion for summary judgment. Id, *see Declaration of Roger D. Bergeron Filed in Support of the Defendants' Motion for Summary Judgment and/or for other Appropriate Relief,* ¶¶ 37-38, 42, a copy of which is attached hereto as Exhibit "C." None of the photographs have been produced by the defendants and appear to be missing.

In addition to not being able to view Mr. Bergeron's original notes and drawings the visual evidence was forever lost to the NECR due to the fact that, as part of its restoration of the five miles of derailment damaged track, it re-surfaced this track (which was just outside of the derailment damaged section of track) prior to re-opening the line after the track structure was repaired.

## II.    **DISCUSSION OF LAW:**

This is a diversity action and, in such an action, this court is required to apply state substantive law and federal procedural law. Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1983). The rules of evidence are generally considered procedural which means that, even in diversity actions, the court apply applicable federal law with respect to evidentiary issues. Headley v.

4

Chrysler Motor Corp., 141 F.R.D. 362, 364-65 (D.Mass. 1991); *see also* Carota v. Johns
Manville Corp., 893 F.2d 448 (1st Cir. 1990). Federal law controls with respect to spoliation of
evidence issues in diversity suits. Chapman v. Bernard's, Inc., 167 F. Supp. 2d 406, 413
(D.Mass. 2001).

**A.    The Defendants' Spoliation of Relevant Material Evidence:**

Spoliation of evidence is defined as "the intentional, negligent, or malicious destruction
of relevant evidence." Townsend v. American Insulated Panel Co., Inc., 174 F.R.D. 1, 4
(D.Mass. 1997). The defendants had a duty to preserve material evidence both during litigation
and during pre-litigation stages as they knew that the evidence was relevant. Blinzler v. Marriott
Int'l Inc., 81 F.3d 1148, 1158-59 (1st Cir. 1996).

In this case, Mr. Bergeron testified that he was very aware of the relevant significance of
this evidence to his employers, as to their determination of the cause and/or happening of the
derailment, of the information documented in his notes and drawings, as well as his visual
observations of the track. Conductor Scappace and the defendants were also aware of the
significance of the missing incident report which is evidenced by the fact that the defendants had
Conductor Scappace re-create the report about three weeks after the incident and Conductor
Scappace took it upon himself to note on the replacement report that he had filed an original
report with the defendants on July 3rd. It is difficult to conceive of documents and/or records
which could be more relevant to the happening of an incident other than an original incident
report drafted by the responsible employee involved in the incident and the original notes,
writings, and/or drawings of the investigating employees seeking to determine what occurred
which led to the happening of the incident.

**B.    The Defendants' Destruction of Mr. Bergeron's Notes, Drawings and Calculations can be only Described as Done in Bad Faith:**

The defendants' bad faith destruction of the documents and records which are relevant to proof of the issues to be presented at trial gives rise to a strong inference that production of those documents and records would have been unfavorable to the them. <u>Townsend</u>, 174 FRD at 4. <u>Nation-wide Check Corp. v. Forest Hills Distributors</u>, 692 F.2d 214, 218 (1st Cir. 1982). "District courts have inherent power to exclude evidence that has been improperly altered or damaged by a party where necessary to protect the non-offending party from undue prejudice." <u>Chapman</u>, 167 F. Supp. 2d at 413, *citing* <u>Sacramona v. Bridgestone/Firestone, Inc.</u>, 106 F.3d 444, 446 (1st Cir. 1997). In that the defendants have admitted that they have destroyed Mr. Bergeron's original documents and records, the court may then impose appropriate sanctions on the defendants for destroying that evidence. <u>Townsend</u>, 174 F.R.D. at 4 (*citing* <u>Corales v. Sea-Land Service, Inc.</u>, 172 F.R.D. 10 (D.P.R. 1997)).

When sanctioning the defendants for spoliating this evidence, the court may: dismiss the defendants' counterclaims, exclude their use of the evidence, or instruct the jury with the "spoliation inference." <u>Corales</u>, 172 F.R.D. at 13, *quoting* <u>Howell v. Maytag</u>, 168 F.R.D 502, 505 (M.D. Pa. 1996). In determining what sanctions to impose, the court weighs the following factors:

> (1) [W]hether the adverse party was prejudiced by the destruction of evidence; (2) whether the prejudice can be cured; (3) the practical importance of the evidence; (4) whether the destruction was in good faith or bad faith; and (5) the potential for abuse if the evidence is not excluded or the party is not otherwise sanctioned.

<u>Corales</u>, 172 F.R.D. at 13, *citing* <u>Mayes v. Black & Decker, Inc.</u>, 931 F.Supp. 80, 83 (D.N.H. 1996); <u>Headley v. Chrysler Motor Corp.</u>, 141 F.R.D. 362, 365 (D.Mass. 1991), *quoting* <u>Lewis v. Darce Towing Co., Inc.</u>, 94 F.R.D. 262, 266-67 (W.D. La. 1982); <u>Northern Assurance Co. v.</u>

Ware, 145 F.R.D. 281 at 283 (D.Me. 1993); *see also* McGuire v. Acufex Microsurgical, Inc., 175

F.R.D. 149, 156 (D.Mass. 1997).

### 1.    The NECR was Prejudiced by the Destruction of Evidence:

The NECR was clearly prejudiced by Mr. Bergeron's intentional destruction of the notes,

drawings and calculations which he created at the scene during his investigation. Without

knowing what writings were set forth in those records, i.e. whether the calculations which were

computed in error (many of the calculations are made to within fractions of inches), whether the

initial unclear drawings contained information favorable to the NECR, whether there was a

scribner's error in transposing the information and data, etc., the NECR has been prejudiced to

argue against what Mr. Bergeron claims to have documented in the cleaned-up records. The

notes, data, and drawings that were contained within the initial destroyed records are what the

defendants have rested their gross negligence claims on against the NECR. Without the original

documents, the NECR cannot possibly effectively challenge the substance of Mr. Bergeron's

testimony or opinions.

Also, the missing original documents and records are the only documents and/or records

which provide evidence of the alleged condition of the curve of the track at or before MP 10.18

after the derailment and before the track re-surfacing by the NECR. That section of track

documented by Mr. Bergeron, is just north of the point of derailment, as previously determined

by the NECR, and thus was not subject to critical inspection by the NECR immediately after the

derailment as it had no reason to believe that the section of the curved track had anything to do

with the derailment.

Further, and even more importantly, Mr. Bergeron never shared his data with the NECR

once he was done with his inspections and calculations.

**2.    The Prejudice Cannot be Cured:**

There is simply no way to cure the prejudice that the NECR has experienced by the destruction of the original notes, drawings and calculations. The NECR has no ability to get the track back into the state or condition that it was in when Mr. Bergeron conducted his investigation. There is no way for the NECR to verify the substance of the calculations or measurements made or taken by Mr. Bergeron and his assistant or to view and/or challenge the original drawings made by Mr. Bergeron at the site. The information is gone forever to the NECR's detriment.

**3.    Practical Importance of the Evidence:**

The initial information acquired and destroyed by Mr. Bergeron forms the sole basis for the remaining claim that the defendants' have against the NECR. The evidence could not be more important to the defendants in making their case. The evidence in dispute is simply the defendants case against the NECR in their counterclaim.

**4.    The Potential for Abuse is Great if the Evidence is Not Excluded:**

The potential for abuse is great if the evidence is not excluded. The parties to this action continue to have business dealings and interchange railcars on a daily basis in accordance with the *Trackage Rights Agreement* as imposed by the Interstate Commerce Commission, n.k.a. the Surface Transportation Board. The parties, given the nature of their industry, will most likely have other incidents, accidents, and collisions as the years pass and the defendants must be placed on notice that their conduct (hiding information from investigations and destroying original notes, records, and calculations concerning incidents) will not be tolerated by the court should an incident occur in the future. They must not be rewarded for their destruction of alleged material evidence of their investigation of the incident.

8

**C.    The Negligent Loss of the Evidence Still Requires that Sanctions be Imposed on the Defendants:**

While bad faith is a consideration in issuing sanctions for spoliation of evidence, it is not required for sanctions to be imposed. Rather, where the NECR has been prejudiced as a result of the destruction of evidence, even where the destruction is the result of carelessness, sanctions may be imposed. Sacramona, 106 F.3d at 444. (upholding sanctions excluding evidence where the defendants were unable to examine the evidence, specifically a wheel, where the plaintiff's expert inspected and cleaned the wheel, thereby making it impossible to discern any markings that were on the wheel at the time of the incident). Bad faith conduct is not "essential. If such evidence is mishandled through carelessness, and the other side is prejudiced...the district court is entitled to consider imposing sanctions, including exclusion of evidence." Kelley v. United Airlines, Inc, 176 F.R.D. 422, 427 (D.Mass. 1997), *quoting* Sacramona 106 F.3d at 447.

Accordingly, an inference that evidence was destroyed because its contents were unfavorable to the defendants *may* be drawn upon a showing that the defendants had notice "of the potential claim and of the document's potential relevance." Kelley., 176 F.R.D. at 427 (*quoting* Blinzler, 81 F.3d at 1158-59; *see also* Nation-Wide Check Corp. v. Forest Hills Distributors, Inc., 692 F.2d 214, 218 (1st Cir. 1982). It is clear from Mr. Bergeron's testimony that the defendants were aware of the potential that the NECR would be seeking its damages from the NECR under the *Trackage Rights Agreement* and that the destroyed notes, drawings and calculations would be the basis of any defense or claim by the defendants in response to the NECR's claims.

This analysis would also be appropriate for sanctions being imposed by the court on the defendants' failure to secure and produce in this litigation their photographs of the curve in the track at or before MP 10.18 and the initial incident report prepared by Conductor Scappace.

9

**1.    The Appearance of the Track at MP 10.18:**

The NECR cannot now refute Mr. Bergeron's statements that the condition of the curve of the track at or before MP 10.18 was clearly visible to the naked eye upon inspection. It also cannot provide evidence that the condition of the ballast was not dirty and spongy. The NECR cannot provide this information due to the fact that the defendants never shared their measurement, data and calculations with the NECR and that it was never made aware, until much later and well after the track had been re-surfaced, that the defendants believed that the cause of the derailment was found at MP 10.18.

**2.    Missing Photographs of MP 10.18:**

Mr. Bergeron instructed his assistant to document the visual condition of the track by photographic means. It was his understanding and belief that his instructions were carried out by his assistant. Those photographs have never been produced in discovery. Either the defendants have misplaced or lost the photographs or the photographs never were taken by Mr. Bergeron's assistant.

The court may impose spoliation sanctions in either situation as the defendants had an obligation to secure and document their evidence at the time it was created or existed. The defendants have failed to produce the evidence that they claim existed at the curve in the track at or before MP 10.18 and now are attempting to use verbal description of that evidence in their claim of gross negligence against the NECR. The court must not permit the defendants to utilize said evidence against the NECR as the defendants were keenly aware of the nature of the derailment clean-up and investigation in the railroad industry. It was clearly known to all the parties to this litigation, that in railroad related accidents and incidents, the railroad suffering the

derailment always seeks to investigate and repair the track as soon as possible in order to avoid further financial losses and back-up of rail traffic due to the track being taken out-of-service.

### III.    CONCLUSION:

For all of the foregoing reasons, the NECR requests that this Honorable Court dismiss the defendants' gross negligence counterclaim; exclude Mr. Bergeron, his assistant, Engineer Kari, and Conductor Scappace from testifying at trial; exclude any and all evidence and/or information obtained or observed by Mr. Bergeron and/or his assistant at the derailment site; and/or, exclude any and all evidence about or contained within Conductor Scappace's incident report. In the alternative, the NECR seeks that the court instruct the jury as to the defendants' spoliation of relevant and material evidence in this action, as well as permit the NECR to argue all reasonable inferences therefrom to the jury.

### IV.    REQUEST FOR HEARING

In accordance with L.R. 7.1(D), the NECR believes that oral argument may assist the court and wishes to be heard, and, therefore requests that the court schedule a hearing on the within motion prior to the commencement of the trial.

Respectfully submitted,
NEW ENGLAND CENTRAL RAILROAD, INC.,
by its attorneys,

/s/ Richard A. Davidson, Jr.

| | |
|---|---|
| Michael B. Flynn | BBO# 559023 |
| *mbflynn@flynnassoc.com* | |
| Richard A. Davidson, Jr. | BBO# 552988 |
| *radavidsonjr@flynnassoc.com* | |
| FLYNN & ASSOCIATES, P.C. | |
| 400 Crown Colony Drive, Suite 200 | |
| Quincy, MA 02169 | |
| (617) 773-5500 | |

Dated: August 10, 2007

11

# EXHIBIT
## "A"

**Roger D. Bergeron**
**January 11, 2007**

Volume 1, Pages 1-180

Exhibits: 10-26

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

NEW ENGLAND CENTRAL RAILROAD, INC.,

Plaintiff

v.                              Docket No. 04-30235-MAP

SPRINGFIELD TERMINAL RAILWAY

COMPANY and BOSTON AND MAINE

CORPORATION,

Defendants

------------------------------

RULE 30(b)(6) DEPOSITION OF SPRINGFIELD TERMINAL

RAILWAY COMPANY by ROGER D. BERGERON

Thursday, January 11, 2007, 10:11 a.m.

Law Office of Robert H. D'Auria

41 North Road, Suite 205

Bedford, Massachusetts  01730


----Reporter:  Kathleen Mullen Silva, RPR, CRR----

Beacon Hill Court Reporting, Inc.

807 Main Street, 2nd Floor

Worcester, Massachusetts 01610

508.753.9286

**Roger D. Bergeron**
**January 11, 2007**

111

1       Q.   Who identified it?

2       A.   Jimmy Austin.

3       Q.   Which wheel was it?

4       A.   It was -- I don't have specific knowledge

5    of the car number.  I would need to review the

6    documents to find it.  But the --

7       Q.   I'm not worried about the car number.

8    Which wheel on that car?

9       A.   It was a truck, a lead truck -- that's why

10   I said I'd have to review the notes.

11      Q.   Well, how many wheels are on a truck?

12      A.   On a truck?

13      Q.   Yes.

14      A.   Four.

15      Q.   As you sit here today, we know which rail

16   the wheel lifted off, correct?

17      A.   Correct.

18      Q.   So was it the truck that was on the A end

19   or B end of the car?

20      A.   I'd have to research my notes.  I know that

21   I was told exactly which end of the car went off.

22      Q.   How many pages are your notes?

23      A.   Well, one, with the -- it might be written

24   on the back a little bit too.

**Roger D. Bergeron**
**January 11, 2007**

112

1       Q.   Are these the notes you're talking about?

2       A.   Part of it, yes, that is correct.

3       Q.   When you say "part of it," was there more

4   to that?

5       A.   Yes.

6       Q.   What else was with that?

7       A.   There's notes to the back of this.

8       Q.   What were the notes on the back?

9       A.   It was some information from a telephone

10   conversation with Mike Walsh.  It was mostly, you

11   know, the car, the car that derailed first and

12   things of that nature.

13       Q.   Okay.  Is there any information on that

14   sheet that you have in front of you which would

15   indicate to you which wheel lifted first?

16       A.   No.

17       Q.   That would be on the back side of that page

18   or page 2?

19       A.   Yeah, I believe so.

20       Q.   Was there only two pages, the front and

21   back side?

22       A.   Yes.

23       Q.   I don't know why we don't have a page 2.

24       A.   There would be a whole other one page with

Roger D. Bergeron
January 11, 2007

113

1   a bunch of notes on it right from the very

2   beginning.  I'm trying to think.

3       Q.  Did you submit those to the company as one

4   document?

5       A.  Yes.

6       Q.  Okay.  While we're here.  This is the chart

7   that you developed with the help of Dan Griffiths?

8       A.  That is correct.

9       Q.  And this is your writing or his writing?

10      A.  Mine.

11      Q.  For the purposes of the record, this has

12  been Bates-stamped ST010386.  Would you tell us what

13  this chart tells us, and while you're doing that --

14  hold on --

15              MR. DAVIDSON:  Off the record real

16  quick.

17              (Discussion held off the record.)

18      Q.  Do you mind if I lean over like this?  It

19  would be a lot easier.

20      A.  No.

21      Q.  With this red pen, would you please put an

22  arrow on your chart that's in front of you to the

23  direction of the north as you understand it on that

24  diagram.

Roger D. Bergeron
January 11, 2007

114

```
 1        A.   (Witness complies.)

 2        Q.   Would you put an "N" at the end of your

 3   pointy arrow indicating north.

 4        A.   (Witness complies.)

 5        Q.   As this document is facing you, the train

 6   was heading away from you, according to this

 7   diagram, correct?  It was heading southbound?

 8        A.   Correct.

 9        Q.   Would you mark on the diagram the point of

10   derailment.

11        A.   (Witness complies.)

12        Q.   Would you circle that, please, and put the

13   number 1 inside it.

14        A.   (Witness complies.)

15        Q.   For the purposes of the record, the witness

16   has circled the initials "PD" and put the number 1

17   inside the circle.  What can you tell us about your

18   measurements at that point?

19        A.   The measurements at the point of derailment

20   geometrywise was 5 1/4 inch static with an

21   additional quarter of an inch live.

22        Q.   When you say "live," what do you mean by

23   "live"?

24        A.   There was evidence that the rail deflected
```

**Roger D. Bergeron**
**January 11, 2007**

115

1  additional to what the static reading was.

2      Q.  And what evidence was that?

3      A.  The space between the rail and the tie

4  plate, the ballast.

5      Q.  Excuse me?

6      A.  The space between the rail and the tie

7  plate.

8      Q.  You just said the ballast before that.  Did

9  you misspeak?

10     A.  In the ballast section.

11     Q.  Okay, in the ballast section.

12          What was the crosslevel measurement you

13  took from that point?

14     A.  That would be 5 1/4 plus a quarter.  So it

15  would be 5 1/2.

16     Q.  What's the next measurement you took

17  southbound on that rail?

18     A.  Southbound on that rail?

19     Q.  Mm-hmm.

20     A.  Would be six inches superelevation.

21     Q.  What's the next measurement after that?

22     A.  Would be the other rail, would be the west

23  rail was at a joint, and that would be five inches

24  in the crossing.

116

1      Q.  When you say "out of joint," what do you

2   mean?

3      A.  At a joint.  The location was at a joint.

4      Q.  Okay.  At a joint.  That's where the CWR

5   met the bolted rail?

6      A.  No, it is not.

7      Q.  Where would that be?

8      A.  That would be approximately at what is

9   indicated at station 9.

10      Q.  Would you circle station 9 with your red

11   pen.

12      A.  (Witness complies.)

13      Q.  Would you put a "CWR" above that.

14      A.  This number 9 represents a geometry reading

15   that was taken.  It doesn't necessarily reflect the

16   accurate location of where the CWR is.

17      Q.  I understand.  You said "about."  I'm using

18   "about."

19      A.  (Witness marking exhibit.)

20      Q.  As you head southbound, what's the next

21   measurement after the point of derailment that you

22   have on there?

23      A.  An indication that's here is negative one.

24      Q.  What does that mean to you?

Roger D. Bergeron
January 11, 2007

117

1       A.   That means station one into the derailment.

2       Q.   Is there a measurement that accompanies

3  that on the crosslevel?

4       A.   Yes, there is.

5       Q.   What's that measurement?

6       A.   That measurement is 4 7/8 inch.

7       Q.   What's the next measurement you took

8  heading southbound at station minus 2?

9       A.   Minus 2, 4 3/4 inch.

10      Q.   And that's the direction in which these

11  stations, minus 1, minus 2, minus 3, it's where the

12  rail car was heading, correct?

13      A.   After it derailed, that is correct.

14      Q.   After derailment.  It was heading

15  southbound that day, correct?

16      A.   Correct.

17      Q.   What do those measurements indicate to you

18  as a certified track inspector?

19      A.   That that was the crosslevel through the

20  crossing, probably the predicted crosslevel for the

21  curve.

22      Q.   Now, is there anything about those

23  measurements that you would find an exception with

24  as a track inspector?

**Roger D. Bergeron**
**January 11, 2007**

118

```
 1      A.   Not between the point of derailment and
 2   station negative 3.
 3      Q.   What about before the point of derailment?
 4      A.   Yes.
 5      Q.   Would you indicate for us which station
 6   that you find an exception as a certified track
 7   inspector, according to your measurements that you
 8   did on whatever day that was -- it says July 3 on
 9   it.
10      A.   No.   July 6.
11      Q.   Okay.   July 6.
12      A.   About 11:30.
13      Q.   Does that refresh your memory as to when
14   you were out there?
15      A.   Yeah.
16      Q.   So you were out there three days after the
17   derailment, correct?
18      A.   That is correct.
19      Q.   Okay.   Good.
20      A.   Now, what was the question?
21      Q.   Would you mark which station that you find
22   an exception with in terms of being a certified
23   track inspector as to the measurements that you
24   took.
```

Roger D. Bergeron
January 11, 2007

119

1     A.  It would be station 3.

2     Q.  And what about station 3 that you found an

3  exception?

4     A.  Between station 3 and the point of

5  derailment, at station 3 we have a 6 1/4 inch static

6  reading with an additional -- it looks like a

7  quarter of an inch.  It might even be a half -- with

8  an additional -- I can't really make it out on this.

9  It's either an eighth -- 1/8.  It's an additional

10  reading, or maybe 1/6, 1/8.  It's very hard to make

11  it out on this copy.

12     Q.  Okay.  What about that?

13     A.  Between that and the point of derailment,

14  the difference in crosslevel is -- it's about an

15  inch and three eighths, roughly.

16     Q.  Okay.  What should it be?

17     A.  Between -- I don't establish the speed on

18  the New England Central for the curvature.

19     Q.  Well, that section of track was set at 25

20  miles per hour class 2.  Does that conform with

21  class 2 requirements of the FRA?

22     A.  Between these readings here --

23     Q.  We were just talking about 3 and the point

24  of derailment.  Are you changing -- are you leaving

Roger D. Bergeron
January 11, 2007

120

1    those points?

2        A.    Yes, I am.

3        Q.    Where are you talking about now?

4        A.    Now what I'm talking about is a reading

5    that goes between 5 and another mark of a joint, and

6    that says 6 1/2 plus 3/8.  And then the reading

7    between a second one that says 5 and another one

8    that says 6 1/2 and another one that says 5 5/8 and

9    the crosslevel here that says 5-inch.  In those

10   differences here, you have the beginnings of what

11   they -- it's 213.63, that's the federal requirement.

12   And it's the difference in your rock-off hazards.

13       Q.    And where is that contained in the federal

14   regulations?

15       A.    It's 49 CFR Part 213.63, that's a standard

16   that covers track surface.

17       Q.    Now, for the sake of the record, you

18   pointed to a number of places here.  For the sake of

19   the record, would you please go back and reference

20   those by the station numbers that you have, and if

21   you need to add in additional letters for your inner

22   curve, that would be fine.  Would you please label

23   this one A, B and C.

24       A.    (Witness marking diagram.)

Roger D. Bergeron
January 11, 2007

121

1       Q.   Now, where were you taking your

2   measurements from before in your previous testimony?

3   You pointed to a 5-inch --

4       A.   Oh.   (Witness marking document.)

5       Q.   Okay.   Would you describe those for the

6   jury?

7       A.   I just marked for the transcript A, B and C

8   as being on what I know to be the west rail --

9       Q.   Correct.

10      A.   -- on this chart here.   The areas that I

11  was talking about where I gave 5, 5, 5 5/8 and 5

12  7/8, when we gave it earlier, were readings that

13  were indicated as joints on the east rail that

14  aren't marked with anything.

15      Q.   Would you mark those with D, E and so forth

16  until you exhaust your markings.

17      A.   (Witness complies.)

18      Q.   Now, would you describe for the jury again

19  what you take exception to from those calculations?

20      A.   It's the geometry readings that you take

21  when you go with E plus A, F plus B and G plus C.

22  When you get those six pairs of joints, you end up

23  with a reading that -- and I don't know

24  specifically -- I don't know the wording exactly out

**Roger D. Bergeron**
**January 11, 2007**

122

1   of the FRA regulation, but it's...

2       Q.   What is your understanding as to what the

3   requirement is?

4       A.   That none of these here can exceed an inch

5   and a quarter.

6       Q.   Do they exceed an inch and a quarter?

7       A.   Yeah.  Oh, yeah.

8       Q.   Which ones exceed an inch and a quarter?

9   Let's back up.  When you say "exceed an inch and a

10  quarter," what do you mean, "exceed an inch and a

11  quarter"?

12      A.   It's that the -- the warp factor.  The

13  difference in crosslevel, when 62 feet exceeds an

14  inch and a quarter.

15      Q.   So when you're talking about 213.63, you're

16  talking about this chart, correct?

17      A.   Yes.

18      Q.   Okay.  What class of track should this have

19  been, or what speed restrictions should have been in

20  place due to your calculations on the warp?

21      A.   10.

22      Q.   And that would be class what?

23      A.   1.

24      Q.   When you made your calculations, some of

**Roger D. Bergeron**
**January 11, 2007**

123

```
 1   your calculations include -- strike that.

 2              At point A you have 61 1/2 plus 3/8 and

 3   then you have a line and then underneath that you

 4   have 56 3/4.  Would you explain to the jury what

 5   that means?

 6      A.  Okay.  The 6 1/2 plus 3/8 is the

 7   crosslevel, the difference in height between the

 8   rail on the east rail and the rail on the west rail.

 9   The 56 3/4 is the gage of the track at that

10   particular spot, 5/8 of an inch below the rail at a

11   plane equal to that at that point A.

12      Q.  What piece of equipment did you use when

13   you made these measurements?

14      A.  A level board gage combination.

15      Q.  Okay.  Is that a tool that you can use by

16   yourself or do you need assistance with that?

17      A.  You can use it by yourself.

18      Q.  Did you, in fact, use it by yourself?

19      A.  Yes, I did.

20      Q.  So you were taking the measurements and you

21   were writing those down yourself?

22      A.  That is correct.

23      Q.  What was Mr. Griffiths doing while you were

24   doing this?
```

124

1    A.   He was standing walking with me.

2    Q.   So he was just standing with you while you

3    were doing the work?

4    A.   When I was taking the readings on the first

5    passthrough, that is correct.

6    Q.   Is this the actual diagram that was created

7    that day, or is this a cleaner copy of that?

8    A.   This is a cleaner copy of that.

9    Q.   Do you have the original numbers and

10   original data that you took?

11   A.   I'm not too sure.  No, I don't think so.

12   Q.   Any reason why you didn't keep it?

13   A.   It was a sloppy copy.  I mean --

14   Q.   I understand it was sloppy.  Is there any

15   reason why you didn't keep it?

16   A.   No.

17   Q.   So it no longer exists?

18   A.   I don't believe so.

19           MR. DAVIDSON:  Can we mark this the next

20   exhibit, please.

21           (Marked, Exhibit 23, track chart, Bates

22   ST010386.)

23   Q.   Do you know if anyone, during the course of

24   their inspection of the car that derailed, ever

**Roger D. Bergeron**
**January 11, 2007**

140

1   stick out when you're comparing them to welded rail

2   because welded rail is smoother all the way through?

3       A.  No.  There was fouled ballast section too

4   under these joints.  It was not a stable -- there's

5   two terms.  Contaminated and foul ballast, and

6   that's when the ballast is so laced with like mud

7   and stuff that it's spongy.  I don't know if any of

8   those terms you're used to.  But there was like

9   fouled ballast in this area too of the joint.

10      Q.  Would you mark on the exhibit where the

11  fouled ballast was on the actual rail, between the

12  two rails.

13      A.  Right here (indicating).

14      Q.  Just for the record would you put a circle

15  around that.

16      A.  (Witness complies.)

17      Q.  The witness has put the initials "FB"

18  northeast of -- excuse me -- to the upper right-hand

19  side of the point marked "B" and to the bottom left

20  side of the point marked "H."

21      A.  Actually --

22      Q.  Now, when you saw the fouled ballast there

23  on your inspection, did you talk to Mr. Griffiths

24  about that?

Roger D. Bergeron
January 11, 2007

141

1      A.   I'm not -- he was --

2      Q.   He was with you?

3      A.   He was with me, yes.

4      Q.   Did you mention to him, "Look at the fouled

5   ballast"?

6      A.   Oh, yeah.

7      Q.   When you did that, did you say, "Hey, make

8   sure you get a picture of that as well when you get

9   a picture of the marking on the rail"?

10     A.   The direction to Mr. Griffiths was when we

11  were leaving this area here.

12     Q.   Okay.

13     A.   I said, "See if you can get a couple of

14  shots showing the joints in that area right around

15  the crossing."  That is the limit of what I

16  instructed him to do.

17     Q.   So get a picture of the joints in the area

18  around the crossing?

19     A.   Crossing.

20     Q.   That would include this area which you've

21  marked "FB," correct?

22     A.   Yes.

23     Q.   It was your intent at that time to document

24  the condition of this curve which included the

**Roger D. Bergeron**
**January 11, 2007**

142

1  fouled ballast, right?

2      A.  Yes, it would have.

3      Q.  Because you felt that was relevant to your

4  investigation, correct?

5      A.  Oh, yes.  Yes.  There was another condition

6  too, because opposite the fouled ballast right up

7  here (indicating) was the station 5 through 3.

8  Because of foul ballast, it had no alignment.  And

9  this was also part of being, you know, how did you

10  see it.  You had a series of low joints that we

11  picked up here.  And then you had this high rail,

12  and instead of being a perfect radius and smooth, it

13  was kicked in about an inch -- it was about an inch

14  and a half.

15      Q.  Now, these conditions you're talking about,

16  they can result from normal wear and tear by the

17  trains using the track, correct?

18      A.  Oh, yeah.

19      Q.  And they could be accentuated by a lot of

20  rain, especially with the spongy ballast, correct?

21      A.  Yes.  Oh, yeah.

22      Q.  So if someone had inspected it a couple of

23  days before and a number of trains had run down the

24  track, it could conceivably been not picked up

# EXHIBIT
# "B"

Joseph C. Scappace, Jr.
January 12, 2007

46

1   you filled out?

2       A.  For what?

3       Q.  For this derailment.

4       A.  One.

5       Q.  Are you sure about that?

6       A.  Mm-hmm.

7       Q.  When did you fill that out?

8       A.  When I got in that night.  Oh, I made

9   out -- I had to make out two, because one of them

10  didn't get through somewhere to the chief, and I had

11  to make out a second one.

12      Q.  Do you remember roughly when you made the

13  second one out?

14      A.  It's on the -- I think it's on the accident

15  report.  A couple of days afterwards.

16      Q.  When you made the initial accident

17  report -- I'm going to show you a document that's

18  already been marked Exhibit 22.  Do you recognize

19  that document?

20      A.  Mm-hmm.

21      Q.  What do you recognize that document to be?

22      A.  An accident report.

23      Q.  Is that the one you completed for this

24  derailment?

Joseph C. Scappace, Jr.
January 12, 2007

47

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | What is the date that you signed that |

3  report?

4  A.  25th of July.

5  Q.  Did you write anything on that report to

6  the right of the date?

7  A.  Yup.  "Slip initially made out on 3 July

8  2004."

9  Q.  Do you have any idea as to why they asked

10 you to provide to them another accident/incident

11 report?

12 A.  Because they didn't have the first one.

13 Q.  Who did you give the first one to?

14 A.  I left a copy of it on the train master's

15 door in Deerfield, and I faxed a copy to the chief

16 dispatcher down in Billerica.

17 Q.  Now, the train master's door in Deerfield,

18 who would that be at the time?

19 A.  That's M. Galvis.

20 Q.  Spell that for us.

21 A.  G-a-v-i -- G-a-l-v-i-s, Galvis.

22 Q.  Is Mr. Galvis still with the company?

23 A.  Yes, he is.

24 Q.  What's his position now?

Joseph C. Scappace, Jr.
January 12, 2007

48

1    A.  Superintendent, western division.

2    Q.  Who did you fax it to in Billerica?

3    A.  Chief dispatcher.

4    Q.  Do you know who that person was?

5    A.  No.

6    Q.  Where did you get the fax number to fax it

7  over?

8    A.  It's on the fax machine in Deerfield.

9    Q.  It's going to seem crazy, but did you

10  actually watch the document go through the fax

11  machine?

12    A.  Yes.

13    Q.  Did you get a receipt?

14    A.  No.

15    Q.  What did you do with the original document

16  that you filled out?

17    A.  I had it to make this out.  I don't know.

18  I don't know.  I just had this.  I remade it out.

19        MR. DAVIDSON:  We'd ask that you look

20  for the faxed version and the one that the gentleman

21  had out in the western district.

22        MR. WRIGHT:  Can we go off the record

23  for just a minute.

24        (Discussion held off the record.)

**Joseph C. Scappace, Jr.**
**January 12, 2007**

49

1    Q.   Where did you get the information that's

2    contained in this report to fill this report out?

3    A.   I made it out.

4    Q.   Did you have any documents with you to

5    assist you in drafting that?

6    A.   Notes and memory.

7    Q.   What notes did you have?

8    A.   What I write in my log.

9    Q.   Do you still have your logbook?

10   A.   Yes.

11        MR. DAVIDSON:  I'd like a copy of his

12   logbook please.

13   A.   No.  That's my logbook.  That's not

14   anything to do with the company.

15        MR. DAVIDSON:  Can we go off the record.

16        MR. WRIGHT:  Off the record.

17        (Discussion held off the record.)

18        MR. DAVIDSON:  Back on the record.

19   Q.   This logbook that you have, it's a logbook

20   that you keep during the course of your workday,

21   correct?

22   A.   Yes.

23   Q.   And this is a logbook -- how many volumes

24   is this logbook?  How many different books are

Joseph C. Scappace, Jr.
January 12, 2007

50

1   there?

2       A.   One per year.

3       Q.   One per year.  Is it a calendar book?  Does

4   it have a calendar in it?

5       A.   I forget.  Sometimes they do, sometimes

6   they don't.  Right now I'm using a Palm Pilot.  I

7   changed things around a little bit, keeping up with

8   the times.

9       Q.   But back in July of 2004, did you have a

10  palm pilot?

11      A.   No.  It's in a book.

12      Q.   When you say "a book" --

13      A.   Written book, a ledger.

14      Q.   What size is this ledger that you had in

15  2004?  Is it one that fits in your pocket or your

16  bag?

17      A.   It's in my bag.

18      Q.   Is it eight and a half?

19      A.   No.  Small.  It's a small ledger.  You

20  know, small logbook, cash book.  That's all it was.

21      Q.   About this big (indicating)?

22      A.   Roughly, yeah.

23      Q.   So it would be four and a quarter by six

24  and a half, something like that.  Do you remember

Joseph C. Scappace, Jr.
January 12, 2007

51

1  what color the cover was?

2      A.  No, I don't.  Black.

3      Q.  You would keep notes in your logbook about

4  things you wanted to remember about particular

5  trips?

6      A.  Sometimes, yes.

7      Q.  So if an event like a derailment came up,

8  that's a pretty significant event?

9      A.  I'd put a few items in there like I did

10  with this I think, yeah.

11      Q.  And you'd have other entries in there for

12  other dates potentially?

13      A.  Yes.

14      Q.  You don't record everything there every

15  day?

16      A.  I record time off duty/time on duty, how

17  much overtime.  If there's anything specifically I

18  wanted to remember about that trip, I'd put it down

19  there.

20      Q.  Okay.  Besides your logbook, what other

21  notes did you have or writings?

22      A.  Nothing.

23      Q.  You said a couple of minutes ago --

24      A.  I tried to find the original.  I had it

**Joseph C. Scappace, Jr.**
**January 12, 2007**

52

1    once.

2        Q.   When was that?

3        A.   On the 3rd of July.

4        Q.   After that, did you ever see the original

5    again?

6        A.   No.

7        Q.   So as we sit here two and a half years

8    later, there's no way you could tell me if there was

9    any differences between what's on this report and

10   what was on the original report, correct?

11       A.   No, I couldn't.

12       Q.   So they could have been different?

13           MR. WRIGHT:   I'm going to object to

14   that.  It's speculative.

15       A.   The dates are going to be different,

16   especially this one, and a few other things, but as

17   far as the information itself, like the time on

18   duty, the date, Hartland, you know, temperature,

19   5.7, Hartland siding, mainline.

20       Q.   Is this your writing in the middle of the

21   form?

22       A.   Yes, it is.

23       Q.   What does it signify to you when you put

24   "N/A"?

**Joseph C. Scappace, Jr.**
**January 12, 2007**

53

| | | |
|---|---|---|
| 1 | A. | None applicable. |
| 2 | Q. | Why is that none applicable? |
| 3 | A. | Personal injuries. |
| 4 | Q. | To no one, correct, to you or Mr. Kari? |
| 5 | A. | No personal knowledge, no. |
| 6 | Q. | You're required by the company to fill out |
| 7 | this form; it's known as a GTSF 100? |
| 8 | A. | Yes. |
| 9 | Q. | That's pursuant to your safety rules? |
| 10 | A. | Yes. |
| 11 | Q. | Any time you have property damage or |
| 12 | derailment you're required to file one of these? |
| 13 | A. | Yes. |
| 14 | Q. | And you're required to file one of these as |
| 15 | soon as you can after the accident, correct? |
| 16 | A. | Yes. |
| 17 | Q. | And you did that that day? |
| 18 | A. | Yes, I did. |
| 19 | Q. | And you sat down in East Deerfield? |
| 20 | A. | Yes, I did. |
| 21 | Q. | And you sat down at a desk or table? |
| 22 | A. | Desk. |
| 23 | Q. | Were you all by yourself? |
| 24 | A. | No.  Mr. Kari was there. |

Joseph C. Scappace, Jr.
January 12, 2007

54

1      Q.   Was he assisting you in any way filling out
2   this form?
3      A.   No.
4      Q.   Did he provide you any information that
5   went into the form?
6      A.   No.
7      Q.   As you were drafting it?
8      A.   No.
9      Q.   When did you get down to East Deerfield?
10      A.   I don't remember.  I don't remember.  I'd
11   have to get my log to find out.
12      Q.   I just want to make sure I'm clear.  You
13   didn't have the original when you filled this one
14   out on July 25?
15      A.   No.
16      Q.   And it's fair to say that this is filled
17   out 22 days after the original was filled out?
18      A.   Yes.
19      Q.   Who asked you to fill this document out?
20      A.   I don't remember.
21      Q.   Do you remember how you were told to --
22      A.   Someone said they didn't have a copy of the
23   accident report.  And I said I faxed one in.  I
24   think it was Mr. Galvis.  I said, "I put one on your

Joseph C. Scappace, Jr.
January 12, 2007

55

1   door when you were getting the equipment ready to go

2   up and take care of this derailment," and they said,

3   "Well, you need an accident report."  So I looked

4   for my copy and I took out my log and found the

5   information there.  I started writing it out and I

6   had a list of the train -- where did I get the list

7   of the train from?  I think I still had a copy of

8   the list, the consist or something.

9       Q.   I thought you just testified that the

10  consist was left with the locomotive.

11      A.   There was a copy of it left.

12      Q.   How many copies of the consist did you

13  have?

14      A.   I don't remember, but I think -- I'm trying

15  to remember here if I had -- I don't remember.  I

16  forget if it was just in my log or if it was a list

17  I had made.

18      Q.   Do you normally make a list of the cars?

19      A.   Well, sure, because you have to write them

20  in here, what's wrong with them.

21      Q.   Where did you keep that list?

22      A.   I don't remember.  Probably in my log, in

23  my ledger.

24      Q.   Would it have been on another piece of

Joseph C. Scappace, Jr.
January 12, 2007

56

1   paper as well?

2       A.   Yes.

3       Q.   So until you take a look at your log, you

4   really don't know where you got that information?

5       A.   I don't remember.

6       Q.   Okay.   That's fair.   I'm just trying to

7   find out what your memory is.

8       A.   I'm trying to think, because when I made

9   this out, I had the information.

10      Q.   And you're referring to page 2 of the

11  exhibit, correct?

12      A.   Mm-hmm.

13      Q.   Did anyone provide you that information

14  when you made this out?   Did you say to someone,

15  "Hey, I don't have it anymore.   Can you give me the

16  derailed cars"?

17      A.   I don't remember.

18      Q.   Do you recall on the first one you did on

19  July 3 that you had the information at that time?

20      A.   It was the same information I had later.

21      Q.   Well, slow down.   You said you just don't

22  recall when you got the information or where you got

23  the information from for this document, which is

24  Exhibit 22?

**Joseph C. Scappace, Jr.**
**January 12, 2007**

59

1     A.  That's why this is two weeks.

2     Q.  You had a two-week vacation starting on

3  July 4?

4     A.  I think it was two weeks.  I forget.

5     Q.  At least one week?

6     A.  Oh, yes.

7     Q.  How long had that been scheduled?

8     A.  Since the previous year.

9     Q.  Do you normally take the 4th of July week?

10  Some people do.  They take the same week every year.

11    A.  It doesn't work that way.  Seniority rules

12  on vacation.

13    Q.  Do you remember what day of the week July 3

14  was that year?

15    A.  Saturday.

16    Q.  This was the last run you were going to

17  make before you went on vacation?

18    A.  Mm-hmm.

19    Q.  Would it be fair to say that as soon as you

20  got this done, you were on vacation?

21    A.  Well, that and after a drug screen.

22    Q.  Why was it necessary to have a drug screen?

23    A.  It's procedure from the FRA.

24    Q.  Slow down a little.  You misunderstood me.

**Joseph C. Scappace, Jr.**
**January 12, 2007**

61

1    those are the mileposts.

2        Q.   So Bellows Falls is 1.48 and Saxonville is

3    1.52.

4        A.   No, no, 148, 152.

5        Q.   Okay.  Did you ever get confirmation that

6    people received your copies of this Exhibit 22?

7        A.   No.

8        Q.   Did anyone come up to you afterwards and

9    say, "Hey, I got the report"?

10       A.   No.

11       Q.   Where is the original of that report?

12       A.   I do not know.

13       Q.   Did you retain it?

14       A.   I thought I did, but I don't know where it

15   is now.

16       Q.   So you only provided copies to the people

17   in the company who needed them?

18       A.   Yes.

19       Q.   Do you have a filing system or a holding

20   system at the house regarding your work at the

21   railroad?

22       A.   No.  Just the log.

23       Q.   Besides your log, do you have a drawer or a

24   place in your house where you keep your railroad

# EXHIBIT

## "C"

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

NEW ENGLAND CENTRAL
RAILROAD, INC.,

        Plaintiff/Counterdefendant,

      -v.-                                      Civil Action No. 04-30235-MAP

SPRINGFIELD TERMINAL
RAILWAY COMPANY, et al.,

        Defendants/Counterclaimants.

---

## DECLARATION OF ROGER D. BERGERON
## IN SUPPORT OF DEFENDANTS/COUNTERCLAIMANTS'
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Roger D. Bergeron declares as follows:

1.     I am employed by the defendants/counterclaimants in this action, Springfield Terminal Railway Company and Boston and Maine Corporation (collectively, "ST/BM"), as Vice-President of Special Projects.  I make this declaration in support of ST/BM's motion for partial summary judgment, both as a percipient witness and, pursuant to the Court's endorsed order of February 21, 2007, as an expert witness.  To the extent the opinions expressed herein are considered those of an expert, they are within the bounds of reasonable engineering certainty and represent my professional opinion.

2.     I have been employed by ST/BM and their predecessor corporations for 36 years. My positions during that period have included trackman in the late 1960's, engineering surveyor and a construction inspector in the early 1970's, resident engineer in the mid-1970's, a track

supervisor from the late 1970's to early 1980's, a roadmaster and engineer of track in the mid-
1980's, an engineer of production and construction until 1996, then assistant vice-president of
engineering until 2006.

3.    My current position includes responsibility for industrial development of railroad
properties, track construction and design projects, preparing estimates for permitting commuter
rail service on certain portions of ST/BM's track, continuing my responsibilities for overseeing
track maintenance and construction. In that capacity I am qualified under Section 213.7 of the
Federal Railroad Administration ("FRA") regulations regarding track safety generally and
regarding track inspection, renewal, and replacement in particular.

4.    I have taken FRA and National Transportation Safety Board accident derailment
courses, and am familiar with the FRA track safety standards (49 C.F.R. Part 213), the FRA
Track Safety Standards Compliance Manual, Association of American Railroads publication on
Train Derailment Cause Finding and the Canadian Pacific handbook on the same subject.
ST/BM generally follows the AAR publication in investigating derailments. In the course of my
thirty-seven year career as a railroad employee, I have headed or participated in investigations of
more than three thousand derailments, of which several hundred occurred on main lines.

5.    In 1988, the Interstate Commerce Commission ("ICC") compelled the Boston and
Maine Corporation to sell approximately forty-eight miles of the Connecticut River Line (the
"Line") to the National Railroad Passenger Corporation ("Amtrak"), which immediately resold
the Line to the Central Vermont Railway. The ICC order, which ultimately was upheld by the
courts, required that the new owner of the Line grant trackage rights to B&M/ST.

6.    Trackage rights are similar to the rights of a lessee of ordinary real property,
giving the tenant railroad certain rights to travel over and use the tracks of the landlord railroad.

2

7.    In February 1990, after Central Vermont and Boston and Maine were unable to agree upon the provisions of a trackage rights agreement, the ICC imposed a trackage rights order ("TRO"). The ICC decision is reported as *Amtrak—Conveyance of B&M in Conn River Line in VT & NH*, 6 I.C.C.2d 539 (1990) ("*Amtrak II*"). The TRO also covered several segments connecting to the transferred portion that already were owned by Central Vermont  and over which Boston and Maine already had trackage rights.

8.    The derailment that is the subject of this action occurred on a segment that already was owned by Central Vermont but that is subject to the TRO. The tracks subject to the TRO are referred to herein as "the Line."

9.    Section 3.2 of the TRO makes CV "solely responsible for dispatching all operations over the Line and for the maintenance and repair of the Line, including the signals and the signal and dispatching system which controls operations on it," as well as for "keep[ing] the Line, at all times throughout the term of this Agreement or any extensions thereof, in not less than FRA Class II condition."

10.    Section 7.1 of the TRO provides:

> each party hereto shall be responsible for and shall assume all loss, damage or injury . . . to persons or property, including the cost of removing any trackage, repairing trackage and correcting environmental damage, which may be caused by its engines, cars. trains or other on-track equipment (including damage by fire originating therefrom) *whether or not the condition or arrangement of the trackage contributes in any manner or to any extent to such loss, damage or injury,* and whether or not a third party may have caused or contributed to such loss, damage or injury, and for all loss or damage to its engines, cars, trains or other on-track equipment while on said trackage from any cause whatsoever . . . .

The full text of the TRO is annexed hereto as Exhibit 1.

3

11.    The TRO remains in force.  ST/BM is the successor in interest to Boston and Maine Corporation; the New England Central Railroad, Inc. ("NECR"), which is the plaintiff/counterdefendant in this action, is the successor in interest to Central Vermont Railway.

12.    In January 2006, in a declaratory order proceeding between the parties to this action, the Surface Transportation Board ("STB"), which is the successor to the ICC, ruled that Section 7.1 of the TRO is not intended to absolve NECR of gross negligence or willful misconduct relating to a derailment.  A copy of the STB ruling is annexed hereto as Exhibit 2.

13.    The Federal Railroad Administration ("FRA") has plenary responsibility for rail safety in the United States.

14.    On June 8 and 9, 2004, the Line was inspected by a track geometry car operated by a contractor to FRA (the "Inspection").  NECR personnel rode on the inspection car and relayed information about defects and remedial actions from there to NECR's dispatchers.  See Exhibits  3 (at 6:6-10) and 4 (at p. 7—Bates #803) hereto.

15.    During such an inspection, instruments on the inspection car automatically record defects, locating each defect using the Global Positioning System ("GPS").  The system for relating defects identified by the inspection car to physical landmarks such as mile posts and bridges is not automated; instead, the railroad's track inspector calls out landmarks as they are passed and an inspector or operator punches a button to mark each such location.  The imprecision of the "call-out," as well as the reaction time for the individual who pushes the marker button, means that that results of such an inspection typically are not precise as to related landmarks such as mile  posts (though they are relatively precise as to GPS readings).

16.    Indeed, it is normal practice, when the track owner's inspection personnel revisit each defect site on foot, to begin by examining the track for several hundred feet on either side of

4

the marked point. In the case of a post-derailment inspection involving a possible crosslevel defect, standard industry practice is to consider the track segment from 300 feet before the derailment to 100 feet after the derailment. Moreover, a crosslevel defect of the sort involved in the Derailment is by definition at least sixty-two feet long; thus even were the inspection car reading precise, the defect could extend for sixty-two feet in either direction from the noted spot. See Exhibit 5 hereto at V-9.

17.    The Inspection revealed 251 defects in a 230-mile stretch of track. Particularly troubling was the fact that 189 of the defects were such that the related track was in *less* than FRA Class 2 condition and that seventy-four defects were such that the related track was in *no* recognized FRA class (i.e., they were not in condition to have trains running over them). See Exhibits 4 and 6 hereto.

18.    The identified defects included a crosslevel defect, also known as a warp, in the vicinity of Milepost ("MP") 10.16. See Exhibit 3 hereto at 7:2-3. The warp near MP 10.18 exceeded the limit established by the FRA's track safety standards. Thus, NECR was aware of this defect at least twenty-five days before the Derailment on July 3, 2004. Moreover, the FRA inspection report included the text of § 213.63 and its critically important note 2. See Exhibit 6 hereto at page Bates #809. NECR's track inspector, Rick Boucher, agreed with the test car's determination of a warp defect in the vicinity of MP 10.18. See Exhibit 7 hereto at 10:5-13.

19.    A recognized authority on the subject of derailment, Train Derailment Cause Finding, states that crosslevel (warp) defects are among the more common types that "cause or contribute to a derailment."

> If a car with a high center of gravity is traveling at a speed such that its trucks are directly over successively low joints at the same time as the car rocks to the side of the low joints, the rocking will become more and more severe until the

5

wheels on the opposite side of the low joints lift off the rail. *The speed at which wheel lift occurs is between 10 and 25 miles per hour.*"

See Exhibit 5 hereto at V-8 and V-9.

20.    According to NECR's roadmaster, "[a] warp would be that [the height difference between the two rails] changes too drastically in a 62-foot segment," and "[t]he rail car could rock if there is too much of a change in a certain distance at a certain speed." See Exhibit 8 hereto at 19:9-20:7. NECR's track supervisor conceded that a warp can cause harmonic rock and that under certain conditions, that in turn can cause wheel lift. See Exhibit 3 hereto at 9:20-11:16.

21.    As a result of the Inspection, NECR placed slow orders at numerous locations on the Line, including the vicinity of MP 10.16. Normal industry practice, including that of the Federal Railroad Administration and ST/BM, is not to impose slow orders on fixed points but on *segments* of track, having varying length depending upon the defect in question. This NECR did not do.

22.    A comparison of NECR's Daily Operating Bulletins for June 10 and 11, 2004, shows that the slow order for the MP 10.16 vicinity, which set a "Class 2" speed limit of twenty-five miles per hour, was not established until two days after the Inspection. Compare Exhibit 9 hereto (at p. 3 of 5—Bates #1397) with Exhibit 10 (at p. 4 of 7—Bates #1403). This delay is highly improper and dangerous, as the ironclad industry practice is to address any defect, at least on a permitted temporary basis, before the next train uses the defective track segment.

23.    The NECR Daily Operating Bulletin for July 3, 2004 shows that the slow order remained in effect on the day of the Derailment. See Exhibit 11 hereto at p. 4 of 6—Bates #000018. The warp had not been repaired when the Derailment occurred. See Exhibit 8 hereto at 23:11-24:4.

6

24.    The proper remedial action would have been tamping up the ballast under the low (inside) end of the ties. This could have been accomplished using a self-lining, self-leveling tamper or, at least temporarily, manually by several workers using basic track tools. See Exhibit 8 hereto at 28:2-29:8. Neither action was taken; the excuse offered by NECR's Richard Boucher was that the operator of NECR's tamping machine went on vacation before NECR got around to correcting this defect. See Exhibit 3 hereto at 9:3-11.

25.    Instead, NECR took the easy—and improper—way out, dropping the segment to Class 2 status, which meant a maximum freight-train speed of twenty-five miles per hour. Ironically, the improper slow order issued by NECR probably created a *greater* derailment risk than would have existed had the segment remained at Class 3—a class whose maximum speed for freight trains of forty miles per hour is well above the harmonic-risk range of 10-25 mph addressed by note 2 to § 213.63.

26.    NECR's track supervisor, Richard Boucher, testified that he measured the defect at MP 10.16 on June 8, 2004, but did not measure it again between then and the occurrence of the Derailment more than three weeks later. See Exhibit 3 hereto at 11:3-11. Moreover, Mr. Boucher admitted that it would not have been the practice of NECR's track inspection department to do so. See Exhibit 3 hereto at 11:12-16. Indeed, track inspector Rick Boucher didn't even record the defect on his subsequent inspection reports, see Exhibit 3 hereto at 8:18-9:1; 21:21-25:19, though the FRA's track safety rules require such recording on *each* track inspection report until the defect has been corrected, see Exhibit 12 hereto at p. 5.140, 2nd full ¶.

27.    Thus NECR had no way of knowing whether the condition had worsened, though FRA recognizes that such an occurrence is a distinct possibility and therefore expects remeasurement *regularly* until the defect has been corrected. NECR's Richard Boucher

7

conceded that this defect could have caused wheel lift of the type that led to the Derailment. See Exhibit 3 hereto at 11:21-12:6.

28.    In the early hours of July 3, 2004, a nineteen-car ST/BM freight train set out in a southerly direction on the Line from White River Junction, Vermont. As the train rounded a curve—the curve with the warp defect—near MP 10.18, the wheels of one truck of a boxcar on the train lifted off the rails.

29.    This "wheel lift" occurred due to the combination of the speed of the train (approximately twenty-three miles per hour), excessive superelevation (more than six inches), the warp (or "crosslevel") defect, and harmonic rocking occurring in that speed range, the relative lack of centrifugal force occasioned by that speed range, in the presence of that type of defect. NECR's Michael Lawyer testified that wheel lift is when "the flange of the wheel is allowed to come up onto the rail, or partially onto the rail head, as opposed to riding on the gauged side of the rail." See Exhibit 8 hereto at 22:2-6. Had NECR followed the FRA's rules and made the required followup inspections and measurements, NECR would have been aware of all these factors.

30.    Approximately twenty-two feet after lifting, the wheels settled back down. Instead of returning to being flush against the rail heads of their respective rails, however, one set of the wheels came down on the ties and tie plates outside its rail and the other set came down on the ties and tie plates inside the opposite rail. See Exhibit 13 hereto at 53:3-20.

31.    My investigation of the marks on and around the track structure showed that the boxcar in question remained upright and, to any observer of the moving train, aligned with the other cars as the train continued southward. Specifically, my examination revealed that the wheels remained tight against their respective rails, but on the wrong side of the rail—a distance

8

of only a few inches from where they were supposed to be. The now-misaligned wheels of the truck caused damage to the ties and tie plates over which they traveled.

32.     The ST/BM crew did not learn immediately that the truck had come off the rails. The weather was foggy, see Exhibits 14 (at 17:2-21; 39:7-16) and 15 (at 20:5-21) hereto, and the computerized record showed that the lead locomotive's ammeter did not reflect unusually high amperage for a train that was accelerating up a 0.50 percent grade after passing a slow-ordered section of track, see Exhibit 16 hereto.

33.     Moreover, the train crew did not feel any unusual jostling or anything else out of the ordinary. See Exhibits 14 (at 17:22-18:2, 20:14-17), and 15 (at 97:17-98:3) hereto.

34.     Visibility was between 240 and 300 feet. See Exhibits 14 (at 18:13-18; 39:10-17) and 15 (at 85:5-86:3) hereto. Freight cars are approximately sixty feet long. The boxcar in question was the sixth car of the train (the eighth car, if one counts the two locomotives at the front), and hence was more than 400 feet behind the locomotive where the operator and conductor were located. This meant that the crew could not consistently see the sixth car. See Exhibit 14 hereto at 57:9-11. At any rate, my examination showed that the boxcar remained upright and was not noticeably out of alignment with the rest of the train. See Exhibit 15 hereto at 86:23-87:14 . The engineer testified that he last looked back to check the train consist shortly before the cars went onto the ground at MP 5.7. See Exhibit 14 hereto at 38:15-39:6.

35.     At approximately MP 5.7, however, the derailed wheels reached the "frog" portion of a switch near Hartland, Vermont, at which time the truck turned sideways and the boxcar in question went onto the ground, taking with it the six cars behind it in the train. See Exhibit 14 hereto at 25:22-27:2.

9

36.    Prior to this point there was no warning to the crew that a set of wheels had derailed.  See Exhibits 14 (at 33:9-11; 58:3-13) and 15 (at 34:16-20; 62:23-63:17; 97:17-98:3) hereto.

37.    I investigated the Derailment on behalf of ST/BM.  I determined that because of the relatively slow train speed (not in excess of twenty-five miles per hour) and the excessive superelevation of the outside rail on the curve at MP 10.18, most of the weight of the boxcar in question was over the inside rail of the curve.  This meant, of course, that the opposite wheels—those on the outside rail of the curve—were bearing an unusually light load; that fact, plus the previously noted deviation in track alignment, plus the harmonic motion that the FRA track safety regulations warn against at Class 2 speeds, caused those wheels to lift off the outside (high) rail of the curve at approximately MP 10.18.

38.    An additional factor was that the track where the wheels initially came off (around MP 10.18) was misaligned by approximately one and one-quarter inches.  Although my inspection occurred after the Derailment, the physical evidence demonstrated that the misalignment was not of recent vintage, but had antedated the Derailment.

39.    Thus, the area around MP 10.18 had both an alignment defect and a crosslevel defect.  As noted at page 6-6 of the Canadian Pacific derailment manual, which is widely used in the railroad industry, each type of defect can aggravate the other type, such that "[t]he combination of forces from alignment and surface defects in the same location . . . has a cumulative effect much greater than either defect alone.  See Exhibit 17 hereto at p. 6-6.

40.    All these factors were within the control of NECR, which had known at least since the Inspection approximately four weeks earlier that a dangerous condition existed at MP 10.18.  Specifically, NECR knew that the elevation of the outside rail at MP 10.18 was higher

10

than permitted by Section 213.63 of the FRA track safety regulations. Note 2 to that section also
provides that because of the danger of harmonic rocking, the presence of such superelevation
requires that the speed limit *not* be that for Class 2 track—namely, twenty-five miles per hour—
but that for Class *1* track, which is ten miles per hour. Section 213.63, including note 2, was
reprinted in the FRA inspection report of June 8, 2007. See Exhibit 6 hereto at Bates #809.

  41. NECR knew that this defect required correction but had failed to correct it. The
defect could have been corrected by "tamping up" the ballast under the inside (lower) rail of the
curve so that the crosslevel difference in elevation was within the limit established by the track
safety regulations. The excuse offered by NECR for not doing this is that the operator of their
tamping machine had gone on vacation. NECR has offered no excuse for not using the
temporary expedient of having workers with basic track tools add ballast (rock) beneath the
lower ends of the relevant ties. See Exhibit 3 hereto at 6:14-9:11.

  42. In conducting my investigation, I noticed that at least one joint of the lower rail at
the MP 10.18 location was sinking into the mud. Moreover, the ballast at that point contained
mud and contaminants and therefore did not properly transmit load to the subgrade. This is an
improper condition because it limits the ability of the track structure safely to handle the load.
Amazingly, NECR's track inspector admitted that he had not noticed these conditions at the
location in question. See Exhibit 7 hereto at 13:4-7.

  43. NECR potentially had available to it a second temporary option—namely, to
slow-order that section of the Line to a *safe* speed, as permitted for up to thirty days by Section
213.9 of the track safety regulations.

  44. NECR issued a slow order but did so without taking into account the disastrous
potential combination of the crosslevel and alignment defects around MP 10.18 with a Class 2

11

speed limit of twenty-five miles per hour. NECR's failure to do so violates a basic element of track safety. That is, NECR knew, or was indifferent to, the fact that the combined effect of the crosslevel defect, the alignment defect, and the Class 2 speed limit created a high likelihood of a derailment.

45.    Given all this, the question was not *whether* a derailment would occur under those conditions, but *when* it would occur.

46.    Of particular interest is the fact that NECR has not suggested that my analysis of the cause is incorrect. When deposed, for example, NECR's track inspector (Rick Boucher) and roadmaster (Michael Lawyer)—surprisingly—testified that they did not know the cause of the Derailment. See Exhibits 7 (at 18:1-20) and 8 (at 32:15-33:8) hereto.

47.    Richard Boucher, NECR's track supervisor, testified that he didn't investigate the cause of the Derailment and that Rick Boucher and Michael Lawyer had done that. See Exhibit 3 hereto at 13:6-17.

48.    Rick Boucher testified that although he participated in the NECR's investigation, he did not know the cause. See Exhibit 7 hereto at 17:22-18:20.

49.    Finally, Michael Lawyer, who was offered by NECR as its corporate witness on track conditions before and after the Derailment, testified he didn't know whether NECR had determined a cause of the Derailment. See Exhibit 8 hereto at 32:15-33:8.

50.    I assume that all the foregoing testimony was truthful and not an effort to obscure the cause of the Derailment. As such, however, it bespeaks either a concession that my analysis is correct or a shocking lack of attention to track safety on the part of NECR.

51.    Moreover, NECR's track inspector (Rick Boucher) admitted that although he was aware of the defect at MP 10.16, he didn't note it (or, presumably, measure it) in any of his

12

semiweekly inspection reports because he hadn't been the individual who *found* the defect. See Exhibit 7 hereto at 8:18-9:1 and 21:5-25:19. This is grossly improper. Section 213.241 of the FRA's track safety regulations, as well as FRA's track safety manual, require that *each* inspection report note a defect from the time it's initially discovered until the time it has been corrected. See Exhibit 12 hereto at p. 5.140, 2nd full ¶. The reason, of course, is that track defects don't correct themselves; indeed, they typically worsen if not attended to. Only by rechecking a known defect at each semiweekly inspection can the track owner be certain that matters are deteriorating further.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed March 22, 2007.

Roger D. Bergeron

13