## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

NEW ENGLAND CENTRAL
RAILROAD, INC.,

      Plaintiff/Counterdefendant,

      -v.-                                Civil Action No. 04-30235-MAP

SPRINGFIELD TERMINAL
RAILWAY COMPANY, et al.,

      Defendants/Counterclaimants.

---

### OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF THE DEFENDANTS' EXPERT, ROGER D. BERGERON

Springfield Terminal Railway Company and Boston and Maine Corporation (collectively, "ST/BM"), which are the defendants/counterclaimants herein, oppose Plaintiff New England Central Railroad, Inc.'s ("NECR") motion *in limine* to exclude the testimony of ST/BM employee Roger D. Bergeron [Dkt. #96].

Mr. Bergeron is a qualified track safety inspector under the rules of the Federal Railroad Administration ("FRA"). Declaration of Roger D. Bergeron in Support of Defendants/Counterclaimants' Motion for Partial Summary Judgment ("Bergeron Declaration") [Dkt. #61-1] ¶ 3. He has investigated literally thousands of derailments in his 36 years as a railroad employee. *Id.* ¶ 4. NECR nonetheless argues that he is not qualified to render expert opinions on that subject. *See* Plaintiff's Motion in Limine to Exclude the Testimony of the Defendants' Liability Expert, Roger D. Bergeron ("NECR Motion to Exclude Bergeron Testimony") [Dkt. # 96] at 3-4.

First and foremost, this Court already has heard—and declined to adopt—the identical argument by NECR in its April 26, 2007 motion to strike Mr. Bergeron's declaration [Dkt. #78-1]. Specifically, this Court denied NECR's motion to strike Mr. Bergeron's testimony, refusing to effectively award NECR judgment on the merits. [Dkt. #92]. Accordingly, NECR should not be permitted to circumvent this Court's prior decision by clothing its previously unsuccessful argument in the garb of a motion *in limine*.

It is also noteworthy, given NECR's extraordinary efforts to remove Mr. Bergeron and his findings from the case, that at no point has NECR questioned Mr. Bergeron's conclusion that the cause of the Derailment was the combination of NECR's uncorrected track defects and the improper slow order imposed by NECR on the site of the Derailment—the track segment that includes MP 10.18 and MP 10.16. ST/BM repeatedly has asked NECR for its view of the cause of the Derailment, but has yet to receive any responsive evidence on this point.

I.  **This Court already has ruled that Mr. Bergeron's testimony is admissible and NECR is not entitled to an order that would require, in effect, a judgment on the merits in favor of NECR.**

In its April 26, 2007 motion to strike Mr. Bergeron's declaration, NECR argued that Mr. Bergeron is not qualified to opine on issues relating to railroad operations and/or mechanical issues. In particular, NECR stated, "Mr. Bergeron, to the extent that he has opined concerning issues relating to railroad operations and/or mechanical issues, is not qualified to render such opinions, therefore any reference to such opinions within his declarations must be stricken." Plaintiff's Memorandum of Law in Support of its Motion to Strike the Declaration of Roger D. Bergeron Filed in Support of the Defendants' Motion for Summary Judgment and/or for Other Appropriate Relief ("NECR Brief") [Dkt. #78-1] at 12.

On July 24, 2007, this Court denied NECR's motion to strike Mr. Bergeron's declaration. Memorandum and Order Regarding Defendants' Motion for Partial Summary Judgment, Plaintiff's Motion for Summary Judgment and Plaintiff's Motion to Strike ("July 24 Order") [Dkt. #92] at 3. Indeed, this Court determined that Mr. Bergeron's opinion concerning the "circumstances surrounding the derailment" is a "proper subject[] for cross-examination." *Id*. at 8. This Court also concluded that excluding Mr. Bergeron's testimony "would require, in effect, a judgment on the merits in favor of Plaintiff" and that such judgment was unwarranted. *Id*.

To allay NECR's supposed concerns over Mr. Bergeron's testimony, and given that no expert report was required of Mr. Bergeron because of Fed. R. Civ. P. 25(a)(2)(B), this Court permitted NECR an opportunity to depose Mr. Bergeron a second time before August 24, 2007. July 24 Order at 8.  NECR, however, has passed up this opportunity to re-depose Mr. Bergeron and the month-long period granted by the Court now has expired.  Indeed, ST/BM has had a standing offer to permit a further deposition of Mr. Bergeron ever since ST/BM identified him as an expert back in February 2007. *See* Memorandum of Reasons in Support of Unopposed Motion for Permission to Designate Expert Witness Out of Time [Dkt. #56] at 2.  NECR has not taken up that offer, either.

Despite this Court's ruling that Mr. Bergeron's testimony is admissible, NECR again seeks to exclude Mr. Bergeron's opinions.  In so doing, NECR even recycles the exact language from its motion to strike: "Mr. Bergeron, to the extent that he has opined concerning issues related to railroad operations and/or mechanical issues, is not qualified to render such opinions, therefore any reference to such opinions within his declarations must be stricken." NECR Motion to Exclude Bergeron Testimony at 3.

As the foregoing makes clear, NECR seeks a second bite at the apple but again has

provided no basis for striking Mr. Bergeron's testimony.  Accordingly, NECR's renewed attempt

to exclude Mr. Bergeron's testimony should be denied.

**II.     Mr. Bergeron is eminently qualified as an expert on the causes and effects of derailments.**

Despite NECR's assertions to the contrary, *see* NECR Motion to Exclude Bergeron

Testimony at 3-4, Mr. Bergeron's qualifications as an expert are considerable.  Mr. Bergeron

has been a railroad employee for 36 years.  Bergeron Declaration ¶ 2.  His positions during that

period have included trackman in the late 1960s, engineering surveyor and a construction

inspector in the early 1970s, resident engineer in the mid-1970s, a track supervisor from the late

1970s to early 1980s, a roadmaster and engineer of track in the mid-1980s, an engineer of

production and construction until 1996, then assistant vice-president of engineering until 2006.

*Id*.  Mr. Bergeron's current position includes responsibility for industrial development of

railroad properties, track construction and design projects, preparing estimates for permitting

commuter rail service on certain portions of ST/BM's track, and continuing responsibilities for

overseeing track maintenance and construction.  *Id*. ¶ 3.  Mr. Bergeron is qualified under

Section 213.7 of the FRA regulations regarding track safety in general and regarding track

inspection, renewal and replacement in particular.  *Id*.

Further, Mr. Bergeron has taken FRA and National Transportation Safety Board accident

derailment courses, and is familiar with the FRA track safety standards (49 C.F.R. Part 213), the

FRA Track Safety Standards Compliance Manual, an Association of American Railroads

publication entitled *Train Derailment Cause Finding* and the Canadian Pacific handbook on the

same subject.  *Id*. ¶ 4.  In the course of his career as a railroad employee, Mr. Bergeron has led

or otherwise been involved in investigations of more than three thousand derailments, including several hundred that occurred on main lines. *Id.*

> Federal Rule of Evidence 702 states:
>
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness *qualified as an expert by knowledge, skill, experience, training, or education*, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (emphasis added). Indeed, as NECR admits by its silence on the point, Rule 702 does not provide fixed criteria as to what qualifies one as expert. The plain language of Rule 702 makes clear that one may qualify as an expert based on experience. *See also* 32 C.J.S. Evidence § 525 (2007) ("There is no precise rule governing the manner in which an expert witness acquires the requisite skill or knowledge . . . . One may also qualify as an expert by practical experience alone."); Fed. R. Evid. 702 adv. comm. n. (2000) ("the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. *In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony*" (emphasis added)). Accordingly, Mr. Bergeron's substantial practical experience over the past 36 years as a railroad employee and track inspector qualifies him as an expert on the subject of derailments.

Further, as Federal Rule of Evidence 702 requires, Mr. Bergeron's testimony is sufficiently reliable. Fed. R. Evid. 702; *see also Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579 (1993). First, notwithstanding NECR's contentions to the contrary, *see* NECR Motion to Exclude Bergeron Testimony at 7-8, to the extent that Mr. Bergeron's testimony is considered expert, rather than lay, testimony it need not be based on personal knowledge. *See* WEINSTEIN'S

FEDERAL EVIDENCE § 702.02[2] (2006) ("Unlike lay witnesses, who must testify based on personal knowledge, expert witnesses do not need to have personal knowledge of the underlying facts."). Indeed, NECR's criticism—and mischaracterization—of Mr. Bergeron's discussions with ST/BM's mechanical and operations officers in his effort to investigate the cause of the Derailment is misplaced. *See* NECR Motion to Exclude Bergeron Testimony at 8. Interviews are a source on which experts in various fields reasonably rely to obtain information for the formation of opinions and inferences. *See* WEINSTEIN'S FEDERAL EVIDENCE § 703.04[3] (2006); *see also American Univ. Ins. Co. v. Falzone*, 644 F.2d 65, 66 (1st Cir. 1981) ("reasonable for one state fire marshal to rely on the contemporaneous and on-the-scene opinions of other investigators on his team as to the portion of the investigation that they carried out within their competence").

Mr. Bergeron communicated with personnel in ST/BM's mechanical and operations departments and relied on their factual findings in determining the cause of the Derailment. In particular, Mr. Bergeron conferred with at least two members of ST/BM's mechanical department, Mike Walsh and Jimmy Austin, regarding the train's locomotive and car dynamics. Rule 30(b)(6) Deposition of Springfield Terminal Railway Company by Roger D. Bergeron at 59-61, 71, 74 (relevant portions annexed hereto as Exhibit A). Mr. Bergeron also relied on a senior ST/BM operations officer's findings regarding the operation of the train at the time of derailment, including the throttle position of the engine and the crew's rest time. Exh. A at 71-73. It was reasonable for Mr. Bergeron to rely on the on-the-scene assessments by such members of ST/BM's mechanical and operations staffs as to the portions of the investigation that they conducted in their areas of expertise. *See, e.g., Falzone*, 644 F.2d at 66.

NECR further claims that Mr. Bergeron's opinions are not "based on any scientific principles, but solely on his subjective opinion." NECR Motion to Exclude Bergeron Testimony at 8. NECR concedes, however, that Mr. Bergeron's testimony is based, in part, on the event recorder download and Mr. Bergeron's observations at the derailment site as to what caused the Derailment. *Id*. As NECR states, the event recorder documents, among other things, "the settings of the throttle, brakes and other various operating components as the train is operated on the tracks." *Id*. at 8 n. 9. Thus, it can hardly be considered unreliable for Mr. Bergeron, as part of his investigation of the cause of the Derailment, to have asked a ST/BM mechanical officer to interpret the recorder data evincing the train's operations. *See* Exh. A at 56. At a minimum, Mr. Bergeron's reliance upon the event recorder data in forming his expert opinion belies NECR's assertion that Mr. Bergeron's expert testimony is based solely on "speculation and conjecture." *See* NECR Motion to Exclude Bergeron Testimony at 9.

Further, NECR admits that Mr. Bergeron inspected "the marks on the rail at the point of derailment as part of his investigation." *Id*. at 8. Mr. Bergeron also surveyed, among other things, the derailment area and various locations along the track segment. Exh. A at 25. Visual observation is a reliable method of forming an expert opinion, *see, e.g., Santos v. Posadas De Puerto Rico Associates, Inc.*, 452 F.3d 59 (1st Cir. 2006), and, as NECR itself acknowledges, Mr. Bergeron is qualified as a track inspector under the FRA regulations, *see* NECR Motion to Exclude Bergeron Testimony at 7. Accordingly, Mr. Bergeron's application in this case of his extensive practical experience visually inspecting derailment sites over the course of his 36-year railroad career is sufficiently reliable.

In addition to his visual inspection of the derailment area, Mr. Bergeron took geometry readings at the point of derailment, performing measurements of the track structure with a level

board, gage combination and tape measure. Exh. A at 25-26, 123. Examination of physical evidence at an accident site is a widely-accepted methodology for forming an expert opinion as to the cause of an accident. *See, e.g., Giard v. Darby*, 360 F. Supp. 2d 229 (D. Mass. 2005); *Brown v. Crown Equip. Co.*, 236 F.R.D. 58 (D. Me. 2006). Thus, Mr. Bergeron's physical assessment of the track conditions was a reliable technique for investigating the cause of the Derailment.

Lastly, Mr. Bergeron reasonably relied on multiple business records, including NECR's track chart, timetable and temporary speed restriction summary, as well as a copy of the exception list generated by the FRA track geometry test on June 8, 2004, *see* Exh. A at 80, as part of his investigation and conclusion that the cause of the Derailment was the combination of NECR's uncorrected track defects and the improper slow order imposed by NECR on the segment where the Derailment occurred. Business records and reports are proper sources of information from which an expert opinion or inference can be formed. *See* WEINSTEIN'S FEDERAL EVIDENCE § 703.04[3] (2006).

The above facts demonstrate that Mr. Bergeron's opinions are not merely "speculation and conjecture." Rather, they are based on sufficient facts and are the product of reliable principles and methods that have been applied to this case. As such, Mr. Bergeron's testimony regarding the cause of the Derailment is admissible pursuant to Federal Rule of Evidence 702.

## Conclusion

This Court already has ruled that Mr. Bergeron's testimony is admissible and that NECR is not entitled to an order that would require, in effect, a judgment on the merits in favor of NECR. NECR's recycled request for the same relief—based upon the same contentions as its initial request—likewise should be denied. Mr. Bergeron is eminently qualified as an expert on

the causes and effects of derailments.  His opinions are based on sufficient facts and are the product of reliable principles and methods that have been applied in this case.

Accordingly, for the reasons set forth above, NECR's motion *in limine* to exclude the testimony of Roger D. Bergeron should be denied in all respects.

Respectfully submitted,

Eric L. Hirschhorn
Debra R. Coletti
Winston & Strawn LLP
1700 K Street, NW
Washington DC 20006
202-282-5700

Robert B. Culliford (BBO #638468)
Pan Am Systems, Inc.
Pease International Tradeport
14 Aviation Drive
Portsmouth NH 03801
603-766-2002

*Attorneys for Defendants/Counterclaimants*
*Springfield Terminal Railway Company*
*and Boston and Maine Corporation*

August 24, 2007

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that service of this Opposition to Plaintiff's Motion *in Limine* to Exclude the Testimony of Defendants' Expert, Roger D. Bergeron, and the accompanying papers will be made on counsel for NECR, the plaintiff/counterdefendant, by means of the Court's electronic filing system.

_____
Debra R. Coletti

EXHIBIT A

Volume 1, Pages 1-180

Exhibits: 10-26

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

NEW ENGLAND CENTRAL RAILROAD, INC.,

            Plaintiff

v.                        Docket No. 04-30235-MAP

SPRINGFIELD TERMINAL RAILWAY

COMPANY and BOSTON AND MAINE

CORPORATION,

            Defendants

-----------------------------

RULE 30(b)(6) DEPOSITION OF SPRINGFIELD TERMINAL

        RAILWAY COMPANY by ROGER D. BERGERON

      Thursday, January 11, 2007, 10:11 a.m.

        Law Office of Robert H. D'Auria

            41 North Road, Suite 205

        Bedford, Massachusetts  01730


----Reporter:  Kathleen Mullen Silva, RPR, CRR----

        Beacon Hill Court Reporting, Inc.

          807 Main Street, 2nd Floor

        Worcester, Massachusetts 01610

              508.753.9286

22

1 know, that Portland area down through the
2 metropolitan Boston area. And then out through the
3 Fitchburg, Mass., Worcester area, that area there
4 would be considered central into Concord, New
5 Hampshire, that would be considered central. And
6 the western section would be from that area in
7 Fitchburg down through to the Greater Hartford,
8 Waterbury area in Connecticut and Westwood through
9 to the capital district, you know,
10 Albany, Amsterdam, that area of New York.
11     Q. And how far north would it go?
12     A. Well, they would cover wherever our trains
13 operate, up to White River Junction and areas like
14 that.
15     Q. So hypothetically I could draw a line from
16 Worcester west and that would be the western
17 district on everything you guys own?
18     A. For the --
19     Q. For the mechanical part.
20     A. Engineering and mechanical would closely
21 follow that alignment.
22     Q. Is there a reason why the mechanical and
23 engineering department are set up slightly different
24 in terms of alignment?

23

1     A. The engineering discipline has more
2 specific demands on territory. The territories are
3 more specific. There are certain line segments that
4 people in each district are responsible for, track,
5 bridges and things of that nature. So there's
6 specific things that require them to do it.
7 Mechanical has more of an overview, oversight. Cars
8 roll from territory to territory, and it's not that
9 you look at the car once it crosses the line in
10 Fitchburg. They may have to -- because of their
11 discipline and training, they would have to follow
12 the cars wherever they roll I guess is a better
13 term.
14     Q. We've identified some management people
15 that showed up. Who was in charge on behalf of the
16 Springfield Terminal Railroad at that scene?
17     A. In charge at the scene and the rerailing
18 would be James Austin.
19     Q. I'm not talking about the rerailing. I'm
20 talking about overall in charge of the scene.
21     A. Overall in charge of the scene would be
22 Jimmy Austin.
23     Q. So did you report to Jimmy Austin when you
24 showed up there?

24

1     A. No, I did not.
2     Q. Who did you report to?
3     A. I didn't report to anybody.
4     Q. Who did you go up there on behalf of?
5     A. I just went up there to satisfy my
6 curiosity as to the incident.
7     Q. No one sent you up there on behalf of the
8 company?
9     A. No, they did not.
10     Q. So you didn't have an official role being
11 there?
12     A. Well, I went there to gather some facts and
13 investigate the derailment.
14     Q. In what capacity?
15     A. As the assistant vice president of
16 engineering under the engineering discipline.
17     Q. Did you go up there with anyone in
18 particular?
19     A. No.
20     Q. Drove up by yourself?
21     A. Yes, I did.
22     Q. Once you got there, did you work with
23 anyone in the course of gathering your facts and
24 investigating the derailment?

25

1     A. Yes, I did.
2     Q. Who did you work with?
3     A. Dan Griffiths.
4     Q. What did you do with Dan Griffiths?
5     A. He just accompanied me while I surveyed the
6 derailment, point of derailment, the derailment area
7 and spot checked various locations along the
8 segment.
9     Q. Was he taking notes on your behalf?
10     A. I believe he did, yes.
11     Q. Did you take notes?
12     A. A few, yes.
13     Q. When did you take notes and what did you
14 take notes about?
15     A. At the point of derailment, I took track
16 geometry readings.
17     Q. Let's start with that. Did you take your
18 own measurements, or were you relying on someone
19 else who was taking measurements and reading them
20 off?
21     A. No. I took my own measurements.
22     Q. What did you measure with?
23     A. A level board and gage combination.
24     Q. Where did you obtain the level board and

(Pages 26 to 29)

**26**

1 gauge combination?
2    A. That's my instrument.
3    Q. Is it something you keep in your truck or
4 your car?
5    A. Yes, it is.
6    Q. And it's always in your truck or car?
7    A. For the most part, yes, it is.
8    Q. Did you measure with any other device or
9 instrument?
10    A. Tape measure.
11    Q. Did you have any other instruments or
12 devices?
13    A. No, not really.
14    Q. Did you have a 62-foot chord?
15    A. No, I did not.
16    Q. During the course of your employment with
17 the STRC and the B&M, Guilford or Pan Am, have you
18 ever been sent to any classes regarding the
19 investigating of derailments?
20    A. Yes, I have.
21    Q. When did you do that?
22    A. A few of them. I've been through an FRA
23 accident derailment course conducted at the Volpe
24 Center in Boston; National Transportation Safety

**27**

1 Board school of accident and incident investigation.
2 I believe that was at the Volpe Center also.
3    Q. What else?
4    A. In derailments, that's it.
5    Q. Okay. Both at Volpe Center?
6    A. To the best of my knowledge, both of them
7 were in the Volpe Center.
8    Q. That's down in Kendall Square?
9    A. Yes.
10    Q. When did you participate in the class for
11 the FRA?
12    A. Gee, that had to be like the late '70s,
13 maybe early '80s, in that general time frame.
14    Q. And what about the NTSB?
15    A. It wasn't that much longer, a year or two
16 after that, maybe, in that time frame.
17    Q. Have you had any other course work in
18 derailments and/or accident investigation since
19 then?
20    A. Since then?
21    Q. Right.
22    A. No.
23    Q. Have you had the opportunity to review any
24 other materials published by either the FRA, the

**28**

1 NTSB or the AAR regarding derailment investigation?
2    A. Oh, yes.
3    Q. Okay. Can you give us the materials and
4 when you have?
5    A. I've read the reports that have come out on
6 the various derailments that have come out through
7 the NTSB or the FRA. They're published and sent
8 around to the different railroads. I've read the
9 AAR, American Association of Railroad's derailment
10 investigation manual and subsequent updates to the
11 manual and various railroads that have derailment
12 investigation techniques.
13    Q. What railroads would that have been?
14    A. I was given a block of information from the
15 CPD&H on their training and all that for their
16 employees for every discipline, from track standards
17 to derailment investigation to their implementation
18 of roadway worker rules. So I've gone over their
19 manuals and things of that nature.
20    Q. Prior to this derailment in 2004, when was
21 the last time that you had updated or read
22 information concerning derailment accident
23 investigation techniques?
24    A. The stuff for the Canadian -- CPD&H, that

**29**

1 was probably 2002 or '03, in that time frame.
2    Q. The AAR manual, when was the last time you
3 reviewed that?
4    A. Probably -- in detail?
5    Q. Mm-hmm.
6    A. Probably 2000, in that general area.
7    Q. Why was it in 2000 that you read the
8 manual?
9    A. We were implementing a change of -- we've
10 adopted the AAR manual as basically the criteria
11 behind derailment investigation on Guilford so we
12 kind of looked it over to make sure that there was
13 nothing that we needed to strengthen in our training
14 to our supervisors.
15    Q. So the Guilford system in 2004 utilized the
16 AAR derailment manual as its rules or guides to
17 investigation?
18    A. As part of its guide to investigation.
19    Q. What else did the Guilford system use in
20 2004 in addition to the AAR manual?
21    A. Involving derailment?
22    Q. Correct.
23    A. It's basically laced throughout -- there
24 are references about an accident/incident in the

8

**Roger D. Bergeron**
**January 11, 2007**

54

```
1   to that decision, did they?
2      A.  No.
3         MR. WRIGHT:  I object to that as to
4   form.
5      Q.  Did you ever look at train handling or
6   operating practices of the crew when you
7   investigated this derailment?
8      A.  That was one of the factors I considered,
9   yes.
10     Q.  What exactly did you find out regarding the
11  train handling and operating of this particular
12  train that day?
13     A.  I believe it was -- we were provided a
14  download, which would be a computer-generated
15  rendering of what goes on in the engineer's control
16  of the locomotive, and the interpretation as to what
17  was done was done by -- well, it was done in front
18  of me -- was I believe -- Marty Moore from our
19  mechanical office was the person that went over
20  the -- collectively they call them tapes, but it's
21  more of a computer chart.
22     Q.  All right.  Are you a certified track
23  inspector?
24     A.  Yes, I am.
```

55

```
1      Q.  How long have you been a certified track
2   inspector?
3      A.  Probably since the -- I was on the first --
4   1970 -- I'd have to be real general here and let me
5   explain to you "real general."
6      Q.  Since the 1970s.  You don't have to tell me
7   exactly.  Since the '70s?
8      A.  Since the regulations came out in the
9   1970s.
10     Q.  And you've never let that certification
11  lapse?
12     A.  No.
13     Q.  As you sit here today, you're a certified
14  track inspector?
15     A.  That's correct.
16     Q.  When was the last time you took a test?
17     A.  I actually provide training to the people
18  that take tests on our system.
19     Q.  But when was the last time that you had to
20  take the test to become certified?
21     A.  There is no test required to become
22  certified.
23     Q.  Who verifies that you have kept up your
24  certification?
```

56

```
1      A.  On our property, no one.
2      Q.  As to the train handling of the crew, you
3   just testified that Marty Moore from the mechanical
4   office read the speed tape, the printout for you?
5      A.  Yes, he did.  Interpreted it for me is a
6   better term.
7      Q.  The event recorder tape?
8      A.  Event recorder tape, that is correct.
9      Q.  So he interpreted it for you?
10     A.  Yes, he did.
11     Q.  And he went over it for you?
12     A.  Yes, he did.
13     Q.  You're not certified to download or read
14  those yourself, are you?
15     A.  I would say no.
16     Q.  You wouldn't say no?
17     A.  I would say no.
18     Q.  Okay.  What department does Marty Moore
19  work for?
20     A.  Mechanical.
21     Q.  Did he ever work for the transportation
22  department?
23     A.  I don't know in his formative years with
24  the railroad whether he did.  He was a long-term
```

57

```
1   railroad employee.  He could have.
2      Q.  Is he with the railroad any longer?
3      A.  I believe he's recently retired.
4      Q.  Aside from reviewing the event recorder
5   tape printout, what else did you do to investigate
6   the train handling of the crew?
7      A.  The marks were a big indication as to train
8   handling.  I mean, they either rule in or rule out
9   certain critical components of derailment
10  investigation.
11     Q.  Okay.  So you looked at the marks.
12     A.  That is correct.
13     Q.  You looked at the event recorder printout?
14     A.  That is correct.
15     Q.  What else did you look at regarding the
16  train handling of the crew?
17     A.  At the time that was it.
18     Q.  At the time that you made your
19  determination as to the derailment cause?
20     A.  That is correct.
21     Q.  Subsequently, have you done anything?
22     A.  There was a --
23         MR. WRIGHT:  I'm going to object to that
24  as being a little ambiguous.  Can you clarify that?
```

(Pages 58 to 61)

---

**58**

1  Q. Subsequent to you coming to your
2  determination as to the cause of the derailment,
3  have you done anything else or reviewed anything
4  else as to the crew's train handling and operating
5  practices on the day of the derailment?
6  A. As part of this case, one of the things I
7  did review is a copy of a transcript of the hearing
8  of the crew. There was an internal hearing held
9  regarding the operation of both crew members on that
10 train that day. I did review a transcript of that.
11  Q. Are you talking about the transcript from
12 the hearing that Springfield held as to whether or
13 not the engineer and conductor should be banned from
14 the NECR's property? Is that the hearing transcript
15 you're talking about?
16  A. I don't know about banned. But it was a
17 hearing of the train crew that were involved in this
18 incident relating to the derailment. I don't know
19 what the --
20  Q. Do you know of any other hearings besides
21 that particular hearing that occurred with this
22 train crew?
23  A. To the best of my knowledge, no.
24  Q. So you know of only one hearing being held

**59**

1  at the STRC involving the train crew of this
2  derailment?
3  A. One for each person.
4  Q. I understand one for each person. But
5  there's only one set of hearings regarding this
6  derailment with this crew at the STRC?
7  A. Yes.
8  Q. I believe I have that information. Other
9  than that, have you done anything else to
10 investigate the train handling and operating
11 practices before you came to your determination as
12 to the cause of this derailment?
13  A. No.
14  Q. What did you do to investigate car
15 dynamics?
16  A. I spoke with the mechanical department,
17 both -- at the time Mike Walsh was keeping a
18 telephone log, and then Jimmy Austin, who was at the
19 site.
20  Q. Would it be fair to say that the STRC, in
21 the course of rerailing those cars which were on the
22 ground, had moved a lot of the damaged rail cars and
23 equipment that were on the ground prior to you
24 getting there at the actual derailment site?

**60**

1  MR. WRIGHT: Objection as to form.
2  A. The equipment was not -- yeah, that's fair
3  to say. The equipment was moved by the time I was
4  up there.
5  Q. So you didn't see the piece of land and the
6  scene where the derailment occurred where the cars
7  actually went off the track in its condition
8  immediately after the derailment, did you?
9  A. No, I did not.
10  Q. So what did Jimmy Austin tell you regarding
11 the car dynamics for the cars?
12  MR. WRIGHT: Objection.
13  MR. DAVIDSON: Excuse me. Can we go off
14 the record.
15  (Discussion held off the record.)
16  Q. We were talking about car dynamics before
17 we went off the record. We'll get back on that
18 topic now. What did you do to investigate
19 locomotive and/or car dynamics in the course of your
20 investigation?
21  A. I spoke with the mechanical officers.
22  Q. What did you learn from speaking to the
23 mechanical officers about those issues?
24  A. That they hadn't taken exception to

**61**

1  anything in the mechanical area.
2  Q. When you say they had not taken exception,
3  were they looking for defects in the rail cars?
4  A. Yes, they were.
5  Q. Have you seen photographs of the scene?
6  A. Yes, I have.
7  Q. When did you look at those photographs?
8  A. Not very good photographs. Copies of
9  photographs. That's what I looked at.
10  MR. DAVIDSON: Off the record.
11  (Discussion held off the record.)
12  Q. These photographs that you've seen, would
13 you describe what you saw in those photographs? I'm
14 talking about the actual point where the cars are on
15 the ground.
16  A. Just what it would look like typically when
17 cars, you know -- the term is "pileup" where the car
18 pileup occurred.
19  Q. There's not a typical derailment. So I'm
20 not going to ask you was this a typical pileup. But
21 was the type of damage that you saw consistent with
22 a derailment under a speed of about 25 miles an
23 hour?
24  A. The answer to the question is not a typical

16

70

1    A. My understanding, it would be springs and
2 snubbers, you know, truck components, I guess would
3 be --
4    Q. Okay.
5    A. And side bearing components.
6    Q. Did they tell you that they specifically
7 found the trucks that belonged to the rail car that
8 derailed?
9    A. To my understanding, yes.
10    Q. They were able to match up those trucks
11 with the rail car?
12    A. To my understanding, yes.
13    Q. Is it your understanding that the trucks to
14 the particular car came off the car during the
15 derailment?
16    A. That's my understanding of it, yes.
17    Q. Do you know how they matched up the trucks
18 to the rail car?
19    A. I don't know how they did, no.
20    Q. Were they able to match up all the trucks
21 that came off the various rail cars with the cars
22 they belonged to?
23    A. I don't know if -- I don't have that
24 knowledge, no.

71

1    Q. Would someone at the company have that
2 knowledge?
3    A. Probably Jimmy Austin.
4    Q. So you relied on the report from Jimmy
5 Austin as to the car dynamics in that he took no
6 exception to anything that he found as part of your
7 determination?
8    A. That is correct.
9    Q. Now, was there anyone from operations
10 involved in your determination as to the cause of
11 derailment?
12    A. Yes.
13    Q. Who was in operations that was involved?
14    A. The person I spoke with was -- one was
15 Larry Ferguson.
16    Q. And what was Larry Ferguson's title at that
17 time?
18    A. I don't know specifically his title. He's
19 the superintendent of -- in operations. I don't
20 know if that's exactly his title. It might be
21 director or something along that idea.
22    Q. And what conversations did you have with
23 Larry?
24    A. The information that came that he relayed

72

1 to me from the crew as to what -- the information
2 that came from the crew as to whether they felt
3 anything -- speed they were doing, things of that
4 nature.
5    Q. What was your understanding as to the speed
6 of the train?
7    A. My understanding of the speed of the train
8 is that it was under 25, in between 20 and 25 miles
9 an hour.
10    Q. At the time of the derailment?
11    A. At the time of derailment.
12    Q. What about the operation of the train?
13 What throttle position was it in?
14    A. Right now I don't have anything that
15 would --
16    Q. Did you ask them that at the time?
17    A. Yes. That was given to me at the time,
18 yes.
19    Q. Did you write that down anywhere?
20    A. I believe it's in my notes.
21      MR. DAVIDSON: Were his notes produced
22 as to the throttle position?
23      MR. WRIGHT: I believe --
24      MR. DAVIDSON: Let's go off the record.

73

1      (Discussion held off the record.)
2      MR. DAVIDSON: Back on the record.
3    Q. So your notes would have the throttle
4 position?
5    A. I believe it does, yeah.
6    Q. Why would you want to know the throttle
7 position?
8    A. Pardon me?
9    Q. Why would you want to know the throttle
10 position of the engine?
11    A. The throttle position speed. I actually
12 believe they gave me the train crew's rest time in
13 all that. That I might not have written down.
14    Q. But to the best of your memory, they were
15 FRA compliant, correct?
16    A. There was nothing that I took exception to
17 when he was giving me the information over the
18 phone.
19    Q. As to their sleeping and their rest time.
20 That's what I was asking. You jumped in there.
21 There was nothing you took exception to there?
22    A. No.
23    Q. Was that your only contact with the
24 operations department as to your investigation as to

(Pages 74 to 77)

74

1  the cause of this derailment?
2    A.  Yes.
3    Q.  You never personally interviewed the crew,
4  did you?
5    A.  No.
6    Q.  Who from the mechanical department did you
7  consult with as to the cause of this derailment?
8    A.  Jimmy Austin.
9    Q.  And that's the contact you told me where he
10  took no exception to the cars?
11    A.  That is correct.
12    Q.  Now, the track department, who did you talk
13  to at the track department?
14    A.  Well, I had Dan Griffiths with me.  So Dan
15  Griffiths.
16    Q.  Anyone else?
17    A.  I believe we spoke with Walt Rice, a
18  very -- terrible conversation.  The telephone
19  reception was awful.  We lost him, so...
20    Q.  Did you ever sit down with Walt Rice before
21  you made your determination as to the cause of the
22  derailment?
23    A.  No, I did not.
24    Q.  Did you ever sit down with Dan Griffiths

75

1  and review the information before you came to your
2  determination?
3    A.  Dan Griffiths was with me while I was
4  taking my notes and all that.
5    Q.  Did you have a chance to speak with him
6  about the substance of your notes prior to you
7  making a determination as to the cause of the
8  derailment?
9    A.  Yes.
10    Q.  And when was that?
11    A.  That's when we were taking the geometry
12  readings.
13    Q.  I understand that you were taking geometry
14  readings.  After you got done gathering all the data
15  that you gathered, did you have a chance to sit down
16  with Dan Griffiths to talk about that which you
17  gathered, that information?
18    A.  No.
19    Q.  So was there anyone from the track
20  department involved with your analytical
21  decision-making as to how this derailment occurred?
22    A.  Other than Dan Griffiths, no, there was no
23  one.
24    Q.  When you went out to the point of

76

1  derailment, what did you see?
2    A.  At the point of derailment?
3    Q.  Yes.
4    A.  Physical characteristics, I found a private
5  rail highway at grade crossing probably 20 feet wide
6  with wood plank in there.  I found it was situated
7  on a curve.  Without looking at my notes, I don't
8  know the degree curve and all that, but it was on a
9  curve.  I found that prior to the point of wheel
10  lift and the point of derailment, that the track was
11  welded, welded rail, and that from a point maybe
12  three rail lengths, which would be north of the
13  private crossing, was stick rail, jointed rail --
14  that's an interchangeable term, "stick" and
15  "jointed" -- that extended from that point through
16  the crossing and then through the crossing onto the
17  tangent alignment to a bridge, undergrade bridge.
18    Q.  Where did you find on the structure the
19  first evidence of the derailment?
20    A.  From my recollection, the first evidence
21  that I seen was very close to the crossing -- I'm
22  not even going to say the dimension -- real close to
23  the crossing, three to ten feet, in that area, and
24  then through the crossing, where it disturbed like

77

1  the planking that was inside the private crossing,
2  and then, opposite the first mark, an area inside,
3  which would be the track structure inside the track
4  where the wheel had bent into the inside of it.  The
5  first indication I explained was on the high side of
6  the curve.  The second one would be on the low side
7  of the curve.
8    Q.  What was the first mark that you saw, the
9  high side or low side?
10    A.  The first one that was obvious to me when I
11  came out was the high side, the mark in the
12  crossing.  I'll explain.  I pulled up to the
13  crossing, and that was the first mark I saw.
14    Q.  Once you got out and looked around, where
15  did you determine that the first wheel lifted off
16  the rail?
17    A.  By following the marks on top of the rail,
18  I followed it down to the point where I believe it
19  climbed.  It was very, very light at the point of
20  climbing the rail on the high side.
21    Q.  Where was that and which rail?
22    A.  That would be -- if White River Junction is
23  north and Brattleboro, Vermont would be south, it
24  would be north of the crossing in the proximity of

20

(Pages 78 to 81)

78

1 the first joint, which would be on the high side of
2 the curve, or specifically the east rail. If the
3 track runs north and south, the east rail would be
4 towards New Hampshire, the west rail would be
5 towards Vermont as a description. It would be on
6 the east rail. It would be north of the crossing by
7 -- close, ten feet, five feet, in that area just
8 north of the crossing.
9    Q. Would that be milepost 10.18 approximately?
10    A. Now I know it to be right around that,
11 approximately, yes.
12    Q. How do you know that?
13    A. By consulting with a track chart.
14    Q. When did you consult the track chart?
15    A. I consulted it that day, but, you know, at
16 the time that I was out there, I didn't have the
17 track chart in front of me.
18    Q. And the mileposts descend in number from
19 north to south, correct, on that section of track?
20    A. That is correct, yes.
21    Q. So if you're standing at the crossing
22 looking north, you go milepost 11, milepost 12, 13,
23 as they go away from you, correct?
24    A. That's the way I would know it to be, yes.

79

1    Q. As you turn around to face south, they
2 descend from there down to 9, 8, 7, 6, 5, 4, 3, 2,
3 0?
4    A. That's what I would say, yes.
5    Q. During the course of your investigation as
6 to the cause of derailment, did you become aware of
7 the fact that there was a speed restriction
8 somewhere near the area of where this derailment
9 occurred?
10    A. Yes.
11    Q. Did you ever come to an understanding where
12 that defect was that caused that speed restriction?
13    A. I was told it was at that point, at that
14 location.
15    Q. At that location. Would that be milepost
16 10.16?
17    A. 10.16, 10.18, in that general area, yes.
18    Q. So it's your understanding it's in that
19 general area?
20    A. In that general area, there was one point
21 that had a speed restriction placed on it, that is
22 correct.
23    Q. Do you know it to be that point where the
24 derailment occurred or someplace north or south of

80

1 that?
2    A. I know it now to be at the point of roughly
3 where it occurred.
4    Q. You keep on saying "roughly." What have
5 you reviewed to tell you where that restriction was
6 placed in there?
7    A. I reviewed the track chart. I reviewed the
8 timetable, New England Central's timetable. I
9 reviewed a temporary speed restriction summary,
10 which is a bulletin order that tells you what the
11 speeds were on -- well, it was for that day. It
12 covered that day. And then after all of that, I
13 reviewed an FRA copy of an exception list that was
14 produced by the FRA's T2000, and that was done about
15 a month or so prior to the derailment.
16    Q. Okay.
17       MR. DAVIDSON: Previously marked during
18 the course of these depositions was Exhibit 2. I'm
19 going to represent to you that is Exhibit 2. Your
20 associate has actual ones with the stickers on them.
21 I never got a copy of the face pages. But that's
22 Exhibit 2 from the depositions we ran yesterday and
23 the day before.
24       MR. WRIGHT: Fair enough.

81

1    Q. I ask Mr. Bergeron, is this the FRA
2 exceptions report that you reviewed or a copy of it?
3    A. It's an FRA exception report.
4    Q. And it's dated June 8, 2004?
5    A. Yes. This one is dated June 8, 2004.
6    Q. Would that be the FRA report that you
7 reviewed?
8    A. It looks to be -- I won't say this is the
9 actual -- there's some things on here that I don't
10 remember noticing on the report that I first
11 reviewed.
12    Q. Who provided to you the FRA exception
13 report?
14    A. The FRA exception report was provided by
15 New England Central.
16    Q. I'm going to make a representation to you
17 that it's my understanding that this is the only FRA
18 exception report for June of 2004. Okay?
19    A. Okay.
20    Q. Specifically you have it open to page
21 Bates-stamped 000803 of Exhibit 2. Keep it open.
22 Would you please -- next to the line number 11,
23 which has next to it 0044, I believe it's 8, it says
24 milepost 10.16. What does it have next to that?

(Pages 122 to 125)

122

1  of the FRA regulation, but it's...
2      Q. What is your understanding as to what the
3  requirement is?
4      A. That none of these here can exceed an inch
5  and a quarter.
6      Q. Do they exceed an inch and a quarter?
7      A. Yeah. Oh, yeah.
8      Q. Which ones exceed an inch and a quarter?
9  Let's back up. When you say "exceed an inch and a
10 quarter," what do you mean, "exceed an inch and a
11 quarter"?
12     A. It's that the -- the warp factor. The
13 difference in crosslevel, when 62 feet exceeds an
14 inch and a quarter.
15     Q. So when you're talking about 213.63, you're
16 talking about this chart, correct?
17     A. Yes.
18     Q. Okay. What class of track should this have
19 been, or what speed restrictions should have been in
20 place due to your calculations on the warp?
21     A. 10.
22     Q. And that would be class what?
23     A. 1.
24     Q. When you made your calculations, some of

123

1  your calculations include -- strike that.
2          At point A you have 61 1/2 plus 3/8 and
3  then you have a line and then underneath that you
4  have 56 3/4. Would you explain to the jury what
5  that means?
6      A. Okay. The 6 1/2 plus 3/8 is the
7  crosslevel, the difference in height between the
8  rail on the east rail and the rail on the west rail.
9  The 56 3/4 is the gage of the track at that
10 particular spot, 5/8 of an inch below the rail at a
11 plane equal to that at that point A.
12     Q. What piece of equipment did you use when
13 you made these measurements?
14     A. A level board gage combination.
15     Q. Okay. Is that a tool that you can use by
16 yourself or do you need assistance with that?
17     A. You can use it by yourself.
18     Q. Did you, in fact, use it by yourself?
19     A. Yes, I did.
20     Q. So you were taking the measurements and you
21 were writing those down yourself?
22     A. That is correct.
23     Q. What was Mr. Griffiths doing while you were
24 doing this?

124

1      A. He was standing walking with me.
2      Q. So he was just standing with you while you
3  were doing the work?
4      A. When I was taking the readings on the first
5  passthrough, that is correct.
6      Q. Is this the actual diagram that was created
7  that day, or is this a cleaner copy of that?
8      A. This is a cleaner copy of that.
9      Q. Do you have the original numbers and
10 original data that you took?
11     A. I'm not too sure. No, I don't think so.
12     Q. Any reason why you didn't keep it?
13     A. It was a sloppy copy. I mean --
14     Q. I understand it was sloppy. Is there any
15 reason why you didn't keep it?
16     A. No.
17     Q. So it no longer exists?
18     A. I don't believe so.
19     MR. DAVIDSON: Can we mark this the next
20 exhibit, please.
21     (Marked, Exhibit 23, track chart, Bates
22 ST010386.)
23     Q. Do you know if anyone, during the course of
24 their inspection of the car that derailed, ever

125

1  obtained the stencil lubrication dates for the
2  equipment?
3      A. I don't know that personally.
4      Q. Have you ever seen that information?
5      A. Yes. Oh, yes.
6      Q. On this particular rail car?
7      A. No, not on this particular rail car.
8      Q. All the questions for the next couple
9  minutes, and I'll let you know when I vary, are
10 involving the car that derailed in this derailment.
11 All right? I asked you if you'd seen that data. I
12 meant for that particular rail car in that
13 derailment. You've never seen that data?
14     A. No, I did not.
15     Q. So that didn't factor into your analysis?
16     A. No, it did not.
17     Q. Do you know whether anyone observed any
18 prior derailment damage to this particular rail car?
19     A. No, I do not.
20     Q. Do you know whether or not anyone made a
21 determination whether there was sufficient
22 lubrication in the trucks in this particular rail?
23     A. No, I do not.
24     Q. Do you know if anyone found any foreign

32