UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CENTRAL RAILROAD, INC.,
Plaintiff,

v.

Civil Action No.:  04-30235-MAP

SPRINGFIELD TERMINAL RAILWAY
COMPANY and BOSTON AND MAINE
CORPORATION,
Defendants

**PLAINTIFF'S OPPOSITIONS TO DEFENDANTS' MOTIONS *IN LIMINE***

The plaintiff, New England Central Railroad, Inc. ("NECR"), hereby files this Opposition

to Defendant's *Motions in Limine.*

**1.      The NECR Must be Permitted to Introduce Derailment Evidence:**

NECR must be permitted to introduce relevant facts and evidence regarding the cause of

and the derailment which is the subject of this litigation.  Relevant evidence is "evidence having

any tendency to make the existence of any fact that is of consequence to the determination of the

action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

All relevant evidence is generally admissible. Fed. R. Evid. 402.  The NECR is prepared to

introduce evidence relevant and related to the cause of the derailment through Michel Lawyer,

Richard Boucher, and R.T. Boucher.  Michael Lawyer (the NECR's Roadmaster), who was the

NECR's Rule 30(b)(6) witness, is prepared to testify as to the track conditions, the NECR's

compliance with the FRA's track safety standards, and the relevant track speeds.  See Trans. Of

Dep. of Michael Lawyer, relevant portions of which are attached at 11-21 (Exh. 1 hereto).

Richard Boucher (the NECR's Track Supervisor) is prepared to testify as to condition of the track at the time of the FRA Geometry Car inspection, the verification of the information discovered, and the necessary repairs as a result of the condition of the tracks following the derailment.  See Trans. of Dep. of Richard Boucher, relevant portions of which are attached at 4-22 (Exh. 2 hereto).  Rich Boucher (a Track Inspector for the NECR) is also prepared to testify regarding inspections of the track, the inspection and location of the defect found at MP 10.16, and inspection of the track after the derailment.  See Dep. Trans. of Rick Boucher, relevant portions of which are attached at 7-12 (Exh. 3. hereto).   These witnesses are qualified to testify about the cause as they regularly investigate causes of accidents and/or work to keep the track in good repair in the course of their everyday job duties.

The actual cause of the accident is, of course, a matter for the fact finder to determine; however, the cause of the derailment is no longer a relevant issue to be determined due to the fact that the Court has already set forth that the Defendants were ordered by the Interstate Commerce Commission (ICC), now the Surface Transportation Board (STB), to compensate Plaintiff for damages resulting from the derailment, in the absence of gross negligence by Plaintiff.  See *Memorandum and Order Regarding Defendants' Motion for Partial Summary Judgment, Plaintiff's Motion for Summary Judgment and Plaintiff's Motion to Strike*, "*Order*" [Dkt. #92] at p.6, n. 2.  In other words, absent a determination that the NECR was grossly negligent in maintaining its line, the Defendants are required to pay to the NECR its damages resulting from the derailment.

II.    **NECR Must be Permitted to Introduce Evidence of the Trainmen's Standard of Care:**

NECR must be prepared to introduce relevant facts regarding the trainmen's standard of care.  NECR is prepared to introduce the standard of care through Engineer Steven Larro.  In his

deposition, Mr. Larro testified he has approximately thirty years of experience in the railroad, including experience as an engineer of locomotive. See Trans. of Dep. of Steven Larro, relevant portions of which are attached at 4-5 (Exh. 4. hereto). In addition, Mr. Larro will testify as to train handling and operating rules. Id. at 7-12. Due to his experience, Mr. Larro is competent to testify as to the standard of care relevant for the operation of locomotives.

With respect to the counter-claim on gross negligence, the issue of the trainmen's standard of care is not relevant. In the Court's *Order*, the Court allowed summary judgment with respect to Counts V-X of the Amended Complaint. [Docket #92] at P.3 ¶ 1. As such, all of the common law claims including Breach of Contract against B & M; Negligence against B&M; Gross Negligence, Willful, Wanton and Reckless Conduct against B & M; Breach of Contract against STRC; Negligence by STRC and Gross Negligence, Willful, Wanton and Reckless Conduct against STRC have been thrown out and only the statutory claims remain in this case. Id.

In addition, the Court already concluded that "in the absence of gross negligence by Plaintiff, Defendants' refusal to compensate Plaintiff for damages resulting from the accident constituted a failure to obey" the Order imposed by the ICC. Id. As such, the applicable standard of care is not the ordinary the trainmen's standard of care. Instead, gross negligence, defined as "negligence that would shock the fair-minded," or "the failure to exercise even slight care" is applicable. Shea v. Fridley, 123 A.2d 358, 363 (D.C. 1956).

III.     **The NECR Must be Permitted to Introduce The Trackage Rights Order**:

§ 7.1 of the ICC's 1990 *Trackage Rights Order* is not only relevant, but is the basis of the NECR's entire lawsuit. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or

less probable than it would be without the evidence." Fed. R. Evid. 401. All relevant evidence is generally admissible. Fed. R. Evid. 402. In the parties' *Joint Pre-Trial Conference Memorandum* ("Joint Memo"), as part of the *Statement of the Facts Established by Pleading, Admissions, or by Stipulation,* both parties agreed that "the duties and obligations of the parties with respect to operation of trains over the line was governed by the ICC-imposed *Modified Trackage Rights Agreement (Agreement).*" See *Joint Memo*, § II(E) [Docket 53]. In addition, the Court already ruled on the correct interpretation of the *Agreement* in its conclusion that "in the absence of gross negligence by Plaintiff, Defendants' refusal to compensate Plaintiff for damages resulting from the accident constituted a failure to obey" the Order imposed by the ICC. *Order,* p.6 n. 2 [Docket 92].

If, however, the Defendant is stipulating that the Court has already found that Defendants' refusal to compensate Plaintiff for damages results in a violation of the *Order*, absent gross negligence, and the only issue left to be litigated is whether or not Plaintiff engaged in gross negligence, then Plaintiff would be willing to exclude Section 7.1 of the *Agreement* from the jury. Absent such a stipulation by Defendants, however, Section 7.1 must be admitted as it is not only relevant, but the Court's recent ruling on the *Agreement* provides the basis for the only issue left to be litigated.

IV.    **The Accident Reports Must Not Be Admissible For Any Purpose:**

Plaintiff agrees with Defendant that evidence of accident reports filed with the Federal Railroad Administration is not admissible. 49 U.S.C. §20903 reads as follows:

> "No part of an accident or incident report filed by a railroad carrier under §20901 of the title or made by the Secretary of Transportation under §20902 of this title may be used in a civil action for damages resulting form a matter mentioned in the report."

> 49 U.S.C. §20903

Evidence of such reports is also not admissible to refresh witness' recollections or to impeach witnesses as to any other purpose. There is no language found anywhere in 49 U.S.C. §20903 limiting the statute to a party's direct case. Instead, the statute presents an outright prohibition against the use of such reports "in any civil action for damages." 49 U.S.C. §20903. As such, the reports should not be admissible for any purpose, including to refresh witnesses' recollections or to impeach witnesses.

V.    **Conclusion**

      WHEREFORE, for the foregoing reasons, the plaintiff NECR respectfully requests that the defendants' *Motions in Limine* be <u>DENIED</u>.

**REQUEST FOR ORAL ARGUMENT**

      Pursuant to Local Rule 7.1(D), the plaintiff NECR respectfully states that oral argument may assist the Court and requests a hearing on its *Opposition* to the Defendants' *Motions in Limine*.

Respectfully submitted,
NEW ENGLAND CENTRAL RAILROAD, INC.,
by its attorneys,

  /s/ Michael B. Flynn
Michael B. Flynn           BBO# 559023
*mbflynn@flynnassoc.com*
Richard A. Davidson, Jr.      BBO# 552988
*radavidsonjr@flynnassoc.com*
FLYNN & ASSOCIATES, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169
(617) 773-5500

Dated:  August 24, 2007

# EXHIBIT 1

1

1                   UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS

2

3   -------------------------------

  NEW ENGLAND CENTRAL
  RAILROAD, INC.

4                 Plaintiff,

COPY

5         VS.              Civil Action No.
                         04-30235-MAP

6   SPRINGFIELD TERMINAL RAILWAY
  COMPANY, ET AL.

7                 Defendants.
  -------------------------------

8

9              D E P O S I T I O N
                    -of-

10              MICHAEL LAWYER

11       Taken on Tuesday, January 9, 2007,
             at the offices of

12     New England Central Railroad, Inc.
           St. Albans, Vermont.

13

14

15   APPEARANCES:
  ON BEHALF OF THE PLAINTIFF:

16   RICHARD A. DAVIDSON, JR., ESQ.
  Flynn & Associates, P.C.

17   400 Crown Colony Drive, Suite 200
  Quincy, MA 02169

18

  ON BEHALF OF THE DEFENDANT:

19   ROBERT B. CULLIFORD, ESQ.
  Senior Vice President and General Counsel

20   Pan Am Systems
  14 Aviation Avenue

21   Portsmouth, NH 03801

22            NORMA J. MILLER, RPR
        COURT REPORTERS ASSOCIATES

23           117 BANK STREET
        BURLINGTON, VT 05401

24           (802) 862-4593

25

1    the record, can we call the handwritten portion of

2    Exhibit 1, 1B, and the typed one 1A?

3    BY MR. CULLIFORD:

4        Q.   Okay.   I think we're done with those now,

5    after that sort of belabored attempt to figure out

6    what they were.   Okay, I'd like to ask you to take a

7    look at this document, as well.

8        A.   Okay.

9        Q.   Have you ever seen that document before, sir?

10       A.   Yes, I have.

11       Q.   Do you know what that document is?

12       A.   Yes.

13       Q.   Could you identify it?

14       A.   Sorry?

15       Q.   Could you identify it?

16       A.   This is the inspection report from the

17   geometry car run by the FRA on June 8th, 2004.

18                (Deposition Exhibit 2 was marked for

19                identification.)

20   BY MR. CULLIFORD:

21       Q.   If you could turn to page the page identified

22   with Bates stamp numbers 000803.

23       A.   Sure.

24       Q.   I'd refer you -- there's a dash mark to the

25   left side of that document?

COURT REPORTERS ASSOCIATES

1    to some extent?

2        A.    Outside of the regulation, I'm not aware of a

3    guideline.

4        Q.    Okay.    So you're not aware of a theory, let's

5    call it for now, that rock would be more likely to

6    occur under these conditions at a slower speed?

7        A.    A theory, no.    I'm familiar with the

8    regulation only.

9        Q.    Do the regulations say that rock would -- the

10   slower the speed, the more likely rock would occur?

11       A.    No, it doesn't speak to rock.    It -- you asked

12   what a car would do if it gave -- if it was

13   subjected to this condition.

14       Q.    Yeah.

15       A.    And I told you it would rock.    That's why

16   there's a restriction placed on it, but I don't know

17   of any guidance from the FRA that tells you this

18   specifically.

19       Q.    Would anyone from New England Central be aware

20   of that?

21       A.    Not to my knowledge.

22       Q.    Are you familiar with the term, "wheel lift"?

23       A.    Yes.

24       Q.    Could you describe what that refers to -- in

25   to your knowledge in the railroad industry,

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------

NEW ENGLAND CENTRAL
RAILROAD, INC.
               Plaintiff,

      VS.                Civil Action No.
                         04-30235-MAP

SPRINGFIELD TERMINAL RAILWAY
COMPANY, ET AL.
               Defendants.

------------------------------

D E P O S I T I O N
-of-
RICHARD R. BOUCHER

Taken on Wednesday, January 10, 2007,
at the offices of
New England Central Railroad, Inc.
St. Albans, Vermont.

APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
RICHARD A. DAVIDSON, JR., ESQ.
Flynn & Associates, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169

ON BEHALF OF THE DEFENDANT:
ROBERT B. CULLIFORD, ESQ.
Senior Vice President and General Counsel
Pan Am Systems
14 Aviation Avenue
Portsmouth, NH 03801

NORMA J. MILLER, RPR
COURT REPORTERS ASSOCIATES
117 BANK STREET
BURLINGTON, VT 05401
(802) 862-4593

 1   Q.   Okay.  Based on this walking the track, did

 2  you come up with a scope of work to be performed?

 3   A.   Not totally that day, no.

 4   Q.   Okay.  Subsequent to that day?

 5   A.   I did just a preliminary basic repairs to run

 6  trains.

 7   Q.   Okay.  Did you walk the track alone, or was

 8  anybody else with you?

 9   A.   Mike Lawyer was there.  I don't remember now

10  if he actually walked with me.  He had walked some

11  of it, I believe, before me.

12   Q.   Was anyone from ECI with you?

13   A.   I don't remember if they were there the first

14  day or not.

15   Q.   Just so we're clear, by ECI, I refer to

16  Engineers Construction, Inc.?

17   A.   Yes.

18   Q.   Could you identify who Engineers Construction,

19  Inc., is?

20   A.   Who they are?

21   Q.   Yes.

22   A.   Yeah.

23   Q.   Who are they?

24   A.   They're a contractor.

25   Q.   For New England Central?

1   A.  Right, right.

2   Q.  I'm talking about the section from Milepost 5

3  up to right before they fell off the tracks.

4   A.  Yeah, I was involved with that.

5   Q.  Okay, with ECI?

6   A.  Not with ECI.  They went in later.  My

7  involvement was the temporary repairs.

8   Q.  Okay.

9   A.  And I went through and marked the ties, or

10  assisted in marking the ties to be replaced.  ECI

11  came in and did the tie replacement.  They were

12  contracted to do the tie replacement.

13   Q.  And you didn't work with ECI at all?

14   A.  On the actual replacement?  From -- No, I was

15  down there a couple times through the course of the

16  project.  It went on for quite some time.

17   Q.  You weren't given invoices to review and

18  approve?

19   A.  I don't get involved in that.

20   Q.  Who would?

21   A.  The roadmaster.

22   Q.  You weren't involved in any services provided

23  by Vermont Rail, either?

24   A.  As far as --

25   Q.  As far as equipment provided, labor provided,

# EXHIBIT 3

1                    UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
2
     - - - - - - - - - - - - - - - - - - - - - - - - -
3    NEW ENGLAND CENTRAL                    COPY
     RAILROAD, INC.
4                          Plaintiff,

5              VS.                    Civil Action No.
                                     04-30235-MAP
6    SPRINGFIELD TERMINAL RAILWAY
     COMPANY, ET AL.
7                          Defendants.
     - - - - - - - - - - - - - - - - - - - - - - - - -
8

9                    D E P O S I T I O N
                          -of-
10                   RICK T. BOUCHER

11         Taken on Wednesday, January 10, 2007,
                    at the offices of
12          New England Central Railroad, Inc.
                   St. Albans, Vermont.
13

14

15   APPEARANCES:
     ON BEHALF OF THE PLAINTIFF:
16   RICHARD A. DAVIDSON, JR., ESQ.
     Flynn & Associates, P.C.
17   400 Crown Colony Drive, Suite 200
     Quincy, MA 02169
18
     ON BEHALF OF THE DEFENDANT:
19   ROBERT B. CULLIFORD, ESQ.
     Senior Vice President and General Counsel
20   Pan Am Systems
     14 Aviation Avenue
21   Portsmouth, NH 03801

22              NORMA J. MILLER, RPR
             COURT REPORTERS ASSOCIATES
23               117 BANK STREET
               BURLINGTON, VT 05401
24               (802) 862-4593

25

                 COURT REPORTERS ASSOCIATES

1    New England Central?

2       A.   Yes.

3       Q.   Were you inspecting the stretch of track

4    between Milepost 11 and Milepost 5?

5       A.   Yeah.

6       Q.   During the course of your inspections, did you

7    ever note a defect at Milepost 10.16?

8       A.   No.

9       Q.   You did not?  After June 8th, 2004, did anyone

10   inform you that the test car had found a defect in

11   Milepost 10.16?

12      A.   Yes.

13      Q.   Who informed you of that?

14      A.   Supervisor.

15      Q.   Do you recall -- would you have been involved

16   at that point in deciding the appropriate remedial

17   action to be taken in response to that defect?

18      A.   No.

19      Q.   Who would have?

20      A.   It was supervisor.

21      Q.   And by supervisor, just who are you referring

22   to?

23      A.   R.R. Boucher.

24      Q.   Okay.  Did he ever -- did R.R. Boucher ever

25   communicate to you what remedial action was taken in

1    Q.  I understand that.  You did an initial

2    measurement to confirm the test results, correct?

3    A.  Correct.

4    Q.  What I'm asking you is were there any

5    subsequent measurements of the condition at Milepost

6    10.16 between your initial measurement and July 3rd,

7    2004, I guess I don't understand your question.

8    Q.  Pardon me?

9    A.  I guess I don't understand your question.

10   Q.  You performed one measurement, if I understand

11   what you're saying, soon after the test truck went

12   over the line?

13   A.  That's correct, yeah.

14   Q.  All's I'm asking is did you do another

15   measurement after the initial one?  We've got one in

16   the book.

17   A.  Yeah.

18   Q.  Did you ever do another measurement between

19   that initial measurement and July 3rd, 2004?

20   A.  Not that I can recall, I guess, no.

21   Q.  Do you recall going out there at your

22   twice-weekly inspections and noticing that the

23   condition remained the same, or was it worsening or

24   was it getting better?

25   A.  To my knowledge, it remained the same.

# EXHIBIT 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------
NEW ENGLAND CENTRAL
RAILROAD, INC.
                    Plaintiff,

        VS.                      Civil Action No.
                                 04-30235-MAP

SPRINGFIELD TERMINAL RAILWAY
COMPANY, ET AL.
                    Defendants.
------------------------------


D E P O S I T I O N
-of-
STEVEN LARRO

Taken on Wednesday, January 10, 2007,
at the offices of
New England Central Railroad, Inc.
St. Albans, Vermont.



APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
RICHARD A. DAVIDSON, JR., ESQ.
Flynn & Associates, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169

ON BEHALF OF THE DEFENDANT:
ROBERT B. CULLIFORD, ESQ.
Senior Vice President and General Counsel
Pan Am Systems
14 Aviation Avenue
Portsmouth, NH 03801

NORMA J. MILLER, RPR
COURT REPORTERS ASSOCIATES
117 BANK STREET
BURLINGTON, VT 05401
(802) 862-4593

1          Wednesday, January 10, 2007, 9:35 a.m:

2             STEVEN LARRO, being duly sworn, deposes and

3             says as follows:

4                        *    *    *

5                        EXAMINATION

6 BY MR. CULLIFORD:

7     Q.   Morning, sir.

8     A.   Morning.

9     Q.   Could you state your name and address for the

10  record, please?

11    A.   Steven E. Larro.  L-A-R-R-O.  And the current

12  address is Box 98, Swanton, Vermont.

13    Q.   And could you give us just a rough history of

14  your professional background?

15    A.   I have approximately 30 years in the railroad

16  industry, between Mechanical Department and

17  Transportation.

18    Q.   What is your position today?

19    A.   Right now I'm an engineer.

20    Q.   An engineer of track, or an engineer as a

21  locomotive?

22    A.   A locomotive engineer.

23    Q.   In June of '04, what was your position?

24    A.   I was Trainmaster.

25    Q.   With the NECR?

Page 5

1    A.    That is correct.

2    Q.    How long had you been in that position as of

3    June of '04?

4    A.    Approximately a year.

5    Q.    Were you still in that position in July of

6    2004?

7    A.    Yes.

8    Q.    Today we're going to talk about a stretch of

9    track on the New England Central between

10   approximately Milepost 11 and Milepost 5.  Are you

11   familiar with that area?

12   A.    Yes, sir.

13   Q.    And we're also going to be talking about an

14   FRA test car inspection of the NECR conducted on

15   June 8th, 2004.  Are you aware of that test car

16   inspection?

17   A.    We do them periodically.

18   Q.    But what I'm asking is, I guess specifically,

19   are you aware of the results of that FRA test car

20   inspection on June 8th, 2004?

21   A.    No, sir.

22   Q.    You're not?

23   A.    No.

24   Q.    Did anyone ever tell you that the test car

25   inspection had discovered a defect at Milepost

 1   Q.  What were your job duties as trainmaster for

 2  New England Central?

 3   A.  Coordinate crews, movement of traffic over the

 4  line, federal test.

 5   Q.  Did you have a specific territory, or was it

 6  the entire New England Central?

 7   A.  It wasn't the entire.  It was basically the

 8  Canadian border to Bellows Falls, Vermont.

 9   Q.  Would that include Milepost 11 to Milepost 5,

10  approximately?

11   A.  Yes, sir.

12   Q.  So is it your testimony that if a test

13  inspection was done, no one would communicate the

14  results of that to you?

15   A.  They would communicate the results, as far as

16  them finding slow orders and how we would coordinate

17  train movements to work around the slow orders.

18   Q.  Okay, can you walk me through that?  How would

19  the slow order -- why would the slow order arise?

20   A.  If an FRA inspection should find defects in

21  the track.

22   Q.  Okay.  And how would that existence of that

23  slow order be communicated to you?

24   A.  It would either be in writing or direct

25  communication with track supervisor.

1   Department, Mechanical, will get involved there.

2   The experts.  Locomotives are downloaded and --

3      Q.   What if there was an issue of train handling?

4      A.   That would be Transportation.

5      Q.   Okay.  What if there was an issue with how the

6   crew was responding to conditions?

7      A.   That would be determined, you know,

8   collectively.  Everything would be determined

9   collectively, all the --

10     Q.   Would Transportation be involved in that

11  investigation?

12     A.   Yes.

13     Q.   Would you, as Trainmaster, be involved in an

14  investigation of a derailment in your territory

15  where the crew's conduct was questioned?

16     A.   Conceivably.

17     Q.   Were you involved in this investigation?

18     A.   No, I was not.

19     Q.   Are you aware that the crew's conduct has been

20  questioned in this derailment?

21     A.   I was aware of that.

22     Q.   Then why wouldn't you be involved in the

23  investigation?

24     A.   It went to experts, if you will.  I don't have

25  the expertise or the training to make those